# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

United States Courts
Southern District of Texas
FILED

JUN 2 1 2004

Michael N. Milby, Clerk of Court

**PERRY ALLEN AUSTIN,**

      **Petitioner,**

    **-VS-**

**CIVIL NO. MC04-206**

**DOUG DRETKE, Director, Texas Department of Criminal Justice, Institutional Division,**

      **Respondent.**

**H-04-2387**

## PETITION FOR WRIT OF HABEAS CORPUS

2004 JUN 21 PM 5: 54
U.S. COURTS
SOUTHERN DISTRICT
OF TEXAS

**THIS IS A DEATH PENALTY CASE.**

Dick Wheelan
Texas Bar No. 21252600

R. E. WHEELAN
440 Louisiana Street, Suite 900
Houston, Texas 77002
TEL  (713) 225-1300

Counsel for Perry Allen Austin

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

United States Courts
Southern District of Texas
FILED

JUN 2 1 2004

Michael N. Milby, Clerk of Court

PERRY ALLEN AUSTIN,       '

       Petitioner,     '

                    '

       -VS-          '       **CIVIL NO. MC04-206**

                    '

                    '

DOUG DRETKE, Director, Texas '
Department of Criminal Justice,   '
Institutional Division,        '

       Respondent.    '

---

2004 JUN 21 PM 3: 51
U.S. COURT
SOUTHERN DIST.
OF TEXAS

**APPLICATION FOR WRIT OF HABEAS CORPUS
BY A PERSON SENTENCED TO DEATH**

     Perry Allen Austin, an indigent prisoner confined on death row in the Texas Department

of Criminal Justice, Institutional Division, petitions this Honorable Court, pursuant to 28 U.S.C.

" 2254 *et seq.*, to issue a writ of habeas corpus ordering that his unconstitutional conviction and

sentence of death be vacated.  This is Mr. Austin's first federal habeas corpus petition.


### PROCEDURAL BACKGROUND

**Trial and Direct Appeal**

     On February 28, 2001, Applicant, Perry Allen Austin, was charged by indictment with

capital murder.  The indictment alleged that on or about:

> August 19, 1992, did then and there unlawfully, while in the course of committing
> and attempting to commit the kidnapping of David Kazmouz, intentionally cause
> the death of David Kazmouz by cutting his throat with a deadly weapon, namely a

knife.

And further alleged that on or about:

> August 19, 1992, did then and there while in the course of committing and attempting to commit the kidnapping of David Kazmouz, intentionally cause the death of David Kazmouz by a manner and means unknown to the Grand Jury.

(RR. 2).

On March 21, 2001 the trial court appointed Mack Arnold to represent Mr. Austin at trial. On November 28, 2001, following a *Faretta* hearing, the court ordered that Mr. Austin be permitted to proceed pro se with Mr. Arnold as standby counsel.

On March 18, 2002 jury selection began and was completed on March 21, 2002.

On April 1, 2002 the Applicant entered a plea of guilty before the jury and the State began submitting evidence to the jury relevant to penalty.

On April 3, 2002 the jury returned a directed verdict, finding Mr. Austin guilty of capital murder as charged in the indictment. The jury also answered "yes" and "no" respectively to the two punishment special issues submitted pursuant to Article 37.071 of the Texas Code of Criminal Procedure, Tex. Code Crim. Proc. Ann. art. 37.071(b), (e). (CR.78-80). As required by Article 37.071(g), the trial court sentenced Mr. Austin to death. Tex. Code Crim. Proc. Ann. art. 37.071(g).

On April 4, 2002, following a *Faretta* hearing, Mr. Austin was permitted to waive the appointment of appellate counsel.

On April 5, 2002 standby counsel, Roland B. Moore, was appointed by the court. No appellate brief was filed in this matter.

On April 2, 2003 the Texas Court of Criminal Appeals affirmed Mr. Austin's conviction and sentence. Austin v. State, (Tex. Crim. App. April 2, 2003). No application for a writ of

certiorari was filed in the United States Supreme Court.

On April 30, 2003 the Texas Court of Criminal Appeals issued its mandate.

On June 2, 2003 the trial court issued a death warrant, setting an execution date of September 8, 2003.

On September 2, 2003 a Motion for Stay of Execution was filed and granted. On that same date an order was made withdrawing the execution date.

On September 24, 2003 an order was made appointing counsel for the first time for state habeas proceedings, Mr. R. E. Wheelan.

On March 15, 2004 an unopposed *Motion to Extend Time to File Brief* was filed. That day, good cause having been shown, an order was made granting an extension of 90 days for the filing of the habeas petition, the trial court setting a filing date of June 21, 2004.[1]

On April 8, 2004 the applicant filed his *Unopposed Motion For Leave To File Skeletal Application For Writ Of Habeas Corpus With Leave To File An Amended Original Application By June 20, 2004*. The Applicant also filed an *Unopposed Motion for Scheduling Order*.

On April 22, 2004 the District Court[2] entered orders granting the applicant's motions and deeming that an amended application filed by June 21, 2004 would be considered an original habeas application.

On May 26, 2004 the Court of Criminal Appeals delivered an *Order on Applicant's Motion for Scheduling Order From Harris County*. That Order, in effect, quashed the order of the trial court, denied leave to file a skeletal petition and declared that time for filing of an

---

[1] A ninety day extension leads to a filing date of Sunday, June 20, 2004 and so by operation of Rule 4.1, Texas Rules of Appellate Procedure, the filing date is deemed to be Monday, June 21, 2004.

[2] The trial judge was unavailable and the order was entered by a visiting judge.

original application had long since expired and any application now filed must be dealt with as an untimely filed application pursuant to Article 11.071 (4)(c)-(e) and 4A.  The applicant has filed for rehearing.

On Monday June 21, 2004 the applicant sought to file an untimely application in state court.

The applicant's federal statute expires on June 30, 2004.  It will not be known before that date whether the Court of Criminal Appeal will permit the untimely application to be filed.  If the Court refuses to allow the application to file the applicant's federal statute may have run and the rejected untimely application may not have served to toll the statute.  In these circumstances the Applicant is bound to file at this time in this Honorable Court.  The Applicant also files a motion to stay and abbey these proceedings to allow exhaustion in the state court.  This application is now filed as a first federal application for a writ of habeas corpus.

## STATEMENT OF JURISDICTION

This Court has subject matter jurisdiction of this case by virtue of the conviction and sentence of Mr. Austin having occurred in Harris County, Texas.  *See* 28 U.S.C.  2241(d).

## EXHAUSTION OF REMEDIES

Many of the claims presented in this petition have been exhausted by the Court of Criminal Appeals sua sponte review for fundamental error (no briefs were filed in this case).  Claims sought to be filed through state habeas may not yet be exhausted.  The Court of Criminal Appeals has held that the Applicant is untimely in filing his first state habeas.  The Applicant has sought to file an untimely application in state court and the decision of the Court of Criminal Appeals as to whether to permit this filing remains pending.  If the Court of Criminal Appeals refuses to allow the application to be filed then the Applicant will have exhausted.  If the Court

4

of Criminal Appeals allows the filing of the brief then the claims in this petition will remain to be exhausted.

# CLAIMS

The applicant presents 23 claims, which have been arranged under thematic headings and save for the first claim, they proceed in the approximate order in which they arose as these proceedings unfolded.

### THERE HAS BEEN A COMPLETE COLLAPSE OF THE ADVERSARIAL TRIAL PROCESS WHICH HAS CREATED A DEATH VERDICT OUT OF PROCEEDINGS THAT WERE WHOLLY UNCONTESTED

**CLAIM I.**       **The death penalty imposed in this case has been imposed in violation of the Federal and Texas Constitutions because it resulted from a complete collapse of the adversarial trial process to a point at which the conviction and sentence cannot be regarded as reliable or as having been produced by a jury trial as understood in American jurisprudence.**

Perry Allen Austin is a seriously mentally ill man and has been all of his life.[3]  He has now confessed to a crime he did not commit in a deranged bid to have himself executed.  Mr. Austin has a history of suicide attempts dating back to his early teens, and this trial was simply the latest and most elaborate.

Until January 2001, Mr. Austin was serving a fifty-year prison term, much of which he had served in segregated environments as a result of his vulnerability as a known homosexual or due to his own misconduct.  In January 2001 Mr. Austin was once again in segregation and his suicidal depression came to a head.  Driven by his mental illness, he wrote to a sergeant of the

---

[3] See allegations and evidence detailed in claims regarding competence.

Houston Police Department offering to confess to the murder of a child on the condition that he would be guaranteed the death penalty.  RR. X-25.  Sergeant Allen went to see Mr. Austin the next day, and Mr. Austin made a false confession to the murder.

Mr. Austin did not kill the child and is not guilty of the crime for which he has been sentenced to death.[4]  He has since passed a polygraph confirming his innocence.  (Ex. 60, Report of J. Bartlett)  Even Sergeant Allen did not believe that Mr. Austin's confession was completely truthful.  RR.X-33-4.

Mr. Austin was indicted in February 2001 and an attorney was appointed for him a short time later.  Six weeks after the attorney's appointment, immediately following the attorney's first and only visit to Mr. Austin at the Harris County Jail, Mr. Austin's attorney told the Harris County Sheriff's Office that Mr. Austin was planning to kill a fellow prisoner.[5]  Mr. Austin was once again transferred to segregation.

The trial was listed before Judge Caprice Cosper in the 339th District Court of Harris County, Texas.

Mr. Austin spent the next year writing a series of letters to Judge Cosper urging that the proceedings be brought forward because, to use his own words, "the sooner we get this circus over with the sooner I can die." Letter to Judge Cosper, August 9, 2001, CR.18-19.  In a number of those letters Mr. Austin stated that he wished to represent himself.  See for example CR.20-21 (August 14, 2001); CR.5-6 (April 17, 2001).

Defense counsel had already expressed concern about Mr. Austin's functioning and before allowing Mr. Austin to proceed pro se the trial court had him assessed by a psychologist.

---

[4] See allegations and evidence detailed in claims regarding actual innocence.

[5] See allegations and evidence detailed in claims regarding counsel's conflict of interest.

The assessment lasted less than half an hour and failed to meet the professional standard of care for such an assessment.[6]  Mr. Austin assured the psychologist that he had no mental health history and knew what he was doing and that it was what he wanted.  He was assessed as competent.[7]

At the *Faretta* hearing Mr. Austin repeated that he had no psychiatric history and that he knew full well what he was doing.  The trial court later summed the matter up to a prospective juror, "Mr. Perry is not representing himself for any other reason other than he wants the jury to give him the death penalty." RR.VI-10.

During the competency evaluation and the *Faretta* hearing Mr. Austin lied outrageously but the defense attorney, the psychologist and the court all omitted to look at the reams of documentation available on Mr. Austin describing: his history of bizarre, violent and self-destructive behavior; his previous suicide attempts; his previous diagnosis of "severe personality disorder", "borderline schizophrenia" and possible brain damage; his personal history of abuse; and, his substance abuse.

Mr. Austin was allowed to represent himself[8] and when it came to voir dire declined to ask any questions and consented to the dismissal of any juror the state did not like.

The state did not use one cause or peremptory challenge but took advantage of Mr. Austin's cooperative attitude to dismiss forty-three jurors by consent.  Every one of the jurors who has agreed to speak to the defense during post-conviction investigation has proven to be

---

[6] See Ex. 91, Affidavit of Dr. Connell and Ex. 90 Affidavit of Dr. Heilbrun

[7] See allegations and evidence detailed in claims regarding competence.

[8] See allegations and evidence detailed in claims regarding waiver of right to counsel.

excludable as unable to consider mitigation evidence in good faith.[9]

On April Fool's Day, 2002 Mr. Austin stood before the jury and entered his plea of guilty [10]to the capital murder of a nine year old boy. When the jury eventually retired they were given a single verdict sheet already typed out with a finding of guilt and directed by Judge Cosper to sign it.[11]

Before that, however, the state presented its penalty phase evidence and Mr. Austin did not involve himself until closing argument save for a bizarre interlude in which he became fixated on the appearance of the victim of an earlier offense for which he had been convicted. In his closing argument he assured the jury that he was a future danger and that there was no mitigation. In another bizarre episode he also advised the jury that he was a homosexual and enjoyed being anally penetrated while in prison.

According to the press the jury was out for less than ten minutes[12] in what is thought to be a record in Harris County. The verdict was guilty and the sentence was death. C.R.-84

The next day Mr. Austin waived the appointment of counsel on appeal.[13] He filed no appellate brief and the Court of Criminal Appeals confirmed his conviction and sentence.[14] While waiting for this decision Mr. Austin wrote to the trial court and asked that his execution be

---

[9] See allegations and evidence detailed in claims regarding juror bias.

[10] See allegations and evidence detailed in claims regarding the voluntariness of the plea of guilty.

[11] See allegations and evidence detailed in claims regarding denial of jury trial rights.

[12] "After deliberating for less than ten minutes Wednesday, a jury sentenced a man to death by lethal injection in the 1992 slaying of a 9-year-old boy whose case was unsolved for almost a decade." L. Teachey, *Man Sentenced to Death for Killing Boy in '92*, Houston Chronicle, April 4, 2002.

[13] See allegations and evidence detailed in claim regarding waiver of appellate counsel.

[14] See allegations and evidence detailed in claims regarding competence at direct appeal and incomplete appellate record.

set on his birthday and for advice on the disposal of his remains.  Ex. 89, Letter to Judge Cosper,

October 25, 2002 (7636-7637).  After his sentence was confirmed he wrote to Judge Cosper,

describing her as the nicest judge he had ever met and thanking her for her kindness.  Ex. 14,

Letter to Judge Cosper, April 7, 2003 (2963-2964)

In September 2003, nine days before his scheduled execution, Mr. Austin finally agreed

to pick up his appeals and habeas counsel was appointed.  Investigation began which has

confirmed Mr. Austin's innocence and that he suffers from brain damage and a severe depressive

disorder.

In May 2004 the Court of Criminal Appeals declared that Mr. Austin's time for filing a

habeas petition had elapsed in early 2003 and any filing now would be considered untimely.

It has been observed that it is an abuse of the justice system to allow delusional

defendants to play out their delusions in court.

> One may question whether the criminal justice system should be used as a forum
> for delusional defendants to exorcise their delusions. . . . Although therapeutic,
> permitting defendants to play out their delusions in court abuses the justice
> system.

Cohen, J.  *The Attorney-Client Privilege, Ethical Rules, and the Impaired Criminal Defendant*,

U. Miami L. Rev. 529, 555 n.166 (1998).   It may be said with some force that it is an abuse of

the justice system to allow suicidally depressed, brain damaged defendants to play out their self-

destructive impulses in court.

> The system of criminal justice should not be available as an instrument of self-
> destruction.

Faretta v. California, 422 U.S. 806, 840 (U.S. 1975) (Burger CJ dissenting, joined by Blackmun

& Rehnquist).

A proceeding is not even worthy of the title "trial" when both sides are in concert and

seeking the same end. The process by which Mr. Austin was convicted and sentenced to death bears none of the hallmarks of an adversarial jury trial that is so essential to our conception of justice.

> "[Truth]," Lord Eldon said, "is best discovered by powerful statements on both sides of the question." This dictum describes the unique strength of our system of criminal justice. "The very premise of our adversary system of criminal justice is that partisan advocacy on both sides of a case will best promote the ultimate objective that the guilty be convicted and the innocent go free." *Herring v. New York*, 422 U.S. 853, 862 (1975).

United States v. Cronic, 466 U.S. 648, 655 (1984) (footnotes omitted).

The Supreme Court has repeatedly emphasized the critical importance of adversarial testing to the ultimate aim of justice.  See  Polk County v. Dodson, 454 U.S. 312, 318 (1981) ("The system assumes that adversarial testing will ultimately advance the public interest in truth and fairness"); Gardner v. Florida, 430 U.S. 349, 360 (1977) (plurality opinion) ("Our belief that debate between adversaries is often essential to the truth-seeking function of trials requires us also to recognize the importance of giving counsel an opportunity to comment on facts which may influence the sentencing decision in capital cases")  The Court in *Cronic* also endorsed Justice Black's statement highlighting the uncertainty of the outcome when there is no adversarial testing:

> Whether a man is innocent cannot be determined from a trial in which, as here, denial of counsel has made it impossible to conclude, with any satisfactory degree of certainty, that the defendant's case was adequately presented.

Betts v. Brady, 316 U.S. 455, 476 (1942) (Black, J. dissenting).

Absent the adversarial process that guarantees the reliability of capital trials death sentences are imposed "wantonly and freakishly" in violation of the underlying principles of Furman v. Georgia.  408 U.S. 238, 310 (1972) (Stewart, J. concurring).  Where the selection process for death sentencing follows no rational pattern, it fails to deliver even-handed justice.

Id. at 388-89 (Burger, C.J. dissenting).   The Eighth and Fourteenth Amendments prohibit the

imposition of the death penalty where the sentencing procedures create a substantial risk of

capricious and arbitrary imposition of the death penalty. Gregg v. Georgia, 428 U.S. 153, 188

(1976).  When procedural protections are not in place to curb arbitrariness, the death penalty is

cruel and unusual in the "same way that getting struck by lightning is cruel and unusual."

Furman, 408 U.S. at 310 (Stewart, J. concurring).

Further, to allow the death penalty to stand in the circumstances of this case would be

inconsistent with the Supreme Court's insistence on heightened standards of reliability in fact

finding and in due process in capital cases.

> In capital proceedings generally, this Court has demanded that factfinding
> procedures aspire to a heightened  standard of reliability. This especial concern is
> a natural consequence of the knowledge that execution is the most irremediable
> and unfathomable of penalties; that death is different.

Ford v. Wainwright, 477 U.S. 399, 411 (1986) citing, inter alia, Spaziano v. Florida, 468 U.S.

447, 456 (1984), Woodson v. North Carolina, 428 U.S. 280,  305 (1976) (opinion of Stewart,

Powell, and Stevens, JJ.); see also, Caldwell v. Mississippi, 472 U.S. 320, 323 (1985); Simmons

v. South Carolina, 512 U.S. 154, 172 (1994) (opinion of Souter, O'Connor, Ginsburg, JJ.) ("The

Eighth Amendment . . . imposes a heightened standard for reliability"); Satterwhite v. Texas, 486

U.S. 249, 263 (1988) (Brennan, Marshall, Blackmun, JJ. concurring) ("[T]he difference of death

from all other punishments requires a correspondingly  greater degree of scrutiny . . .  Because of

this heightened  concern for reliability,  "time and again the Court has condemned procedures in

capital cases that might be completely acceptable in an ordinary case.").[15]

---

[15] Well before the Court established the right to counsel in all felony cases, Gideon v. Wainwright, 372 U.S. 335
(1963), it recognized that right in capital cases,  Powell v. Alabama, 287 U.S. 45, 71-72 (1932).  Time and again the
Court has condemned procedures in capital cases that might be completely acceptable in an ordinary case. See, e. g.
Bullington v. Missouri, 451 U.S. 430 (1981);  Beck v. Alabama, 447 U.S. 625 (1980); Green v. Georgia, 442 U.S.

The particular constitutional violations that infected Mr. Austin's trial are detailed below but it is submitted that this court need not reach these matters. The complete collapse of the adversarial process in this case has created a verdict so unsafe that the process as a whole violates the Constitution and requires reversal. Whether this claim for relief is characterized as a combination of deficits in the trial, a cumulation of deficits or an independent claim highlighting the complete collapse of the adversarial process the important thing is that the standards we set for our system of justice are incompatible with the events and outcome of this case.

## MR. AUSTIN WAS NOT COMPETENT TO BE TRIED

*Factual Overview*

Mr. Austin was not competent to be tried at the time of his waiver of counsel in October 2001 or at the time of his trial in April 2002.

The trial court was satisfied as to his competency only because of the paucity of information placed before it and the failure to conduct an adequate competency examination.

Due to Mr. Austin's suicidal depression[16], counsel's ineffectiveness in investigating his incompetence, the state's failure to disclose relevant information and the Court's failure to conduct an adequate competency evaluation his lack of competence was not determined pre-trial.

The record in this case is replete with indicia of Mr. Austin's incompetence. At its heart is the simple truth that Mr. Austin was a death row volunteer who, due to his mental illness, sought out prosecution and execution in a deliberate attempt to commit suicide.

---

95 (1979) (per curiam); Lockett v. Ohio, 438 U.S. 586 (1978); Gardner v. Florida, 430 U.S. 349 (1977); Woodson v. North Carolina, 428 U.S. 280 (1976). These decisions reflect an appreciation of the fundamental fact that death is different.

[16] This phrase is used to describe the range of forces operating on Mr. Austin including his severe depression, neurological damage, cognitive disorder, the conditions of his confinement as they contributed to his desire to die and the developmental psychopathology of his background of abuse and substance abuse.

In January 2001 while being held in isolation at the Hughes Unit Mr. Austin wrote to Sergeant Waymon Allen of the Houston Police Department offering to confess to a murder if his death were guaranteed.[17]

> Dear Sgt. Allen.
>
> How are you doing?  I hope everything is going well with you.  As for myself, well, I'm hoping things will get better.
>
> I want to help you out if you'll help me out.  I know you want to close that murder case concerning David and I will help you.  I will confess to it on several conditions.  First the charge must be Capital Murder.  Second, I must be guaranteed the death penalty.  This must be guaranteed.

RR. XII-Ex.68  Later that month Mr. Austin made a tape recorded confession to Sgt. Allen that even Sgt. Allen did not believe the whole of.  RR.X-34.

Mr. Austin was indicted on February 28, 2001 and counsel was appointed on March 21, 2001.  In the period between his indictment and his trial Mr. Austin wrote to the trial court and prosecutor on several occasions highlighting his wish to be executed.

On April 17, 2001 Mr. Austin wrote to the trial judge and prosecutor advising that he did not want or require an attorney to represent him. He went on to emphasize his goal of being executed:

> What I do not understand is why must time and money be wasted on a trial?  I'm pleading guilty.  I fully admit to the crime.  You have in your possession a taped confession and now you have this letter.  Just sentence me to death and lets get on with it.

CR.5-6, Letter from Perry Austin to Judge Cosper and Prosecutor, April 17, 2001.  (02859-

---

[17] Mr. Austin's letter and the suicide attempt that it involved are bizarre, self-destructive behavior and should not be downplayed. It is sometimes said that a suicide attempt on its own may not creat a bona fide doubt about competence. This must be looked at on a case by case basis but a suicide attempt in the context of other indicia is a powerful indicator of possible incompetence. See <u>Drope v. Missouri</u>, 420 U.S. 162 (U.S.)

02860)

On May 1, 2001 he was placed in administrative segregation after his court appointed counsel, Mr. Arnold, reported to the Sheriff's office that Mr. Austin had threatened to kill another inmate.

On May 30, 2001 court appointed counsel, Mr. Arnold, moved ex parte for funding to have Mr. Austin assessed by a psychologist as a result of his "highly unusual behavior." Mr. Arnold emphasized that such an assessment was necessary to allow him to render effective assistance of counsel:

> III.
> Counsel for the Defendant, in order to render effective assistance of counsel in this case, believes the Defendant should undergo a psychological examination by Dr. Jerome Brown.

> IV.
> The Defendant has exhibited some highly unusual behavior in the last several months both while incarcerated in the Institutional Division of the Texas Department of Corrections and in the Harris County Jail. In order to understand the impact of this unusual behavior on the accused's mind the undersigned counsels require the assistance of recognized mental health expert.

CR. 12, *Defendant's Motion to Permit Examination of the Defendant and for Authority to Incur Expenses.* On July 13, 2001 the Court granted this motion. (CR. 11.)

On July 13, 2001 in a hearing in chambers Mr. Austin advised the Court that he wished to represent himself and did not wish to present a defense. Though covered within the designation of record for appeal, the transcript of this proceeding has not been prepared. The record does, however, disclose that in this hearing Mr. Austin urged the judge to allow him to proceed *pro se* and the judge indicated that she wished a psychological evaluation completed before proceeding to a *Faretta* hearing. (RR. II-3-4).

On July 20, 2001 Mr. Austin wrote to the court and once again emphasized his desire to

14

be sentenced to death and executed as soon as possible. He also highlighted his depression, his

suicidal intent and the effect that the conditions of his confinement were having on him.

> If you cannot get me out of seg, could you please move up my court date so my
> stay in seg will not be prolonged? My trial should last no longer than two or three
> days as I will be pleading guilty and will not put up a defense in this case. Also,
> as soon as I am able, or am permitted, after sentencing, I will be dropping all
> appeals and will request an execution date as soon as is conveniently possible.
> That means I do not plan on being in this world too much longer and I want to
> spend at least what little time I do have with what little freedom there is by being
> out in population. I cannot handle prolonged isolation I have a very bad problem
> with depression and when I get depressed I tend to think about suicide a lot. If I
> am forced to remain in seg too long I won't be around to stand trial.

Letter from Perry Austin to Judge Cosper, July 20, 2001. (CR. 16).

Three weeks later, on August 9, 2001, Mr. Austin once again wrote to Judge Cosper

urging that the trial and his execution date be brought forward. In the letter he belittled his own

"trial" with ironic quotation marks before calling the proceeding a circus and urging that the

sooner it was over with the sooner he could die:

> I am writing again in hopes that you will consider my previous request to move
> my trial to an earlier date. As I mentioned in my previous letter my "trial"
> shouldn't last more than two days as I will not be defending myself. I will be
> pleading guilty so the only thing the jury will have to assess is my punishment
> which you and I both know will be death. So, the sooner we get this circus over
> with the sooner I can die. No, I don't have a death wish, or at least you all can't
> prove it, but you and I both know that with my past and with what I've told the
> cops, death is inevitable. So, what more do you all need from me? The sooner
> we get this over with the sooner everyone will be happy. Right!? I am even
> willing to waive the psych hearing/interview. I can tell you exactly what he's
> going to say. I am a sociopath, extremely violent, no respect for authority, and no
> feelings of guilt. I am fully competent and definitely know the difference
> between right and wrong. So let's get this show on the road please.

Letter from Perry Austin to Judge Cosper, August 9, 2001. (CR. 18-19).

Less than a week later Mr. Austin wrote to Judge Cosper again, apparently angered that

his efforts to be executed were not proceeding with sufficient speed or certainty:

> Maam, since there seems to be some doubt about my sincerity to not defend

myself concerning the current charge against me, I feel I must do something to prove that I mean what I say.

I am hereby requesting that both attorneys appointed to represent me be discharged and I be permitted to represent myself.  I make this decision fully aware of the consequences and am also aware that this is within my right.  I will permit one (1) attorney to be present to assist in any legal advice although I fail to see what purpose that would benefit.

September 12, 2001 is my next court date, for pre-trial motions.  I do not wish for any motions to be filed on my behalf.

I do not wish to participate in jury selection.  I will not contest any juror the prosecution selects.

Letter from Perry Austin to Judge Cosper, August 14, 2001.  (CR. 20-21).

At this point in the proceedings there were sufficient indicia of incompetence to require counsel and the court to seek a full competency hearing.

