# United States District Court Southern District of Texas

Case Number: _H-04-2387_

# ATTACHMENT

Description:

☐ State Court Record          ☐ State Court Record Continued

☐ Administrative Record

☐ Document continued - Part _I_ of _IV_

☒ Exhibit(s) number(s) / letter(s) _# 102_

Other: _Pltf's First Amended Petiton Habeas Corpus_

EXHIBIT 102

3        THE MARSHAL:  What was the name again, ma'am?

4        MS. BRORBY:  Allen Breed.

5        THE COURT:  Please raise your right hand and be sworn,

6  Mr. Breed.

7            ALLEN BREED, PLAINTIFFS' WITNESS, SWORN

8        THE COURT:  Good morning, Mr. Breed.

9        THE WITNESS:  Good morning, Your Honor.

10       THE COURT:  When was the last time we saw each other?

11  When you were an inspector for the youth correction system?

12       THE WITNESS:  In Texas?

13       THE COURT:  Yes.  All right.  You may proceed.

14       MS. BRORBY:  Thank you, Your Honor.

15               DIRECT EXAMINATION

16  BY MS. BRORBY:

17  Q.  Mr. Breed, will you state your name for the record?

18  A.  Allen, middle initial F, Breed.  B-R-E-E-D.

19  Q.  Where do you live, Mr. Breed?  Where do you live?

20  A.  Outside a small town in the mother lode of California

21  called San Andreas, California.

22       THE COURT:  Are you right on the fault?

012307

23      THE WITNESS:  My response is, that's not our fault,

24  Your Honor.

25  BY MS. BRORBY:

KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

1080

1  Q.  What kind of work do you do, Mr. Breed?

2  A.  I'm currently working as a consultant in criminal justice,

3  with the primary emphasis on special mastering for state and

4  federal courts.

5  Q.  And in what aspect of criminal justice do you specialize?

6  A.  For the last 15 years, almost entirely in the adult field,

7  although, as I've already indicated to the Court, I have had

8  several cases in the juvenile area as well.

9  Q.  And would that be in the field of the -- of corrections,

10  the incarceration of adults?

11  A.  Entirely acting as a monitor, acting as a mediator, acting

12  as a fact finder for the courts on assignment as a special

13  master, using the generic term, special master.

14  Q.  In what -- in what systems or institutions have you served

15  in that kind of capacity as special master or fact finder for a

16  court?

17  A.  I think it would be laborious for all to go through it, but

18  suffice it to say that since my first assignment in the state of

19  Rhode Island under Judge Pattine with the total adult

20  correctional system, I've been involved in 31 other cases at

21  both the state and federal court level.

22  Q.   How many states have you been involved in, if you know?

23  A.   I'd have to count them up, but it would certainly be in

24  excess of 15.

25  Q.   When did you first start working in the field of

KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

1081

1  corrections?

2  A.   In 1945, the end of 1945.

3  Q.   And can you give us a thumbnail sketch of your correctional

4  career?

5  A.   Well, I was in the United States Marine Corps and waiting

6  for admission to law school and became intrigued with what was

7  being done in California in some of the correctional

8  institutions, so accepted a temporary job as a correctional

9  officer at Stockton Correctional Facility, and became so

10  interested in what was being done in California in that regard

11  that I never ended up in law school.

12  Q.   Good for you.  Where did you go from there?

13  A.   After being in the Stockton Correctional Facility, I then

14  opened the first forestry camp in California and stayed there

15  for approximately eight or nine months, at which time I was

16  promoted to the position of assistant superintendent in a

17  juvenile institution called the Fricot Ranch School for Boys,

18  remained there for several years, and then took over as

19  superintendent of the Coarse Gold Forestry Camp.  I was there

20  for some time and then was put in charge of all of the forestry

21  camps in California.

22          From there, I was then promoted to superintendent of

23  the Fricot Ranch School for Boys, remained there for a number of

24  years, and then was transferred to the Preston School of

25  Industry, which was a thousand-bed institution for 18- to


KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

1082

1  25-year-old felons.

