# United States District Court
# Southern District of Texas

## Case Number: _H-04-2387_

## ATTACHMENT

Description:

☐ State Court Record          ☐ State Court Record Continued

☐ Administrative Record

☐ Document continued - Part _II_ of _IV_

☒ Exhibit(s) number(s) / letter(s) _# 102_

Other: _Pltf's First Amended Petiton_
_Habeas Corpus_

1098

1  this as being something that they were hired to do.  I don't

2  know how many times I read grievance reports that said, Take

3  your problem to the major.  One of the biggest problems that I

4  found in administrative segregation particularly is that an

5  inmate can't see a major.  Very often does everything in his

6  power to get the major to come see him so he can talk to

7  someone.  I guess what I am sharing with you is this absence,

8  this almost total void of anybody who tries to help that inmate

9  do what he should and can do with that kind of an assistance.

10  And what you have over here with the correctional officers,

11  their role is to control and they will control in whatever way

12  they feel it's necessary.

13  Q.  What impact do you think it has on the relationship between

14  the prisoner who has perceived needs and the correctional

15  officer who may not have time or inclination to try to meet

16  those needs?  What impact do you think the absence of the

17  classification counselors or any substitute has on the

18  interaction between inmate and the correctional officer?

19  A.   In prisons -- I visited at one time every major prison in

20  the United States, but in prisons they're called by different

21  names and for purposes here generically we'll say classification

22  counselor.  The classification counselor is the bridge between

23  custody and the inmate.  There are some very, very good

24  correctional officers that are out there that want to do the

25  right thing.  Classification counselors have helped them,


KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

012345

1099

1 advised them, shown them how this can be done, sort of act as

2 the intermediary in terms of how correction officers get along

3 with inmates.  With the void that exists now, it very often

4 unfortunately becomes a case of we against them and the inmate

5 body sees the correctional officer as they call them, the cops,

6 the police.  They are not people that they can turn to, in their

7 minds, for help.

8 Q.  Did you have any observations of a systemwide nature about

9 the situation with prisoners trying to get the major's attention

10 or the attention of other kind of rank, what kind of conflict

11 that created in the system?

12 A.  I would ask you to just build on that a little so I'm sure

13 that I understand.

14 Q.  Well, what's jacking in a slot?  What's jacketing a slot?

15     THE COURT:  What is what?

16     MS. BRORBY:  Jacking a lot.  Jacking a food slot.

17     THE COURT:  I still don't understand.

18        THE WITNESS:  I would really ask counsel not to use

19   inmate jargon, because I think it's confusing to everybody,

20   including the record.  Just ask me the question and I'll answer.

21   BY MS. BRORBY:

22   Q.  Have you observed in any of the use of force reports,

23   reports of a situation that starts with an inmate extending his

24   arm through a food slot in a segregated situation and force

25   ensuing?


KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

1100

1 A.   There is innumerable -- and if anybody doubts this, they

2 just merely need to go review any two months' use of force

3 reports.  So many of them begin with the fact that an arm or a

4 towel or something is put outside the food slot so that it can't

5 be closed.

6 Q.   And did you learn why arms were sticking out of food slots?

7 A.   Nine times out of ten the only reason is that the inmate

8 has some hope that he can talk to rank.  Somebody above a

9 correctional officer.  And he's willing to take the serious

10 consequences of what he's doing, because he knows that if he

11 leaves it out there, that what they're going to do eventually is

12 come in, gas him, bring an extraction team in, all for the

13 purpose of closing food slot.

14 Q.   Did you observe similar conflict where inmates were

15 purporting anyway to attempt to speak to rank by withholding

16 food trays in their cell in administrative segregation?

17 A.   There's always a difference of opinion - and that's

18  understandable - why inmates do some of the things they do.  I

19  would have to, and in my opinion, conclude that the majority of

20  cases that I reviewed were efforts on the part of the inmate to

21  talk to someone and they saw this as a method of doing it.

22        One case that came to my attention -- I wasn't there

23  personally, but I reviewed the incident report.  This particular

24  inmate had climbed up the side of the cages on the windows until

25  he was some 20, 25 feet above the ground, refused to come down.


KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

1101

1 He was ordered to come down and didn't. It happened to be that

2 there was a central office assessment team visiting that same

3 day and they came in and the psychologist that was a part of

4 this team then talked the inmate down. I'm using this as an

5 example, because in most cases if inmates are given the

6 opportunity to talk about what it is that they're trying to

7 demonstrate by inappropriate behavior, you can bring about a

8 reasonable responsible kind of solution.

9 Q.  Did you have any observations about how usual or unusual it

10 was to have that kind of event where there was some serious

11 talking about a problem before force was invoked as a method to

12 avoid force?

13 A.  I found, and in this case it had to be based on the record,

14 or based on, and it would still be the record, and that is the

15 use of cameras with the -- with the audio opportunity to hear

16 what has occurred.

17       One case might illustrate best a situation of that

18  kind.  The inmate was in the rec area and wouldn't leave.  He

19  stated when officers demanded that he come out that he would

20  leave if the major would come and talk to him.  After a good

21  deal of verbal exchange back and forth, the major came with a

22  five point -- I mean, a five-person extraction team.  The major

23  made no effort on the record, nor did in reviewing the audio

24  section of the camera film make any effort to do other than, You

25  are ordered to put your hands out through the port.  That was


KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

1102

1  done three times. But there was no effort that was -- that I

2  was able to identify that the major said, I'll talk to you.

3  I'll listen to you. It's -- it's a willingness and it's the

4  best thing in terms of staff protection that I can think of is

5  you exhaust everything you can to see if you can't find a

6  solution short of using force.

7  BY MS. BRORBY:

8  Q.  Did you see in the documentation you reviewed more than one

9  case like the one you just described where before gas was used

10  the only verbal interaction was to order the inmate to do

11  whatever he was being ordered to do and tell the inmate that if

12  he didn't do it he would be gassed?

13  A.  Yes, I -- and I don't know how the Court wishes to use

14  identification of inmates. I've shared both names and numbers

15  with parties. I always hesitate to ever use a name.

16      THE COURT:  Just use the number, will be all right.

17      THE WITNESS:  Okay. An example -- in this particular

18  case the inmate was in ad seg day room.  He refused -- he also

19  refused to come out.  He asked to speak to rank.  The team came.

20  The major also came.  Refused to talk to him.  A 37-millimeter

21  gun was fired five times.  The inmate was subdued, claims that

22  he was kicked in the eye by the sergeant during the process.

23  The medical report indicated that there was retina bruising,

24  vision went from 20/20 down to 2200.  He grieved the incident,

25  was denied.  He had a past history of use of force under the


KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

1103

1  certain -- same kinds of circumstances.  One of the occasions

2  his head was kicked, he had seven stitches in his head.  I could

3  give you many other examples of use of gas and then resulting

4  force.  In no case was there a danger to the institution at that

5  time.  At no case was there a danger to that inmate or to staff

6  when an extreme use of force was precipitated.

7  Q.  In those cases -- in any of those cases that you're

8  referring to was there a documented attempt, either in the

9  videotape or in the use of force reporting to have -- to engage

10  the inmate in a substantive discussion with whatever the

11  inmate's problem was that was causing him to be recalcitrant and

12  not move under threat of gas?

13  A.  As I indicated earlier, I could find none.  I am not saying

14  that it never occurred.  I'm saying that there is no

15  documentation.  And having been an old medical accreditation

16  person in the field of corrections, I've been informed and

17  taught by doctors that if it isn't in the record, it didn't

18  happen.

19  Q.   In addition to the kind of incident that you have been

20  describing with the use of chemical agents on prisoners in

21  confined settings when there is no risk posed and no apparent

22  attempt to use alternatives to force, are there other examples

23  that you can share with us of the kind of wrongful force that

24  you found on a systemwide basis in the Texas Department of

25  Corrections?

1104

1 A.  Yes.  And I'll try to do this very quickly.  As I say, I

2 picked out cases that aren't unusual.  These are cases, though,

3 that represent occurrences in all kinds of units and with both

4 genders.  The first case is 474317.  This is a young woman who

5 was handcuffed.  She was hit in the face and with her arms

6 handcuffed behind her back they were jerked up, breaking her

7 upper arm.  72 hours ad seg even before she was taken to a

8 hospital.  She filed a grievance.  An IA was involved and no

9 fault was found at any point.

