# United States District Court
# Southern District of Texas

## Case Number: _H-04-2387_

## ATTACHMENT

Description:

☐ State Court Record　　　☐ State Court Record Continued

☐ Administrative Record

☐ Document continued - Part _III_ of _IV_

☒ Exhibit(s) number(s) / letter(s) _# 102_

Other: _Pltf's First Amended Petiton_
_Habeas Corpus_

18  IAD office in that they have almost an independent group, but

19  all people with law enforcement backgrounds.  So they bring to

20  the job the orientation as a law enforcement officer of many,

21  many years standing.  However, they are quartered in the same

22  facility in which they investigate.  It doesn't take very long

23  if you are identified with those people that they work with

24  every day, that they have coffee with every day, many cases

25  where they live close to in the community.


KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

1118

1   So what we find, then, is that IAD, good solid law

2   enforcement officers, given a responsibility which is difficult

3   for them, which they didn't enjoy or appreciate doing when they

4   were in police work, coming into the correctional arena and

5   having the same kind of responsibility, but also having a

6   responsibility for criminal investigations.  And I found that in

7   talking to the few IADs that I was allowed to talk to, that they

8   shared with me that they thoroughly enjoyed doing criminal

9   investigations and they felt that having to do use of force

10  investigations was a very difficult and unrewarding chore.

11      The last area that I would just like to touch on

12  briefly has to do with what happens if -- if there is a decision

13  made that undue or excessive force was used.  Now,

14  unfortunately, I have to share with the Court that the data that

15  I was provided is so mixed and so different and only as they're

16  beginning to become more sophisticated in their data gathering

17  are we going to get accurate information.  But one thing that

18  seems to be constant over the last three or four years is that

19  the number or percentage of cases that are sustained by the IAD,

20  that means the cases which they find themselves that there was

21  excessive force used, runs somewhere around seven percent.

22      Now, what would be an appropriate figure?  I can't

23  really answer, but I would certainly feel concerned that if in a

24  court of law that only seven percent of the people were found

25  not guilty that came before the bar, and that's exactly what's

KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

1119

1 happening in Texas at this time.

2      Of 2,619 cases that were presented to me that I

3 reviewed, there were only 188 that were sustained as being

4 excessive uses of force.

5 Q. Were those also sustained as excessive uses of force or

6 were some of those sustained as technical violations of the use

7 of force procedures, such as cameras --

8 A. No. These are just excessive use of force. I took one

9 unit while I was still allowed to talk to IADs openly and they

10 felt comfortable about doing it, and that was the Eastham Unit.

11 In 1997, the IAD opened 70 cases. They sustained only two.

12      I think even more important in terms of this is that

13 staff believe that policies are important if the policies are

14 enforced by some sanction if you violate them. So I took a look

15 at all the administrative sustained cases that occurred between

16 January '98 and July 31st, '98, and there were 172 cases. 48 of

17 them were for excessive use of force. The others were for not

18  properly making out records, not properly operating the camera,

19  et cetera.  Of the 48 cases in which the IAD said that there was

20  justifiable data, facts to sustain the case, this is what

21  happened.  Three of them were reprimanded.  17 were given

22  probation.  14 were given probation and several days'

23  suspension.  Only three were terminated, seven resigned, and

24  nobody knows what happened to four of them.

25        Now, that isn't the whole picture, because the warden,

KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

1120

1  as I indicated initially, has the authority to give whatever

2  discipline he wanted even before it goes to IAD.  So I took a

3  look at the same period of time to see what the wardens were

4  doing themselves before they had an IAD sustained case.  There

5  were a total of -- I have to give it to you in another way, I'm

6  sorry.  There were 75 cases during that period in which the

7  officer was found guilty of not accurately reporting, not

8  writing the report according to procedures.  There were 20 cases

9  where a camera person didn't properly operate the camera.  There

10  were 151 cases in which there was excessive use of force.  Now,

11  once again, the warden has found excessive use of force.  What

12  did he do?  In 29 cases, he issued a reprimand.  In 65 cases, he

13  gave them probation.  In 14 cases, there were no records and we

14  don't know what happened to them.  In 29 cases, he gave them

15  probation and a short suspension.  12 cases were allowed to

16  resign.  In two cases, they resigned, were not to be hired again

17  by the department.

