# United States District Court
# Southern District of Texas

Case Number: _H-04-2387_

# ATTACHMENT

Description:

☐ State Court Record          ☐ State Court Record Continued

☐ Administrative Record

☐ Document continued - Part _IV_ of _IV_

☒ Exhibit(s) number(s) / letter(s) _# 102_

Other: _Pltf's First Amended Petiton_
_Habeas Corpus_

18   closely monitor what's happening to be sure if there is another

19   example of protection needing not being fulfilled, that that

20   case would immediately be brought back for reconsideration of

21   UCC.  The absence of classification counselors carrying out

22   those kinds of functions is probably the greatest reason why as

23   many inmates are being harmed in the Texas system.

24       I have to make an aside, though.  I don't want it

25   thought that the UCC never recognizes that an inmate needs some


KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

1138

1 kind of protection.  And the thing that's most upsetting, I

2 think, to me in this regard is that I found a number of cases

3 where UCC said, This case needs safekeeping.  That has to go up,

4 then, to Huntsville, where the state classification committee

5 makes the decision, and it's turned down.

6        And I suppose there's some reason occasionally why

7 that might occur.  But it's very difficult for me to understand

8 how a decision made by the people that are responsible for the

9 day-to-day operation, responsible for that institution and those

10 prisoners, should be overruled by a central classification that

11 knows nothing more about the case than what's written down on a

12 few pieces of paper.

13 Q.  Are there staffing or staff deployment issues that play a

14 role in the victimization that happens in TDCJ?

15 A.  Which kind?

16 Q.  Either level of staffing or the deployment of staffing?

17 A.  Beyond classification counselors now, you're asking the

18  question?

19  Q.   Yes.  For example, where -- did you make observations about

20  where victimization took place?

21  A.   I have looked and feel somewhat uncomfortable about

22  responding to that question, because I did not do a staffing

23  analysis.  I would like to have done a staffing analysis if

24  there had been time to carry this out just so that I would have,

25  as some people keep requesting, more scientific data to share.


KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

1139

1  Q.  How long does it take to do a staffing analysis in an

2  institution of the size that you were visiting in TDCJ?

3  A.  You could not do an adequate staffing analysis of a

4  2500-bed institution in less -- in less than a week.  That's one

5  institution.  And that would probably take two people to even do

6  that.  I participated in the staffing analysis of all the Texas

7  prisons during the Ruiz case, and I brought in two top level

8  people, and it took us a month to do it, and there was just a

9  handful of facilities compared to what there is now.

10      But to go further, I can observe that the staff that

11  are there now, either because there seems to be in some

12  facilities a high vacancy rate, or whether staff have been

13  reassigned to other functions than their post assignment, or

14  whether staff just aren't doing what their post assignment calls

15  for.

16      For instance, during the heat of summer in

17  administrative segregation units, I found all of the

18  correctional officers gathered in the one place that was air

19  conditioned, which was a control office in bull pen, where their

20  post assignment called for them to be in each of the wings.

21        So I'd have to state, in answer to your question, that

22  I cannot answer whether there are sufficient officers.  I can

23  state my opinion that I did not find the officer coverage

24  satisfactory to be able to observe those areas in which attacks,

25  assaults occurred, which doors were being popped, et cetera.

1140

1 Q.  Did it seem that correctional officers were able to perform

2 a function that you said a classification counselor might be

3 able to perform in terms of keeping an eye on an inmate who had

4 reported a problem who had not yet been moved and following up

5 on any signs of further problem?

6 A.  This is one place where, particularly early in my movement

7 around, just chatting with correctional officers informally, I'd

8 say, Do you see your role as sort of being sure that somebody

9 gets to the hospital if he needs to, et cetera?  And the reply

10 always was, That's really not my job.  My job is to control the

11 wing.  My job is to feed out meals.  My job is to supervise.

12 That's somebody else's job.

13        When I asked the question, Whose job is that?  There

14 always seemed to be a sort of shaking of the head and not really

15 sure.  Maybe -- maybe it would be the major.  But I saw little

16 times when the major was doing any of that.

17 Q.  Did you find -- do you have some examples of individual

18  prisoners whose safety needs were in no way adequately addressed

19  but might help us understand the situation better?

