# United States District Court Southern District of Texas

## Case Number: H-04-2387

## ATTACHMENT

Description:

☐ State Court Record          ☐ State Court Record Continued

☐ Administrative Record

☐ Document continued - Part I of IV

☐ Exhibit(s) number(s) / letter(s) Exh # 103

Other: Pltf's First Amended Pet. Habeas Corpus

EXHIBIT 103

MS. SALITERMAN:  Okay.  Thank you, Your Honor.

8  Plaintiffs will now call Mr. Chase Riveland.  R-I-V-E-L-A-N-D.

9       THE COURT:  Please raise your right hand and be sworn.

10        CHASE RIVELAND, PLAINTIFFS' WITNESS, SWORN

11             DIRECT EXAMINATION

12       THE COURT:  Just take your seat there, please, sir.

13  You might find it necessary to pull that chair up.  Please

14  proceed.

15  BY MS. SALITERMAN:

16  Q.  Okay.  Mr. Riveland, would you please state your name for

17  the record?

18  A.  My name is Chase A. Riveland.

19  Q.  And I'd like to ask you first about your background.  You

20  spent most of your career in corrections; right?

21  A.  I have.

22  Q.  And when did you first begin work in the area of the

23  corrections field?

24  A.  I began in Wisconsin in 1964 as a probation and parole

25  officer.

KATHY CARROLL, OFFICIAL COURT REPORTER

012457

UNITED STATES DISTRICT COURT  (512) 236-0998

777

1 Q.  And how long did you work as a probation and parole

2 officer?

3 A.  At that time, I worked for two and a half years before

4 going into the U.S. Army for three and a half years.

5 Q.  And after the Army, did you go back into corrections work?

6 A.  Initially I returned to graduate school concurrently

7 working as a probation and parole officer, completing my

8 graduate degree in 1971.

9 Q.  And after you got your graduate degree, what work did you

10 do?

11 A.  I returned to being a probation and parole officer until

12 moving to the Mendota Mental Health Institute, where I was a

13 supervisor of their child adolescent program, and subsequently

14 an assistant superintendent at the Mendota Mental Health

15 Institute.

16 Q.  And did you pick a job again in corrections work?

17 A.  I did.  I returned to the corrections department and held

18 several positions, supervisory positions until being appointed

19  as the regional chief of the Milwaukee region in roughly 1976.

20  Q.   And when you say of the Milwaukee region, what was the

21  Milwaukee region?

22  A.   The corrections department divided its activities into six

23  regions.  The Milwaukee region handled the probation and parole

24  system, as well as minimum security prisons.

25  Q.   So that in that position, you were supervising minimum

KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

778

1  custody prisons?

2  A.   That is correct.

3  Q.   Okay.  And for how long were you in that position?

4  A.   Approximately four years.

5  Q.   And then what did you do?

6  A.   I was then appointed as the superintendent of the Portage

7  Correctional Facility.  Portage.  P-O-R-T-A-G-E.

8  Q.   And what is the Portage Correctional Facility?

9  A.   The Portage Correctional Facility was a maximum security

10  prison.

11  Q.   Is that in Wisconsin?

12  A.   It is, in Portage, Wisconsin.

13  Q.   And what was your next position in corrections?

14  A.   I then was appointed as the deputy administrator of the --

15  of the division of corrections.

16  Q.   And that was for the state of Wisconsin?

17  A.   That is correct.

18  Q.   And how long were you in that position?

012461

19 A.  Roughly seven months.

20 Q.  And did you then take another position in corrections?

21 A.  I then was appointed as the executive director of the

22 Department of Corrections in the state of Colorado, which is the

23 cabinet level position administering the corrections department.

24 Q.  And your -- and your responsibilities in that job were

25 what?


KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

779

1 A.  The responsibilities were to administer the prisons within

2 the Department of Corrections, as well as the parole system.

