# United States District Court Southern District of Texas

Case Number: _H-04-2387_

# ATTACHMENT

Description:

☐ State Court Record      ☐ State Court Record Continued

☐ Administrative Record

☐ Document continued - Part _II_ of _IV_

☐ Exhibit(s) number(s) / letter(s) _Exh # 103_

Other: _Pltf's First Amended Pet. Habeas Corpus_

795

1  of the people that had been threatening him.  When he refused

2  it, he was -- he was gassed.  There was OC used against him with

3  a forced cell extraction.  And he subsequently was placed in

4  solitary, where they wanted him to move again back to the same

5  part of the wing that he had been threatened in before.  He was

6  gassed to move him out of solitary, back to general population.

7  And he was at that time being -- the intent was to move him into

8  closed custody rather than medium, which subsequently did

9  happen.  As he was moved into the cell, the cell mate and the

10  inmate next door to him saw, apparently, the vulnerability of

11  this young man.  The man next door to him raped him literally

12  within an hour after he had been placed forcefully in the cell.

13  And that night, the cell mate, the other closed custody inmate,

14  raped him, also.

15        He subsequently began a long cycle of requesting

16  protection, being denied it, and then refusing housing moves,

17  and he has several disciplinary cases that relate to his refusal

18  to accept housing, and ends up spending a great deal of time in

19  solitary confinement, as a result of that, losing what little

20  good time he had already earned, and is shown -- I might add

21  that the medical records back up claims that he's made as to the

22  dates and extent of the injuries that he suggests that he --

23  that he had.

24        In August of '96, he again requested safekeeping or

25  protection.  And a lieutenant wrote, suggesting that that -- to

KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

796

1  the UCC, suggesting it be followed.  The Unit Classification

2  Committee denied the safekeeping again.  He subsequently picked

3  up some more cases for refusing housing.  Again was placed in

4  solitary.  Again refused to leave solitary and ended up spending

5  roughly 90 days in solitary as a result of those refusals.

6        Then subsequently was taken out on a bench warrant for

7  his own protection, requested to go to PAMIO.  By this time, he

8  had been described as being an angry, assaultive individual.  In

9  reviewing the record, it's quite obvious that he does refuse to

10  move into housing that he considers unsafe, but other than that,

11  does not seem to be an assaultive individual.  He was refused

12  the option to go to PAMIO, and subsequently -- the story just

13  continues on.  And he eventually was placed in administrative

14  segregation, which then, of course, did afford him the kind of

15  protection that he wanted.

16  Q.   Well, let me take you some -- through some of this.  Would

17  you first tell the Court what PAMIO is?

18  A.   PAMIO is a program that TDCJ has established --

19          THE COURT:  How do you spell that?

20          THE WITNESS:  It's P-A-M-I, zero, or O.  I'm not sure

21  that I recall, but it's for mentally ill offenders, for those

22  that have been described by the medical department of TDCJ as

23  needing treatment for their mental illness.

24          MS. SALITERMAN:  If I may approach again, Your Honor?

25          THE COURT:  You may.


KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

797

1 BY MS. SALITERMAN:

2 Q.   I'd like to show you Plaintiffs' Exhibits 554 and 555,

3 which are some of the TDC records on Inmate M.  Are those some

4 of the records you reviewed in addition to interviewing -- on

5 which you presented your information about him today?

6 A.   They are.

7 Q.   Now, you said there was a forced cell extraction using gas.

8 From what -- from where was he extracted?  Is this the cell they

9 wanted to move him out of?

10 A.   He was -- he, as I recall, was extracted from the isolation

11 cell.  He was serving isolation time, punitive segregation time,

12 if you will.  And when told that he was to be moved back to the

13 same area that he had been -- that he had left, refused.  And

14 they used a cell extraction, moved him back into a closed

15 custody cell at that point in time, where he subsequently was

16 raped both by his cell partner, as well as a neighbor.

17 Q.   So they gassed him to get him out of the isolation cell,

18 and then took him to the closed custody cell in which he was

19  supposed to be housed?

20  A.   That is correct.

21  Q.   Did you understand he resisted going into the closed

22  custody cell?

