# United States District Court Southern District of Texas

## Case Number: H-04-2387

## ATTACHMENT

Description:

☐ State Court Record ☐ State Court Record Continued

☐ Administrative Record

☐ Document continued - Part III of IV

☐ Exhibit(s) number(s) / letter(s) Exh # 103

Other: Pltf's First Amended Pet. Habeas Corpus

_____

_____

815

1  prisoner assaults generally in TDC, or do you think this is just

2  because it's rape or sexual assault?

3  A.  I don't know that I know that.  I find that the figures,

4  such as these, would suggest to me that there is a greater

5  tolerance for sexual assault than there is for physical assault.

6        MS. SALITERMAN:  I would like to move the admission of

7  Plaintiffs' 7, 8, 9 and 10.

8        MR. YOUNG:  No objection.  To admissibility only.

9        THE COURT:  They're admitted.  While we're at it,

10  reference has been made by counsel to Exhibit 664 and 674 and

11  they have not been submitted, much less admitted.

12        MS. SALITERMAN:  Yes.  Thank you, Your Honor.  Let me

13  present those -- one moment, please.  I'm sorry, Your Honor.

14  I'm swimming in exhibits.  May I approach, Your Honor?

15        THE COURT:  You may.

16        MR. YOUNG:  No objection to 664.

17        THE COURT:  It is admitted.

18        MR. YOUNG:  No objection to 665.  No objection to 666.

19  No objection to 667 or of 668.  No objection to 669.  No

20  objection to 670 through 674.

21        THE COURT:  They are admitted.

22  BY MS. SALITERMAN:

23  Q.  And you're looking at this problem of -- well, let me

24  backtrack.  Do you have any other specific examples on safety

25  protection that you would like to discuss and which you base


KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

816

1  your opinion that there is a serious disregard for the risk of

2  harm to prisoners within TDCJ?

3  A.   In a relationship I guess to what we were talking about in

4  terms of rape kits, I did interview an individual by the name of

5  Billy Kincaid, Number 613359.  Billy had at one point been in

6  safekeeping at Beto Unit, and then was removed from there in May

7  of 1998.  On May 1st, I might add, he had been removed earlier

8  but had filed in late April a grievance requesting protection

9  and a safer situation.  He subsequently then was removed from

10  his safekeeping status.  And then literally two days later one

11  of the inmates that had earlier been threatening him, throwing

12  scalding water at him while he was in his cell, and -- he

13  initially was placed back in safekeeping but then taken off for

14  fighting.  Safekeeping, of course, in Texas is not as defining

15  as it is in many other institutions.  Safekeeping individuals,

16  at least historically for the last several years, although have

17  this housing one could call a protective level of housing are in

18  general population for the purposes of programming, whether it

19  be education, work or eating or recreation.  This was confirmed

20  by the medical department.

21        He then again asked for safekeeping, again was denied,

22  and was raped by two inmates.  And at the time was both denied

23  medical and at no time was submitted to a rape test with a rape

24  kit.

25  Q.  You mentioned, by the way, that he filed a grievance.  And

KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

817

1  was this the first notice to TDC of his feeling that he was at a

2  risk of harm?

3  A.   No, actually he had been in safekeeping earlier at the Beto

4  Unit and subsequently released from safekeeping.  Then after

5  being threatened, filed -- had verbally requested protection.

6  And when he got what he felt was not an adequate response, filed

7  a grievance related to it.

8  Q.   I think in these documents there are examples of grievances

9  in one of the plaintiffs' exhibits.  Would you just tell us

10  briefly what filing a grievance means and who sees it and where

11  it goes?

12  A.   Well, the grievance would normally be the process that an

13  inmate in any correctional system would use to make the system

14  aware of what the inmate observes as a failure of a system to

15  work or of a failure of the system to provide them those things

16  they are due.

17        In this particular instance, the inmate, if he felt

18  that he -- that people had not followed the proper procedure in

19  recognizing his request for a protection, would use the

20  grievance to make his problem known and filing such a grievance,

21  the grievance would go to a grievance officer who in theory

22  would investigate that and then respond in kind with whatever

23  the solution to that grievance would be.

