# United States District Court Southern District of Texas

## Case Number: _H-04-2387_

## ATTACHMENT

Description:

☐ State Court Record          ☐ State Court Record Continued

☐ Administrative Record

☐ Document continued - Part _IV_ of _IV_

☑ Exhibit(s) number(s) / letter(s) _Exh. 103_

Other: _to P|tff's Amended Pet. Habeas Corpus_

835

1  Q.  And how large are those cages?

2  A.  It varies somewhat, but I would say the typical probably is

3  - I would say - 50 feet by 25 feet.

4  Q.  And are there other people recreating when they are out?

5  A.  They may be recreating, but it would be in a separate cage.

6  Q.  So there -- they -- it's a single -- they -- they recreate

7  singly; is that correct?

8  A.  That is correct.

9  Q.  Do you have any other opinions about the operation

10  administrative segregation in Texas?

11  A.  One of the other very alarming things that I found - and it

12  was true I think in just about every ad seg unit that I went to

13  - was what was quite apparent were large numbers of mentally ill

14  offenders that are located in -- or assigned to those units.  By

15  mentally ill offenders, I mean either those where I found

16  documentation that at one point in time at least they had been

17  clinically assessed by mental health authorities as being

18  mentally ill or in some cases where it was quite apparent that

19  somebody should be concerned that they may be mentally ill

20  simply because of the behavior they were evincing at the time I

21  interviewed them.

22  Q.   And under what conditions were these formally or currently

23  mentally ill offenders living?

24  A.   In many instances unfortunately they end up living in Level

25  2 and Level 3, because they frequently do have behaviors that


KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

836

1 are not acceptable.  Feces throwers or people that are banging

2 on the cells or in some cases self-mutilators and a variety of

3 other kinds of behaviors that are the kind of behaviors that

4 don't allow you to progress to higher levels either in ad seg or

5 in the general population, for that matter.

6 Q.  Did you observe or read documents about the kinds of

7 punishments TDC imposes on these mentally ill or potentially

8 mentally ill offenders at Level 2 and 3?

9 A.  One that I ran into quite frequently were those who had a

10  history - at least in the TDCJ medical records - of mental

11  illness, continued some of their behavior - arguably crazy

12  behaviors - in ad seg and subsequently would be put on food loaf

13  as the policy doesn't state as punishment.  Appropriately does

14  not state as punishment.  But, nevertheless, for some kinds of

15  behaviors that I find nonacceptable would be put on food loaf.

16  Food loaf, L-O-A-F.

17  Q.  And they would be put on food loaf even when whatever

18  misconduct was exhibited had nothing to do with food?

19  A.  For example, there were several cases I ran into where the

20  individual had not turned in their milk carton or a cup.  I

21  understand that there are those people who throw liquids, but

22  that's a separate issue.  The person would not return a milk

23  carton on several consecutive occasions and would be placed on

24  food loaf for that particular behavior.

25  Q.  What, by the way, is food loaf?


KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

837

1 A.   Food loaf is -- it differs somewhat by recipe, none of

2 which are very good.  It's generally a meat substance, in some

3 instances a meat substitute, that is nutritionally balanced so

4 that the individual does receive the nutrition items that they

5 need, but it's a very bland, poor tasting loaf.

6 Q.   And is it fair to say, then, that this denial of the

7 minimal life necessities that you mentioned - shampoo and

8 limited exercise and the deprivation of mental stimulation - in

9 ad seg is done deliberately?  That is, it's by ad seg policy?

10 A.   It is.

11 Q.   And you've seen documents produced by TDCJ that support

12 that this is their policy and how they're going to run their

13 administrative segregation?

14 A.   The TDCJ ad seg plan -- or I should say plans - there have

15 been a couple versions - both support this particular approach

16 to administrative segregation.

17 Q.   Thank you.  Let me ask you last your opinion about the use

18 of force.  Now, I know Mr. Breed will be here testifying because

19  he looked at that issue in more depth, but did you form some

20  opinions about the use of force as it is implemented within

21  TDCJ?

22  A.   I did.  And as I mentioned I believe in my report, I was

23  somewhat concerned after visiting several units because it

24  became quite apparent to me that there's -- and I termed it a

25  culture, and I guess in my experience having worked in several

KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

838

1  correctional systems and visited many more, both correctional

2  systems and prisons, individual prisons develop their own

3  cultures.  It's the way -- the philosophies they use to approach

4  the people in their care and custody.  And I'm very concerned

5  about what I observed in TDCJ.

