# United States District Court
# Southern District of Texas

Case Number: _H-04-2387_

# ATTACHMENT

Description:

☐ State Court Record          ☐ State Court Record Continued

☐ Administrative Record

☐ Document continued - Part _I_ of _I_

☐ Exhibit(s) number(s) / letter(s) _Exh #104_

Other: _Pltf's First Amended Habeas Corpus_

_____

_____

EXHIBIT 134

**Report and Statement Regarding Defendants**
Motion to Vacate Final Judgement in the Case of
David Ruiz, et al., vs. Wayne Scott, et al.

1. My name is Chase A. Riveland. My address is P.O. Box 368, Deer Harbor, Washington 98243. I was requested by the attorneys for the plaintiffs in the above-mentioned case to review the conditions of confinement in the Texas Department of Criminal Justice prisons as those conditions relate to the Ruiz Final Judgement.

My professional career, spanning 34 years has included experience in all aspects of corrections, that experience including:

Consultant, trainer, writer on corrections issues, 1997 to present

Secretary, Washington Department of Corrections, Olympia, WA-July, 1986 to January, 1997

Executive Director, Colorado Department of Corrections, Colorado Springs, CO-1983 to 1986

Deputy Division Administrator, Wisconsin Division of Corrections, Madison-1982 to 1983

Superintendent, Portage Correctional Institution, Portage, WI-1980 to 1982

Milwaukee Regional Director, State Bureau of Community Corrections, Milwaukee, WI-1976 to 1980

Probation and Parole Supervisor, Madison, Janesville, and Jefferson, WI-1975 to 1976

Graduate Student Supervisor, University of Wisconsin and Division of Corrections -1974 to 1975

Financial Compliance Officer, Wisconsin Division of Corrections-1973 to 1974

Probation and Parole Officer and Institution Social worker, Wisconsin Division of Corrections-1971 to 1972

Probation and Parole Officer, Wisconsin Division of Corrections, Appleton, WI-1964 to 1966

My resume, attached as Exhibit "A", more completely describes my professional experience.

3. I am knowledgeable about contemporary and generally accepted correctional policies, practices, standards, and procedures.

4. I have I have been retained as an expert witness in two cases over the past four years:

State v. Roberts, King County Superior Court, Seattle, WA
        This a death penalty case in which I testified at the penalty
        phase regarding prison security

State v. Robert Parker, King County Superior Court, Seattle WA
        This is a death penalty case in which I have been deposed
        but have not yet testified

Additionally, I have appeared in court as a witness numerous times over the years, normally as the defendant, in fulfillment of my job responsibilities.

5. I have written a variety of papers, articles, book chapters, and a monograph. The list for the last ten years is attached as "Exhibit B".

6. The opinions expressed in this statement are based on my knowledge and experience in the field of corrections. They are also based on my personal visits to Texas prisons. From March, 1998 through October, 1998 I toured and inspected the following Texas prison Units:

Coffield

Terrell

Dominguez (State Jail)

Estelle

Eastham

Murray

Fergusen

McConnell

Connally

Hobby

Hughes

Gurney

Garza East/West

Neal

Clements

During the inspections I was generally accompanying one or more counsel for the prisoner class; Allan Breed, correctional expert; and a variety of Texas Department of Criminal Justice (TDCJ) representatives from the Unit, Region, or Huntsville Central Office; and on occasion representatives of the Texas Attorney General's office.

The inspections normally consisted of an opening briefing by the Unit Warden and his/her staff, followed by a general orientation tour of the Unit. Typically, I then would interview inmates 'cellside', going from cell-to-cell in close custody and medium custody wings. Although I did interview many inmates in administrative segregation, transient, safekeeping, and pre-hearing detention wings—Mr. Breed focused on those areas. I also toured and interviewed inmates in minimum security dorms and trusty camps, where they existed, as well as inmates who had contacted the office of plaintiff's counsel.

Typically, I would observe recreation periods for each custody level during the course of our visit; as well as observe food serving procedures in the general population chow halls and on the wings where inmates were either fed in their cells or occasionally in dayrooms; movement procedures throughout the Unit; and processing of inmates in intake and orientation areas.

Generally I would attend several Unit Classification Committee Hearings and several Disciplinary Hearings in each Unit. In addition to interviews with virtually hundreds of inmates, interviews were also held with many staff at all levels, including: custody staff and supervisors; administrators; managers; gang investigators; classification supervisors; counselor substitutes; work supervisors; etc.

7.  I reviewed many local and central office and Board Directives; policies and procedures; grievances and grievance responses; inmate files; incident reports; major use of force reports, and copies of disciplinary proceedings. I listened to tapes of disciplinary hearings and reviewed videotapes of Major Use of Force incidents.

The following Texas Department of Criminal Justice (TDCJ) and TDCJ Institution documents were reviewed:

TDCJ Statistical Report: Fiscal Year 1997

Disciplinary Administrative Directives

   Administrative Segregation Plan

   Protective Custody Administrative Directive

   Offender Recreation Program Directive

   Facility Level Review of Requests for Placement in Protective Custody Administrative Directive

   Review of Inmate Disciplinary Placements Administrative Directive

   Board Policy: Offender Grievances

   Management of Offender Grievances Administrative Directive

   Procedures Related to Facility Lockdowns Administrative Directive

   TDCJ Offender Orientation Handbook

TDCJ High Security Facilities Proposal

TDCJ Report on Offender Management –November 24, 199

TDCJ-ID Unit Classification Staff

TDCJ Job and Employee Information

TDCJ Unit Capacities and Populations

8. The following materials were also reviewed:

Criminal Justice Policy Council Report to the Governor and Legislature on
    Projection of Adult and Juvenile Correctional Population and Capacity, FY 1999
    to FY 2003

NCCD Assessment of TDCJ Classification System and Administrative Segregation
    Policies-1994

NCCD Evaluation of TDCJ Administrative Segregation Population.

Defendants Motion to Terminate Jurisdiction

Defendants Supplement to Terminate Jurisdiction

Declaration of Donna Brorby in Opposition to Motions to Terminate Discovery and
    Jurisdiction

Defendant's Responses to Plaintiffs Interrogatories in Connection With Motion to
    Vacate Final Order

Standards For Adult Correctional Institutions-3d Edition

9.  General information applicable to my  opinions are of course influenced by the
general history and present environment of the Texas prison system. The Texas
prison system has undergone phenomenal growth over the last several
years, more than doubling in size from 55, 234 inmates on August 31, 1992 to
140,518 inmates on August 31, 1997. Although having initially handled part of the
growth by 'backing up' state prisoners in county jails; the TDCJ accommodated most
of those backlogged inmates in 1995, following a massive construction program. This

tremendous growth has predominantly occurred since the Court issued it's Final Order.

