# United States District Court Southern District of Texas

## Case Number: _H-04-2387_

## ATTACHMENT

Description:

☐ State Court Record          ☐ State Court Record Continued

☐ Administrative Record

☐ Document continued - Part _I_ of _I_

☐ Exhibit(s) number(s) / letter(s) _Exh #105_

Other: _Pltf's First Amended Habeas Corpus_

EXHIBIT 105

# A P P L I E D     F O R E N S I C S     L L P

00 P Street, N.W., Suite 405
Washington, DC 20036

Tel: (202) 365-1387
Fax: (202) 543-3025

**Keith R. Curry, Ph.D.**
2000 P Street, N.W.
Suite 405
Washington, DC 20036

Tel: (202) 365-1387
Fax: (202) 543-3025

March 19, 2002

Donna Brorby, Esq.
Law Office of Donna Brorby
660 Market Street
Suite 300
San Francisco, CA 94104

Dear Ms. Brorby,

I have completed my site visits regarding Ruiz *et al v.* Gary Johnson *et al.,* having surveyed eight prison units on a total of 15 site days.  These included Robertson on January 31st and February 1st; Allred on February 2nd and 3rd; Clements/PAMIO on February 4th and 5th; McConnell on February 26th and 27th; Lewis/AMPP on February 28th and March 1st; Estelle High Security on March 4th; Coffield on March 5th and 6th; and Smith on March 11th and 12th.

Before the site visits, I reviewed various documents provided by your office relating to the provision of mental health services to inmates housed in Administrative Segregation throughout the Texas Department of Criminal Justice (TDCJ).  These included the following:

- Notice of Filing of Defendants' Intervention Plan for Seriously Mentally-Ill Offenders in Administrative Segregation, dated December 14, 2001

Re: TDCJ
March 19, 2002

- TDCJ Health Services Division (HSD) Policy E-39.1, Health Evaluation and Documentation – Offenders in Segregation

- TDCJ Mental Health Services (MHS) Policy IV J, Pre-Segregation Mental Health Evaluation

- TDCJ MHS Policy IV J.1, Mental Health Evaluation of Offenders in Disciplinary Segregation

- TDCJ MHS Policy K, Segregation Rounds – Mental Health Patients

- TDCJ MHS Policy II.A, Referral of Offenders to Psychiatric Inpatient or Crisis Management Facilities

- Texas Tech University Health Services Center (TTUHSC) pre-service training curriculum relating to mental health issues.

- TDCJ pre-training curricula used for correctional officer Mental Health Training

- A unit summary of transfer data resulting from administrative segregation reviews conducted by TTUHSC and the University of Texas Medical Branch (UTMB) staff from 1999 through 2001

- Admission and referral procedures for the Program for the Aggressive Mentally Ill Offender (PAMIO) program operated by Texas Tech

- A program description for the Administrative Segregation Maintenance Psychiatric Program (AMPP) proposed by UTMB

- Smith Unit In-Cell Psycho-Educational Treatment Modules proposed by TTUHSC

- Minutes of Quality Council Meeting of July 12, 1999 conducted by UTMB

- Administrative Segregation Review staff assignments and résumés

012266

Re: TDCJ
March 19, 2002

The survey included interviews and informal discussions with prison administrators, managers, correctional staff, and medical and mental health staff. I interviewed staff working the day and evening shifts and observed daily routines on the units. Environmental conditions were observed on both preliminary guided tours and later over the course of my stay on the units.

During my visit I interviewed selected inmates and reviewed the medical records of inmates culled from the Mental Health rolls and others based upon their presentation when found in administrative segregation housing areas. A complete list can be found in Appendix A.

The following conclusions are based upon review of institutional documents, meetings and interviews with TDCJ staff, on-site observations, inmate interviews, and review of a sample of medical records.

General Impressions

It has been well established that seriously mentally ill inmates are disproportionately represented in correctional facilities in the United States. Once incarcerated, inmates suffering from schizophrenia, schizoaffective disorder, bipolar disorder, and major depressive disorder display predictable deficits in behavioral and emotional control, maladaptive interpersonal styles, social skills deficits, and distorted perceptions of their environments. As a result, they are less able to conform their behavior to the rigid expectations of prison life and often fall into self-defeating patterns of irrational opposition to the demands placed upon them. Seriously mentally ill inmates are thus more prone to disciplinary infractions and once segregated, react more negatively to the relative inactivity and sensory

Re: TDCJ
March 19, 2002

deprivation of 23 hour a day lock down.  As external reality clues recede, their

mental functioning often deteriorates with concomitant restriction of their already

inadequate coping skills.  In the absence of active mental health treatment, seriously

mentally ill inmates may become the "bottom dwellers" of the prison system, trapped

in segregation units by their illness and unable to adapt to the hard conditions found

at the deep end of the correctional system.

The current limited review of the mental health status of segregated inmates

in seven TDCJ prisons yields findings of 10 to 15% identified by TDJC as suffering

from serious mental illness.[1]  The clinical effects of segregation upon these seriously

mentally ill inmates varied substantially throughout the state depending upon local

factors such as mental health staffing patterns, quality and quantity of care, housing

design, and proximity to an inpatient setting. However, one factor was consistent

across all facilities visited.  Seriously mentally ill inmates were subject to very

lengthy stays in segregation.  Of the 68 inmates reviewed for whom the length of

stay could be roughly estimated from the medical record, the average length of stay

in segregation appeared to be 5.2 years with a range of one month to 17 years.[2]

Administrative Segregation

The structure of administrative segregation at TDCJ presents obstacles to the

effective treatment of severely mentally ill inmates and has created *de facto* long-

---

[1] The PAMIO program at the Clements Unit was excluded from this calculation since it houses exclusively severely mentally ill inmates.

[2] Segregation lengths of stay were estimated based upon dated medical records including pre-segregation mental health evaluations, weekly mental health segregation rounds, and quarterly mental health progress notes and segregation clearance statements.  Precise data could come only from classification documents.  These have been requested of the attorney general's office at the time this report is due.  Supplemental findings will be issued to define the lengths of stay with greater precision.  ("Length of stay" as used here is technically a misnomer since this calculation only sums the number of days spent in segregation to date.  True length of stay data was not available and could only be calculated by summing the total number of segregation days upon release to the general population or from prison.  This latter calculation would by definition produce significantly higher numbers.)

Re: TDCJ
March 19, 2002

term mental health housing.  Administrative segregation employs a three level
system that top TDCJ officials explained to us is meant to deter disciplinary
infractions by already segregated inmates.  By policy, inmates can enter
administrative segregation on any level depending upon the nature of the infraction.
Once they are assigned to administrative segregation may be dropped to level III for
any disciplinary case involving assault.[3]  Level II and III assignments entail
significant restrictions and deprivations as compared to Level I.

Inmates on Level I are allowed a minimum of 7 and a maximum of 12 hours
per week of out-of-cell time in relatively barren recreation areas.  They do not have
access to television or even in-cell education, by state law.  Their visitation privileges
are similar to those of general population.  They are provided desserts with meals
and are allowed personal property and commissary privileges similar to general
population.

Approximately 30% of all administrative segregation inmates are assigned to
Levels II and III.  Most of the seriously mentally ill inmates interviewed were on one
of these levels.   Level II inmates are allowed a maximum of four hours of out-of-cell
time per week.  Level III inmates are permitted only three hours of out-of-cell time
per week to generally single-person recreation enclosures, plus daily showers which
are in-cell at high security units and out-of-cell at other units.  Commissary and
property privileges are severely restricted compared to Level I. Level III inmates are
not allowed to buy or possess shampoo, toothpaste, deodorant, or commercial soap.
Inmates are allowed two visits per month on Level II and one visit per month on
Level III.  None of these can be contact visits.  Inmates on Levels II and III do not get

---

[3] Assault in this instance has been broadly defined to include public masturbation and vague threats.

Re: TDCJ
March 19, 2002

dessert with their dinner.  Any administrative segregation supervisor can place them on property restriction or food loaf for 24 hours for any reason.

Once assigned to Level III, inmates must remain free of major disciplinary cases for 90 days to be eligible ascend to Level II.[4]  TDCJ policy does not prescribe a period for Level II, but 180 days was a common minimum on the units visited. Hence it appears that an inmate assigned to Level III must remain free of major infractions a minimum of 9 months before he can return to Level I.

