# United States District Court Southern District of Texas

## Case Number: *H-04-2387*

## ATTACHMENT

Description:

☐ State Court Record          ☐ State Court Record Continued

☐ Administrative Record

☐ Document continued - Part *I* of *IV*

☑ Exhibit(s) number(s) / letter(s) *Exh. # 106*

Other: *to Pltf's Amended Pet. Habeas Corpus*

EXHIBIT 106

4        MS. BRORBY:  Your Honor, plaintiffs at this time call

5  Dr. Craig Haney.

6        THE COURT:  Come forward, sir, and please take the

7  oath.  Raise your right hand.

8        CRAIG HANEY, M.D., PLAINTIFFS' WITNESS, SWORN

9        MR. ANASTASIADIS:  Excuse me, Your Honor.  Before we

10  begin, I have an objection that I care to make for the record

11  with the Court's indulgence to this witness being allowed to

12  testify at all.  May I proceed?

13        THE COURT:  Yes.

14        MR. ANASTASIADIS:  Your Honor, the Defendant Texas

15  Department of Criminal Justice objects to this witness being

16  permitted to testify at this time on two bases.  One is, as the

17  Court may or may not know, we took his deposition on Monday.

18  This past Monday, I personally took his deposition by telephonic

19  conference.  And during the deposition, I was discussing with

20  him one of the issues that -- that appears on paragraph 31 of

21  his report, and that has to do with his conclusions that ad seg

22  inmates are not being properly monitored or diagnosed or treated

23  and there's a bunch of them that are in need of treatment and
24  that he interviewed them and he saw them at the cell and that

25  that's how he -- he formed his conclusions.  I believe he said

KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

2699

1  he talked to approximately less than 30 of them.  As I asked him

2  that, I was very interested in who these inmates were, of

3  course, so we could check out and verify his opinions and what

4  he based them on.  And he was not able to give me any names.

5  And at that time, he indicated he had taken some notes of the

6  interviews and that these notes were not with him at that time,

7  were in -- at his office.  He was at home when he -- when he was

8  giving the deposition.  He did not have those notes.

9        He has never provided them.  I've never seen them.  I

10  didn't have them at the time of deposition.  He promised me that

11  he would bring them in when he flew in yesterday.  I still have

12  not seen these notes, Your Honor, didn't have the benefit of

13  them during his deposition, don't have the benefit of them

14  today.  And they were requested, as -- as were with all experts,

15  notes that the expert might have took that might shed light on

16  his database and on how -- on some of his opinions.

17        The second basis of the objection to this witness

18  being allowed to testify, Your Honor, is that he's not a medical

19  doctor or psychiatrist, has never treated a patient in his life.

20  He's not qualified to diagnose mental illness.  He's no more

21  qualified to diagnose a -- a mentally ill inmate than Dr.

22  Frasier Crane on the fictional program Cheers or Dr. Laura, who

23  also has a radio program, I believe.  This came out at his

24  deposition.  What I --

25          THE COURT:  Since I -- since I don't listen to radio

KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

2700

1  and very seldom watch TV, you're talking about things I don't

2  understand.

3        MR. ANASTASIADIS:  Your Honor, getting past that,

4  what -- let me tell you what I'm asking the Court to do.  I

5  would like an opportunity to voir dire this witness to establish

6  two things, a Daubert challenge that he is not qualified to

7  diagnose mental illness, even though in his report he proceeds

8  to criticize the diagnostic and assessment tools of the Texas

9  Department of Criminal Justice.  And number two, I would like to

10  make a record that this witness has some notes that he has never

11  provided as to interviews he did, identifying people,

12  identifying events, identifying summaries and things people told

13  him that he's not given to the defense.

14        This is just -- just like Mr. Allen Breed, Your Honor.

15  And the Court -- if I could refresh the Court's recollection on

16  that with Dr. Breed -- with Mr. Breed the Court gave us an

17  opportunity to look at his notes and then redepose him and

18  possibly recall him to trial.  And I'm simply asking the Court

19   to do what it's already done in Mr. Breed's case:  first, allow

20   me to make an -- give me an opportunity to make a record of this

21   improper behavior by this witness and, second of all, give me an

22   opportunity to depose him and then an opportunity to

23   cross-examine him after I have seen what's in these notes.

