# United States District Court
# Southern District of Texas

## Case Number: _H-04-2387_

## ATTACHMENT

Description:

☐ State Court Record        ☐ State Court Record Continued

☐ Administrative Record

☐ Document continued - Part __II__ of __IV__

☑ Exhibit(s) number(s) / letter(s) _Exh. # 106_

Other:_to Pltf's Amended Pet. Habeas Corpus_

_____

_____

2717

1 wanted to try to identify or determine. So fairly shortly after

2 that study I began to have contact with people who worked in

3 real prisons, occasionally was asked to come and give talks

4 to -- to groups of people, sheriff's departments and so on, got

5 involved in training officers who worked in jail settings,

6 consulted for boards of supervisors on jail construction and

7 design and so on. And then began to actually study prison

8 systems, people in prisons and prison systems and so have a

9 continued academic interest in that. But never again did an

10 experiment on the topic from -- really from that point on, all

11 of my knowledge and work with respect to prison environments and

12 prison behavior comes out of observations of -- of actual

13 institutions, comes out of interviews with correctional

14 officials and -- and many, many prisoners, both people who are

15 actually confined in prison, people who've been in prison and

16 have -- have since come out.

17 Q.  Can you indicate in some way how much time you have spent

18 in prisons and how much opportunity you've had to observe the

19 actual workings of prisons in the prison itself?

20 A.   Well, it's difficult to quantify it.  I mean, I've

21 certainly looked at many, many maximum security prisons in

22 states across the country and some foreign countries as well.

23 Most of my work focuses on adult medium and/or maximum security

24 prisons, although from time to time I also look at -- I've

25 looked at jail conditions and the way in which people adapt in


KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

012634

2718

1  jail environments.

2      I've mentioned earlier also that I study the social

3  and institutional histories of people who are accused or

4  convicted of violent crime, and oftentimes that has taken me

5  into these institutions in a somewhat different way to look at

6  how an individual goes through a series of institutional

7  experiences and how they're changed or shaped by those

8  experiences.

9      So in one context or another, I am probably in a jail

10  or a prison, you know, every month in some capacity.  I don't

11  and have not worked in such institutions, but I have studied

12  them pretty consistently for the last 25 or so years.

13  Q.  Can you name the states that come to mind where you've had

14  some significant exposure to one or more of the prison

15  institutions of the state system?

16  A.  Washington, Oregon, extensive exposure to maximum security

17  prisons and medium security prisons in California, the state of

18  New Mexico, again, fairly extensive experience, particularly in

19  the 1980s, New Jersey, Arkansas, Alabama, some of the

20  correctional institutions in Ohio, Pennsylvania, a number of

21  different states, including the state of Texas, actually, also

22  in the 1980s, as you well know.

23  Q.  Let's talk about the time that you have spent in TDCJ

24  prisons.  When did you first come to a prison in the State of

25  Texas system?


KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

2719

1  A.  1982, '83, '84, I came a number of times, touring a variety

2  of adult male prisons in Texas, a couple of times separately to

3  the Ellis Unit where the condemned row inmates are kept, but

4  more visits actually in conjunction with this litigation or this

5  case and, indeed, in response to contacts by you.

6  Q.  Did you -- were you doing work as a potential expert

7  witness in participating in discovery in the Texas system by

8  site visits leading up to the hearing that actually didn't

9  happen about crowding in 1985?

10  A.  Yes.  Yes.  You asked me to visit a number of prisons and

11  to begin to evaluate the issue of the effects of crowding in a

12  sample of prisons in Texas, and I did that, and it involved a

13  series of trips made.  As I recall, it was 1983.

14  Q.  And what did you do on those site visits back in the mid

15  '80s?

16  A.  I toured -- typically toured the particular institutions,

17  spent some time in orientations with staff members, getting an

18  overview of the institution.  And then I typically would draw a

19  random sample of inmates from an inmate roster and conduct

20  interviews with them on a variety of issues pertaining to

21  overall conditions of confinement, how they were being affected

22  by those conditions, any particular problem areas that they --

23  that were -- concerned them.  And there were, you know, a

24  separate set of issues that we -- that we had developed

25  beforehand that I typically addressed in these interviews.


KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

2720

1    I also would typically make a point of walking through

2  some of the housing units or the cellblock areas and talking to

3  people cellside to get an impression of how they were reacting

4  to the environments in which they were being housed.

5  Q.  When was your next trip to Texas after somewhere around

6  1983 and '84 to come to a TDCJ institution?

7  A.  In December of 1998, just a few months ago.

8  Q.  Where did you go in December of 1998?

9  A.  I visited Eastham, Beto, and the high security unit at

10  Estelle.

11  Q.  And that was at my request as a part of the expert

12  discovery in the case?

13  A.  Yes, it was.

14  Q.  What did you do at each of the Eastham, Beto, and Estelle

15  units, if you can address them as a group?

16  A.  Well, I actually followed more or less the same procedure

17  that I had followed earlier, and it's a fairly standard

18  procedure that I try to follow when I'm trying to understand how

19  a prison system works or how a particular institution works and

20  how people who are confined in it are being affected by that.

21        So I would typically attend an initial orientation.  I

22  should say also that I was also oftentimes in the presence of

23  other people, other experts who were there for a slightly

24  different purpose, so we typically had a medical doctor and a

25  psychiatrist with us.  You were present at these visits.


KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

012540

2721

1        And the visits typically commenced with an orientation

2  by the staff, sometimes the warden, sometimes an associate

3  warden, and several members of his or her staff who would give

4  us an overview of the institution.  They typically also provided

5  us with some documentation about the number of prisoners who

6  were confined there, where they were confined, and so on, what

7  kind of units they were running.

8        Typically it would give us a kind of a snapshot or an

9  overview of what was going on at the institution, answer some

10  questions, and then we would each go to our respective areas

11  within the institution.

12        For me, that typically meant getting the inmate

13  roster, the roster of all of the prisoners who were in the

14  institution, and then from that roster I would randomly select a

15  sample of people who I would ask to have brought to me for

16  interviews, and then the interviews would typically proceed.

17  Q.  Let me interrupt you for a minute.  When you designated the

18  people to be brought for interviews, did you write the names of

19  those individuals down on a form that was provided by somebody

20  who was working for the Texas Department of Criminal Justice?

21  A.   Yes, always.  They gave -- they gave me a form.  I filled

22  out the form.  They would then -- they would -- and the form

23  would contain information that I had taken off of the official

24  housing roster.  So I would write the prisoner's name, his TDCJ

25  number, and also the housing assignment that was contained on

KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

012642

2722

1 the roster, so that the staff could go and get the person and

2 bring them.

3 Q.   And did the individuals who were responsible for arranging

4 the interviews that you requested retain a copy of the document

5 you gave them listing the names and numbers of the inmates?

6 A.   Yes, always.  What will typically happen is, I would make

7 out the list.  They would -- they would run a copy of it off.

8 They would have that copy.  They would keep the copy, and that's

9 the copy that they worked from as they -- as they -- as they

10 found and brought prisoners to me for the interviews.

11 Q.   And then you had interviews with the prisoners?

12 A.   Yes.

13 Q.   Approximately how long did your interviews last?

14 A.   Well, they varied in length.  I think they probably

15 averaged around 45 minutes, but that's a rough average.  Some --

16 as you know, some -- like people in general, prisoners -- some

17 are more talkative than others, and so sometimes the interviews

18 were more brief in nature, and sometimes they were longer.  But

19  I think the average was probably about a half hour or 45

20  minutes.

21  Q.   Did you have a particular methodology for the interviews?

22  A.   Yes, I did.  I typically began by asking them some

23  background questions to get a sense of who they were, how long

24  they had been in the system, whether they had been in the system

25  before.  So I took a very brief and general institutional


KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

2723

1  history.

2        And then I asked them directly about their treatment,

3  about how things were going for them in the prison, and whether

4  there were areas about their incarceration at this particular

5  institution that were good, they felt were positive things, and

6  areas of concern, where they -- were there problem areas, if

7  any.

8        I also then had a fairly standard series of questions

9  which I posed to each one of them directed at the issue of

10  psychological effects of stress and some of the kinds of

11  psychopathological reactions that people sometimes have to

12  incarceration.  So I posed in the same order a series of

13  questions to them about how they personally were reacting to

14  the -- to the conditions of confinement.

