# United States District Court Southern District of Texas

## Case Number: _H-04-2387_

## ATTACHMENT

Description:

☐ State Court Record          ☐ State Court Record Continued

☐ Administrative Record

☐ Document continued - Part _III_ of _IV_

☑ Exhibit(s) number(s) / letter(s) _Exh. # 106_

Other: _to Pltf's Amended Pet. Habeas Corpus_

_____

_____

2737

1 or less everyday occurrence.

2 Q.  How bloody was he?

3 A.  He was very bloody.  He -- parts of his body were covered

4 in blood.  It took about 20 minutes for this whole process to

5 unfold.  By the time -- from the time in which he was identified

6 as being in need of being removed until the time he actually was

7 taken out of the unit, it was about a 20-minute period, by my

8 watch, and by that time, he was -- he was pretty well covered in

9 blood.  He was certainly getting medical attention as they -- as

10 they took him away on the gurney.

11        And, again, I mean, I -- I was interested in talking

12 to the staff there about the extent to which this happened.

13 And, again, I was told by a whole series of people with whom I

14 discussed it that this occurred on a more or less regular basis

15 in this unit.

16        This was certainly borne out by the level of trauma

17 and the level of distress that I encountered when I walked into

18 the unit, by the comments that were made to me and the

19  statements that were given to me by the people who I

20  interviewed, by prisoners who showed me on their arms places

21  where they had cut themselves.  The level of desperation and

22  despair in that particular facility as I saw it on the day that

23  I was there was unparalleled in my experience.

24  Q.  How did it -- you've been in Pelican Bay, the super max

25  unit in California, over a period of years; is that correct?


KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

2738

1 A.  Yes.  Yes, I have.

2 Q.  Were you there before the litigation in the Madrid case was

3 resolved?

4 A.  Yes, I was there many times.  I actually testified in that

5 case about conditions of confinement in Pelican Bay, and so I

6 visited the security housing unit at Pelican Bay many times

7 before that case.

8 Q.  And have you been there since the Madrid case was decided?

9 A.  Yes.

10 Q.  How did the conditions you observed in TDCJ administrative

11 segregation, and I guess particularly the Estelle Unit, compare

12 with what you observed in Pelican Bay, both before and after the

13 litigation in California?

14 A.  Well, the Estelle high security unit is the easiest one to

15 compare, because it's -- they are architecturally somewhat

16 similar, and they're the same kind of -- the same kind of unit,

17 in a way.

18        In my opinion, the Estelle Unit was worse by far.  In

19  terms of the -- in terms of what I encountered when I walked

20  through the units, there was nothing at Pelican Bay to compare

21  with the reaction of the inmates, the level of the despair, the

22  level of the obvious distress on the part of the inmates.

23        Pelican Bay was, and to a certain extent still is, a

24  very severe environment in which to incarcerate people.  Before

25  the order of the Court in Pelican Bay, it was a -- it was a


KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

2739

1  more -- much more severe place than it is now.  But it still did

2  not produce the kind of reactions in people that I saw on the

3  Estelle high security unit.  I never encountered that level of

4  desperation in any of the many times that I went through and

5  walked through the units of Pelican Bay.  Nothing even

6  approximated it.

7  Q.   Pelican Bay did, did it not, have one dangerous condition

8  that the Estelle Unit does not have?

9  A.   Well, inmates at Pelican Bay, most of them, were doubled

10  celled, and they are not in the Estelle high security unit.  I

11  think that's a -- certainly a point in favor of the Estelle high

12  security unit.  I think double celling as it was practiced at

13  Pelican Bay could be and sometimes was problematic because --

14  Q.   Even deadly?

15  A.   And sometimes it was that as well, because the pressures

16  that were created in the institution and the pressures that were

17  created by the high level of deprivation oftentimes created a

18  very volatile mix between cellmates.  They were confined to a

19  relatively small space for a very long period of time at Pelican

20  Bay.  Prisoners were allowed to recreate or get out of the cell

21  only an hour and a half a day.  And so for 22 and a half hours a

22  day, there were oftentimes two prisoners confined to about an

23  80-square-foot space.  That was, in my opinion, extremely

24  problematic.  It still is, to a certain extent, in my opinion.

25  But -- and clearly at the Estelle high security unit, they have

KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

2740

1  done a good thing.  They don't have prisoners housed with one

2  another.  They're all single celled.

