# United States District Court Southern District of Texas

## Case Number: H-04-2387

## ATTACHMENT

Description:

☐ State Court Record          ☐ State Court Record Continued

☐ Administrative Record

☐ Document continued - Part _IV_ of _IV_

☑ Exhibit(s) number(s) / letter(s) _Exh #106_

Other: _to Pltf's Amended Pet. Habeas Corpus_

_____

_____

2757

1  a much more generic complaint at this institution.

2      MS. BRORBY:  May I approach the witness, Your Honor?

3      THE COURT:  Yes.

4  BY MS. BRORBY:

5  Q.   Dr. Haney, I've just handed to you Plaintiffs' Exhibit

6  1481; is that correct?

7  A.   Yes.

8  Q.   Can you identify the exhibit?

9  A.   Yes.  It's a -- a report or a declaration which I wrote and

10  submitted in this case.

11  Q.   Do you adopt that report as part of your testimony today?

12  A.   Yes.

13      MS. BRORBY:  May I approach counsel table, Your Honor?

14      THE COURT:  Ma'am?

15      MS. BRORBY:  May I approach counsel table?

16      THE COURT:  Yes.

17  BY MS. BRORBY:

18  Q.   That report doesn't have your CV on it, does it?  Or does

19  it?

20  A.   I believe it has a -- a list of publications over the last

21  ten years, not a full CV, but a -- an abbreviated one.

22       MS. BRORBY:  Your Honor, at this point, I'd offer

23  Plaintiffs' Exhibit 1481.

24       MR. ANASTASIADIS:  Your Honor, the defendants would

25  vigorously object to the admission of this exhibit on two bases.


KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

012714

2758

1 One, in paragraph 31 this witness who's not a medical doctor, a

2 psychiatrist, or has ever treated a patient gives an opinion as

3 to whether there's mentally ill inmates in the Texas Department

4 of Criminal Justice ad seg division.  The second objection, Your

5 Honor --

6       THE COURT:  Go ahead.

7       MR. ANASTASIADIS:  The second objection, Your Honor,

8 and I'd like the record to reflect that I'm holding up the notes

9 which form a partial basis of this report as admitted to

10 Doctor --

11       THE COURT:  Well, now, Counsel, I've already told you

12 that you'll have the opportunity to read those notes in detail,

13 and you can call this witness back and take his deposition.  So

14 let's go forward.

15       MR. ANASTASIADIS:  I understand the Court's ruling,

16 Your Honor, but I'd like to preserve the objection.

17       THE COURT:  All right.  You've got it -- you've got

18 your objection.  Let's go forward with this.

19      MR. ANASTASIADIS:  I had not finished making it.

20      THE COURT:  All right.

21      MR. ANASTASIADIS:  The second part of it, Your Honor,

22  was that the report, as shown by the deposition, was based on

23  some notes that was approximately three inches thick that I got

24  for the first time half an hour ago.  He indicated during

25  questioning at the deposition that the interview -- most of the


KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

2759

1  interviews of -- of -- of certain inmates that thought -- these

2  are apparently the notes.  I have not had time nor could I have

3  had time even at lunch hour to read these hundreds of pages of

4  documents.  For that reason I would object to the report which

5  the deposition indicates form the basis -- the notes form the

6  basis of it.  I would object to the reception into evidence of

7  this report.

8      MS. BRORBY:  If I may respond, Your Honor?

9      THE COURT:  Yes.

10      MS. BRORBY:  I fear that Counsel has mixed up some

11  additional exhibits that were provided with the notes, and I

12  just note for the record that the notes that have been provided

13  are about an inch thick, as opposed to any other description.

14  And I think the deposition testimony is clear that the witness

15  did not rely upon the notes in the preparation of his report

16  and, further, I think on the basis of the witness' testimony

17  it's been clarified that the defendants had in December the

18  information as to every prisoner who was interviewed by the

19  witness.  Finally, I'd note about the paragraphs referenced in

20  the report that the witness does not purport to make any

21  psychiatric diagnoses and that his observations about the

22  apparently psychologically disturbed persons he found in

23  administrative segregation are within the ability of a -- even a

24  lay witness to make in terms of an observation about the

25  behavior of people.


KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

2760

1        THE COURT:  Your objection is overruled.  Let's go

2  forward.  You may cross-examine the witness.