On September 20, 2001 Dr. Jerome Brown, a psychologist, attended on Mr. Austin for the purposes of assessing his competence to stand trial.  The assessment was based on a mental status examination and clinical interview lasting less than 30 minutes in total.  Dr. Brown prepared a brief report for the court, dated September 25, 2001, confirming that the examination consisted solely of an interview with Mr. Austin comprising a mental status examination and clinical interview.  No psychometric or other testing was conducted and the report discloses no awareness of Mr. Austin's prior history of mental illness.  Dr. Brown reported that Mr. Austin was competent.  Report of Dr. Jerome Brown, September 25, 2001.  (CR. 23-26).

On October 11, 2001 the Court conducted a *Faretta* hearing at which it acknowledged receipt of Dr. Brown's report and at which appointed counsel, Mr. Arnold, was asked whether there was anything in the report inconsistent with his own personal determination as to Mr. Austin's competency.  At this point Mr. Arnold had met privately with Mr. Austin once at the Harris County Jail and once at the court house.  He indicated that there was nothing in the report

inconsistent with his observations and that he believed Mr. Austin to be competent. (RR. II-4).

The Court then engaged in a colloquy with the defendant in which it inquired as to whether he had ever been treated for any mental health disorder, whether he had mental health problems in the army and whether he had received counseling in the army. Mr. Austin answered all of these questions in the negative. (RR.II-6-7). As is detailed below, these answers were lies, that are themselves symptoms of Mr. Austin's mental disorder. Mr. Austin went on to confirm his suicidal intent by stating that his reason for seeking to proceed *pro se* was to ensure that no defense was offered at all: "as far as I am concerned there will be no strategy." (RR.II-14). Mr. Austin also confirmed that the reason he was not concerned about rules of evidence and procedure was because he did not want to appeal his case. (RR.II-11).

At this point in the proceedings, notwithstanding the opinion of Dr. Brown, there had been sufficient indicia of incompetence to warrant defense counsel seeking a full examination of Mr. Austin and for the trial judge to order a hearing to determine his competency. Mr. Austin's bizarre behavior, his expressly suicidal intent, his complaints of severe depression and the limited scope of Dr. Brown's assessment should have resulted in a full assessment of Mr. Austin's competency being conducted.

Unfortunately, despite his bizarre and nakedly suicidal conduct, there was no adequate investigation of Mr. Austin's competency before he was declared competent and permitted to proceed *pro se*. As detailed below: defense counsel failed to conduct any investigation and failed to provide adversarial testing of Mr. Austin's competency; the state failed to disclose information in its possession reflecting upon Mr. Austin's mental illness and incompetence; the examination ordered by the court was carried out in such a superficial manner as to amount to no effective examination at all; and, the court failed to order further inquiry as more indicia of

incompetence emerged, despite the limitations of the original inquiry.

The failure to adequately inquire would alone mandate reversal, but the situation became even worse. As the proceedings continued even more evidence emerged in the record indicating that Mr. Austin was seriously mentally ill. This evidence should have led to a renewed inquiry into Mr. Austin's competency.

On February 21, 2002 Sergeant Allen questioned Mr. Austin once again and a tape recorded confession was again developed. (RR. XIV-Ex. 78). Standby counsel was not present for this interview. During the course of the interview Sergeant Allen pressed Mr. Austin on his description of the circumstances leading to the death of David Kazmouz, expressing concern with the accuracy of a number of the things that Mr. Austin had said. Towards the end of that interview Mr. Allen said that the reason he came forward was "depression, I guess." He described breaking down in tears when simply watching television and the fact that he was put in solitary after fighting with a guard, and explained that his depression was worse when he was in solitary. He also confirmed that his confession and trial were no more than an elaborate suicide attempt:

> The only reason I haven't killed myself is because I actually believe in hell and I don't want to go there and this way I am not killing myself, I'm just not putting up a defense.[18]

Tape Recorded statement of Perry Austin, February 21, 2001. RR. XIV-Ex. 78). Contrary to his earlier statements to the trial court and psychologist, Mr. Austin told Sergeant Allen that, "I have been going to see counselors and psychiatrists since I was a young kid." He described his contact with psychiatrists as stemming from his behavioral problems and emotional disturbance and stated that a psychiatrist had been involved in his earlier trial.

---

[18] Note that this religious ideation is symptomatic of Mr. Austin's mental illness.

The day of Sergeant Allen's visit, Mr. Austin wrote to the Court once again confirming that he did not intend to defend himself in the case. (CR. 58-59).

Voir dire commenced on March 18, 2002.  During voir dire Mr. Austin declined to question any prospective jurors and permitted the state to dismiss by consent all of the jurors that it wished. (RR. III-VIII).

Voir dire also disclosed the state's obvious awareness of what was occurring.  The state repeatedly questioned prospective jurors about their view of Mr. Austin's death wish and the fact that he was effectively committing suicide.  The whole of the voir dire is of the same tenor but for an example the court may refer to Voir Dire of Juror Brady.  (RR. IV-38-43).  The trial judge was explicit in stating to one of the jurors that the only reason that Mr. Austin was representing himself was so that he could ensure that he received the death penalty: "Mr. Perry [sic] is not representing himself for any other reason other than he wants the jury to give him the death penalty." (RR. VI-10).

Mr. Austin entered a plea of guilty to the offense of capital murder.  (RR. IX-4).  Mr. Austin did not participate in or present any evidence in the penalty phase until closing argument.[19]  During closing argument Mr. Austin told the jury that they should find he was a future danger and that there was no mitigation.  This was a patently obvious suicide attempt.  Mr. Austin also chose to share with the jury in the penalty phase a description of his participation as a recipient of anal sodomy while in prison. RR. XI-15-20).  This presentation was as bizarre as Mr. Austin's fixation on the physical appearance of Jennifer Ortega, the victim from the earlier aggravated sexual assault charge.

---

[19] In a typically bizarre interlude Mr. Austin asked his only questions of the trial when he tried to establish the physical appearance of Jennifer Ortega, the complainant in his earlier conviction for aggravated sexual assault.

In addition to these indicia of incompetence, the state introduced into evidence a great deal of evidence that illuminated Mr. Austin's history of mental illness and should have put the court, defense counsel and prosecuting counsel in serious doubt about his competence.

First, the state introduced the fact that Mr. Austin's first offense was the bizarre and disturbing rape and attempted rape of two of his sisters and armed robbery of his mother and third sister.

The state also introduced documentary exhibits providing clear indicia of incompetence and conclusively proving that Mr. Austin had lied to Dr. Brown and the court, concealing his length history of mentally disturbed and suicidal behavior.

State's Exhibit 79 was described as a "Pen Packet," and was made up of TDCJ records largely documenting Mr. Austin's incarceration following the 1978 offense. State's Exhibit 81 comprised the records of the Board of Pardons and Paroles. These documents revealed the following previously undisclosed information about Mr. Austin:

- Mr. Austin had, "a previous history of suicide attempts" (01230 and 01238); he "attempted suicide twice at ages 14 and 19 by intentional drug overdoses." (01243, 01261 & 01450).

- Mr. Austin was sexually abused as a child, first participating "in homosexual activity at age 15 with a soldier in Ft. Hood, Texas." (01259).

- Mr. Austin has a history of illicit substance abuse dating back to age ten and had used marijuana, barbiturates, LSD and used alcohol to excess. (01243 & 01261).

- Mr. Austin "has a history of suicide attempts and psychological counseling as a juvenile" (01238), "had psychiatric treatment as a juvenile" (01240), and was referred to a military psychological counselor due to misbehavior in school.

(01243)

- Mr. Austin was discharged from the army due to "inadaptability" (01231 & 01261), was referred to a psychiatrist for disciplinary reasons "following his enlistment in the army, (01243) and that psychiatrist found him unfit to maintain a security clearance. (01449-50).

- Mr. Austin had been "psychiatrically assessed prior to the trial" for the 1978 offense. (01240).

- Mr. Austin had "emotional problems" resulting in an assessment that "Symptoms limit adequate functioning, requires counseling, may require medication." (01246).

- Mr. Austin was regarded by parole officials as a "very disturbed individual." (01239).

- Mr. Austin had plead not guilty by reason of insanity to the 1978 rape charge and a report on Mr. Austin had been prepared by Dr. Franklin Lewis. (01424).

- Following his conviction in 1979, Mr. Austin wrote to the trial judge stating "I know theres something wrong with me . . . I want to go to Rusk to get help for my problem . . . I want help before its to late . . . All I'm asking is that you send me to Rusk until the Doctors solve me of my problem . . . All I want is help and I don't think I can live with myself knowing that my problem is still with me." (01424-6).

- At the direction of the 1979 trial court Mr. Austin's attorney wrote to the Director of the Diagnostic Unit, Texas Department of Corrections to advise them that Mr. Austin "had requested, and did request at the time of sentencing, and feels that he

is in need of, psychiatric help to solve his emotional problems." (1422).

- Mr. Austin underwent a TDC Diagnostic Center Evaluation in 1979 which included a finding that his "insight and social judgment appear to be quite limited" and there was a strong argument for "a severe character disorder." (01451).

The state also played for the jury the tape of Mr. Allen's confessional statement of February 21, 2002 in which he admitted that he was trying to kill himself, but that because of a bizarre interpretation of the Christian prohibition on suicide he was trying to have the court do it on his behalf. (RR. XIV-Ex. 78).

This material clearly indicated that Mr. Austin's psychological assessment and the colloquy at the *Faretta* hearing and plea hearing were wholly vitiated by a lack of relevant information, insufficient investigation and lies from Mr. Austin. A review of the evidence admitted during the trial indicates that the court was dealing with a seriously mentally ill man and could no longer rely upon the previous assessment of competence.

**CLAIM II.** **Mr. Austin's rights to Procedural Due Process as guaranteed under the Constitutions of Texas and the United States and under the Texas Code of Criminal Procedure were violated when, despite sufficient indications of his incompetence, no adequate inquiry was made into his competence to stand trial and waive counsel.**

A defendant has a procedural due process right to a competency hearing whenever the facts before the trial court raise or should raise a bona fide doubt concerning competency. Pate v. Robinson, 383 U.S. 375 (1966). In determining whether a competency hearing is required, a trial court should give particular consideration to (1) the existence of a history of irrational behavior; (2) the defendant's bearing and demeanor at the time of trial; and (3) prior medical opinions. Reese v. Wainwright, 600 F.2d 1085, 1091 (5th Cir.), cert. denied, 444 U.S. 983 (1979). If the

trial court received evidence, viewed objectively, that should have raised a reasonable doubt as to competency, yet failed to make further inquiry, the defendant has been denied a fair trial. See Carter v. Johnson, 131 F.3d 452, 459 n.10 (5th Cir. 1997).

As detailed above, the indicia of incompetence present before the court in this case sufficiently raised a doubt as to Mr. Austin's incompetence such that the federal Constitution required a constitutionally effective competency inquiry to protect Mr. Austin's right to procedural due process.

The Texas Code of Criminal Procedure as it operated at that time provided a detailed system for the review of questions of competency both before and during trial.  Tex. Code Crim. Proc. Article 46.02.  Unfortunately, the trial court failed to follow the procedure laid down by the Code.

Under Article 46.02(2)(a) a court must convene a jury hearing as to competency if, prior to trial, it becomes aware of evidence capable of supporting a finding of incompetence – that is, "some evidence, a quantity more than none or a scintilla, that rationally may lead to a conclusion of incompetence." Sisco v. State, 599 S.W.2d 607 (Tex. Crim. App. 1980); Alcott v. State, 51 S.W.3d 596 (Tex. Crim. App. 2001).  This standard was clearly met, but instead of conducting an incompetency hearing before a jury as envisaged by Article 46.02(4) the trial court conducted its own informal inquiry, satisfied itself and took the matter no further.  In this case there was clearly sufficient evidence to require a proper examination, at which point it is not for the judge to make a further limited inquiry, and there is no utility in doing so.  The trial judge must take the evidence of incompetence at its highest in considering whether there is a need for a hearing. The trial judge's approach in the circumstances of this case violated Mr. Austin's Due Process rights.

It should be noted that while both federal jurisprudence and Texas law use the phrase

"bona fide doubt," the phrase means a different thing in each jurisdiction.  Under Texas law the concept of a bona fide doubt is expressed as follows:

> We have explained that a bona fide doubt exists "if the evidence indicates recent severe mental illness, at least moderate mental retardation, or truly bizarre acts by the defendant." *Collier v. State*, 959 S.W.2d 621, 625 (Tex. Crim. App. 1997) (citing *Mata v. State*, 632 S.W.2d 355, 359 (Tex. Crim. App. 1982)).

Alcott v. State, 51 S.W.3d 596, 602 (Tex. Crim. App. 2001).  The Courts in Collier and Mata used the phrases "only if" and "there must be" respectively.  Collier, 959 S.W.2d at 625; Mata, 632 S.W.2d 359.

This demanding reading of what it means to have a "bona fide doubt" represents a higher threshold than that required by federal jurisprudence.  The federal constitutional standard calls for an assessment of all the circumstances and does not limit the range of factors necessary to be present to establish a sufficient doubt about competency:

> The import of our decision in Pate v. Robinson is that evidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial are all relevant in determining whether further inquiry is required, but that even one of these factors standing alone may, in some circumstances, be sufficient. There are, of course, no fixed or immutable signs which invariably indicate the need for further inquiry to determine fitness to proceed; the question is often a difficult one in which a wide range of manifestations and subtle nuances are implicated. That they are difficult to evaluate is suggested by the varying opinions trained psychiatrists can entertain on the same facts.

Drope v. Missouri, 420 U.S. 162, 180 (1975).  The standard as applied by Texas courts is inconsistent with the federal constitutional standard for review and by considering the case under this standard the trial court failed adequately to protect Mr. Austin's federal constitutional rights.

Federal jurisprudence also supports the need to conduct an adequate examination where the issue is sufficiently raised.

In the context of competency to waive discretionary review of a death sentence, the

Supreme Court provided clear guidance on the sort of inquiry that the district court should conduct:

> To that end, it will be appropriate for the District Court to subject Rees to *psychiatric* and other appropriate medical examinations and, so far as necessary, to temporary federal hospitalization for this purpose . . . The District Court will hold such *hearings* as it deems suitable, allowing the State and all other interested parties to participate should they so desire, and will report its findings and conclusions to this Court with all convenient speed.

Rees v. Peyton, 384 U.S. 312, 314 (1966) (emphasis added).  Two matters from this remand order should be emphasized.  First, the Supreme Court required *psychiatric* examination of the defendant, while not foreclosing other medical examination.  No psychiatric examination was ordered or conducted in this case.  Second, the Supreme Court made it clear that there would be a hearing and that all interested parties, including the defendant's attorney, could participate.

The Fifth Circuit in Mata v. Johnson, 210 F.3d 324 (5th Cir. 2000) recently reviewed the adequacy of examinations required before allowing a defendant to abandon his appeals, and drew an analogy with the examination conducted to determine competency.  Mata, 210 F.3d at 324. The court made the point that both the standard for abandoning appeals and the standard for standing trial "inquire about the discrete capacity to understand and make rational decisions concerning the proceedings at issue."  Id.  The court regarded the authorities on competency to stand trial authorities as instructive and the cases reviewed in Mata are equally instructive in the present context[20]:

The Fifth Circuit in Mata detailed the elements of two constitutionally adequate competency inquiries:

---

[20] It is firmly contended that Due Process requires even greater protections before a potentially incompetent defendant is permitted to stand trial, represent himself and plead guilty to a capital defense than where a prisoner seeks to abandon discretionary review and have executed a sentence of death imposed by a presumptively constitutional court proceeding.

The record showed that prior to finding Rumbaugh competent, the district court held a preliminary hearing to decide the necessary proceedings under the circumstances. See *id.* at 397. The district court then ordered that Rumbaugh be examined by a team of psychiatrists and psychologists. See *id.* These mental health professionals submitted written reports to the court and the parties. See *id.* The court held a two-day evidentiary hearing, at which four mental health experts testified. See *id.* Rumbaugh also testified about his desire to abandon his appeals. See *id.* Only after this full opportunity to develop the facts regarding Rumbaugh's competence, did the district court make its ruling.

* * * *

Before acting on Ford's *pro se* request, the magistrate judge held two evidentiary hearings. *Id.* at 611. At the first hearing, the petitioner appeared in person and the magistrate judge inquired into the petitioner's decision and observed his mental condition. See *id.* After the hearing, the magistrate judge examined the petitioner's prison medical records and appointed a psychiatric expert suggested by petitioner's counsel. See *id.* After the expert evaluated the petitioner and filed a written report, the magistrate judge appointed, at the request of petitioner's counsel, a neurologist to examine the petitioner. See *id.* at 612. At the second evidentiary hearing, both the psychiatrist and the petitioner testified. See *id.* Portions of the petitioner's testimony raised concerns which prompted the psychiatrist to request a second opportunity to examine the petitioner. See *id.* at 613. The magistrate judge granted the request, and the psychiatrist filed a supplement to his earlier written evaluation. See *id.* In response to the psychiatrist's conclusion that the petitioner was competent to abandon collateral review, petitioner's counsel submitted the mental health evaluation of the neurologist, who concluded that Ford was not competent to abandon his appeal. See *id.* at 614. The magistrate judge spoke once more with the petitioner by telephone. See *id.* The magistrate judge then made a report and recommendation to the district court, concluding that Ford was competent to dismiss his appeal. The district court adopted that recommendation after an independent review of the evidence. *Id.* at 614-15.

Mata v. Johnson, 210 F.3d 324, 328 (5th Cir. 2000) (citing Rumbaugh v. Procunier, 753 F.2d 395, 396 (5th Cir. 1985) and Ford v. Haley, 195 F.3d 603 (11th Cir. 1999)).  It is not suggested that these are the only ways that a constitutionally effective examination can be conducted, but the rigor of the approach in these cases does provide guidance.

By comparison with this rigorous examination, or the examination called for by the Code, the trial court appointed a single psychologist to conduct an examination.  Dr. Jerome Brown

was not provided with the records of Mr. Austin's previous history of mental illness and was in fact unaware of those records. Dr. Brown did not engage in any medical examination of Mr. Austin or administer any psychometric or other testing. In fact, Dr. Brown relied wholly upon the self-report of Mr. Austin in an interview that lasted for fewer than 30 minutes. There was no medical opinion sought from a psychiatrist and the finding of competency was made on the basis of a bare report, with no examination or cross-examination of Dr. Brown.

Dr. Brown's report was also not a constitutionally adequate means of determining whether Mr. Austin was competent as it failed to meet the professional standard of care for such an examination and could not survive a *Daubert* challenge on grounds of reliability.

Dr. Mary Connell, an expert in psychologists' standard of care and the President-elect of the American Academy of Forensic Psychology has reviewed the competency examination in this case. (Exhibit 91). Dr. Connell states that the examination did not meet the standard of care in large part because of the failure of the examiner to review collateral sources and to utilize appropriate testing instruments in reaching a conclusion about Mr. Austin's competency. Dr. Connell highlights the fact that certain mental health conditions or illnesses may impair cognitive functioning and decision making capacity without limiting or impairing features such as a factual understanding of proceedings and communication. This is one of the main reasons that an adequate forensic evaluation will have regard to collateral sources and testing instruments; to ensure that a profound but more insidious impairment in rational understanding is not missed. That is exactly what has happened in this case.

Dr. Connell's affidavit highlights the fact that Mr. Austin's presentation and the case's procedural posture at the time of the assessment should have caused a much more detailed inquiry. As the wealth of materials attached to this application and the results of full scale

competency testing demonstrates, a more detailed inquiry would have revealed that Mr. Austin was in fact incompetent.  Dr. Connell also helpfully gathered together a number of references and relevant portions of codes and guidelines that support the position that Dr. Brown's test was below the standard of care and unreliable.

Dr. Kirk Heilbrun, the nation's acknowledged expert in standards of care in forensic psychology and the author of the leading text, *Principles of Forensic Mental Health Assessment*, has also reviewed the competency assessment in this case.  Dr. Heilbrun has provided as statement in which he details the principles of forensic mental health evaluation. (Exhibit 90).

Dr. Heilbrun supports Dr. Connell's position that an adequate assessment of competency requires the examiner to have reference not only to the examination but also to collateral sources of information and testing instruments.  He makes the strong point that such corroboration is critical to ensuring the accuracy of testing and in detecting malingering or other attempts to manipulate the process.

One may pose the rhetorical question: would the state abandon the trial of a defendant if a psychologist reported him incompetent based on a short interview, no review of records and no testing?  Of course not; and neither should any court be willing to accept such a superficial examination where the defendant may be motivated to lie or manipulate the process.  Lest it be suggested that an experienced examiner can detect such dissembling Dr. Heilbrun makes the point that,

> research has suggested that no professional group (including law enforcement personnel as well as mental health professionals) are much better than chance at detecting deliberate deception in the context of a brief interview or observation of behavior.

Statement of Dr. Kirk Heilbrun. (Exhibit 90).  Dr. Heilbrun notes the high risk that mental illness may be sponsoring the actions of a capital defendant seeking to dismiss his counsel and

plead guilty, and describes the type of assessment necessary in such a case:

> An appropriate evaluation under such circumstances would consider history judged through self-report, collateral records and third party interviews, as well as current functioning as reflected by self-report, third party information, psychological testing, and the specialized MacArthur Competence Assessment Tool-Criminal Adjudication.

Dr. Heilbrun concludes that Dr. Brown's assessment falls below professional standards, particularly given the limited sources of information relied upon, the lack of analysis of Mr. Austin's motivation and the shallowness and brevity of the assessment.

This is a capital case and the competency assessment was being conducted to see whether Mr. Austin should be allowed to seek and obtain the death penalty.  The minimum that due Process allows is that a psychological assessment relied upon by the court meet the professional standard of care for such evaluations.  As both Dr. Connell and Dr. Heilbrun point out, from a psychological point of view the colloquy was inadequate as an assessment tool.

The process provided to assess Mr. Austin's competency, the matter having been sufficiently raised, was inadequate as a matter of both Texas and federal constitutional law.

**CLAIM III.      Mr. Austin's rights to Procedural Due Process as guaranteed under the Constitutions of Texas and the United States were violated when, after an initial finding that he was competent, the trial court failed to make further inquiry once new evidence of his incompetence came to light.**

Even after the initial finding of competence was made the trial court remained under a duty to be alert to other evidence raising an issue of the defendant's competency.

> Even when a defendant is competent at the commencement of his trial, a trial court must always be alert to circumstances suggesting a change that would render the accused unable to meet the standards of competence to stand trial.

Drope v. Missouri, 420 U.S. 162, 181 (1975).

The Texas Code of Criminal Procedure also provided at the relevant time that if before

trial a court became aware of or during trial developed a bona fide doubt then a hearing under Article 46.02(4) was required.  Bona fide doubt for these purposes has been used interchangeably with "reasonable doubt" and it "need not be sufficient to support a finding of incompetence and is qualitatively different from such evidence." Mata v. State, 632 S.W.2d 355, 358 (Tex. Crim. App. 1982); Alcott v. State, 51 S.W.3d 596 (Tex. Crim. App. 2001).

Given the evidence put before the court during the trial of the extent and severity of Mr. Austin's mental health problems the earlier, hopelessly flawed competency inquiry could not be regarded as adequate to protect Mr. Austin's Due Process rights.

> The extent and severity of the petitioner's history of mental health problems which have been brought to the court's attention influence the breadth and depth of the competency inquiry required.

Mata v. Johnson, 210 F.3d 324, 330 (5th Cir. 2000).

Evidence was put before the trial court during the trial that not only demonstrated a long and extremely serious history of psychiatric disturbance, physical and emotional abuse, substance abuse and suicidal behavior but also demonstrated that both the court and Dr. Brown had made their earlier assessments of competence upon a factually incorrect basis.  In these circumstances the court should have made further inquiry and should not have deferred to a competency assessment conducted six months earlier.

The indicia of incompetence that the trial court became aware of following the October competency inquiry were such as objectively to raise a bona fide doubt as to Mr. Austin's competence and wholly undermine the earlier determination of the court.

In considering this question it is to be remembered that no single indicator of incompetence is to be considered alone, but rather each such indicator must be placed in the context of Mr. Austin's history and of the other indicia of incompetence.  Drope (supra).  A

suicide attempt considered with other evidence of a defendant's incompetence will raise a bona fide doubt. Drope, 420 U.S. at 170; United States v. Mason, 52 F.3d 1286, 1292 (4th Cir. 1995).

**CLAIM IV.**     **Mr. Austin's right to substantive Due Process as guaranteed under the Constitutions of Texas and the United States were violated when he was subjected to capital trial and sentenced to death when not competent.**

Mr. Austin was not competent at the time of his trial. The Court erred in determining that he was competent and permitting him to stand trial, waive counsel and plead guilty. As a result, Mr. Austin's constitutional rights were violated.

To be competent to stand trial, a defendant must have "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding," and must have "a rational as well as factual understanding of the proceedings against him." Dusky v. United States, 362 U.S. 402 (1960).

In this case, as a result of his mental illness and his deep depression, Mr. Austin did not have the ability to consult with counsel with a reasonable degree of rational understanding and did not have a rational understanding of the proceedings against him.

The Supreme Court has made it clear that the phrase "rational understanding" includes the ability to make a reasoned or rational choice. Godinez v. Moran, 509 U.S. 389, 398 (1993)

The requirement that a defendant be able to make rational choices is fundamental to the court's decision in Godinez. The Court found that the standard for competence to plead guilty or waive counsel was the same as the standard of competence necessary for trial because the *decisions* to be made by the defendant were similarly profound and complex in each case. Id. at 398-9. In Godinez the Supreme Court specifically referenced its jurisprudence regarding the capacity to make a rational choice, a capacity inherent in an assessment of competency to waive

discretionary appeals in capital cases. Id. citing Rees v. Peyton, 384 U.S. 312, 314, 16 L. Ed. 2d 583, 86 S. Ct. 1505 (1966)  The Court also noted that it did not see a difference between the formulation "rational understanding" and the phrase employed by the Ninth Circuit, capacity for "reasoned choice"

> The standard adopted by the Ninth Circuit is whether a defendant who seeks to plead guilty or waive counsel has the capacity for "reasoned choice" among the alternatives available to him. How this standard is different from (much less higher than) the Dusky standard -- whether the defendant has a "rational understanding" of the proceedings -- is not readily apparent to us.

Godinez v. Moran, 509 U.S. 389, 397 (1993).[21]

The Fifth Circuit has also equated the concept of rational choice under the Rees standard and the concept of rational understanding under Dusky. Mata v. Johnson, 210 F.3d 324, 329 (5th Cir. 2000) (both standards inquire into the discrete capacity to understand and make rational decisions concerning the proceedings at issue).