2        From there, I went to the central office and was

3  appointed under both a Democratic governor, a Republican

4  governor, and then another Democratic governor as the director

5  of the Department of Youth Authority with a dual responsibility

6  also as chairman of the Youthful Offender Board.

7  Q.  How did you get into adult corrections?

8  A.  I moved from -- I retired from California and went to

9  Washington on a fellowship.  After a short time, I was asked to

10  come up and be a special master at the Rhode Island Correctional

11  Institution.  And although the Court did not take receivership,

12  the judge desired to do so, I persuaded him not to do so.  But I

13  had the responsibility to hire and fire and to take a system

14  that was at the time locked down for over 19 months, and did

15  that for a little over a year, at which time I was appointed as

16  director of the National Institute of Corrections, which has a

17  primary responsibility for adult corrections, although by law it

18  also has the juvenile area.  Our board determined that we would

19  put 99 percent of our emphasis on the adult field, and for the

20  next four and a half to five years, I worked closely with all of

21  the correctional programs throughout the United States, the

22  technical assistant aspect, and doing the primary research in

23  the field of adult corrections, and in doing any type of service

24  which would help corrections do their very, very difficult job.

25          I then retired from the federal government and


KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

1083

1  returned to California and decided to use the experience that I

2  had at the National Institute of Corrections and also the Rhode

3  Island experience and become a special master.  And since 1983,

4  I have been doing that on a full-time basis.

5        MS. BRORBY:  May I approach the witness, Your Honor?

6        THE COURT:  I beg your pardon?

7        MS. BRORBY:  May I approach the witness, Your Honor?

8        THE COURT:  You may.

9  BY MS. BRORBY:

10  Q.  Mr. Breed, is the document that I have handed you marked

11  Plaintiffs' Exhibit 1519 your curriculum vitae?

12  A.  Yes, it is.

13  Q.  Did you prepare this document?

14  A.  Yes, I did.

15  Q.  Is it a true and correct summary of your training and

16  experience that you consider relevant to your expertise in

17  corrections?

18  A.  Yes, it is.

19  Q.  Mr. Breed, here you are on the witness stand giving

20  testimony about what you have seen and heard in the Texas

21  Department of Criminal Justice and your opinion about that.  How

22  did you come to be involved in this case in which you are now

23  testifying?

24  A.  I was approached by plaintiffs' counsel to review the

25  conditions of confinement as an outgrowth of the motion made by


KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

1084

1 defendants to dismiss the final judgment.  I was intrigued

2 because I was very familiar with the Ruiz case.  I was also

3 familiar with adult corrections during -- before and during that

4 time.  And although I am not a professional witness, I did feel

5 that it was important to come down and review general conditions

6 and then make a decision as to whether or not I would want to

7 testify.

8 Q.   In how many cases have you served as an expert witness for

9 a party in litigation about prison conditions?

10  A.   Over what period of time?  Last four years, as was required

11  by the federal rules?

12  Q.   Well, we can start in the last four years.

13  A.   I think that -- I think there was three cases which I have

14  been an expert witness, yes.

15  Q.   And what kind of cases were those?

16  A.   One was a case for the district court in Arizona where the

17  Court appointed me as an expert to report on conditions of

18  confinement.  The second case was the district of Alabama, where

19  I testified for the plaintiffs on the use of chain gangs and

20  what they call a hitching post.  The third case was in the

21  northern district of Texas, where I testified for the defendants

22  on a juvenile correctional institution case.

23  Q.   In the last ten years, how many other cases have you

24  testified in as an expert witness, not for the Court, but for a

25  party on either side?


KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

012313

1085

1 A.   To the best of my knowledge, there's only been two.  I

2 testified for defendants, the Correctional Services of Canada,

3 at the request of the commissioner.  I testified on one other

4 case where digital searches were being made of inmates, and that

5 was a case in the state of Washington.  Outside of that, I don't

6 believe that I have served as an expert witness.