10        Another case of a woman, 620484, she passed a letter

11 to another inmate, was seen.  The two of them were taken inside

12 and strip searched.  The letter was given to them.  One inmate

13 was allowed to go, the second was asked to be strip searched

14 again and a digital observation or search made.  She refused.

15 She was taken to the infirmary and for several hours stood

16 against the wall and observed, all times handcuffed.  She was

17 then put on a gurney with her arms handcuffed -- hands

18  handcuffed behind her back.  Her clothes were cut off, and a

19  lieutenant made both a vaginal and a rectum digital search.

20  There was a nurse present.  The nurse refused to make the

21  examination and did not have any part in it.

22          I cite this case regardless of the Department of

23  Corrections perhaps coming back and saying it's permissible to

24  have correctional officers make such searches, but I am sure --

25  I am absolutely sure that there was no intention in developing


KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

1105

1  that policy to ever have it applied to female offenders with

2  vaginal searches made by untrained personnel.

3          Another case.  This is a man who had been with the

4  Gang 7 since 1989 and he was locked up in ad seg because of it.

5  Q.  Do you have his number?

6  A.  I was going to give it at the end, but 490569.  He was

7  taken to the shower area under restraint and placed -- and they

8  call it a legal cage, but a small cage right next to the shower

9  area, waiting his turn.  There's no question that he was talking

10  loudly and was told a number of times to keep quiet, but he

11  didn't, so the officer opened the cage, rammed him against the

12  back of the cage, tried to throw him to the floor by himself,

13  was unable to.  The inmate held on to the small table inside the

14  cage and then four or five officers came and forced him to the

15  floor and put him in restraints.  He was taken to the hospital

16  with injuries.  He was charged with striking an officer.  I

17  indicate this case because he was under restraint, he could not

18  strike the officer and he was under total control until the

19  officer independently and by himself opened that cage.

20       The next case, 636644.  This is an inmate in October

21  of '96 who was being escorted to the shower.  He was in

22  administrative segregation.  He's in boxer shorts, in shower

23  shoes.  Otherwise naked.  He was handcuffed behind his back.

24  There was no soap in the shower and he asked for it.  I'm sure

25  that he didn't ask for it appropriately.  He was told there

KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

1106

1 wasn't any soap and they weren't going to get it. I'm sure that

2 there was a good deal of verbal confrontation. But as a result,

3 he was slammed to the ground, became unconscious, was finally

4 taken to the infirmary, where it was found that he had a serious

5 laceration to his chin and a broken jaw. I emphasize this case

6 because he's under constraint. He's certainly not in fighting

7 clothes at the time. There was no reason for him to try to

8 accomplish anything. And although he may have been - I do not

9 know this - verbally abusive, there was no protection needs for

10 the serious damages that resulted.

11      Another case, 531735. This inmate had been -- this

12 inmate had had a mastectomy just five days before this incident

13 and had his left arm in a sling with --

14      THE COURT: Before --

15      THE WITNESS: -- the stitches still in.

16      THE COURT: Before we go forward with this incident,

17 we'll have the noon hour recess. The Court will be in recess

18  for one hour.

19      (Recess at 12:00 p.m., until 1:00 p.m.)

20          THE COURT:  You may resume your direct examination.

21          MS. BRORBY:  Thank you, Your Honor.

22              CONTINUED DIRECT EXAMINATION

23  BY MS. BRORBY:

24  Q.  Mr. Breed, when we broke for lunch you had just begun

25  discussing the case involving the prisoner with the number


KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

1107

1  531735.  Is that the case of Mr. Batiste?

2  A.  Yes.

3       THE COURT:  Is this the broken jaw case?

4       MS. BRORBY:  Your Honor, this is the mastectomy case.

5  BY MS. BRORBY:

6  Q.  This is Mr. Batiste, I think.

7  A.  That's correct.

8  Q.  Who actually testified before the Court about that

9  incident.