18       My conclusion of this process, then, is that although

19  there is an excellent paper process, for a number of reasons

20  that process is not carried out, and consequently the facts are

21  not brought to the decision maker's attention.  When the facts

22  aren't brought to the decision maker's attention adequately,

23  concretely, then the punishment is so limited that the word is

24  that it really isn't all that serious.

25       MS. BRORBY:  May I approach the witness, Your Honor?


KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

1121

1        THE COURT:  Yes.

2        MS. BRORBY:  May I approach the witness?

3        THE COURT:  Yes, you may.

4   BY MS. BRORBY:

5   Q.  Mr. Breed, I just handed you what have been marked as

6   Plaintiffs' Exhibits 18 and Exhibit 24.  Do you see those in

7   front of you?

8   A.  Yes, I do.

9   Q.  Are those the documents that were provided by the TDCJ from

10  which you made the calculations about the discipline that was

11  imposed on officers in use of force situations?

12  A.  Yes, they were.

13       MS. BRORBY:  At this time, Your Honor, I'd move

14  Exhibits 18 and 24 into evidence.

15       MR. ANASTASIADIS:  No objection, Your Honor.

16       THE COURT:  They're admitted.

17       THE MARSHAL:  I'm sorry, what is your name, sir?

012391

18          MR. ANASTASIADIS:  Let me write that down for you.

19 BY MS. BRORBY:

20 Q.   Mr. Breed, the nature and the extent of the use of force

21 that you have been describing in court today, did that become

22 obvious to you in the two or three or four days that you spent

23 on a unit from the activities that you conducted, including

24 walking runs, talking to people, and looking at use of force

25 reports and other unit records?

1122

1  A.  Yes, it was.

2  Q.  Does that -- what kind of risk of harm to prisoners does

3  that kind of regular excessive force pose?

4  A.  Well, it poses it in two ways.  One is as examples that

5  I've given, and there is many, many more.  Inmates are

6  needlessly injured.  But secondly, it creates a climate which is

7  both difficult for inmates and equally difficult for staff.  I

8  have never at any time inferred that all correctional officers

9  in the Texas Department of Corrections are brutal, sadistic

10  individuals.  However, it only takes a few on each unit to

11  contaminate a climate environment and destroy the trust between

12  correctional officer and inmate.  And that's far more dangerous

13  when inmates see other inmates being hurt, physically injured

14  needlessly.  Then they lose all confidence in the responsible

15  actions of correctional officers.

16  Q.  What does it do to other officers who see that kind of

17  physical abuse that they know is against the rules?

18  A.  Restate the question, please.

19  Q.  What effect does it have on other officers who see that

20  kind of physical brutality that is against the rules but seems

21  to be going on?

22  A.  Well, it does two things.  One is that it in some,

23  particularly the younger officers, mind, it makes them -- as I

24  indicated earlier, that this is appropriate.  This is perhaps

25  the way I am going to have to do if I see myself as being

KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

1123

1  successful, and then therefore hopefully promoted.  But, once

2  again, it's far more insidious in terms of correctional officers

3  who really want to treat inmates fairly to have the climate

4  poisoned by the few that insist on using force.  And as long as

5  that force isn't stamped out in every conceivable way that

6  management can do, it's going to continue.

7  Q.  Do you see the steps that TDCJ has been taking to address

8  the use of force issue as being in any way reasonable or

9  responsible, given the level of the problem that exists?

10  A.  Unfortunately, I don't.  Some ways perhaps they've got a

11  burden that I am aware of but maybe not as sensitive to as those

12  that have to actually operate a system as huge and difficult as

13  this one.  I'm very sensitive to that.

14        But I think that as long as there are totally

15  inadequate numbers of classification staff, as long as managers

16  and supervisors are not carrying out investigations that are

17  necessary, and as long as administrators are not reviewing the

18 facts and aggressively trying to get to the truth, as long as

19 staff penalties are as lenient as they currently are, as long as

20 there isn't adequate training regarding how you deal with

21 intervention in a nonaggressive way, until such time as I see

22 wardens and managers of all levels walking those tiers, talking

23 to inmates, and finding out what is happening in their units,

24 correctional officers, some of which are going to do it in

25 illegal ways.


KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

1124

1 Q.  The other area that you focused a great deal of your time

2 on during your investigation in TDCJ was TDCJ's handling of

3 prisoners who perceived themselves to be at risk of being

4 physically injured by other prisoners; is that correct?

5 A.  That's correct.

6 Q.  A prison -- a prison system is not responsible, is it, to

7 protect every prisoner from every possible harm at the hands of

8 another prisoner?

9 A.  It would be an ideal society if we could formulate it in a

10 way that would give that guarantee.  I do believe, however, that

11 corrections has an absolute responsibility to provide reasonable

12 safety for all inmates.

13 Q.  What kinds of inmates are the natural victims in a

14 correctional setting?

15 A.  Well, certainly the small, the weak.  Another category that

16 I'm more and more familiar with, and that's the elder, the

17 older, the gay, the mentally ill.

18     THE COURT:  The what?

19     THE WITNESS:  Mentally ill.  The handicapped, the

20 ex-gang member who really wants to operate outside the gang.

21 But there is forming in Texas more and more, and this phenomena

22 actually exists in only a handful of states around the country,

23 and that is a very active gang activity which constantly looks

24 for new recruits.  So beyond the weak and the vulnerable that

25 I've already identified, almost any inmate coming into

KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

1125

1  corrections today is going to be faced with one of the major

2  gang groups to ride with them.  And I said I don't like to use

3  the inmate language, but it's the only one that is understood

4  fully by all.  The inmate is either willing to pay for

5  protection or provide sexual pleasure for protection.  And this

6  is a phenomena that is of just the recent years to add to the

7  victim list.

8  BY MS. BRORBY:

9  Q.  So the presence of gangs increase the level of

10  victimization in a prison?

11  A.  Oh, yes, no question.

12  Q.  Even without gangs, the stronger try to make the weaker

13  give them what they want; is that right?

14  A.  Yes.

15  Q.  Child molesters are at risk in a prison; is that right?

16  A.  Yes.

17  Q.  And youthful offenders are at risk in a prison?

18 A.  Yes.

19 Q.  Can you run a prison system without having these kinds of

20 vulnerable prisoners in your population?

21 A.  Any -- any large system has to recognize that there is a

22 sizeable number of inmates which we have both now identified

23 that are going to need a protective setting even from the

24 beginning.

25 Q.  Is this something that everybody in corrections knows?


KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

1126

1 A.  It's something that everybody in corrections recognizes and

2 is certainly working towards.  I would suggest as an example

3 that across the country, somewhere between two and a half and

4 three percent of the total population is identified as

5 protective custody needing.  These are people that have to be

6 placed in a situation where they are not in contact with the

7 general population at all.  Two and a half percent in Texas

8 would be several thousand.  At the present time in protective

9 custody, there is less than 60.  Let me make another --

10 Q.  Let me back you up a minute.  I hate to -- I hate to

11 interrupt.  But when we're talking about the national figure of

12 two and a half to three percent who need to be in protective

13 custody that is isolated from the general population, is it also

14 true nationally that prison systems will have additional beds

15 beyond that two and a half and three percent that are in some

16 way designated for the weaker offenders who maybe don't need to

17 be totally separated from the general population, but they're

18  recognized as being in the category that's more vulnerable, and

19  they tend to be housed together so they don't victimize each

20  other?

21  A.   The use of safekeeping in Texas is almost a phenomena that

22  doesn't exist anywhere else in the country.

23  Q.   Is there a soft line in California?

24  A.   I think there's a difference between a soft line and

25  safekeeping.  A soft line would be a prison, a major part of a


KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

1127

1 prison.

2       THE COURT:  You're saying S-O-F-T, soft line?

3       THE WITNESS:  Yes, soft.

4       THE COURT:  I haven't heard it before.

5       THE WITNESS:  Once again, that's a term that counsel

6 has shared with us.

7 BY MS. BRORBY:

8 Q.   A soft line is for softies, right, the people who aren't as

9 tough as all the other guys?

10 A.   Yeah.  What you normally do through classification is try

11 to separate out the -- first, the predators from the vulnerable.