20  A.  Yes.  The first case I would like to share with you is

21  660820.  This is a first-timer and all groups pressured him as

22  soon as he came into the unit.  He was raped three different

23  times on medium and once on close.  He asked the psychologist if

24  he couldn't help him, and the psychologist told him that there

25  wasn't anything he could do about security issues.  UCC

KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

1141

1  recommended safekeeping, and the case went up to the state and

2  it was denied.

3        He refused housing as a method of addressing this

4  problem.  He was put in handcuffs and dragged into the cell,

5  left there, and was raped that night by his cellie.

6        The next case is 766958.  This is an 18-year-old when

7  he arrived in prison, got lots of pressure from the Gang 8.  In

8  September '97 he was badly beaten by the Gang 8 and he reported

9  this to the sergeant.  The sergeant did nothing.  He requested

10  protection and nothing occurred.  UCC wouldn't transfer him.

11        January 1998 he was again assaulted, a concussion,

12  broken jaw, was again denied by UCC for protection.  After that,

13  two inmates came into his cell and beat him.  When I saw him 11

14  days later, he had two black eyes, blood clots in his right eye,

15  a nose that was swollen across his face.  I can only say that he

16  looked terrible, and yet he did not get safekeeping.

17  Q.  In those two cases, would you say that the prison officials

18  at the institutions where the inmates were housed had sufficient

19  information from which the conclusion -- there was no other

20  conclusion but that the inmate required some kind of protection?

21  A.   There's no question that even if you didn't get the names

22  and numbers of who the assailants were, but both of these cases

23  they did, they were given up, the fact that a person could get

24  as badly beaten and not recognize that this individual needs

25  protection is just not justified.


KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

1142

1 Q.  Did you actually meet with these individuals?

2 A.  Yes.  I met with everyone that I'm speaking to you about.

3 Q.  And the two individuals you've been talking about, are

4 those Mr. Mathis and Inmate FF?

5 A.  Are they --

6 Q.  The inmates that you're speaking of, are they --

7 A.  The first case was Mathis; the second case, Inmate FF.

8 Q.  I asked about those inmates in particular because they have

9 also actually testified in court.

10 A.  I would only say, Counsel, for the record, that I didn't

11 know that they were going to testify.  I wouldn't have included

12 them only because I would have just as many other cases as I'm

13 sharing with you.  But --

14 Q.  Well, these are people that we have had an opportunity to

15 see.  Would you say that in seeing them and talking to them that

16 added to the obviousness that they were the type of people who

17 were the -- were people who naturally could be victimized in

18  prison?

19  A.   I think in both of those cases there isn't any question

20  that it wouldn't take a very good observer and a very good

21  interrogator to find out that this is somebody who has a

22  vulnerable background and requires a great deal of protection.

23  But it's the repetitiveness of it that really speaks to the fact

24  that protection is not being provided.

25  Q.   Well, was part of what was repetitive in your observations

KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

1143

1  that the people who you talked to who had been victimized were

2  also the sort of people who just looking at them looked like

3  victims?

4  A.  I'm, again, sorry.  I'm not certain I understand really

5  what you're asking.

6  Q.  Let's go on to another example.

7  A.  Okay.  The next one is Mark Jimenez, 834073.  He was 18

8  years old when he came into prison.  He's five-foot-seven

9  inches, weighs 135 pounds.  He was recognized as being

10  protective custody needing when he was in jail, San Antonio.

11  That was because he had a background in a very small gang in

12  that area and the Gang 7 had put a hit on him.  When he came to

13  the state jail, Dominguez, protective custody was ignored.

14  There were four requests to classification for protective

15  custody, all were denied.  He asked to be interviewed by the

16  lieutenant and the lieutenant told him he couldn't help him

17  until he was hurt.  He refused to join the Gang 7, which they

18  were asking him to do or pay off, and so on September 14th he

19  was very badly beaten.  Even after that, the UCC refused

20  protection.

21        On September 18th, a life endangerment was denied.  On

22  September 25th a life endangerment was denied.  On October 20th,

23  a life endangerment was denied.  On September 20th he was

24  assaulted by two inmates.  He was punched, kicked.  They had a

25  can in a sock and they beat him over the head.  He had a


KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

012436

1144

1  puncture wound, lacerations, his eyes were swollen and black and

2  he had nine stitches to his chin and lip.