3 Q.  And those were all the prisons for the state of Colorado?

4 A.  That is correct.

5 Q.  And for how long were you in that position?

6 A.  I was there nearly four years.

7 Q.  And what did you do next?

8 A.  I then was appointed as the secretary of the Department of

9 Corrections in the state of Washington, the secretary being the

10 cabinet level position, and the director of the correctional

11 department.

12 Q.  And how long were you -- that's the top position running

13 the corrections system in the state of Washington?

14 A.  That is correct.

15 Q.  And for how long were you in that position running the

16 prisons in the state of Washington?

17 A.  I was in the position roughly 11 and a half years.

18 Q.  Which brings us to when?

012463

19  A.  To January of 1997.

20  Q.  Okay.  So that was from about 1986 to 1997?

21  A.  That is correct.

22  Q.  And what were your responsibilities running --

23  A.  My responsibilities were to administer the prisons and the

24  probation and parole system.  At that time, it equated to

25  roughly 12 prisons, 16 work release facilities, 76 probation and

KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

780

1  parole offices statewide.

2  Q.  While you were in these various positions directing

3  corrections systems or assisting in the directing in Wisconsin,

4  Colorado, and Washington, did you have an opportunity to visit

5  other prison systems throughout the United States?

6  A.  I did.  Prior to my being appointed as the deputy in

7  Wisconsin, I had worked -- had helped develop new classification

8  systems, both for probation and parole and for prisons in the

9  state of Wisconsin.  Those systems were subsequently adopted by

10  the National Institute of Corrections.  And I spent a fair

11  number of -- a fair amount of time in the early 1980s visiting

12  different systems that were interested in establishing those

13  classification systems.

14  Q.  Would you tell the Court some of the prison systems you

15  visited in that capacity?

16  A.  During that period of time, it would have included

17  Oklahoma, Minnesota, Iowa, Ohio, Connecticut, Oregon, Idaho,

18  Arizona.  That's some.  I'm sure there were more.

19  Q.   Okay.  Now, you left your position running the prisons for

20  the state of Washington in 1997.  What have you been doing since

21  then?

22  A.   A variety of things, an eclectic group of things, if I may,

23  including writing.  I recently completed a monograph for the

24  National Institute of Corrections on super max prisons.  I've

25  recently completed a chapter in a book for the crime and justice

KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

781

1 series on prison administration from 19 -- the mid 1900s till

2 the mid 2000s, projecting the future of prisons.  I serve as a

3 psych coordinator for a project called the Criminal Justice

4 System Assessment Project, sponsored by the Department of

5 Justice.  I am the psych coordinator for the state of Alaska in

6 their criminal justice system.  I have -- I serve as one of a

7 three-person team putting on a year-long executive training

8 program for up and coming corrections people called Correctional

9 Executive Excellence, and it's provided at the National Academy

10 of Corrections.  And a number of technical assistance kinds of

11 activities, working both with wardens as well as with

12 correctional leadership programs, including one in North

13 Carolina that's an ongoing training for their management and

14 administrators.  And in a couple of instances, have served as an

15 expert witness in death penalty cases at the -- at penalty

16 phase.

17 Q.  And among your activities since you left the state of

18 Washington, have you been involved in a project looking at super

19  max or ad seg prisons in the United States?

20  A.  I was, and I was asked to write a monograph on super max

21  prisons, and in the course of that activity, visited several of

22  the super max facilities or units throughout the country.

23  Q.  Which super max facilities or units have you visited

24  besides any in Texas?

25  A.  It included the Pelican Bay facility in California.  The

KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

782

1  Federal Bureau of Prisons administrative maximum security

2  institution in Florence, Colorado.  The new Colorado super max

3  located in Canon City, Colorado.  The Oak Park Heights facility

4  located in Stillwater, Minnesota.  The intensive management

5  units in Washington state.  And I reviewed the policies and

6  procedures from the Connecticut super max and the Indiana super

7  max, as well as the policies and procedures for administrative

8  segregation units in other states.