23  A.   That's my understanding, yes.

24  Q.   But he was made to go into that cell?

25  A.   He was made to go in the cell.  And as I recall, he

KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

798

1  described that he was crying at the time because of being forced

2  in there, and that the -- both the cell partner as well as the

3  neighbor saw the weakness of this, of him and how vulnerable he

4  was at that point in time, and subsequently was raped by each.

5  Q.  And do you have an opinion as to what the TDC officials

6  that were putting him in that cell understood at the time as

7  they were putting him in the cell?

8  A.  Well, I don't know what they were thinking at the time.  I

9  do believe, though, that for an individual that displays both

10  the physical characteristics of this individual, the fact he

11  already was described in TDCJ medical records as being fragile

12  or traumatized by his earlier assaults, that to put him in that

13  kind of a situation certainly wasn't taking into consideration

14  his protection needs.

15  Q.  Well, do you think it was unreasonable to put him in that

16  cell?

17  A.  I think it's unreasonable.

18  Q.  And -- now, is -- what about the use of gas to remove him

19  from his cell?  Is that a practice that's appropriate in

20  corrections?

21  A.  It certainly is not inappropriate.  I think the use of gas

22  in corrections in a variety of situations is an appropriate

23  response to removal.

24  Q.  And in this -- in this situation, was gas appropriate?

25  A.  I wasn't able to judge that.  I don't know the situation.


KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

799

1  It was not well described as to the degree to which he was

2  refusing.  The concern I would have around the particular

3  situation is, it did not seem that there was -- there was no

4  recording of anyone making an attempt to find out clearly why he

5  wanted -- why he was refusing.  It's not very often that inmates

6  choose to stay in solitary confinement.  Refusing to leave

7  solitary confinement is even rarer.  There should have been, I

8  think, lengthy discussion by someone and probably by somebody

9  from the mental health department to determine if indeed he

10  should be moved or not.

11  Q.  But in your opinion, in his case, the -- was there an

12  obvious risk that he would be harmed by putting him in the

13  living situation that they were forcing him to move into?

14  A.  Judging by his past and judging by his youth and judging by

15  his physical fragility, I would say that one should have made

16  the determination that there was some risk associated with

17  putting him into a cell with another person in a closed custody

18  setting unless the -- that other cell mate was closely assessed

19 as to not being a threat.

20 Q. And you said that he ended up living in administrative

21 segregation?

22 A. Yes.

23 Q. And what is your opinion of that as a housing solution to

24 his problems?

25 A. Well, ironically, it finally served his purpose. He, at

KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

800

1  that point in time, was not placed in administrative segregation

2  for protective custody purposes.  He was placed in there as a

3  result of his behaviors over time.  Nevertheless, it did then

4  afford him a degree of protection.

5  Q.  I understand in his case it at least kept him isolated from

6  predators.  Is that a systemic response to this problem?  Is

7  that appropriate?

8  A.  I'm sorry, I didn't understand.

9  Q.  Well, is it appropriate to have a system that a person can

10  only get protection from harm by ending up in administrative

11  segregation?

12  A.  I do not think that is appropriate.  I think it's the

13  responsibility of corrections professionals to pay attention to

14  the safety needs.  Inmates in a prison are people who can do

15  very little for themselves, very little legitimately.  And it's

16  the responsibility of corrections officials, whether requested

17  or not by the inmate, to pay the utmost attention to safety

18  needs.

19  Q.   Are there other examples you have of prisoners for whom

20  there seem to be a reasonable risk of harm that was being

21  ignored?

22  A.   There was a Inmate E -- I might add that we ran into --

23       THE COURT:  Before we proceed to that prisoner, I

24  noted that you mentioned that this prisoner or inmate had been

25  in isolation for some 90 days?


KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

801

1      THE WITNESS:  Yes, sir.

2      THE COURT:  What effect, if you know, in your field of

3  expertise, is that likely to have upon his mental condition?

4      THE WITNESS:  It's somewhat ironic, Your Honor, in

5  that I tried to address that specific question as I looked at

6  this booming use of super max prisons across the country in this

7  monograph that I did work for.  There's not a lot of detailed

8  research out there in terms of the impact.  However, I believe

9  that my opinion is, and I believe that it's supported by many,

10  many people, not only in the corrections profession, but in the

11  field of psychology and psychiatry, that the severe deprivation

12  of people for extended periods of time will cause people with a

13  predisposition for mental illness to more likely experience

14  mental illness, and for those that may not have that

15  predisposition, to still disassociate from what we would call

16  normal living.  There's a very interesting study that happened

17  in Stanford back in the '60s where they did trials with college

18  students, and they had to call the experiment off because of the

19  severe conditions that the students were exposed to were making

20  them behave very strangely.