24  Q.  Now, you said in theory.  What do you mean by that?

25  A.  It appears in some instances of the many records I reviewed

KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

012540

818

1  that many grievances are not investigated or are not thoroughly

2  reviewed.  In fact, in many instances there are responses that

3  seem to be simply Xeroxes or standard stock responses to a

4  variety of kinds of grievances.

5  Q.   And when you say not many, of all -- could you give the

6  Court an estimate of how many different prisoner files you

7  reviewed in your tour of those 16 units?

8  A.   During the period of tours, I would guess it would have

9  reached a minimum of 25 per unit, and 16 -- roughly 16 units, so

10  300.  And then I have reviewed other prisoner files subsequent

11  to that.

12  Q.   Okay.  And how would you characterize the responses to

13  grievances that you reviewed in that more than 200 files?

14  A.   Unfortunately, I think - as I found during a couple of

15  things during my interviews with inmates - that there is almost

16  a universal distrust of the grievance system, which is

17  unfortunate, because it does need reasonable credibility if it's

18  going to accomplish what I'm sure TDCJ wants it to accomplish.

19      But the belief is, in many instances of many inmates I

20  interviewed and at looking at files, that there is no use in

21  filing a grievance because you're simply going to be denied

22  anyway.

23      MS. SALITERMAN:  And if I may approach, Your Honor.

24      THE COURT:  You may.

25  BY MS. SALITERMAN:


KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

819

1 Q.  I would like to show you Plaintiffs' 48.  Let me represent

2 that this document was produced as an example of a unit's

3 response to grievances.  You testified that there were stock

4 answers to grievances that seemed to be copied or just retyped.

5 Is that Plaintiffs' 48 an example of the kind of stock answers

6 you observed looking through all of those files?

7 A.  It absolutely does.

8      MS. SALITERMAN:  I move its admission, Your Honor.

9      MR. YOUNG:  No objection.

10      THE COURT:  It is admitted.

11      MS. SALITERMAN:  And I would also -- if I could

12 approach again.

13 BY MS. SALITERMAN:

14 Q.  Let me show you a copy of what's going to be marked as

15 Plaintiffs' 15, not 1, protective custody and safekeeping beds

16 as of December 1, '98.  And you testified about prisoners,

17 including the last gentleman, being moved in and out of

18 safekeeping.  And does that exhibit reflect what you know to be

19  more or less the number of safekeeping beds in TDCJ at the time?

20  A.  It does.

21  Q.  And how many safekeeping beds are there in the entire

22  system?

23  A.  This particular document would suggest that as December 1,

24  1998, there were 2,592 safekeeping beds.

25  Q.  Out of a total population of what?


KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

820

1 A.  143,803.

2 Q.  There is also a code called PC and you've mentioned

3 protective custody.  What is protective custody and how does it

4 compare with safekeeping?  What kind of categories of housing do

5 those two classifications offer?

6 A.  Generally, protective custody would be described as the

7 individual being housed and treated in a manner that offers him

8 whatever protection he needs but generally complete protection.

9 It would generally be -- not always, but generally be in a

10 setting such as an administrative segregation, which is where it

11 happens to be with TDCJ.  The beds that they can be protective

12 custody beds are found generally in their administrative

13 segregation units and they're for the most part individuals who

14 are fully restricted in terms of movement and access to other

15 people.

16       Safekeeping in the Texas vernacular is a housing

17 status.  It's an attempt to place an individual who they

18 identify as having safety needs in a safe housing situation.

19  Historically, I think as I mentioned before, however, it's a bit

20  unusual because they frequently -- a person does everything else

21  in general population, including, eating, recreation, going to

22  school, work, et cetera.

23       It's my understanding that TDCJ is attempting and

24  possibly may have already implemented the possibility of placing

25  safekeeping beds in other units that can be more fully


KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

821

1 controlled and look like the more standardly accepted level of

2 protection for such inmates that have that need.

3 Q.  Now, the number of TDCJ prisoners as of December '98 in

4 protective custody is what?  What's the number on that?

5 A.  Excuse me?

6 Q.  In protective custody, how --

7 A.  100 -- this is listed by beds available.  It says 128.  I

8 recall from the National Council of Crime and Delinquency

9 reported that number, and I believe it was in October, was

10 around 70.