6  Q.  Which was what?

7  A.  I observed the culture that relies dominantly on force or

8  the threat of force for the control of people.  It is important

9  that prisons be under control, but control can be achieved in

10  many ways.  Quite honestly, in most jurisdictions these days an

11  attempt is made to control through communication and in many

12  cases privileges or the ability of the inmate to improve

13  themselves rather than relying heavily on the threat of force.

14  And I might point out, for example, most of the institutions

15  that are being built in much of the country these days are what

16  they call direct supervision institutions.  And the staff

17  members are put literally in the living unit - not observing

18  remotely their living unit, but placed in it - for the purpose

19  of developing relationships with inmates, communication patterns

20  that can have an impact on influencing inmate behavior.

21          In Texas I see, albeit I've been told a major

22  improvement from many years, one that still relies heavily on

23  force and the threat of force to maintain that control.

24  Q.   And do you have some examples of this threat or actual use

25  of force that you consider is in -- I mean, that should not be

KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

839

1 implemented within the TDC system?

2 A.  I would I guess offer simply three at this point.  There

3 are many that I have, but being that Mr. Breed I think

4 concentrated on use of force, I'll -- I'll leave much of that

5 for him.

6        There is an individual by the name of Glen Bowling.

7 He's Number 783848.  In this particular instance the individual

8 was in Terrell, and on May 22nd the officer opened the food tray

9 slot to retrieve the tray and the inmate threw the tray out of

10 the slot.  Now, the officer in this particular report is behind

11 a screen - a shield, if you will.  The inmate put his arms

12 outside the slot, which he should not have been doing, but --

13 and tried to grab the shield from the officer, but the officer

14 took what is called a tray tool and rapped him on the arm with

15 the tool tray.  Now, what I find interesting, first of all, this

16 may well be an isolated instance, although there was a second

17 inmate in the same instance that reported and grieved that he

18 too had been hit by the same officer with this tool tray.  There

012333

19  was nothing the officer -- this was reported by both inmates,

20  and the officer was not disciplined.  My concern surrounding

21  that whole kind of scenario is that when different types of

22  force or abusive force or excessive force are used, frequently

23  there's no official response to it that would suggest that

24  something is wrong.  There are people who have been disciplined,

25  but there are too many instances of those that have not.


KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

840

1 Q.  Well, is that an example of force that was being used

2 simply to punish or hurt the prisoner?

3 A.  Absolutely.

4 Q.  And you found -- is this an isolated example or you found

5 other examples like that?

6 A.  Many examples like that.

7 Q.  And you found them throughout all the units that you

8 visited?

9 A.  That is true.

10 Q.  And you said you had another example in --

11 A.  Actually two others.

12 Q.  Okay.

13 A.  This -- some people may not call it a use of force, but I

14 found it again indicative of this culture that I talk about.

15 And, again, it occurred at Coffield during the -- we learned of

16 it at our first visit there.  And this was an inmate by the name

17 of Michael Felder, Number 629211.  Mr. Felder was taken out on

18 Thursday and placed in the legal cage after it was alleged that

19  he had swallowed a handcuff key.  He had been involved in a use

20  of force.  He was the subject of a use of force.  He pulled back

21  when he was being put back in his cell on the cuffs and

22  apparently had the key along with them.  Having pulled them

23  through the trace lock, he -- he then was placed in what's

24  called the legal cage, which is a small cage right outside

25  the -- what Texas calls the picket or the control center on --


KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

0125

841

1  in Coffield.  Mr. Felder --

2  Q.  If I could just interrupt you, we've had some other

3  testimony about cages.  When you say small, can you give the

4  dimensions or estimate the dimensions?

5  A.  I think the legal cage in this particular instance was

6  probably no longer than ten feet and no wider than five or six

7  feet.

8  Q.  Okay.  Thank you.

9  A.  Mr. Felder then was left in the legal cage until the

10  following Monday.

11  Q.  And he was put in when?

12  A.  He was put in on Thursday.  And during that period of time,

13  for the most part he was not released to urinate or to defecate.