The Final Order expects that the prison officials will:

"...continue to employ an adequate number and type of staff to ensure effective monitoring of the prison rules, regulations, policies, and practices in all areas of prison operations and conditions that had been the subject of injunctive relief."

"...employ sufficient trained security and non-security staff to provide for and maintain security control, custody, and supervision of prisoners."

" Defendants shall maintain and enforce written policies and procedures governing when and how force and chemical agents are permitted to be used by TDCJ-ID personnel against prisoners, reporting and internal investigation requirements when force is used or is alleged to have been used, and the discipline of employees for violations of the policies and procedures. The policies and procedures shall require that only the minimum force and chemical agents reasonably believed to be necessary may be used, and shall establish reasonable policies, procedures and standards for the effective investigation of prisoners' allegations of unnecessary or excessive uses of force and discipline of employees determined to have violated the policies and procedures".

In view of the sprit of the Final Order, I intend to express my opinions in the areas of crowding, use of force, and safety and protection, based on my observations, document review, and interviews of inmates and staff.

**Crowding**

Although the individual Units we visited were at or below the court-ordered capacities, it is obvious that the prison system itself is under a great deal of strain due to this massive growth. In my experience as a correctional administrator, rapid expansion frequently challenges the capacity of a corrections system to maintain its equilibrium. As most states face many competing demands for the public dollar and corrections expands disproportionately, the infrastructure necessary to both manage the expansion and to administer and greatly expanded system frequently is not provided by those responsible for providing the money.

The increase in assaults and other incidents in the Texas prison system during this period of considerable growth would suggest, at a minimum, difficulties in properly classifying inmates; shortages of staff; shortages of experienced staff; and a diminishing of program resources. It also appears that the traditional means of central monitoring and control of system-wide policies and procedures by top administrators has also been affected by this growth and subsequent resource challenges.

The TDCJ Internal Audit entitled "Report on Internal Bed Management", (November, 1997) (63617) raised the following concerns:

"The current capacity utilization rate does not permit Classification management the needed flexibility to effectively manage ID beds. The lack of flexibility resulted in mismatched housing, in which offenders were housed in transient beds or a custody other than which they were assigned." (63639)

"Inconsistencies in documentation precluded any conclusive determination concerning the issues of increased safety. According to EAC staff, unit variations in reporting incidents affected comparisons between units. Even though general reporting guidelines were provided by an administrative directive, units were not consistent in reporting non-serious/minor injury incidents." (63635)

"Despite the extensive construction of the past few years, TDCJ did not have enough ID beds to provide the flexibility afforded by a lower utilization rate. Increases in the length of sentences, changes in good time provisions affecting release on mandatory supervision), decreases in paroles, and increases in parole revocations have resulted in accelerated growth of offender population. Due to limited bed availability, <u>along with external pressures to utilize every available bed (emphasis added),</u> a reduction in flexibility was not immediately available." (63639)

"The vague criteria for initial ad seg classification, as set out in the Ad Seg Plan and Classification Manual, indicated a lack of reasonable assurance of appropriate ad seg decisions by unit personnel. <u>Furthermore it appeared control activities requiring SCC (State Classification Committee) review of these decisions may not be operating as intended.</u>" (emphasis added) (63629)

Notably, this Report articulates a common dilemma that is a result of rapid growth in correctional systems, when it states: "The magnitude of the recent increase in TDCJ's capacity and geographic area has resulted in a significant expansion of Classification's responsibilities, <u>with only a limited increase in personnel.</u> (underline for emphasis) (63622)

These observations simply reinforce my own observations and reinforce my opinion that TDCJ has not, unsurprisingly, been able to "...continue to employ an adequate number of staff to ensure effective monitoring...". This became apparent in nearly all parts of TDCJ visited. Central functions such as classification, administration, monitoring, investigations; program activities such as work and education; and hiring, training and promotion of qualified staff; are all areas of particular vulnerability—in my experience.

For example, as expansion occurs, in these days of competition for public funds in state governments, seldom do the funds necessary to maintain an adequate span of

control for administration and management keep pace with the actual need. The reference to the shortage of classification staff at the central office level (above) would be but one example of that.

After visiting numerous Texas Department of Criminal Justice prison units of all custody levels, interviewing hundreds of inmates, reviewing many of the central and Unit policies and procedures, and interviewing large numbers of staff, additional concerns related to crowding have become evident. Although not necessarily problematic standing alone, the convergence of several staffing and operational issues, particularly at units containing administrative segregation, close, and medium custody inmates does give me great concern.

In 1995 the Legislature eliminated the majority of classification counselor positions in the Department, leaving only one or two per Unit to perform the mechanical/technical duties related to classifying inmates and their progression through the system. The removed positions (reportedly 328 as of April, 1995, according to information furnished by TDCJ ), are those that had been assigned to track individual inmates in the institution, maintain records of inmate contacts, assure regular classification reviews, and serve as the conduit of information between the inmate and the system.

This model is common to most correctional systems in this country, as this type of position serves to enhance the inmates' access to medical/psychiatric services as needed; alert staff to protection and safety concerns; and provide the inmate with one person that has some knowledge of their needs and circumstances so that the system resources can be accessed. In many correctional systems this staff position also serves as a counselor to, and advocate for, the inmate and a bridge to the inmates family or significant others.

The American Correctional Association *Standards For Adult Correctional Institutions* states as a required standard: "A planned, organized counseling program is provided by persons qualified by either formal education or training."; and further, "Written policy, procedure, and practice provide for a minimum of one social service staff person for each 100 inmates." (Standards 3-4384 and 3-4385 respectively)

As of September, 1998 the number of classification counselor positions in TDCJ had dwindled to 61 (with an additional 62 data entry positions, assigned to classification offices, also being eliminated since 1995, per information from TDCJ), despite the significant growth and movement in the system. The ratio of classification counselors to inmates in April, 1995 was 1 to 233; in September, 1998 it was 1 to 1,251—probably unprecedented n this country's prisons and clearly far afield of the commonly accepted standards.

The operation of the classification offices was observed at the Hughes, Coffield, Eastham, Ferguson, McConnell, Terrell, and Gurney Units. With the further reduction of data entry clerks, the remaining classification counselors are reduced to record keeping, data entry, and sitting on Unit Classification Committee hearings.

With the demise of the classification counselor positions it falls on the correctional officer staff to serve as the communication link between the inmate and the system. This is a very difficult role for several reasons:

Correctional officers are rotated between posts, pods, runs, and sometimes wings daily, seldom serving on the same post on consecutive days. This results in the officers having little personal knowledge about individual inmates; little opportunity to develop trust; and limited opportunity to develop the relationships necessary to establish positive communication s.