Whether or not this system effectively serves as a deterrent to the typical administrative segregation inmate, its deterrence value for seriously mentally ill inmates is dubious.  Inmates suffering from schizophrenia, schizoaffective disorder, bipolar disorder, psychotic depression, and severe forms of personality disorders have, as a part of their illness, poor impulse control, delusional thinking, volatile emotions, distorted perceptions of their environments, as well as gross social skills deficits.  They typically suffer serious disabilities in terms of planning for future events and learning from experience.  Once segregated, they may lose the ability to track the passage of time. Disoriented and confused psychotic inmates often misinterpret the muffled voices of staff and other inmates in ways that confirm their fantasies and fears, or they may suffer outright hallucinations. Those suffering from paranoia typically misconstrue the motives of others in ways that prevent them from acting in their own best interest.  Once cut off from external reality cues due to social and sensory deprivation, psychotic inmates may become autistic and lose the ability to differentiate events occurring inside versus outside of themselves.  Their behavior

---

[4] In contravention of this TDCJ policy, the Clements Unit was requiring 180 minimums at Level III.

012270

Re: TDCJ
March 19, 2002

can become bizarre and erratic.  Hopelessness, apathy, and disturbances of volition are common symptoms of these disorders.

Given these predictable symptoms, it is plain that seriously mentally ill inmates differentially lack the ability to understand, internalize, and react appropriately to the disincentives of this level system.  Seriously ill inmates are overrepresented in the lower levels of administrative segregation and the long periods spent mired there can be attributed to the serious symptoms of their mental illness.  In a circular fashion, the extreme social and sensory deprivation of segregation in turn exacerbates those same symptoms that have kept these inmates stuck at the bottom.

Many of these symptoms could be ameliorated through aggressive mental health treatment.  Most of these self-defeating behaviors are susceptible to behavior therapy interventions that have been proven effective in correctional facilities.  However, one of the effects found in reviewing administrative segregation assignment at TDCJ is a *de facto* reduction in access to mental health care.  In effect, the inmates most in need of mental health services were least able to get them.[5]

The outcome is a system where seriously mentally ill inmates often enter administrative segregation early in their sentences and either start at or quickly fall to Level III where they become trapped by the effects of their mental illness.  These are the "bottom dwellers", many stuck in segregation for the duration of their sentences.

---

[5] Acuity is not the issue here.  The need expressed here has to do with the direct injurious effects of their illnesses on the sufferers and their life circumstances.  Hospitalized patients may be suffering from through a more acute phase of their illness, but the therapeutic environment of the hospital lessens the immediate impact and interrupts self-defeating cycles.

**Re: TDCJ**
**March 19, 2002**

They behave irrationally, have frequent crises, and cycle in and out of prison psychiatric hospitals.

Mental Health Service Model

Traditional mental health care systems are comprised of a minimum of three elements.  Acute care is intensive round the clock hospital level service for patients suffering from the acute phase of a mental illness where symptoms of psychosis, imminent suicide risk, or dangerousness justify intensive and intrusive measures and curtailment of personal liberties such as forced medication and the application of locked door seclusion or mechanical restraints.  Sub-acute care is typically provided outside of hospital settings for people suffering from severe and chronic conditions that require intensive case management, psychosocial interventions, crisis management, and psychopharmacology in a safe and contained environment in order to prevent painful and dangerous deterioration in their conditions that would otherwise lead to repetitive cycling in and out of acute care hospitals.  Outpatient care is provided in the general community and typically involves supportive counseling, psychotherapy, and other palliative interventions for relatively healthy individuals experiencing psychological symptoms due to mild forms of mental illness or adverse reactions to difficult life circumstances.  Outpatient care may also be appropriate for chronically mentally ill inmates whose symptoms are under control or have gone into remission to such an extent that they can function relatively normally in segregation or general population. (See Appendix B for descriptions of Mental Health Service Models from other departments of corrections)

Re: TDCJ
March 19, 2002

The contracted mental health providers for the TDCJ appear to offer the necessary level of acute care through a sizable prison hospital system.[6] Periodic sweeps over the past two years have located and removed many seriously decompensated inmates from administrative segregation areas thereby improving provision of acute care services to this segment of the population. TDCJ and its contractors have committed to continuing these sweeps on a biennial basis with the assistance of an outside consultant.

Sub-acute care within the TDCJ system is limited to two programs at one site. The state developed a non hospital program, the Program for Aggressive Mentally Ill Offenders (PAMIO), in 1991 at the Clements Unit. A separate service now called the Personality Disorder/Aggressive Behavior Unit evolved out of PAMIO to serve inmates with Axis II disorders.[7] Beyond these two programs, the TDCJ offers no sub-acute care to inmates who require this level of care.

Outpatient care provided within administrative segregation units is inadequate in its own right, but would not even under the best of circumstances be sufficient to meet the needs of inmates requiring sub-acute care. The deficiency is not in the quality but in the type of treatment provided. Outpatient care is appropriate for relatively healthy inmates having difficulty adjusting to prison life or chronically ill inmates who have become essentially asymptomatic. Under normal conditions, the quality of outpatient care would not be relevant to the needs of sub-acutely mentally

---

[6] Although the acute care system was not surveyed for this report, opinions of plaintiff's experts in 1999 as well as currently stated program descriptions and census figures indicate sufficiency at this level of care.
[7] The "Personality Disorder/Aggressive Behavior Program" was formerly known as the "Step Down" program and is so called in the Notice of Filing of Defendants' Intervention Plan for Seriously Mentally-Ill Offenders in Administrative Segregation.

012273

Re: TDCJ
March 19, 2002

ill inmates any more than the quality of sub-acute care would be relevant to the

needs of acutely ill inmates. However, in administrative segregation units of TDCJ

of sub-acute care is nonexistent and inmates requiring this level of service are

offered outpatient care instead. As a result, inmates in this group of sub-acutely

mentally ill inmates are harmed by their long-term assignment to a housing status

where the appropriate level of care necessary to treat their serious illness does not

exist.

The mental health care providers have acknowledged the absence of sub-

acute care for segregated inmates and have proposed new programs meant to

supplement existing outpatient services for inmates within administrative segregation

who do not meet criteria for acute inpatient care. They have not proposed new

facilities, programs, or housing for segregated inmates requiring sub-acute mental

health care to be provided in some form of restricted housing other than regular

administrative segregation.

Unit findings

Overall, the quality of outpatient mental health care delivered to inmates

surveyed in segregation ranged from adequate to virtually nonexistent. As

mentioned, sub-acute care is simply absent from the system outside of PAMIO and

the Personality Disorder/Aggressive Behavior Program at Clements. In most prison

mental health delivery systems, severely and chronically impaired inmates not in

need of acute care hospitalization receive sub-acute care in the form of enhanced

mental health services in specialized custody settings to prevent painful and

expensive decompensations. In the TDCJ model, these inmates were found to be

10

012274

Re: TDCJ
March 19, 2002

receiving the bare minimum of outpatient care in regular administrative segregation housing. This reactive model has allowed and even required inmates to repeatedly deteriorate to the point of rehospitalization in order to receive mental health care beyond the outpatient level. The medical records surveyed at all units revealed numerous examples of minimally treated mentally ill inmates decompensating in segregation, coming to the attention of unit mental health staff during a crisis, transferring to an inpatient setting for treatment, only to be released back to segregation to have the cycle repeated. Outpatient care itself is barely adequate in segregation due to low and variable caseloads, inadequate and uneven staffing, absent or irrelevant individualized treatment planning, serious and persistent problems with medication administration, and most importantly, the substitution of monitoring for treatment. These conditions were found in varying degrees at all segregation units surveyed. Training, supervision, and enforcement of policies and procedures were uniformly weak. Where adequate care was found, it was directly attributable to the presence of one or two dedicated staff members.