24         THE COURT:  What says the plaintiffs?

25         MS. BRORBY:  Your Honor, it is correct that Dr. Haney


KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

2701

1 in his deposition disclosed the existence of notes that he did

2 not realize needed to be produced because they were not relied

3 upon by him in the course of preparing his report and that I did

4 not know existed at that time. And at that time, Dr. Haney said

5 that he would bring the notes with him, which he has done. I

6 did not think, in the rush of doing things last night, of

7 delivering the notes last night to counsel, although certainly,

8 as I do every night, I had some conversations with defense

9 counsel, although not this individual. And if somebody had

10 reminded me that I owed them Dr. Haney's notes, I would have

11 arranged for immediate delivery.

12      At this point, the -- the truth is that there are some

13 notes that I have never seen that Dr. Haney has brought with him

14 for inspection by defense counsel. I would note that this event

15 of overlooking something that needs to be provided to somebody

16 is something that's common in this litigation. It just doesn't

17 happen to be something that the plaintiffs bring up regularly,

18 because the plaintiffs have a different understanding than some

19  of counsel for defendants about the vagaries of this kind of

20  process under this kind of time pressure and realize that things

21  happen and then we just do the best we can to get by.  For

22  example, I think two days ago we were notified of a new witness

23  who has never been on defendants' witness list who is going to

24  be called as a witness in this case on a very important matter,

25  and last night we were delivered two boxes, about four or five


KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

2702

1  or more reams' worth of paper, of documentation that's going to

2  be the basis for the witness' testimony.  I understand that

3  witness is due to be called today.  And quite frankly, it's a

4  difficult task to take on a witness that you didn't know existed

5  before that you hadn't -- well, actually we did take the

6  deposition yesterday -- and to deal with thousands of pages of

7  use of force reports and try to use those in cross-examination.

8        But things happen and I'm not making a motion to

9  exclude that witness, because if it's important for that witness

10  to put on the evidence in court about use of force from the

11  defendants' perspectives, I think they're entitled to call that

12  witness.  I'm going to try to cross-examine that witness today.

13  And if I find it absolutely necessary, I will confer with

14  defendants and see if the witness can be provided for further

15  cross-examination based on the documents after I have a chance

16  to review them.

17        But despite the record that the defendants are making

18  in this case, there is -- at this point I think the record -- if

012603

19  you look at the expert reports that have been filed with the

20  Court by January 15th and the expert reports that are in the

21  discovery, at this point the plaintiffs have provided the

22  defendants much, much, much, much, much more information about

23  the work their experts have done and the basis for their

24  experts' conclusions than has been provided by the defense

25  counsel in this case.  So I vigorously oppose the motion to

KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

2703

1  block this witness' testimony.  I think that that would not be

2  in keeping with the basic rules and understandings we have been

3  operating on in the course of this trial that is under such time

4  pressure.  And I think it would be unfair and wrong to exclude

5  this witness' testimony.

6       We will be happy to make the witness available for a

7  telephonic deposition, as we're doing with Mr. Breed, if counsel

8  finds more questions to ask, based on the handwritten notes,

9  that don't come to counsel's mind based on the report that

10  counsel now has long had.

11       MR. ANASTASIADIS:  I do have a response if the Court

12  cares to hear it.

13       THE COURT:  All right.  Make it short.

14       MR. ANASTASIADIS:  Your Honor, very briefly, very

15  short, the response is that the defense is at a severe

16  disadvantage to challenge conclusions this witness has made that

17  there are mentally ill ad seg inmates that are going untreated

18  without knowing the names of these people, who they are and

19  being able to verify his conclusions independently of a paid

20  witness' testimony.  We didn't have that benefit at the

21  deposition.  We don't have it now.  We're at a disadvantage.