15  Q.  Did you do anything else in the course of your site visits

16  besides what you've described so far, which has been an

17  orientation meeting and interviews of prisoners selected from a

18  roster?

012645

19  A.  Yes.

20  Q.  And what else did you do?

21  A.  I went on a tour of the institution.  When we went on the

22  tour, it would typically vary, and it would be a function of

23  when the staff members had the time to take us on the tour, when

24  there was a break in the interviewing schedule, and so on.

25       We would take an orientation to the unit itself,


KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

2724

1  looking at housing where prisoners recreated, in some instances

2  where they worked.  We would typically visit the infirmary area.

3  And then I would make a point of walking through a number of

4  cellblocks.

5  Q.  Did you spend -- did you spend more time in any one kind of

6  cellblock versus any other kind of cellblock?

7  A.  Yes.  You had asked me to look particularly at conditions

8  of confinement in the ad seg units, and so I made a point of

9  looking inside those units with more frequency or more reliably

10  than I did in the other units.

11        I entered -- always made a point of entering several

12  of the ad seg cellblocks.  And in addition to walking through

13  them, I would also typically spend a considerable amount of time

14  in there talking cellside with a sample of prisoners who would

15  typically come to the -- to the doors of their cells and who

16  were -- who were oftentimes eager to talk.

17  Q.  Did you have occasion to talk with any staff in the course

18  of your site visits?

19  A.   Yes, always, in the course of -- certainly in the course of

20  the orientation, but actually more frequently in the course of

21  just the day-to-day activities in each one of the prisons so

22  that there would be -- there was time when there were escort

23  officers around of whom I would ask questions.

24         And when we would -- when we would go on the tours,

25  the officers who took us on the tours and the officers who we


                KATHY CARROLL, OFFICIAL COURT REPORTER
            UNITED STATES DISTRICT COURT  (512) 236-0998

2725

1 would encounter as we entered different units or different areas

2 of the prison were oftentimes quite open to talking about what

3 was going on.  I would certainly also talk with officers in the

4 ad seg units that I toured.

5 Q.   So you didn't do any interviews of staff.  But you had

6 occasion in the course of being on the unit to have the

7 cooperation of staff and being shown around, and you had some

8 conversations, some questions answered?

9 A.   Yes.  I thought that the staff was accommodating and

10 friendly and typically responsive to questions.

11 Q.   How many days did you spend at each of the units you went

12 to?

13 A.   At Eastham and Beto, two days each.  And at the Estelle

14 high security unit, one day.

15 Q.   Let's focus first on the area that I had asked you

16 particularly to focus on, the conditions in administrative

17 segregation in the institutions that you went to.  And first let

18 me ask you:  Did you have occasion to review any institutional

19  documents pertaining to administrative segregation as well as to

20  the site visit that you described?

21  A.   Yes, I did.  I reviewed a considerable number of documents

22  that you sent me.  But among them were various statistical

23  reports that described the numbers of people incarcerated in the

24  TDCJ over time, and the particular places where they were

25  incarcerated.  You also sent me two ad seg plans, including the

KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

2726

1  most recent one, which I have dated 1998.

2      I also reviewed a report that was done by the National

3  Council of Crime and Delinquency, which evaluated the

4  administrative segregation policy in Texas and made a series of

5  recommendations about changes in their policy.

6  Q.  When you looked at administrative segregation in TDCJ, did

7  you come from a background of some experience in that kind of

8  housing unit?

9  A.  Yes.  I have evaluated and examined and toured and

10  inspected many administrative segregation or solitary

11  confinement or security housing units, and in a sense have

12  become particularly interested in this issue because of the use

13  of long-term administrative segregation, which is a growing

14  issue in the United States and one which I have become

15  increasingly interested in, and had an increasing number of

16  observations and contacts with different systems with respect to

17  the conditions that are created and maintained inside these

18  particular kinds of units.

19  Q.   What are the effects -- or what are the particular

20  conditions that are special about administrative segregation

21  that are what you look at when you look at the effects of

22  long-term administrative segregation on people?