3  Q.  So Estelle high security could be worse?

4  A.  It could indeed.  In that sense it could.

5  Q.  How did the other deprivations in terms of privileges,

6  property, whatever, compare between what you saw in Texas now

7  and Pelican Bay during the time you observed it?

8  A.  Well, as you know, prisoners in the Estelle high security

9  unit in Level 3 exercise an hour a day, only three times a week.

10  Q.  What about Level 2?

11  A.  Level 2, I believe it's five -- it's up to four or five

12  times a week.  But it is still considerably below what the

13  amount of exercise that prisoners at Pelican Bay receive.

14  Q.  If the ad seg plan says four hours a week, you wouldn't

15  quarrel with that, would you?

16  A.  I would not.  The -- in addition to that, prisoners at

17  Pelican Bay were permitted an opportunity to have reading

18  materials in their cell.  They were permitted an opportunity to

19  have televisions if they could purchase them.  All of them had

20  radios, again if they -- if they could purchase them.  And that

21  really was, for many of the inmates at Pelican Bay, a mechanism

22  by which they survived.  So you would -- you would -- I mean,

23  prisoners would tell you the only way they could get through the

24  time was to put on their earphones and, in a sense, to

25  anesthetize themselves by watching television for as much or as

KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

2741

1 long as they could.  Others of them would engage in -- became

2 extensive readers.  They were still confined in their cells

3 without much opportunity for outside activity other than their

4 recreation.

5 Q.  It was an hour and a half a day?

6 A.  Yes, it was.  In the high security unit at Estelle, of

7 course, they have none of those things in their cell.  They are

8 restricted in terms of the reading material, restricted in

9 terms -- obviously, in terms of their ability to get television

10 and radios, which are prohibited for Level 3 prisoners.

11 Q.  And Level 2, also?

12 A.  Yes.

13 Q.  And in fact, televisions are not permitted for Level 1

14 prisoners; is that correct?

15 A.  That's correct.  It's my understanding from the ad seg plan

16 and from what prisoners told me that Level 1 prisoners can

17 have -- can purchase radios, but that's the limit.

18 Q.  When you looked at recreation -- did you see any of the

19  recreation areas at any of the ad seg units?

20  A.  I did.

21  Q.  Those were -- did you see both indoor and outdoor

22  recreation areas?

23  A.  Yes.

24  Q.  And can you describe them briefly?

25  A.  Well, they're very -- they're sparse, and they have -- by

KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

2742

1  which I mean they have very little in the way of exercise

2  equipment of any kind.  They are small, relatively small.  And

3  as you know, they're separated in such a way that prisoners

4  recreate one at a time in a recreation area or pen.  There's

5  very little for people to do.

6  Q.   The indoor recreation area, did it have anything other than

7  a chinning bar in it?

8  A.   I don't remember seeing anything other than that.

9  Q.   Did you ever see a TV in the recreation area in

10  administrative segregation?

11  A.   No, absolutely not.  And I'm told by the prisoners that

12  they're not there, that they don't have them.

13  Q.   The outdoor area had a basketball post and maybe a ball?

14  A.   That's it, and sometimes a chinning bar.

15  Q.   How about in the area of hygiene materials, how does Texas

16  compare with California and other states you've been in

17  administrative segregation?

18  A.   Well, Texas does something which, in my experience, is

19 unusual for Level 3 security detention prisoners, and they were

20 quite vocal about it when I spoke with them and I observed some

21 of the consequences of it.  They are prohibited from purchasing

22 personal hygiene materials like deoderant, soap, shampoo,

23 toothpaste; instead, receive State-issued soap, a couple of bars

24 a week, and State-issued tooth powder.

25 Q.  How many packets of tooth powder, if you know?


KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

2743

1  A.   I -- you know, I don't know.  I don't know how many

2  packets.

3  Q.   How big were those bars of soap?

4  A.   They were quite small.  And many of the prisoners talked

5  about --

6  Q.   How much toilet paper, by the way?

7  A.   I believe they're allowed a roll of toilet paper --

8  Q.   A week?

9  A.   -- in their cell at a time, at a week.  Many of the

10  prisoners talked about the extent to which their deterioration

11  of personal hygiene was part of their overall psychological

12  deterioration inside the unit.