3        MR. ANASTASIADIS:  Thank you, Your Honor.

4        THE COURT:  Both objections are overruled.

5            CROSS EXAMINATION

6  BY MR. ANASTASIADIS:

7  Q.   Good afternoon, Professor Haney.  Welcome to Texas.

8  A.   Good afternoon.  Thank you.

9  Q.   Professor Haney, have you conducted any more make-believe

10  prison experiments lately, or was 1973 the last time you

11  conducted such an experiment?

12  A.   Actually the Stanford prison study was conducted in 1971,

13  and from that point on I began to concentrate on actual prisons

14  and interviewing of actual correctional staff and prisoners in

15  real prisons.

16  Q.   Well, I'm interested in why you haven't conducted more of

17  them.  Don't you believe that correctional personnel everywhere

18  still have plenty to learn from watching untrained white,

19   middle-class college boys behaving badly with nightsticks in the

20   basement of an Ivy League college somewhere in California?

21   Don't you think that's still a valuable experiment that

22   correctional officials can learn from?

23   A.   Well, I think that the demonstration itself made in very

24   dramatic ways the points that I described.  I think that

25   connecting those points to actual correctional institutions in


KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

2761

1  actual environments like the ones I've described in Texas is a

2  much more important and much more realistic and much more

3  practical way of trying to connect those insights and those

4  concepts to actual conditions and actual

5  behavior and practices.

6  Q.  Whose money were you spending doing that experiment at

7  Stanford?

8  A.  I believe that we funded the study with a US Office of

9  Naval Research grant that Professor Zimbardo had at that time.

10  It was a defense department grant.

11  Q.  So you used tax money to conduct that particular

12  experiment?

13  A.  We used -- as I recall, as I said, US Department of Defense

14  grant money to study the nature of violence in institutional

15  conditions.

16  Q.  Professor Haney, you're a lawyer that's never had a client

17  and a doctor that's never treated a patient.  Would that be

18  true, sir?

012721

19  A.  It would.

20  Q.  And you --

21  A.  I'm a professor who has had a lot of students, but

22  that's not a patient and not a client.

23  Q.  Thank you for that clarification, sir.  You've never been

24  licensed to practice law in California or anywhere else.  In

25  fact, you've never even taken the bar exam.  Is that true?


KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

2762

1 A.  Yes, that's correct.  I never practiced law.

2 Q.  And have you ever been a prison inmate?

3 A.  No.

4 Q.  Have you ever been incarcerated in a jail or prison?

5 A.  No.

6 Q.  Despite your never having treated a single patient nor ever

7 stepped in a courtroom except as a witness, nor ever been an

8 inmate, you're being paid, what, $150 an hour to give us an

9 expert opinion on the extent of psychological pain that Texas

10 inmates endure in ad seg?

11 A.  Yes.  The study of psychological pain is something that I

12 have focused on and concentrated on for about 25 years.  And,

13 yes, that's correct, Ms. Brorby has retained me at the rate that

14 you describe - $150 an hour.

15 Q.  So there's no misunderstanding, you're a lawyer, but you've

16 never had a client or practiced law or ever had a license or

17 passed the bar.  You're offering up an opinion in your report as

18 to the constitutionality of certain prison conditions.  Am I

19  correct?

20  A.   Well, no, I'm not sure you are.  I didn't intend in my

21  report to reach a constitutional opinion.  I wasn't asked to do

22  that and I didn't attempt to do that.  I don't think the report

23  reflects that.  I mean, I certainly did reach a number of

24  conclusions, but I didn't see them as legal or constitutional in

25  nature.


KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

2763

1  Q.  I'll be glad to ask the Court's permission to approach, if

2  you think I may be misquoting you.  I'm looking at paragraph 26

3  of your report.  And don't you believe that certain conditions

4  that you describe are, and I quote, are below what I believe are

5  constitutional minima?  Paragraph 26, sir, top of the page.  Did

6  you use those words?

7  A.  Yes, I used the word with respect to out-of-cell time.  And

8  I think I've used the term in passing to describe what I had

9  thought was a working definition of the constitutional minimum

10  of out-of-cell time that even prisoners in ad seg are entitled

11  to.

12  Q.  So you did give some opinion as to what the constitution

13  requires and whether the Texas practices fall below what the

14  constitution requires.