It should be noted that the standard for competency to waive discretionary review in a capital case is more narrowly defined than competency to stand trial and represents a lower threshold for the state.  For instance, the Rees standard as interpreted in Rumbaugh requires the presence of mental disease or defect.  Rumbaugh v. Procunier, 753 F.2d 395, 398 (5th Cir. 1985) (if a person is not suffering from a mental disease or defect then he is necessarily competent). This is to be contrasted with the test for incompetence, which does not require the presence of mental illness. Dusky v. United States, 362 U.S. at 402.; State v. Harris, 53 N.C. 136, 143 (1860).  Competence to stand trial also involves a factual and rational understanding of a broader range of issues than is pertinent in a Rees type of case, including the ability to communicate with

---

[21] The Supreme Court's grievance in Godinez was not the use of the phrase "reasoned choice" but the idea that there were two standards of competency, one to stand trial and one to waive constitutional rights.

counsel and the ability to make choices.

Nevertheless, as to the ability to make a rational choice, a component of rational understanding, the Supreme Court has held that the question is whether the defendant's capacity to make a rational choice is substantially affected. Rees, 312 at 314. Psychologists refer to this aspect of the *Dusky* test as "decisional competence." Statement of Dr. Mary Connell. (Exhibit 91).

In considering the second prong of the Dusky test – the requirement of a "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" Dusky 362 U.S. at 402 – courts have emphasized the importance of the defendant's ability to appreciate and weigh information, particularly as it regards the waiver of constitutional rights:

> In relation to cooperation with counsel, these capacities are put to the test, particularly when defendant is faced with choices whether to waive constitutional rights, such as to waive the right to counsel, to plead guilty or go to trial, to waive a jury, to cross-examine witnesses, and to testify in his own defense. See Godinez v. Moran, 509 U.S. 389, 399, 125 L. Ed. 2d 321, 113 S. Ct. 2680 (1993) (identifying choices which criminal defendants face). *Without the defendant's ability to appreciate and weigh information and advice*, counsel cannot effectively fulfill his role as counselor. See United States v. Nagy, 1998 U.S. Dist. LEXIS 9478, 1998 WL 341940, at (S.D.N.Y. 1998), quoting United States v. Hemsi, 901 F.2d 293, 295 (2d Cir. 1990), and Dusky, 362 U.S. at 402 ("It is not sufficient merely that the defendant can make a recitation of the charges or the names of witnesses, for proper assistance in the defense requires an understanding that is rational as well as factual.") (internal quotation marks omitted).

United States v. Salley, 246 F. Supp. 2d 970, 977 (D. Ill. 2003) (emphasis added).

A defendant will be found incompetent where mental illness prevents him from making a rational choice between his alternatives even though his knowledge of his choices and their consequences is not impaired. In re Cockrum, 867 F. Supp. 484, 487 (D. Tex. 1994) (rev'd on other grounds, Cockrum v. Johnson, 119 F.3d 297) (5th Cir. 1997). In Cockrum the defendant wished to waive his appeals and understood that this would result in his execution: in fact,

execution is what he desired.  Nevertheless he was found incompetent after the district court found that his desire to die stemmed from mental disorder.

Rational understanding is not demonstrated simply by the defendant's goal-directed behavior, or by the fact that his perspective and his acts were consistent with his felt need, particularly where that "felt need" derives from his mental illness.  United States v. Blohm, 579 F. Supp. 495, 499 (D.N.Y. 1983).

In Blohm the court was faced with an intelligent, college educated defendant who had "a capacity to not only understand but to seek to manipulate the proceedings" in which he was involved.  Id. at 500.  The court received unanimous psychiatric evidence that Blohm had "an accurate intellectual understanding of the nature of the charges against him, the criminal proceedings that lie ahead of him and the penalties that may result."  Id. at 501.  Nevertheless, the court found that Blohm did not possess a rational understanding and was therefore not competent because his understanding of his criminal proceedings was distorted by a mental illness which infected his decision making and ability to consult with counsel.  Id. at 505  See also United States v. Timmins, 301 F.3d 974 (9th Cir. 2002) (A defendant is not competent if mental illness would drive him to reject plea offer); United States v. Nagy, 1998 U.S. Dist. LEXIS 9478 (D.N.Y. 1998) (Defendant not competent despite factual understanding because mental illness skewed his understanding of proceedings so that he could not rationally make strategic decisions.).

A prisoner may collaterally attack his conviction by proving his incompetency at the time of the trial by a preponderance of the evidence. He is entitled to an evidentiary hearing for that purpose when he makes a showing by clear and convincing evidence that raises a threshold doubt about his competency.  Zapata v. Estelle, 585 F.2d 750 (5th Cir. 1978).

In addition to the facts and evidence referred to above Mr. Austin relies upon the further facts and evidence detailed below.  The quality, reliability, consistency and weight of this material provides clear and convincing evidence that raises a threshold doubt about his competency.  In these circumstances a competency hearing is mandated.

Counsel has not been able to conduct an investigation of the breadth or depth required in this very difficult case.  The time and resources available at this stage of proceedings are simply not adequate for the task where the defendant is seriously mentally ill and there has been no investigation or adversarial trial conducted previously due to the history of this proceeding.  Nonetheless, from the work that has been done a very clear picture of the tragic circumstances of Mr. Austin's life and functioning has emerged.  In addition to the matters referred to above, the court is referred to the records and statements exhibited to this affidavit.  The Court's attention is particularly drawn to the following:

Mr. Austin was born on June 23, 1959 in Tacoma, Washington to William Niles Austin and Harumi Austin.  William Austin was a career serviceman and his wife a Japanese citizen.  The pair had met while Mr. Austin was stationed in Japan.  William Austin suffers from the symptoms of mental illness and his brother was an alcoholic.

Harumi Austin, Perry Austin's mother, has demonstrated psychological symptoms also and has now become a recluse, speaking to virtually noone.

Mr. Austin's childhood involved him as a victim of significant physical abuse both at home and at school.  He presented as a withdrawn and isolated young boy and was starved of affection.  Mr. Austin began to exhibit the symptoms of mental illness at an early age, including periods in which he would lose time and the like.

In his early to mid-teens Mr. Austin was the victim of sexual abuse at the hands of a

serviceman stationed at the same base as Mr. Austin's father.  Mr. Austin attempted suicide by overdosing on medication and was hospitalized for three days.  Mr. Austin's teenage years and indeed his adult life have been characterized by periods of depression, recurrent suicidal ideation and suicide attempts.

Mr. Austin was taken to psychiatric counseling during his teens as a result of his behavior and presentation.  He also ran away from home a lot, fought a great deal, and received a series of head injuries.

Mr. Austin joined the army where he reported further neurological symptoms, including severe headaches.  He was discharged from the army after being referred to the psychiatrist and assessed with a failure to adapt.

In 1978, while insane, Mr. Austin sexually assaulted two of his sisters and robbed the other at gunpoint.  He was assessed by Dallas-based psychologist Dr. Franklin Lewis as suffering from a serious mental illness and possible brain damage and as having been insane at the time of the offense.[22]  (01424).  During the trial Mr. Austin once again attempted suicide by overdosing on medication.  Mr. Austin was convicted, and after his conviction wrote to the trial judge, seeking placement at Rusk and psychiatric assistance for his disturbance.  (Exhibit 5).

Mr. Austin spent more than ten years in prison.  As a result of his status as an identified homosexual he was placed in restricted, "safe keeping" environments for a significant part of this time.  As an identified homosexual in population or even in mainstream Mr. Austin was forced to endure a highly stressful prison environment in which he was constantly at risk of assault and sexual exploitation.  Mr. Austin received assessments while in prison that confirmed the presence of mental illness but no individual treatment was available.  Mr. Austin's mental illness

---

[22] The now disgraced Dr. Grigson assessed Mr. Austin has sane.

and his upbringing both make it impossible for him to usefully participate in group therapy and so he was effectively denied mental health care during his time in custody. The conditions of Mr. Austin's confinement and the denial of effective mental health services represent a violation of minimum standards for the treatment of prisoners and have been in violation of Texas law, the Eighth Amendment and international standards.

The details of Mr. Austin's release on parole appear from the record of the trial court and the circumstances surrounding the death of David Kazmouz are dealt with elsewhere in this application. For present purposes it will suffice to say that in 1992 John Maranto accidentally caused the death of David Kazmouz and Mr. Austin disposed of David's body in the land fill where it was found eight months later. Meanwhile, Mr. Austin was jailed as a result of his relationship with Jennifer Ortega.

Mr. Austin has always been heavily obsessed with religion, an obsession that continued to manifest in prison. Mr. Austin's obsessive manias also manifest themselves in ritualistic cleaning and accounting practices. He is a compulsive writer. Mr. Austin is also prone to periods of absence that appear to be petit mal seizures. He also has a deviant and over-active sexuality.

During the course of his imprisonment following 1992 Mr. Austin continued to experience the symptoms of mental illness and these are reflected in the records of the Texas Department of Correctional justice and the UTMB medical records. (Exhibit 28).

As a result of death threats received by Mr. Austin and his friends, Mr. Austin was involved in an altercation in the prison and was subsequently convicted of aggravated assault.

Following the prison stabbing Mr. Austin was placed in administrative segregation for approximately three years. Mr. Austin coped very poorly in this environment, and his mental

state deteriorated in the segregation environment.   The conditions in segregation included unlawful violence by staff, sub-standard physical conditions and food, unlawful denial of exercise and educational materials, and prolonged periods of isolation.   As an already mentally ill person Mr. Austin was very vulnerable to the negative effects of isolation, and these years increased the depressive aspects of his illness.

Once released from isolation Mr. Austin was kept at the Eastham Unit.   Mr. Austin was one of several prisoners designated for transfer to the Hughes Unit.   Unfortunately, Mr. Austin was placed in a transit cell where he was kept in isolation for almost four months in violation of Texas, federal and international law.   It was during this period that Mr. Austin's depressive illness became overwhelming and he wrote his confessional letter to Sergeant Allen.   Before he sent the letter he received some relief and was transferred to the Hughes Unit.

On the Hughes unit Mr. Austin became emotionally involved with another prisoner.   In or around January 2001 this relationship broke up, and Mr. Austin was psychologically devastated.   During this period Mr. Austin was kept in a cell without running water and was forced to obtain containers full of water at each change of shift.   One day the cells were being searched and it was rumored that all empty containers would be confiscated.   Mr. Austin tried unsuccessfully to raise this problem with a guard and described the guard as an "idiot."   When Mr. Austin moved away the guard began to assault him.   Mr. Austin reacted and managed to knock the guard down or flip the guard over so that Mr. Austin was on top of the guard.

As a result of this incident Mr. Austin was returned to solitary confinement.   Given his history and the depressive elements of his mental illness Mr. Austin believed that he would serve the rest of his sentence in the shocking conditions of administrative segregation.   After a week of

complete isolation, without so much as a bible or a pen and paper Mr. Austin was provided with his writing materials, which included the letter he had previously drafted to send to Sergeant Allen. Under the influence of his mental illness and the severely depressive effects of his conditions of confinement Mr. Austin sent the letter as a part of an attempt to commit suicide.

From there, and as a direct result of his mental illness, Mr. Austin pursued the same course – doing what was necessary to get the death penalty and be executed.

Mr. Austin has now been the subject of a thorough and searching process of psychological and psychiatric examination and testing. This process has included a large amount of testing by neuropsychologist Dr. Toni Cicerello, multiple attendances by neuropsychiatrist, Dr. George Woods and a review of a large number of records and documents by each of these experts which are also exhibited to this application. (Exhibits 93, 95). These reports are obviously central to the applicant's claims and for the sake of accuracy and convenience the court is referred to them in their entirety.

Dr. Woods has reliably and persuasively expressed the opinion that Mr. Austin was incompetent to stand trial or to be allowed to waive counsel and plead guilty. Ex. 95, report of Dr. Woods.

The case for competency rests on an inadequate psychological examination based upon lies and misinformation; a waiver colloquy of insufficient depth that was, in any event, vitiated by lies; and, the opinion of counsel[23] who had seen Mr. Austin at the jail once and was unaware

---

[23] Defense counsel's opinions can be useful in some cases but carry little weight in a case like the present:

> While defense counsel may often be in the best position to evaluate a client's ability to participate in his defense, a lawyer is not a trained mental health professional capable of accurately assessing the effects of paranoid delusions on the client's mental processes (*Odle v. Woodford*, 238 F.3d 1084, 1088-89 (9th Cir. 2001) (cert. denied, 534 U.S. 888, 151 (2001)). Courts must resist the unquestioning acceptance of counsel's representations concerning client competence (*Drope v. Missouri*, 420 U.S. 162, 177 n.13 (1975)).

of the depth and breadth of Mr. Austin's history of mental impairment.

There is clear and convincing evidence that raises a doubt about Mr. Austin's competence: In fact, upon reviewing the above material, his incompetence becomes clear.

**CLAIM V.**     **Mr. Austin's rights under the Texas and federal constitutions were violated when the state failed to disclose material helpful to Mr. Austin to the court, Mr. Austin or the court appointed psychologist.**

**CLAIM VI.**     **Mr. Austin's rights to counsel under the Texas and Federal Constitutions was violated when the state's failure to disclose evidence relevant to the determination of his competence and the voluntariness of his conduct effectively denied him the assistance of counsel on these issues.**

As will be obvious from the above description of the documentary records available in this case and the documents exhibited to this application, the state was in possession of a large amount of material that would have been favorable to Mr. Austin's interests. Had the material been disclosed there is a reasonable probability that Mr. Austin would have been found incompetent and/or his efforts to waive counsel and plead guilty would have been seen to have been less than knowing, voluntary and intelligent.

Due Process requires the state to disclose material favorable to an accused and a breach will be found irrespective of the good faith or bad faith of the prosecution. Brady v. Maryland, 373 U.S. 83 (1963). The state's obligation of disclosure is not limited to the provision of material upon the request of the defendant. United States v. Agurs, 427 U.S. 97 (1976). Further, the state's obligation extends beyond the bounds of the district attorney's office to others acting on the government's behalf in the case. Kyles v. Whitley, 514 U.S. 419, 437 (1995) (prosecutors

---

United States v. Timmins, 301 F.3d 974, 981 (9th Cir. 2002).

are responsible for "any favorable evidence known to the others acting on the government's behalf in the case, including the police").

The Supreme court has defined the three elements of a <u>Brady</u> prosecutorial misconduct: "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." <u>Strickler v. Greene</u>, 527 U.S. 263, 281-282 (1999).

In this case particular complaint is made of the state's failure to disclose material relevant to the determination of the defendant's competency and the voluntariness of his waiver of critical constitutional rights such as the right to counsel.

The state, through the TDCJ, had full possession of Mr. Austin's custodial and correctional records including those later exhibited in Mr. Austin's trial as exhibits 79, 80 and 81. The Harris County Sheriff's Office had in its possession evidence of suicidal behavior, a hunger strike, statements regarding efforts to become infected with AIDS, and psychological intake forms in which the defendant disclosed previous suicide attempts and a previous history of psychiatric treatment. (Exhibits 14, 15) On information and belief the HCSO also had possession of records from 1992 where the applicant was confined in a padded cell and referred for psychiatric assessment due to his irrational behavior. The state also had in its possession the records of the Houston Police Department and their inquiries into Mr. Austin's history, including the knowledge that he had entered a plea of not guilty by reason of insanity at his 1978 trial. (Exhibit 33).   The prosecuting team in this case obtained direct control of many of these documents through a series of subpoenas issued in January and February 2002, prior to the commencement of the trial.  On February 21, 2002 Sergeant Allen re-interviewed Mr. Austin and

was expressly told of his symptoms of mental illness and his history of treatment by psychiatrists and counselors.  (RR. XIV-Ex.78).  The records subsequently obtained from the state reveal a plethora of material pointing to Mr. Austin's mental illness.

Notwithstanding all of the information contained in these documents the prosecution remained silent throughout the psychological assessment and waiver colloquy in October 2001. The state remained silent even when Mr. Austin asserted he had no psychiatric history, in direct contradiction to the evidence in the state's hands.  As the immediate prosecuting team took direct possession of this material over the coming months the state remained silent.  On April 1, 2002 when the defendant was questioned by the trial judge before entering his plea and stated that he was of sound mind and when the trial judge stated that she was relying on the earlier assessment in accepting the plea the state still remained silent.  These are unequivocal breaches of the state's duty of disclosure. Indeed the state should have made full disclosure right from the moment that the trial court ordered a psychological examination.  Blake v Kemp, 758 F.2d 523 (11th Cir. 1985) (Judge's order of a psychiatric examination placed a duty upon the prosecution to provide the doctor and the defense with material relevant to the assessment.).

It is submitted that the state has a heightened duty of disclosure in a case such as this where a competency issue arises in a capital case and the defendant is seeking to assert his competence and dismiss appointed counsel.  The prosecutor's role as an officer of the court and as a central participant in the truth-finding function of the court is at its most acute in situations like this where the stakes are high and adversarial testing is low.  The Supreme Court has emphasized the special role played by the American prosecutor in the search for the truth.

> We have several times underscored the "special role played by the American prosecutor in the search for truth in criminal trials." Strickler, 527 U.S. 263 at 281; accord, Kyles, 514 U.S. 419 at 439-440; United States v. Bagley, 473 U.S. 667, 675, n. 6, (1985); Berger, 295 U.S. 78 at 88. *See also* Olmstead v. United

States, 277 U.S. 438, 484, (1928) (Brandeis, J. dissenting). Courts, litigants, and juries properly anticipate that "obligations [to refrain from improper methods to secure a conviction] . . . plainly rest[ing] upon the prosecuting attorney, will be faithfully observed." Berger, 295 U.S. 78 at 88. Prosecutors' dishonest conduct or unwarranted concealment should attract no judicial approbation. See Kyles, 514 U.S. 419 at 440 ("The prudence of the careful prosecutor should not . . . be discouraged.").

Banks v. Dretke, 124 S. Ct. 1256 (2004) (parallel citations omitted).

The question under Brady is then whether the suppressed information was material. The

Supreme Court recently reiterated the standard for materiality under Brady:

Kyles instructed that the materiality standard for Brady claims is met when "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." 514 U.S. 419 at 435. See also id. 514 U.S. 419 at 434-435 ("A defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict."); accord, Strickler, 527 U.S. 263 at 290. In short, Banks must show a "reasonable probability of a different result." Kyles, 514 U.S. 419 at 434(internal quotation marks omitted) (citing Bagley, 473 U.S. 667 at 678, 87 L. Ed. 2d 481, 105 S. Ct. 3375).

Banks v. Dretke, 124 S. Ct. 1256, 1276 (2004) (parallel citations ommitted).

To state the test in this case is to answer it. The provision of the information about the

psychiatric history and determinedly suicidal intent of the defendant would put the assessment of

Mr. Austin's competency and the voluntariness of his choices in a whole new light. Instead of a

competency assessment predicated upon the false proposition that Mr. Austin had no mental

health history and was simply seeking his just desserts, the court and Dr. Brown would have

been told that he had a significant and disturbing mental health history and that he was seeking

his own death by multiple means.

The results developed by Dr. Cicerello and Dr. Woods only underscore the obvious point

that this information, if it had been made known, would have fundamentally changed the course

of this case and its outcome. (Exhibits 93, 95).

In addition to the <u>Brady</u> violation in this case it is submitted that the state's failure to disclose this material information had the effect of denying Mr. Austin the effective assistance of counsel. Like the defendant in <u>Blake</u> (<u>supra</u>) the applicant alleges that actions on the part of the state made it impossible for his counsel to render meaningful assistance on the issue of his competence and the voluntariness of his constitutional waivers. In these circumstances the court's inquiry should focus:

> on the effect of the challenged actions upon the adversary process: did they so completely deprive [Austin] of the right "to require the prosecution's case to survive the crucible of meaningful adversarial testing," <u>Cronic</u>, 104 S. Ct. at 2047, as to make the outcome of the trial presumptively unreliable.

<u>Blake v Kemp</u>, 758 F.2d 523 (11th Cir. 1985).

As in <u>Blake,</u> this question must be answered in the affirmative. Counsel had sought a psychological examination to allow him to render effective assistance of counsel. The court then took over responsibility for the psychological assessment, converting it in to an *ad hoc* competency inquiry. Mr. Austin actively sought a finding of competency and misled the psychologist and the trial court as to the existence of any psychiatric history. All the while the state had evidence proving that Mr. Austin was lying, and demonstrating his severe and long-standing impairments. As in <u>Blake,</u> it makes no difference that some of the material was eventually turned over, Mr. Austin was constructively denied the assistance of counsel.

## MR. AUSTIN'S APPOINTED COUNSEL HAD AN UNDISCLOSED CONFLICT OF INTEREST

On March 21, 2001 the court appointed Marshall 'Mack' Arnold as counsel for Mr. Austin. Mr. Arnold remained counsel for Mr. Austin until October 11, 2001 when he was relieved by the Court following a *Faretta* hearing. During the time that Mr. Arnold acted as Mr.

Austin's appointed counsel Mr. Austin had a number of court hearings and, critically, an inquiry was made as to his competence and his ability to knowingly, voluntarily and intelligently waive his right to counsel.

A review of the Harris County Sheriff's Office (HCSO) files from this period reveals that Mr. Arnold was placed in a direct, actual conflict of interest at this time and actively represented interests contrary to those of his client.

The HCSO files reveal that on May 1, 2001 Mr. Arnold breached the confidence of attorney-client communications to advise Captain Hitchcock of the HCSO that Mr. Austin had threatened to kill another inmate.

> Today at approximately 12:05 PM, Marshall Arnold who is the attorney for inmate Austin came to me to discuss a threat that Austin had conveyed to him. Austin had apparently told Marshall that he (AUSTIN) was going to kill another inmate that is in the same cell. Austin described the inmate as a black male, using a racial slur.
>
> Given inmate Austin's current charge and history since incarceration, I recommend Austin be moved to an administrative separation cell and remain there while in our custody.  I have attached Marshall Arnold's business card should you need to contact him.
>
> /s/ Lanny K. Hitchcock, Captain
> 1301 Command

(Exhibit 14).   This threat resulted in Mr. Austin's removal to administrative segregation. (Exhibit 14).

It is apparent from the material in the HCSO file that Mr. Austin tried on many occasions to discover why he had been put in segregation and that these attempts included asking his attorney, Mr. Arnold.

In July 2001 Mr. Austin, in an extremely alarming letter, wrote directly to the trial court asking that he be moved out of segregation.  The letter discloses the fact that Mr. Austin was suffering serious depression from his placement in segregation and was therefore considering

suicide.  In fact, he warned the court that if left in segregation he was likely to commit suicide

before the trial.  Mr. Austin also asked that the trial and execution dates be brought forward.

> Dear Judge Cosper,
>
> I know things are pretty hectic and you've got a lot to do and I really hate to trouble you but I would like to make a special request of you.
>
> Can you get me out of seg and back out into population?  I have not had a disciplinary case since I entered the county jail and although I have a Capital murder charge I am sure there are others in population with similar charges
>
> If you cannot get me out of seg, could you please move up my court date so my stay in seg will not be prolonged?  My trial should last no longer than two or three days as I will be pleading guilty and will not put up a defense in this case. Also, as soon as I am able, or am permitted, after sentencing, I will be dropping all appeals and will request an execution date as soon as is conveniently possible. That means I do not plan on being in this world too much longer and I want to spend at least what little time I do have with what little freedom there is by being out in population.  I cannot handle prolonged isolation I have a very bad problem with depression and when I get depressed I tend to think about suicide a lot.  If I am forced to remain in seg too long I won't be around to stand trial.
>
> I would appreciate your consideration concerning my request.
>
> Thank you for your time.
>
> Sincerely,
>
> /s/
> Perry A. Austin

(CR. 16).  The letter is dated Thursday July 19, 2001, post-marked July 20, 2001 and filed on

July 27, 2001

The Court made it clear on the record that Mr. Austin's letters to the Court were being

placed on file but also forwarded to defense and prosecuting counsel.  *Faretta* hearing, RR. II-3.

Notwithstanding this, Mr. Arnold does not appear to have alerted anybody to the actual conflict

in which he found himself.

On October 6, 2001 Mr. Austin went on a hunger strike in protest of the fact that he was

improperly being detained in segregation. This resulted in a referral for psychiatric screening. (Ex. 14).

On October 15, 2001 Mr. Austin wrote a letter to the authorities at HCSO describing the history of his efforts to find out why he was in segregation and to change his status. In that letter he noted that on October 11, 2001 he asked Mr. Arnold whether Arnold had anything to do with Mr. Austin being in segregation. Mr. Austin's letter reveals that, "[Mr. Arnold] finally confessed that he had it done because of the conversation we had on May 1st during our visit." (Exhibit 14). Mr. Austin also filed an Inmate Grievance Form on that day in similar terms to his letter. (Exhibit 14).

On November 8 or 10, 2001, in response to his grievance, Mr. Austin was told by Sgt. Hawkins that he was in segregation "because he did threaten someone." (Exhibit 14).

**CLAIM VII.    Mr. Austin's right to the effective assistance of counsel was denied as a result of a conflict of interest when he was appointed counsel who after appointment secretly advocated against Mr. Austin's interests.**

Mr. Arnold was appointed counsel to Mr. Austin in March of 2001. Less than two months after his appointment Mr. Arnold disclosed privileged information to the Harris County Sheriff's Office resulting in Mr. Austin being placed into the shocking conditions of administrative segregation.

Mr. Austin then repeatedly sought to find out why he had been moved to segregation and attempted to challenge this classification without success. He sought Mr. Arnold's assistance in getting moved out of segregation but Mr. Arnold did not help and, at that stage, did not tell Mr. Austin of the disclosure of privileged information. Instead, Mr. Arnold provided Mr. Austin with a series of other explanations for why he was in segregation and why Mr. Arnold would not

be able to move him out.

Despite the fact that Mr. Austin protested the move to segregation, sought release from this confinement and described the suicidal depression it was engendering in him, Mr. Arnold did not tell Mr. Austin that it was his disclosure that had landed Mr. Austin in segregation.

Mr. Arnold, whether by statutory duty or not, actively advocated another interest against the interests of his client. This is a clear case of an actual conflict of interest.

The Texas Rules of Professional Conduct[24] provide that notwithstanding professional privilege an attorney may disclose confidential information to prevent commission of an offense:

> (7) When the lawyer has reason to believe it is necessary to do so in order to prevent the client from committing a criminal or fraudulent act.

Rule 1.05(c)(7). The Rules go on to make the disclosure of information mandatory when it is clearly established that the client is likely to commit a crime that is likely to result in death or substantial bodily harm:

> (e) When a lawyer has confidential information clearly establishing that a client is likely to commit a criminal or fraudulent act that is likely to result in death or substantial bodily harm to a person, the lawyer shall reveal confidential information to the extent revelation reasonably appears necessary to prevent the client from committing the criminal or fraudulent act.

Rule 1.05(e).

Importantly, before an attorney is bound to disclose privileged information he or she must have evidence *clearly establishing* that a client is likely to commit a serious violent offense.

Mandated or not, the disclosure of privileged attorney-client communications without the client's consent has a devastating impact on the attorney-client relationship.