7 Q.   In the -- in the 31 other cases that you mentioned that

8 you've been involved in at the state and federal level, in how

9 many of those cases were you working for the Court rather than

10 for either party?

11 A.   Only two.

12 Q.   I'm sorry, I didn't hear you.

13 A.   Well, would you repeat your question, please?

14 Q.   I think you said there were 31 other cases in which you've

15 been involved?

16 A.   Yes.

17 Q.   Of those, in how many of them were you retained by the

18  Court rather than by a party to the litigation?

19  A.  I believe it would be accurate to state that in all cases,

20  I was appointed by the Court.  In some of those cases, parties

21  had agreed and stipulated to my appointment, and the Court had

22  approved.

23  Q.  You said that when you were retained, you agreed to

24  evaluate conditions in the TDCJ and then to provide an opinion

25  about whether you thought that there were any conditions that


KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

1086

1  might result in testimony in the case.  What was your

2  methodology in conducting your study in TDCJ to determine what

3  you thought about conditions?

4  A.   I visited 18 prisons.  In all cases, those visits involved

5  two- to three-, and in some cases, four-day visits.  At no time

6  were the visits less than 12 to 14 hours a day.  I would first

7  comment that I wished I could have visited even more, but that

8  there was a limitation, both in terms of time that was allowed.

9  And it seems to me that we were able to have a cross-section of

10  the major institutions.  And I did a little arithmetic

11  computation last night, and I found that those institutions'

12  units that I visited represented about 32 percent of the total

13  population.

14        In visiting these institutions, I wanted to

15  particularly review safety issues, fairness issues, excess use

16  of force issues.  And I went about that by first reviewing over

17  500 use of force reports.  I reviewed over 600 grievances.  I

18  reviewed over 500 discipline reports, and approximately 800

19  institution files.

20       My process of then visiting the institution following

21  a orientation to the program by the warden and his chief

22  deputies would be a relatively short walking tour of the

23  facility, and then branching out and concentrating on those

24  areas in which I wanted to make my major emphasis.

25       I brought to that process years of experience, both

KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

1087

1  from the California days when I always felt that a warden or a

2  superintendent was only as effective as the very shadow of his

3  being laid over that institution.  I feel that you have to get

4  out and walk them and talk to them and find out what's

5  happening.

6          I actually borrowed from a man who was a good friend

7  and a colleague, George Beto, who was known as Walking George.

8  And Dr. Beto felt that you had to walk the tour -- tiers to know

9  what was happening.  So at each unit, what I did was walk the

10  tiers, talk to inmates that wanted to talk to me, then go to the

11  records and attempt to verify the best I could what I was

12  hearing.

13          Unfortunately, I wasn't able to have the contacts with

14  staff that I would like to have had, because early on it was

15  made mandatory that there be a lawyer present at any time there

16  is any communications between myself and any staff member.  Even

17  later when the lawyers no longer accompanied, it was mandatory

18  that a high ranking unit administrator accompany me.

19      When I tried to talk to staff, it was obvious that

20  they found great difficulty in communicating with me when their

21  boss was there listening to every word they said.

22      When I did occasionally talk to a correctional officer

23  and ask him about situations, I found that they uniformly always

24  did two things.  Once they turned to the escort to find out

25  whether they could answer, and were told they could, they very

KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

1088

1  carefully said exactly what they had written on a report.

2        So there didn't seem to be any purpose that was to be

3  gained by further trying to talk to correctional officers and

4  other staff, although I really regret this.  And as a special

5  master and working in an entirely different environment, I find

6  that through talking to staff, you're able to verify many

7  things, find out many things that unfortunately weren't

8  available to me on this trip.