10  A.  Since the inmate has had the opportunity to testify and

11  present his case, I won't go into any detail other than the fact

12  that obviously an injured inmate, who was in no position to be a

13  threat, after he was restrained and put on the ground was kicked

14  in the ankle, which was broken, and it was five days before even

15  a cast was applied.  I think the important aspect of this case,

16  though, is that he submitted a grievance, which was denied.  He

17  was charged with staff assault and went from an S-4 to an L-1,

18  plus 15 days of solitary.  The warden signed off on this case

19  and the IAD did not investigate the case.

20          The next one I would like to share, is this is an

21  inmate that was being - and I'll get the number and the name -

22  was being escorted to the shower under restraint.  He, in the

23  report by the officer, was moving too slowly and the officer

24  slammed him into a sliding metal door.  The officer claims the

25  inmate wouldn't move fast enough and he was forced to use that

KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

012364

1108

1 kind of force.  As a result, there were eight staples placed in

2 the laceration to the head, bruises to the shoulder.  He was

3 found guilty of trying to pull away from an officer while under

4 restraint.  No action was taken by the warden or the Internal

5 Affairs.  It's interesting, however, that -- on this case

6 705122.

7          The next case was during a shakedown.  The inmate

8 obviously was loud and abusive.  The sergeant claims that the

9 inmate turned aggressively towards him.  The inmate claims that

10 he was grabbed by the back of the neck.  Regardless of who's

11 right, he was slammed into the edge of the shower door several

12 times with five stitches required to the head.  The officer in

13 his statement said he was guided to face the shower door and

14 struck his head on the metal door.  The warden found no fault

15 with the sergeant, however, he did reprimand the officer for

16 failing to ensure that the camera was on wide angle.

17 Q.  Was that inmate restrained?

18  A.  Yes.  The last case, and I have many, but I think this is

19  enough to give examples, was an inmate who wouldn't give the

20  officer his homemade cap.  He was put into restraint and

21  allegedly jerked free of the hold that they had on him.  By the

22  reported self, there were a number of officers there at the

23  time.  He was placed on the floor and was badly beaten.  He had

24  a laceration to the left eyebrow, right eye was punctured --

25  ruptured, cut to the chin, contusions to the cheek.  All of this


KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

012366

1109

1  on a five-foot-eight-inch, 130-pound inmate who is hardly a

2  threat.

3        Two other things about this case that I would like --

4  Q.  Is that really five foot eight inches?

5  A.  Five foot eight inches and 130 pounds.

6        I would like to share, though, also, that on this

7  particular case there were 24 inmates who were listed as

8  refusing to give a statement.  I found this on many, many cases

9  - this one, as many others that I did as well - I went to check

10  with inmates that allegedly had refused to make a statement.

11  Out of the 24 I was able locate six, all stated that they were

12  never asked to give a statement.

13        I think that we'll talk about that more at a later

14  point, but the effort to get statements is a serious problem in

15  being able to determine the facts.

16  Q.  Have you --

17  A.  Unless Counsel wants more cases, I would think that would

18  be sufficient to indicate the area.

19  Q.   In the course of the work that you described earlier during

20  your testimony, have you had occasion to investigate the issue

21  of use of force in systems or institutions outside of TDCJ?

22  A.   Yes, I have.  In almost every prison and jail case, one of

23  the conditions to which I was responsible for monitoring was

24  excessive use of force.  One of the things that I was

25  disappointed in finding in Texas, because I had every hope that

KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

1110

1  that condition had been addressed with the addition of

2  additional officers, was that there was so much use of force in

3  greater amounts and in greater degree of the excessiveness that

4  I found here than I found in any other state system that I have

5  looked at.

6  Q.  Let's move on to the formal policies and procedures

7  concerning the process that has been or will be further

8  described by the witnesses for addressing use of force in the

9  system, a process for complaints for use of force and

10  investigation of uses of force.

11  A.  I was impressed initially when I reviewed the policies and

12  procedures in the department, because I thought in most cases

13  they were very good, but what they really require is a great

14  deal of paperwork, and even the paperwork is not functioning

15  adequately.

16        Let me go through them rather rapidly.  But the first

17  thing that happens with the use of force is that the officer who

18  is responsible for the use of force has to make out a report.