12 Having once identified people as vulnerable, there's obviously

13 varying levels of vulnerability, some of which that are at the

14 top or the bottom of that list, however you want to look at it,

15 would -- should go immediately into protective custody where

16 there's total separation.  Others, depending upon their

17 particular background, their particular security and program

18 needs, would be put in institutions where there are not the

19 aggressive, acting out, predator types, and then observed very

20 closely to see whether or not they can survive in that kind of

21 situation.

22       The cue is that at the first time you see that the

23 vulnerable is being abused, then you have to make a decision

24 about moving them to a place in which he has greater protection

25 - not just transfer him to another facility identical to which

KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

1128

1  he left, but one that has greater protection.  You go through

2  that process until eventually you recognize that there's a

3  sizeable number that have to be provided total protection for

4  their survival.  Let me --

5  Q.  So when you talk about transferring a prisoner to a greater

6  level of protection, are you envisioning a situation where you

7  might have a prisoner in a true general population and then move

8  him to what I use slang to call a soft line because he's not

9  making it in the general population?

10  A.  That would certainly be one of the options that you would

11  have available to you.  And there's --

12  Q.  And then if that prisoner was not making it on the soft

13  line, you might decide that you need to move him to a protective

14  custody situation where he's truly segregated from a general

15  population.  Is that the model that you're speaking of?

16  A.  If you believe in trying to protect human beings in a very,

17  very difficult environment, you have to do it that way.

18      Now, let me just make one comment, though, before we

19 go on in this area, because I think that this is something that

20 Texas folks really need to think through pretty carefully.  I

21 picked up an attitude of sort of tolerating the problems of the

22 weak and the vulnerable, and particularly this seemed to exist

23 where inmates had demonstrated any kind of sexual identification

24 around a homosexual bend.

25      There's an old saying that I remember back from my

KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

1129

1  Marine Corps days when somebody complained about the hard life.

2  You'd say, It's hard, but it's fair.  You had a good home.  You

3  wouldn't stay there.  The only difference is that these

4  vulnerable people get into an institution.  Maybe they had a

5  choice about their criminal activity that got them there.  But

6  once society said, You are going to be locked up, society has a

7  responsibility to be doing everything possible to provide them

8  safety.

9       In Texas in talking to correctional officers, even in

10  talking to some wardens and deputy wardens, one warden told me

11  with a great deal of pride that there was no protective custody

12  on his unit.  There's really a feeling that in some ways,

13  protective custody and the kinds of people that are put in

14  protective custody is a stigma on the manliness of the

15  institution that those people want to run.  So I think there's

16  almost an attitudinal kind of thing that has to be dealt with,

17  that these people are our responsibility, and we have to do

18   everything within our power and authority to protect them.

19   Q.   What, if any, observations did you make about the effect of

20   the attitude that you're describing on institutions' responses

21   to the vulnerable coming forward and asking for protection?

22   A.   One of the very, very large problems is a systemwide method

23   of operating that a person is going to be turned down for

24   protective custody over and over again before any serious

25   consideration is given to it.  It's generally done on the basis

KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

1130

1 of insufficient evidence.  But this occurs even when an inmate

2 has been beaten up, has been raped.  He comes before the UCC,

3 and for whatever set of reasons they say, There isn't sufficient

4 evidence.  Therefore, you'll stay in general population.

5        There's another effort which is quite understandable

6 in that any administrator manager wants to get as much

7 intelligence as he or she can about what's happening in their

8 unit.  But one of the requirements, you know, to get protection

9 is that you've got to give names.  By giving names, you're

10 quickly identified as a snitch.  And one doesn't have to work in

11 the field of corrections to know the reputation of what happens

12 to those that are identified as snitches.

13        There seems to be, in my opinion, far too much

14 emphasis on, You've got to prove you've been hurt over and over

15 again.  And secondly, You've got to give up enough names so it

16 makes it worthwhile before we'll even consider protective

17 custody, or what's called in Texas, safekeeping.