3         Following that on September 25th, and I had already

4  mentioned that the life endangerment was again denied and he was

5  returned to general population.

6         On October 24th -- on 20th he was again denied a life

7  endangerment.  He was to remain in GP.  On November 10th he was

8  again assaulted by Gang 7.

9         Next case is Jeffrey Johnson, 630140.  He was first

10  raped in prison in 1993 in the Robertson Unit.  Every time he

11  went to commissary, the Gang 4 took his purchases.  The gang

12  even got to his parents.  His mother was sending money in to the

13  gang members.  He was transferred to Ramsey, placed on PC, or

14  safekeeping.

15         Six months later he was transferred to Eastham.

16  There's no reason in the file why, but he was taken off

17  safekeeping.  Three weeks after that, he was beaten, raped, and

18  forced to participate in oral copulation.

19      So, finally, after denials of grievances, denials of

20  life endangerment, he decided to refuse housing, refuse

21  showering, refused to cut his hair, and he was locked down in

22  close custody in 30-day increments for 18 months.

23      He was transferred frequently.  In June of 1996 he

24  arrived in Allred.  The Gang 4 knew about him because the word

25  passed rapidly.  He told classification, filed emergency

KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

1145

1  grievances, life endangerment.  All the requests were denied

2  because of insufficient evidence.  So he was again beaten and

3  raped.  And the attackers at the time of my interviews were

4  still on the unit.  The UCC denied him.  The grievances denied

5  him.

6        On 8-31, 8-32 (sic) August -- the end of August, first

7  of September, the Gang 4 beat him badly, forced him again into

8  oral copulation.  He filed life endangerment again.  The

9  lieutenant on duty called the ones who had beat him and he

10  together.  The attacker denied it.  So they're all returned to

11  their unit.  He was beaten again that night.

12        I could go on with case after case that are exactly

13  similar to this, but I would like to conclude unless you want

14  more --

15  Q.  Let's do one more.

16  A.  One more case?  This is well-known to some.  His name is

17  Hulin, H-U-L-I-N, 721364.  Mentally ill by diagnosis of

18  qualified medical practitioners.  A 17-year-old boy who

19  described himself in a letter he wrote as small, skinny, who had

20  been sexually and physically attacked several times.  He

21  reported all of these incidents.  And in his letter he said, I

22  may die any minute.  Please, sir, help me.

23        On 12-18, protective custody was denied.  On 1-16, UCC

24  denied.  On 1-16, he filed a grievance and a request for

25  protection.  It was denied.  On 1-19-96 another grievance for

1146

1  protective custody.  Denied with the response, Does not meet

2  emergency grievance criteria.  On 1-26-96, he hung himself,

3  became a vegetable and died May 10th.

4        It's our obligation to do everything within our power

5  to prevent these tragic occurrences.  There is not a great

6  number of Hulin cases, but the cases I have cited and the dozens

7  and dozens of others that I reviewed are potential Rodney Hulins

8  if we don't give them some feeling of safety.

9  Q.  In TDCJ, as you have observed it to be in 1998 during the

10  course of your tours, what kind of risk of harm are vulnerable

11  prisoners at?  Looking at the system as it is the last time you

12  were there, which was late 1998, how safe are the vulnerable

13  prisoners in TDCJ?

14  A.  Well, I think that the examples I have cited and the

15  problems that I have cited at that time had not been addressed,

16  and that I saw and in my opinion, from having visited 18 units

17  and having spent a great deal of time in each one of them, that

18  the greatest concern I have has to do with the victims, the

19  vulnerables, the people that needed adequate protection and were

20  not receiving it then.

21  Q.  As of the last time that you were in TDCJ in 1998, was TDCJ

22  implementing any measures that were a correctionally reasonable

23  response to the problem that was persisting in the system with

24  the vulnerable prisoners?

25  A.  I've heard that there have been some things done to address

KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

1147

1  some of these issues, but I can only respond that at the time

2  that I made my last visit none of these changes, if they have

3  occurred, had been brought to my attention.