9  Q.   What are super max facilities?

10  A.   The definition that we're using in the monograph that I

11  have used, because it differentiates from punitive segregation

12  and what has been historically administrative segregation, are

13  extended control facilities, facilities in which inmates are

14  placed for extended periods of time, not necessarily for

15  behavioral purposes, but for some other purpose.

16  Q.   And in your connection with your work in this matter, the

17  Ruiz matter, did you have an opportunity to visit the ad seg

18  facilities in Texas?

19  A.  I did.  I visited the ad seg facilities in each of the

20  units that we visited, roughly, 15 or 16, as well as the high

21  security unit at Estelle.

22  Q.  Now, in terms of this matter that brings us in court today,

23  when were you first contacted to become involved?

24  A.  I was contacted, I'm guessing it's probably March --

25  roughly March of 1998.


KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

783

1  Q.  And who contacted you?

2  A.  I was contacted by counsel, Ms. Donna Brorby.

3  Q.  Okay.  And what were you asked to do?

4  A.  I was asked if I would serve as an expert witness in this

5  case, along with Mr. Allen Breed, and if I -- at the time,

6  simply to forward my resume for review by Ms. Brorby.

7  Q.  And did -- and were you given any directions as to what

8  your assignment would be as an expert witness?

9  A.  I was told at the time that the State had brought the

10  matter back before the Court, that there were 40 days available

11  to counsel and counsel's experts for on-site visits within the

12  state of -- within the TDCJ, the institutions of TDCJ, and that

13  we were to assess the conditions of the prisons, specifically in

14  relationship to those issues that might relate to the final

15  order of 1993.

16  Q.  And what did you proceed to do to assess the conditions in

17  the Texas prisons?

18  A.  Well, initially, I had counsel, before even accepting

19  involvement in the case, with Mr. Allen Breed, because I had

20  known him for years and had a great deal of respect for him.  We

21  determined independently that -- and so informed Ms. Brorby that

22  we would be willing to do that if, indeed, we found in our

23  opinion that Texas had met the conditions of the final order,

24  that we would so say, that we were not interested in simply

25  trying to find a lot of things wrong if most things were right.


KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

784

1     We then used I think probably the first two or three

2   visits to sort of get a general assessment of the -- of the

3   units that we had visited and determined between Mr. Breed,

4   myself, and Counsel Brorby as to how we would proceed.

5   Basically, that determination was a very rough breakdown into my

6   generally looking at administrative segregation protection

7   issues and, to some degree, use of force.  On the other hand,

8   Mr. Breed concentrated on use of force issues, disciplinary

9   issues, and some others.

10  Q.   When you said -- mentioned the first few visits were just

11  to get a general feel of conditions in Texas, do you recall the

12  first unit you visited?

13  A.   The first unit we visited was Coffield.

14  Q.   And if you would, tell us how you proceeded to look at

15  Coffield and assess the conditions there.

16  A.   To some degree, we began much the same as we did on any

17  unit we visited, in that we would begin typically with a

18  briefing in the warden's conference room by the warden and his

19  or her staff.  We then generally in most instances would take a

20  tour of the unit, at least getting an idea of all of the types

21  of living pods, cell blocks, and generic general program areas

22  within the unit.

23       We then typically would spend a great deal of time

24  with cell-to-cell discussions and interviews with inmates, sort

25  of random discussions with staff en route to interviewing

KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

012474

785

1  inmates, as well as on the living pods.  From that, we'd

2  generate a list of names of inmates that we would interview.

3  Typically I would sit in on classification hearings with the

4  Unit Classification Committee, normally seeing seven, eight,

5  nine cases, depending on the schedule for the day of the UCC.  I

6  typically would sit in on disciplinary hearings and observe

7  five, six, seven cases, again depending on what was scheduled

8  for the day.  Frequently I would interview one or two types of

9  staff, which could vary from unit to unit.  That could include

10  the classification chief, the disciplinary captain, in a couple

11  of instances the gang investigator, the warden, the assistant

12  wardens, any number of other kinds of staff, depending on the

13  issues that we either were aware of or had run into through

14  cell-to-cell interviews.