21       Having said that, I would once again state that I know

22  of no definitive research.  It's something that --

23       THE COURT:  Well, I remember reading in the history of

24  prisons that the Quakers, in their efforts to reform prisoners,

25  kept them in isolation for years at a time and that they almost

KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

802

1  uniformly went insane.  And that's the reason I was inquiring of

2  you.

3        THE WITNESS:  I suspect that if -- that what we will

4  find when adequate research is done is that that type of thing

5  exactly is what we're going to find, is my opinion.

6        THE COURT:  All right.  Go ahead with your next

7  question.

8  BY MS. SALITERMAN:

9  Q.  Were you able to observe any ill effects on this prisoner

10  as a result of his time in isolation and the other harm that he

11  suffered?

12  A.  He -- at the time that I interviewed him, he was a very

13  withdrawn individual.  I guess I wouldn't rely as much on that

14  as being -- as his solitary time or administration time as being

15  the caused effect, or I don't know that.  What we do know from

16  TDCJ's medical records is that he, in their opinion, suffered

17  from posttraumatic syndrome kinds of behaviors.  Now, whether

18  that is a result of solitary in ad seg and the trauma he had

19 been through the assaults, or combinations of all three,

20 probably.

21 Q.  And that conclusion is in the medical records you reviewed?

22 A.  Yes.

23      MS. SALITERMAN:  I'd like to move into admission the

24 exhibits that you have, which are -- if you would read them,

25 please?


KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

803

1      THE WITNESS:  554 and 555.

2      MR. YOUNG:  No objection to either one of them.

3      THE COURT:  Very well.  They are admitted.

4 BY MS. SALITERMAN:

5 Q.  In addition to the ill effects, perhaps, on his own

6 well-being, in the Texas system, what are the effects of moving

7 from a minimum custody to medium to closed to ad seg in terms of

8 your ability to earn good time, your reduction in class, and so

9 on?

10 A.  Well, in administration segregation in Texas, an individual

11 does not earn good time at all.  And that would be true also,

12 obviously, of solitary.  In fact, solitary typically is a

13 punishment that accompanies, in many instances, the removal or

14 taking away of good time.

15      Generally, people in the non-ad seg and nonsolitary

16 level generally are eligible to earn good time unless they have

17 taken away what is called -- or they have been placed in Line 3,

18 which is a limitation on good time.  My experience is that

19  enormous amounts of good time are taken away in Texas for

20  punitive reasons.

21  Q.  And in his case, by moving to ad seg, he was harmed in

22  terms of his ability to earn good time?

23  A.  He would not earn -- he would not then earn good time, that

24  is correct.

25  Q.  And as a result of not earning good time, you stay in

KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

804

1  prison longer; is that right?

2  A.   That is -- that is correct.

3  Q.   Do you have other examples which show the inadequate

4  practices in Texas causing serious harm to prisoners?

5  A.   There was a gentleman by the name of Inmate GG, 503719.  In

6  March of '98 he was involved in some self-destructive behavior.

7  He was cutting on his wrists.  And in September he complained of

8  a sexual assault by another inmate, saying that it occurred on

9  the 3rd of September, 1998.

10      The medical records confirm that upon examination,

11  that he had been anally penetrated and had another interesting

12  comment that -- I'm not sure where it fits, called him a cured

13  schizophrenic.

14      THE COURT:  I didn't hear that.  Schizophrenic, but --

15      THE WITNESS:  Called him a cured.

16      THE COURT:  Cured.

17      THE WITNESS:  Cured schizophrenic.

18      He maintained on November 10th that the Gang 4 and the

19  Gang 3 had been after him since his arrival at Beto in 1989, and

20  that when he arrived at Beto Unit in 1989 he had been beaten and

21  raped there, and that he gave up the names of the people that

22  assaulted him there, and that subsequently, no matter where he

23  would be, that the -- he would carry, in quotes, snitch jacket

24  along with him, and that put him at risk.