11 Q.  So you recall that the actual number of prisoners with

12 protective custody status was 70, but this shows there are

13 additional beds, so they could put up to 128 beds in that

14 status?

15 A.  Apparently so.

16 Q.  In your experience throughout all the other prison systems

17 that you visited, what -- is this a high number, a low number?

18 Do you have an opinion about this in comparison to the

19  population of 144,000?

20  A.   When I saw this figure and understood safekeeping and

21  protective custody as defined by TDCJ, I was a bit surprised.

22  First of all, I admire a system that tries to limit the

23  necessity for putting people in protective custody.  It's very

24  -- in my opinion, a very inhumane situation.  But there are

25  those people that need that protection.  I find for a population

KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

822

1  of 143,000 that to only have 128 PC beds - protective custody

2  beds - is surprisingly low, in my opinion, compared to systems

3  that I've seen.

4       The 2,592 safekeeping beds also I think are quite low

5  for the population of 143,000, particularly as they historically

6  have been operated as not being protective in the full sense of

7  the word.

8  Q.  What is the use of protective custody?  What's the

9  relationship between having more people in protective custody

10  and preventing the vulnerable and weak and the kinds of

11  prisoners you have described from sexual and other assaults in

12  the system?

13  A.  Well, I would agree with what I would observe as being one

14  theory of TDCJ, that whenever possible if it's in a

15  situation that the protection need is due to a predator, your

16  preference is to lock up the predator, not the victim.  But the

17  vulnerable people, frequently there are too many potential

18  predators to do that.  And there are enough of those people in

19  the system that I find this -- in any system find this a

20  surprisingly low number, which would suggest that if you don't

21  make the beds available, you are going to have to minimize the

22  number of people you place in that status, and I believe we saw

23  from figures produced by TDCJ both per Unit Classification

24  Committee denials as well as the state classification committee

25  denials, that the denials are significantly greater in number at


KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

312550

823

1  the UCC level certainly than those that are accepted.

2  Q.   And you said that the UCC is the unit classification body,

3  and then those decisions are reviewed by a systemlike body

4  called the FEC?

5  A.   That is correct.

6        THE COURT:  Called the what?

7        THE WITNESS:  It's called the State Classification

8  Committee.

9        THE COURT:  Thank you.

10       MS. SALITERMAN:  SCC.  Sorry, I think I misspoke.

11       MS. SALITERMAN:  Your Honor, I would present another

12  document or --

13       THE COURT:  Yes, go ahead.  While we're waiting, you

14  made mention of the fact that these reported incidents is a

15  great -- or astonishingly low considering the prison population.

16  Is there -- insofar as you know, has there been any study as to

17  what the usual number of sexual assaults are in prisons

18  throughout the United States per hundred or per thousand or

19  whatever?

20         THE WITNESS:  I don't know of anything that I would

21  consider to be trustworthy, Your Honor.  There are reporting

22  mechanisms.  There are some little booklets that come out

23  annually from the Criminal Justice Institute.  The problem is

24  that they contain self-reported data from each state

25  jurisdiction, and depending on how good the state's reporting

KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

824

1  procedures are affects that.

2        THE COURT:  I see.

3        THE WITNESS:  However, I think what we can say is I'm

4  sure as acquainted you have been in the years over prison life,

5  that sex in prisons, and particularly the threat of violence in

6  order to obtain that sex, is not an uncommon kind of situation.

7  And that rapes, and particularly I think in male prisons, but

8  it's true also in women prisons, albeit common problem is not

9  the correct word, but uncommon is the correct word for there

10  being a rather frequent incidence of it.

11        THE COURT:  All right.  We'll have the morning recess

12  at this time.  The Court will be in recess for 15 minutes.

13      (Recess at 10:30 a.m., until 10:45 a.m.)

14        THE COURT:  You may resume your direct examination.

15        MS. SALITERMAN:  Thank you.

16            CONTINUED DIRECT EXAMINATION

17  BY MS. SALITERMAN:

18  Q.  Mr. Riveland, in -- I would like to leave the safety area,

19  but I would like to ask you one final question.  Were -- when

20  you were at the 16 units, did you make any attempt to find out

21  if the unit kept any information on what happened to prisoners

22  who had requested some sort of protection or safety and it was

23  denied?