14  He for much of the time was not fed.  He was given some water

15  during the period of time and reports vary on how much food he

16  actually was given.  Now, the intent, I'm sure, was to get the

17  handcuff key back, but there are generally accepted principles

18  and practices for doing that kind of thing.  This is not one of

19  them.

20  Q.  And is this -- this is a case he was out in the open where

21  TDC officials would see him being housed in that cage over that

22  extended time?

23  A.  Any person working in the control center in that particular

24  picket or anybody walking through the central area of this

25  particular wing would have been able to see him, and indeed the

KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

842

1  investigation displayed that many correctional officers saw him.

2  Two or three lieutenants saw him.  The major, who is the duty

3  officer, was the one that directed it.  The alarming part of it

4  in addition to, I think, what is a horrendous situation is that

5  the response to it was to demote the major one rank and transfer

6  him.  No one else in the entire situation was disciplined,

7  albeit many people were aware of the situation.  The individual

8  was not released until an assistant warden appeared on a Monday,

9  which would suggest to me that between Thursdays and Mondays

10  either the administration doesn't visit that area or, if anyone

11  did from the administration, they ignored the situation and the

12  plight of this young man.

13  Q.  And these cages have a steel chair in them?

14  A.  That's --

15  Q.  Is that it?

16  A.  That's it.

17  Q.  That's the only --

18  A.  That's all in there.

19  Q.   -- amenity.

20  A.   That's correct.

21  Q.   And you said you had another example of the use of force

22  that puts prisoners in serious risk that they're going to be

23  unlawfully punished.

24  A.   Yes.  I think the final one that alarmed me a bit, and I

25  think -- because I think it's indicative of not only the


KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

843

1  culture, but of a lot of concerns I have over force, was an

2  incident that happened at Estelle Unit in March of 1998.  It

3  happened on C block.  It was a situation where early in the

4  morning -- this is an administrative segregation unit.  Early in

5  the morning the staff had decided to do a shakedown of C Unit

6  and began having inmates pull their property out and put them

7  either in bags or boxes outside of their cells.  Sometime

8  midday, I -- as I recall it was around 2:00 or possibly a bit

9  earlier, some of the inmates in C Unit, I believe there were 23,

10  began banging on their cell doors and in some instances flooding

11  their cells by plugging up their toilets.

12         Subsequent to that, a decision was made to use gas in

13  C Unit.  And I might add, for some reason that I have never

14  been able to determine, either that morning or early that

15  afternoon 13 inmates from D pod were moved to C pod and 13 from

16  C pod to D pod.  The speculation on the part of the inmates is

17  that -- that the staff knew there was going to be gas used in

18  there and they wanted to get the people in that they wanted

19  gassed.  I don't know if that's accurate, but it was an unusual

20  move back and forth.  Gas was released, and following TDC's own

21  reports, there was no indication that medical was consulted in

22  terms of people who are mentally ill being gassed or people with

23  asthmatic conditions.  There's nothing in the record that would

24  suggest that that occurred despite that being part of TDCJ's own

25  policy and procedures.  There's nothing to suggest that the


KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

844

1  inmates who were not participating in the cell banging and the

2  toilet plugging were moved out so that they wouldn't be

3  indiscriminately involved in it.

4  Q.  So this is a case in which the officials had time to

5  mitigate the risk of harm by taking out anybody who was not

6  acting inappropriately?

7  A.  Absolutely.  I think any responsible -- if it were a

8  situation where all the inmates were out of their cells and you

9  were trying to control a riot, it would be a different

10  situation.  In this instance, all inmates were in their cells,

11  none were in the -- the interior part between cells and control

12  was not a problem.

13  Q.  And was this a pattern that you observed throughout the

14  prisons that you visited in Texas?

15  A.  That particular situation in -- in and of itself is unique.

16  However, it was not unique to find out that entire sections,

17  including large numbers of people, were gassed without trying to

18  take out, remove the nonparticipants or the people who weren't

19  involved.

20  Q.   And when -- when officials had time to mitigate the serious

21  risk of harm and didn't take that opportunity?

22  A.   Absolutely.

23       MS. SALITERMAN:  I have no further questions.  Thank

24  you.  Pass the witness.

25       THE COURT:  You may take the witness on


KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

·4