Staffing levels are arguably insufficient in TDCJ prison units to assure that all the duties and responsibilities of the correctional officer in the housing areas can be fully performed, let alone add the responsibility of serving as a communication link for the inmates to other parts of the correctional system-- that frequently correctional officers are not highly knowledgeable about anyway. Security checks, feeding responsibilities, showering, escorts, and other normal duties consume the greatest share of the correctional officer's time. It was observed in every unit visited that correctional officers were unable to--or failed to--walk the rows as often as TDCJ's own policies required. This not only raises serious safety

concerns, but further reinforces the concern that they are unable to serve as a legitimate communication link for the inmates in the system.

Concurrently, the loss of the classification counselor and data entry positions occurred at a time that the number of inmates being moved into, through, and out of the prison system. The number inmates being moved weekly in TDCJ rose from 6, 079 per week during the period of 12/95 to 11/96 to 11,552 in the period 12/97 to 9/98—a 46% increase. (63811) Although improved technology can replace some types of human tasks, data must still be entered to keep the information systems working.

We now have two examples of the effect of rapid expansion, the first happening by 'omission', namely the failure to increase the size of the central classification staff proportionate to the expansion of workload and duties. The second by "commission', namely the elimination of most classification counselors and classification data entry personnel by the Legislature. The second, the reduction of unit level classification staff, in my opinion, created very serious problems for the operation of the Texas prisons—but also for the inmates in those prisons.

The human communication link between inmates and the system was broken severely, with the remaining classification counselors being relegated to 'office' tasks. De facto, the communication link reverted to the custody officers who in number, duties, and training are ill equipped to fill that critical role.

Likewise, remaining classification officers were found to be left with a situation of making classification decisions based solely on information in a file or on a computer—with little or no personal knowledge of the inmate. This situation results in mitigating the balance that most prison systems seek in balancing the custody needs of a prison system with the needs and rights of the inmate. It removes the sole non-custody communication link and 'advocate' that the inmate

11

has in attempting to gain response from the system to his/her problems, both within and outside of the institution (such as family problems).

Although there was no 'directive' suggesting that correctional officers should assume this role of serving as an information and communication link, they are the only staff left in the prison to serve that role. My observation is that it is a rarity that this is done successfully (for the afore-mentioned reasons). Inmates who feel that they are not getting adequate response from the correctional officer staff must attempt to talk to rank (normally Lieutenants and above). The small number of these individuals on duty at one time (two or three for a given wing, at most) in these very large institutions makes such contact unlikely, at least in a timely manner, if at all.

In close and medium custody wings, and even more compellingly in administrative segregation wings, correctional officers primary responsibilities are feeding, escorting, counting, doing pat and strip searches, operating control rooms, and shaking down areas for contraband. These duties in and of themselves are not conducive to establishing positive communications between the person being controlled and the person doing the controlling.

My inspection and tours of Texas prisons revealed that even access to correctional officers is problematic, as it was common that officers do not make their 'tours' or cell checks with the frequency required by policy for their particular type of wing. As I conducted cell-front interviews I would frequently be in a pod for hours at a time. It was common not to see an officer on the runs during that period of time. This generally occurred during day shifts, and the inmate reports were numerous and consistent that the night shift officers were seldom on the runs except to perform the periodic counts.

Failure, with some regularity, to discharge one's duties in accordance with policy and procedure, particularly across a system, suggests that either there are an insufficient number of supervisory staff, or the existing supervisors lack sufficient experience, or they are not receiving adequate supervisory training, or combinations of all of these. The rapid growth of the Texas prison system and the

012258

12

subsequent dramatic increase in the number of prison units has resulted in many units experiencing the necessity of promoting staff with comparatively limited experience, at all levels, but particularly in the custody staff ranks, as that is where the largest volume of staff positions are.

The combination of these factors raises serious questions around safety and timely access to essential services (such as medical, dental, and psychiatric). It is apparent to me that the 'stretched' central monitoring resources, the elimination of the classification counselor positions, combined with arguably meager custody officer staffing and supervision results in policies and procedures not being implemented and insufficient resources to monitor whether indeed they are.

There is no formula suggesting that a certain amount of staff in general, and custody staff in specific, will assure optimum security and control. One can address trends within a given correctional system and measure the results that are being achieved.

The tremendous growth in the Texas prison system has obviously put a strain on the system in several ways: There are large numbers of new staff with limited experience in many units (as relayed by the wardens of the various units visited); financial strain on the Texas general fund has been enormous; the flexibility of the system has been compromised due to most unit beds being filled at all times (per the Bed Management Report); wardens at some units have had difficulty in keeping staff positions filled; and the incidence of major incidents has risen sharply from 1988 to 1997, as follows:

Assaults on offenders, up 723.6 %

Assaults on staff, up 992.4 %

Disturbances, up 938.9 %

Attempted suicides, up 375.8 %

Although homicides and suicides show numerical increases, they are statistically
      not relevant as rate increases

*(these figures taken from the NCCD Administration Study of 1998)*

13

These figures certainly suggest that <u>security and control are a problem</u> and a problem that has been growing rapidly over time. Observation of custody staff operating in the Texas prison units, and interviews with inmates and staff would strongly suggest that there are insufficient custody staff to fully and regularly implement the policies and procedures meant to assure safety for inmates and staff. Central office representatives touring with me indicated that TDCJ has little money to pay overtime wages, so the general policy is to provide compensatory time off when overtime is worked. This then only exacerbates the staff shortages that may already exist.

The reported increase in attempted suicides, as reflected in this report also raises red flags in my mind. Generally an increase in attempted and/or completed suicides in a prison setting suggests one or more of several things occurring:

depressed or otherwise mentally ill individuals are not being recognized, diagnosed, or properly treated, or all of the above;

inmates being victimized are not being identified or provided adequate protection, or both;

or, staff supervision and monitoring of inmates is deficient.

Numerous inmates in the Units I visited relayed the same story of officers 'seldom' making the checks and tours of the 'runs' with the frequency that policy requires and that they seldom—in some instances never—see rank (Lieutenants, Captains, or Majors) on the 'runs'. I, again, personally observed this failure or inability to comply with policy regarding cell and row checks. This once again suggests either a shortage of custody staff, an absence of proper supervision, a failure to monitor and/ or enforce policy, or combinations of all three.

The reported increase in assaults and disturbances

14

**Administrative Segregation**

One area that is particularly bothersome in relation to the inspection I made of the several Texas prison units is administrative segregation. It is particularly bothersome due to the rapid increase in the size of this population coupled with the fact that administrative segregation inmates are prohibited from participating in work or education opportunities. The number of inmates being incarcerated in administrative segregation in Texas prisons is more than twice the national average when protective custody is excluded(NCCD report of 1998). The administrative segregation inmate population in TDCJ equaled 6.3% of the male population and 1.5% of the female population as of 8/31/97 (according to the TDCJ 1997 Statistical Report)).