Basic identification, medication, and monitoring of mentally ill inmates in segregation constitute almost all of the mental health services rendered in administrative segregation, but these were found to be inconsistent from unit to unit. Although Allred, McConnell, Estelle High Security and Coffield were observed to be doing a good job finding and tracking severely mentally ill inmates, they each constituted examples of isolated personnel factors determining the quality of service. In each of these facilities, the mental health administrators had developed efficient

Re: TDCJ
March 19, 2002

but idiosyncratic ways of functioning with inadequate resources and all utilized

frequent inpatient transfers to care for their chronic and severely mentally ill inmates.

Allred for instance has a staffing level of 8.5 full time equivalent (FTE) mental

health clinicians that is relatively high compared to other units visited and maintains

a caseload of 148 out of 950 or 15% of the inmates in segregation.[8]  The apparent

treatment model at Allred is to cast the widest possible net and then spread staff

resources thinly. Inmate interviews and medical record reviews reveal a lower acuity

threshold for obtaining mental health services than found elsewhere, but also

widespread complaints that individualized treatment is not available.   Furthermore,

inmates report slow responses to requests submitted for mental health attention.

Although a significant number of severely mentally ill inmates were found in Allred's

segregation housing, all appeared to be stable and receiving the most basic care[9].

However, basic outpatient care at Allred, as at all segregation units visited, consisted

almost exclusively of brief 90 day visits for medication management, cursory rounds

conducted cell side weekly or sometimes monthly, and crisis management.  This

passive treatment model of waiting for inmates to deteriorate to the point of needing

hospitalization essentially omits active treatment during the sub-acute phase of

chronic mental illness.  Outpatient treatment necessary to promote stabilization,

symptom management, and adaptive functioning was simply not available to

---

[8] Mental health staffing levels cited are not exclusive to administrative segregation, but to each facility as a whole, i.e. Allred has a total census of 3,150 with 8.5 mental health clinicians.

[9] The pattern of crisis referrals prior to our February 3, 2002 site visit is noteworthy.  After an average of 8.3 crisis transfers from segregation and general population per month from March, 2001 through December, 2001, Allred transferred 22 inmates for crisis management in the month preceding our site visit.  Since the TDCJ mental health treatment model is designed to find and remove seriously ill inmates rather than treat them on site, a snapshot taken following a purge would underestimate the level of acuity occurring naturally at the facility.  Data available on-site did not allow for analysis of composition by housing area so that the numbers of referrals from administrative segregation versus general population could not be determined.

012276

Re: TDCJ
March 19, 2002

outpatient inmates in administrative segregation.[10]   Since chronically and seriously

mentally ill inmates are left to decompensate until they are captured by the mental

health monitoring system, the main role of outpatient mental health providers in this

system is not to provide treatment, but to look for inmates who have deteriorated

beyond a certain threshold and refer them out.

At Allred, the mandated weekly mental health rounds in segregation have

shown significant fluctuations in quality due to recent personnel changes.  A review

of medical records substantiates staff and inmate reports that the quality and

regularity of segregation rounds dropped dramatically when one key clinician retired

in the fall of 2000.  Prior to that, these rounds were conducted door to door as

required and produced meaningful information for the staff monitoring for

deterioration.  Inmates report that for the past year, mental health rounds have been

conducted in the "nursing style" which involves a clinician stepping into the housing

area, shouting, "Psych", speaking briefly with any inmate who shouts back that he is

mentally ill, and then departing the cellblock.  This change in practice due to change

in personnel is typical throughout the system whereby the quality of services is the

product of varying levels interest and effort on the part of staff.  Although this

practice was not directly observed, documentation of mental health rounds has

shown a clear deterioration in quality over that past 18 months.

The Coffield Unit has the second highest staffing level with 7 FTE mental

health clinicians for a total census of 3,161.  Despite this, their administrative

---

[10] TDCJ currently maintains three specialized programs meant to address narrow aspects of this need.  However, while the PAMIO program has operated since 1991, AMPP at the Lewis Unit and the In-Cell Psycho-education Program at the Smith Unit are in their embryonic phase and operate on a small scale.  These attempted remedies will be discussed in a following section.

U 12277

**Re: TDCJ**
**March 19, 2002**

segregation caseload is significantly lower with 66 of 696, or 9% of segregation

inmates receiving care.  Interviews and record reviews reveal that the staff at

Coffield are providing a higher quality of care than found elsewhere, but to inmates

within a more restricted range of acuity.  They are doing a good job of identification,

assessment, and monitoring of the most disordered inmates.  Furthermore, Coffield

was one of only two units visited that provides regularly scheduled individual case

management in offices rather than at cell side.  The responsibility for mental health

rounds is rotated among staff to reduce habituation, resulting in meaningful

observations that enhance monitoring.  Interviews with the 25 most seriously

mentally ill segregation inmates found none who were decompensated or otherwise

in need of a higher level of care.  Dramatic changes in the nature of crisis referrals at

Coffield, as compared to other units, over the past three years demonstrates the

impact of isolated personnel changes.  During a three month period spanning July

through September, 1999, Coffield staff transferred 135 inmates from the facility as a

whole to crisis beds.  Of these, 129 were for self-mutilation and seven were for

psychosis.  This stands in stark contrast to data from the three months spanning

December, 2001 through February, 2002, during which only 28 inmates were

transferred, nine for self-mutilation and 19 for psychosis.  While it is commendable

that self-mutilation has diminished so dramatically and surveillance of psychotic

decompensation has improved, the absence of sub-acute care is still evident in the

need to transfer on average six psychotic inmates per month to inpatient care.[11]

---

[11] Although data was not reported in a manner that allowed for analysis of administrative segregation versus general population crisis referrals, the supervisor of mental health services at Coffield stated that he believed crisis referrals come disproportionately from segregation.

14

012278

Re: TDCJ
March 19, 2002

The only other notable deficiencies found at Coffield were in medication administration and the filing of laboratory results. Pill call practices observed here and elsewhere are not consistent with stated TDCJ policy and are generally unsafe. Medications were observed being dispensed cell side in paper cones passed through the bars of the cell door with no attempt to observe the inmates.  The nurses observed sometimes did not even break stride as they proceed down the tier.  This practice allows inmates to do whatever they please with the medication, including hoarding or disposal, and precludes any meaningful monitoring of compliance.  This happened despite the advantage presented by Coffield's bar front cells.  Nurses at other facilities with solid doors were observed dropping the medication through the slots, setting the medication on the slot shelves and walking away, and in one case kicking the cones of medication under the cell doors.  These practices hamper the effective care of treatment resistant inmates and create a market for dangerous drugs within the facilities.  A reliable indicator that an inmate is disposing, hoarding, or selling his medications can be found in laboratory results for medications such as Lithium, Depakote, or Tegretol.  However, even though lab tests are reliably ordered by the psychiatrist at Coffield, the results were not filed three months after blood was drawn in more than half of the records surveyed.[12]

The McConnell Unit employs 5 FTE mental health clinicians with one vacant Mental Health Liaison position for a total of 2,800 inmates.  Psychiatry is provided via Telehealth due to difficulty recruiting qualified psychiatrists locally.  There are 75 out of 500, or 15% segregation inmates on the mental health rolls.  There is some

---

[12] Obtaining critical laboratory tests was more problematic at other units where they were not reliably ordered by treating physicians.

Re: TDCJ
March 19, 2002

evidence that McConnell staff are adequately identifying and monitoring seriously

mentally ill inmates in segregation and transferring them to inpatient care.  Staff

report that they are able to occasionally see inmates in an office just off the cellblock

for crises or individual case management, but admit that most mental health visits

happen briefly at cell side.  The custody staff at McConnell appear to use the mental

health providers to diffuse potential crises through verbal interventions cell side in a

commendable way not seen at other units.  Mental health rounds are conducted

weekly and produce useful case management and referral information.  However,

meaningful treatment beyond tracking and crisis intervention was rare.  Out of 25

medical records reviewed, one had a barely adequate treatment plan while the other

24 contained treatment plans that were uniformly meaningless and outdated.  While

it may be said that evidence of individualized treatment planning does not guarantee

good treatment, it is widely and in many cases officially recognized that the absence

of individualized treatment planning suggests seat of the pants treatment.[13]  This is

an important issue in a system with poor adherence to policy and weak enforcement

of standards. This lack of individualized treatment planning was uniform at all

administrative segregation units visited and accurately reflects the absence of

systematic treatment offered at the outpatient level.