22  Further, Ms. Brorby has failed to address the second problem

23  with this witness.  And that's the Daubert problem, this -- this

24  man is simply not qualified to --

25      THE COURT:  Well, that's a question for the Court to


KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

2704

1 determine.  You can state that, but it's a question for the

2 Court to determine whether or not he's qualified.

3          MS. BRORBY:  Your -- Your Honor --

4          MR. ANASTASIADIS:  Yes, Your Honor.

5          MS. BRORBY:  -- I failed to respond to that point

6 earlier, and I would note that it is not --

7          THE COURT:  We're wasting -- we're taking a lot of

8 time on this objection.  Go ahead.

9          MS. BRORBY:  Maybe this needs to be dealt with at a

10 later time.  But we do not propose to have doctor -- we had

11 psychiatrists testify about the diagnosis of psychiatrically ill

12 patients in administrative segregation, and that will  not be

13 the purpose of Dr. Haney's testimony.  Dr. Haney is a

14 psychologist, and he does have a greater expertise than most

15 people in this room to recognize mental illness.  And he will

16 speak from the expertise he does have about what he observed in

17 administrative segregation, but he won't be giving the kind of

18 technical, psychiatric, expert, diagnostic kind of testimony

19  that we've relied upon our psychiatrists for.  I can assure

20  counsel of that.

21        THE COURT:  Well, there's a certain merit in the

22  defendants' objections.  I can understand that they would like

23  to know and have the right to know who he talked to.  Suppose

24  you go ahead and present the witness, and the defendant may

25  cross-examine based on what information he has now.  If there is

012609

2705

1  a -- he is to be furnished with these notes.  If there is a need

2  at some future time in his opinion to redepose the witness and

3  to ask him further questions on cross-examination, we'll give

4  him that lead to do so.  Now, that's going to have to be done

5  very shortly, because we have one more week after this.

6      MS. BRORBY:  Yes, Your Honor.

7      THE COURT:  All right.  Let's go ahead.  And the

8  objection as to whether or not the witness is qualified is

9  overruled.  The Court will make that determination.

10         DIRECT EXAMINATION

11  BY MS. BRORBY:

12  Q.  Dr. Haney, will you state your name for the record?

13  A.  Yes.  My name is Craig William Haney.

14  Q.  Where do you live, Dr. Haney?

15  A.  In Santa Cruz, California.

16  Q.  And where do you work?

17  A.  I work at the University of California, the Santa Cruz

18  campus.

19  Q.  What kind of work do you do there?

20  A.  I'm a psychology professor and -- and chair of the

21  psychology department there.

22  Q.  Within the field of psychology, what is your particular

23  area of expertise?

24  A.  Well, I'm trained as a social psychologist, and my area of

25  expertise is actually something called psychology and law, which

KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

2706

1  is the application of psychological principles and data to legal

2  issues and -- and legal settings.  That's the sort of general

3  description of it.  Within that broad area, I have concentrated

4  on a couple of different issues.

5  Q.   And -- and what -- what areas within psychology and law

6  have you concentrated your research and writing time?

7  A.   Well, I've looked at the social and institutional histories

8  of people accused of and convicted of violent crime.  And I've

9  also spent an extensive amount of time studying how people

10  adjust and adapt to institutional settings, primarily adult

11  maximum security prisons, and over about a 25-year period of

12  time looked at what, for lack of a better term, will be called

13  prison behavior, both the behavior of people in prison and also

14  to a certain extent how prisons themselves react and change over

15  time and in response to various pressures in the -- in the

16  surrounding society and within the correctional system itself.

17  Q.   In my question I inquired particularly about your research

18  and writing.  And have you done research and writing in the area

19  that you just mentioned of adjustment and adaptation to

20  institutions and the behavior of people in prison and prisons?

21  A.   Yes.  It was in many ways the first academic interest I had

22  in this area, and I've been doing research and writing about

23  prison behavior, adaptation to prison, the effects of

24  incarceration, for about 25 or more years.

25  Q.   When you say it was one of your first academic interests,


KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

2707

1  was it something that you were working on in the 1970s?

2  A.  It was something that I actually began working on in the

3  very beginning of the 1970s.  I -- I entered graduate school in

4  1969, and this was an issue that I began to study almost --

5  almost immediately the next year.