23  A.   Well, obviously, administrative segregation segregates or

24  separates, people from the rest of the mainline population.  And

25  then administrative segregation conditions vary in terms of the


KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

2727

1 extent of additional deprivations that prisoners who are in

2 these units incur, and also the length of time over which they

3 incur these additional deprivations.  So you look at the -- as

4 you -- as you would in examining any set of conditions of

5 confinement, the overall atmosphere inside the unit.

6         The physical conditions that are created are

7 particularly important here, because it is often the case that

8 in administrative segregation units, prisoners spend a

9 considerable period of time in the housing unit itself, unlike

10 prisoners who are in mainline, or general, population, where the

11 place where they sleep is a place where they don't necessarily

12 spend very much additional time.

13         For people who are in administrative segregation, the

14 atmosphere, the physical conditions, are acutely important

15 because they spend so much time there and have their activities

16 constricted in terms of their ability to do anything else.

17         And that's another area that you examine, what

18 activities are available for people who are in these housing

19  units, to what extent do they have opportunities for social

20  interaction, to what extent do they have opportunities to do any

21  kind of meaningful activity, whether that's recreation,

22  educational activity, work, and so on, and you examine how they

23  fill their day, what kinds of access they have to things in

24  their cell.

25       Assuming that they are restricted in terms of their


KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

2728

1 ability to leave their cells and restricted in terms of their

2 ability to interact with others, what kind of provision is made

3 for them while they're in their cell and living the predominance

4 of their life confined to this relatively small space.

5        You look also at recreation areas, the extent to which

6 they have access to those areas, procedures that are used for

7 taking them out of their cells, mobility within the unit, do

8 they -- if they're confined to the unit, do they have an

9 opportunity to get out of their cell but still be retained in

10 the unit, visitation of the -- the total range of activity that

11 people are permitted inside an ad seg unit.

12 Q.   From the psychological perspective, is some amount of

13 social interaction a basic human necessity?

14 A.   Absolutely.

15 Q.   And what about meaningful intellectual activity?

16 A.   Meaningful intellectual activity is also important.

17 Activity of any kind is important, particularly when you're

18 talking about people who can be confined in these kinds of units

19  for a long period of time.

20  Q.   What about physical exercise?

21  A.   Also important.

22  Q.   How many different systems have you been in where you have

23  seen administrative segregation conditions?

24  A.   Probably 20 or 30 different prisons.

25  Q.   And can you name some of the more notable super maxes or


KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

2729

1  administrative segregation units you've visited?

2  A.  The federal penitentiary in Marion, Illinois; the super max

3  or security housing unit at Pelican Bay are the -- are the two

4  super max prisons that I've -- that I've evaluated.

5  Q.  And what about systems with -- is there a sort of level of

6  administrative segregation that's less max than a super max?

7  A.  Sure.  In most -- virtually all adult prison systems of

8  which I'm aware have some kind of administrative segregation or

9  solitary confinement or punitive segregation units wherein

10  people are housed for some period of time.

11        What's different about super max, so-called super max

12  prisons, is that they are set up to house people for long

13  periods of time in administrative segregation, and that's a

14  relatively new phenomena in American corrections.  And it's --

15  it's one where the issue of the actual conditions of

16  confinement, I think, is all the more important, because these

17  are places that are set up to -- with the expectation that

18  people will spend a considerable period of time there, not like

19  solitary confinement as practiced in the -- in earlier times in

20  American corrections where people would go for just brief

21  periods of time.  Super maxes are set up as places where people

22  stay oftentimes for many months and many years.

23  Q.   So a super max can be something like an extended, almost

24  solitary confinement sort of situation?

25  A.   It can be, and for some prisoners, it is.


KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

2730

1 Q.   When we talk about conditions in administrative segregation

2 in the prisons that you've seen here, should we separate Estelle

3 high security from Beto Unit and Eastham, or should we talk

4 about them all together?

5 A.   Well, we probably should do both.  They have similarities.

6 The general regime of administrative segregation in all three

7 places is similar.

8 Q.   Is that the regime that's in large part described by the

9 administrative segregation plan that you reviewed?

10 A.   Yes.  But the actual physical conditions and structure in

11 the institutions are different.  Eastham and Beto are an

12 administrative segregation unit of one type, of an older type,

13 which I have some familiarity with in other institutions, and

14 the Estelle high security unit is a more modern, smaller super

15 max type design.