13  Q.   Did you observe poor hygiene?

14  A.   I observed poor hygiene regularly, frequently.

15  Q.   How did that compare with other ad segs you've been on?

16  A.   It was worse.  It was much worse.  Prisoners understood it

17  was worse.  They felt -- they felt the effects of it, and the

18  effects of it were apparent to anybody going through the unit.

19  Again, particularly Level 3 prisoners were extremely distressed

20  over, again, a seemingly insignificant part of their existence.

21      But when taken in the context of all the other things

22  that they're deprived of, this for them spoke to their ability

23  to maintain a kind of dignity about themselves.  Even in the

24  limited sphere in which they could control their environment

25  inside their cell, they felt that they were deteriorating along

KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

2744

1 that dimension, as well.

2       And it's not -- it's not an unusual concern or

3 complaint.  People's ability to take care of themselves, to

4 engage in personal hygiene, is part of what allows people to

5 feel healthy.  It allows people to feel some dignity as a -- as

6 a person.

7       One of the undercurrents of the conversations I had

8 with the men in these units was that they felt that they had

9 their dignity completely taken away.  Many of them appeared to

10 be suffering the effects of that kind of -- of that kind of

11 treatment, of that kind of personal humiliation.

12       And many of them were able to talk about it, some of

13 them eloquently to talk about it, and about how painful it was,

14 and about how it was affecting other areas of their life or

15 other aspects of their existence so that they could feel

16 themselves deteriorating while they were in these units.  And

17 some of them feel a kind of desperation about what was happening

18 to them while they were in these units and their inability to --

19  their inability to change the environment around them, the

20  inability to fill their day with activity with anything

21  meaningful, and then to add that -- to add insult to that

22  injury, an inability to keep themselves clean, to keep

23  themselves even personally groomed.

24         THE COURT:  All right.  At this time, we'll have the

25  noon recess.  The Court will be in recess for one hour.


KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

2745

1       (Recess at 12:00 p.m., until 1:00 p.m.)

2       THE COURT:  You may continue with your direct

3  examination.

4       MS. BRORBY:  Thank you, Your Honor.

5           CONTINUED DIRECT EXAMINATION

6  BY MS. BRORBY:

7  Q.  Dr. Haney, before we broke for lunch, you were testifying

8  about administrative segregation.  Are you familiar with the

9  position that we needn't worry about the deprivations in

10  administrative segregation and conditions there because the

11  prisoners who are in segregation, and particularly in Level 2

12  and Level 3 segregation, hold the key to their release from

13  those statuses?  All they need to do is behave properly, and

14  they don't need to live with those privations.

15  A.  Yes, I'm -- I'm familiar with that perspective.  I've heard

16  it before.  It was suggested to me in the course of my

17  deposition earlier this week.

18  Q.  And do you have an opinion about the validity of that

19  perspective?

20  A.  Yes, I do.

21  Q.  And what is that?

22  A.  I believe that it's an -- an unfortunately very superficial

23  and short-sighted evaluation of the effects of that kind of

24  deprivation.  One of the effects of placing people in

25  environments as deprived and as desperate as the environments I

KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

2746

1  saw in the administrative segregation units we've been talking

2  about is that people begin to deteriorate and lose the ability

3  to control their behavior, lose the ability to impose control

4  over what it is they do.  And it's -- it's part of the process

5  of deterioration.  There comes a point in extreme forms of

6  deprivation and the desperation that it produces where even

7  otherwise previously normal people begin to really decompensate

8  in environments like that.  And so this notion that somehow they

9  simply have to pull themselves together and they'll eventually

10  get out, while technically true or true in theory,

11  psychologically becomes an extremely difficult and for many of

12  them impossible plan to -- to actually implement.

13  Q.  Is there also an issue about the dynamic in a housing unit

14  with these kinds of deprivations that have an impact on whether

15  prisoners in them have full control over what kind of

16  disciplinary charges might be brought against them and -- I

17  mean, is there that dynamic between staff and prisoners that

18  might have an impact on an ability to keep a disciplinary record

19  clean and be released from segregation or released from Level 2

20  or 3?