15  A.  Well, I think in the section of that report that you

16  referred to, and I think that's the only section in which I used

17  that term, I tried to provide a frame of reference for the

18  extremely low amount of out-of-cell or exercise activity that

19  prisoners in those units are provided with, and that was a

20  comparison to provide a kind of baseline or frame of reference.

21  Q.   Do you have any -- other than having gone to law school, do

22  you have any qualifications at all whatsoever to present an

23  opinion as to whether a particular Texas practice does fall

24  below or not fall below constitutional minima?

25  A.   Well, I'm not sure what you mean by qualifications.  This

KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

2764

1  is an area that I have studied for 25 years.  I write about it.

2  I certainly write about the legal components to it as well.

3  Most of the writing that I do, most of the work that I publish,

4  some of which is published in law reviews, deals both with the

5  psychological as well as the legal issues.  There is both a

6  legal context here as well as a psychological context.  So the

7  two things are not entirely unrelated.

8  Q.   Professor Haney, have you ever met the director of mental

9  health services at UTMB - University of Texas Medical Branch -

10  Dr. Suzanne Ducate?

11  A.   No, I don't believe I have.

12  Q.   So you're not aware that she's the director of correctional

13  services for a portion of TDCJ?

14  A.   No.

15  Q.   She has asked me to get from you so she can check them out,

16  to get the names and TDCJ numbers of all of these inmates that

17  you claim you saw that were exhibiting signs of psychological

18  distress.  Can I get those names from you now?

19   A.   No, you can't.  I believe I explained this to you before,

20   that I did not take down the names and the numbers of all the

21   people who I saw in the various units that I walked through who

22   were exhibiting these signs of psychological distress.  You do

23   have the names and numbers of all the people who I interviewed,

24   however.

25   Q.   Well, is -- do your notes that I just got half an hour ago,


KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

2765

1  do they reflect which of those inmates were the ones that you

2  say were exhibiting psychological distress?

3  A.   Well, in some instances the notes will indicate that, but

4  many of the other observations were done as I walked through the

5  cellblocks themselves.  And I think, as I explained to you

6  before, I didn't take down names and numbers of those people.

7  Q.   So at this time we have no way of verifying whether any or

8  all of those people have any kind of psychological problems at

9  all.

10  A.   No, except insofar as Dr. Jurczak, who was with me at the

11  time, made similar observations or in instances where I referred

12  those people to Dr. Jurczak or him to them, it's my

13  understanding that he actually did examine them and that you

14  have information that he collected in the course of making a

15  psychiatric examination.

16  Q.   Professor Haney, do you know who Dr. Jeffrey Metzner is?

17  A.   Yes.

18  Q.   You know he's a psychiatrist.  He's a real medical doctor

19  who has actually treated patients, then, don't you?

20  A.   Yes.  I'm familiar with Dr. Metzner's qualifications, and I

21  find him impressive personally and professionally.

22  Q.   I'll represent to you that he testified yesterday before

23  this Court that inmates without mental illness have been known

24  to smear feces for secondary gain.  Do you have a different

25  opinion or do you agree with that?


KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998

2766

1 A.  No, I don't -- I wouldn't -- I wouldn't dispute that.  I

2 don't -- I don't think that inmates who do that are

3 psychologically healthy or are not manifesting or evidencing any

4 form of psychological problem or disturbance, but I would

5 certainly not dispute Dr. Metzner's conclusion that they're not

6 necessarily mentally ill.

7 Q.  And do you agree that that smearing feces is not always or

8 even necessarily the result of mental illness?

9 A.  Well, I tend to -- to agree with you on the last question

10 on that point.  I agree with you, with Dr. Metzner, with other

11 people that it is not necessarily a -- a sign or a symptom of

12 mental illness.  It's -- it's not a sign or a symptom of mental

13 health either.  There are reactions that people have that fall

14 short of mental illness but which are nonetheless adverse and

15 potentially harmful psychological reactions.

16 Q.  Do you agree that exhibition of unusual behavior, although

17 it may be a starting point in making a diagnosis of mental

18 illness, that no competent psychiatrist would make a diagnosis

19  without looking at the patient's medical chart, performing

20  standardized mental health diagnostic tests and other accepted

21  norms of diagnosis and treatment?

22  A.  Well, yes.  I mean, we've established that I'm not a

23  diagnostician, but that I certainly understand that that's the

24  procedure that diagnosticians use when reaching a conclusion

25  about whether or not someone is in fact mentally ill.


KATHY CARROLL, OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT  (512) 236-0998