I agree to the doctrine urged at the bar, as to the delicacy of the relation of client

---

[24] Tex. Disc. R. Prof. Conduct, (1989) reprinted in Tex. Gov't Code Ann. tit. 2, subtit. G, app. (Vernon Supp. 1995)(State Bar Rules art X [[section]]9)).

and attorney, and the duty of a full, frank, and free disclosure by the latter of every circumstance, which may be presumed to be material, not merely to the interests, but to the fair exercise of the judgment, of the client.

Williams v. Reed, 29 F. Cas. 1386, 1390, F. Cas. No. 17733 (No. 17,733) (CC Me. 1824); cited

with approval Mickens v. Taylor, 535 U.S. 162, 181 (U.S. 2002) (per Stevens J. dissenting);

International Business Machines Corp. v. Levin, 579 F.2d 271, 282 (3d Cir. 1978) ("full and

effective disclosure of all the relevant facts must be made and brought home to the prospective

client.").

Here, the situation was made worse by the fact that appointed counsel for Mr. Austin not

only told the Harris County Sheriff's Office that Mr. Austin intended to kill someone, causing

Mr. Austin to be placed in segregation, but failed to tell Mr. Austin about this breach of

confidence. Instead, keeping his disclosure a secret, appointed counsel purported to continue to

maintain an attorney client relationship.

The need for full and frank disclosure by an attorney to his or her client has been long

accepted and is reflected in the Texas Rules of Professional Conduct. Rule 1.03 (Attorney must

keep a client reasonably informed about the status of a matter and shall explain a matter to the

extent reasonably necessary to permit the client to make informed decisions regarding the

representation.). It is clear that an attorney may not withhold information from a client for his

own convenience or interest. Rule 1.03, Comment 4 ("A lawyer may not, however, withhold

information to serve the lawyer's own interest or convenience.").

The solution is simple and clearly mandated by the Rules of Professional Conduct. An

attorney must breach privilege and advise the authorities when his client threatens to kill another

person but counsel must tell his client that he has done this and must either withdraw or must

obtain an informed waiver from the client.

The delicacy of the attorney client relationship cannot survive the attorney becoming a snitch, even where the law requires it of him. The fundamental attributes of loyalty and zealous advocacy are necessarily impaired, if not destroyed, in a case of this sort. Mr. Arnold was placed in a position of conflict of interest between his own actions and interests and those of his client.

The Texas Rules of Professional Conduct define a conflict of interest as including those situations where representation appears to be adversely limited by the lawyer's responsibilities to another or to the lawyer's own interests.

> b) In other situations and except to the extent permitted by paragraph (c), a lawyer shall not represent a person if the representation of that person:
>
> * * * *
>
> (2) reasonably appears to be or become adversely limited by the lawyers or law firm's responsibilities to . . . a third person or by the lawyers or law firms own interests.

Mr. Austin had a constitutionally guaranteed right to conflict-free counsel. Wood v. Georgia, 450 U.S. 261, 271 (1981) ("Where a constitutional right to counsel exists, our Sixth Amendment cases hold that there is a correlative right to representation that is free from conflicts of interest.").

Where a defendant alleges a denial of his right to conflict-free counsel due to an actual conflict, he need only establish (1) an actual conflict of interest that (2) adversely affected his counsel's performance. Cuyler v. Sullivan, 446 U.S. 335, 348 (1980).

An attorney has an actual, as opposed to a potential, conflict of interest when, during the course of the representation, the attorney's and defendant's interests "diverge with respect to a material factual or legal issue or to a course of action." Winkler v. Keane, 7 F.3d 304, 307 (2d Cir. 1993) (citing Cuyler, 446 U.S. at 356 n.3 (dissent of Marshall, J.)). An actual conflict of

interest exists where the defendant "shows that his counsel actively represented conflicting interests." Cuyler, 446 U.S. at 350.

"[T]he adversarial process protected by the Sixth Amendment requires that the accused have 'counsel acting in the role of an advocate.'" United States v. Cronic, 466 U.S. 648, 656 (1984) (quoting Anders v. California, 386 U.S. 738, 743 (1967)). The advocacy must be on behalf of the client, and in the client's best interests: "It is well-settled that the Sixth Amendment right to counsel is normally satisfied only when an attorney's loyalty lies solely with his client." Commonwealth v. Duffy, 394 A.2d 965, 967 (Pa. 1978) (citing cases).

While conflicts of interest normally arise in the context of a conflict in counsel's representation of a co-defendant or a witness, "[c]ompetition between the client's interests and counsel's own interests plainly threatens [the caliber of defense services], and we have no doubt that the conflict corrupts the relationship." U.S v. Hurt, 543 F.2d 162, 166 (D.C. Cir. 1976); U.S. v. Ellison, 798 F.2d 1102, 1106-07 (7th Cir. 1986). This kind of conflict is present when the "interests of counsel . . . [are] 'inconsistent, diverse or otherwise discordant' with those of his client." Government of the Virgin Islands v. Zepp, 748 F.2d 125, 135 (3d Cir. 1984) (conflict both because counsel became a witness against defendant and because counsel's personal interest in avoiding sanction diverged with his client's interests.).

This is a clear case of an actual conflict. Whether or not it arose from an obligation imposed by law,[25] Mr. Arnold actively represented a conflicting interest when he disclosed privileged communications resulting in his client being locked down in segregation. He

---

[25] To the extent that Mr. Arnold's actions were driven by an obligation imposed upon him by law, this obligation created a structural defect in the trial where counsel continued to act for Mr. Austin, preventing appointed defense counsel from performing his institutional role of zealous advocacy. Tueros v. Greiner, 343 F.3d 587, 597 (2d Cir. 2003) (conflicts arising from actual duties are structural flaws in our adversarial system of justice that guarantees each defendant a lawyer functioning in an institutional role that permits zealous advocacy).

continued to actively represent those conflicting interests when he breached his duty to disclose his actions to Mr. Austin; when he failed to act to have Mr. Austin moved out of segregation – even though segregation was obviously increasing Mr. Austin's suicidal depression; and when he misled Mr. Austin as to the basis of his placement in administrative segregation.

Counsel in Mr. Arnold's position could advise their client of the breach of privilege. However, doing so represents a financial risk to counsel as he will almost certainly be dismissed by the client. This is another way in which Mr. Arnold's and Mr. Austin's interests diverged.

Counsel's ethical duty can obviously create a conflict that requires an informed waiver by a client before representation can continue. Where counsel's duty to fully advise a client of his legal options is impaired because he is deflected by his own ethical obligations, this will represent an actual conflict of interest. Smith v. State, 717 P.2d 402, 406 (Alaska Ct. App. 1986) (To the extent that this precluded Smith's counsel from fully advising his client of the options legally open to him, however, the concern of Smith's counsel with his own ethical and moral dilemma was squarely at odds with his duty to "conscientiously protect his client's interest, undeflected by conflicting considerations." ) Such a conflict is particularly acute where a client actually seeks aid or advice on the matter at the heart of counsel's ethical obligation. Here, Mr. Arnold was deflected from fully advising Mr. Austin of his ability to challenge the basis for his placement in segregation by his perceived ethical duty of mandatory disclosure.

Counsel must be an active advocate, pursuing his client's interests with zeal and vigor. Where counsel, out of court, expresses the view that his client is a prime candidate for the death penalty, this will represent a conflict on interest, as discussed in Holland:

> To be effective, an attorney "must play the role of an active advocate, rather than a mere friend of the court." Evitts v. Lucey, 469 U.S. 387, 394 (1985). Unless an attorney represents the interests of a client with zeal and loyalty, the adversarial system of justice cannot operate. Holland II, 876 P.2d at 359 (citing United States

v. Cronic, 466 U.S. 648, 656-57 (1984); Von Moltke v. Gillies, 332 U.S. 708, 725-26 (1948) (plurality opinion)). At the very least, this duty of loyalty requires attorneys to refrain from acting as an advocate against their clients, even in a matter unrelated to the case for which the attorney has been retained. See Holland II, 876 P.2d at 359-60.

If an attorney's loyalty is compromised because he believes that his client should be convicted or because he is influenced by a conflict in loyalties to other defendants, third parties, or the government, the law cannot tolerate the risk that the attorney will fail to subject the prosecution's case to the kind of adversarial challenge necessary to ensure that the accused receives the effective assistance of counsel as guaranteed by the Sixth Amendment.

State v. Holland, 921 P.2d 430, 435-436 (Utah, 1996) (parallel cites omitted).  In this case Mr. Austin's counsel told the Harris County Sheriff's Office that Mr. Austin was a future danger. Mr. Arnold may well have done this out of a sense of ethical obligation but what was created was an intolerable conflict as Mr. Arnold was forced to advocate against his client and disclosure and either waiver or withdrawal should have followed.

In fact, an attorney who is burdened by a conflict between his client's interests and his own sympathies to the prosecution's position is considerably worse than an attorney with loyalty to other defendants, because the interests of the state and the defendant are necessarily in opposition.

Frazer v. United States, 18 F.3d 778, 783 (9th Cir. 1994).

Counsel's performance here was unequivocally adversely affected.  Mr. Arnold's client was a patently suicidal man who made clear what every criminal defense lawyer knows, that the conditions of administrative segregation were greatly increasing his depression and his suicidal drive.  Mr. Austin was kept in segregation for the six months leading up to his competency assessment and his waiver of counsel and the conditions of his confinement obviously spurred his efforts to kill himself.  Effective counsel would have taken steps to improve the conditions of Mr. Austin's physical confinement in order to ameliorate his mental suffering and permit him to exercise rational choices.  Mr. Arnold did not do this and could not do this because of his actual

53

conflict of interest.  Had Mr. Arnold withdrawn in favor of conflict-free counsel Mr. Austin could have sought to challenge the error in the characterization of his words by Mr. Arnold.[26] Indeed, if Mr. Arnold had told Mr. Austin about his breach of privilege Mr. Austin could have sought to clarify his words with Mr. Arnold and if that didn't work, could have sought different counsel to pursue this matter.

As discussed elsewhere in this brief, Mr. Arnold's preparation was perfunctory at best and he provided no real representation for Mr. Austin during the assessment of his competency or at the *Faretta* hearings where Mr. Austin waived counsel.

In the circumstances of this case Mr. Austin was denied conflict free counsel during the critical pre-trial phase of his capital trial, including the determination of his competency and the *Faretta* hearing at which he waived the assistance of counsel.

Automatic reversal is mandated in this case because the secret snitch role adopted by Mr. Arnold is so inconsistent with Mr. Austin's right to "the Assistance of Counsel for his defence" as understood by the Sixth Amendment that Mr. Austin should be regarded as having been constructively denied counsel.  United States v. Cronic, 466 U.S. 648, 650 (1984).

If the court were to find that this matter did not rise to the level of a *Cronic* violation then, recognizing the presence of an actual conflict and the adverse effect that this had, this Court should reverse due to the denial of Mr. Austin's right to the effective assistance of counsel. Cuyler v. Sullivan, 446 U.S. 335, 348 (1980).

If the court is not satisfied that an actual conflict of interest existed then the circumstances of Mr. Arnold's representation still stand to be assessed under the general

---

[26] Mr. Austin attempted to do exactly this on a pro se basis as soon as he became aware of the basis for his detention in administrative segregation. Inmate Grievance Form filed October 15, 2001.  (03883)

ineffectiveness standard.

> The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.

Strickland v. Washington, 466 U.S. 668, 686 (1984). The *Strickland* standard requires: first, that a defendant show that counsel's performance fell below an objective standard of reasonableness; second, that but for counsel's unprofessional errors there is a probability, sufficient to undermine confidence in the outcome, that the outcome would have been different. Strickland, 466 U.S. at 687-8 and 694.

Mr. Arnold should not have reported Mr. Austin when he did. Such a report should only be made when there is a certainty and Mr. Arnold did not seek to challenge Mr. Austin on his statements or clarify if they accurately represented his intent or seek to dissuade him from such a course.

In this case Mr. Arnold violated his duty of loyalty and frankness to his client by failing to reveal his breach of confidence.[27] Tex. Rules of Prof'l Conduct, Rule 1.03; Williams v. Reed, 29 F. Cas. 1386, 1390, F. Cas. No. 17733 (No. 17,733) (CC Me. 1824). When Mr. Austin complained of the conditions of his confinement and indicated that they were exacerbating his suicidal depression Mr. Arnold misled him as to the cause of his confinement; took no action to have him moved from segregation; and, by not disclosing his own part in events, prevented Mr. Austin from effectively challenging his placement in segregation. These failings are objectively unreasonable.

Mr. Arnold took no action whatsoever to submit the state's case that Mr. Austin was competent to adversarial testing. Strickland, 466 U.S. at 688 (citing Powell v. Alabama, 287

---

[27] Prevailing norms of practice are guides to determining what is reasonable. Strickland, 466 U.S. at 688.

U.S. at 68-69) (counsel also has a duty to bring to bear such skill and knowledge as will render the trial a reliable adversarial testing process.)  His conduct allowed Mr. Austin to languish in segregation, exacerbating his suicidal depression.

If effective counsel, unencumbered by Mr. Arnold's conflict, had been appointed he or she could have advocated for the removal of Mr. Austin from segregation – something Mr. Austin was able to achieve once Mr. Arnold finally disclosed why he was being held there.  The obvious and contemporaneously stated link between the strength of Mr. Austin's suicidal depression and his confinement in segregation means that there is a probability that but for Mr. Arnold's errors the result of Mr. Austin's competency hearing could have been different.  That probability is sufficiently high in the circumstances to undermine confidence in the outcome. That probability of a different outcome also extends to the *Faretta* hearing, the acceptance of the plea of guilty and the whole of the trial.  In these circumstances, Mr. Austin's conviction and sentence should be reversed.

## APPOINTED DEFENSE COUNSEL FAILED TO PROVIDE EFFECTIVE ASSISTANCE OF COUNSEL OR OF STANDBY COUNSEL

**CLAIM VIII.** **Mr. Austin's rights under the Fifth, Sixth and Fourteenth Amendments were denied when appointed counsel failed to take any or any sufficient action in the period leading up to and during the determination of Mr. Austin's competency and the waiver of his right to counsel.**

Mr. Austin's rights to Due Process and the assistance of counsel were denied, since the failure of court-appointed counsel to take any action at all amounted to a constructive denial of counsel.  Even if Mr. Arnold's failure to investigate or test the state's case as to Mr. Austin's competency and the intelligence and voluntariness of his waiver of counsel does not rise to the

56

level of a constructive denial of counsel, it nevertheless reaches the level of ineffectiveness of counsel, mandating a retrial.

The Sixth Amendment provides criminal defendants with the right to counsel.  See Michigan v. Harvey, 494 U.S. 344, 357 (1990).  The right to counsel attaches at arraignment and continues through every "critical stage" in the criminal proceedings through direct appeal.  Id. The period between arraignment and trial is "perhaps the most critical period of the proceedings," Powell v. Alabama, 287 U.S. 45, 57 (1932).

> in addition to counsel's presence at trial, the accused is guaranteed that he need not stand alone against the State at any stage of the prosecution, formal or informal, in court or out, where counsel's absence might derogate from the accused's right to a fair trial.
>
> * * * *
>
> In sum, the principle of *Powell v. Alabama* and succeeding cases requires that we scrutinize any pretrial confrontation of the accused to determine whether the presence of his counsel is necessary to preserve the defendant's basic right to a fair trial as affected by his right meaningfully to cross-examine the witnesses against him and to have effective assistance of counsel at the trial itself. It calls upon us to analyze whether potential substantial prejudice to defendant's rights inheres in the particular confrontation and the ability of counsel to help avoid that prejudice.

United States v. Wade, 388 U.S. 218, 226 (1967).

It is axiomatic that a criminal defendant has a right to counsel at competency hearings and during the period preceding the hearing as decisions involving competency indispensibly important:

> As the Court of Appeals observed, the decision to be made regarding the proposed psychiatric evaluation is "literally a life or death matter" and is "difficult . . . even for an attorney" because it requires "a knowledge of what other evidence is available, of the particular psychiatrist's biases and predilections, [and] of possible alternative strategies at the sentencing hearing." 602 F.2d, at 708. It follows logically from our precedents that a defendant should not be forced to resolve such an important issue without "the guiding hand of counsel." *Powell v. Alabama*, supra, at 69.

Estelle v. Smith, 451 U.S. 454, 471 (1981)

The presence of counsel at a competency hearing is required to "assure fairness in the adversary criminal process." United States v. Cronic, 466 U.S. 648, 655-56 (1984).

Counsel's role during the competency stage, as at all other stages, is to put the state's evidence to "meaningful adversarial testing." Cronic, 466 U.S. at 656.  Inherent in testing the state's evidence is investigating and pursuing readily available evidence that would refute the state's claims.  An attorney may not countenance his failure to act on the defendant's behalf at a competency hearing by reference to the defendant's own desire to be found competent or counsel's own untrained opinion.

> it [is] axiomatic that the desire of a defendant whose mental faculties are in doubt to be found competent does not absolve counsel of his or her independent professional responsibility to put the government to its proof at a competency hearing when the case for competency is in serious question.

Hull v. Freeman, 932 F.2d 159, 168 (3d Cir. 1991).

Neither the lawyer's own opinion regarding the defendant's competence, nor the defendant's own desire to be found competent can justify counsel's failure to investigate and test the state's competency claims.  Id.

Mr. Arnold conducted no effective investigation into Mr. Austin's competence despite his awareness that Austin was trying to get the death penalty.

> a complete lack of pre-trial preparation puts at risk both the defendant's right to an "'ample opportunity to meet the case of the prosecution,'" id. at 685 (quoting Adams, supra, at 275), and the reliability of the adversarial testing process. See 466 U.S. at 688.

Kimmelman v. Morrison, 477 U.S. 365, 385 (1986) (citing Strickland v. Washington, 466 U.S. 668 (1984)).

Mr. Arnold first sought a psychological examination of Mr. Austin because of Mr. Austin's bizarre conduct, then failed to conduct any further investigation including even the simple task of record collection, seeking discovery from the state or interviewing to third-parties who knew Mr. Austin, such as family, prison staff, other prisoners. Indeed, the only "investigation" conducted was when Mr. Arnold was approached by Denise Lindsey, a friend of Mr. Austin's, who provided Mr. Arnold with clear evidence of Mr. Austin's suicidal and bizarre thought processes.

Mr. Arnold, then, did not participate in the process of assessing Mr. Austin's competency and without testing the state's case, acceded to a finding of competency. The failure to investigate Mr. Austin's history wholly undermines any deference that may otherwise have been given to Mr. Arnold's choices.

Following Strickland, the Fifth Circuit has identified a standard for assessing ineffectiveness claims relating to competency hearings:

> To establish a claim for ineffective assistance Jernigan must demonstrate that counsel's performance was outside a broad range of reasonable conduct and, but for counsel's ineffectiveness, the result of the competency hearing likely would have been different.

United States v. Jernigan, 20 F.3d 621, 623 (5th Cir. 1994).[28]

In Jernigan the complaint was that counsel had relied upon written reports, rather than calling the authors personally to contest the state's case. The Fifth Circuit distinguished this situation from the constructive denial of counsel that arose in Hull (supra). Jernigan, 20 F. 3d at

---

[28] It is respectfully submitted that to the extent that this formulation requires proof that the outcome of the competency hearing "likely would have been different" it is in conflict with the clear authority of the Supreme Court. In Strickland the Supreme Court expressly eschewed a test that would require a defendant to show that the outcome of the proceeding would likely have been different, favoring instead the lower threshold of reasonable probability.

623.  Here, of course, we are dealing with a situation analogous to Appel v. Horn, 250 F.3d 203, 216 (3d Cir. 2001) and Hull (supra) where counsel has failed to investigate or to test the state's case at all.

Counsel will be clearly ineffective if, as here, he fails to inquire into or request a hearing regarding competency where there were indicia of incompetence that would provide reasonable counsel with reason to doubt Mr. Austin's competency.  Jermyn v. Horn, 266 F.3d 257, 300 (3d Cir. 2001) cited with approval in Althouse v. Cockrell, 2002 U.S. Dist. LEXIS 18371 (N.D. Tex. Sept. 12, 2002).

Ineffectiveness also inheres where preliminary inquiry is inadequate to answer the question and no further investigation is conducted or where counsel is unaware of the indicia because of a failure to conduct any reasonable investigation in the circumstances.  Where a defendant seeks out a capital charge and a death sentence as Mr. Austin did and talks about his significant depression as Mr. Austin did, there can be no excuse for failing to conduct an investigation into that defendant's background.

Mr. Austin's counsel had ready access to Mr. Austin's educational records, medical history, military records, correctional records and prior criminal history, including court records. These sources would have provided meaningful testing of the superficial indications of competency.  However, defense counsel failed to present Mr. Austin's history as disclosed in those records to the court or to the court appointed psychologist, rendering the psychological examination essentially meaningless.  For instance, Mr. Austin received a general discharge from the Army and his medical records indicate problems with "frequent and severe headaches," "depression or excessive worry" and "nervous trouble." Army Medical Records, July 15, 1976. Exhibit 13.  Mr. Austin's military records further indicate that he was placed on limited duty and

prohibited from handling weapons or classified material pending psychiatric evaluation.  Army Medical Records, July 12, 1977.  Exhibit 13.  Defense counsel could have requested these medical records or simply accessed them through the court records as they were entered into evidence in Mr. Austin's earlier trial, where he entered an insanity defense.

Also readily available from the 1978 trial record is Dr. Franklin Lewis' testimony in support of Mr. Austin's insanity claim.  On December 11, 1978, Dr. Lewis testified that Mr. Austin might be suffering from "brain damage" or "brain dysfunction," neither of which could be ruled out without further testing, and diagnosed Mr. Austin as having "severe personality disturbance with schizoid thinking." Direct Examination of Dr. Franklin Lewis.  (Exhibit 17).  The Dallas County Court records also include a letter from Mr. Austin to Judge James B. Zimmerman, begging for psychiatric help: "I pleaded insanity.  I did not make that plea just to get out of going to T.D.C.  I did it because I want help and I need help.  You have Dr. Louis's [sic] report on me about my case.  I know there's something wrong with me and I don't think prison's going to help me any.  I want to go to Rusk to get help for my problem.  I'm willing to do my time in T.D.C. but I want to go to Rusk first.  I want help before its to late." (Exhibit 5).

Mr. Austin's TDCJ Health Records also contained a wealth of material that would have been invaluable in any competency assessment.  It is to be remembered that, at the 2001 *Faretta* hearing, Mr. Austin had spent more than 20 of the previous 21 years in prison.  In these circumstances, obtaining the custodial records is the only prudent course.

These are simply an example of the volumes of evidence that effective counsel would have discovered upon undertaking even a relatively cursory investigation into Mr. Austin's health and history to inform a determination of his competency.[29]

---

[29] Other examples have been detailed in this application in addressing the question of Mr. Austin's actual

Despite extensive and readily available evidence calling Mr. Austin's mental condition into doubt, Mr. Arnold failed to present this evidence to the court and to the court ordered psychologist, apparently on the basis of his own judgment that: "Mr. Austin is competent to stand trial." (RR. II-4).  While counsel is not obliged to develop frivolous arguments in favor of incompetence, see Cronic, 466 U.S. at 656 n. 19 (noting that the Sixth Amendment does not require that counsel do what is unethical or impossible), counsel is obliged to provide meaningful testing of the state's competency claims where material, such as that before Mr. Arnold, demonstrates that the defendant's competence is far from certain.  Counsel thus must act as an advocate at the competency hearing, and present relevant material evidence to the court and to the court appointed psychologist where an alternative version of the defendant's competency exists.  Certainly, before concluding that Mr. Austin, who had after all actively sought a capital charge and was actively seeking a death penalty, was competent counsel should have made reasonable inquiries.

At Mr. Austin's *Faretta* hearing Mr. Arnold asked only four questions, all of them apparently concerned with the status of Mr. Arnold's appointment. Mr. Arnold "just wanted to make sure that it's in the record that you're not requesting that Mr. Loper and I be discharged as your court appointed lawyers because of any personality conflict between you and either of us." (RR.II-16).  Mr. Arnold did not make sure that the evidence of incompetence was considered by the court.

Where counsel's actual or constructive absence from pre-trial procedures results in no adversarial testing of the state's evidence of competency, the defendant's right to a fair trial is fundamentally compromised.  See Cooper v. Oklahoma, 517 U.S. 348 (1996).  While counsel's

---

incompetence.

behavior is often analyzed under the two prongs of <u>Strickland v. Washington</u>, 466 U.S. 668 (1984), which requires that counsel's performance fall below an objective standard of reasonableness and that the defendant be prejudiced by counsel's deficient performance, situations where the defendant is actually or constructively denied counsel fall outside of the Strickland rubric and prejudice is presumed. Where no actual assistance has been provided to the defendant, the Sixth Amendment guarantee of "assistance" for the accused's "defense" has been violated and a showing of prejudice is extraneous to proving the constitutional violation. <u>Cronic</u>, 466 U.S. at 654 n. 11.

Prejudice is presumed where counsel completely failed to advocate for his client, <u>Rickman v. Bell</u>, 131 F.3d 1150, 1157 (6th Cir. 1997), where appellate counsel did nothing on the defendant's behalf. <u>Blankenship v. Johnson</u>, 118 F.3d 312, 317-18 (5th Cir. 1997), and where counsel "made no attempt to represent his client's interests." <u>Tucker v. Day</u>, 969 F.2d 155, 159 (5th Cir. 1992).

Mr. Arnold failed to provide Mr. Austin with representation prior to or during Mr. Austin's *Faretta* hearing. In fact, Mr. Arnold did nothing on Mr. Austin's behalf. After learning that Mr. Austin intended to dismiss his counsel, Mr. Arnold failed to investigate Mr. Austin's competence, failed to challenge or test the state's case and failed to challenge or test voluntariness of the waiver of counsel. Mr. Arnold then declared that he agreed with Dr. Brown's assessment that Mr. Austin was competent.

> Finally, we note that prejudice to a defendant is presumed when his counsel's performance is so deficient as to effectively constitute a denial of the right to counsel. See <u>Strickland</u>, 466 U.S. at 692. In this case, despite the strong evidence of Hull's incompetence (evidence that could presumably be presented only by counsel), Hull's trial counsel "agreed" at the conclusion of the 'competency hearing that Hull was competent to stand trial. This is essentially tantamount to "constructive denial of the assistance of counsel altogether[, which] is legally presumed to result in prejudice." Id. The order of the District Court must therefore

be reversed and the case remanded with instructions to grant the writ.

Hull v. Kyler, 190 F.3d 88, 112 (3d Cir. 1999)  See also Roberts v. Dretke, 356 F.3d 632 (5th Cir. 2004) (Failure to furnish psychiatrist with any documentation of prior mental illness.); Appel, (supra) (Counsel failed to investigate or test case for competency at all.);  Bouchillon v. Collins, 907 F.2d 589, 597 (5th Cir.1990) ("It must be a very rare circumstance indeed where a decision not to investigate would be 'reasonable' after counsel has notice of the client's history of mental problems."); Brown v. Sternes, 304 F.3d 677, 694 (7th Cir.2002) ("Where a defense attorney has received information from a reliable source that his client has had a history of psychiatric problems, but failed to adequately investigate the history, counsel failed to provide effective assistance."); Bloom v. Calderon, 132 F.3d 1267 (9th Cir.1997) (holding trial counsel ineffective for failing to present expert with readily available mitigating evidence); Clabourne v. Lewis, 64 F.3d 1373 (9th Cir.1995) (holding trial counsel ineffective for failing to adequately prepare testifying trial expert with recent mental health records which would have changed the defense expert's diagnosis, as well as state expert's diagnoses).