9        Let me just conclude that sort of methodology by

10  saying that one night in the town of Gatesville, I was walking

11  around in the evening, trying to get some exercise, and a young

12  man came up to me and said, I work out there at one of the

13  facilities.  And you're Allen Breed, aren't you?  And I said

14  yes, I was.  And he said, Well, you know, there's a lot of us

15  that would like to say something, but we're afraid to.  I said,

16  I can fully understand that.  But I said, Somebody sometimes

17  just has to stand up and talk, even though the consequences may

18  not be pleasant.  And he says, I don't think you've lived in a

19  small town very often, or you'd know that your neighbors, your

20  friends, sometimes your relatives, the people you sit next to in

21  church, they'd be the people you'd be talking about.  So if you

22  want to survive, you don't talk.

23          So I add that because I think it's terribly important

24  that correctional officers and other staff -- I'm sure there are

25  many good people in the Texas Department of Corrections, many

KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

1089

1 good people, but they are under a pressure and under a culture

2 that they don't feel that they can share some of their concerns.

3 Q.  Did you review some TDCJ policies and procedures, the

4 written policies and procedures?

5 A.  Yes, I reviewed, as set forth in my statement, innumerable

6 policies and procedures.

7 Q.  And were you focused on the policies and procedures in the

8 areas that you were most concerned about?

9 A.  Yes, I was most concerned about use of force procedures,

10 administrative segregation, protection from harm.  And although

11 I reviewed many others as well, that was where my primary

12 emphasis was.

13 Q.  And you indicated, I think earlier, that in addition you

14 reviewed departmental records in individual inmate files?

15 A.  Yes.

16 Q.  Can you evaluate things like the use of force and

17 protection of prisoners from harm and conditions in

18  administrative segregation by looking only at policies and

19  procedures and paperwork?

20  A.  No.  And in my statement I made it very clear that,

21  generally speaking, I find the policies and procedures are

22  acceptable.  Policies and procedures are merely paper.  Unless

23  the policies and procedures are carried out, they have

24  absolutely no meaning.

25       One of the things I found out, and I've been involved


KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

1090

1  in the accreditation process in corrections since its very

2  beginning, is that very often you will find institutions that

3  have very excellent policies, but as you move beyond, you'll

4  find out the degree of implementation, degree of compliance with

5  those procedures, that it's an entirely different story.

6  Q.  Is it fair to say in the last 20 or 30 years, we've moved

7  to a new stage in corrections where many systems do have

8  policies and procedures that cover areas of prison operations

9  that were once not fully covered in written policies and

10  procedures?

11  A.  That weren't fully covered?

12  Q.  Yes.

13  A.  Yes.

14  Q.  So it's a new stage now to look not only at what is written

15  down in policy and procedure, but how the policy and procedure

16  is complement and if it is implemented?

17  A.  Yes.

U12529

18 Q.   I'd like to turn first to your observations and conclusions

19 in the area of use of force in TDCJ.  What observations did you

20 make about the fact and extent of wrongful uses of force in the

21 Texas Department of Criminal Justice?

22 A.   One of the things that I discovered from the documents that

23 were shared with me by the Texas Department of Corrections was

24 the number of incidents, major incidents that have occurred per

25 1,000 comparing 1992 with 1988, that the number of major

KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

012330

1091

1  incidents increased 113 percent.  The inmate assaults had

2  increased 61 percent.  The staff assaults had increased 61

3  percent.  And the attempted suicides increased 113 percent.

4  That was a backdrop to my review of what was happening

5  systemwide.  And I found that perhaps because of, although

6  certainly as a result of, this dramatic increase that there's a

7  pattern throughout the entire system of attempting to deal with

8  the problems that they were faced with by using force.

9       As one compares the use of force here in Texas with

10  other states with a similar population, you'll find that there

11  is nearly three times as much force reported in Texas as there

12  would be in other major states like New York, California,

13  Michigan, Illinois.

14       There's also a culture of force, if I could use that

15  term.  It seems to me as I've tried to analyze it in thinking

16  back to earlier days when I was very familiar with what was

17  occurring in adult corrections in Texas, that was that the

18  building tender was a primary method of controlling the inmate

19  population.