19  Now, as I indicated earlier, I reviewed over 500 of these use of

20  force reports, and my estimate is that well over 70 percent of

21  those clearly showed excessive force being used.  You have to

22  remember, however, that this report includes officer's

23  perspective of what happened, nothing more.  It's the officer's

24  perspective.  Secondly, witnesses sometimes extensively -- I'm

25  surprised at the number of officer witnesses that evidently were

KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

1111

1  a part of the use of force by the number that are in each

2  packet.  They are almost verbatim to what the officer who

3  initially used force stated.  You get the impression, at least,

4  that peers take a look at what the original incident report said

5  and then they make a very similar kind of comment.

6  Q.  Is that unusual in your experience in your investigations

7  of the use of force in other systems?

8  A.  It's not unusual because I think you will always find that

9  within the fraternity of correctional officers, they're going to

10  support each other.  But the fact that there are three other

11  witnesses, correctional officers who are peers who say exactly

12  the same thing as the reporting officer raises questions.

13  Particularly in view of the fact that it is required as part of

14  the report that there be an inmate statement.

15       Now, of all of the cases that I reviewed, less than

16  five percent of them had inmate statements.  What they do have

17  is a requirement that the inmate refused to make a statement and

18  two officers sign indicating that they are approving that as a

19  submission.

20        I made very strong language in my statement, which I

21  later amended during the deposition.  I'm not accusing

22  correctional officers of falsifying records.  What I am saying

23  is that it's rather unusual that almost all cases the inmate

24  refuses to make a statement when the next day he puts it down in

25  a grievance.  The grievances indicate that the inmate did want

KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

012372

1112

1 to make a statement and either wasn't allowed to or wasn't

2 allowed the necessary forms.

3        The next thing that concerns me about the use of force

4 report is that there is no investigation made by the supervisor

5 or the middle management level to determine actually what the

6 facts are.  I've already indicated that inmate witnesses seldom

7 are used and more often you find this group witness form saying

8 that everybody in that area listed by name refused to make a

9 statement.

10        Now, this package then goes to the warden --

11 Q.  Let me stop you for a minute.  What makes you think that

12 there is no investigation by a supervisor?

13 A.  I have to respond by saying that there is nothing in the

14 file that would indicate there was.  I looked very diligently

15 for this.  I asked majors, I asked captains, and they said that

16 that was not their responsibility to carry on any form of an

17 investigation, even though that would be part of a supervisor

18  and a manager's responsibility regardless of whether it was use

19  of force or any other incident.  That's the first line of

20  defense to get the facts.

21  Q.  How does this compare, in your experience, with use of

22  force systems in other prison systems in terms of documentation

23  of a supervisorial investigation into the facts of what

24  happened?

25  A.  I have always found, I don't believe that there is any --


KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

1113

1  any facility or agency, correctional agency, that I have found

2  that didn't put heavy emphasis on first-line supervisors making

3  a thorough investigation of use of force.  And, secondly, that

4  that be reviewed very carefully, even to the point of doing

5  additional interviewing by management before it goes to the

6  warden.

7  Q.  In your opinion is that an important part of a use of force

8  system in curtailing excessive and unnecessary force?

9  A.  If you don't have that in your system from a system

10  standpoint, you are not addressing the way that enforcement of

11  policies and procedures is carried out in every walk of life.

12  This is a systemwide problem that prior to going to the warden

13  there isn't the information that would be necessary for him to

14  make any kind of a valid, reasonable decision.

15        When it gets to the warden, and this is prepaid by a

16  clerical-type person which has a checklist to assure that each

17  one of these reports, witness reports, medical report, et

18  cetera, is in the package, it then goes to the warden and one

19  would assume that the warden would then carry on some kind of an

20  investigation himself or at least would write some kind of a

21  statement, but unless the warden makes a determination that he

22  wants to have a hearing, which is seldom done, all he does is

23  make a check mark saying that he has completed all of the

24  documents that are required by policy, signs it, and sends it on

25  into region and to Huntsville Central.


KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

1114

1 Q.  And how does that level of warden involvement in the review

2 of the use of force compare with other systems with which you're

3 familiar?