18        And I want to say something about that, because

19  safekeeping is obviously the answer to the fact that in this

20  system there are only 60 beds.  And the last time I made a count

21  on it, of the 60 PC beds, only 40 of them were filled.  I would

22  think that there would not be any shortage of candidates for

23  those protective custody beds, looking at the cases that I have

24  reviewed.  But safekeeping is the method that Texas has chosen

25  to take care of a sizeable number of people that have indicated

1131

1 that they need protection.

2       Some of the problems that really concern me about

3 safekeeping is, one, many of the doors, cell doors can be

4 popped.  Now, I realize that there's no such thing as always

5 guaranteeing that a door can be locked, but I don't know that

6 I've been in particularly new institutions where so many cases

7 of doors being popped occur.  When a door is popped, that means

8 somebody gets out and somebody gets in.  Tragically, in most

9 cases somebody gets in, and then the attack takes place.

10       Second -- and this particularly occurs on medium and

11 closed units, and I saw it over and over again -- inmate up on

12 the second tier yells to the picket and say, Open up.  So the

13 officer opens the door.  That officer hasn't the slightest idea

14 whether that inmate belongs in that door or not.  Another

15 opportunity to get at somebody very easily.

16       The response might well be, well, correctional

17 officers know all their inmates.  They know which cell they're

18  in.  No.  Texas has a system of rotating their officers around

19  so that generally speaking, every day they're on a different

20  unit.  They haven't the slightest idea who the officers -- I

21  mean, who the inmates are, who the vulnerable, who the predators

22  are.  Very often, they aren't even given that kind of

23  information before they come on duty if they don't look at their

24  log.  So they might well open all the cell doors to go to chow

25  when there is three that are in there who are predators that are

KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

1132

1 locked down on purpose.

2      I could go into great deal about this, but what I'm

3 trying to indicate is that safekeeping isn't very often safe,

4 particularly when officers aren't walking those tiers, when

5 officers aren't checking on an every shift basis to see whether

6 there's any lubricant in the locks, whether there's any paper in

7 the locks so that doors can't be popped.

8      I think the most difficult part, however, about

9 safekeeping is that safekeeping will go out into the fields and

10 be working right alongside a group of general population people

11 where their enemies might well be.  They come back from the

12 fields and they go into a shower at the same time the general

13 population inmates.  With the exception of close custody, now,

14 they will go into the same dining hall.  So what I'm suggesting

15 to you is that safekeeping is not safe in Texas as it's

16 currently operating.

17 Q.  If I've understood you correctly, safekeeping is Texas'

18  version of protective custody.  Safekeeping you see as the TDCJ

19  version of protective custody?

20  A.   Safekeeping as it's used in Texas has no relationship

21  whatsoever to protective custody as found in large correctional

22  agencies across the country.

23  Q.   But except for 60 or 100 beds, it's the most protective

24  custody that is available to the vulnerable prisoners in Texas

25  if they can get into it?


KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

1133

1 A.  Yes and no.

2 Q.  Okay.

3 A.  Administrative segregation has become the place to where

4 people that are vulnerable really feel their life is in danger

5 will try to get.  Even as I visited each institution and talked

6 to the folks about their administrative segregation, a question

7 I'd always ask is:  Do you have any protective custody?  No.

8 Protective custody don't come to this facility.  Protective

9 custody are not allowed in our administrative segregation.  I

10 found many people who would qualify under anybody's

11 classification as needing protective custody in administrative

12 seg.  However, the unfortunate part -- and this is where I would

13 hope that administration and management would very, very

14 carefully assess what they're doing.  Inmates have learned they

15 can get to administrative segregation by breaking the rules.

16 And so they refuse to work.  They refuse housing.  They do it

17 because they know they can get to administrative segregation and

18  they will be safer there, at least safe from other inmates.

19  Q.   What do you think of that as a method of providing

20  protection to the vulnerable prisoners in a prison population?

21  A.   I'd rather see that happen than have them left in general

22  population or placed in safekeeping, which is not, at least at

23  the time I reviewed it, truly a safekeeping situation.  I think

24  it's unfortunate that anybody has to break serious rules in

25  order to get protective custody, then be placed in an


KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

1134

1 administrative segregation kind of environment which is sterile,

2 rigid, and has nothing going for it in terms of helping inmates

3 become nonoffenders.