4  Q.  What makes you think that the victims that you found in

5  TDCJ represented a systemwide problem rather than one or two or

6  five people following -- falling between some cracks?

7  A.  Because it is occurring throughout the system, would be the

8  first response to that question, and occurring in sufficient

9  numbers so that it doesn't become just the anecdotal defense

10  that often is taken.  Well, I have given a horrible example as

11  anecdotal, it ceases being anecdotal when there are sufficient

12  numbers and when they are pouring across the system.

13        Now, I want to state that there was one unit and one

14  jail that I visited where there was far less harm, far less

15  safety issues occurring and far less use of excessive force,

16  which tells me two things.  One is that with leadership, with a

17  constant effort to address these problems, you can improve what

18  is occurring throughout the system.  Secondly, though, I would

19  have to emphasize that even in those two facilities I found

20  examples similar to what I have shared with you today.

21  Q.  Which two facilities were those?

22  A.  Allred Unit and Dominguez Jail.

23        THE COURT:  And what was the last one?

24        THE WITNESS:  Pardon?

25        THE COURT:  What was the last one?

KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

1148

1 BY MS. BRORBY:

2 Q.  The judge is asking what the second one was.

3       THE COURT:  The last unit that you mentioned, what was

4 it?

5       THE WITNESS:  Allred.

6       THE COURT:  Allred.

7       THE WITNESS:  And Dominguez Jail, Your Honor.

8       THE COURT:  Thank you.

9 BY MS. BRORBY:

10 Q.  Mr. Breed, I'm not going to ask you to give lengthy

11 testimony about your observations in administrative segregation

12 because some time has been spent on that topic in the testimony

13 of other witnesses, but I would ask you to describe briefly

14 what -- the work that you did in looking at administrative

15 segregation in TDCJ and your observations about conditions in

16 those units.

17 A.  I not just visited, but I spent a great deal of time in

18  every administrative segregation unit.  In effect, there was one

19  in every unit.  I think the Dominguez Jail would probably argue

20  that they don't have administrative segregation, but they do

21  have a unit where they have a number of high security inmates

22  placed, and they use it in that regard.

23      Administrative segregation to begin with, and I have

24  to express my strong feelings in this matter, is a place where

25  you put inmates who have demonstrated by their behavior that


KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

1149

1 they are serious security risks and have a high potential for

2 violence.  And they have demonstrated that sufficiently that you

3 remove them from general population and put them in a very

4 secure kind of environment.

5       If you visit administrative segregation units around

6 the country, however, there is a great effort within the bounds

7 of security and control to also provide as much programming

8 which hopefully will change attitudes and behavior of those that

9 are there.

10      I found a void, an absence of any kind of programming

11 whatsoever in the administrative segregation units.  I found a

12 system of levels that I don't believe exists anyplace in the

13 country today, certainly not that I know of.

14 Q.  How do you mean that it's different from all other

15 administrative segregations you know in the country?

16 A.  Well, when you come into administrative segregation in any

17 other state, you come in and you are entitled to whatever

18  program opportunities there are there.  You lose those only as

19  it can be justified because of your misbehavior in the ad seg

20  unit itself.  That's the first thing you look at in terms of

21  coming into Texas.  With the three level systems, almost all, 95

22  percent of those coming into administrative segregation go in

23  the bottom level, which means you don't get anything except

24  three meals a day and your medical care, and that's the extent

25  of it.


KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

1150

1 Q.  Well, tooth --

2        THE REPORTER:  I'm sorry?  I didn't understand you.

3 BY MS. BRORBY:

4 Q.  The state-issue tooth powder and state-issue soap in Level

5 3?

6 A.  Yes.  You can't have any of your own toiletries or anything

7 of that nature.  But, see, the problem is, you have already

8 taken everything away from the newcomer.  You haven't got

9 anything to take away from him because you have taken all of

10 that away.  And that's true basically at Level 3 and Level 2,

11 and it isn't until you get up to Level 1 that you're able to get

12 a few things from commissary, but you still aren't going to get

13 any programming.  It doesn't make any difference what your

14 educational needs or anything else, even though it could be cell

15 operated, you don't get it.