15  Q.  And while you were on-site, did you also review documents?

16  A.  Typically, yes, in two fashions.  One would be to review

17  documents as a follow-up to the interviews with inmates in order

18  to substantiate or refute the circumstances described by the

19  inmate.  The other would be simply documents that had been

20  produced or identified inmate documents as a result either of

21  letters to counsel at some point in time or interviews by the

22  counsel team that was with us that identified documents that

23  they felt we should look at.

24  Q.  And how much time did you spend at the Coffield Unit?

25  A.  If I recall correctly, I believe it was three days, and the

KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

786

1 days typically were 10- to 12-hour days.

2 Q.   Okay.  So you perhaps spent 30 hours in the Coffield Unit?

3 A.   I think that would be a fair assessment, yes.

4 Q.   And is that practice of spending three days in a

5 correctional -- in a prison typical of what people in the

6 corrections field do to get an assessment of conditions?

7 A.   I think that's rather typical.  I, obviously, approach it

8 as a former administrator of corrections.  It was my practice

9 typically to visit the institutions that were under my

10 administration as frequently as I possibly could, normally at

11 least once, if not a couple of times a year for most

12 institutions.  And although I wouldn't generally spend three

13 days, I would spend most of the day talking with inmates, with

14 staff, and trying to get a handle on exactly what the mood of

15 the institution was, and were the policies and procedures that

16 were in place being effective and being carried out.

17 Q.   Are you aware of the work of the people who do

18 accreditation for the American -- that was Corrections

19  Association?

20  A.  I am.

21  Q.  And when they -- their staff goes in to do an assessment of

22  a prison, how much time do they typically spend?

23  A.  Well, that's varied over the years.  Unfortunately, the

24  majority of their review is of policies and procedures, and the

25  time that they actually spend on-site talking to line staff and

KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

787

1  inmates is generally very limited.  I believe that the

2  accreditation -- typically now, an accreditation team will

3  complete their work in no longer than three days.

4  Q.  And how many team members do they generally send to a unit?

5  A.  Normally three.

6  Q.  After you went to the Coffield Unit, do you have a list

7  maybe -- can you recall the next unit you went to?

8  A.  I don't offhand.

9  Q.  Can you -- do you -- can you tell us what other units you

10  visited?

11  A.  Yes.  I visited roughly 16 units.  Excuse me, Your Honor.

12  (Indicating).  I visited the Coffield, Terrell, Dominguez State

13  Jail.  That was the only state jail that I visited.  Estelle,

14  Eastham, Murray, Ferguson, McConnell, Connally, Hobby, Hughes,

15  Gurney, Garza East and West, Neal, and Clements.

16  Q.  And Garza East and West, is -- are those -- is that a

17  transfer facility?

18  A.  They are transfer facilities, that is correct.

19 Q.  And in each of these different units, did your procedure

20 that you follow more or less -- is it similar to the one that

21 you followed in Coffield?

22 A.  The procedure was generally the same.  It would -- it would

23 change generally only if the nature of the unit was a bit

24 different, which, for example, the transfer units versus the

25 state jails, or the women's unit.  And it would differ somewhat

KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

012480

788

1  based on information that either we had received from someone

2  else or from information I had learned from documents and

3  policies and procedures reviewed in the interim.

4      MS. SALITERMAN:  May I approach the witness?

5      THE COURT:  You may.

6  BY MS. SALITERMAN:

7  Q.  I would like to show you what's marked as Plaintiffs' 1522.

8  And is that an exhibit that reflects the report you prepared

9  based on your visits to all the Texas prisons that you've

10  listed, the 16?

11  A.  It is.

12  Q.  Okay.  And at the back of that report, I believe there's a

13  resume that's part of that exhibit, about page 35 or so?

14  A.  There is.

15  Q.  And does that resume accurately reflect your qualifications

16  and experience in the corrections field?