25        He was refused safekeeping on several occasions in


KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

805

1  there.  And then in an attempt of March 1998, he began refusing

2  housing and went through much of the same pattern of the prior

3  inmate that I talked about, but finally, by refusing housing,

4  ended up in administrative segregation where, albeit once again,

5  he would not be earning good time, but at least got himself into

6  a -- into a safe situation.

7  Q.   Well, earlier you gave an example where you thought on its

8  appearance it was inadequate protection because the inmate

9  seemed weak.  Do I understand you that in Mr. Williams' case,

10  the TDC system had actual knowledge that harm had happened to

11  him?

12  A.   It was documented in his medical file that the 1989 assault

13  did occur.  It -- and the medical records also indicate that he

14  had been anally penetrated.

15  Q.   And yet TDC did nothing to provide him with additional

16  protection?

17  A.   That is correct.

18        MS. SALITERMAN:  If I may have a moment, Your Honor?

19      THE COURT:  Yes.

20  BY MS. SALITERMAN:

21  Q.  I believe the -- you reviewed medical records and other TDC

22  records on Inmate GG?

23  A.  I did.

24      MS. SALITERMAN:  And Your Honor, I think those are

25  already before the Court and been admitted as exhibits.


KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

806

1        THE COURT:  I'm sorry, ma'am?

2        MS. SALITERMAN:  I think they have already been

3  admitted as exhibits.

4        THE COURT:  Yes.

5        MS. SALITERMAN:  The chart, the Plaintiffs' Exhibits

6  664 to 674, for the record.

7  BY MS. SALITERMAN:

8  Q.  In reviewing your records, did you find evidence within the

9  documents that TDC had knowledge of some of the harms that were

10  happening to prisoners and yet took no action?

11  A.  That is correct.

12  Q.  And this is -- this is not just medical records, but in

13  other TDC records?

14  A.  I think it was not uncommon to find a request for

15  safekeeping, and that at the -- generally at the unit

16  classification level, there was a denial.  Now, in some

17  instances those denials are probably quite appropriate.  I think

18  there are many instances, however, where a more thorough

19  investigation, or an investigation, in some instances - in some

20  instances, the investigation did not occur - but at a minimum a

21  more thorough investigation to assure that safety would be

22  provided.

23  Q.  And do you have any other examples you'd like to discuss of

24  this failure to provide inadequate investigation?

25  A.  Yes.  Lest we think that violence is a male gender thing, I

KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

807

1  did interview a woman by the name of Deanna Garcia at Hobby

2  Unit.  Deanna's number is 816332.  She indicated that she had

3  been assaulted on two different occasions by the same inmate,

4  went to the infirmary each time, and each time the perpetrator

5  was released.  She was -- she requested protection and was told

6  to fight back on each occasion.  She was moved to another

7  building, but a week later the same perpetrator, after two prior

8  assaults, was moved right next door to her.  And she at the time

9  told me that she was still afraid at the time but was going home

10  in the following week, and so she thought she could make it

11  through till then.

12      The medical records did verify the fact that she -- of

13  the two beatings and did verify, I might add, in the unit files

14  that the perpetrator was moved next door to her a week after the

15  second beating.

16  Q.  And did you confirm the problems that happened to her in

17  her records as well?

18  A.  I did.

19  Q.  Now, did you find any documents that had confirmed some --

20  well, let's talk about rape.  You've been talking about specific

21  cases in which there seems to be evidence that people are raped

22  and it's allowed to go on in the system.  Did you see any --

23  besides these individual cases, did you see any documents or

24  evidence that suggested that there was an attitude in TDC to

25  allow this to happen?

KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

808

1  A.  We did review some statistics that TDCJ itself produces

2  regarding the number of sexual assaults, forcible sexual

3  assaults, recorded during, I believe -- I don't have that

4  document with me.  I believe it was in 1998.  And it was, I

5  thought, a --

6  Q.  If you'll allow me, I'll bring you the Plaintiffs' exhibit

7  that will show this.  Let me show you, Mr. Riveland, what was

8  marked as Plaintiffs' Exhibits 7, 8, 9, and 10.  And with regard

9  to Plaintiffs' Exhibit 7, which is entitled Alleged Sexual

10  Assaults by Unit -- and I think you'll notice on the last two

11  pages of the exhibit, this is information that was provided in

12  response to interrogatories by Plaintiffs?