24  A.   We did.  And it was somewhat ironic.  At the first unit

25  that I visit, Coffield, it turned out that -- that the -- what

KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

825

1  is required by policy and procedure, the emergency housing log

2  had not been maintained for some extended period of time -

3  several months - and that an attempt had been made to catch it

4  up - I believe it was in February of 1998 - and you could see

5  that there were literally several sheets with the same identical

6  handwriting writing everything in for that period of time and

7  still left three months vacant with no entries as to who had

8  requested emergency housing.  Subsequent units that we

9  approached, though, generally did have such logs, and -- and we

10  were able to observe them in -- in subsequent units.

11        THE COURT:  Well, did -- did the regulations call for

12  them?

13        THE WITNESS:  They did, Your Honor.

14  BY MS. SALITERMAN:

15  Q.  Are the logs the -- do they -- if they're adequately kept,

16  are those all the requests for safekeeping and -- or protection,

17  or some help from being victimized by another inmate?

18  A.  The policy would suggest that it should be all of the

19 requests.  The reality is, in simply from interviewing inmates,

20 that that certainly is not the case.

21 Q.   And if the unit keeps the tally on the requests, did you

22 attempt to find out if the unit kept any information on what

23 happened to requests that were denied?

24 A.   On such a log there is a -- a recording of -- there is to

25 be recorded the -- what the request is, what the problem is, and


KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

826

1 the reaction or the response of the Unit Classification

2 Committee to that request.

3 Q.   Okay.  And if that request is denied, is there any

4 procedure in the unit in which they track what happens to the

5 prisoner in the subsequent month, six months, year, having

6 denied the request for protection?

7 A.   At the time that I requested the information, there --

8 there did not appear, at least I was told there was no such

9 tracking at that point in time.  Subsequent to that and

10  subsequent, I believe literally within the last few weeks, there

11  has been some information generated like that, but it was not

12  available upon request at that time.

13  Q.   And by that are you referring to a defendants' exhibit

14  that's been marked in this hearing -- for this hearing?

15  A.   That is correct.

16  Q.   Have you seen any information other than exhibit or

17  exhibits marked by the defendants?

18  A.   I have not.

19  Q.  Thank you.  Do you have any explanation what might be

20  contributing to this serious disregard of risk of harm -- of

21  serious harm to prisoners within TDC when they need or should be

22  identified as needing protection from assault, victimization and

23  so on?

24  A.  I think one contributing factor certainly is the avenues

25  available for the inmate to communicate to staff what their

KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

827

1  problems are, whether the problem is being threatened or some

2  type of a fear that the inmate has.  One of the things I found

3  quite interesting and alarming, quite honestly, is that

4  apparently in 1995 the Legislature did not appropriate the funds

5  to continue what at that time were called classification

6  counselors, and literally several hundred classification

7  counselors statewide were eliminated.  In almost every prison

8  system that I'm aware of, a position like the historical

9  classification counselor exists and in effect not only is

10  responsible for the inmate's classification and processes

11  regarding their classification, but frequently is an advocate

12  for the inmate and certainly is seen as a neutral person by

13  inmates as one that they can communicate their concerns to.  The

14  elimination of these positions in this system, I think -- and I

15  might add that it -- it obviously was not TDCJ that chose to do

16  this.  I've heard a number of staff around the system talk about

17  the value that existed.  Frequently that counselor position is

18  the one that balances the ultra needs of custody and security

19  people with some concern for the individual inmate.  The absence

20  of that person I think also affects the concerns about safety

21  and the avenues the inmate has to deal with safety issues.

22  Q.  So if I understand you, the elimination of these positions

23  meant that there's no one within the unit who can know the

24  prisoner personally and understand his -- whether there's a

25  validity to his need for some sort of help or protection?


KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

828

1  A.  I think there's very few.  I -- I -- it seems to me that

2  several things contribute to that problem, the -- the fact that

3  on most units that -- that housing officers, correctional

4  officers that are stationed in housing units, are rotated

5  regularly to different posts throughout the wing and creates a

6  disincentive for correctional officers to get to know the

7  inmates and for the inmates to get to know them.  The absence of

8  the classification counselor simply adds to that problem.  And a

9  major communication gap, I -- I believe, is created,

10  contributing to safety problems.