According to the Texas Department of Criminal Justice (TDCJ) *Administrative Segregation Plan, May 1, 1995*, the definition of administrative segregation is "...a non-punitive status involving the separation of an inmate from the general population for the purpose of maintaining safety, security, and order among general population inmates and correctional personnel within the prison..." Yet, as of May, 1998 over 4, 000 of the 7, 000 inmates in administrative segregation were recognized (and not necessarily placed in administrative segregation for behavioral reasons), as Security Threat Group (STG) members.

As the Final Order only specifies that general population inmates are required to be provided work opportunities (and enhanced recreation opportunities), the reduction of close custody inmates from 6, 311 in November, 1996 to 5, 204 in November, 1998 (per the NCCD report) and the concurrent growth in the administrative segregation population from 4,738 to 7,813 (64.9% increase from May, 1994 to May, 1998) suggests that the number of jobs the TDCJ needs to provide will decline proportionately. The lesser requirements for the amount of

recreation time available to ad seg inmates may also result in fewer staff requirements.

Although it is generally more expensive to operate administrative segregation programs, the general location of the TDCJ ad seg programs as wings of much larger institutions mitigates some of that cost normally incorporated into ad seg figures in other jurisdictions. Recent proposals to double-cell Level I ad seg, if the Final Order were no longer in place, could result in mitigating a significant portion of the extra costs.

Therefore, inmates are being denied the opportunity to participate in work or education based on what they might do, rather than what they have done. There are always a few inmates that a correctional system can say are so dangerous that they must be extremely limited on their access to other people, but thoughtful corrections policy limits that to as small a number as possible.

The TDCJ-commissioned study entitled, "Evaluation of the Texas Department of Criminal Justice Administrative Segregation Population" submitted by the National Council on Crime and Delinquency in the summer of 1998 presents several critical findings: There has been a significant increase in the number of inmates classified as gang members (Security Threat Group) over the past five years who are placed in administrative segregation due to their identification as such; of those inmates studied 38.4% had no disciplinary reports for the past year and 18.6% had none for a two-year period; and these same inmates had been in segregation for an average period of four years.

Many of these inmates are placed in administrative segregation not based on actual misbehavior, but due to their gang affiliation and the perception that they may misbehave. Indeed, the TDCJ's own internal audit report of November, 1997 states: "The vague criteria for initial ad seg classification, as set out in the Ad Seg Plan and Classification Manual, indicated a lack of reasonable assurance of appropriate ad seg decisions by unit personnel."

Administrative segregation at all three levels is clearly punitive to the individual. No one in administrative segregation is allowed to work, therefore they do

not earn good time. Programming is not available to administrative segregation inmates at any level. Even books and educational materials are denied Level II and III inmates. Few administrative segregation programs in the country, particularly those holding a large number of inmates are operated under such grueling, privilege-deficient conditions.

The placement of inmates who are threats to the orderly operation of a prison in a special housing area is not an uncommon correctional practice. What is uncommon is:

The extremely large number of inmates being placed in such a status.

The self-described vagueness of criteria for entry into the ad seg status.

The arbitrariness of the process for moving amongst the levels of ad seg.

The severe restriction on privileges.

The impact of loosing good time while in a non-punitive status.

The lengthy periods of time individuals are kept in that status.

The vagueness of exit criteria.

The absence of even basic programming.

The number of mentally ill and intellectually limited inmates in the status.

Out-of-cell time is usually one hour a day or less, including recreation time (the inmate being escorted in restraints) in a very limited dayroom or external cage and showering (the inmate also being escorted in restraints).

Level I inmates are allowed up to 7 days per week of recreation; Level II but five days 1 hour per day); and Level III inmates but one hour per day, three days per week.

Inmates are highly or fully restricted from access to religious services, commissary, counseling, and library services, at the Levels II and III. They are fed in their cells. Their only human contact is yelling to each other, contact with custody staff, and occasional medical/mental health staff coming to their cellfront. Level II and II inmates are denied dessert available to the general population.

<u>Texas's Level III administrative segregation is as devoid of privileges and opportunities  as the most severe segregation programs in the country</u>, that I have observed. Having recently toured numerous 'supermax' facilities in the country in the course of writing a monograph on *Supermax Prisons*, I can personally form such an opinion. Where such similar severely restrictive programs exist they are only applied to the most chronically disruptive inmates. Even personal hygiene commissary items are disallowed in Level III, with the inmate being reliant on state-issued tooth powder and soap (shampoo being forbidden).

Although central policies would allow incoming administrative segregation inmates to be placed in any of the three levels of administrative segregation, the common practice on the units visited was to start nearly everyone at Level III, per conversations with ad seg lieutenants and captains.

Movement to Level II from Level III, and subsequently to Level I, is an arbitrary decision made at the local level. Regression to a lower level also is a local, unmonitored decision. Policy (The Ad Seg Plan) requires the Administrative Segregation Committee to consist of a Captain (or above), a Lieutenant (or above), and a Sergeant or correctional officer from the custody staff.

Most correctional systems, in my experience, would balance such a decision-making body with a counselor, classification counselor supervisor, or some other programmatic staff member. Many jurisdictions actually use a unit team comprised of a custody representative, a counseling representative, and a program person (such as an education or mental health representative).

Only <u>removal</u> or <u>release</u> from administrative segregation requires central approval. The local Unit may place an individual in administrative segregation, with central approval occurring after the fact, with very few denials. Few inmates interviewed knew criteria for advancing to a less restrictive level, or more importantly, what would be required to leave administrative segregation. Many stated they believed they would not be released from administrative segregation until their sentence expired, these generally being inmates in administrative segregation due to

their Security Threat Group Status. Yet, *The Report On Offender Bed Management* states:

> "The percentage of confirmed STG members in the TDCJ <u>population</u> (emphasis added, as the percentage of inmates in ad seg has increased dramatically) has not significantly increased in recent years. Additionally, a large number of confirmed STG members confined in ad seg were assigned to Level I status, indicating the offender maintained good behavior during ad seg confinement." (63628)

> And, "We concluded the Ad Seg Plan provided only vague and limited criteria for determinations concerning an offender's release from ad seg." (63630)

> And finally, in describing the State Classification Committee's review of ad seg inmates being considered for release, the report stated:

> "Based on our observations, review hearings were brief and approximated five minutes per offender. The review forms were largely illegible, and justifications for continued ad seg status were vague and without adequate substantiation. Common justifications were "staff assaultive," "severe disciplinary history," "or "assaultive history", without providing any detail concerning the bases (sic) for these conclusions. In one case, the only justification was "Remain." (63631)

It is obvious that whether intended or not, a disproportionate number (compared to national statistics per the 1998 NCCD report) of inmates are being held in the starkest, sparsest of conditions—with no opportunity for work or education, and a minima of recreation time—without clarity in terms of the threat they present, the benefit being gained, nor the damage being done to them.