McConnell staff relied more heavily upon crisis management services than

any at any other unit, sending out 91 crisis transfers from the facility as a whole from

---

[13] Virtually all major accreditation and governance bodies overseeing organized mental health care in the United States
require individualized treatment planning.  These include the Health Care Financing Administration, the Joint Commission
for the Accreditation of Healthcare Organizations, the National Commission on Correctional Health Care, the Federal Bureau
of Prisons, and the United States Department of Justice in its governance of local jails holding federal detainees.

Re: TDCJ
March 19, 2002

September 1, 2001 through February 28, 2002.[14]  Thirty of these came from the 500 administrative segregation beds while 61 came from the 2,300 general population beds. Nearly half, 44, were repeat referrals.  Nineteen were for psychotic decompensation, and 14 of these came from segregation.  One was a segregated inmate with paranoid schizophrenia who bounced back and forth to the hospital five times in six months.  Eight of the 30 originally reported segregation referrals came in the month preceding our site visit, and none of the seriously mentally ill repeat referrals was in the facility upon our arrival.  Conclusions based upon the fact that these numbers are higher than elsewhere are difficult to draw since neither the most seriously ill inmates nor their medical records were available for inspection. McConnell has the only psychiatric observation bed observed at any of the units visited except for Clements, giving them the relative luxury of isolating and monitoring inmates in crisis for short periods of time in house.  The numbers suggest that the staff at McConnell are identifying seriously mentally ill inmates and transferring them to the hospital when they decompensate.  The staffing is simply not sufficient to provide care much beyond monitoring, crisis intervention, and hospital transfers.

Estelle High Security provided the best example of small scale staff characteristics determining the quality of care provided.  The staff consists of one full-time counselor, .20 FTE of a psychiatrist, and .20 FTE of a psychiatric LVN

---

[14] Data compiled 02/27/02 by McConnell mental health staff on-site indicated 91 crisis transfers for this period, however, cumulative data provided by the Attorney General's office on 03/21/02 adjusted this number to 105 crisis transfers. Of the 14 adjusted crisis transfers, eight were added to February, 2002.  Although no clinical details are available regarding the 14 additional transfers, there is evidence to suggest that as many as 13 inmates may have been transferred from McConnell to crisis management in the seven days preceding our site visit.

012281

Re: TDCJ
March 19, 2002

dedicated to the 500 bed High Security Unit.[15]  Although the mental health rolls are

light, 44 of 500 or 9% of segregated inmates, little indication was found of

unidentified or untreated seriously mentally ill inmates in segregation.  The mental

health staff is vigilant and refers seriously mentally ill patients to the hospital with low

threshold criteria.  There were 69 crisis transfers during the six month period

spanning September 2001 through February 2002.[16]  Out of 45 of these for which

clinical details were available, only one inmate had multiple referrals.  Mental health

follow-up for inmates on the caseload is excellent.  As at Coffield, inmates are seen

reliably for individual case management held in offices off the cellblock and weekly

mental health rounds are rotated among staff to prevent complacency.  The one

counselor and his off site supervisor are both well suited to working with inmates in

segregation.  Both are conscientious and caring, and neither engages patients in

iatrogenic power struggles.  Requests for mental health interviews are addressed

quickly with sound outcomes.  Extensive reviews of the medical records of patients

seen on sick call for mental health issues that were determined not to be in need of

follow-up yielded no false negatives.  Inmate interviews in segregation yielded no

previously unidentified psychotic inmates.[17]  Inmates rate the mental health staff

high on caring and reliability.  It appears that the care provided to mentally ill inmates

at Estelle is the product of the skill and dedication of one conscientious counselor.

---

[15] Staffing data must be analyzed differently at units where administrative segregation is housed exclusively in High Security Units.  For example staffing for Estelle, Lewis, and Smith count staff that provide service only for those inmates assigned to administrative segregation and close custody whereas staffing at Robertson, Allred, McConnell, and Coffield count staff that provide services to both segregated *and* general population inmates.

[16] In contrast to other units, the rate of crisis management transfers at Estelle did not rise in the month preceding the site visit.

[17] It is worth noting that canvassing for mentally ill inmates involved only one psychologist covering 500 inmates and was limited to less than four hours.  Furthermore, the architecture at the high security units (Estelle, Lewis, Smith) complicates discovery of unidentified mentally ill inmates.  The cells have thick, solid doors with glazed apertures.  There are no windows to the outside so that an inmate in his cell with the light off cannot be adequately assessed.

Re: TDCJ
March 19, 2002

As at other units, individualized treatment plans in the medical records were devoid

of meaningful guidance and many were as much as four years old.  Psychiatric care

is the only other notable weakness at Estelle.  The paucity of hours and the lack of a

consistent presence leads to situations where inherited diagnoses are continued

blindly due to insufficient opportunity for comprehensive assessment.  Cell side

interviews yielded a significant number of likely misdiagnoses yielding unnecessary

treatment with potentially harmful medications.

In contrast to the above mentioned units, Robertson, Lewis, and Smith Units

were found to be failing at even the basic services.  The deficiencies at the

Robertson Unit may be attributed to local issues.  However, very serious failures

were found at the Lewis and Smith Units which illuminate systemic problems.

Compared to other units of comparable size, Robertson had slightly fewer

staff with 5 FTE mental health positions, two of which were vacant, to cover a prison

housing 2,800 inmates. Of the segregated inmates only 19 out of 504 or 4% were

identified as in need of services.  The psychiatrist and psychologist on-site saw

nothing wrong with this and expressed certainty that the mental health needs of the

segregated inmates were being addressed.  Medical record reviews and cell side

interviews did not bear this out.

Of the 19 segregation inmates on Robertson's mental health rolls, 7 were

found to be significantly neglected.  These included a 45 year old man with chronic

paranoid schizophrenia found in a decompensated psychotic state.  His thinking was

grossly disorganized and his speech was irrelevant.  He appeared confused,

agitated, and paranoid.  The medical record indicated that his antipsychotic

Re: TDCJ
March 19, 2002

medication had been discontinued on September 24, 2001 due to refusals. There

could be no question that his decompensation was long and tortured.  He clearly

belonged on an inpatient psychiatric unit.  A 28 year old man with schizoaffective

disorder and mental retardation had his antipsychotic medication discontinued on

January 4, 2002 following a verbal altercation with a nurse over drawing blood for

laboratory tests.  Upon interview, he appeared floridly psychotic and deteriorating.

He reported that he had repeatedly requested to be placed back on medications and

had offered to have blood drawn from his right arm.  He showed his left arm from

which the nurse wanted to draw blood.  His left arm was severely mutilated from

multiple self-inflicted lacerations.  A 37 year old man with chronic paranoid

schizophrenia was found in a floridly psychotic state despite receiving long-lasting

injectable antipsychotic medication once a month.  He presented with severe

Parkinsonian side-effects from his medication. He reported that mental health staff

conducted cursory rounds once a month, but did not inquire about medication side-

effects.   A 34 year old man with "Inhalant Psychosis" was found not receiving

treatment due to refusal. He presented as dirty and disheveled with paranoid

delusions, inappropriate affect and bizarre speech.  He required inpatient care but

was instead receiving no psychiatric care other than questionable mental health

rounds once per month.  A 34 year old man with chronic paranoid schizophrenia was

found appearing psychotic in his cell.  He refused to be interviewed.  A review of his

medical record revealed that he was not prescribed any psychotropic medications.

Two other inmates taking antipsychotic medications appeared to psychiatrically

stable, but presented with moderate to severe Parkinsonian side-effects that were

012264

Re: TDCJ
March 19, 2002

not being adequately addressed.  These side-effects are painful and debilitating, requiring immediate medical attention.  Despite being on a remarkably small caseload, none of the above patients were receiving adequate mental health care. In the brief time allotted to canvassing administrative segregation, seven inmates were found with serious mental illness who either had not come to the attention of the mental health staff or had been seen and denied services.  One of these had self-inflicted a two very serious lacerations requiring more than 50 staples on January 21, 2002.  When interviewed by the writer, the inmate reported having current suicidal ideation and a concrete plan to kill himself.  When asked, he volunteered that he had a razor blade in his cell with which he intended to commit suicide.  A subsequent cell search produced the razor which had been hidden under his mattress.