6  Q.  There's been some reference during the testimony in -- in

7  this case to something that's been called the Zimbardo study

8  that apparently is from the 1970s.  Is that something you

9  know -- know anything about?

10  A.  Yes, I was one of the experimenters in the study, and

11  Phillip Zimbardo was my graduate adviser.  And he and I and

12  Curtis Banks were the three people who conducted this study and

13  have written extensively about it since.  I guess it's fair to

14  say I have probably written most about it since we actually

15  conducted the study.  It's remained an interest or an area of

16  mine, not so much for Zimbardo or Banks, but it has for me.

17  Q.  Can you describe briefly what you learned in the Zimbardo

18  study or what -- what's the teaching of that study?

19  A.   Well, the teaching of the study, I think, has a couple of

20  components to it.  I guess the most important one of which is

21  that the -- the basic relationship between prisoners and guards

22  is one which has a potentially very destructive dynamic to it.

23  If -- if it is allowed simply to unfold, the differences of --

24  of power that exist between prisoner and guard have a tendency

25  to pull in opposite directions, and -- and very destructive

KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

2708

1  consequences can occur fairly quickly.

2       The other lesson, also a broad one, is that

3  environments matter and that people are shaped and transformed

4  by the environments that they enter in -- in such a way that

5  people -- people begin to manifest or produce behavior which is

6  very different in an unusual environment from anything they've

7  ever done in the free world. So we saw in this study, for

8  example, people who had not behaved aggressively, had not

9  mistreated people before they entered this study, fairly quickly

10  begin to engage in this kind of behavior in -- in response to

11  the pressures in the situation itself. So it's commonly

12  referred to along with a whole host of other studies in social

13  psychology and sociology as demonstrating that the profound

14  impact and influence of -- of certain kinds of powerful

15  environments, particularly in institutional settings, to change

16  and transform people.

17 Q.  You referred in the course of your discussion just now to

18  the potential for a destructive dynamic in the basic

19  relationship between prisoners and guards.  Is a part of that

20  destructive dynamic the incidence of aggressive behavior that

21  might not have been anticipated based on other factors?

22  A.  Well, that's certainly true.  It's true -- was true in the

23  specific instance of this study, and it's been true in my study

24  of prisons and prison systems for the 25 years following this

25  study that absent intervention, absent oversight, absent

KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

2709

1  constant monitoring of the treatment of inmates by correctional

2  officers, and to a certain extent vice versa, this dynamic is

3  fraught with tension, and it is fraught with destructive

4  potential.

5  Q.  As a psychologist, can you shed any light about why the

6  dynamic?

7  A.  Well, there's -- there's an old saw that comes not out of

8  psychology, but actually out of philosophy, that power corrupts

9  and absolute power corrupts absolutely.  And I think there's

10  some wisdom to that.  It's also the case that prisons are

11  difficult for people to live in.  They're difficult for people

12  to work in.

13       THE COURT:  That comes from Lord Acton.  That's as

14  much as I know.

15       THE WITNESS:  Yes, sir, it does.  And -- and -- and so

16  the tensions that build up inside have no -- typically have no

17  natural outlet.  These are confined spaces by definition.  And

18  so the interpersonal dynamic tends to be concentrated inside

19  those spaces.

20      The ordinary avenues that people in the free world can

21  take when they -- when they confront a difficult situation are

22  not available to people who are confined in prison.  If you or I

23  are having a problem with somebody at work, we can typically

24  arrange to avoid them, or a problem with a neighbor and, in an

25  extreme case, you can move, or you can take a different route


KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

2710

1   down your street to go home and so on.  And this -- this way of

2   avoiding problems is something that we take for granted in the

3   free world.  But it's very difficult to do in a -- in the

4   concentrated environment of prison where there's an immediacy to

5   the interaction and also an unavoidability to it.  And so when

6   tensions begin to build up, they tend -- they tend to be

7   directed across -- across the interaction rather than disbursed

8   elsewhere in the institution.  And so the dynamic is one which

9   requires, as I said, constant monitoring.  And it is one of the

10  reasons why -- why prisons are places where there are instances

11  or episodes of behavior that take place that don't occur with a

12  great deal of frequency in the free world, for example, forms of

13  mistreatment, brutality and so on.