16 Q.   Do you remember approximately how many prisoners were in

17 each of the segregation units you visited, Eastham, Beto, and

18 Estelle high security?

19  A.   I don't remember specifically.  There were several hundred,

20  certainly, in each one of these places.

21  Q.   And what are the salient differences between the older type

22  of administrative segregation in Eastham and Beto and the newer

23  type in Estelle high security?

24  A.   Well, the older type involved basically converted

25  cellblocks, and they -- they are in prisons that are themselves

KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

2731

1  older prisons.  And so the administrative segregation units are

2  larger.  They're stacked tiers.  The cell doors open out onto

3  the tier itself.  And as I said, there are several levels to it.

4  They tend to be more difficult to keep clean.  They tend to be

5  more difficult to keep noise level reduced in.  The general

6  environment is oftentimes one of some disrepair.  They are --

7  they tend to be very noisy places, even under the best of

8  circumstances, and they're oftentimes dirty and dank.  And these

9  units were like ones I've seen elsewhere in all of those

10  respects.

11  Q.   You're speaking now of the older ones?

12  A.   The older ones.

13  Q.   And then what makes Estelle high security different?

14  A.   Well, it's a -- these are smaller confined units.  The

15  organization of the cellblocks themselves are very different, so

16  that the cells are arranged, instead of -- instead of stacked

17  tiers, like large cellblocks in typically older maximum security

18  prisons, one on top of another, the units themselves have an

19   interior design so that there are typically two rows of cells

20   that run alongside of both sides of the -- of the unit or the

21   cellblock, and they're typically -- in Estelle high security, in

22   any event, there were only two of the -- of these tiers, rather

23   than three.  The -- they tend also to have closed doors and --

24   Q.   So it would be solid doors instead of open bar fronts?

25   A.   Yes, exactly.


KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

2732

1 Q.  Or even open bar fronts with Plexiglas?

2 A.  That's correct.  And in theory, they are -- they are easier

3 places to maintain, easier places to keep clean.  They are

4 obviously also newer, and so the design is one in which allows

5 for better lighting, it allows for easier hygiene or sanitation

6 in the unit itself, and so on.

7 Q.  Is there a difference in social isolation between the two

8 kinds of units?

9 A.  There is, and I think perhaps an unintended consequence,

10 but a consequence nonetheless.  Part of what makes the older

11 units noisier is also part of what makes the isolation in the

12 units themselves a little bit less severe or drastic.  That is

13 to say, people can talk or shout outside of their cells because

14 they're open bars typically on the -- on the outside of the cell

15 itself.  It's what makes them noisier, but it also allows for at

16 least a degree of very strained, but communication nonetheless.

17       In the Estelle high security unit, that's not

18 possible.  The doors are solid, and the communication patterns

012563

19  are almost completely constricted or constrained.  It's very

20  difficult for people to communicate with any ease up and down --

21  up and down the cellblock or across the cellblock.  The

22  isolation is much more dramatic and seemingly psychologically

23  severe.

24  Q.   Were you informed during your site visits and from some of

25  the documentation that you reviewed that there -- the Estelle


KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

2733

1  high security unit is the first of several to be brought

2  on-line?

3  A.  Yes.

4  Q.  What were your observations about administrative

5  segregation as you observed it at the Eastham, Beto, and Estelle

6  high security units?

7  A.  My observation was that particularly, and primarily in

8  Levels 2 and 3, these were potentially psychologically very

9  destructive units in which, in my opinion, high numbers of

10  prisoners were living in psychological distress and pain; that

11  there is in these units a high risk of psychological harm for

12  people -- particularly for people who are being confined there

13  for periods of longer than a year, and that they -- all three of

14  the units, despite the difference in architecture between them,

15  are, in my opinion, extremely problematic in terms of long-term

16  housing units because of the -- of the mix of psychological

17  issues that are created there, including the fact that there

18  appear to be people who are housed there who are manifesting

19  signs and symptoms of some form of psychological disorder.

20  Q.  Now, counsel for the AG's office was correct, wasn't he,

21  that it's not your business to diagnose and treat seriously

22  mentally ill people; is that correct?