21  A.   Yes, there is.  It's a very important issue.  Imagine how

22  difficult it would be for even a normal person to sit in a cell,

23  a cell that -- in which they're not permitted to have personal

24  hygiene materials that they -- that they can purchase.  They're

25  not permitted things like deodorant.  They have no opportunity

KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

2747

1  for education, no real reading material except very limited

2  access to legal materials which they can have in their cells.

3  They have no recreation other than three hours a week when they

4  go outside to one of these kinds of exercise areas that we've

5  described.  They have no other meaningful activity that they can

6  engage in, no meaningful work activity that they're provided

7  with an opportunity, no group counseling, no normal social

8  interaction of any kind.  It's difficult for even the most

9  psychologically healthy people to survive in an environment like

10  that unscathed.  Many of the people who are sent to these units

11  have preexisting problems.  Whether they rise to the level of a

12  mental illness or not is in -- in a way beside the point.  For

13  many of them, being subjected to this level of deprivation and

14  this level of desperation, it begins to bring out the worst in

15  them.  They begin to decompensate not only in the sense of not

16  being able to control themselves but also not to be able to

17  control their actions.  They are easily provoked and provocative

18  as they interact with other people, because many of them get

19  extremely on edge, they're upset, they're desperate.

20  Q.  Does that have an impact on the other people they interact

21  with?

22  A.  It has an impact on other prisoners, who have to listen to

23  this and then thereby also become increasingly distressed by it.

24  But the most obvious way that it has an impact is on

25  guard/prisoner interactions so that when prisoners and guards in

KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

2748

1 these conditions of desperation interact with each other,

2 typically neither group is at its best.  And prisoners often do

3 act in ways that guards find and any of us would find offensive,

4 problematic, troublesome, obnoxious.  And it calls from -- forth

5 from guards also behavior that under other circumstances they

6 probably would not engage in.  And it's a typically normal,

7 perfectly reasonable social dynamic that occurs in a

8 particularly unreasonable, abnormal social setting or situation.

9 Q.   You have kind of gotten us back to what we started with in

10 talking about the destructive dynamic in prisons and the need

11 for countervailing forces to prevent the downward spiral in

12 dangerous and inhumane conditions.  What did you observe about

13 this dynamic in TDCJ more generally, kind of going beyond

14 administrative segregation now, and the countervailing forces?

15 A.   Well, administrative segregation is part and parcel of

16 that, and I think part of what I observed in those units is

17 connected to this whole issue of the balance in the -- in the

18 system and the creation and maintenance of stable, humane norms

19  throughout the system.  But one of -- but an issue which came up

20  in the course of interviews which I conducted with prisoners in

21  nonadministrative segregation situations as well had to do with

22  their belief, and I have -- it's a belief that I'm unable to

23  validate without more information, but their belief that there

24  were very many disparate different cultures and environments

25  being created in different institutions throughout the system,


KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

2749

1  and that, in fact, the system has units which operate, although

2  technically under the same set of rules and regulation, with a

3  very different set of operating principles, that the atmosphere

4  in different units is fundamentally different than it is in

5  other units.  And that's an example, really, of -- to the extent

6  to which it's borne out in these other units, but of a system

7  becoming inconsistent and somewhat unstable.  I think in this

8  particular case the most obvious potential explanation for this

9  or cause of it, if you will, is the enormous increase in the

10  size of this system over a relatively short period of time.

11  Q.  How important is that?

12  A.  Well, it's hard to imagine anything more important.  Any

13  time an organization grows as rapidly as this one has grown,

14  issues of stability, issues of consistency in terms of policy

15  and consistency in terms of behavior become important.  This is

16  a system that literally has doubled or more in size in about a

17  six-year period of time, so half of the system didn't exist six

18  or so years ago.  Half of the people who are there as prisoners,

19  half of the people who were there as staff weren't in this

20  system in 1992.

21        It creates extraordinary pressures or stresses on a

22  system to grow that rapidly and maintain consistent policy,

23  consistent behavior, consistent monitoring of people within that

24  system.  All the more true and important in a prison system,

25  where for prisoners the stability of the environment is one of


KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

2750

1  the mainstays of their psychological survival.  It's one of the

2  ways in which they're -- they're able to adjust to new

3  surroundings, adjust to new people, adjust to things over which

4  they have relatively no control, by having some sense of

5  predictability, that the rules and regulations will be enforced

6  in one place in the same way that they were in some other place.