Even if the court finds that Mr. Austin was not constructively denied counsel, Mr. Austin was denied *effective* assistance of counsel.

The Sixth Amendment recognizes the right to assistance of counsel because it envisions counsel's playing a role that is critical to the ability of the adversarial system to produce just results.  Strickland v. Washington, 466 U.S. 668, 686 (1984). The right to counsel is not fulfilled whenever a person who happens to be a lawyer is appointed to stand beside the accused at trial, rather the Sixth Amendment right to counsel encompasses the right to effective assistance of counsel.  Id.  Counsel is ineffective when his performance falls below an objective standard of reasonableness and counsel's deficient performance prejudiced the defense. Id. at 687.

While <u>Strickland</u> teaches that the affirmative conduct of counsel is subject to deferential review, "this measure of deference must not be watered down into a disguised form of acquiescence." <u>Profitt v. Waldron</u>, 831 F.2d 1245, 1248 (5th Cir. 1987). Further, such deference afforded to counsel's "strategic" decisions is wholly inappropriate where counsel has failed to conduct a through investigation to allow a reasoned strategic judgment. <u>Wiggins v. Smith</u>, 539 U.S. 510 (2003) (finding the counsel's duty to conduct investigation firmly established and "virtually unchallengeable").

In an ineffectiveness claim regarding an assessment of competency a petitioner need not show that he was incompetent – only that there was a reasonable probability that he was incompetent, and counsel failed to inquire into that incompetency.  <u>Hull v. Kyler</u>, 190 F.3d 88, 110 (3d Cir. 1999) ("Therefore, to prove that he was prejudiced by his counsel's performance, Hull need not demonstrate that he definitely was incompetent in 1979. Rather, he must only establish that there was a reasonable probability that he was.")

> These cases unequivocally provide that a criminal defendant is entitled to adequate procedures, including the opportunity to present evidence and to cross-examine government witnesses, when his competency is at issue. . . . Under these circumstances, when a defendant's own attorney fails to effectively use the procedures to determine competency that are mandated by Supreme Court precedent, we believe that the prejudice to the possibly still-incompetent defendant is manifest.

<u>Hull v. Kyler</u>, 190 F.3d 88, 111 (3d Cir. 1999).

**CLAIM IX.**    **In violation of Mr. Austin's constitutional rights he was provided with ineffective assistance by his standby counsel who failed to urge a competency hearing or a reconsideration of the previous competency hearing when evidence emerged mandating this course.**

By letter dated August 14, 2001 Mr. Austin advised the court that he wished to proceed *pro se* with the assistance of standby counsel.  CR. 20-21.

Following a hearing on October 11, 2001 the trial court in this case granted Mr. Austin's request that he be allowed to proceed *pro se* and appointed Mr. Arnold as standby counsel.

Mr. Austin, by letter dated January 23, 2002 advised the court that he wished to proceed pro se without stand by counsel. At a hearing conducted on January 25, 2002 Mr. Austin was persuaded by the court that he was better served proceeding *pro se* with standby counsel. This is ultimately the course that Mr. Austin chose.[30] A notation reflecting the result of this hearing was made on the court's copy of Mr. Austin's letter of January 23rd. (CR. 60-61).

There is no question but that "whatever else may or may not be open to him on appeal, a defendant who elects to represent himself cannot thereafter complain that the quality of his own defense amounted to a denial of 'effective assistance of counsel.'" Faretta, 422 US at 834 n.46

However, it remains open to a defendant to challenge a conviction based upon the ineffectiveness of standby counsel not in relation to the defense presented but in relation to counsel's performance of the responsibilities of standby counsel.[31]

This contention flows from a correct understanding of the Supreme Court's holding in McKaskle v. Wiggins, 465 U.S. 168, 177 (1984). The court in McKaskle made it clear that an election to proceed *pro se* implicated two constitutional-rights – the right to the assistance of counsel and the right to present one's own defense. A defendant who by consent or request proceeds *pro se* with stand by counsel is taking advantage of both constitutional rights.[32] The

---

[30] This hearing has not been included in the record for appeal, notwithstanding Mr. Austin's designation of the appellate record. During this hearing the trial judge urged Mr. Austin to continue to proceed with Mr. Arnold as standby counsel.

[31] Importantly, this claim is narrowly expressed to cover the conduct of standby counsel as standby counsel. It is wholly separate and distinct from the consideration of hybrid representation.

[32] This understanding is consistent with the long held principle that every presumption against a waiver of constitutional rights should be entertained and such a waiver must be clear, express and unequivocal.

McKaskle court made the point that a trial court is not bound to accept this type of arrangement but where a court does so the constitutional requirement that the assistance of counsel be effective is controlling.[33]

Importantly, such an ineffectiveness claim does not revolve around the presentation of the defense at trial; that is a matter subject to the defendant's ultimate control as *pro se* counsel. The ineffectiveness that must be analyzed is the performance of standby counsel's duties in that role.  One of those central roles is as a "safety net" to ensure that a defendant receives a fair trial.[34]

The Supreme Court in McKaskle made the point that standby counsel had considerable latitude to involve himself in the conduct of a criminal trial.  With power comes responsibility and the conduct of standby counsel in this regard may be subject to review for ineffectiveness.[35]

---

[33] A trial court may insist on an all or nothing waiver of the right to the assistance of counsel but unless it does so a defendant should not be taken to have waived his right to the effective assistance of counsel in his or her role as standby counsel.

[34] See, e.g. United States v. Bertoli, 994 F.2d 1002, 1018-19 (3d Cir. 1993) (discussing two purposes of standby counsel: to insure defendant has fair trial and to allow trial court to conduct trial efficiently); State v. Ortisi, 706 A.2d 300, 308-09 (N.J. Super. Ct. App. Div. 1998) (citing Bertoli dual purpose proposition).

[35] A number of courts have expressed a willingness to conduct such a review in narrow circumstances.  People v Bloom, 774 P.2d 698 (Cal. 1989) (defendant might be able to show ineffective assistance by demonstrating that standby "counsel failed to perform competently within the limited scope of the duties assigned to or assumed by counsel."); Ali v. United States, 581 A.2d 368, 380 (D.C. 1990) (holding that pro se defendant could assert ineffective assistance of counsel claim challenging standby counsel's competency "'within the limited scope of duties assigned to or assumed by counsel'); People v Doane, 246 Cal. Rptr. 366, 372 (Ct. App. 1988) (finding that standard for standby counsel's effectiveness must reflect her small role); Jelinek v. Costello, 247 F. Supp. 2d 212, 266 (D.N.Y. 2003) (In an appropriate case, a defendant who proceeds pro se may make out a claim that he received ineffective assistance of standby counsel.)  see also Downey v. People, 25 P.3d 1200, 1204 (Colo. 2001) (en banc); State v. Bettney, 529 A.2d 1356, 1357 (Me. 1987) (per curiam)  Circuit Courts of Appeal dealing with the matter have explicitly left such a claim open even where they have dismissed particular claims before them.  Wiggins v. Procunier, 753 F.2d 1318, 1321-1322 (5th Cir. 1985) (Resolved "without reaching the difficult issue as to the possibility of an ineffective assistance of counsel claim vis-a-vis standby counsel, appointed to assist an individual in conducting his own defense."; United States v. Schmidt, 105 F.3d 82, 90 (2d Cir. 1997)  (leaving open the possibility of IAC claim against standby counsel in appropriate circumstances.); United States v. Cochrane, 985 F.2d 1027, 1029 (9th Cir. 1993) (Not deciding whether IAC generally available against standby counsel.); United States v. Pina, 844 F.2d 1, 7 (1st Cir. 1988) (Where standby counsel had been dismissed defendant was not served by counsel, standby or otherwise, so no ineffectiveness claim.)

The present case does not require this court to define the contours of the responsibility of standby counsel because the matter at hand is clear as a matter of logic.  Standby counsel remains counsel for the defendant albeit in a standby role.

It is clearly ineffective assistance for counsel to fail to inquire into or seek a hearing regarding competency where there were indicia of incompetence that would provide reasonable counsel with reason to doubt a defendant's competency.  <u>Jermyn v. Horn</u>, 266 F.3d 257, 300 (3d Cir. 2001).

As a matter of common sense, one of the inarguable roles of standby counsel who becomes aware of evidence that a defendant is incompetent is to seek to have competency examined and resolved.  This responsibility inheres in his roles as an officer of the court and his responsibility to the defendant as standby counsel.  It is a role that is consistent with the interests of justice and that in no way infringes a defendant's *Faretta* rights; counsel's role in no way extends to the manner of conduct of the defense.  If the defendant is incompetent his purported exercise of his *Faretta* rights need not be respected.[36]

Such an approach is indicated in the Supreme Court's recognition that a defendant's *Faretta* right "exists to affirm the dignity and autonomy of the accused and to allow the presentation of what may, at least occasionally, be the accused's best possible defense." <u>McKaskle</u>, 465 U.S. at 176-7

It should also be remembered that a defendant is not able to personally waive a competency hearing or represent himself at such a hearing because of the inherent contradiction

---

[36] The Court in <u>Faretta</u> acknowledged that one of the roles of standby counsel is "to represent the accused in the event that termination of the defendant's self-representation is necessary." <u>Faretta</u>, 422 U.S. at 835 n46. There could be no more poignant example of when self-representation needs to be terminated than when the defendant becomes or is discovered to be incompetent.

in having a possibly incompetent defendant represent himself. <u>Pate</u>, 383 U.S. 384. For the same reason it can hardly be suggested that a possibly incompetent defendant can represent himself on the issue of whether evidence suggesting that he is incompetent exists. This role of standby counsel falls wholly outside the scope of the rights protected by <u>Faretta</u>.

In this case, for the reasons described above, there emerged during the trial of this matter substantial evidence pointing to Mr. Austin's incompetence and the fact that his earlier competency hearing had been vitiated by inadequate and inaccurate information. In those circumstances it was ineffective for Mr. Arnold not to seek a competency hearing. Had he done so there is a reasonable probability that Mr. Austin would have been found to be incompetent.

## THE WAIVER OF COUNSEL WAS NOT KNOWING, VOLUNTARY AND INTELLIGENT

**CLAIM X.**     **Mr. Austin's rights to Due Process and to counsel as guaranteed under the Constitutions of Texas and the United States were violated when he was subjected to a capital trial without counsel without having made a competent, knowing, voluntary and intelligent waiver of counsel.**

In addition to *Dusky* competency, before allowing a defendant to waive counsel, "a trial court must satisfy itself that the waiver of his constitutional rights is knowing and voluntary." <u>Godinez v. Moran</u>, 509 U.S. 389, 400 (1993) (citing to <u>Faretta v. California</u>, 422 U.S. 806, 835 (1975)). <u>Godinez</u> explains that this additional element creates "a 'heightened' standard for... waiving the right to counsel,' but not "a heightened standard of competence." 509 U.S. at 401 (emphasis in original). The distinction is explained in a footnote:

> The focus of a competency inquiry is the defendant's mental capacity; the question is whether he has the ability to understand the proceedings... The purpose of the 'knowing and voluntary' inquiry, by contrast, is to determine whether the defendant actually does understand the significance and consequences of a particular decision and whether the decision is uncoerced.

509 U.S. at 401 n.12.[37]

Waiver of the right to counsel must be knowing, intelligent and voluntary. Johnson v. Zerbst, 304 U.S. 458 (1938). A "penetrating and comprehensive" examination must be undertaken by the trial court in order to determine the validity of any attempted waiver of counsel. Von Moltke v. Gillies, 332 U.S. 708, 724 (1948). In this examination, the purpose of the "knowing and voluntary" inquiry is to determine whether the defendant actually does understand the significance and consequences of a particular decision and whether the decision is uncoerced. Godinez v. Moran, 509 U.S. 389, 401 n.12 (1993). A waiver of counsel is intelligent where the defendant is "made aware of the dangers and disadvantages of self-representation" and the record establishes that "he knows what he is doing and his choice is made with eyes open." Faretta v. California, 422 U.S. at 835 (internal quotations omitted). The validity of a waiver of counsel is considered under the totality of the circumstances, Young v. Lockhart, 892 F.2d 1348, 1351 (8th Cir. 1989), and depends on a range of case-specific factors, including the defendant's education or sophistication, the complex or easily grasped nature of the charge, and the stage of the proceeding. See Johnson, 304 U.S. at 464.

Courts have recognized that a decision to waive the right to pursue legal remedies is involuntary if it results from duress, including conditions of confinement. See, e.g., Smith v. Armontrout, 812 F.2d 1050, 1058-59 (8th Cir. 1987) (reviewing for error the district court's determination on whether petitioner's particular conditions of confinement rendered his decision to waive appeals involuntary), cert. denied, 483 U.S. 1033 (1987); Groseclose ex rel. Harries v.

---

[37] The "knowing and voluntary" standard of Godinez is sometimes expressed as a "knowing, intelligent and voluntary" standard; though, the meaning seems to be identical. Wilkins v. Bowersox, 145 F.3rd 1006, 1011 (8th Cir. 1998).

Dutton, 594 F. Supp. 949, 961 (M.D. Tenn. 1984) ("In the judgment of this Court, the conditions of confinement inflicted on [prisoner] are so adverse that they have caused him to waive his post-conviction remedies involuntarily"); Wilkins v. Bowersox, 145 F.3d 1006, 1015 (8th Cir. 1998) (Mental and emotional problems as well as the limitations those problems might impose on his ability to make rational decisions.)

It is specifically alleged that the conditions of confinement of Mr. Austin in TDCJ fall below Eight Amendment and other legal standards and that the coercive pressure of those unlawfully harsh conditions compelled Mr. Austin to his suicidal course. Specific mention is also made in this regard to the failure to provide adequate mental health care for Mr. Austin.

Courts need to consider the mental health of a defendant in considering the validity of the waiver of counsel and as Godinez teaches, this is a distinct enquiry from mere competency and establishes a heightened standard. See United States v. Cash, 47 F.3d 1083, 1089-90 (11th Cir. 1995) (The mental health of a defendant is also a relevant consideration in assessing whether a waiver of counsel was knowing, intelligent, and voluntary); Wilkins v. Bowersox, 145 F.3d 1006, 1012 (finding mental health relevant in consideration of whether waiver is knowing, intelligent and voluntary).

In Wilkins, a seventeen-year old defendant decided to waive counsel and assist the state in seeking the death penalty. Id. The Eight Circuit found the trial court's examination of Wilkins insufficient to establish a knowing, intelligent, and voluntary waiver where the court inquired only into his youth and lack of education and did not consider his history of child abuse, drug use since kindergarten and suicidal tendencies. Id., at 1012.

> Initially, we note that the state trial court's inquiry to determine the validity of
> Wilkins' waiver of his right to counsel was not the kind of "penetrating and
> comprehensive examination" required to ensure that an accused's waiver of
> counsel is valid. Von Moltke, 332 U.S. at 724 (plurality). The court's colloquy

> with Wilkins regarding his decision to waive counsel consisted predominantly of leading questions that failed to allow Wilkins to articulate his reasoning process. While Wilkins' simple "yes" and "no" answers indicated an intention to waive his right to counsel, this does not conclusively establish that his waiver of counsel was valid.

Id.

The trial court in <u>Wilkins v Bowersox</u> was faced with a difficult situation that bears many similarities with the current case.  In considering the adequacy of the waiver colloquy the Court of Appeals emphasized the need for a truly probing enquiry that takes into account those elements of a defendant's background that may suggest mental disturbance or that the waiver is not wholly knowing, voluntary and intelligent.

> In the present case, while the state trial court briefly addressed Wilkins' youth and limited educational background, the court took no account of Wilkins' upbringing. The record is uncontroverted that Wilkins was severely abused as a child by his mother and her boyfriends, that he had a history of drug abuse, and that by the age of 10, he had been in and out of mental health facilities and had been described as having demonstrated homicidal and suicidal tendencies. Given the combination of Wilkins' young age and the record evidence of his severely troubled childhood, the state trial court's colloquy with Wilkins was far from the kind of in-depth inquiry that is necessary to ensure a valid waiver of counsel.

Id., at 1012-1013.

In  the present case there can be no serious dispute about the defendant's very distressing personal history and mental illness.  It also cannot be disputed that both the competency assessment and the waiver colloquy were vitiated by a lack of background information and misinformation.

Similarly, in <u>Schafer v. Bowersox</u>, 329 F.3d 637, 649-51 (8th Cir. 2003) the court overturned Schafer's waiver of his right to counsel.  The Court found that the trial court's colloquy fell below the constitutional minimum in warning the defendant and failed to establish a knowing, intelligent, and voluntary waiver in light of Schafer's mental illness and personality

disorder which made him prone to compulsive decision making.

The enquiry to determine whether Mr. Austin's waiver was knowing, voluntary and intelligent fell below constitutional standards and cannot be relied upon as having produced a valid waiver of counsel.

In any event, as a matter of fact clearly established by the evidence of mental illness and the coercive conditions of Mr. Austin's environment, Mr. Austin's waiver was not knowingly, voluntarily and intelligently made. Instead it was made as the product of suicidal depression, life long brain impairments and the shocking and coercive conditions of his confinement.

## THE PLEA OF GUILTY WAS NOT KNOWING VOLUNTARY AND INTELLIGENT

**CLAIM XI.**     **Mr. Austin's rights to Due Process and to trial by jury as guaranteed under the Constitutions of Texas and the United States were violated when his plea of guilty was accepted because it was not competent or voluntary.**

It is beyond dispute that a guilty plea must be both knowing and voluntary. See, e.g., Boykin v. Alabama, 395 U.S. 238 (1969); McCarthy v. United States, 394 U.S. 459, 466 (1969). "The standard was and remains whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant." North Carolina v. Alford, 400 U.S. 25 (1970). That is so because a guilty plea constitutes a waiver of three constitutional rights: the right to a jury trial, the right to confront one's accusers, and the privilege against self-incrimination. Boykin, 395 U.S. at 243.

Parke v. Raley, 506 U.S. 20, 28-29 (1992)

For the same reasons that the waiver of counsel was not a valid waiver, Mr. Austin's plea of guilty was not a valid waiver of the constitutional rights implicit in such a plea. Mr. Austin's plea of guilty was not a voluntary and knowing choice amongst the alternatives presented. Rather, it was a product of severe mental illness and the coercive conditions of his confinement.

As with the colloquy preceding the waiver of counsel, the plea colloquy was inadequate

73

to support a valid waiver in this case.  As observed in relation to competency, by this stage of the trial both the state and the trial court had even more information relating to his mental illness than at the time of the waiver of counsel.  In these circumstances a more probing enquiry, including a renewed mental health examination was called for.

The plea colloquy was also defective in that it did not create a record addressing the waiver of rights as mandated by the Supreme Court:

> Several federal constitutional rights are involved in a waiver that takes place when a plea of guilty is entered in a state criminal trial. First, is the privilege against compulsory self-incrimination guaranteed by the Fifth Amendment and applicable to the States by reason of the Fourteenth. Malloy v. Hogan, 378 U.S. 1. Second, is the right to trial by jury. Duncan v. Louisiana, 391 U.S. 145. Third, is the right to confront one's accusers. Pointer v. Texas, 380 U.S. 400. We cannot presume a waiver of these three important federal rights from a silent record.

Boykin, 395 U.S. at 243.

While it may not be necessary to parrot a particular formula of words, the record in the trial court is silent as to the waiver of rights regarding confrontation and self-incrimination and positively assures the defendant that he is not waiving his jury trial right when, of course, he was.

In these circumstances the defendant's waiver cannot be said to have been obtained knowingly and voluntarily and was obtained in violation of his due process rights.

## WITHOUT VALID WAIVER THERE WAS A DENIAL OF A JURY TRIAL

Mr. Austin was indicted on February 28, 2001.  The transcript of proceedings in this case commences at Volume II of the Reporter's Record, recording proceedings from October 11, 2001. There were in fact a number of hearings prior to this date.  However, no transcript of those proceedings appears in the record.

On October 22, 2001 the court conducted a Faretta hearing and granted Mr. Austin's motion to waive counsel and to proceed *pro se*.

74

On April 1, 2002 Austin entered a plea of guilty to the indictment and the State began the presentation of its case for death.

A jury had been selected over the course of the week of March 18, 2001. Before the jury was sworn Austin was arraigned in the absence of the jury and entered a plea of guilty to the indictment. (RR.9 at 4.)  The court confirmed with Austin that he intended to enter a plea of guilty before the jury as well.   A colloquy then ensued in which the Court conducted some enquiry as to Austin's understanding of the ramifications of a plea of guilty.

> THE COURT:  I need to give you certain admonishments before you do that.  You understand the charge against you is capital murder; is that correct?
> MR. AUSTIN:  Yes, ma'am.
> THE COURT:  You have the right to a jury trial.  The law provides that you must have a jury trial in this instance, and we are getting ready to proceed with one.  Do you understand the range of punishment that applies to someone who is found guilty of capital murder is either life imprisonment or the death penalty?
> MR. AUSTIN:  Yes, ma'am.
> THE COURT:  Has anyone reached any agreement with you to get you to enter your plea?
> MR. AUSTIN:  No, ma'am.
> THE COURT:  Has anybody promised you anything to get you to enter your plea?
> MR. AUSTIN:  No, ma'am.
> THE COURT:  Has anybody threatened you to get you to enter your plea?
> MR. AUSTIN: No, ma'am.
> THE COURT:  Are you of sound mind?
> MR. AUSTIN:  Yes, ma'am.
> THE COURT:  And, Mr. Austin, when you committed this offense, were you of sound mind?
> MR. AUSTIN:  Yes, ma'am.
> THE COURT:  Do you understand the ramifications and consequences of entering your plea of guilty?
> MR. AUSTIN:  Yes, ma'am.
> THE COURT:  Do you understand, sir, that in entering a plea of guilty to capital murder, you are essentially admitting each and every element necessary to establish your guilt for the offense of capital murder?
> MR. AUSTIN:  Yes, ma'am.
> THE COURT:  The law requires me to admonish you, Mr. Austin, that this is a felony.  Of course, a plea of guilty or no contest could result in your exclusion from admission to this country, denial of naturalization under Federal

75

law or possible deportation if you are not a United States citizen.  If you are a United States citizen, you may disregard that.

Let the record reflect that prior to this the Court has received information concerning Mr. Austin's competency and, I believe, sanity or not?

MR. ARNOLD:  I believe, Your Honor, it was just competency to stand trial.

THE COURT:  All right.  And based on that evaluation and based upon prior conversations with Mr. Austin, his persistence in entering his plea of guilty before the jury for this many months, based on that, the Court finds, Mr. Austin, that you are mentally competent to enter your plea of guilty, that you are doing so freely and voluntarily with full knowledge of the consequences.

A final question, however.  Do you understand that by entering a plea of guilty before the jury, in addition to admitting each and every element necessary to establish your guilt, that you are effectively waiving any defense that you may have?

MR. AUSTIN:  Yes, ma'am.

THE COURT:  Including a possible insanity defense if there was one to submit?

MR. AUSTIN:  Yes, ma'am.

THE COURT:  The Court, therefore, will accept the defendant's plea of guilty.

At the conclusion of this colloquy the Court stated that it accepted Austin's plea of guilty. (RR.9 at 6.)

The jury was then brought in to the court, sworn[38] and given general admonishments by the Court.  Austin was arraigned in front of the jury and entered a plea of guilty to the indictment. (RR. 9 at 15.) The Court then stated the following to the jury:

Ladies and gentlemen of the jury, the defendant has entered a plea of guilty to the offense of capital murder.  Having been fully admonished by the Court and the Court having determined that Mr. Austin is mentally competent to enter his plea of guilty and that he is entering this plea freely and voluntarily with full knowledge of the consequences, this Court has accepted his plea of guilty, that which you have just heard him enter before the jury.  At the conclusion of the trial, *the jury will be ordered by the Court to find Mr. Austin guilty of capital murder.*  The following evidence, therefore, is admitted for the purpose of aiding you, if it does aid you, in intelligently exercising your discretion regarding punishment and the punishment issues which will be submitted to you.

---

[38] "You and each of you do solemnly swear that in the case of the State of Texas against the defendant, you will a true verdict render according to the law and the evidence, so help you God." Tex. Code Crim. Proc. art. 35.22

(RR. 9 at 16) (emphasis added).  The State then presented its penalty phase case over the next two days.  On April 3, 2004 the Court charged the jury on the law.  (RR. 9 at 4.)  The charge was read to the jury and a copy was provided to the jury to take with them in to the jury room.  The charge included the following:

> Notwithstanding that, the Court, as required by law, has admonished him of the consequences.  It plainly appearing to the Court that the defendant is mentally competent, and that he makes this plea freely and voluntarily, said plea is received by the Court.  *You are instructed to find the defendant guilty of the offense of capital murder as charged in the indictment*, and assess the punishment in this cause.

(C.R. I at 70) (emphasis added).  The jury was provided with a pre-typed verdict form containing a finding of guilt and requiring only the Foreman's signature.  (C.R. I at 77.)  The Court's direction that the jury must enter a verdict of guilty was further emphasized by the state in closing argument.  (R.R. IX at 5.)

In less than ten minutes the jury returned a verdict of guilty and answers of "yes" and "No" to the two special issues.  (R.R. IX at 29; C.R . I at 77 et. seq.)

**CLAIM XII.**  **The trial court denied Mr. Austin his right to trial by jury as guaranteed by the Texas Constitution when, even though a jury trial may not be waived in a capital case in Texas, it accepted his guilty plea and directed a verdict of guilt.**

Mr. Austin had a right to jury trial that is enshrined in the Texas Constitution.  Importantly, not only is right to jury trial declared to be *inviolate*, the terms of the Constitution limit the legislature to the passage of laws needed to regulate trial by jury and to maintain its *purity:*

> § 15.  Right of trial by jury
>
> Sec. 15.  The right of trial by jury shall remain inviolate. The Legislature shall pass such laws as may be needed to regulate the same, and to maintain its purity

and efficiency. . . .

Tex. Const. Art. I § 15.  See also Tex. Code Crim. Proc. Art. 1.12.

While the Code allows for the waiver of the right to jury trial, in an ordinary felony case, a defendant cannot waive his right to trial by jury in a death case.  Tex. Code Crim. Proc. art. 1.13 (a), (b); art. 1.14 (a).

No person can be convicted of a capital felony in a trial at which the State seeks the death penalty other than by verdict of a jury duly rendered.  Tex. Code Crim. Proc. art. 1.15.

In this case, the verdict was that of the judge.  The Court provided the jury with a guilty verdict form and ordered that the foreperson sign it.  It defies reason to describe this procedure as producing a "verdict of a jury duly rendered".  A directed verdict represents an impermissible waiver by the court of the defendant's constitutionally guaranteed jury trial right.