20          With the Ruiz case and the termination of building

21  tenders, what happened was, many new correctional officers were

22  hired.  Limited training was given, particularly initially.

23  There -- the fantastic growth that took place in corrections

24  here in Texas meant that you didn't have that stability of

25  strong supervisors and middle managers that had come through the

1092

1  system and taken years before they were promoted.  Instead, you

2  found young people who were promoted almost within the first

3  year to 18 months that they were in the system.

4          And in attempting to gain control, what was happening,

5  as I reviewed it and in my opinion, is that correctional

6  officers began to use the same techniques, the same approaches

7  that building tenders had previously used.

8  Q.   What are those techniques and approaches?

9  A.   Well, the best way -- if you want me to go into any

10  particular detail on that at this juncture, I'll be very happy

11  to, because there's a number of things that I'd like to share in

12  that regard.

13          It seems to me that one of the biggest problems in the

14  Texas system that I saw is that officers can't keep their hands

15  off prisoners.  They want to guide them.  They want to push

16  them.  They want to shove them.  They do all kinds of things in

17  which there is a touching or a physical contact.  One of the

012333

18  first things you do in corrections is teach people not to touch

19  unless it's absolutely necessary, and not even then unless

20  you're sure that you have sufficient manpower, people power to

21  be able to handle the situation.

22  Q.  What's the problem with touching?

23  A.  One of the biggest problems -- and it's bigger in prisons

24  than anyplace else, I think, in our society except in the

25  streets from which our prisoners come.  Out in the streets, you

KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

1093

1  don't touch somebody unless you want to fight them.  And if you

2  think of a young person growing up on the streets of our urban

3  areas, having lived under that kind of a culture, coming into

4  prison, and then having somebody come up to them, very loud,

5  very profane, most often quite vulgar voice, and start poking

6  them with their finger and saying, You do this, you do this, the

7  natural reaction is to respond physically.

8         What happens secondly besides the touching is that

9  there is a quick response for a correctional officer to put

10  somebody to the ground.  And I'm using a term now that

11  correctional officers shared with me, because they call it

12  slamming.  This isn't an offender term, it's a correctional

13  officer's term.

14  Q.  Although have offenders picked it up?

15  A.  I'm sure they must have.  But it's -- somebody is doing

16  something, and instead of stepping back, instead of calling for

17  help, instead of getting a supervisor, you slam them to the

18  ground.  Now you've got a fight going.  And you haven't used the

19  most important thing, and that is all of the nonaggressive, all

20  the nonviolent techniques that have been developed over more

21  recent years as a method of avoiding the very thing that you've

22  gotten into.

23      There's also a macho kind of concept of -- of

24  manliness that goes -- that -- you -- you almost have to prove

25  that you're tougher than the prisoner is.  If he uses -- and


KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

1094

1  you'll find that so many of the assaults -- one of the things

2  that was really curious to me is how many assaults on staff were

3  occurring in Texas until I began to analyze the assaults.  And I

4  found that a large percentage of those were verbal assaults.

5  Now, I don't have any objections whatsoever to some kind of

6  punishment for offenders using profane language against an

7  officer or anybody else, but it's hardly justification for

8  physical force and slamming somebody to the ground.  But in some

9  way without the training that's necessary and the constant

10  supervision that's necessary, there's a tendency upon

11  particularly young officers that their very identity has been

12  attacked if they don't respond physically.  So what very quickly

13  happens in these cases is you get a barroom brawl with officer

14  and inmate on the ground with other officers rushing up to try

15  to rescue their peer.

16  Q.  What's your basis for these observations?  Where did you

17  get the information that showed you the pattern of touching, the

18  pattern of slamming very quickly rather than using communication

19  and other nonviolent methods of resolving the situation?

20  A.  Obviously, much of it had to come from the discussions,

21  interviews that I had with inmates, but it's surprising how much

22  of it came from the official records themselves, because it's

23  not uncommon for the correctional officer to write in his report

24  that he was threatened verbally and therefore slammed the inmate

25  to the ground, restrained him and then carried out the use of

KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

1095

1  force report.