4 A.  A system that -- any system that I have found that has

5 really tried to address this because it was a problem just in

6 terms of the numbers of cases that were occurring, it becomes of

7 the highest priority for the warden not to just sign a form, but

8 for the warden to know exactly what's happening.  If there's any

9 question in his mind, then he or she should carry out additional

10 investigations, either themselves or by someone else that they

11 have the utmost confidence in.

12          Now, in those few isolated cases where I said that the

13 warden did have a hearing, the hearing consists of the officer

14 and any of the officer witnesses coming in and repeating what

15 has already been put into the record in the way of statements.

16 Inmate witnesses do not get called and the inmate against who

17 the force was used is not called.

18       Really about all the warden does at that juncture is

19   either, one, decide that the action was appropriate and closes

20   the matter; two, he might want to let the Internal Affairs

21   department review it, and he would refer it to them; or, three,

22   he himself awards punishment.

23       Now, the second avenue by which an inmate has the

24   opportunity to bring the use of force to the attention of

25   administrators is by filing a grievance.  It's interesting to


KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

1115

1  note that there are more use of force reports coming through the

2  grievance procedure than there is through the official use of

3  reports going up through the line.

4         The grievance officer has a responsibility not to

5  personally investigate.  Generally speaking, in talking to

6  grievance officers, they review to see that the paperwork is

7  there.  And if the paperwork is there, they're satisfied to send

8  the package on to the warden.  If in the eyes of the grievance

9  officers there is some question that he feels it should be

10  answered, then he turns it over to custody and asks for a

11  report.

12         I found few cases in where it was turned over to a

13  management major, captain or lieutenant to review, but in every

14  case in which that procedure was followed, I found that the

15  major or the captain or the lieutenant quoted from the original

16  officer's statement and said that the action was appropriate.

17         The grievance then is returned, denied in every single

18  case around use of force.  The inmate does have the right to

19  appeal the grievance to the second level, but I found in no case

20  where it was grieved to the second level did the second level

21  approve of the grievance or in effect ask for anything further

22  in the way of investigation.

23      What the grievance does do, however, and it seems to

24  be sort of the end of the trail, is that they make a referral to

25  the Internal Affairs division.


KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

1116

1       However, before we speak about that process, let me

2   state that there is no feedback whatsoever from the IAD back to

3   the grievance officer or back to the warden that could be found

4   in any record to indicate whether they accepted the case,

5   whether they opened the case, whether they closed the case

6   administratively, or whether they sustained the case.

7       It would appear to me that the unit level, both

8   grievance and warden, depend upon the IAD as a way of shifting

9   the responsibility for any further investigation to that entity.

10  So the last group would be the IAD.  They receive from the

11  warden, from the grievance officer or from outside elements,

12  parents, relatives, sometimes even legislators.  It is, however,

13  within their total discretion to whether they even open the

14  case.

15      I would suggest that the number of cases that they

16  open are far fewer than what one would expect if you were having

17  a vigilant group that was overseeing what was happening within

18  the department.  And I think the most --

19  Q.   What's your basis for that conclusion?

20  A.   Pardon?

21  Q.   What is it that makes you think that if they were being

22  more vigilant about the use of force issue in TDCJ that the IAD

23  would open more cases?

24  A.   I believe that if it was a requirement, as an example, that

25  the IAD had to report back to the warden on every single case as

KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

012382

1117

1  to whether or not they were going to open it for investigation,

2  and secondly, if they decided not to, the reasons for their

3  taking that position, which would then also allow the warden a

4  second opportunity to make a decision as to whether or not

5  further investigation should be carried on.  It's the sheer

6  numbers of cases that are -- are transferred to the IAD and the

7  relatively small number that are open that brings me to the

8  conclusion that I made.

9       There's a great deal of difficulty for law enforcement

10  personnel to investigate law enforcement personnel.  One only

11  has to have even limited experience working with our police

12  agencies across the country and the great difficulty they have

13  with their Internal Affairs groups of getting them to go out in

14  terms of reviewing what their peers are doing, and there is a

15  tendency to always look at it favorably from the standpoint of

16  the officer.

17       However, Texas was very, very wise in setting up their