4 Q.  Does it have an adverse impact on the amount of time a

5 prisoner will spend in prison when he chooses to go to

6 administrative segregation or cell restriction as a means of

7 gaining protection?

8 A.  Would you repeat the question?  I want to be sure I answer

9 it.

10 Q.  Does it have any impact on a vulnerable prisoner's time

11 that he's going to serve in prison if he chooses to obtain

12 protection by getting serious disciplinary offenses and going to

13 administrative segregation or cell restriction?

14 A.  Well, there's no question that it does, because, first,

15 generally speaking, to get an administrative segregation, even

16 though they have chosen to break a rule to get there, like

17 refusing to work or refusing housing, they'll probably lose all

18  their good time.  Not just lose all of their good time, but in

19  some cases this is hundreds and hundreds of days.  If somebody

20  would compute that time to some legislators, I'm certain they

21  would be terribly upset about the cost that's being ensued in

22  order to take away people's good time and keep them in prison

23  longer.

24        However, in getting to administrative segregation,

25  they have no opportunity to get good time.  They have no

KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

1135

1 opportunity to get any kind of programming that may be helpful

2 to them upon release to society.  So it's a lose-lose situation,

3 with the one caveat, and that is that for the first time, the

4 inmate feels safe.

5 Q.  Did you observe any systemic causes for a level of

6 victimization that you found in Texas besides the natural

7 presence of victims in the population who were not in protective

8 custody?

9 A.  Well, there's no question that if you're going to leave

10 vulnerable people where predators are present, there's going to

11 be more attacks, assaults, rapes, et cetera.  It's difficult for

12 me to understand.

13       And earlier you asked me a question that in other

14 facilities, can't you place some of these vulnerable people in a

15 situation where they can be safer and yet not have the rigidity

16 of an ad seg or even a protective custody?  And it's true, if

17 you operate an effective classification system, that will assure

18  you reasonably that by putting this group of vulnerables

19  together that, in most cases, they can live compatibly.  And

20  they can, and that's done throughout this country.

21  Q.  Is that something like what safekeeping is supposed to be?

22  A.  Well, it could be a piece of what safekeeping is, but these

23  vulnerable people, then, aren't put out where they're in contact

24  with the general population.

25  Q.  And then for the vulnerable people who are too vulnerable

KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

1136

1  to make it in that setting, there would be a protective custody

2  for them to go to?

3  A.   Yes.

4  Q.   Did you observe any other conditions in the TDCJ that

5  facilitated victimization?

6  A.   One of -- one of -- one other factor about protective

7  custody -- and I really can't speak except in the limited

8  numbers that they have.  But in safekeeping, people are put in

9  safekeeping finally because they have almost exhausted the whole

10  process of life endangerment, I-60 memorandums, grievances, over

11  and over again until in some cases they finally get into

12  safekeeping.

13          Once in safekeeping, if they break rules -- this

14  doesn't have anything to do now with rules of why they were

15  brought into safekeeping, but other kinds of rules -- they will

16  be first threatened that if you don't straighten up your act,

17  you're going to be taken off of safekeeping.

18      But, secondly, case after case after case that I

19  reviewed and that I have records on, people broke rules, and

20  then the UCC removed them from safekeeping and put them back in

21  the general population because they had broken rules.  They get

22  back in the general population, they're assaulted again, they're

23  raped again.

24      I would suggest that people that break rules should be

25  disciplined just like somebody in general population is.  But if

KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

1137

1   you have classified and stated that an inmate needs protection,

2   you don't take that protection away if you're carrying out your

3   responsibility of protecting inmates.

4   Q.   That's not a fair discipline for a wrongdoing?

5   A.   Absolutely not.

6   Q.   Do you see the lack of any classification counselors or

7   substitute, therefore, as playing any role in the problem that

8   victims face in TDCJ?

9   A.   Well, I would just see back to the 1995, whenever they had

10  classification counselors, even at the level of one to 200, a

11  classification counselor being aware of these problems, being

12  very much involved with them, trying to work something through.

13  Then when the UCC says, Leave them in the general population, a

14  good classification counselor is going to speak up strongly,

15  present all the reasons why safekeeping and protective custody

16  is required.

17       And even then, if overruled by UCC, then they would