16        But let's go back to Level 3 where the inmate who

17 comes in finds himself.  Now, if a person has misbehaved when he

18  comes into ad seg and needs to go into solitary, I'm not a

19  bleeding heart liberal that says you shouldn't use solitary.

20  That's what you probably should do.  Or whatever other

21  discipline you would do with any other inmate that misbehaved.

22        But in Level 3 administrative seg you've taken

23  everything away so there isn't any really to lose.  The only

24  thing you're holding out, and I debated this frequently with

25  folks in ad seg units in Texas, is they said, Well, the hope of


KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

1151

1 getting something better if you get out.  So the problem is

2 twofold.  If you're going to start out with an attitude that, I

3 don't have anything and I'm going to have to stay in this kind

4 of condition for months - in many cases it's months and months

5 and months and months - to heck with it, I'm at the bottom of

6 the barrel and I might just as well cuss people out and throw

7 things at them and do anything else.  Well, they haven't got

8 anything else left then to even punish them, discipline them or

9 anything else.

10      I think that what they're doing to people when you put

11 them in administrative segregation before they have even broken

12 a rule has absolutely no correctional justification whatsoever.

13 There's no reason.  For instance, females put in Level 3 ad seg

14 can't take their deodorant in with them, which I think really

15 ought to be a problem for the staff.

16 Q.  That's true for males, too, isn't it?

17 A.  Yes, but I think it's even more important that a woman at

18  least be allowed to have deodorant.

19  Q.   That sounds like a sexism appropriate to your generation.

20  A.   Something which I fully accept with my age.   But I use it,

21  though, more as an example of the foolishness of trying to take

22  away something when you really don't have anything more to take

23  away, so you take away those things which really legitimately

24  people ought to have.

25       I found in ad seg no effort whatsoever to try to be of


KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

1152

1 any help to inmates in terms of their improving themselves.  In

2 ad seg, 50 percent of the people and more that are in it are in

3 there because they are gang members and have been identified as

4 gang leaders.  I won't even get into a discussion of whether

5 that's a valid decision or not.  But if a person is put in ad

6 seg because he has a gang identification of some kind, stays

7 there for four, five, seven years, one that I interviewed there,

8 with clean records, still doesn't know how to read and write and

9 wants to have some kind of help in that area and it's refused

10 because there is a rule against educational programs in ad seg,

11 I say that the program is serving no useful purpose.

12        The last thing, though, that I really want to share

13 with you, Texas has a very firm procedure that you don't get

14 into ad seg without central approval and you don't get out of

15 seg without central approval.  And I have mixed feelings about

16 that, but I would say on the whole it gives it sort of control.

17 Somebody is looking pretty carefully about both in and out,

18  although I would say the out part out to be totally an

19  institution decision.

20       But once in ad seg, whether you're in Level 3, 2, or

21  1, is totally left up to the correctional family.  That's the

22  correctional officers, basically.  Because although the warden

23  is on the ad seg classification committee, he appoints as his

24  designee the captain in charge of the ad seg unit.

25  Q.  What's the problem with that?


KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

012454

1153

1  A.  The problem --

2      THE COURT:  Well, before we get into that, let's have

3  a recess.  The Court will be in recess for 15 minutes.

4      (Recess at 2:30 p.m., until 2:45 p.m.)

5      THE COURT:  Please continue with your direct

6  examination.

7      MS. BRORBY:  Thank you, Your Honor.

8          CONTINUED DIRECT EXAMINATION

9  BY MS. BRORBY:

10  Q.  Mr. Breed, when we took a break, you were telling us

11  something about the administrative segregation committee, its

12  composition.  And I think my last question was, what problem do

13  you see with a committee comprised of ranking supervisors and

14  correctional officers in administrative segregation making the

15  decisions that they make?

16  A.  First, you've got to understand that ad seg within the

17  typical Texas Department of Corrections unit system is a world

18  almost unto itself.  Once the inmate is placed in there, what

19  happens to him within that unit in terms of discipline, what

20  happens to him in terms of any kind of additional privileges

21  which the level system speaks to is controlled by correctional

22  officers and usually a captain or a lieutenant.  The captain or

23  lieutenant supports their correctional officers.

24          Correctional officers have a tremendous weapon.  If,

25  for whatever reason, they're unhappy with an inmate, they can


KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998