17  A.  It does.

18      MS. SALITERMAN:  I'd like to move the admission of

19 Plaintiffs' 1522.

20        MR. YOUNG:  Subject to the Court's earlier

21 announcement that it's considering everything without undue

22 objection, we would object only if something arises in the

23 report that's -- or connects with the report that's not

24 disclosed on the face of it as far as any opinion might be

25 concerned.  But we have no objection to admissibility only.


KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

789

1      THE COURT:  All right.  The exhibit will be admitted.

2      MS. SALITERMAN:  Thank you, Your Honor.

3 BY MS. SALITERMAN:

4 Q.  Okay.  Well, Mr. Riveland, you mentioned that you focused

5 your attention in looking at the Texas prisons on three issues,

6 one of which you called protection.  Is that also known as

7 safety or safekeeping or the helping avoid prisoner-on-prisoner

8 harm?

9 A.  That is correct.

10 Q.  Okay.  And did you form an opinion as to the conditions in

11 the Texas prisons with regard to protection or safety?

12 A.  I did.  What became apparent as we sat in on UCC hearings -

13 Unit Classification Committee hearings - that we're considering

14 those persons who had requested either protective custody or

15 safekeeping or transfer because of a threat or a perceived

16 threat, alleged threat.  There are too frequently policies and

17 procedures of TDCJ, although generally seen as adequate, that

18 were not followed.

19        THE COURT:  Do I understand from what you're saying

20   that the paper procedures were all right, but it was the actual

21   performance that you found deficient?

22        THE WITNESS:  Yes, sir.

23        THE COURT:  Very well.  Thank you.

24        THE WITNESS:  Those concerns came up in several ways.

25   One from the interviews with inmates that we would then -- that


KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

790

1  I would then verify from either medical records for injuries

2  that occurred or from unit records that would describe the --

3  what had happened and either verify or refute the inmate's

4  story.  It seemed that two or three kinds of cases began to

5  concern me.  One was the instance where the inmate would

6  indicate to a staff member, a correctional officer, a sergeant

7  or lieutenant or a major that they had concerns for their

8  safety -- for any variety of reasons.  It could be that they

9  were being pressured for -- to share their commissary, pressured

10  for sex, pressured for -- to join a gang, and that it was not

11  reported per TDCJ's own policy and procedures at all.  A second

12  grouping, I think, of people were those who, even if not

13  requesting safekeeping or protection, either physically or

14  mentally were of such stature or status that it was obvious that

15  their protection should be considered by a correctional system.

16  And thirdly are those that requested safekeeping or protection

17  but for some reason or other in the process were denied what

18  would seem to be on the face of it some kind of required

19 protection.

20 BY MS.SALITERMAN:

21 Q.   Well, let's take the -- those three different types once by

22 one.  You said there should be some concern for the prisoner's

23 safety, but that nothing was reported.  And by that, you mean

24 that there was a request made to somebody, but it didn't go up

25 through the system to the warden's office, or beyond that?


KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

791

1  A.  I think in many instances, we found is that the request for

2  safety was simply ignored.  It was not formally entered as

3  policy would require.  It simply was either brushed off or --

4  and certainly at least not legally recorded as a request per

5  TDCJ policy.

6  Q.  And you have some specific examples of that?

7  A.  I do.  I interviewed on the Hughes Unit an inmate by the

8  name of Henry Ralff who -- Number 749098.  He indicated to me

9  that he had been forced into sex by a number of gang members

10  over the last couple of years, and that one of those physically

11  assaulted him in February of 1998.  He was hit a number of

12  times, both eyes being blackened, and his head was jammed

13  against the sink.  The officer in responding refused to have him

14  escorted to the infirmary, slammed the door on the inmate's

15  hand, and indeed took the tip of the inmate's finger off with

16  the cell door hitting the doorjamb.  It states on several

17  occasions he informed staff that he -- that he needs protection,

18  that he has given them names of the people who are threatening

19  him, which frequently is a requirement, and that he has

20  regularly been denied by the Unit Classification Committee.  But

21  he also indicates that on several instances where he has not

22  requested protection, that it's been obvious that he had been --

23  was being pressured by the gangs and that that had been ignored

24  by staff and not formally entered as a request for protection.