13  A.  That is correct.

14  Q.  And you had a chance to look at that document?

15  A.  I have.

16  Q.  And on the second -- third page, it gives the yearly totals

17  of -- excuse me -- alleged sexual assaults by unit.  And if you

18  would read for the Court's information the figures for 1993

19  through 1998?

20  A.  The document suggests that in 1993, there were 73 alleged

21  sexual assaults total, TDCJ.  In 1994, 82.  In 1985, 131.  In

22  1986 (sic), 83.  In 1980 -- '97, 87.  In 1998, 81.

23  Q.  And by alleged sexual assaults, what do you understand this

24  totals?

25  A.  My understanding is, that are -- those are the sexual

KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

809

1  assaults reported by the inmates but not necessarily confirmed

2  through investigation.

3  Q.  And did you -- did you receive any information that

4  described the policy and practice in TDC of what happens when a

5  prisoner -- or what's supposed to happen when a prisoner makes a

6  claim of sexual assault?

7  A.  Yes.

8  Q.  And maybe I can direct your attention to Plaintiffs' 8 and

9  9.  And 8 is a May 19, 1997 letter from Debbie Miller, Executive

10  Services of TDCJ, to Joanne Mariner, Human Rights Watch.  And 9

11  is the June 29, 1998 letter from Debbie Miller to Joanne

12  Mariner.  Do you see those?

13  A.  I do.

14  Q.  Okay.  And if I could direct your attention to the fourth

15  paragraph on Plaintiffs' 8, it -- well, perhaps it's paragraphs

16  3 and 4.  And maybe you could tell the Court what TDC's policies

17  and practices are supposed to be with regard to the reporting of

18  rapes.

19  A.  The author of the letter, Ms. Debbie Miller from TDCJ

20  Executive Services, suggests that once an offender reports

21  having been raped, the immediate response is to direct him to

22  the medical clinic -- direct him to the medical clinic.  There

23  he is examined by a doctor, who administers a rape kit if the

24  incident occurred within 12 hours.  A referral is then made to

25  psychiatric services to offer the victim therapeutic counseling.


KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

810

1  Meanwhile, the classification department is notified of the

2  reported rape, and they issue a request to security for

3  investigation.  Facts of the incident are collected, including

4  the time and location of the incident, the name of attackers,

5  name of witnesses.  If confirmation exists to presume a rape did

6  occur, the victim is segregated from the other population.  The

7  investigative report is reviewed by the classification staff

8  based on whether or not the allegations are considered founded.

9  The department makes a recommendation for the victim's transfer

10  to another unit and/or placement in safekeeping housing or has

11  the claimant return to his housing assignment to resume regular

12  duties.  Then it goes on to say that the Internal Affairs

13  Department is also notified, and elaborates on details regarding

14  their activities.

15  Q.  Well, taking it step by step, from your review of cases and

16  documents within TDC, did you find that these steps were being

17  followed, that is, the classification department would be

18  notified of reported rapes?

19  A.  I found, first of all, in almost a crescendoing order that

20  in many instances a rape reported to line staff was not reported

21  anywhere else at all.  Secondly, that many individuals who claim

22  to have been raped were not referred to the medical department.

23  And that in some instances when they're referred to the medical

24  department, that the rape kit was not applied, even though the

25  allegation was that the rape had occurred within 12 hours.


KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

811

1 Q.   And were -- did you find any examples in which there was an

2 investigative report that was reviewed by the classification

3 staff?

4 A.   I don't recall such a report.

5 Q.   And did you see any information that the Internal Affairs

6 Department was notified of these alleged rapes?

7 A.   I don't recall anything I have seen that would suggest

8 that.

9 Q.   Now, I had you read the data on rape that was in

10 Plaintiffs' 7 which showed in 1997, in terms of alleged raped,

11 they had 87; right?

12 A.   That is correct.

13 Q.   Now, if you look at the report by Ms. Miller to Joanne

14 Mariner, in the last paragraph, approximately -- can you just

15 read that in terms of the number of rapes and -- or sexual

16 assault cases that have been investigated, not just alleged, but

17 investigated -- alleged and investigated that occurred each

18 year?  Do you see that on that Exhibit 8?