11       MS. SALITERMAN:  If I may approach, Your Honor.

12  BY MS. SALITERMAN:

13  Q.  I would like to show you what's been marked as Plaintiffs'

14  11, Unit Classification Staff, 9 - excuse me - 1995 and 1998.

15  And, Mr. Riveland, if you would look, the number of

16  classification positions in 1995 is how many?

17  A.  This document would indicate 328.

18  Q.  And that's serving a prison population of what size?

19  A.  Of -- serving 76,406.

20  Q.  And in -- as of September 1998 --

21  A.  I would say --

22  Q.  -- how many classification counselors positions?

23  A.  61.

24  Q.  And --

25  A.  With a population that states here of 76,328, but that has

KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

829

1  to be wrong.

2  Q.  That -- that's wrong.  Right.

3  A.  It has to be in the 140,000s.

4  Q.  Thank you.

5      MS. SALITERMAN:  I will, at this time, not move that

6  in admission; and we'll prepare a corrected exhibit.

7  BY MS. SALITERMAN:

8  Q.  It -- now, have you seen any documents or reviewed any

9  testimony by the defendants' expert, Mr. DeLand, as to who else

10  within the unit might be helping perform the classification

11  counselors' role?

12  A.  I did read the deposition of Mr. DeLand and suggested in --

13  in his report that -- excuse me.  I read it in his report.  In

14  his report he suggested that a number of other positions assume

15  the duties, including some by correctional officers, some by

16  people who work in the count room and some by chaplains.  I find

17  that highly unusual, and it doesn't really get to the issue I

18  have with the problem.  There basically on most units is a

19   singular chaplain who can't serve 2,000 or, in some cases, 4,000

20   people the role I'm suggesting.  The count room people basically

21   are clerical persons who keep track of the placement of people

22   within the institution are neither professionally trained to

23   handle communication issues nor do they even have access in most

24   instances.  And the correctional officers both have a lot of

25   duties to perform as well as frequently are not highly trained

KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

830

1  in trying to do that, and then it's confused by this rotating

2  staff issue.  And I -- I'm still left with the premise that a

3  big gap in providing a safe environment for inmates is that they

4  simply do not have an adequate avenue of communication to

5  express their safety concerns.

6  Q.   What role did the count room personnel play in the

7  classification process?

8  A.   Basically once the -- the determination of the Unit

9  Classification Committee is made as to the custody level and

10  the -- the general housing assignment that the inmate should go

11  to, they determine such things as, does the person -- do we have

12  to put them in a lower bunk for whatever reasons, and if so,

13  here are the lower bunks available.  They literally have little

14  trinkets, if you will, that hang on a hook, and -- and they

15  determine what inmate will be housed in what particular cell or

16  what particular bed given the conditions that have been laid

17  down by the Unit Classification Council -- Committee.

18  Q.   And -- and do they have any personal information about --

19  other than what's written in the record about these prisoners?

20  A.   No personal information, no.

21  Q.   So it's a -- more of a clerical or administerial function

22  they perform?

23  A.   That is correct.

24  Q.   Okay.  Thank you.  Earlier you testified that you looked at

25  conditions in administrative segregation in the Estelle Unit and


KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

831

1  all the administrative segregation facilities in the prisons you

2  visited?

3  A.  That is correct.

4  Q.  Did you form an opinion about the operation and -- and the

5  actual implementation of administrative segregation programs

6  within Texas prisons?

7  A.  I was -- yes, I did.  Several, actually.

8  Q.  Would you provide us with those opinions?

9  A.  First of all, particularly in the Level 2 and Level 3

10  sections of administrative segregation, I was absolutely amazed

11  at the stark and severe conditions that are imposed on inmates

12  in those particular levels.

13  Q.  Could I just interrupt you?  Would you explain what these

14  levels are?  I mean --

15  A.  Texas administrative segregation consists of -- in recent

16  years of three levels.  The Level 3 is the most severe and

17  according -- although policy would allow an inmate to be placed

18  by the local committee in any one of the three, most units I

19 visited I was told that people generally start out in Level 3.