The TDCJ audit report states that both the criteria for entry and exit from ad seg are vague and that the process for release is flawed. I agree. The net result is that large numbers of inmates are being placed, and held for extended periods of time with no hope and with he barest of privileges.

Large numbers of inmates interviewed in administrative segregation wings in all units appeared to be mentally ill. Some were obviously mentally ill and diagnosed as such; some had been so diagnosed in the past, but were now declared not mentally ill; others displayed obvious symptoms but had not been diagnosed. Circumstances, as observed and gained through interviews, varied as to the frequency that mental health staff visits the administrative segregation populations. In nearly every case, little or no standardly recognized treatment is available to these inmates, other than some whom are medicated. Usually an inmate has to display serious self-destructive behavior, assaultive behavior, or chronically bizarre behavior ( and at times this doesn't work) in order to receive treatment or be transferred to a unit where it can be provided.

One exception to treatment being available was on the PAMIO wing of the Cements Unit, operated specifically as a program for mentally ill inmates. Yet, the administrative segregation rules applied to these inmates (even though some actually carried a custody rating of minimum.

The number of mentally ill and developmentally disabled inmates found in administrative segregation wings is shocking. Frequently we would find that the behaviors that clearly indicate mental illness were being treated as simple disciplinary cases or subjection to 'food loaf'. This part of an offender population is in particular need of work, educational, treatment and recreational opportunities—yet are in the least opportunistic environment.

A few of the inmates whose files were reviewed and/or interviewed fitting this description, upon which I base my opinion include:

#596927                              Estelle

File states he suffers from severe mood disorder (as of 7/20/98). Yet was cleared for disciplinary action and punishment with statements that his mental status has no bearing on his actions. The inmate, when interviewed was very withdrawn.

#687262        Ad Seg        Estelle

File confirms he had spent some earlier time in PAMIO. The inmate states he had an incident when he swallowed metal (states he did it because he couldn't see the Doctor) and the officers wouldn't take him to the infirmary. He states that three days later was throwing up blood. Then two days later was x-rayed, then surgery to remove the metal. He said that if the staff thinks you may be suicidal they withhold your showers, this occurring after two inmates hung themselves in the dayroom. States the boredom depresses him as well as seeing no future for himself. His medical file confirms the medical chronology stated above.

#611844        Ad Seg        Estelle

The inmate states he was in C Wing during the gassing incident on C-wing, in which entire wing was gassed. He didn't believe there was any check made to see if psych cases or medical cases should be removed from a gas situation. Said two canisters were thrown in. Some got him in the face. Wasn't removed until about twenty minutes later. The file confirms he has also been in PAMIO with a long psych history.

#617283        Estelle

Psych patient with history of a number of suicide attempts, self-mutilations, assaults, destroying property, and sexual misconduct. The file states that on 8/15; 8/19; 8/20; and 8/22 he was put on food loaf—on each occasion for failure to return a milk carton. Then a use of force in his cell on 8/24/98. The inmate states that he has nothing to do in his cell, "...it drives me crazy."

#627908                    Estelle

The file states that the inmate has seizure disorders and is a psych patient. Multiple cases for spitting and destroying property. Over 9 instances of being put on food loaf, usually for refusal to return the food tray or throwing liquid.

#532428                    Estelle

Record says the inmate has an I.Q. of 60. In 2/96, after many requests for PC, which were denied, was found to be providing other inmates sex in lieu of beatings. In 11/97 cutting himself. Put on food loaf on 8/18/98 (for contraband in the cell); 7/19/98 (for arm in food slot; 4/18/98 (arm in slot; 1/1/98 (arm in slot); 4/24/98 (arm in slot); 4/30/98 (arm in slot).

#402942                    Estelle

Borderline intelligence, record states I.Q. at 60 or below. Record states he has difficulty in comprehending or following orders. Put on food loaf: 7/22/98 (refusal to return milk carton); 7/29/98 (same); 8/14/98 (same); gassed in cell on 8/26/98 (for throwing feces). Record states he has a history of suicide attempts and of attempting to open old gunshot wounds in his stomach and his eye.

#279069                    Estelle

Record says the inmate I.Q. is 64. Axis I, Bi-polar; severe psychosis. Multiple instances for being placed on food loaf for non-food issues. Eight instances between 7/3/98 and 8/29/98, all but one for failure to return milk carton.

It is my opinion that the impact of these sterile environments, particularly on inmates who have not been placed there based on actual misbehavior and those that are mentally ill or intellectually limited, is very destructive. The absence of social interaction, the withdrawal of most humane privileges, the absence of reasonable stimulus, the isolation, and the stigma of being housed in a n environment thought to hold but the worst-of-the-worst; all blend into a setting that probably will cause a deterioration of most human beings. The added factors of arbitrary movement between Levels and ambiguity of how to exit administrative segregation add to the potentially damaging nature of these facilities.

The TDCJ definition of administrative segregation states it is to be non-punitive, yet it's rules, withdrawal of privileges, policies, and procedures would suggest that it is anything but. Although the TDCJ states it has only slightly over 100 inmates in administration segregation for protective custody purposes, those individuals are subject generally to the same rules, the same loss of opportunity to earn good time, and the same stark conditions as the rest of the administrative segregation population.

Responsible correctional practice, in my opinion requires the withdrawal of 'basic' privileges for very limited reasons. It is difficult to imagine the correctional purpose served by not allowing Level III ad seg inmates shampoo, some for many years. The same questions arise in my mind regard not allowing an inmate on non-punitive status to have a radio, for years. The complete denial of access to education to non-punitive status inmates, particularly when they are not allowed to work, also seems to not serve the interest of a correctional objective.

Even if it is defensible to place individuals believed to be Security Threat Group members in Administrative segregation (and I have some question about that), there is no correctional objective to be met by denying them even basic privileges. If the objective is to keep them from having access from the general population so that they do not threaten the orderly operation of the institution, this may be accomplished while still providing humane conditions-to include either work or programs, or both.

**Use of Force**

The most disturbing circumstances I found while touring and inspecting Texas prisons was the over use of force, the threat of force, and the abuse of force. It seems that the culture among many custody staff in most units I visited is one that perpetuates threatening inmates with force, reverting to actual force—both chemical and physical--very quickly, and in too many instances using a level of force that is uncalled for, or in some instances abusing the inmate during the use of force. Although any prison system is going to experience some individual staff members who over use, or abusively use, force, the frequency and level of these instances in Texas is astonishing.