The Robertson Unit had by far the lowest incidence of crisis management referrals over the past 12 months compared to comparable facilities. This is likely due in part to the fact that the mental health staff does not conduct the mandated weekly segregation rounds and does not respond appropriately to requests for mental health treatment.  A more thorough review would be required to fully assess the impact this neglect is having on mentally ill inmates housed in segregation at Robertson.  However, based upon the available prevalence rates at comparable facilities and the low rate of identification and hospital referral at Robertson, it is probable that a significant number of seriously mentally ill inmates have been and are being medically neglected in administrative segregation there.

012235

Re: TDCJ
March 19, 2002

The Lewis Unit was selected for site visit in order to evaluate the "Administrative Segregation Maintenance Psychiatric Program" (AMPP) begun there in November, 2001.  This program was initiated by UTMB staff to provide some portion of the missing sub-acute care necessary for chronic, seriously ill inmates who do not require inpatient hospitalization.  Staffing for this program as described in the Notice of Filing of Defendants' Intervention Plan for Seriously Mentally-Ill Offenders in Administrative Segregation, dated December 14, 2001 was consistent with in-brief discussions held with UTMB staff on site.  However, discussions with AMPP staff revealed that no other mental health staff had been assigned to provide care for the approximately 800 administrative segregation and close custody inmates housed at Lewis. The AMPP staff reported that since their arrival in the fall of 2001, they had been providing all of the mental health care for the High Security building.  When asked about this, the Director of Mental Health Services for UTMB asserted that AMPP had been staffed based upon the premise that TDCJ had been prohibited from housing mentally ill inmates at Lewis other than inmates who developed psychiatric disorders *after* admission or those referred expressly to the AMPP program.[18]  The Director produced a TDCJ inter-office communication dated March 15, 1995 from the Health Services Liaison to the Classification Committee detailing units which lacked sufficient mental health staff to maintain outpatient caseloads.  Lewis (and Smith) were designated as such.  The Classification Committee was asked not to assign inmates with PULHES[19] scores higher than S1AP to these units since there were no mental health staff on site.  A review of

---

[18] The AMPP census was 19 at the time of the site visit.
[19] PULHES is a TDCJ classification tool designed to categorize severity of risk in various domains.  A PULHES score of S1AP would indicate that the inmate had no psychiatric problems.

012286

Re: TDCJ
March 19, 2002

medical records quickly produced 40 severely mentally ill inmates exclusive of

AMPP scattered throughout the facility.  All of these inmates were admitted with

PUHLES scores greater than S1AP.  Many had PUHLES scores of S3NT upon

admission, indicating moderate to severe psychiatric problems.  Several had

PUHLES scores of S4PT indicating psychiatric problems requiring inpatient

treatment.  Ten inmates were found to have been transferred to Lewis directly from

psychiatric inpatient hospitals.  One inmate was transferred to Lewis while on suicide

monitoring at another unit.  Cell side interviews turned up a substantial number of

psychotic inmates.  One man had a history of frequent psychotic decompensations

leading to inpatient admissions.  Another had been transferred for inpatient care

twice during his stay at Lewis.  A third man with paranoid schizophrenia had been

transferred from Lewis to an inpatient unit in February, 2002, and returned to Lewis

within the past seven days.  One severely ill interviewee reported that his cell mate

had been wildly psychotic for months, screaming at the mirror throughout the night,

refusing to bathe, and ranting about paranoid delusions. Upon inspection, the cell

mate was found in a state of florid psychotic decompensation.  He appeared

confused and agitated with incoherent speech.  His medical record revealed that he

had denied the need for psychiatric care and therefore had not been treated for his

psychosis.  None of the inmates identified were receiving adequate care whether

they were on the mental health rolls or not.  This is not surprising since the staff

assigned to treat them (prescribe medication and conduct cell side rounds once a

month) were hired specifically to staff the AMPP program and had been given these

responsibilities beyond their AMPP duties.  Many of these inmates were admitted to

012257

Re: TDCJ
March 19, 2002

Lewis many months before the AMPP staff arrived in the fall. It is unclear what mental health staff had provided services at this unit nominally designated for "nonmentally ill" inmates only. An average of 8.1 inmates per month were transferred from all of the Lewis Unit to hospitals for crisis management from March, 2001 through January, 2002. Interestingly, the number of crisis transfers nearly doubled (15) for the month of February, 2002. None of this reflects negatively upon the AMPP program except to the extent that the proposed staffing numbers are effectively diluted by the need to provide routine mental health services to a relatively large non-AMPP segregated population. Unfortunately, the staffing proposed for the AMPP program as it is currently configured could not possibly be sufficient to cover the needs of this other population in addition to the highly specialized requirements of the AMPP program. (This will be discussed further in the program descriptions to follow.)

The Smith High Security Unit houses 800 inmates, 450 in administrative segregation with the remainder in double bunked close custody. Approximately 130 out of 800 or 16% are receiving some form of mental health care.[20] However, this relatively high percentage may not be meaningful. First, the mental health staffing is grossly deficient in two ways.[21] Only 1.5 FTE's are allotted to the High Security facility in the form of one registered nurse and a half-time physician's assistant. This number is insufficient in own right given the size of the overall population and the known level of acuity. Neither of these clinicians have the training or experience to

---

[20] At the time of the site visit, 12 segregation inmates were enrolled in the In-Cell Psycho-education Program. These were a subset of the 130 on the mental health rolls. This program will be described in detail below.

[21] This staffing might be adequate if the Smith Unit was in fact restricted to "nonmentally ill" inmates as indicated in the TDCJ memorandum of 3/15/95.

24

012238

Re: TDCJ
March 19, 2002

provide the kind of psychiatric services required.  The facility employs no

psychiatrist, psychologist, social worker, counselor, or mental health liaison.  While

the full-time nurse is dedicated and conscientious, her psychiatric experience is

limited to one year at a state hospital.  She is expected to provide virtually all of the

mental health services to a large population of severely mentally ill inmates in High

Security.  She apparently receives no supervision from a clinician with corrections

experience and she has no clerical support.  By policy, she is expected to conduct

mental health rounds on 130 inmates every week.  Even conducting these rounds

once a month, as she reports she does, little could be expected in terms of

thoroughness.  She could hardly be expected to provide even case management or

crisis intervention.

The physician's assistant works half-time as a medical provider and half-time

prescribing psychotropic medications.  His psychiatric supervisor is located

approximately 100 miles away and is infrequently on site.  The results are

predictably appalling.  Of the 101 inmates prescribed psychotropic medications, 55

were receiving sleep medications of either Amitriptyline or Doxepin often in high

doses.  Medical record reviews clearly indicated that these medications were

prescribed for sleep despite universally held beliefs that doing so is contraindicated

in correctional settings.  They are prone to abuse and lead to tolerance and

withdrawal.  Most importantly though, these medications are lethal in relatively small

dosages and are a common means of suicide.  Given the absence of reliable

observation of inmates actually swallowing their medications and the inevitable black

market that develops in facilities where these medications are prescribed, one could

Re: TDCJ
March 19, 2002

expect their unrestricted abuse.  This was in fact indicated by correctional incident

reports indicating quantities of pills either found on cell searches or taken during

suicide attempts.[22]  One might expect that vigilance would at least be found in

monitoring of blood levels for these medications to assess compliance and toxicity.

This was not the case.  Of 25 medical records reviewed for this purpose, 15

contained no orders for lab tests.  Five records contained recent lab results showing

no presence of medication in the blood and two more detected low levels.  One

record indicated that blood was drawn on February 12, 2002 but as of March 12, no

results filed in the chart.  Just two of the 25 yielded lab results in the expected range.

Prescription practices for other psychotropic medications were equally

questionable.  For instance, a 40 year old man with an extensive history of explosive

behavior, frequent disciplinary infractions, and psychotic decompensations who was

prescribed a high dose of a mood stabilizer and the highest allowable dose of an

antipsychotic medication, after having no completed lab results since 1999, had no

presence of medication in his blood when tested in January, 2001.  Despite this, no

further lab results could be found in his medical record since he was transferred to

Smith in March, 2001.  All psychotropic medications were abruptly discontinued on

March 4, 2002 after the inmate failed to, "get back from door during pill pass on 3/3

and 3/4."  A 28 year old man with explosive behavior and psychotic

decompensations taking a very high dose of a mood stabilizer plus an antipsychotic

and a tranquilizer had nothing detected in his blood on August 22, 2001.  These

results were not commented upon in the medical record and the medications were

---

[22] For instance an inmate attempted suicide by swallowing "20-24" Doxepin tablets on January 28, 2001.  Another inmate ingested, "an ample amount of unknown red pills" in a suicide attempt on December 14, 2001.  On December 9, 2001 an inmate attempted suicide by swallowing 30 pills.