14        THE COURT:  I didn't hear your last comment.  Forms of

15  what?

16        THE WITNESS:  Mistreatment, brutality and -- and so

17  on.

18  BY MS. BRORBY:

012519

19  Q.  You said one thing that went right over my head and other

20  people might have missed it, too.  I'll try to point you to it.

21  Something about expressing something across a dynamic rather

22  than disbursing it someplace?

23  A.  Yes.  I mean, it has to do with what your degrees of

24  freedom are, where -- whether you can -- whether you can avoid

25  confrontation or conflict.  You have -- and this is certainly --


KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

2711

1  I mean, I want to describe this in a way that -- that

2  acknowledges that both sides of this interaction are limited in

3  terms of -- in terms of the freedom that they have to avoid

4  conflict or problems.  You -- you -- you -- people who are

5  confined in prison have to figure out ways of, if you will,

6  dealing with each other and -- and have very few options to

7  avoid interacting with each other or interacting with people who

8  are -- who are problematic or with whom they have difficulties.

9  And so the -- the tension oftentimes tends to build up between

10  them.  And because of the power balance or the -- the -- the way

11  in which one side of this interaction tends to have far more

12  power than the other, the potential, the potential - and I -- I

13  really do want to emphasize that - for abuse is ever-present.

14  Q.   In the dynamic around power, is there a sort of action and

15  reaction?  Is that part of what the studies show in terms of the

16  potential for destructive interactions between prisoners and

17  guards?

18  A.   Yes.  That -- that's absolutely true.  And then it's --

012621

19  it's underscored or intensified by the fact that people who are

20  in prison typically don't want to be there.  And they're not

21  easy places to live in typically.  And they don't bring out

22  necessarily the best in people.  And so this action/reaction

23  dynamic is one which occurs and recurs frequently in -- inside a

24  prison environment.  Put somewhere in more basic terms,

25  prisoners are not at their best, they sometimes behave in ways


KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

2712

1  that are problematic or offensive to guards, who then try to

2  address the behavior, reduce the offensive quality of the

3  interaction, and conflict ensues and it -- and it ensues

4  oftentimes at a much higher rate than it does elsewhere in

5  society.

6  Q.  Can you summarize, you know, just so we sort of established

7  what it was, just basically what happened in the Zimbardo study?

8  What was the experiment and -- and what happened?

9  A.  Well, it was an experiment in which we were attempting to

10  measure or assess the effects of the environment itself as

11  opposed to the interaction between people's characteristics and

12  the environments that they enter.  So we selected people on the

13  basis of psychological health abnormality.  They were screened

14  in advance along those dimensions, and then they were randomly

15  assigned either to be prisoners or guards.  And they entered a

16  simulated prison environment in which we had set up

17  opportunities to observe and to collect data periodically over

18  what we anticipated would be about a two-week period of -- of

19  incarceration.  But -- but the results of the study were so

20  dramatic and -- and indeed the -- the environment itself was far

21  more powerful than anything we had anticipated or predicted that

22  the study was terminated after only six days because the

23  reactions of the people in the study were so extreme.

24  Q.   Was there an ethical reason at that point for terminating

25  the study?


KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

2713

1 A.   There was certainly an ethical reason.  The -- the extremes

2 of behavior had exceeded anything that we had anticipated.  What

3 happened -- we were -- we were frankly concerned about the

4 safety of the people in the prison.  It is probably a study that

5 should have been ended earlier, frankly.  But -- but we were --

6 we were so taken off guard by this -- the unexpected extremes of

7 the behavior that I -- that I think in retrospect we didn't

8 react quickly enough.

9 Q.   Can you describe a little bit about the basic demographics

10 of your subjects who participated in this study?

11 A.   They were college student volunteers who were living in the

12 Palo Alto area in the summer of 1971.  They were paid $15 a day

13 for their participation.  They were all Caucasian, with the

14 exception of one Asian participant.  And they averaged 19, 20,

15 21 years old.

16 Q.   Was it a --

17 A.   All male.

18 Q.   Was it a -- and you said that you created a simulated

19  prison environment.  Can you just describe the basics of that?