23  A.  That's absolutely correct.  And I am not purporting to

24  render a diagnosis here at all, but rather simply to talk about

25  observations of what were obviously and dramatically disturbed


KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

2734

1  forms of behavior.

2  Q.   And from the perspective of maybe a better psychologically

3  educated layperson than most of the rest of us, can you describe

4  what you observed that is the basis for your saying from your

5  perspective that there were people who seemed to be extremely

6  psychologically disturbed?

7  A.   Yes, I can.  I'm talking about forms of behavior that are

8  easily recognizable and that are stark in nature when you see

9  them, when you look at them, when you're exposed to them.  In a

10  number of instances, there were people who had smeared

11  themselves with feces.  In other instances, there were people

12  who had urinated in their cells, and the urination was on the

13  floor.  And in the case of the -- of the open cellblock areas in

14  Eastham and Beto, the urine was spilling out onto the walkway in

15  the units themselves.

16       There were many people who were incoherent when I

17  attempted to talk to them, babbling, sometimes shrieking; other

18  people who appeared to be full of fury and anger and rage and

19  were, in some instances, banging their hands on the side of the

20  wall and yelling and screaming; other people who appeared to be

21  simply disheveled, withdrawn, and out of contact with the --

22  with the circumstances or surroundings.  Some of them would

23  be -- would be huddled in the back corner of the -- of the cell

24  and appeared incommunicative when I attempted to speak with

25  them.


KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

2735

1        Again, these were not subtle diagnostic issues.  These

2   were people who appeared to be in profound states of distress

3   and pain.

4   Q.   You actually happened to be on a tour with Dr. Dennis

5   Jurczak, a psychiatrist, is that correct, at the Eastham and

6   Beto Units?

7   A.   Yes, he was -- he was with us on both cases.

8   Q.   And did you get any information from him about his

9   observations of actual psychiatric illness in the units that you

10  had visited?

11  A.   Yes.  He and I talked at some length in the course of these

12  visits.  And on occasion, I would identify somebody who I

13  thought was severely disturbed and would refer that person to

14  him.  And in other instances, we simply talked about our -- both

15  of our observations about the numbers of people in these units

16  who appeared to be in psychological pain.  In some instances,

17  there were people who he was able to diagnose as schizophrenic.

18  That's his diagnostic expertise, not mine.

19        But it certainly came as no surprise to me that they

20  were diagnosably mentally disturbed, because the extreme and

21  obvious nature of their disorder was apparent to me, as it was

22  to him.

23  Q.  How did the conditions and deprivations in administrative

24  segregation in the TDCJ units you visited compare to what you're

25  familiar with in other institutions around the country?


KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

2736

1 A.   They were as bad or worse as any I've ever seen.  The level

2 of deprivation in these units in terms of what people are

3 allowed to have and allowed to do is rock bottom.  The

4 conditions in the atmosphere that I saw at the high security

5 unit at Estelle was, I believe, the worst I've ever seen.  The

6 experience I had in that unit in walking out onto the cellblocks

7 was unlike any I have ever had in any institution that I've --

8 that I've entered.

9 Q.   What made it special?

10 A.   The -- the bedlam which ensued each time I walked out into

11 one of those units; the number of people who were screaming, who

12 were begging for help, for attention; the number of people who

13 appeared to be disturbed; the existence, again, of people who

14 were smeared with feces; the intensity of -- of the noise as

15 people began to shout and ask, Please come over here.  Please

16 talk to me.  Please help me.  It was -- it was shattering.

17       And as I discussed this atmosphere with the people who

18 worked here, I was told that this was an everyday occurrence,

19  that there was nothing at all unusual about what I was seeing.

20         I happened to be on the Estelle Unit on a day when --

21  or at a time when a man was removed from one of the units for

22  having lacerated his arms and his -- the veins in his ankles.

23  And I watched the staff remove him from his cell, put him on a

24  gurney, and take him out of the unit.  And I discussed with the

25  staff how unusual this was.  And I was told that it was a more


                KATHY CARROLL, OFFICIAL COURT REPORTER
                UNITED STATES DISTRICT COURT  (512) 236-0998