7  As when that gets set in flux, as many of them said to me that

8  it was in this system, it becomes a particularly difficult

9  environment overall in which to live.

10  Q.   Did you see any support for that view in the -- some -- the

11  statistics that you looked at on incidents in prison?

12  A.   Well, these -- you know, these aggregate statistics are

13  difficult to interpret, because they're -- it is my view that

14  single factors or single explanations are very difficult to use

15  to explain large changes within a system.  But clearly there

16  have been increases in aggregate statistics on assaults over

17  time, which may be a result of a number of things, including

18  perhaps these kinds of difficulties.  A system rapidly expanding

012699

19  and having a very difficult time maintaining stable norms in the

20  system, stable policies of humane treatment.  Not just policies

21  as they're written, but policies as they're actually

22  implemented, policies as they're monitored and enforced on a

23  day-to-day level.

24  Q.   In the course of the testimony in this trial, there has

25  been some discussion both of policies and practices in the areas

KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

2751

1  of use in -- use of force and the protection of prisoners who

2  report some risk of harm from other prisoners.  Did you have any

3  observations in -- in those areas with regard to sort of .

4  problems that might exist and countervailing forces to prevent

5  the destructive dynamic?

6  A.   Well, prisoners in both of the two mainline institutions

7  that I looked at, Eastham and Beto, had some similar and

8  slightly different kinds of complaints which they registered to

9  me on a fairly consistent basis.  On the one hand, prisoners in

10  both institutions talked about the fact that this is a system --

11  still a system in which a tremendous amount of responsibility is

12  placed on prisoners themselves to deal with their own problems.

13  This is certainly consistent with my observations of the system

14  in 1983 and '84.

15  Q.   To deal with their own what kind of problems?

16  A.   Their own -- their own psychological problems, their own

17  interpersonal problems, problems that they may be having in

18  terms of conflict that they may be having with other inmates.

19  Conflict that appeared, at least in terms of comparing the two

20  time periods, more prevalent in the earlier time period, but --

21  Q.   When you talk about conflict, are you referring to

22  predation?

23  A.   I'm talking about predation, being exploited, being

24  intimidated and so on.  That was -- was rampant when I looked at

25  the system in the early 1980s.  It appears, based on the


KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

2752

1 snapshot I have of it in 1988, to be less rampant, certainly,

2 but it is by no means the case that prisoners have no concerns

3 in that area. It is still the case that prisoners talk about

4 this as being a system in which the onus is placed on them to

5 figure out what to do about the problems that they confront.

6 Deal with it, as many of them put it to me, is what they're --

7 is what they're told. And to the extent to which that is a

8 reflection of the system's inability or unwillingness to respond

9 to these kinds of problems, it would be -- it would be part and

10 parcel of this issue of a lack of countervailing forces or

11 countervailing pressures to keep a system humane and to monitor

12 the nature of the interactions that take place inside. Not just

13 between guards and prisoners, but between prisoners and

14 themselves, other -- other -- other prisoners.

15       The other kind of -- the other kind of issue, and this

16 is where the two places were different, that was raised --

17 Q.  What two places were different?

18 A.  I'm sorry. Eastham and Beto. This was a complaint that

19  was raised fairly consistently at Beto, and it was not one that

20  I heard with any degree of consistency at Eastham.

21  Q.   Which complaint was that?

22  A.   It was that the correctional officers at Beto were

23  inappropriate in their physical treatment of prisoners, that

24  they were provocative, was a term that prisoners used an

25  unusually high number of times with me, that they felt they were

2753

1  being provoked.  They, the prisoners, were being provoked by the

2  staff, who then would typically respond to their reactions by

3  putting them in administrative segregation or punishing them in

4  some way.

5       It's -- this is an unusual kind of complaint.  I have

6  no way of verifying objectively whether or not it's taking place

7  except to say that this was something that prisoners, a random

8  selection of prisoners, so I think it is fair to say a

9  representative sample of prisoners, pulled randomly out of the

10  population at that institution said to me with -- with a fairly

11  high degree of consistency.

12  Q.  As you have toured the country and gone into many different

13  prisons, what's your experience in terms of the either

14  consistency or dissimilarity of the kinds of information that

15  you get from prisoners about what they experience as problems?