The Texas Court of Criminal Appeals has held that a directed verdict is permissible in the case of a capital felony trial where a plea of guilty is entered before the jury.

> Appellant's claims that the judge's instructing action in a verdict deprived appellant of trial by jury and that instructed verdicts are not provided for in capital cases are also without merit. In Crawford v. State, 617 S.W.2d 925 (Tex.Cr.App. 1980), cert. denied 452 U.S. 931, 101 S. Ct. 3067, 69 L. Ed. 2d 431, reh. denied 453 U.S. 923, 101 S. Ct. 3160, 69 L. Ed. 2d 1005 (1981), the defendant pled guilty to the offense of capital murder, the trial judge directed a verdict of guilt, and the jury subsequently assessed punishment at death. We noted no fundamental error in directing the verdict of guilt in the case, nor do we find such error now. A directed verdict, therefore, is permissible in capital cases where the defendant pleads guilty, and the plea is properly accepted by the court. Furthermore, the defendant is not deprived of a trial by jury when a verdict is directed pursuant to a guilty plea since the jury receives evidence at the punishment stage and must determine whether the defendant is to receive life imprisonment or the death penalty.

Morin v. State, 682 S.W.2d 265, 269 (Tex. Crim. App. 1983)

It should, however, be recognized that Morin was a volunteer who did not seek a grant of certiorari from the U. S. Supreme Court or pursue federal habeas review.  Rehearing was denied

by the Court of Criminal Appeals on January 9, 1985 and he was executed on March 13, 1985.

The sole case relied upon by the court in Morin, Crawford v. State, 617 S.W.2d 925 (Tex.Cr.App. 1980), cert. denied 452 U.S. 931, reh. denied 453 U.S. 923 (1981), provides no real authority for the proposition that a directed verdict is permissible. The Crawford court did not address the probity of the directed verdict, merely reciting it as a part of the procedural background of the case. The denial of certiorari in that case appears to relate to a point of jury selection and the Supreme Court's decision in Witherspoon, not any consideration of directed verdicts.

It is respectfully submitted that the Court of Criminal Appeals conclusion that a directed verdict is permissible and consistent with the conduct of a constitutionally guaranteed jury trial is incorrect. The Constitutional imprecation is that the right to jury trial is inviolate and that the purity of the jury trial system will remain intact. Directed verdicts of guilt are anathema to this ideal.

It is to be remembered that even on a guilty plea the role of the jury in determining culpability is not purely ceremonial. For instance, a jury empanelled to consider punishment on a felony plea continues to have a role in rejecting the defendant's guilt on the basis of its finding that the defendant is insane. Tex. Code Crim. Proc. art. 37.13.

In truth, a plea at culpability phase followed by a directed verdict of guilt does not afford a defendant his jury trial guarantee in a capital trial. However, the Court of Criminal Appeals has held that a capital trial involving a plea and directed verdict is still a jury trial because the critical issue is for the jury to determine the special issue questions. Matchett v. State, 941 S.W.2d 922, 930-931 (Tex. Crim. App. 1996); Holland v. State, 761 S.W.2d 307, 313 (Tex. Crim. App. 1988), cert. denied, 489 U.S. 1091 (1989); Williams v. State, 674 S.W.2d 315, 319

(Tex. Crim. App. 1984).

It is respectfully submitted that the reasoning in these cases is flawed. The Texas Constitution and the Code of Criminal Procedure provide for no waiver of a jury trial in a capital case. It is not possible to allow a defendant to waive jury trial at culpability phase and still refer to the whole proceeding as a jury trial merely because the special issues are submitted to the jury. This is at least a partial waiver of jury trial and is inconsistent with the Code and Mr. Austin's jury trial guarantee. It does nothing to preserve the purity of the jury trial system and certainly does not preserve this right as inviolate. The legislature has chosen trial by jury as the sole means of determination of guilt and penalty in capital cases and this decision should be respected.

**CLAIM XIII.**   **Without a valid waiver, the trial court denied Mr. Austin his right to trial by jury as guaranteed by the Sixth and Fourteenth Amendments when it accepted Austin's plea of guilty and directed a verdict of guilt.**

The Sixth and Fourteenth Amendments accord to Mr. Austin a right to a jury trial before he can be convicted and sentenced to death.

> The Sixth Amendment provides that "in all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury . . . ." In Duncan v. Louisiana, 391 U.S. 145, 149, 20 L. Ed. 2d 491, 88 S. Ct. 1444 (1968), we found this right to trial by jury in serious criminal cases to be "fundamental to the American scheme of justice," and therefore applicable in state proceedings. The right includes, of course, as its most important element, the right to have the jury, rather than the judge, reach the requisite finding of "guilty." See Sparf v. United States, 156 U.S. 51, 105-106, 39 L. Ed. 343, 15 S. Ct. 273 (1895). Thus, although a judge may direct a verdict for the defendant if the evidence is legally insufficient to establish guilt, he may not direct a verdict for the State, no matter how overwhelming the evidence. Id. See also United States v. Martin Linen Supply Co., 430 U.S. 564, 572-573, 51 L. Ed. 2d 642, 97 S. Ct. 1349 (1977); Carpenters v. United States, 330 U.S. 395, 410, 91 L. Ed. 973, 67 S. Ct. 775 (1947).

Sullivan v. Louisiana, 508 U.S. 275, 277-278 (1993).

Waiver of the right to a jury trial is possible only where there is an express, knowing and intelligent waiver of that right. <u>Patton v United States</u>, 81 U.S. 276 (1930); <u>Boykin v. Alabama</u>, 395 U.S. 238 (1969).

There was no waiver of the jury trial right in this case, in fact, Mr. Austin was assured that the law required that a jury trial be conducted and that such a trial was about to proceed.

> You have the right to a jury trial. The law provides that you must have a jury trial in this instance, and we are getting ready to proceed with one.

(R.R. IX at 4.)

In the absence of a waiver the trial court was obliged to provide a jury trial as understood by the Federal Constitution.

A plea of guilty is inherently inconsistent with the right to a jury trial under federal jurisprudence. Federal jurisprudence holds a plea of guilty is more than a confession that admits that the accused did various acts; it is itself a conviction; nothing remains but to give judgment and determine punishment.[39] See <u>Kercheval v. United States</u>, 274 U.S. 220, 223. In this way, the concept of a guilty plea that results in a verdict rendered by a jury is impossible. A guilty plea and a jury trial on the issue of guilt are mutually exclusive for the purposes of the Sixth and Fourteenth Amendments.

Furthermore, given that the court was obliged to provide a jury trial within the terms of the Sixth Amendment, it was impermissible for the court to direct a verdict of guilty. <u>Sparf v. United States</u>, 156 U.S. 51, 105-106 (It is not competent for the court, in a criminal case, to instruct the jury peremptorily to find the accused guilty of the offence charged.); <u>United Brotherhood of Carpenters & Joiners v. United States</u>, 330 U.S. 395, 408 (1947) (A judge may

---

[39] Notably, the plea colloquy in this case did not advise Mr. Austin of this fact, describing the effect of the plea as no more than an admission to each of the elements of the offense.

not direct a verdict of guilty no matter how conclusive the evidence);  Rose v. Clark, 478 U.S.

570, 578 (1986) (Where there is a directed verdict the wrong entity judged the guilt of the

defendant);  Neder v. United States, 527 U.S. 1, 17 (1999) (Affirming the continued force of

Rose v. Clark).

By allowing the defendant to plead guilty and directing the jury to return a verdict of guilt

the court denied Austin's rights as guaranteed by the Sixth and Fourteenth Amendments.

**CLAIM XIV.** **The trial court denied Mr. Austin his right to trial by jury as guaranteed by the State and Federal Constitutions when it made findings of fact that Mr. Austin's plea was competent and voluntary when these facts were, in the circumstances, the equivalent of elements of the offense.**

Following the decision of the Supreme Court of the United States in Ring v Arizona it

has been made clear that factual findings necessary to the infliction of a death penalty are to be

treated as elements of the offense and to be determined by a jury, rather than a judge alone. Ring

v. Arizona, 536 U.S. 584, 588-589 (2002)[40]  (The Sixth Amendment does not permit a defendant

to be exposed to punishment beyond that allowed by the facts reflected in the jury verdict

alone.); Apprendi v. New Jersey, 530 U.S. 466, 499 (2000) (Scalia, J., dissenting) (All the facts

which must exist in order to subject the defendant to a legally prescribed punishment must be

found by the jury.)

When a defendant pleads not guilty there is a presumption of competence and a

presumption of sanity.  However, when a defendant pleads guilty the burden shifts and before

---

[40] The decision Ring was delivered after the verdict in this case but before the conviction and sentence were made final upon denial of the appeal.

accepting the plea there must be satisfactory proof of competence and voluntariness:

> (b)   No plea of guilty or plea of nolo contendre shall be accepted by the court unless it appears that the defendant is mentally competent and the plea is free and voluntary.

Tex. Code Crim. Proc. art. 26.13 (b).   At one time it was accepted in Texas that the determination of these factual questions should be submitted to the jury with the plea.  Harris v. State, 76 Tex. Crim. 126, 130-2 (Tex. Crim. App. 1915).  However, it was later determined that findings of competence and voluntariness of a plea should be made by the trial judge alone. Taylor v. State, 88 Tex. Crim. 470 (Tex. Crim. App. 1918).  These decisions came at a time when a defendant in Texas could only be convicted of a felony offense upon the entry of a verdict by a jury.  A short time later a procedure for the waiver of a jury trial to allow a plea before a judge alone in felony prosecutions was introduced.  Articles 10a, 11 and 12, C.C.P. 1925, as amended by Acts 1931, 42nd Leg., ch. 43, p. 65, §§ 1, 2 and 3.  Fairfield v. State, 610 S.W.2d 771, 776 (Tex. Crim. App. 1981) citing Thornton v. State, 601 S.W.2d 340 (Tex. Crim. App. 1980).  However, no waiver of jury trial is permitted in a capital case.

The logic of Taylor cannot survive the insight provided by Ring.  Given that Texas practice calls for a jury to be directed to convict upon a plea of guilty, the findings of fact necessary for the acceptance of such a plea become the equivalent of elements of the offense. Indeed, under federal jurisprudence, the acceptance of the plea is the entry of a conviction.

Here the facts reflected in the verdict actually returned by the jury (rather than directed by the judge) are insufficient to expose him to any penalty.  Mr. Austin is only exposed to a penalty by the directed finding that he was guilty of first degree murder.  This finding in turn was mandated by the trial judge's factual findings that the plea was competent and voluntary.  Such a position is inconsistent with the entrenched role of the jury in determining critical facts in

homicide cases. Ring, 536 U.S. at 599 (2002) citing  Walton v. Arizona, 497 U.S. 639, 710-711 (1990) (Stevens, J., dissenting).  The Due Process Clause guarantees that the jury will be solely responsible for the determination of guilt and this has been breached in Austin's case. United States v. Gaudin, 515 U.S. 506, 509-511 (1995); Sullivan v. Louisiana, 508 U.S. 275, 277-278, (1993); Williams v. Florida, 399 U.S. 78, 100 (1970).

A finding by the trial judge that a defendant's plea is competent and voluntary is not just tantamount to a judicial finding of each element of the offense.  It is a finding of guilt by a judge, not a jury.  This violates Mr. Austin's Due Process and jury trial guarantees.

## THE JURY IN THIS CASE WAS ACTUALLY BIASED

**CLAIM XV.**  **Mr. Austin was denied his right to a fair and impartial tribunal as a result of the unconstitutional prejudice of jurors preventing them from considering the imposition of a life sentence as an option in a case of capital murder.**

**CLAIM XVI.**  **Mr. Austin was denied his right to a fair impartial tribunal when a majority of jurors provided misleading answers as to their willingness to consider evidence in mitigation were he to be convicted of capital murder.**

*Whatever else might be said of capital punishment, it is at least clear that its imposition by a hanging jury cannot be squared with the Constitution.*

Witherspoon v. Illinois, 391 U.S. 510, 523 (1968)

*It took us longer to choose a foreperson than to decide on the death penalty.*

Ronnie Erwin, a juror in the trial of Perry Austin.  Statement of Juror Erwin.

The Sixth and Fourteenth Amendments of the Federal Constitution and Article 1, Section 10 of the Texas Constitution guarantee a criminal defendant a fair and impartial jury.

This guarantee is violated where any juror, let alone the bulk of the jury, is actually

biased against the defendant.

> In essence, the right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors. The failure to accord an accused a fair hearing violates even the minimal standards of due process. In re Oliver, 333 U.S. 257, 92 L. Ed. 682, 68 S. Ct. 499 [(1948)]; Tumey v. Ohio, 273 U.S. 510, 71 L. Ed. 749, 47 S. Ct. 437 [(1927)]. 'A fair trial in a fair tribunal is a basic requirement of due process.' In re Murchison, 349 U.S. 133, 136, 99 L. Ed. 942, 75 S. Ct. 623 [(1955)]. In the ultimate analysis, only the jury can strip a man of his liberty or his life. In the language of Lord Coke, a juror must be as 'indifferent as he stands unsworne.' Co. Litt. 155b. His verdict must be based upon the evidence developed at the trial. Cf. Thompson v. City of Louisville, 362 U.S. 199, 4 L. Ed. 2d 654, 80 S. Ct. 624 [(1960)]. This is true, regardless of the heinousness of the crime charged, the apparent guilt of the offender or the station in life which he occupies. It was so written into our law as early as 1807 by Chief Justice Marshall in 1 Burr's Trial 416 (1807). 'The theory of the law is that a juror who has formed an opinion cannot be impartial.' Reynolds v. United States, 98 U.S. 145, 155, 25 L. Ed. 244 [(1879)]."

Irvin v. Dowd, 366 U.S. 717, 721-722 (1961) (footnote omitted). See also Turner v. Louisiana, 379 U.S. 466 (1965) at 472 and n.10 (Due process alone demands that, if a jury is to be provided the defendant, regardless of whether the Sixth Amendment requires it, the jury must stand impartial and indifferent to the extent commanded by the Sixth Amendment.)

A short time later the Supreme Court directly applied the Sixth Amendment jury trial guarantee to the states, creating a further impartial jury guarantee. Duncan v. Louisiana, 391 U.S. 145 (1968) (The Fourteenth Amendment guarantees a right of jury trial in all state criminal cases which, were they tried in a federal court, would come within the Sixth Amendment's guarantee of trial by jury.)

The Sixth and Fourteenth Amendments guarantee the impartiality of a capital sentencing jury. Morgan v Illinois, 504 U.S. 719, 728 (1992).

The Supreme Court has made it clear that no death penalty imposed by a jury that contains even one juror who cannot, in good faith, consider the presence of mitigating evidence can be allowed to stand. Morgan, 504 U. S. at 735, n.8 ("the measure of a jury is taken by

reference to the impartiality of each, individual juror"); Ross v. Oklahoma, 487 U.S. 81, 85

(1988).

> A juror who will automatically vote for the death penalty in every case will fail in
> good faith to consider the evidence of aggravating and mitigating circumstances
> as the instructions require him to do. Indeed, because such a juror has already
> formed an opinion on the merits, the presence or absence of either aggravating or
> mitigating circumstances is entirely irrelevant to such a juror. Therefore, based on
> the requirement of impartiality embodied in the Due Process Clause of the
> Fourteenth Amendment, a capital defendant may challenge for cause any
> prospective juror who maintains such views. If even one such juror is empaneled
> and the death sentence is imposed, the State is disentitled to execute the sentence.

Morgan v Illinois, 504 U.S. 719, 729 (1992).

The Supreme Court has set forth a particularized test for determining whether a new trial

is required in the context of juror "dishonesty" during voir dire or on jury questionnaires. In

order to obtain a new trial, the defendant "must first demonstrate that a juror failed to answer

honestly a material question . . . and then further show that a correct response would have

provided a valid basis for a challenge for cause." McDonough Power Equip., Inc. v. Greenwood,

464 U.S. 548 (1984).

The McDonough test is now routinely applied in a criminal context and applies equally to

deliberate concealment as to innocent mistakes.

> Although in *McDonough* the juror's incorrect response in voir dire was an honest
> mistake, the test applies equally to deliberate concealment and to innocent non-
> disclosure, as our sister circuits have held. See, e.g., Zerka v. Green, 49 F.3d
> 1181, 1185 (6th Cir. 1995); United States v. Langford, 990 F.2d 65, 68 (2d Cir.
> 1993); Artis v. Hitachi Zosen Clearing, Inc., 967 F.2d 1132, 1141-42 (7th Cir.
> 1992); Burton v. Johnson, 948 F.2d 1150, 1158 (10th Cir. 1991); United States v.
> St. Clair, 855 F.2d 518, 522-23 (8th Cir. 1988); United States v. Scott, 854 F.2d
> 697, 698 (5th Cir. 1988).

Jones v. Cooper, 311 F.3d 306, 310 (4th Cir. 2002).

In addition to considerations of misleading responses by jurors, a defendant may always

bring a claim of actual bias and seek a hearing to demonstrate the existence of that bias.

> Thus, regardless of whether a juror's answer is honest or dishonest, it remains within a trial court's option, in determining whether a jury was biased, to order a post-trial hearing at which the movant has the opportunity to demonstrate actual bias or, in exceptional circumstances, that the facts are such that bias is to be inferred.  See Smith v. Phillips, 455 U.S. 209, 215-216 (1982); id., at 221-224 (O'Connor, J., concurring).

McDonogh, 464 U.S. at 556 (Blackmun, J., concurring).  The remedy for a claim of actual bias is a hearing and if bias is proven a retrial.

> This Court has long held that the remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias.

Smith v. Phillips, 455 U.S. 209, 215 (1982).

In this case Mr. Austin specifically makes claims for relief on both bases, that is, misleading responses on voir dire concealing a basis for cause challenge and actual bias.

In any event, in this case it is less important to determine whether the jurors acted deliberately or innocently in failing to disclose their unconstitutional bias in favor of the death penalty than in some cases.  This is not a case where the undisclosed information gives rise to an implied bias and the concealment of the information is used inferentially to support a finding of bias.  In this case the undisclosed information is the very fact that the juror actually possesses an unconstitutional bias.

The central thrust of this claim is that when asked at voir dire whether they could answer the special issues in such a way as to result in a life sentence each juror responded that they could and that they could consider mitigating evidence.  Each had therefore denied the existence of a bias of the sort condemned in Morgan.[41]

As demonstrated below, a number of the jurors unequivocally believed that death would

---

[41] Given the questions the jury asked and were answered there can be no suggestion that the defendant waived any claim of bias by failing to explore for partiality.  The juror's clearly answered that they were not biased.

be the only appropriate penalty were a guilty verdict returned and that this would be the only verdict they would return.  The strength of the juror's views leaves no doubt as to the effect that their views had upon their voting.  These jurors were ineligible to serve under *Morgan* because of bias.  There is also no question that had the jurors frankly answered questions about their willingness to vote for life and consider mitigation then the basis for a challenge for cause would have been made out.

**Juror William Gibbs**

In a post-conviction interview Juror Gibbs stated:

> I believe that "an eye for an eye" is correct.  I you kill someone you should face the death penalty.

> Once someone is guilty of capital murder I believe that the only appropriate penalty is the death penalty.  I do not think that there is anything that would be mitigating so that a person should not get the death sentence, this includes being insane.

> Once I heard that Perry Austin had admitted to intentionally killing a nine year old boy I was only going to vote one way - I was going to vote "yes" he was a future danger and "no" there was nothing mitigating.  I was not going to vote for anything other than the death penalty.

Statement of William Gibbs

*Juror David Condon*

> In a post-conviction interview Juror Condon stated:

> For me, if somebody is not insane and kills somebody, especially a child, the only appropriate penalty is the death penalty. Other than showing that it was an accident or the person was insane I do not think that any other considerations are relevant. If you are found guilty of capital murder you should get the death penalty.

Statement of David Condon

*Juror Ronnie Erwin*

In a post-conviction interview Juror Erwin stated:

I believe that if you are found guilty of capital murder the only appropriate penalty is the death penalty. The only thing that would make that different is if the person was insane. After Perry Austin admitted he did the murder the case was pretty simple. He wanted the death penalty and we were happy to give it to him. When we got sent to the jury room we were ready to go home. No one wanted to be the foreperson. It took us longer to choose a foreperson than to decide on the death penalty.

Statement of Ronnie Erwin

### Juror Bryan Finnegan

Ina post-conviction interview Juror Finnegan stated:

We did not deliberate very long it was about ten minutes. Everybody agreed that Austin was guilty and during the penalty phase all agreed that Perry deserved the death penalty.

I believe that once Austin was found guilty of the murder of the victim the only appropriate sentence was death in accordance with Texas law.

I believe that the prosecutors chose me to be on Austin's jury because Perry wanted to die and Perry knew with me working in law enforcement, I would sentence him to death.

I've never known another FBI agent to serve on a capital murder jury.

Statement of Juror Finnegan.

### Juror Israel Tamayo

In a post-conviction interview Juror Tamayo stated:

It only took eight or nine minutes to come to our decision.  The judge told us after sentencing that she had predicted we would take ten minutes to sentence him to death.  IT wasn't even discussed and we just went in the jury room and that was it, period.

The death penalty is especially appropriate for child killers.  I do not consider mental illness to be mitigation because it is too easy for defendants to lie and manipulate circumstances.

Statement of Juror Tamayo

**Juror Jimmy Maddox**

In a post-conviction interview juror Maddox stated:

> I believe that when somebody is found guilty of very violent murders especially
> against children and premeditated or repeated crimes the death penalty should be
> imposed.  If it is shown that a person has a serious mental illness or defect this is a
> situation where the jury should consider not imposing the death penalty.

Statement of Juror Maddox

**Juror Sharon Phillips**

> In a post-conviction interview Juror Phillips stated:

> 1. I found the experience of being on a capital jury very sad.  I was sad for the
> victim, sad for his family and sad for Perry.  Obviously he didn't grow up in the
> Cleaver family.  What's sad is that maybe he didn't have better parents, he
> probably needed some help when he was a young man.

> Nevertheless if you kill a child and know what you are doing and you are
> convicted by a jury of your peers and there's overwhelming evidence, then that's
> it, you should get the death penalty.  If, however, you don't know what you are
> doing when you commit the murder you should be taken off the streets and given
> psychiatric help for the rest of your life.

Statement of Juror Phillips

***Alternate Juror Robert Earhart***

> In a post-conviction interview alternate Juror Earhart stated:[42]

> Perry Austin pled guilty to the capital murder of a nine year old boy.  I did not
> have to vote in this case but if I had there would have been no doubt that I would
> have voted for death.

> I believe that if someone is guilty of the intentional killing of a nine year old boy,
> that the only appropriate sentence is the death penalty.  Other than someone being
> completely insane, I cannot thing of anything that I would regard as mitigating.  I
> cannot imagine voting on the two questions in the penalty phase in any way other
> than "yes" and "no" in a case where someone intentionally killed a nine year old
> boy.

---

[42] It is appreciated that actual bias on the part of an alternate juror is, of itself, no basis for relief but Juror Earhart's
reflections are included to emphasize the complete collapse of the orderly trial process in this case.

Statement of Robert Earhart

## THE PRIOR CONVICTIONS USED BY THE STATE IN PENALTY PHASE WERE UNCONSTITUTIONALLY OBTAINED

At the outset of this claim it should be noted that insufficient time and resources have been available to permit an adequate exploration of the circumstances of each of Mr. Austin's prior convictions. Nevertheless, preliminary enquiry reveals a number of issues of constitutional magnitude.

**CLAIM XVII. Mr. Austin's Due Process and Eighth Amendment rights were violated when the state relied upon prior convictions for violent and sexual offences where those convictions had been obtained unconstitutionally.**

In violation of Mr. Austin's constitutional rights the state in the penalty phase of this capital trial introduced evidence of three prior convictions, each of which was obtained unconstitutionally.

The first prior conviction was the 1978 aggravated sexual assault. This conviction is constitutionally infirm as a result of <u>Brady</u> violations and the ineffective assistance of counsel. It is also an unconstitutional conviction in as much as Mr. Austin is factually innocent of the offense; being instead not guilty by reason of insanity. The conviction was only allowed to stand because of the ineffectiveness of appellate counsel.

The psychological and psychiatric evidence developed in this habeas petition demonstrates for the first time the severe prejudice suffered by Mr. Austin as a result of counsel's ineffectiveness in the 1978 trial. Despite the opinion of psychologist, Dr. Lewis, that more testing was necessary because of the possibility of serious organic injury no further testing

91

was conducted.  Further, counsel failed to adequately investigate Mr. Austin's history and develop documentary evidence of Mr. Austin's bizarre child hood behavior and difficulties while on military caps as a dependent and then as an enlisted man.  Even the limited investigation and examination that has been conducted for the purposes of this habeas petition has disclosed reliable information regarding Mr. Austin's history and then mental functioning.

The state's mental health witness was the now infamous Dr. Grigson.  On information and belief the state were aware of substantial impeachment material available about Dr. Grigson and failed to disclose it.

Sanity was the central and only issue in this case and the jury asked to hear Dr. Lewis's testimony again.  These constitutional errors, striking as they do at the heart of the sanity question cannot be regarded as harmless.

Even if the decision of the jury in 1979 is otherwise constitutionally defensible, the fact that Mr. Austin is factually innocent makes the conviction and sentence violative of the constitution.  As the mental health evidence in this case shows, Mr. Austin has a significant cognitive impairment and a severe mood disorder.  A jury considering the 1978 offense in the light of the new evidence of Mr. Austin's innocence would not convict.

Finally, the brief filed by appellate counsel was cursory and ineffective.

The second conviction relied upon is that following on from a plea to aggravated sexual assault in relation to Jennifer Ortega.  In this case the court failed to conduct a colloquy that ensured that a knowing, voluntary and intelligent plea had been obtained in the case.  The court has also failed to preserve a record of this colloquy despite Mr. Austin's refusal to authorize the destruction of the record of the plea.  Counsel in this case also provided ineffective assistance by failing to explain to the prime suspect in a capital murder that a conviction for aggravated sexual

92

assault would be used against him should he ever be charged with capital murder.  Beyond this counsel was ineffective in failing to investigate the case adequately, including investigation into mitigating evidence such as the genuine consent of both Jennifer and her mother to the relationship and the fact that Jennifer had been in a previous relationship with an older man..

The third conviction is the aggravated assault case in the prison.  In this case, on information and belief, there was a substantial Brady violation when the state failed to disclose critical evidence in Mr. Austin's defense, including the record of death threats the TDC was aware of against Mr. Austin and his friends in the lead up to the incident.  Similarly, there was a failure to disclose evidence of staff participation in the tit for tat violence that was plaguing the Unit at that time.  The Brady violation was so pervasive as to constructively deny Mr. Austin the assistance of counsel altogether.  Mr. Austin was also denied the effective assistance of counsel due to a complete breakdown in the relationship between Mr. Austin and counsel to the point where he was constructively denied counsel.  Counsel was also ineffective in failing to conduct an adequate investigation, which would have uncovered a number of the matters detailed above.