2        I also very carefully assessed the medical records to

3  determine whether or not through this use of force there had

4  been physical injury.  And, unfortunately, in such a very large

5  number of cases inmates had been injured, often seriously.

6  Q.  What makes -- in a correctional setting, what makes the use

7  of force wrongful?

8  A.  Well, it would be wrongful, first, if it was done without

9  being required to maintain the safety of both staff and the

10  inmates.  Secondly, force is necessary, there isn't any question

11  about it, and that's why it becomes so critical that we have an

12  environment in which correctional officers clearly understand

13  that they are to use every technique possible to avoid force and

14  that when they have to use force, that they use it in a way

15  that's fair, sensible, reasonable and safe as possible.

16        In a number of cases, and I think I said that there

17  was well over 500, probably of those 500 cases, some 70 percent

18  of them I would say excessive force was used.  I made one step

19  further, however, and said, all right, out of those cases in

20  which, in my opinion, excessive force was used, let's just look

21  at those cases in which there was several things.  One, that the

22  inmate was already in restraint.  That means that he was

23  handcuffed with his hands behind his back.  Secondly, that while

24  under that restraint he was hit in the face numerous times with

25  a closed fist.  And, third, that there were injuries, often very

KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

1096

1  serious injuries, that resulted in that.  It was those types of

2  cases that I concentrated on.  And I found them in enough of the

3  units - in fact, all of the units that I visited, although some

4  units were worse than others in that regard - which gave me the

5  opinion that I have to share that this is a systemwide problem,

6  not an isolated situation that occurred in only one facility.

7  Q.  Did you make any observations about what might be the

8  causes of such a systemwide use of unnecessary or excessive

9  force?

10  A.  Well, I think there's a number of things that come to my

11  mind.  One is that I've already mentioned, and that is this

12  amazing growth in the Texas prison system, the hiring of very

13  often quite young.  It's the only state I believe in the union

14  that allows 18-year-olds to be hired as correctional officers.

15  You hire people with absolutely no experience required

16  whatsoever in any kind of work that might hopefully be a

17  preparation for the difficult job in corrections.

18        With this and conditions of crowding that exists --

19   and when I use the word "crowding," I'm talking about so many

20   bodies in limited space that very often puts people in the wrong

21   custody classification; that often puts people in places where

22   they're going to be jeopardized because the appropriate

23   placement isn't available.  It's a combination of all of these

24   factors that then causes the kind of use of force that I have

25   been speaking to.


                    KATHY CARROLL, OFFICIAL COURT REPORTER
                    UNITED STATES DISTRICT COURT  (512) 236-0998

012342

1097

1 Q.  Do you think the stress and strain on the staff is they

2 attempt to perform all of the duties that are theirs to perform

3 plays a role in it?

4 A.  That's a very good point and I neglected to emphasize,

5 because in my estimation if there's any one factor which creates

6 the problems both of undue and excessive use of force, but also

7 does not provide the degree of protection from harm that I have

8 found in the Texas system, is the absence of classification

9 counselors.  Now, my statement I indicated that there had -- on

10 the basis of a legislative decision a reduction in

11 classification counselors, but that reduction has brought it

12 down from one classification counselor to several hundred, now

13 to one to over a thousand inmates.  There isn't anybody in the

14 facility that can act as a coordinator, a planner, the

15 programmer/arranger, the person who often acts as the advocate

16 to be sure that the problems that inmates have are addressed.

17 The fact that was shared with me that these duties have been

18   taken over by others is -- I found at no time was there any

19   reality to that whatsoever.  That there's only two, one of whom

20   is an administrator's classification type people, in a facility

21   that has 2500 to 3,000 inmates.  They -- their entire time is

22   spent in just doing the routine paper processing that the

23   movement in and out requires for a facility of that size.

24        The idea that in some way correctional officers will

25   do this, they do not see this as their role.  They do not see


KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

U1c244