25  He was an individual who presented himself as extremely


KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

792

1  frightened and demoralized.  And the medical records review

2  support the incident of the finger being severed and of the

3  other abrasions he received from the assault.  And his files

4  support his being denied the protective status.  Missing from

5  the equation, of course, difficult to find, are the pieces of

6  story he tells, at least, that would suggest that he is a person

7  that should have been considered for protection earlier on.

8  Q.  And were there other examples that illustrate that point

9  that you had?

10  A.  There was an individual by the name of Dennis Huff, 814725.

11  He was an individual who uses crutches to walk.  He's a Social

12  Security disabled individual, first-time offender.  Nine days

13  after he was received at Neal, he was attacked and assaulted by

14  two people.  He's the type of individual in looking at him that

15  I would initially have some concern for him, whether he

16  requested protection or not, simply because of his inability to

17  defend himself.  He's an individual who has physical

18  disabilities as well as some limited intellectual abilities, and

19  obviously if he has resources, is vulnerable if for no other

20  reason for pressure for his -- his resources, his things from

21  the commissary.

22        As it -- as it happened, he was -- he was attacked in

23  his cell by two people about nine days after he was received at

24  Neal.  It ruptured his spleen.  When he asked to be taken to

25  medical, he was not taken.  He collapsed the next day.  He was


KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998


012490

793

1  taken by wheelchair to the infirmary, sent off-site for

2  emergency surgery. And the file has no indication at any time

3  of any investigation regarding a need for protection, either at

4  the time he came in, visibly looked vulnerable, nor any

5  subsequent time to the -- to the attack.

6  Q.  Well, is it your testimony that a system -- prison system,

7  just by looking at someone like Mr. Huff, should know that he

8  needs some kind of protection?

9  A.  It certainly has to be a consideration. I think there are

10  several types of people that any correctional process and

11  profession will have to follow. One would be the person that is

12  of small stature. Those that are physically vulnerable, such as

13  Mr. Huff, because of infirmities of one type or another. And a

14  third common type would be the individual that has limited

15  intellectual ability or is mentally ill.

16       MS. SALITERMAN: If I may approach again?

17       THE COURT: Yes.

18  BY MS. SALITERMAN:

19  Q.  I'm giving you three Plaintiffs' Exhibits, 233, 232, and

20  234, which represent some of the TDC records on Mr. Huff.  In

21  forming your opinion that Mr. Huff was vulnerable and the things

22  you said happened to him did happen, did you have a chance to

23  review these kinds of documents?

24  A.  I did.  Exhibit 233 are the clinical notes regarding

25  Mr. Huff.


KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

794

1 Q.  And those notes document his injuries?

2 A.  They do.

3      MS. SALITERMAN:  And I'd ask that those exhibits be

4 moved into evidence, Your Honor.

5      MR. YOUNG:  No objection to 232, 233, and 234.

6      THE COURT:  They're admitted.

7 BY MS. SALITERMAN:

8 Q.  Do you -- are there other examples that you found that

9 support your opinion that the considerations of safety or

10 protection are not being met in the actual implementation of TDC

11 policies?

12 A.  There are.  I interviewed an individual by the name of

13 Inmate M, 739840, at Clements.  Inmate M, at the time he arrived

14 in TDCJ, was a 19-year-old light-skinned black man who was a

15 fairly fragile-looking individual, a very vulnerable-looking

16 individual, both because of his youth and his physical build.

17      He arrived initially at Terrell, where he was

18 immediately being pressured to join the gang, requested

012493

19  protection, was denied it, and was told to fight, that no one

20  had seen him receive any injuries yet.  This was during the

21  first week of his arrival.  Arguably having seen Inmate M, I

22  would say that he was an individual that one should pay -- at

23  least pay attention to and watch very carefully.

24          He then refused housing, because he alleges, at least,

25  that he was being asked to move to a house, a cell, that had one

KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

012494