01252

19  A.  I do.  It suggests -- it states in the final paragraph,

20  Over the past four years, an average of 110 offender sexual

21  assault cases have been investigated annually.  Since 1984,

22  Internal Affairs has investigated a total of 519 cases of this

23  nature.  Four cases have resulted in prosecution, with the

24  guilty party receiving an additional prison sentence.

25  Q.  But from your observation, most sexual assaults are either


KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

812

1  never reported, or if reported, there's not a rape test, and

2  that there's no ongoing reporting to the Internal Affairs

3  Division; is that right?

4  A.   That is correct.  Assuming that these figures are accurate,

5  I find it astonishing that in a -- in a correctional system the

6  size of TDCJ that, for example, there would only be 81 alleged

7  sexual assaults in 1998.  That's a decrease -- despite the

8  population rising to over 140,000 inmates, a decrease from 1997,

9  when there were only 87.

10  Q.   And does that underreporting of alleged sexual assaults

11  support your opinion that TDC is failing to reasonably protect

12  prisoners from serious risk of harm?

13  A.   Given the nature of prison life, I think that's, again, an

14  astonishingly low number of alleged sexual assaults, given their

15  population.  And I think certainly is indicative that something

16  is awry systemically, that the number of alleged assaults at

17  least isn't proportionate to their population, the correctional

18  population.

012529

19  Q.  Does it suggest that there is a systemic toleration of

20  sexual assault?

21  A.  I don't know if it's toleration or if it's a failure to

22  simply follow the policies and procedures that they have in

23  place.  I quite honestly would feel more firmly and grounded in

24  the second of the two.

25  Q.  Thank you.  Now, if you look at Plaintiffs' Exhibit 9,


KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

813

1  there is a more firm number in terms of the number of offender

2  sexual assault cases that were reported.  Do you see that in the

3  first paragraph of Exhibit 9, June 29, 1998?

4  A.  I do.

5  Q.  Okay.  Would you just give those numbers and then give half

6  of the year of '98; right?

7  A.  It states in this letter that I am providing the number of

8  reported cases of inmate on inmate rape and sexual assaults in

9  our system.  In the year 1997, approximately 123 offender sexual

10  assault cases were reported.  From January 1 to June 1, 1998, 59

11  cases have been reported.

12  Q.  So at least it appears, doesn't it, that the figures went

13  up from alleged assaults of 87 in 1997 to 110 investigated and

14  now we've got 123 offender sexual assault cases being reported;

15  is that right?

16  A.  The two pieces of data seem to be inconsistent.

17  Q.  Let me direct your attention next to Exhibit 10,

18  Plaintiffs' Exhibit 10, which are disciplinary code totals for

19  sexual assault.  Did you come to understand in your visits in

20  TDCJ prisons that there is a disciplinary code for sexual

21  assault?

22  A.  I did.

23  Q.  And that's code 7?

24  A.  That's right.

25  Q.  And this compilation, which I report is based on TDC

KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

814

1  documents, gives the year and the population and then the number

2  of prisoners who were disciplined, therefore found guilty for

3  sexual assault.  And would you tell the Court what -- how many

4  prisoners were disciplined for sexual assault in 1997?

5  A.   The report would suggest in 1997 that there were five

6  prisoners that were disciplined for code 7.

7  Q.   And how many in 1998?

8  A.   The number for 1998 is stated as six.

9  Q.   And what is your opinion of those numbers?

10 A.   I would find that number to be low if I were looking at a

11 single unit, let alone an entire system.

12 Q.   And what do you think of that number in comparison to the

13 number of cases investigated as reported in the other exhibits

14 and what you know about the TDC disciplinary system?

15 A.   I, first of all, find the numbers of alleged sexual

16 assaults as stated in the TDCJ document to be astonishing.  I

17 find the number of disciplinary actions for a code 7 to be

18 almost unbelievable.  But -- and, again, I would reiterate that

012533

19  I would find that to be an astonishingly low number for one

20  single prison anywhere.

21  Q.  Now, rape is, you know, the most extreme assault, some

22  people would argue, isn't that correct?

23  A.  It certainly is a very serious type of assault.

24  Q.  Let me put it this way:  Do you think this  underreporting

25  in rape cases is indicative of the underreporting of prisoner on

KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998