20 Level 3 is an extremely highly restricted area with arguably, in

21 my opinion, even some human necessities removed from the inmate.

22 The inmate, for example, is not allowed to have shampoo.  He's

23 allowed only to have the personal hygiene items that are

24 provided by the State, is limited to any access to literature

25 and materials from the library.  Level 3 is one of the three

KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

832

1  levels.  The other levels progressively supposedly being --

2  offering more privileges as one moves through them.  Level 2

3  having a bit more recreation time, a bit more option for

4  property, but not much.

5  Q.  Let me interrupt you.  Do you recall how many hours out of

6  cell for recreation Level 3 prisoners get?

7  A.  As I recall, Level 3 is an hour a day three times a week.

8  Level 2 is five -- an hour a day five times a week and Level 1

9  an hour daily, seven days a week, is -- is my recollection.

10  Q.  And so for Level 2, it's three hours a week out of cell

11  time?

12  A.  That's my recollection.

13  Q.  And you said that you understood that a prisoner

14  automatically goes into Level 3 when he's classified to go into

15  ad seg.  From whom did you hear this?

16  A.  It isn't automatic.  The policy would allow the local

17  committee - the administrative segregation committee - to place

18  them in whatever level they choose.  I was told by a variety of

19  staff, as I visited ad seg, that they generally start the person

20  out in Level 3.  This varied from majors to ad seg lieutenants.

21  Q.  All of whom said they invariably start on Level 3.

22  A.  Yes.

23  Q.  And did you -- for how long does this prisoner remain in

24  Level 3 before there's any review of changing the level?

25  A.  Generally, as I recall by policy, they would only have to


KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

833

1 be there 90 days.  The experience of those I talked to is they

2 tend to be there longer.  In some instances very much longer.

3 Q.  And I interrupted.  You were describing the deprivation in

4 Levels 3 and 2.  I didn't -- I think I interrupted your

5 testimony.

6 A.  Well, Level 3, for all practical purposes, then, is an

7 individual who is not allowed to have property other than

8 state-issued hygiene, to exclude, I might add, shampoo.  And I

9 find it amazing that we can find a correctional purpose for

10 denying somebody shampoo.

11      THE COURT:  What was the purported reason; do you

12 know?

13      THE WITNESS:  What has been told to me is that it's so

14 important to -- that people who are in -- who may be placed in

15 administrative segregation know that they are going to be

16 deprived of what I would suggest even our normal human needs

17 kinds of issues, that I guess there's a fear that should set

18 into their mind that they will improve their behavior.  I'm not

19  sure that I follow the logic very well, but it's the most

20  drastic I have seen and -- and having been in the major super

21  maxes around the country I was a little surprised to find it in

22  what is in an administrative segregation unit, not a punitive

23  segregation unit.

24  BY MS. SALITERMAN:

25  Q.  So when you compare the Level 3 and Level 2 administrative

KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

834

1  segregation in Texas, how does that compare with the

2  restrictions in the super maxes you visited elsewhere?

3  A.   In most of the super maxes that I visited, with the

4  exception of very small numbers of inmates who have continued to

5  be assaultive and for a period of time have to be locked down in

6  severe conditions, there's some attempt made, first of all, to

7  keep property levels fairly high.  I might add that Pelican Bay,

8  which is -- has a notorious reputation and finally resolved

9  litigation through an agreed upon order, allows in many of its

10  segregation cells, its super cells max, televisions - personal

11  televisions - let alone a wide range of reading materials, and

12  certainly allows people to buy from the commissary.  Now, there

13  are small numbers of people they may restrict from that, but

14  that's based on behavioral acting out, not on a general

15  condition.

16  Q.   And did you observe the implementation of what limited

17  opportunities Level 2s and 3s have for recreation?

18  A.   I did.

19  Q.  Okay.  And what is the -- where do they recreate?  Indoors?

20  Outdoors?  Out in --

21  A.  In -- in most instances in the units that I visited, the ad

22  seg people recreate in a cage that's -- cages that are located

23  outside of the segregation building.  They're locked

24  individually in those cages after being moved there in

25  restraints and moved back in restraints.


KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998