Control is essential in any prison setting. Most systems, however use a variety of ingredients to establish and maintain control, including: technology; architecture; training staff in communication skills with inmates and those that are culturally different; training staff to develop positive relationships; rewards for positive behavior; and provision of pragmatic and meaningful programming.

It appears, through observation and interviews, that the best that inmates in the TDCJ-ID can hope for—rather than rewards for positive behavior—is the absence of punishment, often physical.

The TDCJ Directives, policies and procedures meet or exceed generally accepted professional standards. The behaviors put in practice, however, neither meet the expectations nor the spirit of those policies, nor in my opinion, the order of the court.

Instances of entire pods being gassed for the misbehavior of a few are documented. Mentally ill inmates being gassed and extracted from their cells for behaviors more than likely related to their mental illness; inmates being 'slammed' while already in restraints; and other similar instances are prevalent in the statements of the inmates as well as in some of TDCJ's own reports.

The mechanisms set up to try to identify overuse or abuse of force, don't work. The grievance process of the Inmate Grievance System has no credibility or

trust from the inmate population. There are serious enough problems with the filing of grievances, response (or lack thereof) to grievances, failure to investigate the MUOF grievances, and retaliation for filing grievances, that many inmates subjected to use or abuse of force don't bother

Some inmate stories and records that support my opinion of overuse, inappropriate use or abuse of force are the following:

#629211   Close          Coffield

Was placed and kept in the 'legal cage' for four days beginning 7/17/97, located near the picket on the wing. Believed to have a handcuff key. Apparently very little food and forced to urinate and defecate in the cage. The Major was demoted to Captain and transferred. Higher authorities deny knowledge during the time the incident was occurring. Rest of custody staff that helped implement or were aware said they were simply "...following orders." (109718)

#732264        Ad Seg        Terrell Unit

First came in on 9/30/78—has now been in Ad Seg for 3 years. States on 9/10/98 was beat in the hallway after being gassed in cell for resisting a cell move States COIII punched him a couple of times. States a Sgt. was there. Was then kicked in jaw twice. They said I tried to kick them. No video, medical said I had a scratch on the ear. The MUOF report does not confirm decontamination in a timely basis, statements differ why not—eventually did decontaminate over an hour later. Pictures taken through cell door contained in the MUOF file allegedly showing inmate—don't. Cpt. was told by three inmates what happened but no investigation. The inmate states that there is no use in filing a grievance they ignore or cover-up.

#618368   Ad Seg        Terrell Unit

Came in system in June, '92; Terrell since July. 1994. Was in general population for one year, then was in a fight and tagged as Texas Mafia. Back a couple of months ago he claims he was 'slammed' outside the shower. He said they tore up his family pictures, and the Lt. said "...we'll teach him a lesson..."—used OC and CS. They then took him out of his cell and didn't decompress from the gas. He stated an officer was running the camera—but didn't turn it on until later. The medical record states that he suffers from asthma and high blood pressure. The MUOF report makes no notation of checking the gas list. He feels his life is in danger—that staff will find some way to get him. Filed grievance but it came back saying it was resolved. The MUOF report says the camera went dead. Also states that medical warned that inmate has asthma. A second MUOF report states that on 5/18/98 @ 7:35am this inmate refused to exit the rec yard. The officers used gas grenades, then a canister, then two more ball grenades— the report states that the camera was "...inadvertently not turned on...".

#615466   Ad Seg         Terrell Unit

On 1/6/98 apparently the inmate assaulted an officer during the course of a cell search. During the subsequent cell extraction an officer grabbed inmate by the testicles—taking 32 sutures to close. The MUOF report states that the camera went dead. There were no after action pictures taken showing medical condition— the report said inmate refused. The inmate said the officer hit him 3 or 4 times after releasing his testicles. States many of the young officers are afraid and so write up inmates for anything. The inmate states it does no good to grieve—either no response or denied regardless of circumstances.

#749098                         Hughes Unit

The inmate states he has been forced into sex by a number of gang members over the last couple of years. One of these physically assaulted him in February, 1998 in his cell. Was hit a number of times, both eyes being blackened, and his head being jammed against the sink. The officer responding, refused to have him escorted to the infirmary, and slammed the cell door on inmate's hand, resulting in the end of one finger being cut off. He states that

on several occasions he has informed staff that he wants out and asking for protection and has named names. His requests have been denied by the UCC. He presents himself as frightened, demoralized and in a hopeless situation. The medical records support the incident of the finger being severed. The files support his being denied protective status.

The afore-mentioned cases are but a few of those I have interviewed over the last several months. Certainly inmates do not all tell the truth, nor always tell all the truth. The stories of over use and abuse of force are compelling and insidious, and it is clear that the response of supervisors and administrators is critically deficient.

**Safety and Protection**

Related to the use of force issues are the issues of protection and safety. Because of the cavalier attitude of controlling, through the use, threat, or abuse of force, it is a probably-related attitude that shows a systemic lack of concern and action for inmates requiring protection.

Once again, the central policies are consistent with generally accepted standards. The implementation of those policies and apparent practice vary widely.

Repeatedly throughout the units that were visited, individuals who had obvious protection needs were found in general population units. Those being threatened if they refused to join gangs; those who are physically vulnerable; those who are mentally ill or developmentally disabled; those being pressured to perform sex; and those inmates being pressured for money or commissary were but some of those refused protection.

Protective custody of course requires a single-cell. The TDCJ has less than 110 of these inmates (as of May, 1998) out of a total prison population of over 140, 000 inmates (per the NCCD report of 1998).

Ironically, many of the inmates held in safekeeping status, are housed separately, but must eat, recreate, and program with general population inmates. For those inmates that do need protection this practice, although economically efficient, it puts those needing protection at risk.

Most correctional systems attempt to hold down the number of inmates in protective custody, but the casual response by TDCJ staff to claims for protective needs is astonishing.