012290

Re: TDCJ
March 19, 2002

continued with no further lab work ordered to date. A 32 year old man with Bipolar

Disorder and a history of multiple crisis referrals who is prescribed a fairly high

dosage of a mood stabilizer had none detected in his blood on November 13, 2001.

A notation was entered on February 6, 2002 and labs were appropriately if belatedly

reordered. When the inmate was next seen for routine follow-up on March 7, 2002,

no mention was made of the second abnormal finding. The inmate's medication

continued unchanged and no further labs were ordered. A 30 year old man

diagnosed with Schizoaffective Disorder is prescribed an antipsychotic medication, a

mood stabilizer, and a sleep medication. He last had labs ordered in December,

2000 and was last seen by the physician's assistant at Smith on October 4, 2001.

The inmate refused his next scheduled psychiatric follow-up appointment on January

31, 2002.[23] There are no mental health notations in this inmate's medical record

since October, 2001 despite his extensive history of psychotic episodes leading to

psychiatric inpatient admissions. The required lab test for this inmate's mood

stabilizing medication is at least eight months overdue as well.[24] And finally, a 20

year old man with Explosive Disorder had required labs ordered for his mood

stabilizer 12 months late on November 15, 2001. As of March 11, 2002, no results

were in the medical record and the inmate is three weeks overdue for his 90 day

follow-up.

In short, the mental health care provided at Smith is of very poor quality and

there is too little of it. The high security architecture and the limit on time allotted for

canvassing door to door precluded a comprehensive survey of mentally ill inmates

---

[23] Even this missed appointment was late. A 90 follow-up would have been scheduled for January 2, 2002.
[24] Commonly accepted practice guidelines for inmates taking Carbamazepine call for serum levels every six months, or more frequently if there are indications of toxicity, poor compliance or when dosage is changed.

Re: TDCJ
March 19, 2002

not on the mental health rolls.  However, it was possible to locate one profoundly

psychotic man housed in administrative segregation.  This involved a 39 year old

man admitted to Smith from Coffield on September 19, 2001 where he had been

treated with a high dose of antipsychotic medication for the diagnosis of Psychotic

Disorder NOS.  Since the patient's medication was discontinued shortly before

transfer, the nurse at Smith did not pick up the psychiatric history upon chain review.

This occurred despite descriptions of extensive prior treatment and an inpatient

admission for bizarre behavior and psychotic decompensation as recently as

January 22, 2001.  As a result, no referral was made to mental health.  The inmate

was observed on rounds by the psychiatric nurse on October 1st and 11th, 2001 after

custody staff commented upon the inmate's bizarre behavior.  The nurse noted that

the inmate was, "delusional, disorganized, agitated, labile, with rapid speech, flight of

ideas, and loosening of associations."  Despite this, she noted that he was in, "no

apparent distress."  She nonetheless suggested that he see the physician's assistant

for a medication evaluation.  However, the inmate declined this offer and no further

mental health notations were made in his medical record.  On the day of the site

visit, the inmate was highly agitated with prominent paranoid delusions.  He was

grossly disoriented with rapid speech, loosening of associations, clang associations,

and apparent responses to internal stimuli.  This inmate would stand out as severely

impaired on any psychiatric inpatient unit, but was receiving no mental health

services while being locked in a windowless box 24 hours a day for six months.

**Re: TDCJ**
**March 19, 2002**

### Special Programs

The TDCJ has proposed several special mental health programs aimed at addressing the sub-acute needs of segregated inmates.  These include the Program for the Aggressively Mentally III Offender (PAMIO) and the "Personality Disorder/Aggressive Behavior Program" at the Clements Unit, the Administrative Segregation Maintenance Psychiatric Program (AMPP) at the Lewis Unit, and the In-Cell Psycho-Education Program at the Smith Unit.[25][26]  Although the programs at Clements are well established, the latter two programs are best described as in their embryonic stage of development and have very small caseloads.  Although impressive claims were made about the scope of these new programs in the Notice of Filing of Defendants' Intervention Plan for Seriously Mentally-III Offenders in Administrative Segregation, it is not yet apparent that TDCJ has committed the necessary resources to ensure either their efficacy or survival.

PAMIO

According to the program description disseminated by TDCJ, PAMIO was initiated in 1991 after the plaintiffs and defendants determined that administrative segregation was an anti-therapeutic environment for persons with serious mental illness.  PAMIO was designed with the goal of helping mentally ill inmates, "adjust to prison and control their behavior to the point that they no longer required segregation."  The program is now established with its own building and a census of approximately 425.

---

[25] The PAMIO program straddles the line between acute and sub-acute care.  It is considered inpatient care by TDCJ and like an acute care hospital requires voluntary consent.  In many other ways however, it functions like traditional sub-acute care. For instance, the program description states that PAMIO in not an acute inpatient unit and does not take "doctor to doctor" referrals.

[26] The "Personality Disorder/Aggressive Behavior Program" was formerly known as the "Step Down" program and is so called in the Notice of Filing of Defendants' Intervention Plan for Seriously Mentally-Ill Offenders in Administrative Segregation.

Re: TDCJ
March 19, 2002

Staffing is good with three FTE psychiatrists, seven FTE psychologists (three Ph.D.'s and four M.A.'s), four FTE social workers (bachelor's level), four FTE recreation therapists, two FTE expressive therapists, one FTE occupational therapist, plus 24 hour a day nursing coverage. A copy of the PAMIO Unit Policy and Procedure Manual of July 2001 provided on site offers ample evidence of the thoroughness and maturity of the program. On site observations of both individual and group therapy supported claims of a high quality of care. The line staff observed all appeared to be well trained and supervised. Medical record reviews suggest that PAMIO staff are consistently offering the services promised. The treatment interventions appear to be conceptually correct for addressing the problems of aggressive mentally ill inmates. Most importantly, PAMIO has developed a program of environmental interventions and contingency management that goes beyond individual counseling and psychotropic medication in the suppression and management of maladaptive behaviors caused by chronic mental illness.

To their credit, PAMIO administrators have recognized two program shortcomings over the past decade and have adapted by spinning off subunits to address specialized needs. A subgroup of PAMIO patients with severe and persistent psychotic disorders was known to deteriorate shortly after graduating from PAMIO and returning to their sending facilities. Over time, a pod was set aside (F Pod) for their long-term treatment and maintenance without the expectation of graduation. This, in effect, created a small but important locale dedicated to sub-acute care for men with intractable schizophrenia and schizoaffective disorders. The

012294

Re: TDCJ
March 19, 2002

broader PAMIO environment supported a much higher level of care than currently available anywhere in the system outside of psychiatric hospitals. Patients were afforded intensive case management, individual and group therapy, 24 hour psychiatric coverage, on-site crisis management, and enhanced opportunities for social skills training and other psychosocial interventions as a result of greater out of cell opportunities compared to traditional administrative segregation. Without this level of care, the patients assigned to F Pod would be bouncing back and forth between inpatient facilities and outpatient services in administrative segregation, entailing frequent psychotic decompensations, numerous disciplinary infractions, major uses of force, and potential injuries to themselves and those around them.

A second significant adaptation came in the form of the "Personality Disorder/Aggressive Behavior Unit" formerly known as the "Step Down" program housed in E Pod at Clements. While this program is housed contiguous with PAMIO and shares staff with PAMIO, it is not technically a part of the program. The Personality Disorder Unit evolved to serve those seriously mentally ill inmates whose personality disorders precluded their effective treatment at PAMIO, but whose crisis management needs were of sufficient intensity as to make them unmanageable in traditional administrative segregation.[27] Left to their own devices, these inmates engage in frequent self-mutilation, parasuicidal behavior, intense and unpredictably violent behavior, and bring out the worst possible responses from custodians and caregivers. The treatment model developed at E Pod has shown that through relatively inexpensive interventions and environmental alterations, these aggressive

---

[27] The inmates assigned to the Personality Disorder Unit typically display a constellation severe symptoms from the cluster of antisocial, narcissistic, and borderline personality disorders (Cluster B).