20  A.   Sure.  We remodeled the -- a basement area in the

21  psychology department building, Jordan Hall, at Stanford

22  University.  And so we took the -- the regular doors off of

23  several laboratory rooms.  They were transformed into cells, so

24  bar doors were placed instead.  We put cots in the -- in the

25  laboratory rooms themselves where the -- where the prisoners

2714

1   stayed.  There was an area, a hallway outside of the -- of these

2   cells or laboratory rooms that were -- a hallway that was

3   cordoned off.  That became essentially the cellblock area.

4   There was a large table inside that cellblock area that was used

5   for -- for meals.  And we dressed the prisoners and the guards

6   in uniforms.  And then we had an orientation meeting in which

7   the guards developed some rules and regulations that were to be

8   implemented the next day.  We told the guards that one basic

9   rule that we would enforce was that we did not want any physical

10  mistreatment of the prisoners.  And then with -- with all of

11  those things in mind, we proceeded.

12        The prisoners were apprehended by the Palo Alto police

13  at their homes, brought to the -- brought to the Stanford

14  prison -- they -- they were -- they were anticipating this --

15  brought to the -- brought to the Stanford prison and then we

16  began a new processing procedure.  And they were housed in their

17  cells.  As I said, they were anticipating, as were the guards,

18  that this -- that this study would go for 14 days.  We had ten

19  prisoners, and we had three guards on each of three eight-hour

20  shifts.

21  Q.  Was the rule against physical mistreatment of prisoners

22  observed?

23  A.  No, it was not.  It was broken.  We became aware of this

24  only at the very end of the study when we -- when we debriefed

25  or talked to the prisoners and -- and the guards about what had

KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

2715

1  happened.  We certainly, by the end of the study, had gotten a

2  sense that the tensions between the guards and the prisoners

3  were so dramatic and -- and the relationships had deteriorated

4  so much that there was the potential that this was happening,

5  but it wasn't apparent to us until we -- until we talked to both

6  sets afterwards.

7  Q.   Has there been research since the Zimbardo experiment that

8  confirms the conclusions that you drew earlier about it?

9  A.   Well, there has been a lot of research in a lot of

10  different disciplines which confirms the basic points, namely

11  that social environments or situations are powerful and can

12  transform people so that when people enter extreme environments,

13  particularly the institutional environments, they sometimes

14  engage in behavior that they have never engaged in before or

15  will since and also that -- that prison environments

16  particularly, because of the issues that I talked about a few

17  minutes ago, that the imbalance of power and the nature of the

18  tensions and so on are particularly potent environments to -- to

19  intensify this dynamic.

20  Q.  That was something of a sidetrack from discussing your

21  education and background and work in the fields that lead you to

22  be an expert witness today.  So let me go back to having you

23  describe -- why don't we start with your educational

24  qualifications.

25  A.  I have a bachelor's degree in psychology from the

KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

2716

1 University of Pennsylvania.  After that, I went to graduate

2 school in psychology at Stanford, got a master's degree, I

3 think, around 1971, continued in the Ph.D. program at Stanford,

4 mid 1970s became interested enough in legal issues that I

5 actually attended and then graduated from Stanford Law School.

6 So I have a Ph.D. in psychology from Stanford and a J.D. degree

7 from the Stanford Law School.

8 Q.   And at this time I think you said you're a professor of

9 psychology and a chair of the department of psychology at the

10 University of California, Santa Cruz campus.

11 A.   Yes.

12 Q.   And have you been working in the academic world in your

13 field that you've described from about 1969 until now --

14 A.   Yes.

15 Q.   -- steadily?

16 A.   Yes.  Consistently.

17 Q.   Has your work been exclusively academic, or have you had

18 opportunity to be inside real prisons?

19   A.   No, I've had an opportunity to study, observe, interview

20   people inside of real prisons, which I began to do not long

21   after the -- the Stanford prison study that we -- that we

22   described.  I was very much influenced by that study, and -- and

23   it crystallized for me an interest in institutional behavior.

24   And it -- it was obviously a simulation with -- with limited

25   implications for the real world but which limited indications I

KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998