16  A.  There is -- there are some issues that are of consistent

17  concern, and they're -- in a sense they're taken for granted

18  issues in prison.  Most prisoners don't like the food, they --

19 they are usually concerned about the -- about the visiting

20 policies and so on. It goes without saying most of them would

21 rather be somewhere else. But then there are differences in

22 terms of specific kinds of complaints or concerns that tend to

23 be concentrated in particular places. So you don't hear it, it

24 is not the case that there's a standard laundry list of

25 complaints that prisoners give you, it doesn't matter where you

KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

2754

1  are, it doesn't matter which prison you're asking the question

2  in or which prisoner you're asking it of.  Prisoners do actually

3  differentiate issues, they do differentiate concerns.  And when

4  you begin to hear a consistent set of concerns in a particular

5  place, that's not clear and convincing proof that those

6  complaints are valid, but it gives you reason for concern.

7  Oftentimes those complaints do relate to something that is

8  different and that is problematic in the institution from which

9  the complaints arise.

10  Q.  From the information that you gathered during your site

11  visits in Texas, did you note any consistent kinds of serious

12  problems reported by prisoners that were either the same or

13  different from what you've experienced in other prisons, other

14  places you've been?

15  A.  Well, the issue that I -- the two issues that I just talked

16  about, the sense in which this is a system in which prisoners

17  feel that they are -- and I emphasize that, they feel that they

18  are being told by the staff that they -- that they ought to deal

19  with their own problems, that they ought to solve their own

20  problems, that they ought to take care of whatever issues they

21  have with respect to conflict and so on, that they ought to, as

22  some of them said, be a man about it.

23  Q.   Now, when you say "be a man," that sounds like you're

24  talking about the vulnerability issue.

25  A.   Yes.  With respect to vulnerability, whether you're talking

KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

2755

1  about vulnerability at the hands of another prisoner or you're

2  talking about vulnerability in terms of your own inability to

3  manage the psychological stress or distress of being

4  incarcerated in an environment like this.

5        That, in my experience, is a relatively unusual

6  complaint.  I'm not -- I can't say that I've never heard it

7  anywhere else, but the consistency with which it's expressed

8  among the people that I talked to was somewhat unusual.

9  Q.  And it wasn't as bad as the mid-'80s, but it was

10  reminiscent of the mid-'80s?

11  A.   It certainly wasn't as bad as the mid-'80s, but it was

12  reminiscent of it.  I mean, in the mid-'80s it was a -- it was a

13  very different kind of situation in terms of events,

14  victimization taking place.  I -- I recall interviewing people

15  who had been -- many people who had been victimized that week

16  and talked about it.  That's different now.  And prisoners --

17  prisoners whose time in the prison spanned this period of time

18  or who were in at that time and then have came back more

19  recently acknowledge that and -- and -- and told me so in the

20  course of the discussions.  But it was also the case that

21  they -- that they continue to feel that to the extent to which

22  these kinds of problems arise, they are -- they are being told,

23  this is their perception, they are being told that it's -- that

24  the onus is on them to resolve or take care of these problems on

25  their own.


KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

012710

2756

1        And the other thing which is unusual is also that --

2  the issue that I mentioned with respect to Beto.  That is to

3  say, the guards are -- are, from their perspective, provoking

4  the prisoners.  That's a very unusual -- a very unusual

5  complaint.  It is simply not the case that -- that anywhere you

6  go or any maximum security prison that you go into this is the

7  kind of thing that you can expect to hear from -- from prisoners

8  about guards.  It's actually -- it's actually quite an unusual

9  kind of complaint.

10 Q.  By "provoking," are we -- what are we talking about?  What

11 kind of behavior or what kind of problem?

12 A.   Well, a lot of -- a lot of it the prisoners felt was verbal

13 provocation, that they -- that they were being provoked in ways

14 where they were being insulted, where they were being -- where

15 they were being disrespected or they were being taunted, and

16 that -- and that this -- but that this -- these kinds of verbal

17 interactions sometimes intensified into actual physical

18 confrontation where they were being touched or they were being

19  pushed.  And ostensibly at times this would begin, as they would

20  describe it, in a playful way, but then -- but then would very

21  quickly turn into something else.

22        And if it was something that was described to me once

23  or twice, you know, I wouldn't know what to make of it, and I

24  would probably have attributed it to just a particular

25  correctional officer or a few.  But it -- it began to sound like


KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998