In these circumstances it was a violation of Mr. Austin's Due Process and Eighth amendment guarantees for the state to rely upon these impugned convictions.

## THE WAIVER OF APPELLATE COUNSEL WAS NOT KNOWING VOLUNTARY AND INTELLIGENT

**CLAIM XVIII.  Mr. Austin's constitutionally guaranteed right to appellate counsel was denied when the trial court accepted a purported waiver of counsel that was not a knowing, voluntary and intelligent waiver of his right to the assistance of counsel.**

The Due Process clause of the Fourteenth Amendment guarantees appellants the right to counsel on direct appeal.  Douglas v. California, 372 U.S. 353, 355-57 (1963); Evitts v. Lucey, 469 U.S.

387, 392 (1985); Clark v. Johnson, 227 F.3d 273, 283 (5th Cir. 2000). "The Fourteenth Amendment guarantees a criminal appellant the right to counsel on a first appeal as of right." Penson v. Ohio, 488 U.S. 75, 79 (1988). The Gideon v. Wainwright right to effective assistance of counsel, and the Due Process right to appellate counsel creates a constitutional right to effective appellate counsel:

> a party whose counsel is unable to provide effective representation is in no better position than one who has no counsel at all. A first appeal as of right therefore is not adjudicated in accord with due process of law if the appellant does not have the effective assistance of an attorney.

Evitts, 469 U.S. at 397; see Gideon v. Wainwright, 372 U.S. 335, 339 (1963) (finding a constitutional right to counsel); Cuyler v. Sullivan, 446 U.S. 335, 344 (1980) (finding a constitutional right to effective counsel). Given the complexity of the appellate system, the Supreme Court has observed that the right to appeal would be "a meaningless ritual" and a "futile gesture" without effective assistance. Douglas, 372 U.S. at 358; Evits, 469 U.S. at 397. The Court has noted that:

> The need for forceful advocacy does not come to an abrupt halt as the legal proceeding moves from the trial to appellate stage. Both stages of the prosecution, although perhaps involving unique legal skills, require careful advocacy to ensure that rights are not forgone and that substantial legal and factual arguments are not inadvertently passed over.

Penson, 488 U.S. at 85.

Mr. Austin's purported waiver of appellate counsel took place on April 4, 2002 and formed a part of the same course of conduct as the waiver of trial counsel and the plea of guilty. In the same way that each of those decisions was vitiated by a lack of competence and a lack of voluntariness, the decision to waive appellate counsel is also to be set aside. Mr. Austin's decision to waive counsel was a decision of his mental illness, not a knowing and voluntary decision of his own. Ex. 95 Statement of Dr. George Woods.

Further, given the additional indicia of incompetence and involuntariness that had arisen during the course of the trial the trial court's colloquy with the defendant was insufficiently probing in the circumstances to support a constitutionally valid waiver.

## MR. AUSTIN WAS NOT COMPETENT AT THE TIME OF HIS DIRECT APPEAL

Mr. Austin's constitutionally guaranteed right to Due Process was denied when his case was submitted for direct appellate review at a time at which he was not competent. Mr. Austin's lack of competence stemmed from and was a continuation of the same lack of competence that undermined his trial. ex. 95, Report of Dr. Woods.

Competence is a continuing concept and does not cease to be a prerequisite for fairness at the point at which the jury has returned its verdict. Inherent in the recognition of a right to counsel on direct appeal is the right to be competent to take advantage of the assistance of counsel. See Rohan ex rel. Gates v. Woodward, 334 F.3d 803, 812-13 (2003); Commonwealth v. Silo, 364 A.2d 893, 894-95 (Pa. 1976); Commonwealth v. Haag, 809 A.2d 271, 299 (Pa. 2002); State v. Debra A.E. 523 N.W.2d 727, 729 (Wis. 1994); Carter v. State, 706 So.2d 873, 875 (Fla. 1997); People v. Owens, 564 N.E.2d 1184, 1187 (Ill. 1990)

## THERE WAS NO EFFECTIVE DIRECT APPELLATE REVIEW OF MR. AUSTIN'S TRIAL

*Factual Overview*

The Reporter's Record in this case is incomplete as a result of the omission of transcript of at least two critical hearings, bearing directly upon Mr. Austin's competence and the voluntariness of his waiver of counsel. As a result, the Court of Criminal Appeals did not conduct the constitutionally and statutorily mandated review of the entire record prior to affirming Mr. Austin's conviction and sentence. Had this transcript been available, the Court of

Criminal Appeals would have reversed Mr. Austin's conviction and death sentence.

Mr. Austin was convicted and sentenced to death on April 3, 2002. On April 10, 2002, pursuant to Rules 25 and 34 of the Texas Rules of Appellate Procedure, Mr. Austin timely filed a *Designation of the Clerk's Record on Appeal.* (C.R. 99-101). Mr. Austin's Designation requested, *inter alia*, that the Clerk and Court Reporter prepare as a part of the record in the appeal of this cause true and correct copies of:

> 4. All hearings held outside the presence of the jury;
> * * * *
> 6. All communications between the Trial Court and the Defendant, Counsel for the Defendant, and the Prosecutor.

(C.R. 99).

The Reporter's Record was originally due on June 6, 2002, but was not filed by this date. The Court of Criminal Appeals wrote to Linda Hacker, the Official Court Reporter, seeking either the filing of the record or a motion to extend time. (01667)

On July 1, 2002 the Court Reporter filed a *Request for Extension of Time to File Record* seeking an extension until August 30, 2002. (01666) In that request the Court Reporter observed that the record in the appeal was expected to cover approximately 2,500 pages and 14 days of testimony. The request for an extension of time was granted.

On August 27, 2002 the Court Reporter once again filed a *Request for Extension of Time to File Record,* seeking until October 30, 2002 for the filing of the Reporter's Record. In this request the Court Reporter reiterated that the record covered 14 days of testimony but refined her estimate of the length of the record to approximately 700 pages.

On October 18, 2002 the Official Court Reporter, Linda Hacker, certified the various Volumes of the Record as containing:

> a true and correct transcription of all portions of evidence and other proceedings

and requested in writing by counsel for the parties to be included in this volume of the Reporter's Record, in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

(See, for example, RR. XI-33).

The Reporter's Record filed by the Official Court Reporter consists of the following:

Vol. 1 -     Clerk's Record
Vol. 2 -     October 11, 2001 – Faretta Hearing
Vol. 3 -     March 18, 2002 – General Voir Dire
Vol. 4 -     March 19, 2002 – Individual Voir Dire
Vol. 5 -     March 20, 2002 – Individual Voir Dire
Vol. 6 -     March 21, 2002 – Individual Voir Dire
Vol. 7 -     March 21, 2002 – General Voir Dire
Vol. 8 -     March 21, 2002 – Individual Voir Dire
Vol. 9 -     April 1, 2002 – Punishment Phase
Vol. 10 -    April 2, 2002 – Punishment Phase
Vol. 11 -    April 3, 2002 – Punishment Phase
Vol. 12 -    April 4, 2002 – Appeal Hearing
Vol. 13 -    Exhibits
Vol. 14 -    Exhibits
Vol. 15 -    Exhibits

As can be observed, the Reporter's Record consists of only 9 days of testimony/hearings spread over 11 volumes.

On October 25, 2002, pursuant to Texas Code of Appellate Procedure art. 37.2, the Court of Criminal Appeals officially notified Mr. Austin that the Reporter's Record had been received and filed.  (01670)

Mr. Austin did not submit a brief and the State chose to waive its right to submit a brief. In the interests of justice and consistent with Tex. Code Crim. Proc. art. 37.071, § 2(h) the Court of Appeals accepted the case without benefit of briefs and "reviewed the entire record." The court, finding no unassigned fundamental error, affirmed the judgment of the trial court. Austin v. State, (Tex. Crim. App. April 2, 2003).

Unfortunately, due to the omission of transcript of critical hearings from the Reporter's

Record, the Court of Criminal Appeals did not review the entire record in this case and was not able to conduct a meaningful review for fundamental error.

The following table lists the court appearances as reflected in the Clerk's Record and the Reporter's Record:

| Date | Event | Clerk's Record | Reporter's Record |
|------|-------|----------------|-------------------|
| 04/25/01 | Agreed setting (?) "disp" (?) for 6/26/01<br>Defendant present | 0004 | |
| 07/13/01 | Agreed Setting of 9/12/01 for "PTMO" (Pre-Trial Motions)<br>Defendant present | 0015 | |
| 09/12/01 | Agreed Setting to 10/1/01 for "Disp"<br>Defendant not brought to court | 0022 | |
| 10/1/01 | Agreed setting to 10/11/01 for Hearing<br>Defendant present | 0023 | |
| 10/11/01 | Court Hearing - Faretta Hearing – 20 pages<br>Agreed Setting to 2/4/02 for "JTRL" and 2/1/02 for "PTCR" | 0034 | Vol. 2 |
| 01/25/02 | Agreed Setting to 3/18/02 (JTRL) and 2/27/02 (OTHR)<br>(Defendant Present) | 0039 | |
| 03/18/02 | Court Hearing - General Voir Dire – 87 pages | | Vol 3 |
| 03/19/02 | Court Hearing - Individual Voir Dire – 67 pages | | Vol 4 |
| 03/20/02 | Court Hearing - Individual Voir Dire – 91 pages | | Vol 5 |
| 03/21/02 | Court Hearing - Individual Voir Dire – 52 pages | | Vol 6 |
| 03/21/02 | Court Hearing - General Voir Dire – 55 pages | | Vol 7 |
| 03/21/02 | Court Hearing - Individual voir dire – 37 pages | | Vol 8 |
| 04/01/02 | Court Hearing - Penalty Phase | | Vol. 9 |
| 04/02/02 | Court Hearing - Penalty Phase | | Vol. 10 |
| 04/03/02 | Court Hearing - Penalty Phase | | Vol. 11 |
| 04/04/02 | Court Hearing - Appeal Hearing – 10 pages | | Vol 12 |

As can be seen, a review of the Clerk's Record reveals five court dates that are not reflected in the Reporter's Record. It is apparent from the record that at least two of these hearings involved the court's direct communications with Mr. Austin regarding his waiver of right to counsel, and were relied upon by the trial court in finding Mr. Austin competent, accepting his waiver of counsel and accepting his plea of guilty.

At the commencement of the *Faretta* hearing held on October 11, 2001 – the first hearing reflected in the Reporter's Record – the trial judge said:

> about six weeks ago... Mr. Austin was brought into chambers with the prosecution and the defense with a court reporter present and at that time Mr. Austin indicated, consistent with at least one of his letters, that he wanted to discharge his lawyers and proceed *pro se*.

(RR. II-3).

It is clear from this remark that on a date earlier than October 11, 2001 the court had conducted a substantive discussion with Mr. Austin about his decision to waive his right to counsel, and that this discussion had taken place in the presence of the Court Reporter. The Clerk's Record suggests that this hearing may have been held on October 1 or July 13; or, it may have taken place on another date altogether.

On January 23, 2002 Mr. Austin wrote a letter to the trial court indicating that he wished to dismiss Mr. Arnold as stand-by counsel. That letter is preserved in the Clerk's Record but has had added to it a holographic notation recording Mr. Austin's agreement of January 25, 2002[43], made in open court, to continue to accept Mr. Arnold as stand-by counsel. (CR. 64) Obviously, there was some form of colloquy with Mr. Austin on the question of his representation. Equally obviously, this colloquy was once again omitted from the Reporter's Record. In fact, the trial judge urged Mr. Austin to accept standby counsel and ultimately persuaded him to do so by explaining the presence of a pro forma standby counsel would make it more likely that Austin's sentence would be upheld on appeal.

The trial judge made it clear at the October 11, 2001 *Faretta* hearing that she had regard to her earlier discussion with Mr. Austin in determining that he was competent and that his

---

[43] The notation actually places the date in 2001 but this is obviously an error.

waiver was voluntary.  On April 1, 2002, on accepting Mr. Austin's plea of guilty,  the trial judge once again referenced her unrecorded prior conversations with Mr. Austin, making it clear that the hearings absent from the record influenced her decision-making.  (RR. IX–6).

A further undocumented communication is revealed by Mr. Austin's letter to the trial court of September 1, 2002.  This letter records that the trial judge advised Mr. Austin on the appropriate papers to file to hasten his execution.

> When I was sentenced in your court you had advised me to file certain motions and briefs to expedite the appeals process, otherwise it would take just as long, if not longer to attain what I am seeking.

Letter from Perry Austin to Judge Cosper, September 1, 2002.  In fact, Judge Cosper advised Mr. Austin on how to expedite his execution by filing an *Anders* brief.  (Exhibit 89).

The Reporter's Record in this cause is deficient in a number of critical respects and as a result there has been no effective appellate review of Mr. Austin's death sentence.

**CLAIM XIX.**    **The execution of the death sentence imposed upon Mr. Austin would be in violation of the Eighth Amendment to the Federal Constitution and Article 1, Section 13 of the Texas Constitution as there has not been searching appellate review of Mr. Austin's conviction and sentence of death due to critical omissions from the record as filed.**

**CLAIM XX.**    **Mr. Austin is entitled to a new trial where, despite his due diligence, critical parts of the trial record have been lost or destroyed.**

**Argument And Authorities**

The Eighth Amendment[44] mandates comprehensive direct review of capital convictions.

---

[44] The same considerations are implicated by Article 1, Section 13 of the Texas Constitution ("Excessive bail shall not be required, nor excessive fines imposed, nor cruel or unusual punishment inflicted.") and this claim references

In the absence of this meaningful review, the imposition of the death penalty is arbitrary and capricious. Gregg v. Georgia, 428 U.S. 153 (1976). To avoid running afoul of the Eighth Amendment, the death penalty must be administered "in a way that can rationally distinguish between those individuals for whom death is an appropriate sanction and those for whom it is not." Spaziano v. Florida, 468 U.S. 447, 460 (1984). Appellate review is an indispensable safeguard against such arbitrariness: "We have emphasized repeatedly the crucial role of meaningful appellate review in ensuring that the death penalty is not imposed arbitrarily or irrationally." Parker v. Dugger, 498 U.S. 308, 321 (1991). "[M]eaningful appellate review" in capital cases "serves as a check against the random or arbitrary imposition of the death penalty." Gregg, 428 U.S. at 195 (opinion of Stewart, Powell, and Stevens, JJ.); and see, e.g. Clemons v. Mississippi, 494 U.S. 738, 749 (1990) ("[T]his Court has repeatedly emphasized that meaningful appellate review of death sentences promotes reliability and consistency.").

The Supreme Court has consistently found that the constitutionality of state death penalty schemes, including Texas' own death penalty scheme, is predicated on the provision for mandatory and meaningful appellate review:

> By providing prompt judicial review of the jury's decision in a court with statewide jurisdiction, Texas has provided a means to promote the evenhanded, rational, and consistent imposition of death sentences under law. Because this system serves to assure that sentences of death will not be "wantonly" or "freakishly" imposed, it does not violate the Constitution. *Furman v. Georgia*, 408 U.S. at 310 (Stewart, J. concurring).

Jurek v. Texas, 428 U.S. 262, 276 (1976); see *Whitmore v. Arkansas*, 495 U.S. 149, 171 (Marshall, J. dissenting) (listing instances in which the constitutionality of state death penalty schemes depends upon the provision for appellate review). Considering Florida's death penalty

---

both.

scheme, the Court found it crucial that the risk that "the death penalty will... be imposed in an arbitrary or capricious manner... is minimized by Florida's appellate review system." <u>Proffitt v. Florida</u>, 428 U.S. 242, 253; <u>and see</u> <u>Dobbert v. Florida</u>, 432 U.S. 282, 295 (1977). In allowing for the resumption of the death penalty in Georgia, the *Gregg* court observed that "an important aspect of the new Georgia legislative scheme... is its provision for appellate review . . . in every case in which the death penalty is imposed." <u>Gregg v. Georgia</u>, 428 U.S. 153 at 211; <u>see also</u> <u>McCleskey v. Kemp</u>, 481 U.S. 279, 303 (1987) ("the Georgia system adds 'an important additional safeguard against arbitrariness and caprice' in a provision for automatic appeal of a death sentence to the State Supreme Court."); <u>Zant v. Stephens</u>, 462 U.S. 862, 884 (1983) ("Our decision in this case depends in part on the existence of an important procedural safeguard, the mandatory appellate review of each death sentence by the Georgia Supreme Court to avoid arbitrariness and to assure proportionality.").

Just as the death penalty cannot be constitutional under the Eighth Amendment without meaningful appellate review, no constitutionally effective review can be undertaken when the trial record is incomplete as to the critical issue of the competency and voluntariness of a waiver of counsel. Indeed, the Supreme Court has held that, where plain error – the federal equivalent of Texas' fundamental error – is alleged, "a reviewing court cannot properly evaluate a case except by viewing such a claim against the entire record." <u>U.S. v. Young</u>, 470 U.S. 1, 16 (1985). In <u>Gardner v. Florida</u>, 470 U.S. 349 (1977) the Court vacated a Florida death sentence, holding that a denial of due process had occurred when a portion of the presentencing report, relied upon by the judge when he sentenced the defendant to death, was not provided to the Florida Supreme Court on appeal: "Even if it were permissible to withhold a portion of the report from a defendant, and even from defense counsel, pursuant to an express finding of good cause for

nondisclosure, it would nevertheless be necessary to make the full report a part of the record to be reviewed on appeal" Id at 361 . See also Parker v Dugger, 498 U.S. 308, 321 (1991) ("It cannot be gainsaid that meaningful appellate review requires that the appellate court consider the defendant's actual record.").

Justice Frankfurter is the author of an important concurrence that has come to stand for the principle that meaningful appellate review demands review of the "entire record of the proceedings": "In reviewing criminal cases, it is particularly important for appellate courts to re-live the whole trial imaginatively and not to extract from episodes in isolation abstract questions of evidence and procedure." Johnson v. U.S. 318 U.S. 189, 202 (1943) (Frankfurter, J. concurring). *And see, e.g.* U.S. v. Dweck, 913 F.2d 365, 370 (7th Cir. 1990) (quoting from Johnson); Beets v. Iowa Dep't of Corrections Servs. 164 F.3d 1131 (8th Cir. 1999) (same).

All federal circuit court of appeals have insisted that meaningful appellate review, particularly where plain error is alleged, must include an examination of the entire record. *See* U.S. v. Joyner, 191 F.3d 47, 55 (1st Cir. 1999) ("We must consider the likely impact the prosecutor's remarks had on the jury in light of the entire record, including the closing argument presented by the defense"); U.S. v. Salameh, 152 F.3d 88, 128 (2d Cir. 1998) ("Reversal for judicial bias is appropriate only where [there has been] an examination of the entire record"); U.S. v. Graham, 758 F.2d 879, 883 (3d Cir. 1985) ("The determination of whether plain error has occurred... is to be made by the reviewing court on a case-by-case basis, upon review of the entire record"); U.S. v. Cedelle, 89 F.3d 181, 185 (4th Cir. 1996) ("The court does not view the error in isolation, but rather by viewing it against the entire record"); U.S. v. Rodriguez, 43 F.3d 117, 123 (5th Cir. 1995) ("An error is harmless if the reviewing court is sure, after viewing the entire record, that the error did not influence the jury or had a very slight effect on its verdict.").

Texas law encodes the constitutional requirement of meaningful appellate review for capital sentences. Death sentences "shall be subject to automatic review by the Court of Criminal Appeals," Tex. Code Crim. Proc. art. 37.071, § 2(h). Appellate review must be review of the entire record. Even in ordinary felony cases, Texas' Rules of Appellate Procedure mandate a new trial where there is a loss or destruction of even part of the record:

> Rule 34.6(f) is a relatively new rule, but the principles that brought it into being are not. It has a predecessor in the former Rules of Appellate Procedure and more than one predecessor within former versions of the Code of Criminal Procedure. We have noted before that the cases under former versions, including Article 40.09 of the Code of Criminal Procedure, are still helpful and that the principles underlying these former versions apply to the newer rules. See Gomez v. State, 962 S.W.2d 572, 574 (Tex. Crim. App. 1998); Gibbs v. State, 819 S.W.2d 821, 828 (Tex. Crim. App. 1991).
>
> The Rule applies whether we are faced with the loss or destruction of the entire record or only a portion of the record. See, e.g. Harris v. State, 790 S.W.2d 568, 574 (Tex. Crim. App. 1989) (pretrial motion); Austell v. State, 638 S.W.2d 888, 890 (Tex. Crim. App. 1982) (voir dire examination); Gamble v. State, 590 S.W.2d 507, 509 (Tex. Crim. App. 1979) (final arguments); Hartgraves v. State, 374 S.W.2d 888, 890 (Tex. Crim. App. 1964) (hearing on motion for new trial). We have said that "the circumstances in such cases should be viewed from the appellant's standpoint, and any reasonable doubt resolved in favor of the appellant." Gamble, 590 S.W.2d at 508 (citing Young v. State, 146 Tex. Crim. 220, 222, 172 S.W.2d 500, 501 (1943); Lamkin v. State, 138 Tex. Crim. 311, 317, 136 S.W.2d 225, 228 (1940)). Further, the unavailability of the record through no fault of the appellant is not immune from a harm analysis. The provision in the rule that the appellant show that the missing portion of the record is necessary to her appeal is itself a harm analysis. Issac v. State, 989 S.W.2d 754, 757 (Tex. Crim. App. 1999)

Routier v. State, 112 S.W.3d 554, 570-571 (Tex. Crim. App. 2003).

The weighty public policy considerations reflected in this insistence on a complete record for appellate review have even more gravity when the proceeding to be reviewed results in a sentence of death. The Supreme Court has long recognized the need for heightened procedural safeguards where life is at stake. Well before the Court established the right to counsel in all felony cases, Gideon v. Wainwright, 372 U.S. 335 (1963), it recognized that right in capital

cases, <u>Powell v. Alabama</u>, 287 U.S. 45, 71-72 (1932).  Time and again the Court has condemned procedures in capital cases that might be completely acceptable in an ordinary case.  See, e. g. <u>Bullington v. Missouri</u>, 451 U.S. 430 (1981);  <u>Beck v. Alabama</u>, 447 U.S. 625 (1980); <u>Green v. Georgia</u>, 442 U.S. 95 (1979) (per curiam);  <u>Lockett v. Ohio</u>, 438 U.S. 586 (1978);  <u>Gardner v. Florida</u>, 430 U.S. 349 (1977); <u>Woodson v. North Carolina</u>, 428 U.S. 280 (1976).   These decisions reflect an appreciation of the fundamental fact that death is different.[45]  It follows that the Texas Rule providing for retrial where the record is incomplete on appeal should be enforced even more stringently where life and death hang in the balance.

In considering the predecessor provisions to the current Rules governing preparation of the record for appeal.  Court of Criminal Appeals Justice Clinton referenced Supreme Court jurisprudence in <u>Furman</u> and <u>Jurek</u> before emphasizing the public policy interest in a review of the *entire* record in capital cases.

> That this court have before it the entire record in a capital case serves a public policy which considers assuring evenhanded imposition of the ultimate penalty as important, if not more so, than faulting the one condemned for inability to demonstrate on appeal how an error resulted in disadvantage

<u>McGee v. State</u>, 711 S.W.2d 257, 260 (Tex. Crim. App. 1986) (Clinton, J. concurring).

The constitutional requirement of effective appellate review in capital cases has not been met in this case.  The interests of public policy demand searching appellate review to confirm the

---

[45]     The Supreme Court has also consistently required a heightened standard of fact-finding in capital cases because of the dire consequences for the defendant and the community.  <u>Ford v. Wainwright</u>, 477 U.S. 399, 411 (1986) ("in capital proceedings generally, this Court has demanded that fact-finding procedures aspire to a heightened standard of reliability") (citing, inter alia, <u>Spaziano v. Florida</u>, 468 U.S. 447, 456 (1984), <u>Woodson v. North Carolina</u>, 428 U.S. 280, 305 (1976) (opinion of Stewart, Powell, and Stevens, JJ.)); see also, <u>Caldwell v. Mississippi</u>, 472 U.S. 320, 323 (1985); <u>Simmons v. South Carolina</u>, 512 U.S. 154, 172 (1994) (opinion of Souter, O'Connor, Ginsburg, JJ.) ("The Eighth Amendment . . . imposes a heightened standard for reliability"); <u>Satterwhite v. Texas</u>, 486 U.S. 249, 263 (1988) (Brennan, Marshall, Blackmun, JJ. concurring) ("[T]he difference of death from all other punishments requires a correspondingly greater degree of scrutiny.... Because of this heightened concern for reliability, "time and again the Court has condemned procedures in capital cases that might be completely acceptable in an ordinary case.").

probity of allowing Mr. Austin to stand to trial, and to represent himself, given his mental state. Knowing and intelligent waiver of the right to counsel is inherent in the assertion of the right to self-representation and must be affirmatively reflected in the record. Martin v. State, 630 S.W.2d 925, 956 (1982) (Davis, J. concurring).   A reviewing court's examination of a defendant's knowing and intelligent waiver of his right to counsel must involve an examination of the whole of the defendant's words and actions on this subject and the whole of the explanations and qualifications presented to him by counsel and the trial court.  These matters are so fundamental as to represent structural error, not amenable to harmless error analysis.  The missing portions of transcript are directly relevant to these questions.

The question here is one of constitutional, rather than statutory dimensions.  Even were a constitutional question not at stake, however, Mr. Austin would be entitled to a new trial under the terms of the Rules of Appellate Procedure, art. 34.6(f):

First, Mr. Austin timely requested a reporter's record. Art. 34.6(f)(1).

Second, without Mr. Austin's fault a significant portion of the recording has been lost, destroyed or is inaudible. Art. 34.6(f)(2).

Third, the lost, destroyed or inaudible portion is necessary to the appeal's resolution.  Art. 34.6(f)(3).

Fourth, the missing portion cannot be replaced by agreement of the parties.  Art. 34.6(f)(4).

Mr. Austin timely filed a designation of the record seeking to have the court reporter transcribe the relevant material.  Due diligence requires no more.  See Bond v. State, 694 S.W.2d 622, 623 (Tex App. Beaumont 1985, pet. ref'd) (citing cases standing for the proposition that defendant need be diligent only in requesting the transcription of the record.  When, through no

fault of his own, the defendant is deprived of the record, an appellate court cannot affirm the conviction).

Having designated the record, Mr. Austin received a notice from the Clerk of the Court of Appeal certifying that the record had been prepared in accordance with the Court of Appeal's order on the preparation of the record. Code of Appellate Procedure art. 37.2. In these circumstances, particularly as a *pro se* defendant, Mr. Austin cannot be faulted for not raising the error before now.

In addition to his constitutional right to have an appellate court review the entirety of his trial record, Mr. Austin had a statutory right to a complete and certified record, in compliance with his request for trial records. Texas Code App. Proc. art. 37.2. Here, the clerk erroneously certified an incomplete record for appellate review. This error foreclosed the searching review mandated by <u>Furman</u> and its progeny as a protection against caprice and arbitrariness, and deprived Mr. Austin of his statutory rights.