Some of the inmates that have relayed stories for the need but were refused are as follows:

#703263          Ad Seg          Terrell Unit

The inmate states he has been stabbed twice, and feels his life in danger. After no response for protection he began cutting on himself, and was sent to Skyview and Jessup and put on meds. He states he was O.K. while on meds but was taken off them when sent back to Terrell and regressed. He states he cut himself at 7p.m. and they didn't find him until 11 p.m. He states the grievance system doesn't work that he sent in two different grievances but got exactly the same response to each. The medical records confirm he was taken off the psych caseload, despite self-destructive behavior. He states that no one from psych comes to his cell and that Medical doesn't respond I-60's or grievances. He states he was told by the social worker "...there is nothing we can do about it if you want to kill yourself...". States he was "slammed and beat" by staff on the Connally Unit and a couple of months later cut himself as a way of getting to a safe place. Was on safekeeping for a while then taken out of it, then stabbed twice. Has requested protection on numerous occasions over the years—only given once. Stated he again requested protection in 8/97 and gave info on the Aryan Circle—but was denied either a change of Unit, Safekeeping, or transient—rather was put in Ad Seg with the claim he was assaultive. His records show a history of intelligence deficit, depression, schizophrenia, and psych hospitalizations at the times and places he indicated and that he is now off psych caseload and meds. The denials of protection were confirmed from his records.

#646670          PC          Eastham Unit

States he requested P.C. on 3/19/97 and several times thereafter. He states he was regularly denied and told by the Captain that "...we can't do anything about it until something happens". Ended up being assaulted and received a several inch cut on his neck, inflicted by a gang member who had threatened him. Was put in P.C. 2 days before our arrival. The denials for PC were confirmed from his record and the assault and cut from his medical records.

#810197          Neal Unit

States he was getting a lot of pressure to join gang. Reported it and asked for protection, but not given it. They kept assigning him to a cell where the 'cellie' was a gang member, he would refuse housing and be written up. Had 'cases' back to back, one day after another for refusing housing—lost all his good time due to those 'cases'. His disciplinary cases for "...refusal..." were documented from the file.

#814725                    Neal Unit

He states he was attacked by two inmates a couple of days after his arrival at Neal. He states his spleen was ruptured and officers wouldn't send him to the infirmary until he passed out in the dayroom, several hours after the beating. He was eventually sent out of the Unit for surgery. The medical records confirm the time he arrived at the infirmary and the surgery on his spleen. It states that he now suffers from post-traumatic syndrome and is seeing the psychologist for it. No record in the file that he has been investigated for possible protection needs.

#681867                    Neal Unit

The inmate states that he was pressured to join the Aryan Circle after his arrival preceded by many threats. Eventually reported this to authorities but was denied protection. He states he was later was raped by a Crip gang member and the UCC

again denied protection. The file confirms the denial but there is no record in the file as to protection investigations. He states continues to pay money to the AC. The medical record states the rape has reportedly aggravated his psychiatric problems.

#543378                           Hughes Unit

The inmate states he has been in safekeeping a couple of times while in prison, but has also been 'forced ' out a couple of times. During one of those times was sent to close and ended up being raped and his jaw broken while being beaten. This assault was confirmed in the file, as well as the injuries in the medical file. He states he was told at the UCC while requesting PC in 1996 that "...if you're gay you have to pay...". He is gay. The record states he also suffers from major depressive disorders and has a history of psychosis.

#646670   Medium/Safekeeping          Eastham Unit

Had requested protection since May, 1997. Denied, then recently was assaulted and received a several inch cut on his neck.  The denial of protection on earlier occasions was confirmed in the file and the injuries from the medical file and observation. Finally put in protection two days before our arrival.

#704281   Ad Seg                 Connally

The inmate states that he was in general population and it was rumored that he was a Blood—but that he wasn't and he is not. States he was threatened twice, then requested PC or a transfer. Grieved it when they wouldn't give him either one. Then reverted to refusing housing to avoid the threat and was given 'cases' as a result and placed in ad seg. Denials of protection requests or transfer were verified from the file. Inmate showed me a copy of the denied grievance.

#816330                          Hobby Unit

The inmate states she was jumped twice and beat by the same inmate. She went to the infirmary each time and the perpetrator was released each time. Requested protection, but denied, was told to "...fight back...". Was moved to another building but a week later the perpetrator was moved next door. Still afraid but is going home next week. The injuries from the beatings were verified from the medical file and the denials of protection from the inmate file.

The concept of safety in prison administration is one of universal importance, safety of staff, visitors, and inmates alike. Obviously the group that is most dependent on others for safety is the inmate population. Inmate safety may be at risk for a number of reasons. Certainly a number of inmates in any large inmate population are predatory. Their predatory behavior may be attempting to extort sexual favors, money, drugs, money, or other contraband. It may be attempting to influence another inmate to join a gang or other group.

There are inmates who attack other inmates due to the nature of their crime, or because they 'informed' on another inmate, or because they were a witness at a trial. Some inmates belonging to one gang threaten, or attack, members of another gang for any variety of reasons.

Because inmates also have a variety of characteristics: some gay; some physically frail; some intellectually limited; some gang members; some mentally ill; etc., prison administrators must have policies and procedures that assure that due consideration is given to assessing the potential threat presented, as well as the potential victimization potential in any group of inmates—as well as for individual inmates. In the ideal world one would simply lock up all predators, but it is unpractical to assume this can be done.

It is incumbent on prison administrators to make all attempts to assure personal safety for inmates. The inmate is dependent on prison administrators for determining where he/she will be housed, where he/she will eat, where he/she will work, etc.—for all aspects of daily living. It therefore, is essential that the policies and procedures of a correctional agency assure that all due consideration be give to fully assessing any potential danger to those inmates under its' care and custody. But more importantly, it must assure that the administrators and staff follow those policies and procedures.

As previously stated, the TDCJ Directives and policies are consistent with generally accepted correctional guidelines and standards. It does not appear that those policies are being implemented in a manner that would assure a reasonable level of safety for individual inmates.

Providing protection and safety can mean many things. Initially it means taking any report or claim of threat seriously (whether from the inmate being threatened or from another source of information). Secondly, it means thoroughly investigating the threat, claim, or situation. If the threat or claim is valid, it then requires some action that will mitigate or negate the threat to the individual inmate.

Mitigation or negation can be achieved in a variety of ways, depending on the threat. In some instances movement to a different part of the institution will suffice, in others to a different institution. In some cases placement in a specialized program, living unit, or institution will suffice. In some instances placement in a full protective custody environment or a transfer to a different correctional jurisdiction is required.

The bottom line is that the correctional agency has the responsibility to do "whatever is necessary" to assure safety.

As evidenced in the cases referenced above and other case reviews and interviews, it is my opinion that staff at TDCJ does not fulfill the requirement to take "...any report or claim of threat seriously." Nor, in my opinion, do they thoroughly regularly investigate such reports or claims—as required even in their own policies. Finally, too frequently the inmate seeking protection is simply left in the environment in which they are threatened until something happens. Frequently, this "...something..." is a

physical assault, sexual assault, or continued victimization through extortion for money, materials, favors, or sex.

### Conclusion

It is my opinion that the rapid and massive growth of the Texas prison system has resulted in several unintended, but nevertheless unacceptable conditions.