Re: TDCJ
March 19, 2002

behaviors can be significantly reduced over time.  Importantly, assignment to the

Personality Disorder Unit is a custody placement and does not require voluntary

consent.  While this treads a fine line in terms of consent to treatment and the right

to refuse intrusive interventions, the alternatives are either untenable in the case of

voluntary admission to a hospital or inhumane in the case of their frequent

abandonment by mental health staff in outpatient settings and the typically draconian

custody measures heaped upon these inmates at the most restrictive end of

segregation.  These inmates, often referred to as 'the worst of the worst' by

corrections administrators, have demonstrated significant behavioral improvement

as a result of treatment on the Personality Disorder Unit.[28]

AMPP

The AMPP program at the Lewis Unit is designed to provide sub-acute care

to roughly the same inmate population currently being served at PAMIO's F Pod.

The UTMB program description aptly portrays the process whereby administrative

segregation inmates are discharged from inpatient facilities in good remission only to

decompensate as outpatients at their assigned unit.  AMPP was expressly intended

to serve as a maintenance program that would interrupt the admission-discharge-

crisis-admission cycle.  The program description aptly depicts this circular model of

treatment as, "staff time consuming, costly and sub-optimal for the offenders' mental

health care."

Although the program is conceptually appropriate and benefits from

knowledgeable and dedicated staff, caution is deserved.  First, as mentioned in the

---

[28] I interviewed a former E Pod inmate at currently housed at Coffield who complained vociferously about the services he received at Clements.  He nonetheless reported that he had since gone 27 months without a disciplinary infraction and had no crisis referrals since his discharge.

above discussion of the Lewis Unit, the promised staffing levels may be illusory since staff hired specifically for AMPP have been assigned to provide routine care for an additional 800 segregated and close custody inmates in Lewis High Security. Even at face value, there is no reason to expect that current or projected staffing could adequately serve both purposes. Without the statistically necessary staff dedicated solely to Lewis High Security and a firewall between the two services, the AMPP program could be expected to degrade into an understaffed, highly restrictive dumping ground for uncooperative seriously disordered inmates. Second, despite assurances that the AMPP program was located at Lewis because of the support of its warden, placing a mental health program at a high security facility creates distinct limitations. The architecture is a formidable obstacle to providing mental health care. Lewis' sound deadening cells with thick doors and glazed apertures make communication between staff and inmates difficult at best. Group treatments designed to enhance social skills are necessarily conducted in four adjacent cinder block holding cells in a hallway. Under these circumstances it is hard to find the "group" in group treatment since the inmates cannot see or effectively hear one another and the therapist can only address one inmate at a time. Furthermore, the profound social and sensory deprivation inherent in Lewis' windowless cells devoid of any outward signs of the passage of time and with virtual 24 hour a day isolative lock down may prove to be deleterious to inmates prone to disorientation, hallucinations, and states of delirium.

It is unclear in terms of scope whether the AMPP program can make a significant contribution to the need for sub-acute services in the long run. Nineteen

012297

Re: TDCJ
March 19, 2002

inmates were enrolled at the time of the site visit.  The program description allows

for expansion to a maximum of 60 inmates.

Staffing projections allow for increases tied to census figures.  However,

these increases are not designed to maintain the staff to inmate ratio observed at

the time of the site visit.  The ramping up of staff is proposed as follows:  15

offenders to 4 staff; 30 offenders to 5 staff; 60 offenders to 6 staff.  In other words,

the inmate to staff ratio goes from roughly 5 to 1 at the present time up to a high of

10 to 1 when all the bed are full.[29]  Given the cell isolation and limited group

treatment options, it is hard to see where any economy of scale will develop.

In-Cell Psycho-Education Program

The In-Cell Psycho-Education Program demonstrated at the Smith Unit is still

in the pilot phase.  It currently provides roughly one hour per week of contact to 12

administrative segregation inmates.  Staff for this program do not work at Smith, but

drive the roughly 100 miles down from Montford Hospital in Lubbock every Thursday

afternoon to run the program.[30]  Each week three out of a pool of eight Montford

clinicians (social workers, recreation therapists, and occupational therapists) make

the trek to spend four hours conducting group interventions in conditions identical to

those described at Lewis.  Inmates are encouraged to work on hand-outs between

sessions and these are assigned and reviewed during their out of cell sessions.  The

psycho-educational modules are conceptually relevant to segregated inmates,

including such topics as anger, boredom, exercise, hygiene, sleep, stress

---

[29] The AMPP proposal included in the Notice of Filing of Denfendants' Intervention Plan for Seriously Mentally-Ill
Offenders in Administrative Segregation allows for "temporary reallocation of existing staff existing elsewhere in the
system" pending the hiring of permanently assigned staff.
[30] Mental health staffing at Smith is insufficient to provide basic care let alone conduct special programs.

management, and relaxation.  Inmates are assigned specific modules based on

need with an average of 8 sessions per inmate. The materials are professionally

produced and the staff are enthusiastic and committed.

The future of this program beyond the pilot phase is problematic. The current

plan is to export the model to other units with large administrative segregation

populations.  However, since none of these facilities are within easy driving distance

of Lubbock, existing mental health staff at each site would be required to learn the

techniques and then implement them in addition to or in place of their current duties.

Program fidelity would be promoted and monitored through periodic supervisory

visits from the program's founders.  Units such as Smith would, unfortunately, be

excluded due to insufficient staff to conduct the weekly sessions.

Under the best of circumstances this essentially unfunded program, which is

designed to provide about eight weeks of in-cell handouts and group interventions,

might be of limited utility to a large population of severely mentally ill inmates stuck

in segregation for an average of more than 5 years.

With the exception of the programs long established at the Clements Unit, this

last issue is relevant for all of the intervention options proposed to address the sub-

acute needs of seriously mentally ill administrative segregation inmates.  Even under

the best of circumstances the scope of the proposed services could not significantly

ameliorate the directly harmful effects and exacerbation of psychiatric symptoms

caused by prolonged segregation.  It is also doubtful that any of these programs

could achieve the ultimate goal of helping a significant proportion of the seriously

012299

Re: TDCJ
March 19, 2002

mentally ill inmates languishing in administrative segregation control their behavior

so that they no longer need segregation from the general population.

Conclusions

The administrative segregation units surveyed contained large numbers of

seriously mentally ill inmates.  These inmates have lengthy stays in segregation as a

product of the interaction of their mental illness and the three tiered level system

employed to deter bad behavior.  Even a relatively effective program such as PAMIO

has not demonstrated the power to successfully help seriously mentally ill inmates

master the skills necessary to string together the lengthy periods of behavioral

control required to meet the criteria for reclassification.  Lengthy stays in

administrative segregation in the form practiced within TDCJ are manifestly harmful

and unfair to seriously mentally ill inmates who have proven to be incapable of

demonstrating "good enough" behavior without the necessary sub-acute care for

their emotional and behavioral disorders.  The absence of sub-acute care and its

substitution with low intensity outpatient care in highly restrictive and isolative

conditions has led to a deformed mental health delivery system where inmates cycle

back and forth from outpatient care to hospitalization, spanning a systems gap

where sub-acute care would normally be.

The mental health providers have proposed a system that relies heavily upon

identification and referral of inmates who have been allowed to become psychotic in

segregation.  The findings of this survey support the notion that aggressive sweeps

such as those conducted prior to this site visit can cleanse most psychotically

decompensated inmates, present in the moment, from segregation areas and

Re: TDCJ
March 19, 2002

transfer them to a higher level of care. To their credit, the defendants propose to

conduct biennial sweeps of administrative segregation and report that they have

retained an outside consultant to supplement this process. Although this partially

addresses the needs of segregated inmates who have already decompensated, it

does not address the needs of those seriously mentally ill left behind who, because

sub-acute care is not available and the outpatient care they receive instead is so

thin, are bound to decompensate on a later date.