## THE COMPLETE ABSENCE OF ANY DEFENSE HAS PRODUCED A SENTENCE THAT IS ARBITRARY AND UNRELIABLE

**CLAIM XXI.** **The death penalty imposed upon Mr. Austin is violative of the Fifth, Sixth, Eighth and Fourteenth Amendments to the Federal Constitution and the corresponding provisions of the Texas Constitution where the trial court permitted Mr. Austin to represent himself with the express intention of presenting no mitigation evidence and seeking the death penalty thus denying the defendant and the community a regularly applied, fair, and non-arbitrary capital-sentencing proceeding conducted before a jury.**

**CLAIM XXII.** **The death penalty imposed upon Mr. Austin is violative of the Fifth, Sixth, Eighth and Fourteenth Amendments to the Federal**

**Constitution and the corresponding provisions of the Texas Constitution where the presentation of no defense at all has prevented the conduct of a constitutionally mandated proportionality review.**

## Argument and Authorities

The Constitution requires heightened standards of reliability in death cases and a death sentence imposed in the absence of such standards of reliability will be unconstitutional. In particular, the court has jealously guarded the need for an individualized consideration of mitigation and sentence.

The United States Supreme Court in Furman v. Georgia, 408 U.S. 238 (1972) decided that existing death penalty statutes violated the Eighth Amendment's ban on cruel and unusual punishment. Justice White aptly summed up the problem with the death penalty statutes as they existed in 1972, when he wrote that they lacked a "meaningful basis for distinguishing the few cases in which it is imposed from the many cases in which it is not." 408 U.S. at 313 (White, J. concurring). A few years later, the Court in Gregg v. Georgia, 428 U.S. 153 (1976) approved Georgia's revised death penalty statute which created a separate sentencing proceeding where the finder of fact weighs aggravating and mitigating circumstances to determine whether death is the appropriate penalty. In particular, the consideration of aggravating and mitigating circumstances serves an important function by channeling jury discretion. Gregg, 428 U.S. at 197 (Stewart, J., for the plurality).

The presentation of both aggravating and mitigating circumstances is necessary for the jury to make an individualized determination that the death penalty is the appropriate penalty. Eddings v. Oklahoma, 455 U.S. 104, 110-12, 71 L. Ed. 2d 1, 102 S. Ct. 869 (1982). Without this critical information, the jury cannot make an informed, reliable determination. The Court has repeatedly recognized the importance of the presentation of mitigating evidence during the sentencing phase of a capital case. See Skipper v. South Carolina, 476 U.S. 1, 90 L. Ed. 2d 1, 106 S. Ct. 1669 (1986) (holding that capital defendant had right to present all relevant mitigating evidence); Lockett v. Ohio, 438 U.S. 586, 606, 57 L. Ed. 2d 973, 98 S. Ct. 2954 (1978) (overturning Ohio's death penalty law which allowed consideration of only three types of mitigating evidence).

Indeed, withholding mitigating evidence undermines the jury's ability to consider the pivotal question it is supposed to consider during its deliberations:

State v. Dodd, 120 N.W.2d 1, 41 (Wash. 1992) (Utter J, dissenting).

Mr. Austin sought to represent himself expressly so that he could put on no defense; not as an exercise in reverse psychology or some other tactic but in an effort to ensure that no defense would be presented, that no adversarial proceeding at all would be conducted and that he would be executed.  As a result of his suicidal depression Mr. Austin pursued a death wish that mounted a direct attack on our community's constitutionally supported interest in an adversarial trial system.  In violation of the constitution, the trial court allowed that attack to succeed.

> The system of criminal justice should not be available as an instrument of self-destruction.

Faretta v. California, 422 U.S. 806, 840 (1975) (dissent of Burger, C.J., joined by Blackmun & Rehnquist, JJ.).

This is not a case in which a defendant's right to present his own defense is implicated. It is a case in which the community's Eighth Amendment interest in avoiding the arbitrary and capricious imposition of the death penalty is implicated and where there is no countervailing constitutionally protected right vested in the defendant.

There may be a constitutionally protected right to defend oneself but there is no constitutionally protected right to state assisted suicide.[46]

In Faretta the Supreme Court made it clear from the outset that the question it was considering was whether a defendant had a right to *conduct a defense*:

---

[46] V.T.C.A. Penal Code § 22.08 criminalizes aiding in suicide: (a) A person commits an offense if, with intent to promote or assist the commission of suicide by another, he aids or attempts to aid the other to commit or attempt to commit suicide.  An offense under this section is a Class C misdemeanor unless the actor's conduct causes suicide or attempted suicide that results in serious bodily injury, in which event the offense is a state jail felony. V.T.C.A. 22.08(b).

Placing poison in the mouth of a person attempting to commit suicide is murder, rather than assisting in suicide. Aven v. State, 277 S.W. 1080 (Cr. App. 1995).  Euthanasia or mercy killing is considered murder in the state of Texas.  Flores v. State, 920 S.W.2d 347, 353 (1996).  Thus, this section encompasses action which indirectly contributes to another's voluntary suicide, and does not include action on part of an accused which directly causes the death of another, even if the action was undertaken at the request of the deceased.  Such action would be murder.

the question is whether a State may constitutionally hale a person into its criminal courts and there force a lawyer upon him, even when he insists that he wants to conduct his own defense.

Faretta v. California, 422 U.S. 806, 807 (1975).

In Faretta the Court reviewed a long line of cases upholding the right of self-representation but each referred to the right to conduct one's own *defense*. None of the cases there discussed involved an abandonment of the adversarial process and the desire to have *no strategy* and *no defense* in a capital case. Indeed the entire language of the court in Faretta emphasizes the right to make one's own defense. What the right acknowledged in Faretta prohibits is having stand-by counsel "make or substantially interfere with any significant tactical decisions." McKaskle v. Wiggins, 465 U.S. 168, 178 (1984).

It is the right to defend oneself, and even to defend oneself poorly, that is guaranteed by the Sixth Amendment. But the Constitution and the Bill of Rights guarantee minimum standards of procedure and substance not just for the good of the individual but for the good of the society as a whole.

A prisoner has the right to defend himself because it is he who will suffer the consequences of failure and a respect for an individual's choice as to how to defend himself must be honored out of "that respect for the individual which is the lifeblood of the law." Faretta, 422 U.S. at 819-820 ("The right to is given directly to the accused; for it is he who suffers the consequences if the defense fails.") This does not mean, however, that as a community we surrender control over the integrity of our justice system.

In United States v. Davis, 285 F.3d 378 (5th Cir. 2002) the Fifth Circuit was required to consider the case of a prisoner who, as a part of his defense strategy, wished to offer no

---

Goodin v. State, 726 S.W.2d 956 (App. 2 Dist. 1987).

traditional mitigation evidence.  The Court ruled that the appointment of independent amicus counsel to present mitigation evidence was inappropriate "when that appointment will yield a presentation to the jury that directly contradicts the approach undertaken by the defendant." Davis, 285 F.3d at 381

Critical to the Fifth Circuit's resolution of the case was the finding that Davis was *defending* himself.  The Court found that

> Davis has indicated that he *intends to employ an admittedly risky strategy* during the penalty phase. Instead of presenting traditional mitigating evidence, he intends to attack the strength of the government's case as to his guilt. *This is a specific tactical decision.* Davis has made it quite clear that he does not want any traditional mitigating evidence to be presented on his behalf. Nevertheless, the district court has appointed the independent counsel specifically for the purpose of presenting a full penalty phase defense which will utilize traditional mitigating factors. As such, *Davis's strategy* is in direct conflict with the independent counsel's approach. Because Davis's right to self-representation encompasses the *right to direct trial strategy*, the district court's decision to impose an independent counsel into these proceedings is overturned.

Id. at 384-385 (footnotes omitted) (emphasis added).

The Fifth Circuit distinguished Davis from the case of a defendant with a death wish by noting that the Davis defendant was proposing to utilize his residual doubt argument and further that he envisaged a strategy in which he would attract a higher standard of guilt phase review if a death penalty were imposed.  Id. at 384 n.6.  Critically, Davis had a strategy, however bad it may have been, and that strategy did represent *a defense.*

In Mr. Austin's case he explicitly stated that he did not want a defense and did not want any strategy: "As far as I'm concerned, there will be no strategy." RR. II-14.  See also CR. 5-6, 16, 18-19, 20-21, 58-59).  In this unusual and narrow situation, the logic in Davis is not apposite.

The adversarial criminal trial process is not simply a personal right of a defendant.  It represents a critical component of our democratic system of government and our civil society.

As much as it may value a defendant's autonomy, society's interest in the adversarial trial process extends well beyond the defendant's right to present the defense of his choosing.

> Nor is it accurate to suggest, as the Court seems to later in its opinion, that the quality of his representation at trial is a matter with which only the accused is legitimately concerned. See ante, at 834. Although we have adopted an adversary system of criminal justice, see Gideon v. Wainwright, supra, the prosecution is more than an ordinary litigant, and the trial judge is not simply an automaton who insures that technical rules are adhered to. Both are charged with the duty of insuring that justice, in the broadest sense of that term, is achieved in every criminal trial. See Brady v. Maryland, 373 U.S. 83, 87, and n. 2 (1963); Berger v. U.S., 295 U.S. 78, 88 (1935). That goal is ill-served, and the integrity of and public confidence in the system are undermined, when an easy conviction is obtained due to the defendant's ill-advised decision to waive counsel. The damage thus inflicted is not mitigated by the lame explanation that the defendant simply availed himself of the "freedom" "to go to jail under his own banner...." U.S. ex rel. Maldonado v. Denno, 348 F. 2d 12, 15 (CA2 1965).

Faretta v. California, 422 U.S. 806, 839-840 (1975) (per Burger CJ dissenting); see also Ake v. Oklahoma, 470 U.S. 68, 83 (1985) (the interests of the State in an accurate capital proceeding are substantial.).

Even when a prisoner does seek to present a defense, the right to self-representation is not unalloyed and not inviolate.   Illinois v. Allen, 397 U.S. 337 (1970) (The trial judge may terminate self-representation by a defendant who deliberately engages in serious and obstructionist misconduct.)  The Court retains the right, in protection of the trial process, to force representation upon a defendant.

In short, even if the Sixth Amendment right to conduct one's own defense may ordinarily be said to triumph over the Eighth Amendment's prohibition on arbitrarily and capriciously imposed death penalties, where a prisoner conducts absolutely no defense then the sabotage of the adversarial process must yield to the Eighth Amendment's prohibition against the arbitrary imposition of capital punishment.

This is the position reached after careful consideration by the courts of New Jersey.  State

v. Koedatich, 112 N.J. 225, 548 A.2d 939 (1988), cert. denied, 488 U.S. 1017 (1989).

A similar view has been entertained by the Supreme Court of Georgia:

In view of the concern for reliability inherent in our death-penalty procedures, including the automatic review by this court, see O.C.G.A. §§ 17-10-2; 17-10-30 and 17-10-35, the trial court in a case like this may have an obligation to conduct an independent investigation into the possible existence of evidence in mitigation.

Morrison v. State, 258 Ga. 683, 687 (1988).

The Florida Supreme Court, concerned at the need for accuracy and the creation of an appropriate record for proportionality review has also ordered that where a defendant presents no evidence in mitigation the court must do one of the following: order a comprehensive PSI and call witnesses where there is significant mitigation; appoint counsel to present mitigation evidence; or, use stand-by counsel for this purpose. Muhammad v. State, 782 So. 2d 343 (Fla. 2001).

Texas lack's Florida's provision for a pre-sentencing report, and there is no systemic independent voice providing information upon which the sentencer's discretion can rely. Here, where standby counsel fails to play his proper role, the ensuring complete failure to defend a capital case thwarts the proportionality review that is so fundamental to the constitutionality of capital sentencing schemes.


## MR. AUSTIN IS INNOCENT OF THE OFFENSE FOR WHICH HE WAS CONVICTED AND SENTENCED TO DEATH


**CLAIM XXIII. Mr. Austin is entitled to relief based upon the fact that new evidence shows that he is unquestionably innocent of the offense for which he was convicted and sentenced to death**

Mr. Austin is innocent of the capital murder of David Kazmouz, the offense for which he stands convicted and sentenced to death.

> Our system fails every time any time an innocent person is convicted, no matter how meticulously the procedural requirements governing fair trials are followed. That failure is even more tragic when an innocent person is sentenced to a prison term ... . [W]e will not elevate form so highly over substance that fundamental justice is sacrificed.

State v. Thomas, 586 A.2d 250, 253-54 (N.J. Super. Ct. App. Div. 1991); accord Commonwealth v. Brison, 618 A.2d 420, 424 (Pa. Super. Ct. 1992); Sewell v. State, 592 N.E.2d 705, 707 (Ind. Ct. App. Dist. 3 1992).

The Supreme Court held in Robinson v. California, 370 U.S. 660 (1962), that "[e]ven one day in prison would be cruel and unusual punishment for the 'crime' of having a common cold." Id. at 667; and see Herrera v. Collins, 506 U.S. 390, 398 (1993) ("The central purpose of any system of criminal justice is to convict the guilty and free the innocent."). One might argue that a person with the common cold might potentially be infectious: the wholly innocent person is not even guilty of a hypothetical offense. Pottinger v. City of Miami, 810 F.Supp. 1551, 1565 (S.D.Fla. 1992) (a person "may not be convicted under the Eighth Amendment" of "innocent conduct"), remanded in part on other grounds, 40 F.3d 1155 (11th Cir. 1994).

Actual innocence is clearly understood by the Court of Criminal Appeals to represent a free-standing claim for relief under the Due Process clause of the Fourteenth Amendment. Ex parte Franklin, 72 S.W.3d 671, 675 (Tex. Crim. App. 2002); Ex parte Elizondo, 947 S.W.2d 202, 208 (Tex. Crim. App. 1996). Notwithstanding the position taken by the Fifth Circuit on this issue, it is submitted that the correct reading of Herrera is to allow relief from execution upon a

truly persuasive showing of innocence.[47] Actual innocence will also act as a doorway allowing a petitioner to reach the merits of a claim that may otherwise be procedurally barred. Schlup v. Delo, 513 U.S. 298 (1995).

This case relies upon the evidence of a single eyewitness, and the single eyewitness is Mr. Austin himself.  The police thoroughly investigated the case back in 1992 and in the absence of Mr. Austin's false confession at that time they were not even able to charge him.  It was only Mr. Austin's own confession, almost ten years later, that allowed the case to proceed.

New evidence has now been developed that proves Mr. Austin's innocence.  That evidence does not simply impeach the state's case against Mr. Austin but – as has been true in other single eyewitness cases – it proves innocence.

The truth of the matter is that John Maranto, not Perry Austin, was responsible for the death of David Kazmouz.

John Maranto was a local drug dealer and, as was his modus operandi, used school age children to distribute some of his drugs.  One of those children was Karrem Kazmouz, the older brother of David Kazmouz.   Karrem was then, and went on to be, a drug dealer, at that time dealing in marijuana on behalf of John Maranto in return for free drugs by way of a commission. (See Exhibit 30, Houston Police Department Record of John Maranto; Exhibit 20, Houston Police Department Record of Karrem Kazmouz).

John Maranto, again as was his modus operandi, became paranoid that Karrem Kazmouz was skimming from him.  Maranto enlisted the aid of his former cellmate Perry Austin to find

---

[47]    Altogether, six Justices in Herrera (O'Connor, Kennedy, Stevens, Souter, White, and Blackmun) appeared to hold that "truly persuasive" evidence of actual innocence would create a viable federal habeas claim, although they articulated slightly different standards for granting relief. See Herrera v. Collins, 506 U.S. 390, 419-20 (1993) (O'Connor and Kennedy, J.J. concurring) (recognizing constitutional right to make a "truly persuasive" showing of actual innocence as basis for federal habeas relief); id. at 429 (White, J. concurring) (same); id. at 441-42

Karrem so that he could confront him with his allegation. Mr. Austin took the day off work and drove around looking for Karrem and instead found David Kazmouz. David, familiar with Mr. Austin, volunteered to drive with him to look for Karrem. After driving around for sometime they drove to John Maranto's house and went inside. David remained a willing participant in the excursion. An effort was made to call places that Karrem may have been visiting but without success. Mr. Austin left to visit one more place that Karrem may have been, leaving the still-consenting David in Maranto's company.

Mr. Austin's search was fruitless, and upon his return to the house he discovered David Kazmouz bound and gagged in the back room of the house. Tragically, David had died, apparently suffocating on the gag in his mouth. Mr. Austin then assisted in the disposal of David's body by taking it to the area of the landfill where it was ultimately found.

Mr. Austin never intended or foresaw that David Kazmouz would be killed or seriously injured. Indeed, given David's consent to his travels with Mr. Austin, Mr. Austin's conduct does not amount to kidnapping.

To the best of Mr. Austin's knowledge, David Kazmouz's death was accidental and, importantly for David's family, Mr. Austin does not believe that David was molested in any way before his death.

Mr. Austin has submitted to a polygraph examination conducted by Joe Bartlett, an impeccably qualified polygrapher of nearly forty years experience in law enforcement. In Mr. Bartlett's professional opinion Mr. Austin's description of the circumstances of David's death and his role in it is a truthful account. (Exhibit 60, Report of Joe Bartlett).[48]

---

(Blackmun, Stevens, and Souter, J.J. dissenting) (same).

[48] It is understood that polygraph examinations are not admissible in jury trials in Texas and as a result are not

The Texas Court of Criminal Appeals has defined some of the contours of an actual innocence claim and has specifically approved a trustworthy witness recantation as actual evidence of innocence even in the face of a guilty plea. Ex parte Elizondo, 947 S.W.2d 202 , 209 (Tex. Crim. App. 1996); Ex parte Franklin, 72 S.W.3d 671 (Tex. Crim. App. 2002); Ex parte Tully, 109 S.W.3d 388 (Tex. Crim. App. 2002) (rehearing denied, Ex parte Tuley, 2003 Tex. Crim. Appl. Lexis 158 (2003)).

This is a single eyewitness case.  The Houston Homicide Division and the FBI agree that the only evidence corroborating Mr. Austin's confession was some similarities between a generic piece of rope in Mr. Austin's car and the degraded rope found at the scene where David Kazmouz was found.[49]  However, this evidence is clearly of little probative force and in no way impedes a finding of innocence.   Cf. Elizondo (supra) (sexually explicit drawing and inappropriate note as possible corroboration of sole eyewitness' initial account are discounted

---

available as evidence of actual innocence.  It is submitted that this construction of a remedial, equitable remedy is unduly narrow.  It also represents a violation of Mr. Austin's Sixth Amendment rights to present a defense.  A *per se* ban should not be permitted to stand and Mr. Bartlett's methods and results should instead be subjected to analysis under *Daubert*.  United States v. Posado, 57 F.3d 428 (5th Cir. 1995).

In any event, the results of Mr. Austin's polygraph examination remain relevant and admissible even if not as direct evidence of innocence.  First, the examination provides evidence directly relevant to competency – the fact that Mr. Austin was lying when he confessed to a capital offense is an indicator of incompetency.  Jackson v. State, 548 S.W.2d 685 (Tex. Crim. App. 1977).

Secondly, the polygraph report is an information source relied upon by psychologists and psychiatrists and as a part of the factual basis for the opinion of the mental health professionals in this case is admissible.  See Charles W. Daniels, Using Polygraph Evidence After Scheffer, 27 Champion 36 (2003); Jackson v. State, 548 S.W.2d 685 (Tex. Crim. App. 1977); Joiner v. State, 825 S.W.2d 701 (Tex. Cr. App. 1992).

Thirdly, such evidence may be considered, even if it is not admissible, as a part of a Schlup-type claim.  Reasonover v. Washington, 60 F. Supp. 2d 937, 971 (E.D. Mo. 1999).

[49] FBI records show that a homicide detective, presumably Sgt,. Allen, requested assistance in coordinating FBI witnesses for the trial.

> He [the homicide detective] explained that in 1993, FBI agents recovered rope from the subject's vehicle, which is the only known corroborating evidence to the confession.

when the witness credibly recants).

There is no reason in principal for distinguishing between the recantation of a third party eye witness and the recantation of a defendant eye witness.  The question is one of the reliability of the recantation.

In this case Mr. Austin's recantation of his eyewitness statement against himself is highly credible.  A full and credible explanation has been provided for the offering of the false statement and is supported by the highly reliable evidence of Dr. Woods and Dr, Cicerello. (Exhibits 93, 95).  Mr. Austin is and was suffering from a serious mental illness, and this illness sponsored his attempt at state-assisted suicide.

The original confessional statement was itself dubious, attracting the suspicion of Sergeant Waymon Allen, who was unconvinced as to its accuracy, particularly as to motive.  In fact, Sgt. Allen's February 2002 interview, explicitly designed to clarify areas in which Mr. Austin's account was not believed, disclosed other reasons to doubt the accuracy of the confession.  For instance, the account of David Kazmouz's behavior was apparently inconsistent with David's character.   David was apparently a boisterous child and Mr. Austin's false confession paints him as an entirely passive figure.  RR.XII-Ex.78

Apart from the obviously false account of motive for the killing of David Kazmouz, Mr. Austin's false confession provides a highly implausible version of the cause of death.  Despite the fact that the police did not find a drop of David's blood on Mr. Austin, his car or David's clothes, Mr. Austin maintained that he had slashed David's throat.  There was also no sign of any injury to David's throat area, which might be expected if David had died as Mr. Austin had claimed.  As the opinion of Dr. Marc Krouse, Deputy Medical Examiner for Tarrant County

(Exhibit. 62, FBI Memorandum (07156, 07157)).

confirms, this absence of damning evidence confirms what one would expect to see if Mr. Austin's account were true.  (Exhibit 97).

Mr. Austin's confessional statement was also inaccurate as to the manner in which David's body was tied.   Despite multiple opportunities to change his story, Mr. Austin maintained in both the January 2001 and February 2002 statement that the only rope on David was tied around his hands and up around his neck.  This is a false detail in a false confession. Mr. Austin did not tie David up and so was unable to recall that, in fact, David's legs had been tied together – a fact clearly demonstrated by the forensic evidence.  (See RR. XIV).

New evidence supports Mr. Austin's true account.  Witnesses have now disclosed that Karrem was, in fact, dealing drugs at that time. This fact is corroborated by Karrem's significant criminal history, which reveals substantial drug dealing activity at a young age.  (Exhibit 20). New evidence also demonstrates that John Maranto was a drug dealer and would routinely use young people to sell his drugs for them.  (Exhibits 30, 31).  Further, John Maranto was prone to becoming angered and accusing his dealers of stealing from him.  (Exhibit 83, Statement of Michael Goodner; Exhibit 59, Statement of Jennifer Ortega).

New evidence has also emerged from John Maranto's niece, Lori Sascenberg, who has a memory of Perry sitting on the couch at her house sobbing and hysterical and distressed because of something that John had done on the day of David Kazmouz' disappearance.  (Exhibit 92, Affidavit of Eleni Antonopoulos (07669)).

Perry Austin's claims of innocence of this crime are not a new thing.  He denied responsibility in 1992, but – interestingly – made it clear to Sgt. Allen that he could not speak out because there was someone else involved.  The indications that someone close to Perry might be involved are corroborated by new evidence of John Maranto's emotional reaction on the

discovery of the body and his avoidance of a lie detector test. (Exhibit 33, Houston Police Department Records). Mr. Austin has also previously maintained his innocence of this offense to Denise Lindsey and, on information and belief, disclosed to her that John Maranto was the person responsible. Mr. Austin was also unable to lie to his pastor about his guilt in the crime even when pursuing his self-destructive course in 2001. (Exhibit 78, Statement of Ned Hicks).

Upon a comparison of this showing with the analysis of the court in Elizondo, reveals that relief is mandated. In Elizondo there was a witness recantation with a credible motive provided for the original false testimony – the pressure of the natural father. There is now a witness recantation with a credible motive for the original false testimony. In Elizondo there was other potentially corroborating evidence for the original guilty statement in the form of overly sexualized behavior by the alleged child victim. Here there is the rope which could not be matched to the rope at the crime scene. However, in Elizondo the natural father fervently denied applying pressure to produce the original inculpatory statement. Here there is no countervailing evidence to Mr. Austin's retraction: in fact, there is new evidence supporting it.

To borrow from the court's style in Elizondo: Mr. Austin's claim of a false confession is not implausible on its face, and a jury comparing the false confession made in the midst of the bizarre and flagrant suicide attempt with the more reasoned account now provided would find the account now provided more credible. Elizondo, 947 S.W.2d at 209. The evidence of Mr. Austin's false confession not only voids the earlier inculpatory evidence but also provides affirmative evidence of innocence. There is clear and convincing evidence that no reasonable jury would convict Mr. Austin in light of the new evidence.

It is further submitted that Mr. Austin's innocence claim is connected to constitutional violations – in particular, the claims in this application relating to competency, waiver of counsel

at trial and appeal and the plea of guilty are constitutional violations that are directly related to the innocence claim. They are all about the failure to detect or respond to Mr. Austin's mental illness, the same mental illness that sponsored the false confession. And so, to the extent necessary, Mr. Austin meets the requirements of Schlup v. Delo, 513 U.S. 298 (1995) such that procedural bars should not operate to the prejudice of Mr. Austin's claims.

## PRAYER FOR RELIEF

ACCORDINGLY, Applicant Perry Allen Austin prays that this Court:

1. Issue a writ of habeas corpus to have him brought before it, to the end that he may be discharged from his unconstitutional confinement and restraint and/or relieved of his unconstitutional sentence of death;

2. Grant such other relief as law and justice require.

Respectfully submitted,

Dick Wheelan
Texas Bar No.

R. E. WHEELAN
440 Louisiana Street, Suite 900
Houston, Texas 77002
TEL (713) 225-1300

Counsel for Perry Allen Austin

## CERTIFICATE OF SERVICE

I hereby certify that on the _21st_ day of June 2004, I served a true and correct copy of the foregoing pleading by depositing it in U.S. First Class Mail for delivery on opposing counsel:

Assistant Attorney General
United States Attorney's Office
910 Travis, St 1500
Houston, TX 77002
713/567-9000

## VERIFICATION

STATE OF TEXAS      )
                        )

COUNTY OF POLK      )

### Affidavit of Perry Allen Austin

    I, Perry Allen Austin, upon oath state that I have read the foregoing Application for Writ of Habeas Corpus; I am familiar with its contents, and to the best of my knowledge and belief the allegations of the petition are true and correct.

Perry Allen Austin

    Subscribed and sworn to before me this 21 day of JUNE 2004.

Notary Public

My commission expires:

01-27-2008

CHRISTY PUTNAM
NOTARY PUBLIC STATE OF TEXAS
My Commission Expires: 01-27-2008

**Notary without Bond**

2004 JUN 21 PM 5:51

U.S. COURT
SOUTHERN DISTRICT
OF TEXAS

1