The agency is experiencing difficulty in assuring that it's policies and procedures are being implemented. This may, at least in part, be related to limited resources. The ability of inmates to communicate their problems and access services in the system has been seriously eroded; arguably resulting in safety problems and difficulty in accessing medical, mental health, and program services.

The frequency of use of, criteria for entry to and exit from, and conditions of confinement in administrative segregation are wholly inconsistent with generally acceptable correctional practice. The number of mentally ill offenders incarcerated under these repressive conditions is shocking. Administrative segregation as administered in TDCJ is in my opinion inhumane, and possibly unconstitutional.

The culture in the Texas prison units is one that relies predominantly on the threat of or use of force. Force is used to quickly when other means are available to resolve the situation. Frequently the amount of force used is excessive for the situation. Also too frequently abuse of inmates, in contrast to TDCJ's own policy, is occurring. When abuse occurs, it frequently is either not reported, is under reported, or not thoroughly investigated.

Protection of inmates in the Texas prison system is another area where the central policies simply are not being implemented or are being circumvented. Frequently inmates are being denied protection until serious injury occurs. Extortion for sex, materials, or gang membership are common.

When conditions, as mentioned above, exist and the grievance system is universally seen by inmates as dysfunctional at best; non-responsive, non-creditable, and biased toward staff at worst—a questionable environment exists—even in a prison.

As with the grievance system, the disciplinary system is considered by the bulk of the inmate population (of the hundreds I interviewed) to be unjust, biased, overly punitive, and frequently simply a means of retaliation.

Whether the inmate perceptions are accurate or not, the degree to which prisons can maintain an environment that provides basic human protections relies partially on the perception by those in its custody that they will be treated responsibly under the law. The remainder of the responsibility for assuring basic human protection is left to the development of sound policy, with accompanying monitoring and supervision to assure its consistent application. Unfortunately, I believe that TDCJ is failing in the latter.

## CHASE RIVELAND                    (EXHIBIT A)

### EDUCATION;

M.S.S.W. Degree, University of Wisconsin-Madison, 1971
B.S. Degree, Sociology/Psychology, University of Wisconsin-La Crosse, 1964
Strategic Management, Wharton College, University of Pennsylvania, 1978
Management In Corrections [MADCAP]-USC, 1980
J.F.K. School of State and Local Government-Harvard, 1984
Aspen Institute, 1984

## PROFESSIONAL EXPERIENCE

Consultant, Riveland Associates, Deer Harbor, WA- January, 1997 to present

Secretary, Washington Department of Corrections, Olympia, WA-July, 1986 to January, 1997

Executive Director, Colorado Department of Corrections, Colorado Springs, CO-1983 to 1986

Deputy Division Administrator, Wisconsin Division of Corrections, Madison-1982 to 1983

Superintendent, Portage Correctional Institution, Portage, WI-1980 to 1982

Milwaukee Regional Director, State Bureau of Community Corrections, Milwaukee, WI-1976 to 1980

Probation and Parole Supervisor, Madison, Janesville, and Jefferson, WI-1975 to 1976

Graduate Student Supervisor, University of Wisconsin and Division of Corrections -1974 to 1975

Financial Compliance Officer, Wisconsin Division of Corrections-1973 to 1974

Probation and Parole Officer and Institution Social worker, Wisconsin Division of Corrections-1971 to 1972

Probation and Parole Officer, Wisconsin Division of Corrections, Appleton, WI-1964 to 1966

## RELATED EXPERIENCE

Supervisor, Child/Adolescent Program, Mendota Mental Health Institute, Madison, WI-1972

Assistant to the Superintendent, Mendota Mental Health Institute, Madison, WI-1973

Officer, U.S. Army-1966 to 1969 [Vietnam Veteran]

## MEMBERSHIP; PROFESSIONAL ORGANIZATIONS AND ASSOCIATIONS

Association of State Correctional Administrators-1983 to 1997

American Correctional Association

Western Correctional Association

Washington Correctional Association

Washington Council On Crime and Delinquency

National Council on Crime and Delinquency

Campaign for an Effective Crime Policy (Steering Committee Member)

American Probation and Parole Association

Edna McConnel-Clark Justice Advisory Board-1988 to 1994   [Chair-1993 to 1994]

Editorial Board Member, *Crime and Justice*—A Review of Research Journal - 1995 to present

Editorial Board Member, *Correctional Management Review* - 1996 to present

Editorial Board Member, *Criminal Justice 2000,* National Institute of Justice - present

World Future Society
National Council on Crime and Delinquency, Board of
   Directors, 1998 to Present


Honors
National   Governors   Association   Distinguished
Leadership          in   Government          Award-1989

Association of State Correctional Administrators,
Michael  Franke  Outstanding  Director  Award-1993

IARCA, Margaret Meade Award-1994
Maude Booth Award, Volunteers of America-1998


Mark Cooper Lifetime Achievement Award-WCCD-1998

*Riveland  Associates:  Box  367  Deer  Harbor,  WA
Telephone: (360)376-2870*
           *e-mail:    riveland@rockisland.com*
      *Facsimile:  (360)376-2879*

**Publications by Chase Riveland for Last Ten Years:**          **(EXHIBIT B)**

Supermax Prisons: Overview and General Considerations; A monograph completed and accepted by the U.s. Department of Justice/National Institute of Corrections under TA#98P4002; to be published in January, 1999.

"Being a Director of Corrections in the 1990's; Federal Probation; published by the Administrative Office of the Courts; June 1991.

"Baseball or Public Policy"; Journal of Interpersonal Violence; September, 1994

"Margaret Meade Lecture Series"; The IARCA Journal; February, 1995

"Prison Administration"; Chapter in Crime and Justice: A Review of Research; accepted for publication in March, 1999.

"Punishment, Politics, and People"; Overcrowded Times; December, 1992

A Review of "The Cost of Corrections: In Search of the Bottom Line"; Research in Corrections; Volume 2, Issue 1; February, 1989.

"Let's Invest in People, Not Prisons"; Guest editorial in the *Seattle Post-Intelligencer*; March 17, 1994.

"Three Strikes and You're Out Isn't The Answer to Our Crime Problem"; Press release for the *Campaign For Effective Crime Policy*; September 18, 1996.

"Leadership and The Corrections Executive"; with Robert Brown and Marie McTavish; Corrections Management Quarterly; Aspen Publishing; Volume 2, Issue4; Fall, 1998.

"The Correctional Leader and Public Policy Skills"; Correctional Management Quarterly; Aspen Publishing; Volume 1, Issue 3; Summer, 1997.

"Prisons Over The Next Several Decades; Guest Column for the Walla Walla Bulletin; accepted for publication in February, 1999.