Outpatient care as it is currently delivered to seriously mentally ill

administrative segregation inmates is grossly deficient in its own right, but would,

even if optimal, be inadequate in type for the needs of these sub-acutely ill inmates.

The supposition that outpatient care as provided by TDCJ could substitute for sub-

acute care for seriously mentally ill inmates in segregation is belied by the poor

quality of the outpatient services observed and the poor condition of inmates seen

there.

Both the quality and quantity of care fall well below community standards on

all measures. Mental health staffing numbers range from poor to abysmal.

Monitoring is substituted for treatment. Necessary individualized treatment plans are

either missing or so poorly constructed as to be meaningless. Prescription practices

are sometimes dangerously inadequate. Medication administration practices are

dangerous and interfere with adequate care. Important laboratory tests are

inconsistently ordered, filed, and reviewed. Individual counseling and group therapy

are widely unavailable. The majority of mental health contacts take place at cell side

with no privacy or confidentiality. Mental health rounds are often conducted in a

Re: TDCJ
March 19, 2002

manner that requires inmates to publicly proclaim their illness in a hostile social environment. Statewide standards of care are not enforced. Profoundly ill inmates can be "lost" in the system. Psychiatrists are replaced by physician's assistants and Telehealth. Doctoral level psychologists are replaced by master's level providers. Master's level social workers are replaced by bachelor's level providers.

Although the psychiatric inpatient programs at Jester IV, Skyview, and Montford were not surveyed, it is assumed, based upon prior knowledge, that they are providing adequate acute care services to inmates housed there. The PAMIO program is well established and was found to be providing quality care to the most aggressive segment of the seriously mentally ill population in segregation.

The Personality Disorder/Aggressive Behavior Unit formerly known as the "Step Down" program housed in E Pod at Clements has proven to be an innovative and successful program for extinguishing severely maladaptive behavior displayed by inmates with serious personality disorders. This program is the only model of true sub-acute care within the TDCJ system. It is apart from the traditional administrative segregation structure and does not require voluntary consent. It offers enhanced case management, behavioral programming, crisis management, cognitive behavioral training, and aggressive psychopharmacology within a secure but therapeutic environment. It is not meant to service the needs of acutely ill inmates the way PAMIO sometimes does and is less staff intensive than PAMIO or hospital services.

The new programs proposed to create sub-acute care are not likely to fill the current service gap. Both programs have significant limitations. Although the AMPP

012302

Re: TDCJ
March 19, 2002

program has been well conceived, its implementation on a scale large enough to

address the demonstrated need is in doubt.[31]  It has been placed in a High Security

facility where the architecture presents formidable obstacles to psychosocial

interventions.  Adequate staffing is problematic as the program grows, and is

threatened altogether by the need for AMPP staff to provide routine care to a sizable

segregated population outside of the program.  The AMPP program could

conceivably provide a portion of the sub-acute needs if guaranteed resources and

autonomy and freed from the constraints of a High Security administrative structure.

The In-Cell Psycho-Education Program, in its pilot phase at Smith, could be a

valuable resource, but is not likely to have much of a mitigating influence on the

damaging effects of prolonged segregation of a large population of seriously

mentally ill inmates.  When and if this program is exported to other units, it will go

without staff resources.  It would therefore replace existing services rather than

supplement them in a zero sum gain.  Since the program relies heavily upon inmate

completion of written handouts, it could not address the needs of functionally

illiterate inmates or those so ill that they could not concentrate on or understand the

material.  This program promises valuable ancillary care, but has not been proposed

in a way that suggests sufficient intensity or duration of services to raise it to the

level of sub-acute care.

Recommendations

The TDCJ and their contracted mental health care providers must develop a

model for delivering care to sub-acutely mentally ill inmates currently housed in

---

[31] At the time of the site visit the AMPP program was operating from their program description since policies and procedures
had not yet been developed.

012303

Re: TDCJ
March 19, 2002

administrative segregation. This would necessarily involve the creation of an

effective system for care to segregated inmates that goes well beyond the current

level of outpatient service.  There are two logical possibilities.  Either create a

system separate from, but parallel to administrative segregation for seriously

mentally ill inmates who require separation from the general population or

dramatically enhance mental health services to inmates in their current locations by

filling the service gap with true sub-acute care.

The most straight forward and least expensive way to address the need for

sub-acute care would require treatment settings that, while separate and secure,

would be outside the administrative segregation structure.  For these settings to

allow the kind of biological and psychosocial interventions appropriate for treating

serious mental illness, restrictions on movement and out of cell time would have to

be altered as they are at the Clements Unit.  F Pod at PAMIO and the AMPP

program are good models for this level of care for inmates suffering from severe Axis

I disorders although care would be needed in selecting appropriate housing.  Unlike

PAMIO, inmates should be assigned rather than voluntarily admitted and aggression

should not be a necessary selection criteria.  The Personality Disorder/Aggressive

Behavior Program at Clements is an excellent model for habilitating the most difficult

and self-defeating segregation inmates, but would have to be conducted on a larger

scale, preferably at scattered sites.  Inmates meeting strict diagnostic criteria for

serious mental illness and who demonstrate their behavioral intractability by crossing

a prescribed length of stay threshold in segregation, i.e. one year, should, under this

model, be diverted to designated mental health housing that maintains safety, but

012304

Re: TDCJ
March 19, 2002

allows treatment in a therapeutic setting.  Seriously mentally ill inmates identified in

the sub-acute phase of their illness and likely to be harmed by administrative

segregation by exacerbation of their symptoms would be diverted directly to this

alternative setting at the time of the Pre-Segregation Mental Health Evaluation.[32]

This outcome could be accomplished without the creation of new facilities by sorting

inmates into more appropriate mental health housing.

    If TDCJ abhors the creation of dedicated housing for the mentally ill outside of

hospitals, then it must provide enhanced treatment to those sub-acutely ill inmates

trapped in segregation by their mental illness. Using the same measure of

behavioral intractability, i.e. one year in segregation, it would be incumbent upon the

mental health providers to offer enhanced treatment with firm minimum standards.

Individualized treatment plans should by necessity include specific behavioral goals

designed to actively teach/reinforces the cognitive skills and behaviors necessary to

progress through the level system.  Treatment success could be objectively defined

as meeting the behavioral criteria reclassification.

    Beyond these program options, TDCJ should consider making alterations to

the administrative segregation level system.  It seems prudent and parsimonious to

change the rules such that prolonged stays are not the natural and inevitable

outcome for inmates with known impairments in emotional and behavioral control.

At virtually no cost to the state, TDCJ could shorten the intervals at Level II and III

such that fewer seriously mentally ill inmates would be trapped and for shorter

---

[32] By policy (TDCJ Mental Health Services Policy IV J, Pre-Segregation Mental Health Evaluation) inmates are
currently evaluated by a psychiatrist prior to admission to administrative segregation in order to determine if the
conditions there would be harmful given the severity of the inmates' mental illness. Since no sub-acute alternative
is currently available, only those most acutely ill inmates meeting the criteria for hospitalization can be diverted.

Re: TDCJ
March 19, 2002

periods at the most isolative and constraining end of segregation.  This would allow some portion of these inmates to be reclassified to a custody level where they would not be subjected to social and sensory deprivation of such magnitude that it exacerbates their mental illness and where they could have improved access to an appropriate level of mental health care.  Similar results could be achieved by eliminating one level altogether.  Either way, the original disincentive remains intact for the vast majority of inmates in segregation, since the deterrence value of 30 days of Level III restrictions in liberty and privileges is for all intents and purposes phenomenologically indistinguishable from 15 days.  Six months at Level II in the current system, given the harsh atmosphere and negative reciprocal expectations, is simply insurmountable for many seriously mentally ill inmates and effectively serves as a barrier to their reclassification.   Continuing the current level system as it is currently structured will complicate any efforts to address the needs of sub-acutely mentally ill inmates in segregation regardless of which service model is chosen.  The intensity and duration of the social and sensory deprivation inflicted at Levels II and III are not only exacerbating current symptoms of mental illness, but are creating intractable conditions that will require ever more resources for their future treatment.

Please call me if you have any questions.

Sincerely,


Keith R. Curry, Ph.D.
Licensed Psychologist

01??00