**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **PERRY ALLEN AUSTIN,** | § | |
| | § | |
| **Petitioner,** | § | |
| | § | |
| | § | |
| **-VS-** | § | **CIVIL NO. H-04-2387** |
| | § | |
| | § | |
| | § | |
| **NATHANIEL QUATERMAN,** | § | |
| **Director, Texas** | § | |
| **Department of Criminal Justice,** | § | |
| **Institutional Division,** | § | |
| | § | |
| **Respondent.** | § | |

_____

**<u>SECOND AMENDED PETITION FOR WRIT OF HABEAS CORPUS</u>**

**THIS IS A DEATH PENALTY CASE.**

Richard Bourke
Texas Bar No. 24040553
636 Baronne Street
New Orleans, Louisiana  70113
TEL  (504) 558 9867
Dick Wheelan
Texas Bar No.  21252600
440 Louisiana Street, Suite 900
Houston, Texas 77002
TEL  (713) 225-1300

Counsel for Perry Allen Austin

# <u>TABLE OF CONTENTS</u>

PROCEDURAL BACKGROUND.................................................................................................1

   **Trial and Direct Appeal** ..................................................................................................1

   **State Post-Conviction Proceedings**........................................................................3

   **Federal Post-Conviction Proceedings** ..................................................................4

STATEMENT OF JURISDICTION.......................................................................................5

EXHAUSTION OF REMEDIES...........................................................................................5

JUSTICE IS TRUTH IN ACTION - MR. AUSTIN'S TRIAL WAS AN EXERCISE IN FICTION   6

CLAIMS   41

THERE HAS BEEN A COMPLETE COLLAPSE OF THE ADVERSARIAL TRIAL PROCESS WHICH HAS CREATED A DEATH VERDICT OUT OF PROCEEDINGS THAT WERE WHOLLY UNCONTESTED .......................................................................................41

   CLAIM I.      The death penalty imposed in this case has been imposed in violation of the Federal and Texas Constitutions because it resulted from a complete collapse of the adversarial trial process to a point at which the conviction and sentence cannot be regarded as reliable or as having been produced by a jury trial as understood in American jurisprudence. 41

MR. AUSTIN WAS NOT COMPETENT TO BE TRIED .........................................................49

   CLAIM II.     Mr. Austin's rights to Procedural Due Process as guaranteed under the Constitutions of Texas and the United States and under the Texas Code of Criminal Procedure were violated when, despite sufficient indications of his incompetence, no adequate inquiry was made into his competence to stand trial and waive counsel. ..............................................60

   CLAIM III.    Mr. Austin's rights to Procedural Due Process as guaranteed under the Constitutions of Texas and the United States were violated when, after an initial finding that he was competent, the trial court failed to make further inquiry once new evidence of his incompetence came to light. ..................................................................................73

   CLAIM IV.    Mr. Austin's right to substantive Due Process as guaranteed under the Constitutions of Texas and the United States were violated when he was subjected to capital trial and sentenced to death when not competent. ..................................................74

   CLAIM V.     Mr. Austin's rights under the Texas and federal constitutions were violated when the state failed to disclose material helpful to Mr. Austin to the court, Mr. Austin or the

court appointed psychologist. ................................................................................88

CLAIM VI.    Mr. Austin's rights to counsel under the Texas and Federal Constitutions was
violated when the state's failure to disclose evidence relevant to the determination of his
competence and the voluntariness of his conduct effectively denied him the assistance of
counsel on these issues. ...........................................................................................88

MR. AUSTIN'S APPOINTED COUNSEL HAD AN UNDISCLOSED CONFLICT OF
INTEREST 94

CLAIM VII.   Mr. Austin's right to the effective assistance of counsel was denied as a result
of a conflict of interest when he was appointed counsel who after appointment secretly
advocated against Mr. Austin's interests. .................................................................97

APPOINTED DEFENSE COUNSEL FAILED TO PROVIDE EFFECTIVE ASSISTANCE OF
COUNSEL OR OF STANDBY COUNSEL ...........................................................................106

CLAIM VIII.  Mr. Austin's rights under the Fifth, Sixth and Fourteenth Amendments were
denied when appointed counsel failed to take any or any sufficient action in the period leading
up to and during the determination of Mr. Austin's competency and the waiver of his right to
counsel.      106

CLAIM IX.    In violation of Mr. Austin's constitutional rights he was provided with
ineffective assistance by his standby counsel who failed to urge a competency hearing or a
reconsideration of the previous competency hearing when evidence emerged mandating this
course.       116

THE WAIVER OF COUNSEL WAS NOT KNOWING, VOLUNTARY AND INTELLIGENT120

CLAIM X.      Mr. Austin's rights to Due Process and to counsel as guaranteed under the
Constitutions of Texas and the United States were violated when he was subjected to a capital
trial without counsel without having made a competent, knowing, voluntary and intelligent
waiver of counsel. .................................................................................................120

THE PLEA OF GUILTY WAS NOT KNOWING VOLUNTARY AND INTELLIGENT.......124

CLAIM XI.    Mr. Austin's rights to Due Process and to trial by jury as guaranteed under the
Constitutions of Texas and the United States were violated when his plea of guilty was
accepted because it was not competent or voluntary. .............................................124

WITHOUT VALID WAIVER THERE WAS A DENIAL OF A JURY TRIAL .......................126

CLAIM XII.   The trial court denied Mr. Austin his right to trial by jury as guaranteed by the
Texas Constitution when, even though a jury trial may not be waived in a capital case in
Texas, it accepted his guilty plea and directed a verdict of guilt. ...........................129

CLAIM XIII.  Without a valid waiver, the trial court denied Mr. Austin his right to trial by
jury as guaranteed by the Sixth and Fourteenth Amendments when it accepted Austin's plea of

guilty and directed a verdict of guilt. ....................................................................131

CLAIM XIV.  The trial court denied Mr. Austin his right to trial by jury as guaranteed by the State and Federal Constitutions when it made findings of fact that Mr. Austin's plea was competent and voluntary when these facts were, in the circumstances, the equivalent of elements of the offense. ..........................................................................................133

THE JURY IN THIS CASE WAS ACTUALLY BIASED......................................................135

CLAIM XV.   Mr. Austin was denied his right to a fair and impartial tribunal as a result of the unconstitutional prejudice of jurors preventing them from considering the imposition of a life sentence as an option in a case of capital murder. .................................................135

CLAIM XVI.  Mr. Austin was denied his right to a fair impartial tribunal when a majority of jurors provided misleading answers as to their willingness to consider evidence in mitigation were he to be convicted of capital murder. ...........................................................136

THE PRIOR CONVICTIONS USED BY THE STATE IN PENALTY PHASE WERE UNCONSTITUTIONALLY OBTAINED ................................................................142

CLAIM XVII. Mr. Austin's Due Process and Eighth Amendment rights were violated when the state relied upon prior convictions for violent and sexual offences where those convictions had been obtained unconstitutionally. ....................................................................142

THE WAIVER OF APPELLATE COUNSEL WAS NOT KNOWING VOLUNTARY AND INTELLIGENT..........................................................................................145

CLAIM XVIII.   Mr. Austin's constitutionally guaranteed right to appellate counsel was denied when the trial court accepted a purported waiver of counsel that was not a knowing, voluntary and intelligent waiver of his right to the assistance of counsel. ..............................145

THERE WAS NO EFFECTIVE DIRECT APPELLATE REVIEW OF MR. AUSTIN'S TRIAL146

CLAIM XIX.  The execution of the death sentence imposed upon Mr. Austin would be in violation of the Eighth Amendment to the Federal Constitution and Article 1, Section 13 of the Texas Constitution as there has not been searching appellate review of Mr. Austin's conviction and sentence of death due to critical omissions from the record as filed. ............151

CLAIM XX.   Mr. Austin is entitled to a new trial where, despite his due diligence, critical parts of the trial record have been lost or destroyed. ...........................................151

THE COMPLETE ABSENCE OF ANY DEFENSE HAS PRODUCED A SENTENCE THAT IS ARBITRARY AND UNRELIABLE ......................................................................158

CLAIM XXI.  The death penalty imposed upon Mr. Austin is violative of the Fifth, Sixth, Eighth and Fourteenth Amendments to the Federal Constitution and the corresponding provisions of the Texas Constitution where the trial court permitted Mr. Austin to represent himself with the express intention of presenting no mitigation evidence and seeking the death

penalty thus denying the defendant and the community a regularly applied, fair, and non-arbitrary capital-sentencing proceeding conducted before a jury. ..........................................158

CLAIM XXII. The death penalty imposed upon Mr. Austin is violative of the Fifth, Sixth, Eighth and Fourteenth Amendments to the Federal Constitution and the corresponding provisions of the Texas Constitution where the presentation of no defense at all has prevented the conduct of a constitutionally mandated proportionality review. .......................................158

MR. AUSTIN IS INNOCENT OF THE OFFENSE FOR WHICH HE WAS CONVICTED AND SENTENCED TO DEATH ........................................................................................................164

CLAIM XXIII.   Mr. Austin is entitled to relief based upon the fact that new evidence shows that he is unquestionably innocent of the offense for which he was convicted and sentenced to death            164

MR. AUSTIN WAS NOT COMPETENT AT THE TIME OF HIS DIRECT APPEAL............171

CLAIM XXIV.   Mr. Austin's rights under the Sixth and Fourteenth Amendments were violated when his direct appeal was considered and determined while he was not competent171

THE DUE PROCESS AND EQUAL PROTECTION CLAUSES AND THE EIGHTH AMENDMENT PROHIBITS THE EXECUTION OF AN OFFENDER SENTENCED TO DEATH WHERE LIFE WITHOUT PAROLE WAS NOT AN AVAILABLE SENTENCING OPTION    172

CLAIM XXV. The Eighth and Fourteenth Amendments prohibit the execution of an offender sentenced to death when life without parole was not an available sentencing option.............173

TEXAS HAS NARROWED ITS CAPITAL SENTENCING ELEMENTS, REDUCING THE CIRCUMSTANCES IN WHICH A DEATH SENTENCE MAY BE ANNOUNCED..............186

CLAIM XXVI.   It violates the Eighth Amendment to execute Mr. Austin where the mitigation sentencing element of the Texas death penalty has been amended to reduce the level of mitigation necessary to avoid the death penalty and Mr. Austin would not now be sentenced to death....................................................................................................................188

CLAIM XXVII. It violates the Eighth and Fourteenth Amendments to execute a man when the future dangerousness sentencing element by which he became eligible for the death penalty has since been de facto abolished. ...........................................................................191

CLAIM XXVIII. It violates the Eighth Amendment to execute Perry Austin where that execution would be arbitrary and would serve no legitimate penological purpose................194

NARROWING THE SENTENCING ELEMENTS FOR CAPITAL MURDER ON A PURELY PROSPECTIVE BASIS GIVES RISE TO INVIDIOUS DISCRIMINATION .........................201

CLAIM XXIX.   By operation of the Due Process and Equal Protection Clauses, and the Eighth Amendment the legislative changes of September 1, 2005 are retroactive to Mr.

Austin's sentence and he is innocent of the death penalty as now cast. ..................................202

THE TEXAS MITIGATION SPECIAL ISSUE CONTAINS AN IMPERMISSIBLE NEXUS REQUIREMENT ............................................................................................................213

CLAIM XXX. Mr. Austin's rights under the Eighth Amendment were violated when the jury's consideration of mitigating factors was unconstitutionally limited by the nexus requirement in the mitigation special issue. ...................................................................................................214

LETHAL INJECTION AS APPLIED IN TEXAS VIOLATES MR AUSTIN'S CONSTITUTIONAL RIGHTS UNDER THE FIRST AND EIGHTH AMENDMENTS .........220

CLAIM XXXI.  LETHAL INJECTION, AS RESPONDENTS ADMINISTER IT IN TEXAS, POSES AN INTOLERABLE AND FORESEEABLE RISK OF CAUSING UNNECESSARY PAIN, TORTURE, AND LINGERING DEATH, IN VIOLATION OF THE EIGHTH AMENDMENT. 232

CLAIM XXXII.  LETHAL INJECTION, AS RESPONDENTS ADMINISTER IT IN TEXAS, CONSTITUTES A VIOLATION OF PLANTIFF'S FIRST AMENDMENT RIGHT TO FREE SPEECH AND TO PETITION THE GOVERNMENT. .............................................239

CLAIM XXXIII. IN VIOLATION OF THE EIGHTH AMENDMENT TDCJ ARE ACTING WITH DELIBERATE INDIFFERENCE TO PETITIONER'S MEDICAL NEEDS IN EITHER REFUSING TO PLAN FOR A METHOD OF CENTRAL VENOUS ACCESS OR IN SECRETLY PLANNING TO PERFORM MEDICALLY INVASIVE PROCEDURES ON PETITIONER WITHOUT EVEN MINIMAL PROPER SAFEGUARDS IN PLACE. .........241

PRAYER FOR RELIEF ...........................................................................................................245

CERTIFICATE OF SERVICE ................................................................................................245

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **PERRY ALLEN AUSTIN,** | § | |
| | § | |
| **Petitioner,** | § | |
| | § | |
| | § | |
| **-VS-** | § | **CIVIL NO. H-04-2387** |
| | § | |
| | § | |
| **NATHANIEL QUATERMAN,** [1] | § | |
| **Director, Texas** | § | |
| **Department of Criminal Justice,** | § | |
| **Institutional Division,** | § | |
| | § | |
| **Respondent.** | § | |

---

**SECOND AMENDED APPLICATION FOR WRIT OF HABEAS CORPUS
BY A PERSON SENTENCED TO DEATH**

Perry Allen Austin, an indigent prisoner confined on death row in the Texas Department of Criminal Justice, Institutional Division, petitions this Honorable Court, pursuant to 28 U.S.C. §§ 2254 *et seq.*, to issue a writ of habeas corpus ordering that his unconstitutional conviction and sentence of death be vacated. This is Mr. Austin's first federal habeas corpus petition.


## PROCEDURAL BACKGROUND

**Trial and Direct Appeal**

On February 28, 2001, Applicant, Perry Allen Austin, was charged by indictment with capital murder. The indictment alleged that Mr. Austin on or about:

---

[1] On June 1, 2006 Nathaniel Quaterman replaced Douglas Dretke as the Director of the TDCJ, accordingly Quaterman "is automatically substituted as a party". Fed. R. Civ. P. 25(d)(1).

August 19, 1992, did then and there unlawfully, while in the course of committing and attempting to commit the kidnapping of DK, intentionally cause the death of DK by cutting his throat with a deadly weapon, namely a knife.

And further alleged that Mr. Austin on or about:

August 19, 1992, did then and there while in the course of committing and attempting to commit the kidnapping of DK, intentionally cause the death of DK by a manner and means unknown to the Grand Jury.

(RR. 2).

On March 21, 2001 the trial court appointed Marshall "Mack" Arnold to represent Mr. Austin at trial.  On November 28, 2001, following a *Faretta* hearing, the court ordered that Mr. Austin be permitted to proceed *pro se* with Mr. Arnold as standby counsel.

On March 18, 2002 jury selection began and was completed on March 21, 2002.

On April 1, 2002 the Applicant entered a plea of guilty before the jury and the State began submitting evidence to the jury relevant to penalty.

On April 3, 2002 the jury returned a directed verdict, finding Mr. Austin guilty of capital murder as charged in the indictment.  The jury also answered "yes" and "no" respectively to the two punishment special issues submitted pursuant to Article 37.071 of the Texas Code of Criminal Procedure, Tex. Code Crim. Proc. Ann. art. 37.071(b), (e).  (CR.78-80).  As required by Article 37.071(g), the trial court sentenced Mr. Austin to death.  Tex. Code Crim. Proc. Ann. art. 37.071(g).

On April 4, 2002, following a *Faretta* hearing, Mr. Austin was permitted to waive the appointment of appellate counsel.

On April 5, 2002 standby appellate counsel, Roland B. Moore, was appointed by the court.  No appellate brief was filed in this matter.

On April 2, 2003 the Texas Court of Criminal Appeals affirmed Mr. Austin's conviction

2

and sentence.  <u>Austin v. State</u>, (Tex. Crim. App. April 2, 2003).  No application for a writ of certiorari was filed in the United States Supreme Court.

On April 30, 2003 the Texas Court of Criminal Appeals issued its mandate.

**State Post-Conviction Proceedings**

On June 2, 2003 the trial court issued a death warrant, setting an execution date of September 8, 2003.

On September 2, 2003 a Motion for Stay of Execution was filed and granted.  On that same date an order was made withdrawing the execution date.

On September 24, 2003 an order was made appointing counsel for the first time for state habeas proceedings, Mr. R. E. Wheelan.

On March 15, 2004 an unopposed *Motion to Extend Time to File Brief* was filed.  That day, good cause having been shown, an order was made granting an extension of 90 days for the filing of the habeas petition, the trial court setting a filing date of June 21, 2004.[2]

On April 8, 2004 the applicant filed his *Unopposed Motion For Leave To File Skeletal Application For Writ Of Habeas Corpus With Leave To File An Amended Original Application By June 20, 2004*.  The Applicant also filed an *Unopposed Motion for Scheduling Order*.

On April 22, 2004 the District Court[3] entered orders granting the applicant's motions and deeming that an amended application filed by June 21, 2004 would be considered an original habeas application.

On May 26, 2004 the Court of Criminal Appeals delivered an *Order on Applicant's Motion for Scheduling Order From Harris County*.  That Order, in effect, quashed the order of

---

[2] A ninety-day extension leads to a filing date of Sunday, June 20, 2004 and so by operation of Rule 4.1, Texas Rules of Appellate Procedure, the filing date is deemed to be Monday, June 21, 2004.
[3] The trial judge was unavailable and a visiting judge entered the order.

the trial court, denied leave to file a skeletal petition and declared that time for filing of an original application had long since expired and any application now filed must be dealt with as an untimely filed application pursuant to Article 11.071 (4)(c)-(e) and 4A.   Rehearing was denied.

On June 21, 2004 Mr. Austin filed an original application for writ of habeas corpus in the convicting court; the 339th Judicial District Court of Harris County, Texas.

On June 29, 2004 pursuant to Article 11.071 § 4(d)(2) the convicting court entered findings of fact and recommended that good cause be found to have been shown without the need to reach Mr. Austin's proffered explanations of good cause for the untimely filing.   The Court then forwarded Mr. Austin's application and its order finding good cause to have been shown to the Court of Criminal Appeals.

On July 6, 2004, the Court of Criminal Appeals found that good cause had not been shown for the untimely filing and, as required by Article 11.071 §4A(b)(1) dismissed Mr. Austin's application.

**Federal Post-Conviction Proceedings**

On June 21, 2004 simultaneous with his filing in state court, Petitioner timely filed his *Petition for Writ of Habeas Corpus (Docket Entry 4)* in this Court.

Given the novel and uncertain procedural status of Mr. Austin's claim before the state court he also filed *Motion For Evidentiary Hearing And Briefing Regarding Exhaustion And Abatement (Docket Entry 5)*.   When Mr. Austin's petition was dismissed in state court on June 6, 2004 his stay and abey motion became moot and he filed a motion to dismiss the motion.   On

4

August 3, 2004 the court dismissed the motion as moot. *(Docket Entry 11)*[4]

Respondent sought dismissal of Mr. Austin's petition with prejudice, alleging procedural default. *(Docket Entry 6)* Following response and reply this court considered the matter and denied the respondent's motion. *(Docket Entry 25)*

On April 19, 2005 the state filed *Respondent Dretke's Answe*r (Docket Entry 26). In its Answer Respondent alleged at various points that Petitioner had insufficiently briefed a number of claims and had failed to adequately identify those parts of the exhibits that were relied upon in support of various claims.

Petitioner sought leave to amend his Petition to correct these non-substantive defects and by order of May 19, 2005 this court granted leave to amend. *(Docket Entry 29)*

Petitioner now timely files his *First Amended Petition For Writ Of Habeas Corpus.*

## STATEMENT OF JURISDICTION

This Court has subject matter jurisdiction of this case by virtue of the conviction and sentence of Mr. Austin having occurred in Harris County, Texas. *See* 28 U.S.C. 2241(d).

## EXHAUSTION OF REMEDIES

Mr. Austin has exhausted state remedies in respect of each of the claims presented in this petition by the filing of his state post-conviction petition or by the Court of Criminal Appeals *sua sponte* review for fundamental error (no briefs were filed in this case).

Respondent has expressly conceded that Mr. Austin's claims are exhausted, albeit for different reasons:

> A federal habeas petitioner who has defaulted his claims in state court due to untimely filing has met the technical requirements for exhaustion. Coleman v.

---

[4] On January 18, 2005 the court also entered an order striking this motion on the basis of a failure to conference or properly serve. *(Docket Entry 25)*

Thompson, 501 U.S. 722, 732 (1991).  Thus, despite Austin's failure to raise his claims on direct appeal and his subsequent failure to file a state habeas application, the Director agrees that the exhaustion doctrine is no longer a procedural bar to consideration of Austin's claims in this Court.

*Respondent's Reply To Petitioner's Response To Respondent's Motion To Dismiss (Docket Entry 23)*

# JUSTICE IS TRUTH IN ACTION - MR. AUSTIN'S TRIAL WAS AN EXERCISE IN FICTION[5]

Mr. Austin is a seriously mentally ill man who has been convicted and sentenced to death after confessing to a crime he did not commit.  His trial, conviction and sentence were based upon fiction, rather than truth.  This habeas petition is an attempt to tell the truth.

Counsel has not been able to conduct an investigation of the breadth or depth required in this very difficult case.  The time and resources available at this stage of proceedings are simply not adequate for the task where the defendant is seriously mentally ill and there has been no investigation or adversarial trial conducted previously due to the history of the proceedings.  Nonetheless, from the work that has been done a very clear picture of the tragic circumstances of Mr. Austin's life and his dysfunction has emerged.

### *Mr. Austin was a small, shy, abused, isolated and overwhelmingly sad child*

Mr. Austin was born on June 23, 1959 in Tacoma, Washington to William Niles Austin and Harumi Austin.  William Austin was a career serviceman and his wife a Japanese citizen.  The pair had met while Mr. Austin was stationed in Japan.[6]  William Austin suffers from the symptoms of mental illness[7] and his father and grandfather were alcoholics.[8]  William Austin is

---

[5] "Justice is truth in action", Benjamin Disraeli (1851)
[6] Exhibit 82 – Affidavit of William Niles Austin
[7] Exhibit 82 – Affidavit of William Niles Austin (When my mom died, when my dad died, when my brother died, when my aunt died. I did not shed a tear, not one. I thought 'Well things happen', and just got on with it. I knew I loved them, but didn't care when they died. People were looking at me as if to say 'what is wrong with him?'. That's

described as having been easy going (but crazy) before his military service but having hardened in the service.[9]

Harumi Austin, Perry Austin's mother, has demonstrated psychological symptoms also and has now become a recluse, speaking to virtually noone.[10]

As described below, Mr. Austin was a victim of significant and continuing physical, psychological and emotional abuse both at home and at school.

As a child Perry Austin is remembered by those who knew him as a "quiet and shy boy"[11] but also one who was "very troubled"[12] and "seemed to carry a lot of anger inside".[13]

He presented as a withdrawn and isolated young boy and was starved of affection at home.

---

not right, that's not normal, there has to be something wrong with me. . . . When any of my animals die I bawl my eyes out, but with people I don't care.") (Describing a number of unusual incidents - "My neighbors had a dog that would bark all through the night, just outside the bedroom window. After calling the police about it, I mixed up lemon juice and Tabasco and sprayed it in the dog's eyes. . . . In the army, I got a new guy to pull out a grounding pole on a radio tower, and when the guy got an electric shock I had a good laugh. One time when I was young, I nearly drowned. I wasn't scared of drowning; I didn't really care.") Exhibit 58 – Statement of Marilyn Grady (Describing cruel "pranks" by William Austin such as smashing toys, locking his aunt in the outside toilet and catching her in barbed wire.); exhibit 42 – Statement of Larry Cook ("Niles Austin was always real nervous acting. He would move quickly, talk quickly and had a mannerism that I remember; he would blink his eyes a lot when he spoke to you.")

[8] Exhibit 82 – Affidavit of William Niles Austin ("My father was an alcoholic and he died of the drink. My father lost the family business because of the drink . . . My grandfather Purkey was also an alcoholic.")

[9] Exhibit 58 – Statement of Marilyn Grady ("Niles was more like his mother Leona; friendly, easy going and crazy. It was after Niles joined the military that Niles became stern.")

[10] Exhibit 58 – Statement of Marilyn Grady ("Nile's wife, Perry Allen Austin's mother, Harumi (Bonnie) Austin was a real oddball. She would not talk. . . . She just was not a friendly, social person, in my estimation she was anti social."); Exhibit 82 – Affidavit of William Niles Austin ("My wife has always been a bit odd, but she gets stranger and stranger everyday. She has become a recluse and will not answer the door or telephone."); Exhibit 42 – Statement of Larry Cook ("I remember that the mother never went to town unless she had to and was real quiet and backward; she would not speak to you."); Exhibit 46 – Statement of Bruce Hinshaw ("You seldom saw his parents. It was like they didn't really go outside. They had just moved into town and weren't real familiar with people.")

[11] Exhibit 41 - Statement of Russell Ross ("At school he was quiet and shy"); Exhibit 44 - Statement of James Martino ("Perry Austin was very small and shy, he struggled to find friends because he was new in town . . . I remember when he was at school he never talked to anyone"); Exhibit 43 – Statement of Michael Reed (Mr. Austin was "insecure and afraid at school."); Exhibibt 45 – Statement of Betty Ward ("Perry was always quiet . . . he was not the kind of kid that would talk out in class . . . he was timid and a loner type of kid"); Exhibit 57 – Statement of Mary Lou Austin ("Perry was extremely quiet and shy.")

[12] Exhibit 41 - Statement of Russell Ross;  Exhibit 57 – Statement of Mary Lou Austin ("there was something sure troubling him")

Poor little Perry was all alone with his father away in the military for such a long time . . . [Perry's mother] took care of her kids the best she could but I never saw her loving on them. I don't remember ever seeing Perry being hugged or kissed by either of his parents. . . . I feel that there is something the matter with Perry and it might have something to do with him never having felt that he was loved. . . . I don't remember Perry ever being shown affection or attention by his parents. I think this is why he liked being with my husband and me.

Exhibit 57 – Statement of Mary Lou Austin.

This account is supported by that of his own father:

Nobody in the family was ever close and we are still not a very close family. My wife and I were not affectionate with the children and did not demonstrate or speak to them about love. I believe that this was a mistake and that they may have grown up believing that they were not loved.

Exhibit 85 – Affidavit of William Niles Austin.

His father was a strict disciplinarian and was physically abusive of Mr. Austin.[14]

I was a lot rougher on Perry than I was his sisters; I guess, in my mind, the girls could do no wrong and he done everything wrong.  It all rolls down the hill. What my dad done to me, I did to him . . . my kids, especially my son were brought up with the belt. After hollering at them for a while the belt would come out . . . I was mean. . . . I was absent for a lot of his life, and then when I was at home I was real mean with him, and he resented me for it.

Exhibit 85 – Affidavit of William Niles Austin.  In his later teens the violence and aggression of

the Austin home was observed by a friend, Pedra Ropple:

Growing up, I would sometimes visit Perry at his family home. I remember being struck at how different his home life was to mine. There was always yelling going on at the house. Perry's mother was Asian and she cowered a lot, like abused women do. Perry's dad yelled a lot and I remember that there was always furniture being pushed around and that there did not seem to be any order in the

---

[13] Exhibit 41 - Statement of Russell Ross
[14] Exhibit 57 – Statement of Mary Lou Austin ("Austin was a strict disciplinarian and rough with Perry.");  Exhibit 81 – Statement of Gucemindo Tobias Jr ("I remember that Perry had a lot of issues with his family. There was a lot of verbal abuse. I cannot remember clearly if there was physical abuse, but out of all the kids I knew growing up, he was the one that I would say came from an unhappy home and had a bad childhood. I do not recall ever having gone to his home."); Exhibit 80 – Statement of Teresa Valdez Tobias ("I remember he told me that he had pretty strict parents. He always had to let them know where he was. If they said he had to go home he went home straight away."); Exhibit 46 – Statement of Bruce Hinshaw ("They were strict, Perry couldn't just do whatever he wanted without asking first.")

house.  I remember that when Perry and I would go to his house after school it seemed like he could not get to his room fast enough. One time I was with Perry and some other kids and Perry's father walked past us and he did not even acknowledge him. Perry did not talk to me about his home life, except to say that he did not get along with his father. Looking back I realize that things were much worse for him at home than I had imagined. I recall seeing Perry with darkened eyes and I think he talked to me about being pushed around at home; I know it wasn't kosher at the house

## Exhibit 92 - Affidavit of Eleni Antonopoulos

Outside of his home, Mr. Austin's life was that of a small, mixed-race child growing up in Cicero, Indiana where he was isolated and subject to discrimination.[15]

Back then, there was maybe one colored family in town so Perry stood out. The kids in the town and at school shied away from Perry.

## Exhibit 45 – Statement of Betty Ward.

Mr. Austin was subject to terrifying and humiliating bullying on a virtually daily basis.[16]

Mr. Austin was "scared to death of school",[17]  His plight is poignantly and eloquently recalled by one of his fellow students:

I think he was so quiet because he was terrified of school because he was picked on so badly. I remember that the basketball players would torment him

---

[15] Exhibit 42 – Statement of Larry Cook ("Perry Allen Austin's mother was Oriental.  That was frowned upon in town because it was a real close knit community"); Exhibit 41 – Statement of Russell Ross (Mr. Austin different because of race and failed to fit in.); Exhibit 46 – Statement of Bruce Hinshaw ("Perry was real quiet and kept to himself. I think that this was because of his race. It is like if a white kid went to a school that was 98% black they would get bullied like Perry did at our school."); Exhibit 47 – Statement of Gary Ward ("I believe that Perry would have been picked on at school because of his race. . . . I think that being new in town and looking different would have made Perry a target for prejudiced people."); Exhibit 57 – Statement of Mary Lou Austin ("The people in the town would call him "The Mexican". He tried to hide the fact that he was Japanese, he seemed ashamed of this.  I think he felt like an outsider, he was more or less a loner"); Exhibit 85 – Affidavit of William Niles Austin ("When we got back to America, from Japan, we moved to my hometown, Cicero.  My mother called my wife 'a Jap' because she had grown up during the war and resented the Japanese.")

[16] Exhibit 41 – Statement of Russell Ross (There were bullying and initiation rituals at school and "when you are small and easily intimidated like Perry, these rituals are particularly difficult and stressful."); Exhibit 46 – Statement of Bruce Hinshaw ("I guess when you are a kid and you get picked on every day you go to bed and you know the next day is going to be exactly the same, always being harassed, I guess he anticipated it. . . . There is just something about some kids at school its like they have a bulls eye on their back."); Exhibit 47 – Statement of Gary Ward ("Looking back at high school and the way people were treated I can understand what makes kids do crazy things like what happened at Columbine.");  Exhibit 57 – Statement of Mary Lou Austin ("I remember that he was teased badly in Cicero")

[17] Exhibit 44 – Statement of James Martino

relentlessly, especially in PE class. They would throw baseballs and basketballs at him. They would pick on him all day, everyday, I would have been terrified if I was Perry. These guys tried to start the same thing with me because I was also small but they soon left me alone because I would defend myself. Perry did not defend himself . He would try to get away from the beatings and when he couldn't escape he would cover his head and cry. Eventually the tears would dry up and he would just stand there quietly and take it.

I remember one incident in particular that made me feel so bad for Perry. We were in gym class and the coach had left the gymnasium. A really big guy, Brian Hawkins, took a basketball and threw it from one end of the gymnasium to the other at Perry. Perry turned around and the ball hit him straight in the face, knocking him over and bloodying his nose. Perry got up and was crying. Brian went over to him, punched him in the face and laughed.

It was unbelievable what they did to that kid. Everybody knew he got picked on so no one wanted to be around him because they were scared that they trouble would spread to them. I know that's why I did not hang out with Perry. It got so bad that everybody started ignoring how much Perry was bullied. It seemed like even the teachers ignored it most of the time. I remember another time when Matt Knightenhauser beat Perry up. It always seemed like a couple of guys started it and soon it was like half the school was shoving him around.

* * * *

I think, without a doubt he was depressed in school and the abuse and fear of the abuse was huge. It was frightening being so little when you live in Cicero.

Exhibit 44 – Statement of James Martino.

Unsurprisingly he was a lonely boy who craved affection[18] and sought out environments in which he might be protected from the constant physical and emotional abuses he suffered at home and at school.[19]  He would talk little of his home life and while he would stay at or visit other children's houses nobody entered his house.[20]  As is often the case, given a chance, Perry

---

[18] Exhibit 41 - Statement of Russell Ross ("I could see that he was lonely and needed a friend"); Exhibit 44 – Statement of James Martino ("He had a need to be accepted and liked"); Exhibit 47 – Statement of Mary Lou Austin ("Perry seemed very lonely".)

[19] Exhibit 41 – Statement of Russell Ross ("I believe that Perry was happiest and most at ease when we all camped out and played in the woods.  He also enjoyed church activities.  I do not believe that he was happy at home or at school."); Exhibit 45 – Statement of Betty Ward ("I felt he really enjoyed coming to church . . . I think he enjoyed being in a community of people that accepted him.")

[20] Exhibit 41 – Statement of Russell Ross ("Perry Austin . . . spent a lot of time at my house. . . . I do not know what

Austin was able to show a sweet and positive side that appealed to people but he was given very few chances.[21]

Fellow students and teachers who remember Mr., Austin agree that he had an unhappy childhood and few remember ever seeing him smile.[22]  As one classmate puts it, "I feel he had an unhappy childhood, there is no doubt about that."  <u>Exhibit 41 – Statement of Russell Ross</u>.  Just as telling were the number of teachers who could remember virtually every other child in the school photographs but could not remember Mr. Austin – a small, lonely and isolated boy who fell between the cracks.[23]

There is a sense of inevitability to the fact that Mr. Austin fell prey to substance abuse at

---

kind of life he had at home because he was not an open person and never spoke about his problems . . . He stayed the night at my house a thousand times and I stayed at Ricky Repp's house but we never stayed the night at Perry's house."); <u>Exhibit 45 – Statement of Gary Ward</u> ("Everyone was always welcome in everyone's house in Cicero and as kids we were always in and out of each other's houses. I don't remember ever being invited into Perry's house. I don't remember him ever having a birthday party."); <u>Exhibit 55 – Statement of Irma Johnson</u> ("My friends and I spent a lot of time going back and forth from each other's houses. I never went to Perry's house. Nor did I know his family.")

[21] <u>Exhibit 57 – Statement of Mary Lou Austin</u> ("Perry had a heart of gold and was very polite. He was always good to my children Jeffrey, Kevin and Jennifer, who were younger than him. . . . Even after I found out what had happened I was never scared of him, he had a heart of gold."); <u>Exhibit 43 – Statement of Michael Reed</u> ("Perry was a good student and a good kid.  Whenever I needed help with my homework I would ask Perry.  If I had to predict a career that Perry might have pursued I would imagine that he would work for the space program, he seemed that smart."); <u>Exhibit 41 – Statement of Russell Ross</u> ("We were both active in the church and used to take part in church activities . . . Perry's family did not attend with him, he went on his own. . . He never spoke badly about people."); <u>Exhibit 45 – Statement of Betty Ward</u> ("Perry was one of my students.  Perry was always quiet and well behaved at church. . . . I felt that he really enjoyed coming to church and did so of his own free will . . . Perry got along well with the kids at church, although he was timid and a loner type of kid.")

[22] <u>Exhibit 41 – Statement of Russell Ross</u> ("He was not the kid of kid that would smile and say 'hey' to kids in the corridor. He would walk straight past staring into space with a serious look on his face.");  <u>Exhibit 43 – Statement of James Martino</u> ("I saw him smile a couple of times but he would not smile very much.").

[23] <u>Exhibit 51 – Statement of Diana Bryant</u> ("I pride myself on remembering my students. . . . It struck me that I remembered all the students in the photographs except for Perry Austin. I found this particularly odd because at the time we did not have a lot of students of color and from the pictures it was obvious that he stood out from his peers."); <u>Exhibit 50 – Statement of Jan Hoch</u> ("I am in the photograph, as is Perry Austin. I do not recognize Perry Austin or recall anything about him. . . . I can pull up memories of most of the students in the photograph, but not Perry."); <u>Exhibit 49 – Statement of Stan Renner</u> ("I recognized several of the students on the photograph and could remember stories about the. I do not remember Perry Austin, he must have been a non descript kid.");  <u>Exhibit 48 – Statement of Mike Jenkins</u> ("Perry Austin is in these photographs. I do not recognize Perry Austin, but I do recognize several of the other students in the photographs.")

an early age in another failed attempt to fit in and to escape the misery of his life.[24]

> When I was friends with Perry we were hanging out with older people who had cars. I remember Perry trying really hard to be part of it and fit in. I think he thought that if he was part of this crowd he would be protected from bullying. It was during this period that Perry started experimenting with marijuana. Smoking marijuana was expected by the group and something Perry started doing so that people would like and accept him. Despite his expectations Perry continued to be bullied. Some of the bullying came from within this group. I recall seeing him taking off from school running to escape the bullies.

Exhibit 43 – Statement of Michael Reed.

Even though only a young boy himself, Russell Ross became so concerned about Mr. Austin that he "went to the guidance counselor to talk about Perry" because he was "worried about him and wanted advice on how to help him."[25]

***During his teenage years, Mr. Austin experienced further abuse and tried to kill himself***

In addition to his father's absences due to military service, Perry Austin and his family moved regularly with Mr. Austin Sr's military placement.  While in his early teens the Austin family moved to Fort Hood, Texas.

Perry Austin continued to develop as a sad, lonely, timid and socially awkward teenager.[26]  He also continued to show a gentle and caring side when he could escape from the many abuses and terrors of his childhood.[27]  The mother of one of his few friends describes him

---

[24] Exhibit 41 – Statement of Russell Ross ("I think Perry started smoking pot in the 9th grade because everyone else did. . . . when he started hanging with the bad crowd he got sucked in because when yopu have pain in your life it makes you weak and unable to stand up for yourself"); Exhibit 13 – Armed Forces Records, Record of Medical Care (p.4134-5) ("States history of substance abuse since early childhood."); Exhibit 28 – TDC Records, Psychological Evaluation (p.2831-2), 6/27/1979 ("I learned in the interview with this inmate that he has abused various kinds of chemical substances since his middle adolescent years including marijuana, various kinds of "speed," "acid", and other chemical substances when they were available.")

[25] Exhibit 41 – Statement of Russell Ross

[26] Exhibit 38 – Statement of Katerina Ropple ("Perry was timid. I guess the other kids maybe didn't want to talk to him"); Exhibit 55 – Statement of Irma Jackson ("Perry was always real quiet and shy . . . He always looked serious and sad . . . I remember that he was treated badly by some of the kids because of his nationality.")

[27] Exhibit 55 – Statement of Irma Johnson ("Perry was really sweet, but it took a lot for him to relax around people. When he did, he was fun to be around."); Exhibit 38 – Statement of Katerina Ropple ("Perry would often come to our house to visit with Pedra. I remember that he was always polite and reserved. He was never boisterous or loud.

coming to the house and simply sitting quietly, rather than going home.[28]  He is described as having come from "an unhappy home and had a bad childhood".[29]

One of Mr. Austin's teachers from this time, Mr. Krausky, described the sort of hypervigilance psychologists associate with abuse, or as Mr. Krausky put it, "like someone who has just come out from Special Forces".[30]  Mr. Austin was also demonstrating the stubborness, rigidity of thought and limited problem solving ability that has now been identified as a symptom of his dysfunction.[31]  This rigidity also expressed itself in a more positive but ultimately double edged characteristic of fierce loyalty to those few people he was able to make his friends.[32]

In his early to mid-teens Mr. Austin was the victim of sexual abuse at the hands of a serviceman stationed at the same base as Mr. Austin's father.[33]  On March 24, 1975 attempted suicide by overdosing on medication and was admitted to the Darnell Army Hospital where he

---

He always looked neat and clean. Perry was timid. I guess the other kids maybe didn't want to talk to him. I think that maybe he sought out girls because they were kinder and more accepting."); Exhibit 80 – Statement of Teresa Valdez Tobias ("I never let my boys have too many friends but I did not mind Perry coming to the house because he was a quiet, respectful boy.")

[28] Exhibit 38 – Statement of Katerina Ropple ("I felt like Perry was a lost soul.  A lot if times he would come over and sit quietly watching television or sit in Pedra's room while she did her homework. He would just sit there."); Exhibit 92 - Affidavit of Eleni Antonopoulos (Pedra Ropple "Often he would sit quietly on the couch with my dad, while I did my homework. On other occasions he would sit in my room while I did my homework. He would not do anything or say much, he just sat there. I remember one day I was doing my homework, and my dad was watching television. Nobody noticed when he got up to leave. He stood at the door saying "Bye, Bye," waiting for someone to acknowledge him. By the time anyone had noticed our pet bird had flown out the front door. My dad yelled at Perry. It was sad.")

[29] Exhibit 81 – Statement of Gumeciondo Tobias Jr

[30] Exhibit 54 – Statement of Del Krausky ("I remember he seemed to always be on watch, like someone who has just come out from Special Forces, always on the look out for trouble, always on the watch.")

[31] Exhibit 81 – Statement of Gumecindo Tobias Jr ("He would fight with his parents and decide to leave home, he could not be reasoned with. Juan and I would try to talk him out of it, but he just went ahead and did whatever he had decided; it did not matter what we said to him.  . . .  He would often make comments about wishing he was dead. My brother Juan, and I would try to talk to him about it, ask him why he felt that way, and erase it from his head. When he got into that mentality it was really hard to talk him out of something when he got an idea in his thick skull. He was very stubborn. This is one of the things that stands out most in my mind about Perry.")

[32] Exhibit 81 – Statement of Gumecindo Tobias Jr ("Something else that stands out when I think of Perry is his unwavering loyalty to his friends. If you were his friend, he acted like you walked on water. He would do anything for a friend. He would do anything for you regardless of any consequences for himself. I think he was easily blinded by people who had a bad nature and he was easily taken advantage of. His loyalty was blind and absolute.")

[33] Exhibit 81 – Statement of Gumecindo Tobias Jr ("I know that he used to hang out with a GI in Fort Hood. The GI was older than us.")  Without the ability to take advantage of discovery and compulsory process it has not been

was hospitalized for three days.  He was diagnosed as suffering from:

> Adolescent adjustment reaction in a mixed personality manifested by Adolescent Suicide Attempt (ASA) overdose.
> Severity: Severe. Acute.
> External Precipitating Stress: Severe: As manifested by school and family problems.

Exhibit 97 - Darnell Hospital Medical Records (Clinical Record and Cover Sheet) 04/26/1975.

Perry Austin's father reported to Stephen Jordan, Major MC, that his son had a "history of being 'runaway'- gone last week came home tonight", where he overdosed on a bottle of painkillers  . Dr. Jordan noted that Perry Austin "refuse[d] to give history of how many ASA [adolescent suicide attempts] he (illegible)".  Mr. Austin was discharged with an "instruction to seek family counseling at Bell County MHMR."  Exhibit 97 - Darnell Hospital Medical Records

One session of family counseling was pursued[34] and then the Austin family dealt with this incident as they dealt with many of the stressors and problems they encountered; by pretending it had not happened:

> He was kept in hospital for three days. After he was released from hospital his suicide attempt was never discussed. We just went on as normal.

Exhibit 85 – Affidavit of William Niles Austin.

Mr. Austin's teenage years and indeed his adult life have been characterized by periods of depression, recurrent suicidal ideation and suicide attempts.[35]

He also ran away from home a lot,[36] was involved in fights and received a series of head

---

possible to develop the facts surrounding this abuse to the extent desired.
[34] Exhibit 27 – Central Counties MHMR Center Client Demographics Form (Showing family counseling services April 28, 1975); Exhibit 85 – Affidavit of William Niles Austin ("I remember the entire family attended family counseling in Fort Hood. . . . we only attended one session.  We should have kept going.")
[35] Exhibit 81 – Statement of Gucemindo Tobias Jr ("He would often make comments about wishing he was dead. . . . I know that he attempted suicide one time. I think that he cut his wrist. I don't know why he did this but I know that he was very unhappy at home.")
[36] Exhibit 47 – Statement of Mary Lou Austin (Describing occasions on which Mr. Austin ran away from home to stay with his aunt.);  Exhibit 81 – Statement of Gumecindo Tobias Jr (Describing Mr. Austin running away from

injuries.[37]  He tried to move out of home to live with his grandparents but this was not allowed.[38]

***Mr. Austin ran away to join the Army but was psychologically unfit for service***

In part as a continuing flight from his miserable and abusive homelife[39] Mr. Austin joined the army where he reported further neurological symptoms, including severe headaches, sleeplessness, depression and anxiety.[40]    While in the army his great potential was noted[41] but so was his volatility and his dysfunctional stubborness.[42]  Mr. Austin was prohibited from handling weapons pending a psychiatric examination[43] and was ultimately discharged from the army in October or November 1977 after being assessed with a "failure to adapt socially and emotionally".[44]

---

home for nights or even a week and sleeping in a car or with the Tobias family.); Exhibit 92 - Affidavit of Eleni Antonopoulos (Pedra Ropple: "Perry would often tap at my window at ten o' clock at night. He would tell me that he had fought with his dad. I remember one time he said that he had run away again.  Perry would come to my window late at night so often that I started ignoring him, eventually he stopped. I think that he would visit me at night, because he was lonely and needed someone to talk to.")

[37] Exhibit 81 – Statement of Gucemindo Tobias Jr ("I don't know how the fight started but I remember Perry left to use the restroom and the next thing I knew he was on the ground fighting with someone. There was a crowd gathered around them. After the fight was over Perry was bloody around the head. I assume that he had been hit with a beer bottle or some sort of object. I saw him many times in Carizzo Springs with black eyes and a busted lip.")

[38] Exhibit 13 – Armed Forces Records, Record of Medical Care (p.4134-5) ("in separation from parents . . . He requested but denied transfer to care of grandparents.")

[39] Exhibit 13 – Armed Forces Records, Unit Commaders Report for Psychiatric Examination (p.4130-1), 7/1/1977 ("I have counseled Pfc Austin about his family, and his reply is that he does not know where they are and do not want to write them. He also stated that they had moved and don't know that he is in Germany."); Exhibit 13 – Armed Forces Records, Record of Medical Care (p.4134-5) ("in separation from parents (was 'kicked out' of house in present unit since Feb")

[40] Exhibit 13 – Armed Forces Records, Report of Medical History (p.4123), 7/15/1976 (Frequent or sevcere headache . . . Eye trouble . . . Depression or excessive worry . . . Nervous trouble".); Exhibit 13 – Armed Forces Records, Report of Medical History (p.4143-4) ("Frequent Trouble Sleeping")

[41] Exhibit 13 – Armed Forces Records, Unit Commaders Report for Psychiatric Examination (p.4130-1), 7/1/1977 ("is an outstanding worker  . . . I feel individual has great potential for retention in the service.")

[42] Exhibit 13 – Armed Forces Records, Unit Commaders Report for Psychiatric Examination (p.4130-1), 7/1/1977 (".  Sgt Martin stopped the fight and tried to talk to both individuals.  Pvt Austin would not say a word to him or his Plt leader. . . . Nor problems exists until he becomes angry, then he becomes a different person altogether.  He then becomes angry with everyone."); Exhibit 13 – Armed Forces Records, Chronological Record of Medical Care (p.4134-5), (7/12/1977) ("Over past month has been easily angered and fights with personnel in unit."); Exhibit 13 – Armed Forces Records,  Record of Informal Counseling (p.4110), 10/5/1977 ("Pvt. Austin still refuses to accept orders and carry out instructions."); Exhibit 13 – Armed Forces Records, Record of Informal Counseling (p.4111) (Repeated refusal to sweep floor on the basis that "This is not our area".)

[43] Exhibit 13 – Armed Forces Records, Medical Condition Physical Profile Record (p.4132-3), 7/12/1977 ("No Handling of Weapons of Classified Material Pending Psychiatric Evaluation")

[44] Exhibit 13 – Armed Forces Records, Letter re Separation (p.4106), (10/14/1977) ("Individual will be separated

***Mr. Austin returned home and his mental illness worsened***

Mr. Austin returned home and his substance abuse, which had continued from his childhood, worsened as did the symptoms of his mental illness. He is described as spending most of his time on his own in his room, having no friends and having virtually no communication with his family, although he lived with them.[45]

In October 1978, while under the influence of severe mental illness,[46] Mr. Austin sexually assaulted two of his sisters and robbed the other at gunpoint. He was assessed by Dallas-based psychologist Dr. Franklin Lewis as suffering from a long standing serious mental illness and possible brain damage and as having been insane at the time of the offense:

Diagnostic Impression:

1. Severe personality disturbance with schizoid thinking and anti-social features.

2. Latent borderline schizophrenia.

Conclusion:

At the present time Perry Austin is suffering from a mental illness. The mental illness is long standing in nature and probably stems from early childhood. It is my further opinion that on Oct. 4, 1978, Mr. Austin was legally insane at the time the alleged crimes were committed.

Exhibit 28 – Psychological Evaluation of Dr. Franklin Lewis. Having conducted psychometric testing with an appropriate validity scale and a clinical examination Dr. Lewis opined:

Throughout the examination, Mr. Austin was mildly depressed. . . . He noted that he has always had difficulty in relating to members of his family and always felt distant from them. . . . The only treatment he has ever received was "2 or 3

---

UP of the Expeditious Program, for the reason of failure to adapt socially and emotionally.")

[45] Exhibit 17 – Transcript of 1978 Trial, Testimony of Teresa Austin, Beverly Gonzales

[46] It is submitted that Mr. Austin was, in fact, legally insane at thge time of the commission of this offense, as was opined by Dr. Lewis at the trial. However, he was ultimately convicted. Nevertheless, there can be little doubt that he is and was severely mentally ill. The subsequently disgraced Dr. Grigson gave evidence for the prosecution and, on the basis of a mental status examination only, opined that Mr. Austin was sane. Exhibit 17 – Transcript of 1978 Trial, Testimony of Dr. Grigson.; Exhibit 85 – Affidavit of William Niles Austin. ("It is my belief that he was severely ill at the time he attacked his sisters, and his mental illness remains untreated today.")

counseling sessions." He denied he had any mental illness and was extremely sensitive to the suggestion that he might. . . . Although he was alert and generally oriented, he did exhibit some deficits in memory abilities, particularly regarding incidents involved in his loss of impulse control and engaging in sudden assaultive behaviors. . . . The MMPI was administered . . . Test results were valid. That is, Perry did (sic) lie, try to fake, or otherwise try to distort his answers in order to project a certain type of personality pattern.  Seven of the clinical scales on the MMPI were outside normal limits, and indicate that Perry is suffering from a mental illness. . . . There is evidence of anti-social personality characteristics but sociopathy is nested within a mental illness.  MAT indicates that much of his behaviors are unconsciously motivated and that pathology was in all probability laid down in childhood.  He uses a great deal of denial and repression in order to negotiate day-to-day life.  Furthermore, thinking is unusual and unconventional and may be quite distorted at times.  There is some evidence that he feels guilty about his behaviors and that behaviors are not sadistic in nature.

Exhibit 28 – Psychological Evaluation of Dr. Franklin Lewis.  Dr. Lewis expanded upon this opinion in his testimony at the trial and also gave evidence under oath that there were indications of brain dysfunction but that further testing would be required to rule this in nor out.:

There is some suggestion that brain damage or brain disfunction might be present. Unfortunately, at this point – you know, I told you we would use testings to give us further direction for examination or exploration.  Unfortunately, at this point we cannot rule out or rule in, you know, that brain disfunction is there.  But there is some data to suggest that.

Exhibit 17 – Direct Testimony of Franklin Lewis.

During the trial Mr. Austin once again attempted suicide by overdosing on medication.[47]

Mr. Austin was convicted, and after his conviction wrote to the trial judge,  seeking placement at Rusk and psychiatric assistance for his disturbance:

. . . I want help and I need help. You have Dr Louis' report on me about my case, I know theres something wrong with me and I don't think prisons going to help me any. I wan to go to Rusk to get help for my problem. I'm willing to do my time in TDC but I want help before its to late. . . .  All I'm asking is that you send

_____

[47]  Exhibit 28 – TDC Records, Psychological Evaluation (p.2831-2), 6/27/1979 ("in jail subsequent to the current offense, the inmate again overdosed on an unknown number of 'red pills' in what he describes as a 'suicide attempt'");  RR XIV – Ex. 81. Pen Packet: Texas Department of Criminal Justice, Institutional Parole Office Case Summary 05/01/1998 (1334) ("Mental: Available file material indicates that subject attempted suicide at age 14 and 19 by overdosing. TDCJ-ID Medical Records do not indicate any mental health needs at this time")

me to Rusk until the doctors solve me of my problem then go ahead and send me to TDC for life if you want to. . . . All I want is help and I don't think I can live with myself knowing that my problem is still with me.

Exhibit 5 – Court Record Dallas County Aggravated Assault Charge, Letter from Perry Austin to Judge Zimmerman (p.1700-1).  Judge Zimmerman arranged for this letter to be forwarded to the TDC Diagnostic Unit.    Exhibit 5 – Court Record Dallas County Aggravated Assault Charge, Letter from Rod Poirot to Director of Diagnostic Unit (p.1697), 6/25/1979.

***Mr. Austin spent more than ten years in prison without any effective treatment***

Mr. Austin was not referred to Rusk and did not receive the sort of psychiatric care that his history and assessments called for. Instead Mr. Austin entered the Texas Department of Corrections, a system that was at that time chaotic and broken. [48]

Mr. Austin entered the Texas Department of Corrections on July 2 1979, when he was assigned to the Ferguson Unit. [49]  Mr. Austin was twenty years old. As a young homosexual prisoner who was small for his age he was left vulnerable to an environment recognized to be severely deficient in its ability to protect its prisoners. See Ruiz. v. Estelle, 503 F.Supp. 1265, 1280 (S.D.Tex. 1980) (noting the "ever-present risk of assaults, rapes, and other violence").

As a result of his status as an identified homosexual he was placed in restricted, "safe keeping" environments for a significant part of this time.  As an identified homosexual in mainstream population or even in safekeeping Mr. Austin was forced to endure a highly stressful prison environment in which he was constantly at risk of assault and sexual exploitation. During

---

[48] The TDC environment of 1979 in which Mr. Austin was placed was so disastrous as to found to be in violation of the United States Constitution and state law in numerous areas, including: (1) prisons were grossly overcrowded and sanitation and recreational facilities were wholly inadequate; (2) health care was inadequate; (3) hearing procedures for discipline was inadequate; (4) access to courts was inadequate; and (5) fire safety and sanitation standards were in violation of state law and the constitution. Ruiz v. Estelle, 679 F.2d (5th Cir.1982).
[49] Exhibit 99 - Letter from Thomas Warren, SCC Assistant, Texas Department of Criminal Justice July 14, 2005

this period Mr. Austin was assessed as having a "severe character disorder",[50] was referred for ongoing psychological consultation (though this did not eventuate) and was noted on a number of occasions to have psychological and self-harming issues.[51]   No individual treatment was available to Mr. Austin.  Mr. Austin's mental illness and his upbringing both make it impossible for him to usefully participate in group therapy and so he was effectively denied mental health care during his time in custody.[52]

On July 19, 1979 Mr. Austin was transferred to the Wynne Unit, where he spent time housed in solitary confinement[53] and on cell restriction.[54]   In the <u>Ruiz</u> litigation prisoners testified to the despair and irrationality they would experience as a result of solitary confinement in the same conditions to which Mr. Austin was subjected, including a diet of only 10-16% of a person's daily nutritional needs.[55]

---

[50] <u>Exhibit 28 – TDC Records</u>, Psychological Evaluation (p.2831-2), 6/27/1979.

[51] <u>Exhibit 28</u> – TDC Records, Psychological Evaluation (p.2831-2), 6/27/1979 (referred for psychological monitoring and assessment of self-harm risk.); unlabelled entry (p.2826), ("This inmate has a deep-seated, long lasting conflict with his father which has a lot to do with his present personality problems."); Clinic notes (p.2803), 11/7/1983 ("possible nervous condition patient states is hyperactive");  Individualized Treatment Plan (p.2827), 1/26/1984 (noting history of "self-mutilation" and "Potential self-threat"); Progress Notes (p.2825), 5/6/1986 ("Due to patient history, he will be refer to appropriate psychiatric personnel");  Clinic Notes (p.2822) ("Chain review SIAP will refer to unit psychologist due to past psych . . . This inmate has not been seen since 3-10-88, has past suicide attempts.").

[52] <u>Exhibit 15 - Harris County Sheriff's Office Medical Records</u>, MHMRA Adult Mental Health Forensic Services Pre-Trial/ Screening Intake (p. 4058-4060), 04/08/2002 ("Consumer states that he does not plan to seek counseling in TDC because only therapy is offered and he does not want to discuss his problems in a group. He states that he feels that individual counseling has helped him."); (p. 4094-4099), 02/25/2002 ("Other treatment reported by consumer: 79 psychologist Wynne Unit- just saw a couple of times but would not cooperate, 76 tried family counseling in Killeen but wouldn't cooperate");

[53] <u>Exhibit 13 – TDC Records</u>, Disciplinary Report (p. 4669), 7/3/1984; Disciplinary Report (p. 4664), 6/25/1985. On information and belief, at the Wynne unit, in 1979, in solitary confinement Mr. Austin had no reading material, except one Bible and some stamped envelopes, a three-inch thick mattress, a raggedy blanket, one jumpsuit, no socks, no underwear, one shower per week, a full meal every third meal, and in between every third meal, one spoon of vegetables, a slice of bread, and a cup of water.  He would not receive toothpaste or toothbrushes.  Instead, he would be given a stick like on a tootsie roll pop with some foam tied to the top of it and a pink substance on the end. The cells in solitary confinement were approximately 5 feet by 9 feet.  The guards controlled the light because the switch was on the outside of the cell.

[54] <u>Exhibit 13 – TDC Records</u>, Disciplinary Report (p. 4668), 8/20/1984; Disciplinary Report (p. 4662), 7/24/1986; Disciplinary Report (p. 4663), 8/8/1985; Disciplinary Report (p. 4661), 12/19/1985.

[55] The court lamented that it could not find these solitary confinement conditions unconstitutional per the Eighth Amendment due to 5th Circuit precedent, but held TDC's arbitrary sending of prisoners in violation of its own rules

On April 2, 1986 Mr. Austin was transferred to the Clemens Unit from where he was taken to the Beto 1 Unit on May 1 1986.  Mr. Austin spent approximately six and a half years at Beto 1.[56]  Again he spent periods on cell restriction.[57]

In the Ruiz litigation the court recognized the severe deficiencies that existed in TDC's ability to protect its prisoners.  See Ruiz. v. Estelle, 503 F.Supp. 1265, 1292 (S.D.Tex. 1980) ("inmates live in a climate of fear and apprehension by reason of the constant threat of violence").

When Dr. Craig Haney[58] testified in Ruiz v Johnson  in 1999,  he observed that at the Beto 1 Unit and the Eastham Unit (where Mr. Austin was later incarcerated) an "institutional resistance to resolving serious safety problems pervad[ed] the system."  Ruiz v. Johnson, 37 F.Supp.2d 855, 915 (S.D.Tex. 1999).  Shockingly, this was the testimony of what the system was like even after the court acknowledged that the prison system in Texas had improved.[59]  Before these improvements, when Mr. Austin was housed in Beto 1, conditions were even worse and Mr. Austin's status as mentally ill, young, and an identified homosexual left him particularly vulnerable.

On December 13 1989, Mr. Austin was transferred to the Ellis 2 Unit (now Estelle).  On February 6, 1990, Mr. Austin was returned to the Beto 1 Unit, from which he was moved to the Coffield Unit on September 9, 1990.

The conditions of Mr. Austin's confinement throughout this entire period and the denial

---

amounted to an independent due process violation. Ruiz. v. Estelle, 503 F.Supp. 1363 (S.D.Tex. 1980)

[56] Exhibit 99 - Letter from Thomas Warren, SCC Assistant, Texas Department of Criminal Justice July 14, 2005

[57] Exhibit 13 – TDC Records – Disciplinary Reports (p.4647-4657), 3/3/1986-11/2/1989.

[58] The court went into considerable detail in describing Dr. Haney's qualifications when qualifying him as an expert. Ruiz v Johnson, 37 F.Supp.2d at 908, n. 93 (citations to the record omitted).

[59] The court still found that the system was lacking in its failure to adequately protect inmates from sexual assault from other inmates, the reliance of guards on "the physical control of excessive force to enforce order" and the deprived environment of administrative segregation. Ruiz v. Johnson, 37 F.Supp.2d 855, 940 (S.D.Tex. 1999).

of effective mental health services was a violation of minimum standards for the treatment of prisoners, Texas law, the Eighth Amendment and international standards.

On July 24, 1991 Mr. Austin was released from custody under mandatory supervision to Harris County.

***Mr. Austin was paroled and tried to get his life back together after being incarcerated but was free for only a year***

Mr. Austin was paroled in July 1991 to reside with former inmate and lover John Maranto.[60]   He took a job at a bakery and moved out of Maranto's apartment when Maranto descended in to drug use and dealing.[61]

During this time Mr. Austin struck people as having psychological problems[62] but also showed a positive side to his character.[63]

Mr. Austin took a job at Moeller's bakery, where he proved a hard worker, kept to himself and was even described as "a blessing" by a fellow worker.

> Perry Austin was a hard worker. He often worked on Sundays painting or doing odd jobs for extra money. I felt that he was trying to get his life back together after being incarcerated. . . . Most of the time, he just worked hard and kept to himself. I thought of him as being like the straight B+ student at school who was perfect and behaved but could not handle being teased. . . . Perry was like a

---

[60] John Maranto and Mr. Austin had been companions in prison.  Mr. Maranto's criminal history includes car theft, aggravated robbery with a deadly weapon and possession of drugs with intent to distribute. Exhibit 31 – Certificate of Disposition (p.4766-68);  Exhibit 30 – Houston Police Department Records.  John Maranto was murdered on 3/12/1998 and was noted as a known drug dealer who liked young boys and was murdered on the way to a drug deal.  Exhibit 30 – Houston Police Department Records (p.2182-2220).

[61] Exhibit 40 – Statement of Margaret Maranto ("My brother John dealt drugs and Perry was not involved. John was dealing long before Perry was released from prison."); Exhibit 59 – Statement of Jennifer Ortega ("I never saw him deal or take drugs . . . Perry Austin was not involved in dealing drugs. I believe that I would have been aware of it if Perry Austin was dealing drugs because I was with him all the time."); Exhibit 82 – Statement of Michael Goodner (John Maranto was dealing drugs); Exhibit 84 – Statement of Craig Clinton Poag (John Maranto was dealing drugs)

[62] Exhibit 40 – Statement of Margaret Maranto ("I remember that Perry Austin had behavioral problems . . . I believe he had psychological problems that made him nervous around people. He seemed like he was scared of people."); Exhibit 56 – Statement of Johnny Springs (Describing Mr. Austin's powerful personal reaction to a young boy at the bakery being bullied and his own sensitivity to being teased.")

[63] Exhibit 40 – Statement of Margaret Maranto ("Perry was always very quiet and shy. I never saw him behave ugly. . . . Perry was a nice, polite guy")

blessing falling on us. He was quiet, kept to himself and knew that he could do what he had to do and just did it.

Exhibit 56 – Statement of Johnny Springs.  He is remembered as someone who was trying to

make a real effort to make a go of it:

> I believe that Perry was a person trying to bounce back the honest way . . . He was a fighter, and was fighting and felt like he was getting back on top

Exhibit 56 – Statement of Johnny Springs

While at the bakery Mr. Austin began to see a co-worker, Lora Krier.  Ms. Krier called

off the relationship in order to placate her husband but introduced Mr. Austin to her underage

daughter, Jennifer, and encouraged them to form a relationship.[64]  While it is true that Jennifer

was underage and that this relationship was therefore unlawful, those who knew the couple

believed that Mr. Austin truly loved Jennifer and it is clear that the relationship was

consensual.[65]

> I entered the relationship with Perry Austin fully aware of what I was doing. I was mature for my age. I started working at Moeller's Bakery with my mother when I was twelve. I had previously had a relationship with an older man . . . and recommenced the relationship . . . when Perry Austin went to prison. . . . My relationship with Perry Austin was consensual. I thought this at the time, and now that I am older, my opinion has not changed. He treated me respectfully and was good to me.

Exhibit 59 – Statement of Jennifer Ortega, (April 19, 2004).

Through his relationship with Jennifer Mr. Austin came to meet KK and DK.  During this

period John Maranto was dealing drugs and was using children to sell drugs for him, including

---

[64] Exhibit 56 – Statement of Johnny Springs ("Perry Austin had a relationship with Jennifer Ortega. Jennifer Ortega was the daughter of another employee, Lora Krier. Jennifer was underage at the time, but I know that Lora consented to the relationship. I remember that Lora actually encouraged Perry and Jennifer to date."); Exhibit 59 – Statement of Jennifer Ortega ("I met Perry Austin through my mother, Lora Krier. . . . Perry Austin would come over to the house to visit with my mother. This is how we started dating. . . . My mother was aware of my relationship with Perry Austin.")

[65] Exhibit 56 – Statement of Johnny Springs ("Perry told me that he loved Jennifer and that they would be married one day. . . . he was in love with Jennifer and knew that they were going to get married.")

KK, the elder brother of the deceased.[66]   A dispute arose between Maranto and KK when Maranto became paranoid and believed that KK was stealing from him.  Maranto asked Mr. Austin for help and Mr. Austin, once again loyal to a fault, took a day off work to look for KK. Ultimately, he encountered DK and the two set off to look for KK together.  Unable to find him they went to Mr. Maranto's apartment where Mr. Austin left DK in order to search further for KK. In Mr. Austin's absence, John Maranto tied DK up[67] and apparently placed him in a back room of the house where he accidentally suffocated as a result of his bonds.  Upon his return Mr. Austin discovered that DK had died and assisted by disposing of the body.

The story is succinctly told in the conclusions of veteran police officer and polygrapher, Joe Bartlett:

> No reactions indicative of deception were noted by the examiner to relevant questions asked the subject concerning the death of DK.  In the opinion of the examiner the subject is being truthful when denying that he killed DK.  In the opinion of the examiner the subject's involvement in this case consists of 1) him picking up DK and taking DK to John Maranto's apartment, 2) removing DK's body from the apartment and 3) disposing of the body where it was found.

Exhibit 60 - Letter from Joe Bartlett, Jr., Polygraph Examiner.

Mr. Austin was cooperative with the investigation, despite the heavy handed way in which he was targeted and in which his history was paraded before the community in which he had tried to build a life.[68]

---

[66] Exhibit 82 – Statement of Michael Goodner ("John Maranto was a drug dealer the entire time I knew him. I clearly recall that he had kids all over town dealing dope for him. I remember him chewing kids out on the phone when he thought they had stolen from him.");  Exhibit 84 – Statement of Craig Clinton Poag (John Maranto "He was dealing drugs when I knew him.");  Exhibit 59 – Statement of Jennifer Ortega ("I never saw [Perry Austin] deal or take drugs.  I knew other people who dealt drugs, including KK.").   KK's record shows convictions for serious drug and weapons offenses.   Exhibit 24 - Harris County Clerk Certificate of Disposition (p.5104-6) and Publicdata.com Arrests (p.5107-38).

[67] Exhibit 84 – Statement of Craig Clinton Poag ("I was friends with John Maranto before he was murdered in 1998. John told me that he tied people up. I know that he did this because he showed me ropes and toys he used. John was by my standards a bit weird.")

[68] Exhibit 56 – Statement of Johnny Springs ("The Houston police Department was very heavy handed and

While the state could not build a case against Mr. Austin for DK's death they prosecuted him for his relationship with Jennifer. When Mr. Austin was prosecuted for his relationship with Jennifer he saw his attempts to create a life on the outside collapse and was completely devastated.

> What really stuck in my gut all these years was that he was in love with Jennifer and knew that they were going to get married. He was a fighter, and was fighting and felt like he was getting back on top and all the wind went out of his sails when Jennifer and Lora pressed charges – the wound goes real deep. Perry felt as if he had been used and as a result nothing else mattered to him, everything that was good in his life was gone in a moment. He put so much confidence in one thing and when that happened he lost confidence in everything.

Exhibit 56 – Statement of Johnny Springs. Mr. Austin entered a plea of guilty and requested a sentence of life imprisonment. He was sentenced by a jury to 30 years imprisonment.

Those who knew Mr. Austin during this period have long believed that his confession was false.[69]

***Mr. Austin returned to prison with a sentence that would see him die there and in the pitiless crucible of administrative segregation him mental illness bloomed into suicide***

On May 5, 1994 Mr. Austin returned to TDC custody where he was assigned to the Eastham Unit on September 28, 1994 after a brief period in transit at the Tulia Unit. At the Eastham Unit Mr. Austin was a victim of administrative apathy regarding his safety. This indifference to the safety of, and consequences for, its wards was condemned by the court in

---

unprofessional in the way they investigated Perry, including the way that they arrested him. Perry was always cooperative and would tell them that he would be at the bakery and wasn't going anywhere. Notwithstanding this, they arrested him while he was driving his car in an ambush style arrest with gun's drawn. Sgt. Allen also told people things about Perry that was none of their business, I remember him being up in Vic's face telling him a whole lot of stuff that didn't amount to much of anything.")

[69] Exhibit 56 – Statement of Johnny Springs ("I was completely shocked when I heard that Perry had confessed as I had gotten to know him a bit at the bakery. I would not be surprised if it turned out that this was a false confession."); Exhibit 59 – Statement of Jennifer Ortega ("When Perry Austin confessed to killing DK as an act of revenge against KK for stealing Perry Austin's drugs, I did not believe it. I did not believe it because Perry Austin was not involved in dealing drugs. I believe that I would have been aware of it if Perry Austin was dealing drugs because I was with him all the time.")

Ruiz v Johnson, 37 F.Supp.2d at 916.[70]

Mr. Austin was placed in solitary confinement five hours after arriving at the Eastham Unit after defending himself against a threat of sexual assault. The Ruiz court acknowledged the existence during the period that Mr. Austin was being held of a pervasive environment in which "[the] more vulnerable inmates are raped, beaten, owned, and sold by more powerful ones. Despite their pleas to prison officials, they are often refused protection". See Ruiz v Johnson, 37 F.Supp.2d at 940. The lack of protection against sexual assault was observed to be particularly bad at the Eastham Unit by Dr Craig Haney. See Haney at 2751.

In 1999 the court in Ruiz v Johnson found that psychiatric care in TDC was negligent and inadequate.  Johnson, 37 F.Supp.2d at 861.  The court noted that expert "Dr. Metzner found 'systemwide deficiencies' in the mental health care system."  Id. at 903 (citations omitted).  Even with the poor quality of mental health care and monitoring in the prison, Mr. Austin's mental health problems were observed.[71]   Mr. Austin was, however, a victim of "[t]he problems, as related by Dr. Metzner, [that] include 'not recognizing or minimizing symptoms indicative of major mental illnesses by either over-diagnosing malingering or 'no Axis I diagnosis.' As a result of the inadequacies described by Dr Metzner, Mr. Austin remained untreated.

---

[70]     To preserve their physical safety, some vulnerable inmates simply subject to being bought and sold among groups of prison predators, providing their oppressors with commissary goods, domestic services, or sexual favors.  The lucky are those who are allowed to pay money for their protection.  Other abused inmates find that violating prison rules, so that they may be locked away in single cells in administrative segregation, is a rational means of self-protection, despite the loss of good time that comes with their "punishment."  To expect such a world to rehabilitate wrong-doers is absurd.   To allow such a world to exist is unconstitutional.
Ruiz v Johnson, 37 F.Supp.2d at 916
[71] Exhibit 28  Clinic Notes Texas Department of Criminal Justice Institutional Division, " M Vincent: Assessment: Impairment of Mental Status." p24 05/22/1996, Diagnostic and Evaluation Report, by Angela D, Broadus, M.A., Clinical Psychologist, Diagnostic II, "Inmate Austin was identified as possibly manifesting signs and symptoms of psychiatric illness. Consequently he was referred to the Diagnostic & Evaluation Process to determine if he was in need of mental health services  and to provide information to the Classifications Committee. Results of the clinical interview suggested that he was currently experiencing no significant psychological difficulties. Therefore, he does not require, nor did he request, any mental health services at this time, 09/30/1994.

After continued threats on Mr. Austin's life and the lives of his friends, and despite continued pleas by Mr. Austin, his friends, and their families for protection, the administration failed to act. Within "a system in which a tremendous amount of responsibility is placed on prisoners themselves to take care of their own problems" [72](*Haney testimony* at 2751). Mr. Austin felt forced to act out to protect his and his friends' lives[73].

Mr. Austin was placed in administrative segregation in August 1995 where he remained until 1998.[74] On September 30, 1997 he was sentenced to twenty years for aggravated assault with a deadly weapon.[75]

> Perry stabbed another inmate, Spencer Franklin, because he and a prison gang, the Dallas Crips, were threatening to kill Perry, Tony Coats, Kevin Batts, John Roberts, Rodney Robertson and myself. They passed written threats to us through the broken windows in the day room. These were death threats. We were verbally threatened as well. The administration knew all of this because my mother, Frances Goeglein, my sister Rebecca Goeglein and Denise Lindsey wrote and told them that we were being harassed and constantly receiving death threats. Perry endured it for a long time but he was obsessed with the fear that one of us would be killed. Finally he broke and struck out. The situation caused him a lot of distress; he was not right in his head, not rational, before the stabbing.

Exhibit 87. Affidavit of Richard Goeglein See also Exhibit 71 Affidavit of Robert Richardson[76]

Following the prison stabbing Mr. Austin was placed in administrative segregation for

---

[72] Dr Haney considered this to be particularly true of the Eastham and Beto 1 Units.

[73] Exhibit 71 Affidavit of Robert Richardson ("We were all scared and believed that at least one of us would be killed.") , Exhibit 87. Affidavit of Richard Goeglein ( "Perry endured it for a long time but he was obsessed with the fear that one of us would be killed. Finally he broke and struck out. The situation caused him a lot of distress; he was not right in his head, not rational, before the stabbing").

[74] Exhibit 28 Texas Department of Criminal Justice Institutional Division Pre-Segregation Health Evaluation

[75] Exhibit # Warren Letter *Supra*

[76] Exhibit 71 Affidavit of Robert Richardson ("The incident arose because the man who was stabbed had put a hit out on Perry Austin, Tony Coats, Richard Goeglin, Kevin Batts, and myself. The Crips were harassing us; they would follow us around and make death threats. We were all scared and believed that at least one of us would be killed. The hit was put out on us because Kevin and Spencer Franklin, who was the man who was stabbed, were lovers. Kevin wanted to end the relationship.  Spencer Franklin became jealous and believed that it was us who were influencing Kevin to end the relationship. One day in 1995 Perry and Spencer Franklin got into a fight. Perry was stabbed in the neck and he stabbed Franklin.")

approximately three years.[77]  Mr. Austin coped very poorly in this environment, and his mental

state deteriorated in the segregation environment.   The conditions in segregation included

unlawful violence by staff,[78] sub-standard physical conditions[79] and food[80], unlawful denial of

exercise and educational materials, and prolonged periods of isolation.   As an already mentally

ill person Mr. Austin was very vulnerable to the negative effects of isolation, and these years

increased the depressive aspects of his illness.

     Mr. Austin was assigned to administrative segregation in the Wynne Unit, the Beto I

---

[77] On information and belief Mr. Austin spent the vast majority of this time in Level II and several months in Level III.

[78] Exhibit 71 Affidavit of Robert Richardson ("Another time guards slammed me down, smashed my head against the concrete and punched me several times. I was cuffed the entire time. After the beating they took me to the infirmary."), Exhibit 53. Affidavit of Alan Fontenot ("In Eastham segregation guards have their cliques and they are down together and look out for each other so will turn a blind eye to neglect or abuse of inmates. I've seen guards in the segregation section throw inmates down stairs in the presence of other guards. I have witnessed guards going to shake down a cell and instead of going to the cell of the inmate with whom they have a grievance they will go to the identical, corresponding cell of another inmate on another pod. It seems like they wait until the second guy is at recreation and they knock on his door. He doesn't answer, of course, because he is not in his cell. They will video tape this and call it a failure to obey orders. They will then go to the pod on which the first inmate lives and run in on him for this failure to obey orders. What we call the 'goon squad', five guards, with a shield, pepper spray, helmets and full protective gear will run in on the inmate. They will throw him on the ground and cuff him and depending on how badly they have beaten him up, take him to the infirmary or the hold over cell. I have heard the guards boasting about these types of stunts. Eventually the administration took some of the members of the goon squad off the segregation section because they were doing this too much."); Exhibit 52. Affidavit of Bernard Richard (" Some of the guards would beat inmates, if inmates cussed at them or made them mad. They would come to your cell and cuff you and tell you that you had a visit, or need to see the sergeant, so that you would come out of your cell and then they would beat you up. This usually happened with two or three guards beating an inmate. This never happened to me personally, but I witnessed it often. This is something that inmates feared. When news guys came into administrative segregation and did not know how things were, they quickly found out. I remember a guy called Christopher Hardman; He witnessed a guard beating up an inmate and that inmate filed a law suit about it. Christopher was a witness for the suit. Christopher was then beaten so badly and placed in a lock down cell for about two weeks until he was healed. He was never taken to the infirmary. I know that he was not taken to the infirmary because I (was) in lock down five or six cells down the run and he spoke to me everyday.")

[79] In the summer temperatures would rise to 120 degrees in there.  The administrative segregation cells were infested with roaches and spiders including brown recluses and black widows.  Inmates were not allowed any hygiene products beside state issued little squares of soap.  Inmates would flood their cells.  Exhibit 52 Affidavit of Bernard Richard ("As inmates, we were often denied basic items like toilet paper and cleaning supplies for the cells. It seems like you needed to make trouble to get these basic items, this was very frustrating.")

[80] Exhibit 71. Affidavit of Robert Richardson ("At Eastham the officers used to mess with you a lot. They will feed you cold food or make you go for sometimes fourteen hours with no food, and then stack up three meals a couple of hours apart.").

Exhibit 52.Affidavit of Bernard Richard (" The meals in administrative segregation are much smaller and of lesser quality than in general population. All prisoners in Texas are supposed to get eight ounces of food per meal. At Eastham Unit, on segregation, we were given much less than eight ounces, we were rarely given the full serving. If you did not supplement your meals with food from the commissary you were going to lose weight. Guys who had no

Unit, the Estelle Unit, the Hughes Unit, and the Eastham Unit,[81] all of which were criticized for their treatment of segregated inmates.  *See, e.g.,* Estelle, 503 F.Supp. at 1293, 1301, 1313; Johnson, 37 F.Supp.2d at 909, 911; Riveland testimony at 787; Breed testimony at 1119, 1164; Haney testimony at 2720.

The Ruiz court in 1999 found that the experts had revealed the conditions in administrative segregation housing to be a "frenzied and frantic state of human despair and desperation."  Ruiz v Johnson, 37 F.Supp.2d at 913.  The court found

> by a preponderance of the evidence that inmates in administrative segregation, particularly those in Levels II and III, are deprived of even the most basic psychological needs.  More than mere deprivation, however, the court found that TDC's administrative segregation regime violated the Eight Amendment because these inmates suffer "actual psychological harm from their almost total deprivation of human contact, mental stimulus, personal property and human dignity

Id. at 913-15.

As a mentally ill prisoner Mr. Austin's "deplorable and outrageous" incarceration in administrative segregation was unconstitutional Id. at 940.

In Ruiz v Johnson Dr Haney testified that the conditions in Texas' administrative segregation units, particularly the Eastham and Beto1 Units where "as bad or worse as any I've seen". He explained:

> The bedlam which ensued each time I walked out into one of those units, the number of people who were screaming, who were begging for help, for attention, the number of people who appeared to be disturbed, the existence, again, of

money for the commissary would suffer.")
[81] *See* TDC Visual Activity Data Form 4/7/80, Exhibit 28 at 2847, TDC  Optical Prescription 5/8/80, Exhibit 28 at 2848, Clinic Notes 4/9/85-4/18/86, Exhibit 28 at 2795-2799, TDC Clinic Notes 7/12/79-3/22/84, Exhibit 28 at 2802-2819, TDC Mental Health Services Unit Individualized Treatment Plan 1/26/84 at 2827-2828; *See* TDC Clinic Notes 12/31/86-12/13/89, Exhibit 28 at 2789-2792, TDC Clinic Notes 2/3/88-3/10/88, Exhibit 28 at 2823-2824; *See* TDC Clinic Notes 12/15/89-8/23/90, Exhibit 28 at 2785-2788, TDC Clinic Notes 12/18/89-9/11/90, Exhibit 28 at 2822.  *See* TDC Pre-Segregation Health Evaluation, Exhibit 28 at 2527; TDC Pre-Segregation Health Evaluation, Exhibit 28 at 2526; TDC Pre-Segregation Health Evaluation, Exhibit 28 at 2525; TDC Pre-Segregation Health Evaluation, Exhibit 28 at 2524.

people who were smeared with feces, the intensity of the noise as people began to shout and ask, Please come over here.  Please talk to me. Please help me.  It was shattering.  And as I discussed this atmosphere with the people who worked here, I was told that this was an everyday occurrence, that there was nothing at all unusual about what I was seeing.

Ruiz v. Johnson, 37 F.Supp.2d at 910.  Inmates held in administrative segregation in Eastham bear witness the mental decomposition of men psychologically more robust than Mr. Austin.[82] The Ruiz court recognized that the conditions of confinement in Administrative Segregation constituted an "almost total deprivation of human contact, mental stimulus, personal property and human dignity" and this alone was mental illness inducing and unconstitutional, Johnson, 37 F.Supp.2d at 913.

Mr. Austin's psychological suffering was observed by other inmates who have described his worsening mental state, increased isolation and reduced communication, evidence of self-harming behavior and Mr. Austin being reduced to a near catatonic condition, not moving or even eating for days at a time.[83]

The court criticized TDC for its deliberate neglect of prisoners' needs:  "it is determined

---

[82] Exhibit 52. Affidavit of Bernard Richard ("The cells mess with you mentally; you need to be strong mentally to be locked up 23-24 hours a day. I saw guys that I knew from population who came into segregation and it was like the cells were getting smaller, closing in on them. Soon enough they start breaking down mentally, I remember guys talking about hanging themselves"), Exhibit 53 Affidavit of Alan Fontenot .("A lot of guys start to cut themselves. I think they do this just to get out of the cell because they cannot handle it anymore. My next door neighbor "Big Heavy" hung himself. He was 25 years old and had been in segregation for a year. I know that other people have cut their necks and wrists. I think this happens to people because they are locked up for 23 hours a day and the cells are so small. I have …..seen people with strong minds and wills be broken by administrative segregation, like my friend who hung himself ").Exhibit 71. Affidavit of Robert Richardson ("Segregation deteriorates mental capacity, it will decapitate your mental capabilities. Some guys got to thinking they were Jesus, some that they have been abducted by UFOs, one thinks he's a clone made by the Russians.")

[83] Exhibit 71. Affidavit of Robert Richardson ("I know that administrative segregation affected Perry very badly. I know this because at the time he wrote me a lot about his mental state and his sexual urges, he wrote about these things in a way that was not normal. Perry's mental state went from bad in general population to worse in administrative segregation") Exhibit 70 Affidavit of John Thompson ("Perry showed me scars from cutting himself. I think they were on his wrists. He said that he had tried to commit suicide while he was incarcerated in TDC. I don't know when he made this suicide attempt") Exhibit # Affidavit of Dempsey Sutton ("Sometimes in Segregation people would try to talk to Perry and he would say he didn't want to talk or ignore them. There were also times when he would ball up in a corner with his hands on his knees. People would come and ask him what was wrong, he would stay quiet. There were periods of two or three days where he would just lie in bed in Segregation. He

that defendants have been deliberately indifferent to the serious risks posed by subjecting [mentally ill] inmates to confinement in administrative segregation for extended periods of time." Johnson, 37 F.Supp.2d at 915. The court concluded that "extreme deprivations and daily psychological harm" endured by inmates, particularly the mentally ill "cannot stand in our society, under our Constitution". Johnson, 37 F.Supp.2d at 940.

After almost three years of unconstitutional confinement, Mr. Austin was released from administrative segregation into safekeeping[84] at the Eastham Unit. Unsurprisingly, given his experiences and his pre-existing mental illness, his mental turmoil continued. Jordan Massad was Mr. Austin's cellmate for six months after he was released from administrative segregation. And remembers that Mr. Austin

> was withdrawn and that he did not associate with other inmates....other inmates saying that he was crazy because he had been in administrative segregation for so long….. Perry seemed very depressed. He stayed in the cell all day everyday and read. The only time he left the cell was to lift weights with me. Even then Perry would not interact with other inmates.

Exhibit 37 Affidavit of Jordan Massad.[85]

While at the Eastham Unit, Mr. Austin was one of several prisoners designated for transfer to the Hughes Unit. This only made matters worse. Mr. Austin was placed in a transit cell where he was kept in isolation in many ways more profound than even administrative segregation for almost four months in violation of Texas, federal and international law. It was

---

wouldn't eat, wouldn't shower and wouldn't come out of the cell")

[84] As discussed below, the phrase safekeeping is something of a misnomer. Prisoners in safekeeping continued to be subject to violence form guards and general population prisoners. It was also common practice for predatory members of the general population to have themselves placed in safekeeping, where they could rape and "hog" more vulnerable inmates.

[85] Massad also recalled Mr. Austin talking about the death of DK ("During this time I recall Perry Austin talking about having been investigated in relation to the death of a little boy in Houston. I do not recall all the details, but clearly remember that he was adamant that he did not kill the little boy. If anyone asked a question he would say, 'I didn't do it', but would not say anything else. I felt that he was protecting somebody. I remember thinking that his brother or somebody very close to him was involved in the little boy's death.")

during this period that Mr. Austin's depressive illness became overwhelming and he wrote his suicide note to Sergeant Allen.  Before he sent the letter he received some relief and was finally transferred to the Hughes Unit.

Mr. Austin was housed as a safekeeping inmate at the Hughes Unit.  Safekeeping status is accorded to inmates who require protection from other inmates. Homosexual inmates are often kept in safekeeping. Living in safekeeping is not supposed to be punitive; inmates are theoretically entitled the same privileges as general population inmates of the same classification level. The reality of the lives of the men in safekeeping is vastly more restricted.

At the Hughes Unit safekeeping inmates are discriminated against in a number of ways; Safekeeping inmates are given fewer job options[86], fewer contact visits[87], are unable to become trustees[88], and have fewer educational opportunities[89]. Safekeeping inmates also report that they are routinely vilified and brutalized by guards at the Hughes Unit[90]. Freedom of movement is

---

[86] Safekeeping inmates at the Hughes Unit can only work as a staff Supporting Inmate (SSI)  on the administrative segregation tier, in the laundry or at the garment factory. In contrast general population inmates can choose to work in the kitchen, the chapel, with the horses, in maintenance, in school, or in the infirmary See  Exhibit # Affidavit of Anna Arceneaux Margot Vennik interviews with Jeffrey Wilson, Michael Harrell and John Creekmore

[87] On safekeeping you don't get the same opportunities as they do in general population. G1 inmates are allowed four contact visits a month with any visitor. G2 inmates are allowed only three contact visits a month, only with their immediate family. Safekeeping inmates are not awarded G1 status by the TDCJ.  See Exhibit # Affidavit of Anna Arceneaux Margot Vennik interview with Jeffrey Wilson

[88] Only G1 inmates can become trustees See Exhibit # Affidavit of Anna Arceneaux Margot Vennik interview with Jeffrey Wilson

[89] See  Exhibit # Affidavit of Anna Arceneaux Margot Vennik interview with Jeffrey Wilson  ("A safekeeping inmate is only allowed in units where safekeeping is located. So when it comes to school and certain classes that are given, safekeeping inmates don't get the same options if a class is given in a unit without safekeeping. We are simply not allowed to go there").

[90] Exhibit # Affidavit of Anna Arceneaux Margot Vennik interview with Jeffrey Wilson ("The officers who work on the safekeeping unit mess with you. They call us names and beat us up. When Perry Austin was in safekeeping at the Hughes Unit, the officers would beat someone up at least once a week. The officers are very homophobic."), Ricky Johnson ("At the Hughes Unit, officers can be aggressive. That never seemed to stop. Officers would tell me to hit another inmate to help them fix whatever problem they had with that inmate. Officers play power games with us. An officer would tell me to pick up another inmate's property. This is something an officer is supposed to do himself. Inmates are not allowed to pick up other inmate's belongings. Whenever something would be missing, they'd blame me. Or, if I refused to pick it up I would get a case for disobeying an order. We would always be the last to eat. I heard officers say things like: "Let's feed those punks last"). Michael Harrell (Certain officers at safekeeping don't treat us well. I know they are homophobic. They would organize an extra shakedown, out of hatred. They know they will get away with it. I really feel that certain officers don't like safekeeping inmates. I have

restricted, and inmates are confined to their cells for substantial periods of time.

On the Hughes unit Mr. Austin became emotionally involved with another prisoner.  In or around January 2001 this relationship broke up, and Mr. Austin was psychologically devastated[91].  During this period Mr. Austin was kept in a cell without running water and was forced to obtain containers full of water at each change of shift.  One day the cells were being searched and it was rumored that all empty containers would be confiscated.  Mr. Austin tried unsuccessfully to raise this problem with a guard and described the guard as an "idiot."  When Mr. Austin moved away the guard began to assault him.  Mr. Austin reacted and managed to knock the guard down or flip the guard over so that Mr. Austin was on top of the guard.

As a result of this incident Mr. Austin was returned to solitary confinement.  Given his history and the depressive elements of his mental illness Mr. Austin believed that he would serve the rest of his sentence in the shocking conditions of administrative segregation.  After a week of complete isolation, without so much as a bible or a pen and paper Mr. Austin was provided with his writing materials, which included the letter he had previously drafted to send to Sergeant Allen.  Under the influence of his mental illness and the severely depressive effects of his conditions of confinement Mr. Austin sent Sgt Allen a letter on or about January 20, 2001 requesting that officers help in his suicide.

***Mr. Austin is moved to Harris County Jail where he is placed in segregation and his suicidal***

---

also been locked up in safekeeping at Coffield Unit. I felt they were treating me more like a person there.")  Brian Whetstone ("The guards at the Hughes Unit were very prejudiced against the inmates on safekeeping.  I'd say that most of them are homophobic.  They would greet us by saying things like: "Hi girls.")

[91] Exhibit 74 - Affidavit of John Creekmore ("When Perry and Frank Skoff's relationship ended, he was very depressed. He said he didn't want to talk to anyone and that he wanted to be by himself. After the break up Perry lost all motivation. Losing Frank was a major set back for him psychologically."); Exhibit 73 - Affidavit of Michael Harrell ("When Perry and Frank Skoff broke up Perry was devastated; he went back into his shell, and acted strange and on edge about everything"); Exhibit 75 - Affidavit of Frank Skoff Perry was depressed when we broke up. We broke up because it was a volatile relationship and things that would be bad for other people were cataclysmic for Perry. His emotions went from zero to sixty in a second").

*behavior continues unabated*

After falsely confessing to the murder of DK, Mr. Austin was bench warranted to Harris County on March 25, 2001. Mr. Austin was housed in administrative segregation from May 1, 2001 and February 14, 2002.[92]

Documentation from Mr. Austin's incarceration in Harris County Jail, disclose a rich and devastating record of a confused and seriously mentally ill man.  His plan to end his life by the hand of the state was compromised by his return to the oppressive conditions of administrative segregation. These conditions exacerbated his already fragile mental state, and caused him to reveal, quite unwillingly, the seriousness of his impairment and its influence on his decision making.

On May 2, 2001, Mr. Austin wrote to Dr. Ned Hicks, a pastor with whom he had been corresponding and told him that he had been charged with murder after having confessed.[93]  Dr. Hicks, who had maintained a lengthy correspondence with Mr. Austin in the past, suspected that the confession was false[94] and probed Mr. Austin on the point. Exhibit 78 - Affidavit of Ned Hicks.

In a revealing letter, Mr. Austin wrote back to Dr. Hicks and, consistent with his subsequent diagnosis, described the depression that had led him to write his suicide note and the fact that he could not now change course.

> I want to thank you for your concern. It helps a lot. I am in seg right now and it is really hard. I've got too much time to think and this situation is really eating me up. I don't know that anything can be done right now. The state insists on pursuing the death penalty so I don't see how I can fight it. Yes, I confessed to it at a time of extreme depression. It was after an altercation wih the guard in

---

[92] Exhibit 14 - Transfer Sheet  ("admin move: threatened other inmates") 05/01/2001 Exhibit 14 - Transfer Sheet ("Rehouse in GP Pen") 02/14/2002
[93] Exhibit 78 - Affidavit of Ned Hicks  (Letter from Perry Austin attached)
[94] Exhibit 78 - Affidavit of Ned Hicks

January and I thought I was going back to seg. I was very surprised that I was let go but its too late to make any retractions and I don't  plan on it. I'm just going to have to face what I started. I'm sorry. Right now I just want it to be over with as soon as possible.

Exhibit 78 – Letter from Perry Austin to Ned Hicks.

On May 9, 2001 Deputy R Chacon documented that he had received a phone call from a friend of Mr. Austin's who informed him that Mr. Austin "repeatedly wrote about killing himself, he also mentioned to her that he would do it during the early hours and he would use a razor blade to achieve the suicide attempt."[95] On the same day "Deputy Miller spoke to Inmate Austin. Inmate Austin denied any such letter. [There were] no further problems". [96]

On May 14 2001, Mr. Austin underwent psychological screening where he denied any mental health history[97].

On July 19 2001, Mr. Austin wrote to Judge Cosper, pleading that he be released from administrative segregation:

Can you get me out of seg and back into population? I have not had a disciplinary case since I entered the county jail and although I have a Capital Murder charge I am sure there are others in population with similar charges. If you cannot get me out of seg, could you please move up my court date so my stay in seg will not be prolonged? My trial should last no longer than two or three days as I will be pleading guilty and will not put up a defense in this case. Also, as soon as I am able to am permitted after sentencing I will be dropping all appeals and will request an execution date as soon as is conveniently possible. That means I do not plan on being in this world too much longer and I want to spend at least what little time I do have with what little freedom there is by being out in population. I cannot handle prolonged isolation. I have a very bad problem with depression and when I get depressed I tend to think about suicide a lot. If I am forced to remain in seg too long I won't be around to stand trial. I would appreciate your consideration concerning my request.

---

[95] Exhibit 14 Harris County Sheriff's Records Detention Command

[96] Exhibit 14 Harris County Sheriff's Records Harris County Sheriff's Department Inmate Classification Section Planning and Evaluation Bureau: Referral for Psychiatric Screening

[97] Exhibit 15 - Harris County Sheriff's Office MHMRA Adult Mental Health Forensic Services Pre-Trial/ Screening Intake

(CR. 16-17) On August 8 2001, Mr. Austin wrote to the judge again asking that his trial date be moved forward so his suffering in administrative segregation would come to an end through his execution:

> I am writing again in hopes that you will consider my previous request to move my trial to an earlier date. As I mentioned in my previous letter my trial should not last more than two days as I will <u>not</u> be defending myself. I will be pleading guilty so the only thing the jury will have to assess is my punishment which you and I both know will be death. So, the sooner we get this circus over with the sooner I can die. *No, I don't have a death wish, or at least you all can't prove it,* but you and I both know that with my past and with what I have told the cops death is inevitable. So what more do you want from me? The sooner we get this over with the sooner everyone will be happy. Right!? I am even willing to waive the psych hearing/interview. I can tell you exactly what he is going to say. I am a sociopath, extremely violent, no respect for authority and no feelings of guilt. I am fully competent and definitely know the difference between right and wrong. So lets get this show on the road please.

(CR. 18)   In his next letter to Judge Cosper on August 14 2001, Mr. Austin increasingly desperate asked that his attorneys be discharged so that he can "prove" his "sincerity" in not defending himself against his capital murder charge. (CR. 20)

On September 25 2001, Dr Jerome Brown assessed Mr. Austin and found him competent to stand trial.

On October 7, 2001 Mr. Austin went on a hunger strike in protest at his continuing detention in segregation.[98] Mr. Austin was referred to the Harris County Sheriff's Department Inmate Classification Section Planning and Evaluation Bureau for psychiatric screening on

---

[98] <u>Exhibit 14 - Harris County Sheriff's Records,</u> Letter from Perry Austin to Major Berry, 10/15/2001; Detention Command, 10/16/2001 (""At approximately 1650 hours while feeding C quadrant I attempted to give inmate Austin his meal tray. I opened the pan hole and Inmate Austin stated to get that tray out of his cell that he was refusing to accept food. I again attempted to place his meal tray in the pan hole and this made Inmate Austin very agitated and he stated "Get it the Fuck out of here". Inmate Austin has placed a note in the window of 5C4-3 cell door which states: "I AM REFSUING ALL MEALS HUNGER STRIKE! Please quit trying to put food in HERE." Inmate Austin stated that he was not eaten in ten days. Inmate Austin said he is on a Hunger strike to protest his being in administrative Segregation.")

October 16, 2001.[99]

On October 18, 2001 Mr. Austin was interviewed by Karen Wilson of the Harris County Sheriff's Office Medical Services Division, because of concern about his hunger strike. Mr. Austin told Ms. Wilson that he had ended his hunger strike because a sergeant finally told him why he was in administrative segregation. Mr. Austin "complained of decreased sleep 'a couple of hours here, a couple of hours there' he states he has no interest in obtaining psychiatric assistance." Exhibit 14 – Harris County Sheriff's Records, Harris County Sheriff's Office Medical Services Division Progress notes, 10/18/2001.

Conditions of confinement were described by Greg McCracken who was also housed in administrative segregation at the Harris County Jail at the same time as Mr. Austin. Mr. McCracken spoke of deplorable mistreatment and neglect of administrative segregation inmates, in areas of recreation (inmates were forced to recreate in handcuffs and leg irons)[100], dietary restriction[101] and deprivation of stimulus.[102]   As Mr. McCraken relates, during this period Harris County Jail was a violent place in which violence towards prisoners was not uncommon:

I remember that if you made the guards mad, they would beat you.  One time

---

[99] Exhibit 14 - Harris County Sheriff's Records Harris County Sheriff's Department Inmate Classification Section Planning and Evaluation Bureau: Referral for Psychiatric Screening 10/16/2001

[100] Exhibit 14 Harris County Jail Records: Segregation Cell Record: Daily Activity Log, Exhibit 98 Affidavit of Anna Arceneaux  ("Perry and I and some others were cuffed and shackled during rec.  The guards would take us off to one side.  The shackles and cuffs meant very limited movement.  We got to do this maybe once a week.  Sometimes we wouldn't get to rec for two or three weeks.  It lasted for an hour or so. In 701, we got an hour a day to do everything – make phone calls, shower, whatever.  Your hour could be at any time of the day.  It could have been real early or real late.  In 1301, if a guard was mad at you, he would just ignore you and not let you go [to rec].  We didn't have rec at all in 701.") (Jorge Rodriguez: I remember that Perry told me that when he was in seg at Harris County that he had to wear handcuffs and shackles during his recreation time.")

[101] Exhibit 98 Affidavit of Anna Arceneaux ("I was in Harris County Jail when Tropical Storm Allison hit Houston.  I remember that for almost 2 days we were only given fruit (one piece) and milk for breakfast and a little Debbie snack and milk at night.")

[102] Exhibit 98 Affidavit of Anna Arceneaux ("In 701, there was no TV in our cells.  There may have been one in the day room, but we couldn't see it, and it could have been just a metal box where the TV was supposed to go.  I remember that Perry didn't have a TV for two weeks.  My neighbor didn't have a TV for 10 days, and I remember he cut himself.  I saw them taking him out with blood all over himself.") (Jorge Rodriguez: At Harris County, there was only one TV in the day room for 40 people.  The radios on the walls in the cells did not work when I got there in 2001.")

about six guards beat me because I was trying to get my toilet fixed.  It had been broken for almost 3 days, and no one would fix it.  I was sent to the infirmary and had a broken toe, a busted nose and my back was hurt.  I couldn't get out of bed for 2 or 3 days.  I remember the nurse at the infirmary saying "This is ridiculous. I don't know how many times I've seen this."  This kind of thing would happen in 1301 anytime you made the guards mad.

Exhibit 98 Affidavit of Anna Arceneaux.

After approximately eight months in administrative segregation Mr. Austin's suffering was acute. On January 24, 2002, Mr. Austin was referred again for psychiatric screening because he was observed to be "very depressed"[103]. The deterioration of Mr. Austin's psychological condition was obvious to his friends.[104] Dr Hicks was concerned about Mr. Austin's mental degeneration in administrative segregation and contacted the jail.[105]

Utterly despairing and irrational, Mr. Austin wrote to Major Berry in January 2002 asking that he be moved to a "double door separation" cell, an even more isolated confinement than the administrative segregation. Mr. Austin's hopelessness is palpable in his letter:

Could you please have me moved to double-door separation? I have been feeling and thinking violent and aggressive thoughts lately and they get worse as time goes on. I think you would agree that it is better to nip this in the ole rear now as a preventative measure to protect and ensure the safety of others, including myself of course. Also as you ordered, I was written up for making: threats" in my last letter. Really sir, what good does that accomplish? I'm already in ad-min

---

[103] Exhibit 14 Harris County Sheriff's Records: Referral for Psychiatric Screening 01/24/2002.

[104] Exhibit 75 Affidavit of Frank Skoff  ("When Perry was bench warranted to Harris County Jail, he wrote to me at least once a week, sometimes more. He indicated to me in his letters that he wanted to be given the death penalty. He was self-destructive and did not care about himself at all….. I remember he wrote about the flood in Houston and how the jail was flooded and there were roaches everywhere and no electricity. They were fed a baloney sandwich three times a day.") Exhibit 74. Affidavit of John Creekmore  ("I remember there was a flood in Houston and Perry complained that the court house was flooded and his trial would be delayed. I thought this was a strange thing to hear from somebody who was facing the death penalty. He said that the conditions were bad and same of his property had been stolen.") Exhibit 98 Affidavit of Anna Arceneaux Margot Vennik Interview with Ricky Johnson ("He wrote about how terrible it was in Harris County jail"), (Greg McCracken: "Perry told me more than once that he had thought about killing himself"), (Jorge Rodriguez: "I remember one time when Perry was crying with me. He told me he was so tired of "this fucking life".)

[105] Exhibit 78 - Affidavit of Ned Hicks  ("I remember talking to somebody at the Harris County Jail about my concerns for Perry's mental health while he was being kept in Administrative Segregation at the Jail. I do not recall who I spoke to but remember that I was speaking to a Captain Hughes and a Dr Cordova around that time because the Jail was sending back the bible correspondence materials I was sending to Perry")

separation. I'm out of money so I don't go to commissary. I quit going to rec since my friend caught the chain. I don't make phone calls or get visits. I guess you could take my tv but that wouldn't hurt me either. It doesn't pick up and I only use it to drown out the sound of the idiot in one cell who never shuts up. I've been in prison all my life. I've been in seg before in TDC in worse conditions than this. I am facing the death penalty and will be dead in another two or three years. I've been cliqued on and beat up by TDC guards. I've had my property trashed and/or taken away from me and left with nothing. I've been held in isolation without means of outside communication for months at a time. What more can you possibly do to me?

Exhibit 14 Harris County Sheriff's Record, Letter from Perry Austin to Major Berry, January 2002.

On February 21 2002, Mr. Austin was referred for Psychiatric Screening after stating to a Sergeant Martinez "he had sexual activity with other inmates in an attempt to get the HIV virus. He stated he fired his lawyers and was now representing himself. He stated he hoped to get the death sentence". Exhibit 14 Harris County Sheriff's Record The screening was also ordered "due to the fact that inmate Austin seems too calm and peaceful on the resolution to get the death penalty it is recommended that he is placed on a suicide watch to prevent him harming himself while in custody". He was also observed to be "very confused; distracted and preoccupied; very depressed".[106] When confronted about his behavior, he denied suicidal intent. [107]

During this screening, on February 25, 2002, Mr. Austin admitted to a "history of non compliance with mandatory psychiatric therapy…..substance abuse since he was fifteen years old". Mr. Austin also finally admits to having previously attempted suicide.[108] Mr. Austin's denial of his bizarre and sad mission to contract the HIV virus has been refuted by two of the

---

[106] Exhibit 14 Harris County Sheriff's Record, Referral for Psychiatric Screening 02/21/2002
[107] Exhibit 14 Harris County Sheriff's Record, Detention Command ("I have not at any time knowingly and intentionally engaged in sex in order to contract HIV. I am charged with capital murder, and because I have discharged my attorneys, am representing myself and am not going to defend myself against this murder charge, several people think I have a death wish. This is not true I am not depressed") 02/21/2002
[108] Exhibit 15 Harris County Sheriff's Medical Records MHMRA Adult Mental Health Forensic Services Pre-Trial/ Screening Intake

men Mr. Austin was having sex with.[109]

On February 28, 2002 Mr. Austin was diagnosed as suffering from a "depressive disorder not otherwise specified" and prescribed the antidepressant Remeron.[110]

On March 28, 2002 Karen Wilson spoke to Mr. Austin again. He told her that he had been accused by a friend of "manipulating the system in a way so that Harris County has no choice but to sentence him to death". Miss Wilson reported that Mr. Austin said that this was "probably true".[111]

On April 4, 2002 Dr M. Ferguson interviewed Mr. Austin. Mr. Austin had been sentenced to death the previous day. Dr Ferguson observed:

> Mood dysphoric, affect blunted. Reduced psychomotor activity. Speech soft, fairly productive but usually only answers questions put directly to him. Sallow complexion, darkened circles under his eyes.

Exhibit 15 Harris County Sheriff's Medical Records, Medical Services Division: Progress Notes

On April 8, 2002 Karen Wilson interviewed Mr. Austin:

> MHMRA ……..Consumer states that he is not afraid to die, but suspects he'll become scared as the time gets closer. He states that right now he is most upset about being moved away from friends in 801 and back into a segregation cell.[112]

Exhibit 15 Harris County Sheriff's Medical Record, Division Progress Notes 04/08/2002.  Mr. Austin also revealed to Wilson, why the Texas Department of Corrections had been so

---

[109] Exhibit 70 Affidavit of John Thompson ("Perry told me he wanted to die. He had unprotected sex with me knowing that I am HIV positive, he said that he wanted to get HIV and that he did not care about his life, he wanted it over as quickly as possible. He said he wanted the trial over and wanted the death sentence. His whole intent was to get the death sentence and he did not want anything to hinder that.) Affidavit of Anna Arceneaux, Interview with Fabian Rodriguez ("Perry had unprotected sex with me even though he knew I was HIV positive.  He said he did not care about getting HIV.  It did not bother him at all.  Perry told me that he wanted lethal injection so he could die. He told me he was going to die anyway.)

[110] Exhibit 15 Harris County Sheriff's Medical Records

[111] Exhibit 15 Harris County Sheriff's Medical Records Harris County Sheriff's Office Medical Services Division, Progress Notes.

[112] id Harris County Sheriff's Office Medical RecordsHarris County Sheriff's Office Medical Services Division Progress notes 04/08/2002

ineffective in treating his mental illness,

> Consumer states that he does not plan to seek counseling in TDC because only therapy is offered and he does not want to discuss his problems in a group. He states that he feels that individual counseling has helped him.

Finally, Mr. Austin elucidated why he had chosen such a complicated mode of suicide,[113]

> He…. stated that though he will not ask for forgiveness he will never commit suicide because he knows that forgiveness from God will be impossible at that point "It's a sin".

> This consultation was only days after Mr. Austin's trial had resulted ina conviction and

death penalty.

Mr. Austin has now been subjected to a detailed psychological and psychiatric assessment involving reliance upon multiple clinical interviews, psychometric and neuropsychological testing, review of records, review of previous assessments and review of information from collateral informants. Exhibit – 93 Statement of Antoinette R. Cicerello; Exhibit 95 – Statement of Dr. George Woods. These reports are obviously central to the applicant's claims and while they are discussed in detail below the Court is urged to read them in their entirety.

Dr. Woods has reliably and persuasively expressed the opinion that Mr. Austin was incompetent to stand trial or to be allowed to waive counsel and plead guilty. Exhibit 95 – Statement of Dr. George Woods.

The case for competency is unsupported by the wealth of material now available and instead rests on an inadequate psychological examination based upon lies and misinformation; a waiver colloquy of insufficient depth that was, in any event, vitiated by lies; and, the opinion of

---

[113] See also Exhibit 98 Affidavit of Anna Arceneaux (Greg Mc Cracken: " I remember that Perry told me one time [while he was in administrative segregation] that he wished he could just end his life, but he didn't want to end his own life because he didn't want to go to hell."

counsel[114] who had seen Mr. Austin at the jail once and was unaware of the depth and breadth of

Mr. Austin's history of mental impairment.

## CLAIMS

The applicant presents 24 claims, which have been arranged under thematic headings and

save for the first and last claims, they proceed in the approximate order in which they arose as

these proceedings unfolded. The last claim was included but not enumerated in the initial petition

and so has been moved to the end and labeled Claim 24.

### THERE HAS BEEN A COMPLETE COLLAPSE OF THE ADVERSARIAL TRIAL PROCESS WHICH HAS CREATED A DEATH VERDICT OUT OF PROCEEDINGS THAT WERE WHOLLY UNCONTESTED

**CLAIM I.**     **The death penalty imposed in this case has been imposed in violation of the Federal and Texas Constitutions because it resulted from a complete collapse of the adversarial trial process to a point at which the conviction and sentence cannot be regarded as reliable or as having been produced by a jury trial as understood in American jurisprudence.**

Perry Allen Austin is a seriously mentally ill man and has been all of his life.[115]  He has

now confessed to a crime he did not commit in a deranged bid to have himself executed.  Mr.

Austin has a history of suicide attempts dating back to his early teens, and this trial was simply

the latest and most elaborate.  It would be a disservice to our criminal justice system to honor

---

[114] Defense counsel's opinions can be useful in some cases but carry little weight in a case like the present:
> While defense counsel may often be in the best position to evaluate a client's ability to participate in his defense, a lawyer is not a trained mental health professional capable of accurately assessing the effects of paranoid delusions on the client's mental processes (*Odle v. Woodford*, 238 F.3d 1084, 1088-89 (9th Cir. 2001) (cert. denied, 534 U.S. 888, 151 (2001)). Courts must resist the unquestioning acceptance of counsel's representations concerning client competence (*Drope v. Missouri*, 420 U.S. 162, 177 n.13 (1975)).

United States v. Timmins, 301 F.3d 974, 981 (9th Cir. 2002).

[115] See allegations and evidence detailed in claims regarding competence.

Mr. Austin's suicide attempt.

Until January 2001, Mr. Austin was serving a fifty-year prison term, much of which he had served in segregated environments as a result of his vulnerability as a known homosexual or due to his own misconduct.  In January 2001 Mr. Austin was once again in segregation and his suicidal depression came to a head.  Driven by his mental illness, he wrote to a sergeant of the Houston Police Department offering to confess to the murder of a child a decade earlier on the condition that he would be guaranteed the death penalty.  RR. X-25.  Sergeant Allen went to see Mr. Austin the next day, and Mr. Austin made a false confession to the murder.

Mr. Austin did not kill the child and is not guilty of the crime for which he has been sentenced to death.[116]  He has since passed a polygraph confirming his innocence.  Ex. 60 - Report of J. Bartlett  Even Sergeant Allen did not believe that Mr. Austin's confession was completely truthful.  RR.X-33-4.

Mr. Austin was indicted in February 2001 and an attorney was appointed for him a short time later.  Ironically, [117] the trial was listed before Judge Caprice Cosper in the 339th District Court of Harris County, Texas.

Six weeks after the attorney's appointment, immediately following the attorney's first and only visit to Mr. Austin at the Harris County Jail, Mr. Austin's attorney told the Harris County Sheriff's Office that Mr. Austin was planning to kill a fellow prisoner.[118]  Mr. Austin was once again transferred to segregation.

Mr. Austin spent the next year writing a series of letters to Judge Cosper urging that the

---

[116] See allegations and evidence detailed in claims regarding actual innocence.
[117]    In one of the many dark ironies in this case Mr. Austin's case was allotted to a judge who was a former capital prosecutor in Harris County and who, in those days, referred to herself as a middle of the road extremist and kept a noose hanging over her door.  Exhibit 21 – Newsweek, "The Fryers Club Convention", (8/27/1990).
[118] See allegations and evidence detailed in claims regarding counsel's conflict of interest.

proceedings be brought forward because, to use his own words, "the sooner we get this circus over with the sooner I can die." Letter to Judge Cosper, August 9, 2001, CR.18-19.  In a number of those letters Mr. Austin stated that he wished to represent himself.  See for example CR.20-21 (August 14, 2001); CR.5-6 (April 17, 2001).

Defense counsel had already expressed concern about Mr. Austin's functioning and before allowing Mr. Austin to proceed *pro se* the trial court required that he be assessed by a psychologist.[119]  The assessment lasted less than half an hour and failed to meet the professional standard of care for such an assessment.[120]  Mr. Austin assured the psychologist that he had no mental health history and knew what he was doing and that it was what he wanted.  He was assessed as competent.[121]

At the *Faretta* hearing Mr. Austin repeated that he had no psychiatric history and that he knew full well what he was doing.  The trial court later summed the matter up to a prospective juror, "Mr. Perry is not representing himself for any other reason other than he wants the jury to give him the death penalty." RR.VI-10.

During the competency evaluation and the *Faretta* hearing Mr. Austin lied outrageously but the defense attorney, the psychologist and the court all omitted to look at the reams of documentation available on Mr. Austin describing: his history of bizarre, violent and self-destructive behavior; his previous suicide attempts; his previous diagnosis of "severe personality disorder",  "borderline schizophrenia" and possible brain damage; his personal history of abuse; and, his substance abuse.  The state was in possession of many of these reams of documentation

---

[119] "The Court had already granted a Motion for Psychological Evaluation for the Defense.  However, that had not yet been accomplished at the time that Mr. Austin made this known to the court; and the Court explained to Mr. Austin that it wanted a psychological evaluation accomplished before we proceeded to a Faretta Hearing" RR. II-3-4
[120] See Exhibit 91 - Affidavit of Dr. Connell and Exhibit - 90 Affidavit of Dr. Heilbrun
[121] See allegations and evidence detailed in claims regarding competence.

pointing to Mr. Austin's mental illness but sat mute and allowed the defense lawyer, the psychologist and the court to proceed under the fiction that Mr. Austin had no relevant history.

Mr. Austin was allowed to represent himself[122] and when it came to voir dire declined to ask any questions and consented to the dismissal of any juror the state did not like.

The state did not use one cause or peremptory challenge but took advantage of Mr. Austin's cooperative attitude to dismiss forty-three jurors by consent. Every one of the jurors who has agreed to speak to the defense during post-conviction investigation has proven to be unfit for capital jury service, being unable to consider mitigation evidence in good faith.[123]

On April Fool's Day, 2002 Mr. Austin stood before the jury and entered his plea of guilty[124] to the capital murder of a nine year old boy. When the jury eventually retired they were given a single verdict sheet already typed out with a finding of guilt and directed by Judge Cosper to sign it.[125]

Before that, however, the state presented its penalty phase evidence and Mr. Austin did not involve himself until closing argument save for a bizarre interlude in which he became fixated on the appearance of the victim of an earlier offense for which he had been convicted. In his closing argument he assured the jury that he was a future danger and that there was no mitigation. In another bizarre episode he also advised the jury that he was a homosexual and enjoyed being anally penetrated while in prison.

According to the press the jury was out for less than ten minutes[126] in what is thought to be a record in Harris County. The verdict was guilty and the sentence was death. C.R.-84

---

[122] See allegations and evidence detailed in claims regarding waiver of right to counsel.
[123] See allegations and evidence detailed in claims regarding juror bias.
[124] See allegations and evidence detailed in claims regarding the voluntariness of the plea of guilty.
[125] See allegations and evidence detailed in claims regarding denial of jury trial rights.
[126] "After deliberating for less than ten minutes Wednesday, a jury sentenced a man to death by lethal injection in

The next day Mr. Austin waived the appointment of counsel on appeal.[127]  He filed no appellate brief and the Court of Criminal Appeals confirmed his conviction and sentence.[128] While waiting for this decision Mr. Austin wrote to the trial court and asked that his execution be set on his birthday and for advice on the disposal of his remains.  Ex. 89, Letter to Judge Cosper, October 25, 2002 (7636-7637).   After his sentence was confirmed he wrote to Judge Cosper, describing her as the nicest judge he had ever met and thanking her for her kindness.  Ex. 14, Letter to Judge Cosper, April 7, 2003 (2963-2964)

In September 2003, nine days before his scheduled execution, Mr. Austin finally agreed to pick up his appeals and habeas counsel was appointed.  Investigation began which has now confirmed Mr. Austin's innocence and that he suffers from brain damage and a severe depressive disorder.

It has been observed that it is an abuse of the justice system to allow delusional defendants to play out their delusions in court.

> One may question whether the criminal justice system should be used as a forum for delusional defendants to exorcise their delusions. . . . Although therapeutic, permitting defendants to play out their delusions in court abuses the justice system.

Cohen, J.  *The Attorney-Client Privilege, Ethical Rules, and the Impaired Criminal Defendant*, U. Miami L. Rev. 529, 555 n.166 (1998).   It may be said with some force that it is an abuse of the justice system to allow suicidally depressed, brain-damaged defendants to play out their self-destructive impulses in court.

The system of criminal justice should not be available as an instrument of self-

---

the 1992 slaying of a 9-year-old boy whose case was unsolved for almost a decade." L. Teachey, *Man Sentenced to Death for Killing Boy in '92,* Houston Chronicle, April 4, 2002.
[127] See allegations and evidence detailed in claim regarding waiver of appellate counsel.
[128] See allegations and evidence detailed in claims regarding competence at direct appeal and incomplete appellate record.

destruction.

Faretta v. California, 422 U.S. 806, 840 (U.S. 1975) (Burger CJ dissenting, joined by Blackmun & Rehnquist).

A proceeding is not even worthy of the title "trial" when both sides are in concert and seeking the same end. The process by which Mr. Austin was convicted and sentenced to death bears none of the hallmarks of an adversarial jury trial that is so essential to our conception of justice.

> "[Truth]," Lord Eldon said, "is best discovered by powerful statements on both sides of the question." This dictum describes the unique strength of our system of criminal justice. "The very premise of our adversary system of criminal justice is that partisan advocacy on both sides of a case will best promote the ultimate objective that the guilty be convicted and the innocent go free." *Herring v. New York*, 422 U.S. 853, 862 (1975).

United States v. Cronic, 466 U.S. 648, 655 (1984) (footnotes omitted).

The Supreme Court has repeatedly emphasized the critical importance of adversarial testing to the ultimate aim of justice.  Polk County v. Dodson, 454 U.S. 312, 318 (1981) ("The system assumes that adversarial testing will ultimately advance the public interest in truth and fairness"); Gardner v. Florida, 430 U.S. 349, 360 (1977) (plurality opinion) ("Our belief that debate between adversaries is often essential to the truth-seeking function of trials requires us also to recognize the importance of giving counsel an opportunity to comment on facts which may influence the sentencing decision in capital cases")  The Court in Cronic also endorsed Justice Black's statement highlighting the uncertainty of the outcome when there is no adversarial testing:

> Whether a man is innocent cannot be determined from a trial in which, as here, denial of counsel has made it impossible to conclude, with any satisfactory degree of certainty, that the defendant's case was adequately presented.

Betts v. Brady, 316 U.S. 455, 476 (1942) (Black, J. dissenting) cited in United States v. Cronic,

466 U.S. 648 at n.16 (1984)

Absent the adversarial process that guarantees the reliability of capital trials death sentences are imposed "wantonly and freakishly" in violation of the underlying principles of Furman v. Georgia.  408 U.S. 238, 310 (1972) (Stewart, J. concurring).  Where the selection process for death sentencing follows no rational pattern, it fails to deliver even-handed justice. Id. at 388-89 (Burger, C.J. dissenting).  The Eighth and Fourteenth Amendments prohibit the imposition of the death penalty where the sentencing procedures create a substantial risk of capricious and arbitrary imposition of the death penalty. Gregg v. Georgia, 428 U.S. 153, 188 (1976).  When procedural protections are not in place to curb arbitrariness, the death penalty is cruel and unusual in the "same way that getting struck by lightning is cruel and unusual." Furman, 408 U.S. at 310 (Stewart, J. concurring).

Further, to allow the death penalty to stand in the circumstances of this case would be inconsistent with the Supreme Court's insistence on heightened standards of reliability in fact finding and in due process in capital cases.  The Eighth Amendment demands and the United States Supreme Court has "stressed the "acute need" for reliable decision making when the death penalty is at issue." Deck v. Missouri, 125 S. Ct. 2007, 2014 (2005)  Whatever the case may be in non-capital prosecution, the Eighth Amendment demands that specific consideration be given to the capital nature of the case in order to determine whether the rules and procedures applied in an ordinary case reach the standard of heightened reliability that the law requires.

> In capital proceedings generally, this Court has demanded that factfinding procedures aspire to a heightened  standard of reliability. This especial concern is a natural consequence of the knowledge that execution is the most irremediable and unfathomable of penalties; that death is different.

Ford v. Wainwright, 477 U.S. 399, 411 (1986) citing, inter alia, Spaziano v. Florida, 468 U.S. 447, 456 (1984), Woodson v. North Carolina, 428 U.S. 280,  305 (1976) (opinion of Stewart,

Powell, and Stevens, JJ.); see also, <u>Caldwell v. Mississippi</u>, 472 U.S. 320, 323 (1985); <u>Simmons v. South Carolina</u>, 512 U.S. 154, 172 (1994) (opinion of Souter, O'Connor, Ginsburg, JJ.) ("The Eighth Amendment . . . imposes a heightened standard for reliability"); <u>Satterwhite v. Texas</u>, 486 U.S. 249, 263 (1988) (Brennan, Marshall, Blackmun, JJ. concurring) ("[T]he difference of death from all other punishments requires a correspondingly  greater degree of scrutiny . . .  Because of this  heightened  concern for reliability,  "time and again the Court has condemned procedures in capital cases that might be completely acceptable in an ordinary case.").[129]

This heightened standard of reliability in fact finding is also reflected in applicable standards of international law, which hold that capital cases warrant "a particularly stringent need for reliability in determining whether a person is responsible for a crime that carries a penalty of death."  Inter-American Commission for Human Rights, Report No. 97/03 (<u>Graham v United States</u>), para 27.

The particular constitutional violations that infected Mr. Austin's trial are detailed below but it is submitted that this court need not reach these matters.  The complete collapse of the adversarial process in this case has created a verdict so unsafe that the process as a whole violates the Constitution and requires reversal.  Whether this claim for relief is characterized as a combination of deficits in the trial, a cumulation of deficits or, as it is intended, as an independent claim highlighting the complete collapse of the adversarial process the important thing is that the standards we set for our system of justice are incompatible with the events and outcome of this case.

_____

[129] Well before the Court established the right to counsel in all felony cases, <u>Gideon v. Wainwright</u>, 372 U.S. 335 (1963), it recognized that right in capital cases, <u>Powell v. Alabama</u>, 287 U.S. 45, 71-72 (1932).  Time and again the Court has condemned procedures in capital cases that might be completely acceptable in an ordinary case.  See, e. g. <u>Bullington v. Missouri</u>, 451 U.S. 430 (1981);  <u>Beck v. Alabama</u>, 447 U.S. 625 (1980); <u>Green v. Georgia</u>, 442 U.S. 95 (1979) (per curiam);  <u>Lockett v. Ohio</u>, 438 U.S. 586 (1978);  <u>Gardner v. Florida</u>, 430 U.S. 349 (1977); <u>Woodson</u>

# MR. AUSTIN WAS NOT COMPETENT TO BE TRIED

Mr. Austin was not competent to be tried at the time of his waiver of counsel in October 2001 or at the time of his trial in April 2002.

The trial court was satisfied as to his competency only because of the paucity of information placed before it and the failure to conduct an adequate competency examination.

Due to Mr. Austin's suicidal depression[130], counsel's ineffectiveness in investigating his incompetence, the sub-standard investigation of Dr. Brown, the state's failure to disclose relevant information and the Court's failure to conduct an adequate competency evaluation his lack of competence was not determined pre-trial.

The record in this case is replete with indicia of Mr. Austin's incompetence.  At its heart is the simple truth that Mr. Austin was a death row volunteer who, due to his mental illness, sought out prosecution and execution in a deliberate attempt to commit suicide.

In January 2001 while being held in isolation at the Hughes Unit and under the influence of severe depression[131] Mr. Austin wrote to Sergeant Waymon Allen of the Houston Police Department offering to confess to a murder if his death were guaranteed.[132]

Dear Sgt. Allen.

How are you doing?  I hope everything is going well with you.  As for myself, well, I'm hoping things will get better.

---

v. North Carolina, 428 U.S. 280 (1976).   These decisions reflect an appreciation of the fundamental fact that death is different.

[130] This phrase is used to describe the range of forces operating on Mr. Austin including his severe depression, neurological damage, cognitive disorder, the conditions of his confinement as they contributed to his desire to die and the developmental psychopathology of his background of abuse and substance abuse.

[131] Exhibit 78 – Letter from MR. Austin to Mr. Hicks ("I confessed to it at a time of extreme depression. It was after an altercation with the guard in January and I thought I was going back to seg.")

[132] Mr. Austin's letter and the suicide attempt that it involved are bizarre, self-destructive behavior and should not be downplayed. It is sometimes said that a suicide attempt on its own will not necessarily craete a bona fide doubt about competence.  This must be looked at on a case by case basis but a suicide attempt in the context of other indicia is a powerful indicator of possible incompetence. See Drope v. Missouri, 420 U.S. 162 (U.S.)

> I want to help you out if you'll help me out.  I know you want to close that murder case concerning DK and I will help you.  I will confess to it on several conditions. First the charge must be Capital Murder.  Second, I must be guaranteed the death penalty.  This must be guaranteed.

RR. XII-Ex.68   Later that month Mr. Austin made a tape recorded confession to Sgt. Allen gicing an account of the death of DK that even Sgt. Allen did not entirely believe.  RR.X-34.

Mr. Austin was indicted on February 28, 2001 and counsel was appointed on March 21, 2001.  In the period between his indictment and his trial Mr. Austin wrote to the trial court and prosecutor on several occasions highlighting his wish to be executed.

On April 17, 2001 Mr. Austin wrote to the trial judge and prosecutor advising that he did not want or require an attorney to represent him. He went on to emphasize his goal of being executed:

> What I do not understand is why must time and money be wasted on a trial?  I'm pleading guilty.  I fully admit to the crime.  You have in your possession a taped confession and now you have this letter.  Just sentence me to death and lets get on with it.

CR.5-6, Letter from Perry Austin to Judge Cosper and Prosecutor, April 17, 2001.  (02859-02860)

On May 1, 2001 he was placed in administrative segregation after his court appointed counsel, Mr. Arnold, reported to the Sheriff's office that Mr. Austin had threatened to kill another inmate.

On May 30, 2001 court appointed counsel, Mr. Arnold, moved *ex parte* for funding to have Mr. Austin assessed by a psychologist as a result of his "highly unusual behavior."  Mr. Arnold emphasized that such an assessment was necessary to allow him to render effective assistance of counsel:

III.

50

Counsel for the Defendant, in order to render effective assistance of counsel in this case, believes the Defendant should undergo a psychological examination by Dr. Jerome Brown.

IV.

The Defendant has exhibited some highly unusual behavior in the last several months both while incarcerated in the Institutional Division of the Texas Department of Corrections and in the Harris County Jail.  In order to understand the impact of this unusual behavior on the accused's mind the undersigned counsels require the assistance of recognized mental health expert.

CR. 12, *Defendant's Motion to Permit Examination of the Defendant and for Authority to Incur Expenses*.  On July 13, 2001

On July 13, 2001 in a hearing in chambers Mr. Austin advised the Court that he wished to represent himself and did not wish to present a defense.  Though covered within the designation of record for appeal, the transcript of this proceeding has not been prepared.  The record does, however, disclose that in this hearing Mr. Austin urged the judge to allow him to proceed *pro se* and the judge indicated that she wished a psychological evaluation completed before proceeding to a *Faretta* hearing.  (RR. II-3-4).  It was on this date that the Court granted the defendant's motion to permit examination of the defendant.  (CR. 11.)  It is apparent that by this time the psychological assessment had transformed from the grant of funds on an *ex parte* basis to assist "the defense preparation"[133] to an direction for assessment by the court made at an *inter partes* hearing that resulted in a report being generated by Dr. Brown that was addressed to judge Cosper and related that:

The above named defendant was interviewed and examined on September 20, 2001 pursuant to an order from your court for competency evaluation.

CR. 24, <u>Report of Dr. Jerome Brown </u>(9/25/2001)

On July 20, 2001 Mr. Austin wrote to the court and once again emphasized his desire to

---

[133] CR. 12, *Defendant's Motion to Permit Examination of the Defendant and for Authority to Incur Expenses* at 13.

be sentenced to death and executed as soon as possible.  He also highlighted his depression, his suicidal intent and the effect that the conditions of his confinement were having on him.

> If you cannot get me out of seg, could you please move up my court date so my stay in seg will not be prolonged?  My trial should last no longer than two or three days as I will be pleading guilty and will not put up a defense in this case.  Also, as soon as I am able, or am permitted, after sentencing, I will be dropping all appeals and will request an execution date as soon as is conveniently possible. That means I do not plan on being in this world too much longer and I want to spend at least what little time I do have with what little freedom there is by being out in population.  I cannot handle prolonged isolation I have a very bad problem with depression and when I get depressed I tend to think about suicide a lot.  If I am forced to remain in seg too long I won't be around to stand trial.

Letter from Perry Austin to Judge Cosper, July 20, 2001.  (CR. 16).

Three weeks later, on August 9, 2001, Mr. Austin once again wrote to Judge Cosper urging that the trial and his execution date be brought forward.  In the letter he belittled his own "trial" with ironic quotation marks before calling the proceeding a circus and urging that the sooner it was over with the sooner he could die:

> I am writing again in hopes that you will consider my previous request to move my trial to an earlier date.  As I mentioned in my previous letter my "trial" shouldn't last more than two days as I will not be defending myself.  I will be pleading guilty so the only thing the jury will have to assess is my punishment which you and I both know will be death.  So, the sooner we get this circus over with the sooner I can die.  No, I don't have a death wish, or at least you all can't prove it, but you and I both know that with my past and with what I've told the cops, death is inevitable.  So, what more do you all need from me?  The sooner we get this over with the sooner everyone will be happy.  Right!?  I am even willing to waive the psych hearing/interview.  I can tell you exactly what he's going to say.  I am a sociopath, extremely violent, no respect for authority, and no feelings of guilt.  I am fully competent and definitely know the difference between right and wrong. So let's get this show on the road please.

Letter from Perry Austin to Judge Cosper, August 9, 2001.  (CR. 18-19).

Less than a week later Mr. Austin wrote to Judge Cosper again, apparently angered that his efforts to be executed were not proceeding with sufficient speed or certainty:

> Maam, since there seems to be some doubt about my sincerity to not defend

myself concerning the current charge against me, I feel I must do something to prove that I mean what I say.

I am hereby requesting that both attorneys appointed to represent me be discharged and I be permitted to represent myself.  I make this decision fully aware of the consequences and am also aware that this is within my right.  I will permit one (1) attorney to be present to assist in any legal advice although I fail to see what purpose that would benefit.

September 12, 2001 is my next court date, for pre-trial motions.  I do not wish for any motions to be filed on my behalf.

I do not wish to participate in jury selection.  I will not contest any juror the prosecution selects.

Letter from Perry Austin to Judge Cosper, August 14, 2001.  (CR. 20-21).

At this point in the proceedings there were sufficient indicia of incompetence to require counsel and the court to seek a full competency hearing.

On September 20, 2001 Dr. Jerome Brown, a psychologist, attended on Mr. Austin for the purposes of assessing his competence to stand trial.  The assessment was based on a mental status examination and clinical interview.[134]  It lasted less than 30 minutes.  No psychometric or other testing was conducted and the report discloses no awareness of Mr. Austin's prior history of mental illness.  Dr. Brown was not provided with any background material,[135] and despite the terms of the court's order was not provided with information from the MHMR files, including Mr. Austin's suicidal ideation.  Dr. Brown reported that Mr. Austin was competent.  Report of Dr. Jerome Brown, September 25, 2001.  (CR. 23-26).

On October 11, 2001 the Court conducted a *Faretta* hearing at which it acknowledged

---

[134] Dr. Brown prepared a brief report for the court, dated September 25, 2001, confirming that the examination consisted solely of an interview with Mr. Austin comprising a mental status examination and clinical interview.

[135] Mr. Arnold had originally intended to provide Dr. Brown with "much more information" but this did not happen. Exhibit 35 – Letter from Mack Arnold to Dr. Brown ("Enclosed is a certified copy of an order appointing you to examine the above named defendant who is charged with Capital Murder in the 339th District Court of Harris County, Texas. This is the defendant that we discussed on the phone recently. I should be able to give you much more information about his case within the next week or so.")

receipt of Dr. Brown's report and at which appointed counsel, Mr. Arnold, was asked whether there was anything in the report inconsistent with his own personal determination as to Mr. Austin's competency.  At this point Mr. Arnold had met privately with Mr. Austin once at the Harris County Jail and once at the court house.  He indicated that there was nothing in the report inconsistent with his observations and that he believed Mr. Austin to be competent.  (RR. II-4).

The Court then engaged in a colloquy with the defendant in which it inquired as to whether he had ever been treated for any mental health disorder, whether he had mental health problems in the army and whether he had received counseling in the army.  Mr. Austin answered all of these questions in the negative.  (RR.II-6-7).  As is detailed below, these answers were lies, that are themselves symptoms of Mr. Austin's mental disorder.  Mr. Austin went on to confirm his suicidal intent by stating that his reason for seeking to proceed *pro se* was to ensure that no defense was offered at all: "as far as I am concerned there will be no strategy." (RR.II-14).  Mr. Austin also confirmed that the reason he was not concerned about rules of evidence and procedure was because he did not want to appeal his case.  (RR.II-11).

At this point in the proceedings, notwithstanding the opinion of Dr. Brown, there had been sufficient indicia of incompetence to warrant defense counsel seeking a full examination of Mr. Austin and for the trial judge to order a hearing to determine his competency.  Mr. Austin's bizarre behavior, his expressly suicidal intent, his complaints of severe depression and the limited scope of Dr. Brown's assessment should have resulted in a full assessment of Mr. Austin's competency being conducted.

Unfortunately, despite his bizarre and nakedly suicidal conduct, there was no adequate investigation of Mr. Austin's competency before he was declared competent and permitted to proceed *pro se*.  As detailed below: defense counsel failed to conduct any investigation and

failed to provide adversarial testing of Mr. Austin's competency; the state failed to disclose information in its possession reflecting upon Mr. Austin's mental illness and incompetence; the examination ordered by the court was carried out in such a superficial manner as to amount to no effective examination at all; and, the court failed to order further inquiry as more indicia of incompetence emerged, despite the limitations of the original inquiry.

The failure to adequately inquire would alone mandate reversal, but the situation became even worse. As the proceedings continued even more evidence emerged in the record indicating that Mr. Austin was seriously mentally ill. This evidence should have led to a renewed inquiry into Mr. Austin's competency.

On February 21, 2002 Sergeant Allen questioned Mr. Austin once again and a tape recorded confession was again developed. (RR. XIV-Ex. 78). Standby counsel was not present for this interview. During the course of the interview Sergeant Allen pressed Mr. Austin on his description of the circumstances leading to the death of DK, expressing concern with the accuracy of a number of the things that Mr. Austin had said. Towards the end of that interview Mr. Allen said that the reason he came forward was "depression, I guess." He described breaking down in tears when simply watching television and the fact that he was put in solitary after fighting with a guard, and explained that his depression was worse when he was in solitary. He also confirmed that his confession and trial were no more than an elaborate suicide attempt:

> The only reason I haven't killed myself is because I actually believe in hell and I don't want to go there and this way I am not killing myself, I'm just not putting up a defense.[136]

Tape Recorded statement of Perry Austin, February 21, 2001. (RR. XIV-Ex. 78). Contrary to his earlier statements to the trial court and psychologist, Mr. Austin told Sergeant Allen that, "I

---

[136] Note that this religious ideation is symptomatic of Mr. Austin's mental illness.

have been going to see counselors and psychiatrists since I was a young kid." He described his contact with psychiatrists as stemming from his behavioral problems and emotional disturbance and stated that a psychiatrist had been involved in his earlier trial.

The day of Sergeant Allen's visit, Mr. Austin wrote to the Court once again confirming that he did not intend to defend himself in the case. (CR. 58-59).

Voir dire commenced on March 18, 2002. During voir dire Mr. Austin declined to question any prospective jurors and permitted the state to dismiss by consent all of the jurors that it wished. (RR. III-VIII).

Voir dire also disclosed the state's obvious awareness of what was occurring. The state repeatedly questioned prospective jurors about their view of Mr. Austin's death wish and the fact that he was effectively committing suicide. The whole of the voir dire is of the same tenor but for an example the court may refer to Voir Dire of Juror Brady. (RR. IV-38-43). The trial judge was explicit in stating to one of the jurors that the only reason that Mr. Austin was representing himself was so that he could ensure that he received the death penalty: "Mr. Perry [sic] is not representing himself for any other reason other than he wants the jury to give him the death penalty." (RR. VI-10).

Mr. Austin entered a plea of guilty to the offense of capital murder. (RR. IX-4). Mr. Austin did not present any evidence in the penalty phase until closing argument.[137] During closing argument Mr. Austin told the jury that they should find he was a future danger and that there was no mitigation. This was a patently obvious suicide attempt. Mr. Austin also chose to share with the jury in the penalty phase a description of his participation as a recipient of anal sodomy while in prison. (RR. XI-15-20). This presentation was as bizarre as Mr. Austin's

---

[137] In a typically bizarre interlude Mr. Austin asked his only questions of the trial when he tried to establish the

fixation on the physical appearance of Jennifer Ortega, the victim from the earlier aggravated sexual assault charge.

In addition to these indicia of incompetence, the state introduced into evidence a great deal of evidence that illuminated Mr. Austin's history of mental illness and should have put the court, defense counsel and prosecuting counsel in serious doubt about his competence.

First, the state introduced the fact that Mr. Austin's first offense was the bizarre and disturbing rape and attempted rape of two of his sisters and armed robbery of his mother and third sister.

The state also introduced documentary exhibits providing clear indicia of incompetence and conclusively proving that Mr. Austin had lied to Dr. Brown and the court, concealing his length history of mentally disturbed and suicidal behavior.

State's Exhibit 79 was described as a "Pen Packet," and was made up of TDCJ records largely documenting Mr. Austin's incarceration following the 1978 offense.  State's Exhibit 81 comprised the records of the Board of Pardons and Paroles.  These documents revealed the following previously undisclosed information about Mr. Austin:

- Mr. Austin had, "a previous history of suicide attempts" (01230 and 01238); he "attempted suicide twice at ages 14 and 19 by intentional drug overdoses." (01243, 01261 & 01450); Mental: "Available file material indicates that subject attempted suicide at age 14 and 19 by overdosing" (1334)

- Mr. Austin was sexually abused as a child, first participating "in homosexual activity at age 15 with a soldier in Ft. Hood, Texas." (01259).

- Mr. Austin has a history of illicit substance abuse dating back to age ten and had

_____

physical appearance of Jennifer Ortega, the complainant in his earlier conviction for aggravated sexual assault.

used marijuana, barbiturates, LSD and used alcohol to excess. (01243 & 01261).

- Mr. Austin "has a history of suicide attempts and psychological counseling as a juvenile" (01238), "had psychiatric treatment as a juvenile" (01240), and was referred to a military psychological counselor due to misbehavior in school. (01243)

- Mr. Austin was discharged from the army due to "inadaptability" (01231 & 01261), was referred to a psychiatrist for disciplinary reasons "following his enlistment in the army, (01243) and that psychiatrist found him unfit to maintain a security clearance. (01449-50).

- Mr. Austin had been "psychiatrically assessed prior to the trial" for the 1978 offense. (01240).

- Mr. Austin had "emotional problems" resulting in an assessment that "Symptoms limit adequate functioning, requires counseling, may require medication." (01246).

- Mr. Austin was regarded by parole officials as a "very disturbed individual." (01239).

- Mr. Austin had plead not guilty by reason of insanity to the 1978 rape charge and a report on Mr. Austin had been prepared by Dr. Franklin Lewis. (01424).

- Following his conviction in 1979, Mr. Austin wrote to the trial judge stating "I know theres something wrong with me . . . I want to go to Rusk to get help for my problem . . . I want help before its to late . . . All I'm asking is that you send me to Rusk until the Doctors solve me of my problem . . . All I want is help and I don't think I can live with myself knowing that my problem is still with me."  (01424-

6).

- At the direction of the 1979 trial court Mr. Austin's attorney wrote to the Director of the Diagnostic Unit, Texas Department of Corrections to advise them that Mr. Austin "had requested, and did request at the time of sentencing, and feels that he is in need of, psychiatric help to solve his emotional problems." (1422).

- Mr. Austin underwent a TDC Diagnostic Center Evaluation in 1979 which included a finding that his "insight and social judgment appear to be quite limited" and there was a strong argument for "a severe character disorder." (01451).

The state also played for the jury the tape of Mr. Allen's confessional statement of February 21, 2001. (RR. X-35) In that taped interview he admitted that he was trying to kill himself, but that because of a bizarre interpretation of the Christian prohibition on suicide he was trying to have the court do it on his behalf.  (RR. XIV-Ex. 78).  What is more, it unequivocally announced to the judge that her earlier competency ruling was based on a fiction.  In direct contradiction to his answers to Dr. Brown and at the *Faretta* colloquy Mr. Austin's own recorded voice announced:

> I've been going to counseling and psychiatrists since I was a kid. I guess I had behavioral problems and I was always in trouble at school. I was emotionally disturbed, psychiatrist said at my trial that I didn't have no feelings that I had no conscience at all.

Exhibit 101 - Transcript of Perry Austin's Second Statement to Sergeant Allen (RR. XIV-Ex.78)

This material clearly indicated that Mr. Austin's psychological assessment and the colloquy at the *Faretta* plea hearings were wholly vitiated by a lack of relevant information, insufficient investigation and lies from Mr. Austin.  A review of the evidence admitted during the trial indicates that the court was dealing with a seriously mentally ill man and could no

longer rely upon the previous assessment of competence.

**CLAIM II.**   **Mr. Austin's rights to Procedural Due Process as guaranteed under the Constitutions of Texas and the United States and under the Texas Code of Criminal Procedure were violated when, despite sufficient indications of his incompetence, no adequate inquiry was made into his competence to stand trial and waive counsel.**

A defendant has a procedural due process right to a competency hearing whenever the facts before the trial court raise or should raise a bona fide doubt concerning competency. Pate v. Robinson, 383 U.S. 375 (1966).  In determining whether a competency hearing is required, a trial court should give particular consideration to (1) the existence of a history of irrational behavior; (2) the defendant's bearing and demeanor at the time of trial; and (3) prior medical opinions. Reese v. Wainwright, 600 F.2d 1085, 1091 (5th Cir.), cert. denied, 444 U.S. 983 (1979).  If the trial court received evidence, viewed objectively, that should have raised a reasonable doubt as to competency, yet failed to make further inquiry, the defendant has been denied a fair trial. See Carter v. Johnson, 131 F.3d 452, 459 n.10 (5th Cir. 1997).

As detailed above, the indicia of incompetence present before the court in this case sufficiently raised a doubt as to Mr. Austin's incompetence such that the federal Constitution required a constitutionally effective competency inquiry to protect Mr. Austin's right to procedural due process.

The Texas Code of Criminal Procedure as it operated at that time provided a detailed system for the review of questions of competency both before and during trial.  Tex. Code Crim. Proc. Article 46.02.  Unfortunately, the trial court failed to follow the procedure laid down by the Code.

Under Article 46.02(2)(a) a court must convene a jury hearing as to competency if, prior to trial, it becomes aware of evidence capable of supporting a finding of incompetence – that is,

"some evidence, a quantity more than none or a scintilla, that rationally may lead to a conclusion of incompetence." <u>Sisco v. State</u>, 599 S.W.2d 607 (Tex. Crim. App. 1980); <u>Alcott v. State</u>, 51 S.W.3d 596 (Tex. Crim. App. 2001).  This standard was clearly met, but instead of conducting an incompetency hearing before a jury as envisaged by Article 46.02(4) the trial court conducted its own informal inquiry, satisfied itself and took the matter no further.  In this case there was clearly sufficient evidence to require a proper examination, at which point it is not for the judge to make a further limited inquiry, and there is no utility in doing so.  The trial judge must take the evidence of incompetence at its highest in considering whether there is a need for a hearing. The trial judge's approach in the circumstances of this case violated Mr. Austin's Due Process rights.

It should be noted that while both federal jurisprudence and Texas law use the phrase "bona fide doubt," the phrase means a different thing in each jurisdiction.  Under Texas law the concept of a bona fide doubt is expressed as follows:

> We have explained that a bona fide doubt exists "if the evidence indicates recent severe mental illness, at least moderate mental retardation, or truly bizarre acts by the defendant." *Collier v. State*, 959 S.W.2d 621, 625 (Tex. Crim. App. 1997) (citing *Mata v. State*, 632 S.W.2d 355, 359 (Tex. Crim. App. 1982)).

<u>Alcott v. State</u>, 51 S.W.3d 596, 602 (Tex. Crim. App. 2001).  The Courts in <u>Collier</u> and <u>Mata</u> used the phrases "only if" and "there must be" respectively.  <u>Collier</u>, 959 S.W.2d at 625; <u>Mata</u>, 632 S.W.2d 359.

This demanding reading of what it means to have a "bona fide doubt" represents a higher threshold than that required by federal jurisprudence.  The federal constitutional standard calls for an assessment of all the circumstances and does not limit the range of factors necessary to be present to establish a sufficient doubt about competency:

> The import of our decision in <u>Pate v. Robinson</u> is that evidence of a defendant's irrational behavior, his demeanor at trial, and any prior medical opinion on competence to stand trial are all relevant in determining whether further inquiry is

> required, but that even one of these factors standing alone may, in some
> circumstances, be sufficient. There are, of course, no fixed or immutable signs
> which invariably indicate the need for further inquiry to determine fitness to
> proceed; the question is often a difficult one in which a wide range of
> manifestations and subtle nuances are implicated. That they are difficult to
> evaluate is suggested by the varying opinions trained psychiatrists can entertain
> on the same facts.

Drope v. Missouri, 420 U.S. 162, 180 (1975).  The standard as applied by Texas courts is inconsistent with the federal constitutional standard for review and by considering the case under this standard the trial court failed adequately to protect Mr. Austin's federal constitutional rights.

Federal jurisprudence also supports the need to conduct an adequate examination where the issue is sufficiently raised.

In the context of competency to waive discretionary review of a death sentence, the Supreme Court provided clear guidance on the sort of inquiry that the district court should conduct:

> To that end, it will be appropriate for the District Court to subject Rees to
> *psychiatric* and other appropriate medical examinations and, so far as necessary,
> to temporary federal hospitalization for this purpose . . . The District Court will
> hold such *hearings* as it deems suitable, allowing the State and all other interested
> parties to participate should they so desire, and will report its findings and
> conclusions to this Court with all convenient speed.

Rees v. Peyton, 384 U.S. 312, 314 (1966) (emphasis added).  Two matters from this remand order should be emphasized.  First, the Supreme Court required *psychiatric and other medical examination* of the defendant.  No psychiatric examination was ordered or conducted in this case. Second, the Supreme Court made it clear that there would be a hearing and that all interested parties, including the defendant's attorney, could participate.

The Fifth Circuit in Mata v. Johnson, 210 F.3d 324 (5th Cir. 2000) recently reviewed the adequacy of examinations required before allowing a defendant to abandon his appeals, and drew an analogy with the examination conducted to determine competency.  Mata, 210 F.3d at 324.

The court made the point that both the standard for abandoning appeals and the standard for standing trial "inquire about the discrete capacity to understand and make rational decisions concerning the proceedings at issue."   Id.   The court regarded the authorities on competency to stand trial as instructive and the cases reviewed in Mata are equally instructive in the present context[138]:

The Fifth Circuit in Mata detailed the elements of two constitutionally adequate competency inquiries:

> The record showed that prior to finding Rumbaugh competent, the district court held a preliminary hearing to decide the necessary proceedings under the circumstances.  See id. at 397. The district court then ordered that Rumbaugh be examined by a team of psychiatrists and psychologists. See id. These mental health professionals submitted written reports to the court and the parties. See id. The court held a two-day evidentiary hearing, at which four mental health experts testified. See id. Rumbaugh also testified about his desire to abandon his appeals. See id. Only after this full opportunity to develop the facts regarding Rumbaugh's competence, did the district court make its ruling.

> * * * *

> Before acting on Ford's pro se request, the magistrate judge held two evidentiary hearings. Id. at 611. At the first hearing, the petitioner appeared in person and the magistrate judge inquired into the petitioner's decision and observed his mental condition. See id. After the hearing, the magistrate judge examined the petitioner's prison medical records and appointed a psychiatric expert suggested by petitioner's counsel. See id. After the expert evaluated the petitioner and filed a written report, the magistrate judge appointed, at the request of petitioner's counsel, a neurologist to examine the petitioner. See id. at 612. At the second evidentiary hearing, both the psychiatrist and the petitioner testified. See id. Portions of the petitioner's testimony raised concerns which prompted the psychiatrist to request a second opportunity to examine the petitioner. See id. at 613. The magistrate judge granted the request, and the psychiatrist filed a supplement to his earlier written evaluation. See id. In response to the psychiatrist's conclusion that the petitioner was competent to abandon collateral review, petitioner's counsel submitted the mental health evaluation of the

---

[138] It is firmly contended that Due Process requires even greater protections before a potentially incompetent defendant is permitted to stand trial, represent himself and plead guilty to a capital defense than where a prisoner seeks to abandon discretionary review and have executed a sentence of death imposed by a presumptively constitutional court proceeding.

> neurologist, who concluded that Ford was not competent to abandon his appeal.
> See *id*. at 614. The magistrate judge spoke once more with the petitioner by
> telephone. See *id*. The magistrate judge then made a report and recommendation
> to the district court, concluding that Ford was competent to dismiss his appeal.
> The district court adopted that recommendation after an independent review of the
> evidence. *Id*. at 614-15.

Mata v. Johnson, 210 F.3d 324, 328 (5th Cir. 2000) (citing Rumbaugh v. Procunier, 753 F.2d

395, 396 (5th Cir. 1985) and Ford v. Haley, 195 F.3d 603 (11th Cir. 1999)).  It is not suggested

that these are the only ways that a constitutionally effective examination can be conducted, but

the rigor of the approach in these cases does provide guidance.

By comparison with this rigorous examination, or the examination called for by the Texas

Code, the trial court "appointed" a single psychologist to conduct an examination.  Dr. Jerome

Brown was not provided with the records of Mr. Austin's previous history of mental illness and

was in fact unaware of those records.  Nor was Dr. Brown provided with the contemporaneous

records of the Harris County Jail or the MHMR service at the jail, even though the court had

specifically allowed of access to the MHMR records.  Dr. Brown did not engage in any medical

examination of Mr. Austin or administer any psychometric or other testing.  In fact, Dr. Brown

relied wholly upon the self-report of Mr. Austin in an interview that lasted for fewer than 30

minutes.

The Seventh Circuit has warned of the dangers of failing to review appropriate records in

making an assessment of competency to stand trial:

> Indeed, it is the imprecise and imperfect nature of the science known as
> psychiatry that makes a review of the past available psychiatric records <u>an
> essential part</u> of an evaluation of a defendant's competency to stand trial. See, e.g.,
> Randy Borum & Thomas Grisso, *Establishing Standards for Criminal Forensic
> Reports: An Empirical Analysis*, 24 Bull. Am. Acad. Psychiatric & L. 297 (1996)
> (psychiatric history is an "essential" element in a competency evaluation); Daniel
> W. Shuman, *Psychiatric & Psychological Evidence* § 11.08 (2d ed. 2001)
> (sources of information to consider include other psychiatrists or psychologists
> who have diagnosed or treated the defendant, the defendant's family and friends,

etc.); Kirk Heilbrun, et al., *The Use of Third-Party Information in Forensic Assessments: A Two State Comparison*, 22 Bull. Am. Acad. Psychiatry & L. 399 (1994) (the person's mental health history is among the most important sources of third-party information in forensic assessments). . . . We think it is obvious that a psychiatrist's diagnosis, especially when dealing with a chronic schizophrenic, must necessarily rely heavily on the patient's past psychiatric history, family history, criminal activity, and medical records. See, e.g., *Drope v. Missouri*, 420 U.S. 162, 180, 43 L. Ed. 2d 103, 95 S. Ct. 896 (1975); *Parkus v. Delo*, 33 F.3d 933 (8th Cir. 1994).

Brown v. Sternes, 304 F.3d 677, 696-7 (7th Cir. 2002)

In this case there was no medical opinion sought from a psychiatrist and the finding of competency was made on the basis of a bare report, with no examination or cross-examination of Dr. Brown.

Dr. Brown has been made aware that there was relevant and significant information that he did not have at the time of his assessment.  Dr. Brown now states that the records that were not sought or obtained at the time of the assessment might have provided critical information to the determination of Mr. Austin's competency, that it is possible that Mr. Austin's judgment was significantly impaired by his mental difficulties and finally, that as a result of the limited information provided, Mr. Austin did not receive a fair and impartial competency evaluation:

> Pursuant to the request of his current defense attorneys, I have reviewed the affidavit of Antoinette R. Cicerello, Ph.D. dated June 21st, 2004 as well as my original competency evaluation of Mr. Perry dated Sept. 28, 2001.  As a result of this review, I have become aware that information relevant and significant to the evaluation results was withheld by Mr. Perry.  Specifically, this information involved his past psychiatric history, including a limited history of psychiatric treatment and what the affidavit of Dr. Cicerello referred to as "extensive psychiatric difficulties in the past, beginning at a very young age." Because of this, records concerning his past psychiatric problems were not sought or obtained, but which might have provided information critical to the determination of his competency to stand trial at the time.

> Based upon the following information now available to me, it is possible that Mr. Perry's judgment was significantly impaired by his mental difficulties at the time I saw him, which then resulted in his making decisions concerning his defense that were not in his best interests, or which he otherwise would have not pursued

had he been in satisfactory possession of his faculties.

Because be the standards outlined by the Texas law regarding competency are quite conservative, and require the defendant to have been unable to make decisions with a reasonable degree of rational understanding, a review of accurate information regarding his functioning would be extremely important to ensure that he received a fair and impartial evaluation of his abilities at that time.  For example, the greater the disturbance that might have been revealed, the greater the possibility that his competency to stand trial had been compromised, and that his decisions regarding his defense went beyond the merely irrational to the unreasonable.  Because of his decision to withhold important information, it was not possible for this to occur in this case.

Exhibit 96 – Affidavit of Dr. Jerome Brown.

In any event, Dr. Brown's September 2001 report failed to meet the professional standard of care for such an examination and could not survive a *Daubert* challenge on grounds of reliability.  As such it cannot be regarded as supporting a constitutionally adequate determination of competence.

Dr. Mary Connell, an expert in psychologists' standard of care and board member of the American Board of Forensic Psychology has reviewed the competency examination in this case.

Exhibit 91 – Statement of Dr. Mary Connell.   Dr. Connell's statement is a considered, responsible and well-sourced analysis and it is a damning indictment of the competency evaluation conducted in this case.  Dr. Connell provides a detailed and enlightening explanation of the flaws in the assessment and concludes that the assessment fell below the professional standard of care in the circumstances:

In summary, in examining the relevance and reliability of a proffered opinion on a matter of competency to stand trial or to confess in a capital case, professional standards require that a mental health expert's opinion would be predicated upon a careful review of the defendant's history, including family of origin, academic, employment, medical, mental health, and relationship history; exploration of the functional capacities of the defendant to engage in meaningful consideration of the matter before the court and to assist the defense attorney in considering the effects of various trial strategies, pleas, witness testimony, and other factors; and administration and interpretation of performance on relevant measures of the

capacities involved in competency such as the MacCAT—CA.   An opinion formulated without review of all relevant data should be properly delimited with a description of how absence of the relevant data may affect its reliability, and finally, the expert can reasonably be expected to be willing to take new information into account, once it is known, and modify the opinion accordingly.

The assessment submitted to the court by Jerome Brown, Ph.D. does, in my opinion, fall below the standard of care. The standard of care, in the face of information apparently known to Dr. Brown, required further elucidation of the defendant's mental processes. Dr. Brown noted in his report that the defendant apparently sought a death charge by writing to a homicide detective to discuss the case, decided to represent himself though knowing that the sentence, should he be found guilty, would be life or death, and planned to testify for the prosecution if asked. The normally prudent evaluator would attempt, in the face of such data, to obtain a clearer understanding of what motivated the defendant and whether his behavior was the product of rational thought or of mental illness that impaired decisional capacity.

Exhibit 91 – Statement of Dr. Mary Connell.  Dr. Connell makes the point that a short interview of the type undertaken here or the court colloquy will not be capable of identifying impairments of decisional competence

Certain mental health conditions or illnesses may impair cognitive functioning and decision making capacity without limiting or impairing the individual's ability to engage in conversation and cooperate with interview requests.   The examiner cannot know, without actively pursuing multiple sources of information, whether the defendant is presenting an accurate picture of his/her general functioning, honestly acknowledging impairments or limitations, or accurately reporting history of functioning.  The presence of influences on decision-making, such as severe depression, suicidal ideation associated with mental illness, or delusional or irrational thinking, may not be apparent to a trained clinician upon interview and may be determined only through systematic assessment that relies upon multiple data sources.

* * * *

These less obvious impairments in decisional competency that may not be apparent to a clinician during interview may also elude officers of the court, who may have even less opportunity to review a range of systematically collected data to determine whether the defendant meets the jurisdictional standard for competency.

Exhibit 91 – Statement of Dr. Mary Connell.

As a fuller assessment has now revealed, Mr. Austin suffers from exactly the type of impairment apt to be missed by an assessment based upon self-report.

> I have reviewed the report of Dr. Brown, who assessed Mr. Austin at the time of trial but note that his conclusions are undermined by the lack of reference to the ample records and other collateral sources available in Mr. Austin's case. Dr. Brown also did not have the advantage of considerable psychometric and neuropsychological testing that have now been administered to Mr. Austin. The type of impairment suffered by Mr. Austin at the time of his trial is exactly the sort that is apt to be missed by an assessment based upon self report.

Exhibit 95 – Statement of Dr. George Woods.

Dr. Connell has also helpfully gathered together a number of references and relevant portions of codes and guidelines that support the position that Dr. Brown's test was below the standard of care and unreliable. Exhibit 91 – Statement of Dr. Mary Connell

Dr. Kirk Heilbrun, the nation's acknowledged expert in standards of care in forensic psychology and the author of the leading text, *Principles of Forensic Mental Health Assessment*,[139] has also reviewed the competency assessment in this case. Dr. Heilbrun has provided a statement in which he first details the twenty-nine principles of forensic mental health evaluation. Exhibit 90 – Affidavit of Kirk Heilbrun. Dr. Heilbrun details the sources of information that should be relied upon in the conduct of a competency assessment in a capital case, which include self-report, testing, records and third-party interviews.

> The three broad sources of information relevant to any forensic evaluation are self-report, testing (whether psychological tests relevant to mental health and intellectual functioning, or specialized tests measuring response style or functional legal capacities), and collateral information (records and third party interviews).

Exhibit 90 – Affidavit of Kirk Heilbrun

Dr. Heilbrun has provided a detailed explanation of why the multiple sources of

---

[139] Heilbrun K. Principles of Forensic Mental Health Assessment. New York, Kluwer/ Plenum, 2001

information are required and why reliance upon a clinical interview and mental status examination alone is unsatisfactory.

*4.  Why are these sources necessary?*
For several reasons:

    a.    To obtain information that minimizes the error associated with any single source

    b.    To "triangulate" conclusions by relying most heavily on observations that are consistent across sources, and weighing less heavily those that are inconsistent

    c.    To generate and test out ideas (hypotheses) regarding mental status and functional deficits, some of which may not have been considered at the start of the evaluation.  To gauge specifically whether there is distortion in the individual's response style—whether he/she is deliberately exaggerating or minimizing relevant symptoms or deficits

*5.  What are the dangers of relying on a MSE and clinical interview?*
The MSE (mental status examination) is conducted as part of the larger clinical interview.  It is an important part of any forensic evaluation.  However, when used in isolation, there are a number of potential problems that can result (see #4, above):

    a.    Any error associated with self-report cannot be cross-checked. Some defendants can convincingly present in a way that exaggerates or minimizes symptoms or deficits, or even fabricates or flatly denies them. Without input from other sources, even the most skilled of forensic evaluators will be misled much more often.

    b.    Conclusions must be presented in terms of the evaluator's judgment rather than from multiple sources.  Clinical judgment used in isolation has been demonstrated to be less accurate than other measures such as actuarial tools or specialized measures (rigorously developed).

    c.    Clinical judgment alone is also subject to influence by a number of biases, as reflected in the scientific literature on decision-making.  The use of additional sources of information ensures that such biases will not influence the conclusions in an unchecked fashion.

    d.    Forensic clinicians are not as good at detecting distorted response style (exaggeration or minimization) from an interview as they are when using multiple sources.   In fact, research has suggested that no professional group (including law enforcement personnel as well as mental health professionals) are much better than chance at detecting deliberate deception in the context of a brief interview or observation of behavior.

If self-report is not accurate, and the evaluating forensic clinician does not recognize the distortion, then any conclusions drawn will be more likely in error. In addition, a recognized strategy for dealing with inaccurate self-report is to rely more heavily on other sources; if no other sources are considered, there is no

alternative on which to rely.

Exhibit 90 – Affidavit of Kirk Heilbrun

One may pose the rhetorical question: would the state abandon the trial of a defendant if a psychologist reported him incompetent based on a short interview, no review of records and no testing?  Of course not; and neither should any court be willing to accept such a superficial examination where the defendant may be motivated to lie or manipulate the process.  As both Dr. Heilbrun and Dr. Connell have opined, even an experienced examiner may not detect such dissembling.

> The presence of influences on decision-making, such as severe depression, suicidal ideation associated with mental illness, or delusional or irrational thinking, may not be apparent to a trained clinician upon interview and may be determined only through systematic assessment that relies upon multiple data sources.

Exhibit 91 – Statement of Dr. Mary Connell; Exhibit 90 – Affidavit of Kirk Heilbrun.

While acknowledging that a prisoner may decide to plead guilty and receive the death penalty without being influenced by clinical depression or severe mental illness Dr. Heilbrun makes the point that:

> there is a substantial risk that such a decision would be influenced by mental health symptoms affecting judgment and reasoning, particularly if the defendant had a history of serious mental health difficulties, so it would be important to consider history, nature of the disorder, current clinical condition, and to gauge the impact of currently-experienced symptoms on the reasoning and judgment associated with such a decision. . . . An appropriate evaluation under such circumstances would consider history judged through self-report, collateral records and third party interviews, as well as current functioning as reflected by self-report, third party information, psychological testing, and the specialized MacArthur Competence Assessment Tool-Criminal Adjudication.  It would distinguish motivation that was driven by depression or other clinical symptomatology from motivation that was not, in the decision to dismiss counsel, plead guilty, and receive a death sentence.

Exhibit 90 – Affidavit of Kirk Heilbrun.  Dr. Heilbrun concludes that Dr. Brown's assessment

falls below professional standards, particularly given the limited sources of information relied upon, the lack of analysis of Mr. Austin's motivation and the shallowness and brevity of the assessment.

> However, there were several respects in which this evaluation seems to fall short of professional standards for an assessment of competence to stand trial in a capital case.  I would describe these as follows:
>
> > (1)      Sources of information—the evaluation report cited only the use of the interview, from which the evaluator obtained the defendant's self report.  No psychological testing was described (including psychological testing that would have a measure of the defendant's response style).  The specialized tool for assisting in the assessment of competence to stand trial, the MacCAT-CA, would have been very helpful in this case.  No collateral information was cited, which would also have been helpful, particularly if the defendant was inclined to minimize current symptoms or mental health problems in his history.  It also would have been useful to conduct one or two collateral interviews, probably involving jail staff (to gauge the defendant's current behavior, whether he is in population or special housing [and if the latter, whether for mental health treatment purposes or disciplinary reasons] and perhaps someone familiar with the defendant's history.
> >
> > (2)      Analysis of defendant's motivation to proceed pro se—in the fourth paragraph on page 2 of the report, Mr. Austin is quoted as stating that he "fired my lawyers…because I'm guilty…I'm not trying to make excuses."  He went on to say that trying to defend himself would be "like trying to get out of what I did."  The report goes on to say, "He stated that he will be willing to testify if the prosecution wishes it."  These statements raise a significant concern about the nature of the defendant's motivation for his actions in this case, a concern that should have been addressed through further information clarifying that such motivation was largely unaffected by clinical symptoms.
> >
> > (3)      Length and depth—this case strikes me as complex in some important respects.  If the defendant has a significant mental health history, and is acting in a way that is likely to result in his receiving a death sentence, then the question of whether this is deliberately self-destructive behavior, and what motivates such behavior, should be considered in depth.  An evaluation of this importance and complexity should probably be described in a length of closer to 10+ single-spaced pages than the present 2.5

Exhibit 90 – Affidavit of Kirk Heilbrun.

> This is a capital case and the competency assessment was being conducted to see whether

Mr. Austin should be allowed to represent himself and seek and obtain the death penalty.  The minimum that Due Process allows is that an assessment relied upon by the court meet the professional standard of care for such evaluations.  As both Dr. Connell and Dr. Heilbrun point out, from a psychological point of view the colloquy was also inadequate as an assessment tool.

In considering the adequacy of the competency assessment in this case, it cannot be over emphasized that this was a capital proceeding in which the defendant was trying to have himself killed.  Even if this is not a bar to pressing forward with the case, it calls for close scrutiny.

The Eighth Amendment demands and the United States Supreme Court has "stressed the "acute need" for reliable decision making when the death penalty is at issue." Deck v. Missouri, 125 S. Ct. 2007, 2014 (2005)  This acute need for reliability was present in the competency assessment and the assessment of the waiver of Mr. Austin's constitutional rights. Unfortunately, the enquiry conducted fell far short of the heightened standard of reliability to which the court should have been aspiring.

> In capital proceedings generally, this Court has demanded that factfinding procedures aspire to a heightened standard of reliability. This especial concern is a natural consequence of the knowledge that execution is the most irremediable and unfathomable of penalties; that death is different.

Ford v. Wainwright, 477 U.S. 399, 411 (1986)

Perhaps the final word belongs to Dr. Brown who, having become aware that there was much more to this case than met the eye, has very fairly conceded that:

> a review of accurate information regarding his functioning would be extremely important to ensure that he received a fair and impartial evaluation of his abilities at that time . . . it was not possible for this to occur in this case.

Exhibit 96 – Affidavit of Dr. Jerome Brown.

The process provided to assess Mr. Austin's competency, the matter having been sufficiently raised, was inadequate as a matter of both Texas and federal constitutional law.  Mr.

Austin's rights under the Eighth and Fourteenth Amendments were violated.

**CLAIM III.**    **Mr. Austin's rights to Procedural Due Process as guaranteed under the Constitutions of Texas and the United States were violated when, after an initial finding that he was competent, the trial court failed to make further inquiry once new evidence of his incompetence came to light.**

Even after the initial finding of competence was made the trial court remained under a duty to be alert to other evidence raising an issue of the defendant's competency.

> Even when a defendant is competent at the commencement of his trial, a trial court must always be alert to circumstances suggesting a change that would render the accused unable to meet the standards of competence to stand trial.

Drope v. Missouri, 420 U.S. 162, 181 (1975).

The Texas Code of Criminal Procedure also provided at the relevant time that if before trial a court became aware of or during trial developed a bona fide doubt then a hearing under Article 46.02(4) was required.  Bona fide doubt for these purposes has been used interchangeably with "reasonable doubt" and it "need not be sufficient to support a finding of incompetence and is qualitatively different from such evidence." Mata v. State, 632 S.W.2d 355, 358 (Tex. Crim. App. 1982); Alcott v. State, 51 S.W.3d 596 (Tex. Crim. App. 2001).

Given the evidence put before the court during the trial of the extent and severity of Mr. Austin's mental health problems the earlier, hopelessly flawed competency inquiry could not be regarded as adequate to protect Mr. Austin's Due Process rights.

> The extent and severity of the petitioner's history of mental health problems which have been brought to the court's attention influence the breadth and depth of the competency inquiry required.

Mata v. Johnson, 210 F.3d 324, 330 (5th Cir. 2000).

Evidence was put before the trial court during the trial that not only demonstrated a long and extremely serious history of psychiatric disturbance, physical and emotional abuse,

substance abuse and suicidal behavior but also demonstrated that both the court and Dr. Brown had made their earlier assessments of competence upon a factually incorrect basis.[140]   In these circumstances the court should have made further inquiry and should not have deferred to a competency assessment conducted six months earlier.   It is notable that in the six months since the initial assessment Mr. Austin had further corresponded with the court in a bizarre manner that should have proved a "red flag".   His conduct in the prison during this period also demonstrated a serious mental health problem.

The indicia of incompetence that the trial court became aware of following the October competency inquiry were such as objectively to raise a bona fide doubt as to Mr. Austin's competence and wholly undermine the earlier determination of the court.

In considering this question it is to be remembered that no single indicator of incompetence is to be considered alone, but rather each such indicator must be placed in the context of Mr. Austin's history and of the other indicia of incompetence.   Drope (supra).   A suicide attempt considered with other evidence of a defendant's incompetence will raise a bona fide doubt.   Drope, 420 U.S. at 170; United States v. Mason, 52 F.3d 1286, 1292 (4th Cir. 1995).

**CLAIM IV.**     **Mr. Austin's right to substantive Due Process as guaranteed under the Constitutions of Texas and the United States were violated when he was subjected to capital trial and sentenced to death when not competent.**

Mr. Austin was not competent at the time of his trial.   The Court erred in determining that he was competent and permitting him to stand trial, waive counsel and plead guilty.   As a result,

---

[140] Exhibit 96 – Affidavit of Dr. Jerome Brown ("a review of accurate information regarding his functioning would be extremely important to ensure that he received a fair and impartial evaluation of his abilities at that time . . . it was not possible for this to occur in this case.")

Mr. Austin's constitutional rights were violated.

To be competent to stand trial, a defendant must have "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding," and must have "a rational as well as factual understanding of the proceedings against him."  Dusky v. United States, 362 U.S. 402  (1960).

In this case, as a result of his mental illness and his deep depression, Mr. Austin did not have the ability to consult with counsel with a reasonable degree of rational understanding and did not have a rational understanding of the proceedings against him.

The Supreme Court has made it clear that the phrase "rational understanding" includes the ability to make a reasoned or rational choice.  Godinez v. Moran, 509 U.S. 389, 398 (1993)

The requirement that a defendant be able to make rational choices is fundamental to the court's decision in Godinez.  The Court found that the standard for competence to plead guilty or waive counsel was the same as the standard of competence necessary for trial because the *decisions* to be made by the defendant were similarly profound and complex in each case.  Id. at 398-9.   In Godinez the Supreme Court specifically referenced its jurisprudence regarding the capacity to make a rational choice, a capacity inherent in an assessment of competency to waive discretionary appeals in capital cases.  Id.  citing Rees v. Peyton, 384 U.S. 312, 314, 16 L. Ed. 2d 583, 86 S. Ct. 1505 (1966)  The Court also noted that it did not see a difference between the formulation "rational understanding" and the phrase employed by the Ninth Circuit, capacity for "reasoned choice"

> The standard adopted by the Ninth Circuit is whether a defendant who seeks to plead guilty or waive counsel has the capacity for "reasoned choice" among the alternatives available to him. How this standard is different from (much less higher than) the Dusky standard -- whether the defendant has a "rational understanding" of the proceedings -- is not readily apparent to us.

<u>Godinez v. Moran</u>, 509 U.S. 389, 397 (1993).[141]

The Fifth Circuit has also equated the concept of rational choice under the <u>Rees</u> standard and the concept of rational understanding under <u>Dusky</u>.  <u>Mata v. Johnson</u>, 210 F.3d 324, 329 (5th Cir. 2000) (both standards inquire into the discrete capacity to understand and make rational decisions concerning the proceedings at issue).

Dr. Connell has provided a useful analysis of the <u>Dusky</u> test from the perspective of the mental health professions:

> In making an assessment of adjudicative competence, there are two areas of inquiry under *Dusky* (1960):  "whether he [the defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and "whether he has a rational as well as factual understanding of the proceedings against him" (p. 402). Thus, the forensic examiner must make an assessment of competence to assist counsel and decisional competence (Poythress, Nicholson, Otto, Edens, Bonnie, Monahan, & Hoge, 1999). Adjudicative competence includes not only "competence to assist counsel," wherein attention is given to evaluation of the defendant's understanding of charges faced, his or her ability to understand the purpose of the criminal process and the roles of its players, the defendant's recognition of his or her own role as a defendant in the adversarial process, the ability to work with counsel, and the ability to relate pertinent data to assist counsel in one's defense; but also, adjudicative competence includes "decisional competence," those additional abilities that may be needed for autonomous decision making (Poythress, et al., 1999).  The forensic evaluator examines the defendant's ability to seek out and rationally weigh the consequences of various trial strategies or decisions. Of relevance, then, is whether the defendant may suffer from some mental illness or disorder that impairs his or her ability to participate in reasoned consideration of the enormity of the consequences of a capital proceeding, with the possibility of a sentence of death.
> Certain mental health conditions or illnesses may impair cognitive functioning and decision making capacity without limiting or impairing the individual's ability to engage in conversation and cooperate with interview requests.

<u>Exhibit 91 – Statement of Dr. Mary Connell.</u>

It should be noted that the standard for competency to waive discretionary review in a

---

[141] The Supreme Court's grievance in <u>Godinez</u> was not the use of the phrase "reasoned choice" but the idea that there were two standards of competency, one to stand trial and one to waive constitutional rights.

capital case is more narrowly defined than competency to stand trial and represents a lower threshold for the state.  For instance, the <u>Rees</u> standard as interpreted in <u>Rumbaugh</u> requires the presence of mental disease or defect.  <u>Rumbaugh v. Procunier</u>, 753 F.2d 395, 398 (5th Cir. 1985) (if a person is not suffering from a mental disease or defect then he is necessarily competent). This is to be contrasted with the test for incompetence, which does not require the presence of mental illness. <u>Dusky v. United States</u>, 362 U.S. at 402.; <u>State v. Harris</u>, 53 N.C. 136, 143 (1860).  Competence to stand trial also involves a factual and rational understanding of a broader range of issues than is pertinent in a <u>Rees</u> type of case, including the ability to communicate with counsel and the ability to make choices.

Nevertheless, as to the ability to make a rational choice, a component of rational understanding, the Supreme Court has held that the question is whether the defendant's capacity to make a rational choice is substantially affected.  <u>Rees</u>, 312 at 314.  Psychologists refer to this aspect of the *Dusky* test as "decisional competence."   <u>Exhibit 91 – Statement of Dr. Mary Connell.</u>

In considering the second prong of the <u>Dusky</u> test – the requirement of a "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" <u>Dusky</u> 362 U.S. at 402 – courts have emphasized the importance of the defendant's ability to appreciate and weigh information, particularly as it regards the waiver of constitutional rights:

> In relation to cooperation with counsel, these capacities are put to the test, particularly when defendant is faced with choices whether to waive constitutional rights, such as to waive the right to counsel, to plead guilty or go to trial, to waive a jury, to cross-examine witnesses, and to testify in his own defense. See <u>Godinez v. Moran</u>, 509 U.S. 389, 399, 125 L. Ed. 2d 321, 113 S. Ct. 2680 (1993) (identifying choices which criminal defendants face). *Without the defendant's ability to appreciate and weigh information and advice*, counsel cannot effectively fulfill his role as counselor. See <u>United States v. Nagy</u>, 1998 U.S. Dist. LEXIS 9478, 1998 WL 341940, at (S.D.N.Y. 1998), quoting <u>United States v. Hemsi</u>, 901 F.2d 293, 295 (2d Cir. 1990), and <u>Dusky</u>, 362 U.S. at 402 ("It is not

sufficient merely that the defendant can make a recitation of the charges or the names of witnesses, for proper assistance in the defense requires an understanding that is rational as well as factual.") (internal quotation marks omitted).

United States v. Salley, 246 F. Supp. 2d 970, 977 (D. Ill. 2003) (emphasis added).

A defendant will be found incompetent where mental illness prevents him from making a rational choice between his alternatives even though his knowledge of his choices and their consequences is not impaired.  In re Cockrum, 867 F. Supp. 484, 487 (D. Tex. 1994) (rev'd on other grounds, Cockrum v. Johnson, 119 F.3d 297) (5th Cir. 1997).  In Cockrum the defendant wished to waive his appeals and understood that this would result in his execution: in fact, execution is what he desired.  Nevertheless he was found incompetent after the district court found that his desire to die stemmed from mental disorder.

Rational understanding is not demonstrated simply by the defendant's goal-directed behavior, or by the fact that his perspective and his acts were consistent with his felt need, particularly where that "felt need" derives from his mental illness.  United States v. Blohm, 579 F. Supp. 495, 499 (D.N.Y. 1983).

In Blohm the court was faced with an intelligent, college educated defendant who had "a capacity to not only understand but to seek to manipulate the proceedings" in which he was involved.  Id. at 500.  The court received unanimous psychiatric evidence that Blohm had "an accurate intellectual understanding of the nature of the charges against him, the criminal proceedings that lie ahead of him and the penalties that may result."  Id. at 501.  Nevertheless, the court found that Blohm did not possess a rational understanding and was therefore not competent because his understanding of his criminal proceedings was distorted by a mental illness which infected his decision making and ability to consult with counsel.  Id. at 505  See also United States v. Timmins, 301 F.3d 974 (9th Cir. 2002) (A defendant is not competent if

mental illness would drive him to reject plea offer); <u>United States v. Nagy</u>, 1998 U.S. Dist. LEXIS 9478 (D.N.Y. 1998) (Defendant not competent despite factual understanding because mental illness skewed his understanding of proceedings so that he could not rationally make strategic decisions.).

A prisoner may collaterally attack his conviction by proving his incompetency at the time of the trial by a preponderance of the evidence. He is entitled to an evidentiary hearing for that purpose when he makes a showing by clear and convincing evidence that raises a threshold doubt about his competency. <u>Zapata v. Estelle</u>, 585 F.2d 750 (5th Cir. 1978).

Mr. Austin was not subject to an adequate examination of his competence before trial or the waiver of counsel and appellate rights. The deficiencies in both the information available and the methodology of the pre-trial assessment have been detailed above and acknowledged by Dr. Brown himself.[142]

By way of contrast, Mr. Austin has now been subjected to a detailed psychological and psychiatric assessment involving reliance upon multiple clinical interviews,[143] psychometric and neuropsychological testing,[144] review of records,[145] review of previous assessments[146] and review

---

[142] <u>Exhibit 96 – Affidavit of Dr. Jerome Brown</u> ("a review of accurate information regarding his functioning would be extremely important to ensure that he received a fair and impartial evaluation of his abilities at that time . . . it was not possible for this to occur in this case.")

[143] <u>Exhibit – 93 Statement of Antoinette R. Cicerello</u> ("Clinical interview, mental status examination, and neuropsychological and psychological testing conducted on 5/26/04, totaling approximately 6 hours."); <u>Exhibit 95 – Statement of Dr. George Woods</u> ("In order to complete my examination, I interviewed Mr. Austin on two separate occasions, May 26, 2004, and June 19, 2004, a total of 4 hours.")

[144] <u>Exhibit – 93 Statement of Antoinette R. Cicerello</u> ("Test of Memory Malingering; Miller Forensic Assessment of Symptoms Test; Vocabulary and Similarities Subtests from the Wechsler Abbreviated Scale of Intelligence; Digit Span and Digit Symbol Subtests from the Wechsler Adult Intelligence Scale-III; Mini-Mental State Examination; Wide Range Achievement Test-3 (Tan Version); Wisconsin Card Sorting Test; Trail Making Test, Parts A and B; Boston Naming Test; Letter and Category Fluency; Reitan-Indiana Aphasia Screening Test; Ruff Figural Fluency Test; Hooper Visual Organization Test; Digit Vigilance Test; Wechsler Memory Scale-III, Abbreviated Version; Rey-Osterrieth Complex Figure Test; Finger Tapping; Grip Strength; Personality Assessment Inventory.")

[145] <u>Exhibit – 93 Statement of Antoinette R. Cicerello</u> & <u>Exhibit 95 – Statement of Dr. George Woods</u> ("Register record of contact with Family Counseling Service in 1975; Hamilton Heights High School records (1971-1974); Killeen Independent School (1974); Military Records for Perry Austin; Letter from Perry Austin to trial judge

of information from collateral informants.[147]   Utilizing this information Dr. George Woods, an

eminently qualified psychiatrist, has conducted an assessment of Mr. Austin's competency at the

time of trial.  Dr. Woods has concluded that Mr. Austin was not competent to stand trial and that

his decisions to waive the right to counsel and to plead guilty were not knowing, intelligent or

voluntary.  He states his conclusion as follows:

> Mr. Perry Austin is a 44 year old male who is currently incarcerated on Death
> Row in Texas. During the period that he was on trial for his life, his suicidal
> ideation precluded him from making a rational choice among his legal options.
> Mr. Austin's suicidal ideation also precluded him from making a rational choice
> among his legal options at the point at which he was able to toll his appellate
> process.
>
> Acknowledging the difficulties in making an assessment of a person's functioning
> at some point in the past, it is my opinion which I hold to a reasonable degree of
> medical certainty that Mr. Austin was not competent to stand trial or to participate
> in the appellate process and that his decisions to proceed unrepresented and to

---

seeking psychiatric assistance following 1979 conviction; Letter from Rod Poirot, Esq., Mr. Austin's 1979 trial attorney, alerting the courts to Mr. Austin's plea for psychiatric intervention; Perry Austin's statement to police on 8/25/1992; Police Interview Notes between Sgt. Allen and Perry Austin, 9/6/1992; Police Interview notes between Sgt. Allen and Perry Austin, 4/25/1993; Letter dated 9/7/2000, actually sent 1/2001, by Perry Austin offering to confess if guaranteed the death penalty; Statement of Perry Austin, 1/31/2001; Transcript of evidence and argument in capital trial, day 1 (4/1/2002); Transcript of evidence and argument in capital trial, day 2 (4/2/2002); Transcript of evidence and argument in capital trial, day 3 (4/3/2002); Letter from Perry Austin to Judge Cosper, 4/17/2001; Letter from Perry Austin to Judge Cosper, 7/20/2001; Harris County Jail records, 10/2002 - 4/2002; Letter from Perry Austin to Judge Cosper, 8/14/2001; Letter from Perry Austin to Judge Cosper, 1/23/2002; Letter from Perry Austin to Judge Cosper, 2/19/2002; Letter from Perry Austin to Judge Cosper, 2/21/2002; Letter from Perry Austin to Judge Cosper, 4/7/2003; Letter from Perry Austin to Judge Cosper, 8/29/2003; Letter from Perry Austin to Judge Cosper, 6/24/2003; Harris County Jail Records (10/2001 - 4/2002); TDCJ records relevant to 1978 rape offense.

[146] Exhibit – 93 Statement of Antoinette R. Cicerello   & Exhibit 95 – Statement of Dr. George Woods (Psychological Report of Franklin Lewis, Ph.D. (12/11/1978); Testimony of Franklin Lewis, Ph.D.; Testimony of James P. Grigson, M.D. (1/1979); Brief competency letter of Jerome Brown, Ph.D., 9/25/2001; Harris County Jail Records (10/2001 - 4/2002); Harris County Jail records, 10/2002 - 4/2002; Transcript of Faretta hearing to determine competency of Perry Austin's right to waive counsel, 10/11/2002; Transcript of Faretta Hearing on appeal rights, 4/4/2002; Report of Polygrapher, Joe Bartlett, 5/14/2004; Neuropsychological Report of Antoinette Cicerello, PhD, dated 6/21/2004; Forensic Report of Mary A. Connell, PhD, date 6/21/200436.

[147] Exhibit – 93 Statement of Antoinette R. Cicerello   & Exhibit 95 – Statement of Dr. George Woods (Statement of Stan Renner; Statement of Mary Lou Austin;Statement of Marilyn Grady; Statement of Larry Cook; Statement of James Martino; Statement of Jan Hoch; Statement of Gary Ward; Statement of Bruce Hinshaw; Statement of Diana Bryant; Statement of Irma Johnson; Statement of Delma Krasusky; Statement of Michael Reed; Statement of Rena Ropple; Statement of Michael Goodner; Affidavit of Mary Picton; Affidavit of Celia Picton; Statement of Johnny Springs; Affidavit of Charles Ledford; Affidavit of Dempsey Sutton; Affidavit of Frank Skoff; Affidavit of Jimmy Hinson; Affidavit of John Creekmore; Affidavit of Michael Harrel; Affidavit of Allan Fontenot; Affidavit of Bernard Richard;   Exhibit – 93 Statement of Antoinette R. Cicerello   ("In-person collateral interview with Mr. William Austin (Perry Austin's father) on 5/17/04, totaling approximately 1-¼ hours.")

plead guilty were not knowing, voluntary, nor intelligent.  It is my opinion that Mr. Austin's actions were the product of severe and long standing mental illness/defects rather than the autonomous decisions of a person with rational understanding.

Exhibit 95 – Statement of Dr. George Woods.

It is appropriate to discuss the assessment and analysis of Mr. Austin's lack of competence in more detail.

A brief mention should be made of the assessment of Dr. Lewis from twenty-five years ago.  Dr. Lewis administered psychometric testing, reviewed some records and conducted a clinical interview and ultimately concluded that Mr. Austin had reached the level of legal insanity.  He reported that:

> Seven of the clinical scales on the MMPI were outside normal limits, and indicate that Perry is suffering from a mental illness...Many of his behaviors are unpredictable, even to himself...There is evidence of  antisocial personality characteristics, but sociopathy is nested within a mental illness...MAT indicates that much of his behaviors are unconsciously motivated and that pathology was in all probability laid down in childhood...Furthermore, thinking is unusual and unconventional and may be quite distorted at times...

Exhibit 28 – Report of Psychological Evaluation by Franklin D. Lewis.  In his testimony at trial, Dr. Lewis referred to the possibility of "brain damage or brain dysfunction" and the need for further testing to confirm this possibility.  Exhibit 17 – Direct Testimony of Franklin Lewis

As a result of the clear indications of brain dysfunction in Mr. Austin's background and Dr. Lewis' earlier recommendation for further testing the assessment of Mr. Austin's competence included a neuropsychological evaluation undertaken by Dr. Cicerello.  Dr. Cicerello subjected Mr. Austin to a battery of testing in a lengthy examination.

As a starting point Mr. Austin was honest and forthright with Dr. Cicerello and her test results are valid.  Dr. Cicerello noted that Mr. Austin was

cooperative throughout the evaluation . . . was putting forth complete effort on

both cognitive and psychological tests . . . there was no indication of malingering or exaggeration of cognitive difficulties . . . a test of psychiatric symptamatology revealed that Mr. Austin was not exaggerating or malingering any psychiatric symptoms. . . results of the Personality Assessment Inventory . . . indicated that Mr. Austin was being open and forthright when responding to items on the test, suggesting no exaggeration of psychopathology.

Exhibit – 93 Statement of Antoinette R. Cicerello.  Indeed, Dr. Cicerello noted that:

Mr. Austin appeared to minimize or externalize any psychiatric symptoms or portrayals of family history suggesting mental illness, and it was apparent throughout this examination that he did not want to be seen as mentally ill.

Exhibit – 93 Statement of Antoinette R. Cicerello.  Dr. Cicerello's findings of the frankness of

Mr. Austin were echoed by Dr. Woods and both doctors noted that this feature was corroborated

by the results of polygrapher, Joe Bartlett.[148]  The results of the testing and examinations by Dr.

Cicerello and Dr. Woods should be regarded as valid and reliable.

Dr. Cicerello provides a detailed description of the results of her neuropsychological

testing and summarizes the results in her clinical summary including the findings that:

he demonstrated significant difficulties in the areas of initial conceptualization, inflexibility of processing on complex tasks, and fine motor skills, and to a lesser degree, gross manual strength.  Alternatively, language skills and memory ability were relative strengths for this individual.  His overall pattern of cognitive performance suggests dysfunction of pre-frontal systems.  This pre-frontal dysfunction was consistent with mental status findings of reduced spontaneity of speech and increased response latency, and his history that is replete with observations by others of apathy, poor judgment, difficulty in adapting to new situations, and blunted social sensibility.  This presentation and pattern of behavior appears to have been present since childhood and may be the product of a neurodevelopmental anomaly.

Exhibit – 93 Statement of Antoinette R. Cicerello.  Dr. Cicerello conducted a "mental status

examination, which revealed severe depressive symptomatology, including ongoing suicidal

---

[148] Exhibit 80 - Letter from Joe Bartlett, Jr., Polygraph Examiner ("No reactions indicative of deception were noted by the examiner to relevant questions asked the subject concerning the death of DK. In the opinion of the examiner, the subject is being truthful when denying that he killed DK. In the opinion of the examiner the subject's involvement in this case consists of 1) him picking up DK and taking DK to John Maranto's apartment, 2) removing

ideation and plan, but the mental status further identified compulsive-type behaviors of washing,

writing, sexual deviancy, and ritualistic-like masturbation." These findings were supported by

the results of Dr. Cicerello's psychological testing, which revealed:

> significant depression, history of problems with drugs, suicidality, history of physical aggression, antisocial behaviors, anxiety related to a traumatic event, identity problems, and potential for self-harm, all of which have been identified in the records or reported by Mr. Austin.

Exhibit – 93 Statement of Antoinette R. Cicerello.  Finally, Dr. Cicerello described the complex

interplay of Mr. Austin's various psychiatric conditions:

> The interplay of Mr. Austin's various psychiatric conditions is complex.  The cognitive disorder that he suffers from predisposes him to severe bouts of depression given his inflexibility of thinking, poor ability to adapt, difficulty with conceptual initiation, mental rigidity, and blunted social sensibility, particularly in environments such as prison, where adaptability is the key to survival.  He would have difficulty finding alternative ways of coping or dealing with stressful situations and may become fixed on one method of responding, even though it may not be working.  In turn, during times of depression, his cognitive deficits become exacerbated, leading to increased difficulties in attention and concentration, problem solving, and basic ability to function on a day-to-day basis.

Exhibit – 93 Statement of Antoinette R. Cicerello.  Dr. Cicerello found that the results of testing

were consistent with her clinical examination, records reviewed, previous assessment and

collateral sources.  Ultimately Dr. Cicerello diagnosed Mr. Austin as suffering from severe

mental illness as follows:

> According to the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, the following diagnoses are appropriate:
> Axis I:   296.33    Major Depressive Disorder, Recurrent, Severe (possibly with psychotic features)
> 294.9  Cognitive Disorder Not Otherwise Specified (pre-frontal dysfunction)
> 304.80 Polysubstance Dependence in Sustained Full Remission in a Controlled Environment
> 300.00 Anxiety Disorder Not Otherwise Specified (features of

---

DK's body from the apartment and 3) disposing of the body where it was found.")

> posttraumatic    stress    disorder    and    obsessive-compulsive
> disorder)

Axis II:    301.9      Personality  Disorder  Not  Otherwise  Specified
(antisocial and borderline personality traits)

Exhibit – 93 Statement of Antoinette R. Cicerello.

Dr. Woods made use of Dr. Cicerello's findings in formulating his opinion, as well as the

other sources referred to above.  In his report Dr. Woods expresses the opinion that Mr. Austin

suffers from a severe mood disorder and organic impairment of his brain.

> It is my professional opinion which I hold to a reasonable degree of medical
> certainty that Mr. Austin suffered from a mental disease/defect at the time of his
> trial, sentencing, and during the period that he refused to consider his appeals. Mr.
> Austin was suffering from not only a mood disorder that manifested itself in
> suicidal behavior, he was also suffering from organic impairments that precluded
> him from being able to determine, initially, the effective manner to weigh and
> deliberate his circumstances.

> Mr. Austin has suffered from a severe mood disorder and organic impairment of
> his brain for many years.

Exhibit 95 – Statement of Dr. George Woods.

Dr. Woods found support for his opinion in Mr. Austin's history, including his military

records and the assessment of Dr. Lewis.  Dr. Woods notes Dr. Lewis' recommendation of

further testing and that "testing has now confirmed that Mr. Austin suffers from organic brain

impairment."   Further that the current diagnosis made by both himself and Dr. Cicerello

"subsume the antisocial presentation, in the way that Dr. Lewis presaged in his testimony."

Exhibit 95 – Statement of Dr. George Woods.

Dr. Woods describes Mr. Austin's deterioration in custody and his actions in service of

his irrational mood disorder:

> He continued to deteriorate, secondary to his unstable mental state and, by the
> time he was charged with the crime for which he has now pled guilty and been
> sentenced to death, Mr. Austin was actively suicidal. He believed that the state
> would be, from a religious perspective, the most appropriate vehicle for his death

and, in the service of his irrational mood disorder, began to prepare the pathway of his personal destruction.

Exhibit 95 – Statement of Dr. George Woods.

Dr. Woods analyzes Mr. Austin's communications with Sgt. Allen and the trial court stating that Mr. Austin:

> made his intentions clear, that he wanted to be found guilty and executed . . . However, even within his multiple attempts to kill himself, using the state as the weapon to take his life, there are indications that Mr. Austin was not rational.

Exhibit 95 – Statement of Dr. George Woods.  Dr. Woods also analyzes Mr. Austin's awareness of the "the inability of the court to act effectively on his incompetence", Mr. Austin's other suicidal behavior and ideation during this period and the consistency of his suicidal intent after the verdict.

Dr. Woods goes on to analyze the way in which Mr. Austin's impairments acted to deprive him of rational understanding or choice in his decision to seek "death by state" and the delicate balance that has allowed Mr. Austin to be drawn back from the tipping point of incompetence:

> Mr. Austin was not able to rationally assist in the preparation of his defense, given his steadfast desire to die by the hands of the state. This suicidal ideation, based upon his mental disease and reinforced by his cognitively derived inability to effectively weigh and deliberate decisions at the time of their presentation, rendered Mr. Austin incompetent to rationally weigh and deliberate his legal decisions at the time of his trial. His incompetence continued through the period of time that Mr. Austin had to weigh and deliberate his legal options to appeal.

> * * * *

> Mr. Austin's acknowledgment of "bouts of depression" during previous periods reinforces the "Death by State" ideation that comes through so clearly in his drive to eliminate any legal impediment to his suicidal, irrational, behavior during his trial and during the time that he refused to invoke his right to an appellate process.

> Mr. Austin's examination corroborated the record of his trial and subsequent relinquishment of his appellate process. He was able to discuss the depth of his

depression and his fervent, irrational suicidal ideation. He acknowledged his wish to die, and remembered little of his trial, or the months following his trial. Although he continues to suffer from neurovegetative symptoms of depression, including psychomotor retardation, sleep disruption, problems with eating, and impulse control; the intervention of his father and other loved ones has moved him away from the tipping point of incompetency he was suffering from at the time of his trial and during subsequent periods when he was unable to effectively weigh and deliberate his right to appeal.

The "Clinical Analysis" section of Dr. Woods' report provides a sophisticated and compelling account of Mr. Austin's dysfunction and lack of competence at the time of trial and appeal.  Acknowledging that a mere desire to abandon appeals or seek the death penalty does not prove incompetence Dr. Woods explains that in this case Mr. Austin has a pre-existing and serious mental illness that was the operating cause in his decision to kill himself:

> Mr. Austin suffers from a profound depression. Following detailed objective testing Dr. Antoinette Cicerello diagnosed Mr. Austin as suffering from a recurrent, severe, Major Depressive Disorder.  I concur with this diagnosis.

> This depression is accentuated by frontal lobe dysfunction, as identified by the neuropsychological testing of Dr. Cicerello. Dr. Cicerello's objective testing noted that Mr. Austin has difficulty initiating frontal lobe tasks, particularly being able to initiate weighing and deliberating tasks, and recognizing appropriate social cues. She notes, in her report, that Mr. Austin has problems with initiating complex emotional tasks and is apathetic in his own responses to emotionally laden situations. This corroborated in the clinical interviews and Mr. Austin's history.

> Mr. Austin's long standing psychiatric impairments, captured by Dr. Franklin's psychometric testing 26 years ago, continue to be present. Statements by inmates that were in Harris County Jail with Mr. Austin document his desire to infect himself with the AIDS virus, even while he was refusing to defend himself in a capital trial on a charge from which he now claims he is innocent. Polygraphy supports his contention.

> Mr. Austin's longstanding suicidal ideation has the ability to impair his factual ability to understand the charges he is facing and the powers of the various officers of the court. Most importantly, his suicidal ideation impaired his ability to **rationally** prepare a defense, to accept attorneys that can prepare a defense, and participate in the appellate process, a right which all defendants have.

> It is possible to theorize a prisoner who would choose to abandon his appeals or

seek the death penalty independent of any mental illness or defect.  Mr. Austin is not such a prisoner.  He has a pre-existing and serious mental illness that is, in my opinion which I hold to a reasonable degree of medical certainty, the operating cause in his decision to kill himself.  This illness is exacerbated by his organic impairments.

It is appropriate to be cautious in expressing an opinion about Mr. Austin's competency and the voluntariness of his conduct at an earlier time but in this case, I feel confident in rendering an opinion.  Mr. Austin's history is documented and corroborated from multiple sources, he cooperated with and responded honestly to neuropsychological testing conducted by Dr. Cicerello, and it is my professional opinion that there is sufficient evidence to express a reliable opinion.

Exhibit 95 – Statement of Dr. George Woods.  Dr. Woods goes on to provide a formal diagnosis as follows:

| | |
|---|---|
| I. | Major depressive disorder, severe, recurrent |
| | Cognitive disorder, not otherwise specified |
| | Obsessive compulsive disorder |
| II. | Borderline personality disorder |
| III. | A.  Difficulties initiating executive function tasks |
| | B.  Symptoms consistent with temporal lobe syndrome, including sexual deviancy, magical thinking, unusual religious beliefs, hypergraphia |
| IV. | Legal problems |
| V. | GAF: 45 |

Exhibit 95 – Statement of Dr. George Woods.

This court now has available to it detailed psychological and psychiatric assessments of Mr. Austin, extensive psychometric and neuropsychological testing, volumes of records, a history of previous assessments and statements from a wide range of collateral informants.  The quality and consistency of this material presents an overwhelming picture of Mr. Austin's long-standing, severe mental illness and his inability to rationally understand or decide at the time of his trial and appeals.  Of course, the fact that he wrote to a police officer to confess to a crime on the express condition that he would be executed, sacked his lawyers before trial, plead guilty on April Fool's Day, asked the jury for death, thanked the judge for sentencing him to death and asked to be executed on his birthday are of no small significance even without the wealth of

other material.

The evidence is clear and convincing and it certainly raises a doubt about Mr. Austin's competence.  In fact, upon reviewing the above material, his incompetence becomes clear.

**CLAIM V.**  **Mr. Austin's rights under the Texas and federal constitutions were violated when the state failed to disclose material helpful to Mr. Austin to the court, Mr. Austin or the court appointed psychologist.**

**CLAIM VI.**  **Mr. Austin's rights to counsel under the Texas and Federal Constitutions was violated when the state's failure to disclose evidence relevant to the determination of his competence and the voluntariness of his conduct effectively denied him the assistance of counsel on these issues.**

As will be obvious from the above description of the documentary records available in this case and the documents exhibited to this application, the state was in possession of a large amount of material that would have been favorable to Mr. Austin's interests.  Had the material been disclosed there is a reasonable probability that Mr. Austin would have been found incompetent and/or his efforts to waive counsel and plead guilty would have been seen to be less than knowing, voluntary and intelligent.

Due Process requires the state to disclose material favorable to an accused and a breach will be found irrespective of the good faith or bad faith of the prosecution. Brady v. Maryland, 373 U.S. 83 (1963).  The state's obligation of disclosure is not limited to the provision of material upon the request of the defendant. United States v. Agurs, 427 U.S. 97 (1976).  Further, the state's obligation extends beyond the bounds of the district attorney's office to others acting on the government's behalf in the case. Kyles v. Whitley, 514 U.S. 419, 437 (1995) (prosecutors are responsible for "any favorable evidence known to the others acting on the government's behalf in the case, including the police").

The Supreme court has defined the three elements of a <u>Brady</u> prosecutorial misconduct: "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." <u>Strickler v. Greene</u>, 527 U.S. 263, 281-282 (1999).

In this case particular complaint is made of the state's failure to disclose material relevant to the determination of the defendant's competency and the voluntariness of his waiver of critical constitutional rights such as the right to counsel and the collection of rights waived by his plea of guilty.

The state, through the TDCJ, had full possession of Mr. Austin's custodial and correctional records including those later exhibited in Mr. Austin's trial as exhibits 79, 80 and 81.  The Harris County Sheriff's Office had in its possession evidence of suicidal behavior, a hunger strike, statements regarding efforts to become infected with AIDS, and psychological intake forms in which the defendant disclosed previous suicide attempts and a previous history of psychiatric treatment. <u>Exhibit 14 - Harris County Sheriff's Office Records</u>; <u>Exhibit 15 - Harris County Sheriff's Medical Records</u>. On information and belief the HCSO also had possession of records from 1992 where the applicant was confined in a padded cell and referred for psychiatric assessment due to his irrational behavior. The state also had in its possession the records of the Houston Police Department and their inquiries into Mr. Austin's history, including the knowledge that he had entered a plea of not guilty by reason of insanity at his 1978 trial.  <u>Exhibit 33 - Houston Police Department Records</u>.  The prosecuting team in this case obtained direct control of many of these documents through a series of subpoenas issued in January and February 2002, prior to the commencement of the trial.  On February 21, 2002 Sergeant Allen re-

interviewed Mr. Austin and was expressly told of his symptoms of mental illness and his history of treatment by psychiatrists and counselors.   (RR. XIV-Ex.78).   The records subsequently obtained from the state reveal a plethora of material pointing to Mr. Austin's mental illness.

Notwithstanding all of the information contained in these documents the prosecution remained silent throughout the psychological assessment and waiver colloquy in October 2001. The state remained silent even when Mr. Austin asserted he had no psychiatric history, in direct contradiction to the evidence in the state's hands.  As the immediate prosecuting team took direct possession of this material over the coming months the state still remained silent.   On April 1, 2002 when the defendant was questioned by the trial judge before entering his plea and stated that he was of sound mind and when the trial judge stated that she was relying on the earlier assessment in accepting the plea the state still remained silent.   These are unequivocal breaches of the state's duty of disclosure. Indeed the state should have made full disclosure right from the moment that the trial court ordered a psychological examination.  Blake v Kemp, 758 F.2d 523 (11th Cir. 1985) (Judge's order of a psychiatric examination placed a duty upon the prosecution to provide the doctor and the defense with material relevant to the assessment.).

This circuit has long recognized the state's obligation to disclose evidence relevant to a defendant's competence.  A matter of weeks after Brady was announced and without the need to refer to that holding, the Fifth Circuit held that the Government's failure to disclose the existence of psychiatric opinions, indicating that the defendants were legally incompetent, was a suppression of evidence resulting in a denial of due process. Ashley v. Texas, 319 F.2d 80 (5th Cir. 1963), cert. denied, 375 U.S. 931 (1963)

The holding in Ashley has represented the law in the State of Texas for forty years and has been explicitly recognized by the Court of Criminal Appeals:

> Therefore, we hold that, like exculpatory evidence, information about the incompetence of a defendant can be of such substantial value to the defense that elementary fairness requires it to be disclosed even without a specific request from the defendant. *Accord*, *Ashley v. Texas*, 319 F.2d 80 (5th Cir.), *certiorari denied*, 375 U.S. 931, 84 S. Ct. 331, 11 L. Ed. 2d 263 (1963).

Ex parte Lewis, 587 S.W.2d 697, 701 (Tex. Crim. App. 1979) (Requiring disclosure even in the case of guilty pleas.)[149]

The Court of Criminal Appeals in Lewis made the point that it can never be an answer to an allegation of this sort to suggest that the defendant himself knew of his own psychiatric history:

> The State argues that the prosecutor's duty to disclose extends only to favorable information unknown to the defense, and it points out that the applicant knew that he had seen a psychiatrist. It would be anomalous to hold that the (concededly) illiterate, mentally retarded, alcoholic, and (according to the psychiatrist) psychotic applicant had a duty to tell his counsel that there was available evidence of his insanity and incompetence.

Ex parte Lewis, 587 S.W.2d 697, 701 (Tex. Crim. App. 1979)

It is submitted that the state has a heightened duty of disclosure in a case such as this where a competency issue arises in a capital case and the defendant is seeking to assert his competence and dismiss appointed counsel.  The prosecutor's role as an officer of the court and as a central participant in the truth-finding function of the court is at its most acute in situations like this where the stakes are high and adversarial testing is low.  The Supreme Court has emphasized the special role played by the American prosecutor in the search for the truth.

> We have several times underscored the "special role played by the American prosecutor in the search for truth in criminal trials." Strickler, 527 U.S. 263 at 281; accord, Kyles, 514 U.S. 419 at 439-440; United States v. Bagley, 473 U.S. 667, 675, n. 6, (1985); Berger, 295 U.S. 78 at 88.  *See also* Olmstead v. United States, 277 U.S. 438, 484, (1928) (Brandeis, J. dissenting). Courts, litigants, and

---

[149] See also V.A.C.C.P., Article 2.01 "It shall be the primary duty of all prosecuting attorneys . . . not to convict, but to see that justice is done. They shall not suppress facts or secrete witnesses capable of establishing the innocence of the accused."

juries properly anticipate that "obligations [to refrain from improper methods to secure a conviction] . . . plainly rest[ing] upon the prosecuting attorney, will be faithfully observed." Berger, 295 U.S. 78 at 88.  Prosecutors' dishonest conduct or unwarranted concealment should attract no judicial approbation. See Kyles, 514 U.S. 419 at 440 ("The prudence of the careful prosecutor should not . . . be discouraged.").

Banks v. Dretke, 124 S. Ct. 1256 (2004) (parallel citations omitted).

The question under Brady is then whether the suppressed information was material.  The

Supreme Court recently reiterated the standard for materiality under Brady:

Kyles instructed that the materiality standard for Brady claims is met when "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." 514 U.S. 419 at 435. *See also id*. 514 U.S. 419 at 434-435 ("A defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict."); *accord*, Strickler, 527 U.S. 263 at 290. In short, Banks must show a "reasonable probability of a different result." Kyles, 514 U.S. 419 at 434(internal quotation marks omitted) (citing Bagley, 473 U.S. 667 at 678, 87 L. Ed. 2d 481, 105 S. Ct. 3375).

Banks v. Dretke, 124 S. Ct. 1256, 1276 (2004) (parallel citations ommitted).

To state the test in this case is to answer it.  The provision of the information about the

psychiatric history and determinedly suicidal intent of the defendant would put the assessment of

Mr. Austin's competency and the voluntariness of his choices in a whole new light.  Instead of a

competency assessment predicated upon the false proposition that Mr. Austin had no mental

health history and was simply seeking his just desserts, the court and Dr. Brown would have

been told that he had a significant and disturbing mental health history and that he was seeking

his own death by multiple means.  Instead of defense counsel undertaking no independent

investigation he would have been pout on notice and would have undertaken a detailed

investigation of Mr. Austin's history and resisted his efforts to go *pro se*. See also Ashley v.

Texas, 319 F.2d 80, 85 (5th Cir. 1963) ("the fact of the opinions of Drs. Crowe and Tracktir,

favorable to the defendants, is of such vital significance to the accused persons in planning and

conducting their defense, the failure of the District Attorney to inform their counsel of this fact amounts to such fundamental unfairness in the trial of a criminal case as to amount to a denial of due process."); Ex parte Lewis, 587 S.W.2d 697, 701 (Tex. Crim. App. 1979) ("We think that if the applicant's counsel had been aware of this letter he would not have agreed, on the first day he was appointed and without investigation, to a plea of guilty for a life sentence. The harm is clear.")

 

The results developed by Dr. Cicerello and Dr. Woods only underscore the obvious point that this information, if it had been made known, would have fundamentally changed the course of this case and its outcome.  Exhibit – 93 Statement of Antoinette R. Cicerello  & Exhibit 95 – Statement of Dr. George Woods.

In addition to the Brady violation in this case it is submitted that the state's failure to disclose this material information had the effect of denying Mr. Austin the effective assistance of counsel.  Like the defendant in Blake (supra) the applicant alleges that actions on the part of the state made it impossible for his counsel to render meaningful assistance on the issue of his competence and the voluntariness of his constitutional waivers.   In these circumstances the court's inquiry should focus:

> on the effect of the challenged actions upon the adversary process: did they so completely deprive [Austin] of the right "to require the prosecution's case to survive the crucible of meaningful adversarial testing," Cronic, 104 S. Ct. at 2047, as to make the outcome of the trial presumptively unreliable.

Blake v Kemp, 758 F.2d 523 (11th Cir. 1985).

As in Blake, this question must be answered in the affirmative.  Counsel had sought a psychological examination to allow him to render effective assistance of counsel.  The court then

took over responsibility for the psychological assessment, converting it in to an *ad hoc* competency inquiry.  Mr. Austin actively sought a finding of competency and misled the psychologist and the trial court as to the existence of any psychiatric history.  All the while the state had evidence proving that Mr. Austin was lying, and demonstrating his severe and long-standing impairments. As in <u>Blake</u>, it makes no difference that some of the material was eventually turned over, Mr. Austin was constructively denied the assistance of counsel.

## MR. AUSTIN'S APPOINTED COUNSEL HAD AN UNDISCLOSED CONFLICT OF INTEREST

On March 21, 2001 the court appointed Marshall 'Mack' Arnold as counsel for Mr. Austin.  Mr. Arnold remained counsel for Mr. Austin until October 11, 2001 when he was relieved by the Court following a *Faretta* hearing.  During the time that Mr. Arnold acted as Mr. Austin's appointed counsel Mr. Austin had a number of court hearings and, critically, an inquiry was made as to his competence and his ability to knowingly, voluntarily and intelligently waive his right to counsel.

A review of the Harris County Sheriff's Office (HCSO) files from this period reveals that Mr. Arnold was placed in a direct, actual conflict of interest at this time and actively represented interests contrary to those of his client.

The HCSO files reveal that on May 1, 2001 Mr. Arnold breached the confidence of attorney-client communications to advise Captain Hitchcock of the HCSO that Mr. Austin had threatened to kill another inmate.

> Today at approximately 12:05 PM, Marshall Arnold who is the attorney for inmate Austin came to me to discuss a threat that Austin had conveyed to him. Austin had apparently told Marshall that he (AUSTIN) was going to kill another inmate that is in the same cell.  Austin described the inmate as a black male, using a racial slur.

94

Given inmate Austin's current charge and history since incarceration, I recommend Austin be moved to an administrative separation cell and remain there while in our custody.  I have attached Marshall Arnold's business card should you need to contact him.

/s/ Lanny K. Hitchcock, Captain
1301 Command

Exhibit 14 - Harris County Sheriff's Office Records.  This threat resulted in Mr. Austin's

removal to administrative segregation.  Exhibit 14 - Harris County Sheriff's Office Records

It is apparent from the material in the HCSO file that Mr. Austin tried on many occasions

to discover why he had been put in segregation and that these attempts included asking his

attorney, Mr. Arnold.

In July 2001 Mr. Austin, in an extremely alarming letter, wrote directly to the trial court

asking that he be moved out of segregation.  The letter discloses the fact that Mr. Austin was

suffering serious depression from his placement in segregation and was therefore considering

suicide.  In fact, he warned the court that if left in segregation he was likely to commit suicide

before the trial.  Mr. Austin also asked that the trial and execution dates be brought forward.

Dear Judge Cosper,

I know things are pretty hectic and you've got a lot to do and I really hate to trouble you but I would like to make a special request of you.

Can you get me out of seg and back out into population?  I have not had a disciplinary case since I entered the county jail and although I have a Capital murder charge I am sure there are others in population with similar charges

If you cannot get me out of seg, could you please move up my court date so my stay in seg will not be prolonged?  My trial should last no longer than two or three days as I will be pleading guilty and will not put up a defense in this case. Also, as soon as I am able, or am permitted, after sentencing, I will be dropping all appeals and will request an execution date as soon as is conveniently possible. That means I do not plan on being in this world too much longer and I want to spend at least what little time I do have with what little freedom there is by being out in population.  I cannot handle prolonged isolation I have a very bad problem with depression and when I get depressed I tend to think about suicide a lot.  If I

am forced to remain in seg too long I won't be around to stand trial.

I would appreciate your consideration concerning my request.

Thank you for your time.

Sincerely,

/s/
Perry A. Austin

(CR. 16).  The letter is dated Thursday July 19, 2001, post-marked July 20, 2001 and filed on

July 27, 2001

The Court made it clear on the record that Mr. Austin's letters to the Court were being

placed on file but also forwarded to defense and prosecuting counsel.  *Faretta* hearing, RR. II-3.

Notwithstanding this, Mr. Arnold does not appear to have alerted anybody to the actual conflict

in which he found himself.

On October 6, 2001 Mr. Austin went on a hunger strike in protest of the fact that he was

improperly being detained in segregation.  This resulted in a referral for psychiatric screening.

(Ex. 14).

On October 15, 2001 Mr. Austin wrote a letter to the authorities at HCSO describing the

history of his efforts to find out why he was in segregation and to change his status.  In that letter

he noted that on October 11, 2001 he asked Mr. Arnold whether Arnold had anything to do with

Mr. Austin being in segregation.  Mr. Austin's letter reveals that, "[Mr. Arnold] finally confessed

that he had it done because of the conversation we had on May 1st during our visit." Exhibit 14 -

Harris County Sheriff's Office Records.  Mr. Austin also filed an Inmate Grievance Form on that

day in similar terms to his letter.  Exhibit 14 - Harris County Sheriff's Office Records.

On November 8 or 10, 2001, in response to his grievance, Mr. Austin was told by Sgt.

Hawkins that he was in segregation "because he did threaten someone." Exhibit 14 - Harris

County Sheriff's Office Records..

**CLAIM VII.    Mr. Austin's right to the effective assistance of counsel was denied as a result of a conflict of interest when he was appointed counsel who after appointment secretly advocated against Mr. Austin's interests.**

Mr. Arnold was appointed counsel to Mr. Austin in March of 2001.  Less than two months after his appointment Mr. Arnold disclosed privileged information to the Harris County Sheriff's Office resulting in Mr. Austin being placed into the shocking conditions of administrative segregation.

Mr. Austin then repeatedly sought to find out why he had been moved to segregation and attempted to challenge this classification without success.  He sought Mr. Arnold's assistance in getting moved out of segregation but Mr. Arnold did not help and, at that stage, did not tell Mr. Austin of the disclosure of privileged information.  Instead, Mr. Arnold provided Mr. Austin with a series of other explanations for why he was in segregation and why Mr. Arnold would not be able to move him out.

Despite the fact that Mr. Austin protested the move to segregation, sought release from this confinement and described the suicidal depression it was engendering in him, Mr. Arnold did not tell Mr. Austin that it was his disclosure that had landed Mr. Austin in segregation.

Mr. Arnold, whether by statutory duty or not, actively advocated another interest against the interests of his client.  This is a clear case of an actual conflict of interest.

The Texas Rules of Professional Conduct[150] provide that notwithstanding professional privilege an attorney may disclose confidential information to prevent commission of an offense:

---

[150] Tex. Disc. R. Prof. Conduct, (1989) reprinted in Tex. Gov't Code Ann. tit. 2, subtit. G, app. (Vernon Supp. 1995)(State Bar Rules art X [[section]]9)).

97

> (7) When the lawyer has reason to believe it is necessary to do so in order to prevent the client from committing a criminal or fraudulent act.

Rule 1.05(c)(7).  The Rules go on to make the disclosure of information mandatory when it is clearly established that the client is likely to commit a crime that is likely to result in death or substantial bodily harm:

> (e) When a lawyer has confidential information clearly establishing that a client is likely to commit a criminal or fraudulent act that is likely to result in death or substantial bodily harm to a person, the lawyer shall reveal confidential information to the extent revelation reasonably appears necessary to prevent the client from committing the criminal or fraudulent act.

Rule 1.05(e).

Importantly, before an attorney is bound to disclose privileged information he or she must have evidence *clearly establishing* that a client is likely to commit a serious violent offense.

Mandated or not, the disclosure of privileged attorney-client communications without the client's consent has a devastating impact on the attorney-client relationship.

> I agree to the doctrine urged at the bar, as to the delicacy of the relation of client and attorney, and the duty of a full, frank, and free disclosure by the latter of every circumstance, which may be presumed to be material, not merely to the interests, but to the fair exercise of the judgment, of the client.

Williams v. Reed, 29 F. Cas. 1386, 1390, F. Cas. No. 17733 (No. 17,733) (CC Me. 1824); cited with approval Mickens v. Taylor, 535 U.S. 162, 181 (U.S. 2002) (per Stevens J. dissenting); International Business Machines Corp. v. Levin, 579 F.2d 271, 282 (3d Cir. 1978) ("full and effective disclosure of all the relevant facts must be made and brought home to the prospective client.").

Here, the situation was made worse by the fact that appointed counsel for Mr. Austin not only told the Harris County Sheriff's Office that Mr. Austin intended to kill someone, causing Mr. Austin to be placed in segregation, but failed to tell Mr. Austin about this breach of

confidence.  Instead, keeping his disclosure a secret, appointed counsel purported to continue to maintain an attorney client relationship.

The need for full and frank disclosure by an attorney to his or her client has been long accepted and is reflected in the <u>Texas Rules of Professional Conduct</u>.  Rule 1.03 (Attorney must keep a client reasonably informed about the status of a matter and shall explain a matter to the extent reasonably necessary to permit the client to make informed decisions regarding the representation.).  It is clear that an attorney may not withhold information from a client for his own convenience or interest.  Rule 1.03, Comment 4 ("A lawyer may not, however, withhold information to serve the lawyer's own interest or convenience.").

The solution is simple and clearly mandated by the Rules of Professional Conduct.  An attorney must breach privilege and advise the authorities when his client threatens  to kill another person but counsel must tell his client that he has done this and must either withdraw or must obtain an informed waiver from the client.

The delicacy of the attorney client relationship cannot survive the attorney becoming a snitch, even where the law requires it of him. The fundamental attributes of loyalty and zealous advocacy are necessarily impaired, if not destroyed, in a case of this sort.  Mr. Arnold was placed in a position of conflict of interest between his own actions and interests and those of his client.

The Texas Rules of Professional Conduct define a conflict of interest as including those situations where representation appears to be adversely limited by the lawyer's responsibilities to another or to the lawyer's own interests.

> b) In other situations and except to the extent permitted by paragraph (c), a lawyer shall not represent a person if the representation of that person:

> * * * *

> (2) reasonably appears to be or become adversely limited by the lawyers or law

firm's responsibilities to . . .  a third person or by the lawyers or law firms own interests.

Mr. Austin had a constitutionally guaranteed right to conflict-free counsel.  Wood v. Georgia, 450 U.S. 261, 271 (1981) ("Where a constitutional right to counsel exists, our Sixth Amendment cases hold that there is a correlative right to representation that is free from conflicts of interest.").

Where a defendant alleges a denial of his right to conflict-free counsel due to an actual conflict, he need only establish (1) an actual conflict of interest that (2) adversely affected his counsel's performance. Cuyler v. Sullivan, 446 U.S. 335, 348 (1980).

An attorney has an actual, as opposed to a potential, conflict of interest when, during the course of the representation, the attorney's and defendant's interests "diverge with respect to a material factual or legal issue or to a course of action." Winkler v. Keane, 7 F.3d 304, 307 (2d Cir. 1993) (citing Cuyler, 446 U.S. at 356 n.3 (dissent of Marshall, J.)).  An actual conflict of interest exists where the defendant "shows that his counsel actively represented conflicting interests." Cuyler, 446 U.S. at 350.

"[T]he adversarial process protected by the Sixth Amendment requires that the accused have 'counsel acting in the role of an advocate.'" United States v. Cronic, 466 U.S. 648, 656 (1984) (quoting Anders v. California, 386 U.S. 738, 743 (1967)).  The advocacy must be on behalf of the client, and in the client's best interests:  "It is well-settled that the Sixth Amendment right to counsel is normally satisfied only when an attorney's loyalty lies solely with his client." Commonwealth v. Duffy, 394 A.2d 965, 967 (Pa. 1978) (citing cases).

While conflicts of interest normally arise in the context of a conflict in counsel's representation of a co-defendant or a witness, "[c]ompetition between the client's interests and

counsel's own interests plainly threatens [the caliber of defense services], and we have no doubt that the conflict corrupts the relationship."  U.S v. Hurt, 543 F.2d 162, 166 (D.C. Cir. 1976); U.S. v. Ellison, 798 F.2d 1102, 1106-07 (7th Cir. 1986).  This kind of conflict is present when the "interests of counsel . . . [are] 'inconsistent, diverse or otherwise discordant' with those of his client."  Government of the Virgin Islands v. Zepp, 748 F.2d 125, 135 (3d Cir. 1984)  (conflict both because counsel became a witness against defendant and because counsel's personal interest in avoiding sanction diverged with his client's interests.).

This is a clear case of an actual conflict.  Whether or not it arose from an obligation imposed by law,[151] Mr. Arnold actively represented a conflicting interest when he disclosed privileged communications resulting in his client being locked down in segregation.  He continued to actively represent those conflicting interests when he breached his duty to disclose his actions to Mr. Austin; when he failed to act to have Mr. Austin moved out of segregation – even though segregation was obviously increasing Mr. Austin's suicidal depression; and when he misled Mr. Austin as to the basis of his placement in administrative segregation.

Counsel in Mr. Arnold's position could advise their client of the breach of privilege. However, doing so represents a financial risk to counsel as he will almost certainly be dismissed by the client.  This is another way in which Mr. Arnold's and Mr. Austin's interests diverged.

Counsel's ethical duty can obviously create a conflict that requires an informed waiver by a client before representation can continue.  Where counsel's duty to fully advise a client of his legal options is impaired because he is deflected by his own ethical obligations, this will

_____

[151] To the extent that Mr. Arnold's actions were driven by an obligation imposed upon him by law, this obligation created a structural defect in the trial where counsel continued to act for Mr. Austin,  preventing appointed defense counsel from performing his institutional role of zealous advocacy.  Tueros v. Greiner, 343 F.3d 587, 597 (2d Cir. 2003) (conflicts arising from actual duties are structural flaws in our adversarial system of justice that guarantees each defendant a lawyer functioning in an institutional role that permits zealous advocacy).

represent an actual conflict of interest.  Smith v. State, 717 P.2d 402, 406 (Alaska Ct. App. 1986) (To the extent that this precluded Smith's counsel from fully advising his client of the options legally open to him, however, the concern of Smith's counsel with his own ethical and moral dilemma was squarely at odds with his duty to "conscientiously protect his client's interest, undeflected by conflicting considerations." )  Such a conflict is particularly acute where a client actually seeks aid or advice on the matter at the heart of counsel's ethical obligation.  Here, Mr. Arnold was deflected from fully advising Mr. Austin of his ability to challenge the basis for his placement in segregation by his perceived ethical duty of mandatory disclosure.

Counsel must be an active advocate, pursuing his client's interests with zeal and vigor. Where counsel, out of court, expresses the view that his client is a prime candidate for the death penalty, this will represent a conflict on interest, as discussed in Holland:

> To be effective, an attorney "must play the role of an active advocate, rather than a mere friend of the court." Evitts v. Lucey, 469 U.S. 387, 394 (1985). Unless an attorney represents the interests of a client with zeal and loyalty, the adversarial system of justice cannot operate. Holland II, 876 P.2d at 359 (citing United States v. Cronic, 466 U.S. 648, 656-57 (1984); Von Moltke v. Gillies, 332 U.S. 708, 725-26 (1948) (plurality opinion)). At the very least, this duty of loyalty requires attorneys to refrain from acting as an advocate against their clients, even in a matter unrelated to the case for which the attorney has been retained. See Holland II, 876 P.2d at 359-60.
>
> If an attorney's loyalty is compromised because he believes that his client should be convicted or because he is influenced by a conflict in loyalties to other defendants, third parties, or the government, the law cannot tolerate the risk that the attorney will fail to subject the prosecution's case to the kind of adversarial challenge necessary to ensure that the accused receives the effective assistance of counsel as guaranteed by the Sixth Amendment.

State v. Holland, 921 P.2d 430, 435-436 (Utah, 1996) (parallel cites omitted).  In this case Mr. Austin's counsel told the Harris County Sheriff's Office that Mr. Austin was a future danger. Mr. Arnold may well have done this out of  a sense of ethical obligation but what was created was an intolerable conflict as Mr. Arnold was forced to advocate against his client and disclosure

and either waiver or withdrawal should have followed.

> In fact, an attorney who is burdened by a conflict between his client's interests and his own sympathies to the prosecution's position is considerably worse than an attorney with loyalty to other defendants, because the interests of the state and the defendant are necessarily in opposition.

Frazer v. United States, 18 F.3d 778, 783 (9th Cir. 1994).

Counsel's performance here was unequivocally adversely affected.  Mr. Arnold's client was a patently suicidal man who made clear what every criminal defense lawyer knows, that the conditions of administrative segregation were greatly increasing his depression and his suicidal drive.  Mr. Austin was kept in segregation for the six months leading up to his competency assessment and his waiver of counsel and the conditions of his confinement obviously spurred on his efforts to kill himself.  Effective counsel would have taken steps to improve the conditions of Mr. Austin's physical confinement in order to ameliorate his mental suffering and permit him to exercise rational choices.  Mr. Arnold did not do this and could not do this because of his actual conflict of interest.  Had Mr. Arnold withdrawn in favor of conflict-free counsel Mr. Austin could have sought to challenge the error in the characterization of his words by Mr. Arnold.[152] Indeed, if Mr. Arnold had told Mr. Austin about his breach of privilege Mr. Austin could have sought to clarify his words with Mr. Arnold and if that didn't work, could have sought different counsel to pursue this matter.

As discussed elsewhere in this brief, Mr. Arnold's preparation was perfunctory at best and he provided no real representation for Mr. Austin during the assessment of his competency or at the *Faretta* hearings where Mr. Austin waived counsel.

In the circumstances of this case Mr. Austin was denied conflict free counsel during the

---

[152] Mr. Austin attempted to do exactly this on a pro se basis as soon as he became aware of the basis for his detention in administrative segregation.  Inmate Grievance Form filed October 15, 2001.  (03883)

critical pre-trial phase of his capital trial, including the determination of his competency and the *Faretta* hearing at which he waived the assistance of counsel.

Automatic reversal is mandated in this case because the secret snitch role adopted by Mr. Arnold is so inconsistent with Mr. Austin's right to "the Assistance of Counsel for his defence" as understood by the Sixth Amendment that Mr. Austin should be regarded as having been constructively denied counsel.  United States v. Cronic, 466 U.S. 648, 650 (1984).

If the court were to find that this matter did not rise to the level of a *Cronic* violation then, recognizing the presence of an actual conflict and the adverse effect that this had, this Court should reverse due to the denial of Mr. Austin's right to the effective assistance of counsel. Cuyler v. Sullivan, 446 U.S. 335, 348 (1980).

If the court is not satisfied that an actual conflict of interest existed then the circumstances of Mr. Arnold's representation still stand to be assessed under the general ineffectiveness standard.

> The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result.

Strickland v. Washington, 466 U.S. 668, 686 (1984).  The *Strickland* standard requires: first, that a defendant show that counsel's performance fell below an objective standard of reasonableness; second, that but for counsel's unprofessional errors there is a probability, sufficient to undermine confidence in the outcome, that the outcome would have been different.  Strickland, 466 U.S. at 687-8 and 694.

Mr. Arnold should not have reported Mr. Austin when he did.  Such a report should only be made when the matter to be reported is clearly established and Mr. Arnold did not seek to challenge Mr. Austin on his statements or clarify if they accurately represented his intent or seek

to dissuade him from such a course.

In this case Mr. Arnold violated his duty of loyalty and frankness to his client by failing to reveal his breach of confidence.[153]   Tex. Rules of Prof'l Conduct, Rule 1.03; <u>Williams v. Reed</u>, 29 F. Cas. 1386, 1390, F. Cas. No. 17733 (No. 17,733) (CC Me. 1824).   When Mr. Austin complained of the conditions of his confinement and indicated that they were exacerbating his suicidal depression Mr. Arnold misled him as to the cause of his confinement; took no action to have him moved from segregation; and, by not disclosing his own part in events, prevented Mr. Austin from effectively challenging his placement in segregation.   These failings are objectively unreasonable.

Mr. Arnold took no action whatsoever to submit the state's case that Mr. Austin was competent to adversarial testing.   <u>Strickland,</u> 466 U.S. at 688 (citing <u>Powell v. Alabama</u>, 287 U.S. at 68-69) (counsel also has a duty to bring to bear such skill and knowledge as will render the trial a reliable adversarial testing process.)   His conduct allowed Mr. Austin to languish in segregation, exacerbating his suicidal depression.

If effective counsel, unencumbered by Mr. Arnold's conflict, had been appointed he or she could have advocated for the removal of Mr. Austin from segregation. The obvious and contemporaneously stated link between the strength of Mr. Austin's suicidal depression and his confinement in segregation means that there is a probability that but for Mr. Arnold's errors the result of Mr. Austin's competency hearing could have been different.   That probability is sufficiently high in the circumstances to undermine confidence in the outcome.   That probability of a different outcome also extends to the *Faretta* hearing, the acceptance of the plea of guilty and the whole of the trial.   In these circumstances, Mr. Austin's conviction and sentence should

---

[153] Prevailing norms of practice are guides to determining what is reasonable.  <u>Strickland</u>, 466 U.S. at 688.

be reversed.

## APPOINTED DEFENSE COUNSEL FAILED TO PROVIDE EFFECTIVE ASSISTANCE OF COUNSEL OR OF STANDBY COUNSEL

**CLAIM VIII.**   **Mr. Austin's rights under the Fifth, Sixth and Fourteenth Amendments were denied when appointed counsel failed to take any or any sufficient action in the period leading up to and during the determination of Mr. Austin's competency and the waiver of his right to counsel.**

Mr. Austin's rights to Due Process and the assistance of counsel were denied, since the failure of court-appointed counsel to take any action at all amounted to a constructive denial of counsel.  Even if Mr. Arnold's failure to investigate or test the state's case as to Mr. Austin's competency and the intelligence and voluntariness of his waiver of counsel does not rise to the level of a constructive denial of counsel, it nevertheless reaches the level of ineffectiveness of counsel, mandating a retrial.

The Sixth Amendment provides criminal defendants with the right to counsel.  See Michigan v. Harvey, 494 U.S. 344, 357 (1990).  The right to counsel attaches at arraignment and continues through every "critical stage" in the criminal proceedings through direct appeal.  Id. The period between arraignment and trial is "perhaps the most critical period of the proceedings," Powell v. Alabama, 287 U.S. 45, 57 (1932).

> in addition to counsel's presence at trial, the accused is guaranteed that he need not stand alone against the State at any stage of the prosecution, formal or informal, in court or out, where counsel's absence might derogate from the accused's right to a fair trial.
>
> * * * *
>
> In sum, the principle of *Powell v. Alabama* and succeeding cases requires that we scrutinize any pretrial confrontation of the accused to determine whether the presence of his counsel is necessary to preserve the defendant's basic right to a

> fair trial as affected by his right meaningfully to cross-examine the witnesses
> against him and to have effective assistance of counsel at the trial itself. It calls
> upon us to analyze whether potential substantial prejudice to defendant's rights
> inheres in the particular confrontation and the ability of counsel to help avoid that
> prejudice.

United States v. Wade, 388 U.S. 218, 226 (1967).

It is axiomatic that a criminal defendant has a right to counsel at competency hearings

and during the period preceding the hearing as decisions involving competency are uniquely

complex:

> As the Court of Appeals observed, the decision to be made regarding the proposed
> psychiatric evaluation is "literally a life or death matter" and is "difficult . . . even
> for an attorney" because it requires "a knowledge of what other evidence is
> available, of the particular psychiatrist's biases and predilections, [and] of possible
> alternative strategies at the sentencing hearing." 602 F.2d, at 708. It follows
> logically from our precedents that a defendant should not be forced to resolve
> such an important issue without "the guiding hand of counsel." *Powell v.
> Alabama*, supra, at 69.

Estelle v. Smith, 451 U.S. 454, 471 (1981)

The presence of counsel at a competency hearing is required to "assure fairness in the

adversary criminal process."  United States v. Cronic, 466 U.S. 648, 655-56 (1984).

Counsel's role during the competency stage, as at all other stages, is to put the state's

evidence to "meaningful adversarial testing."  Cronic, 466 U.S. at 656.  Inherent in testing the

state's evidence is investigating and pursuing readily available evidence that would refute the

state's claims.  An attorney may not countenance his failure to act on the defendant's behalf at a

competency hearing by reference to the defendant's own desire to be found competent or

counsel's own untrained opinion.

> it [is] axiomatic that the desire of a defendant whose mental faculties are in doubt
> to be found competent does not absolve counsel of his or her independent
> professional responsibility to put the government to its proof at a competency
> hearing when the case for competency is in serious question.

Hull v. Freeman, 932 F.2d 159, 168 (3d Cir. 1991).

Neither the lawyer's own opinion regarding the defendant's competence, nor the defendant's own desire to be found competent can justify counsel's failure to investigate and test the state's competency claims. Id.

Mr. Arnold conducted no effective investigation into Mr. Austin's competence despite his awareness that Austin was trying to get the death penalty.

> a complete lack of pre-trial preparation puts at risk both the defendant's right to an
> "'ample opportunity to meet the case of the prosecution,'" id. at 685 (quoting
> Adams, supra, at 275), and the reliability of the adversarial testing process. See
> 466 U.S. at 688.

Kimmelman v. Morrison, 477 U.S. 365, 385 (1986) (citing Strickland v. Washington, 466 U.S. 668 (1984)).

Mr. Arnold first sought a psychological examination of Mr. Austin because of Mr. Austin's bizarre conduct, then failed to conduct any further investigation including even the simple task of record collection, seeking discovery from the state or interviewing third-parties who knew Mr. Austin, such as family, prison staff, other prisoners. Mr. Arnold had originally intended to provide Dr. Brown with "much more information" than the simple cover letter and the court's order for examination, however, this did not happen.[154]  Mr. Arnold's failure to investigate fell below prevailing standards of professional conduct in capital defense.[155]

---

[154] Exhibit 35 – Letter from Mack Arnold to Dr. Brown ("Enclosed is a certified copy of an order appointing you to examine the above named defendant who is charged with Capital Murder in the 339th District Court of Harris County, Texas. This is the defendant that we discussed on the phone recently. I should be able to give you much more information about his case within the next week or so.")

[155] See, for example, ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases § 4.1, comment. (rev. ed. 2003), reprinted in 31 Hofstra L. Rev. 913, 956-7 (2003) (footnotes omitted).

> Evidence concerning the defendant's mental status is relevant to numerous issues that arise at various
> junctures during the proceedings, including competency to stand trial . . . Creating a competent and reliable
> mental health evaluation consistent with prevailing standards of practice is a time-consuming and
> expensive process. Counsel must compile extensive historical data, as well as obtain a thorough physical

Indeed, the only "investigation" conducted was when Mr. Arnold was approached by Denise Lindsey, a friend of Mr. Austin's, who provided Mr. Arnold with clear evidence of Mr. Austin's suicidal and bizarre thought processes.  Mr. Arnold did not pass this information on to the court.

It is to be remembered that from March 21, 2001, when he was appointed, until April 4, 2002 when the court granted Mr. Austin's request to proceed *pro se* Mr. Arnold was court appointed counsel for a Harris County prisoner facing a capital murder charge in which the state had indicated its intention to seek death.  It would be expected that in the more than twelve months that Mr. Arnold had been counsel of record he would have conducted some investigation, records gathering or even review of the prior criminal offenses to be alleged against Mr. Austin. Wiggins v. Smith, 539 U.S. 510 (2003); Rompilla v. Beard, 125 S. Ct. 2456, 2461 (2005) Any one of these things would have disclosed the red flags that would have led to a full and effective competency examination.

Ultimately, Mr. Arnold did not participate in the process of assessing Mr. Austin's competency and without testing the state's case, acceded to a finding of competency.  The failure to investigate Mr. Austin's history wholly undermines any deference that may otherwise have been given to Mr. Arnold's choices.

Following Strickland, the Fifth Circuit has identified a standard for assessing ineffectiveness claims relating to competency hearings:

> To establish a claim for ineffective assistance Jernigan must demonstrate that

---

and neurological examination. Diagnostic studies, neuropsychological testing, appropriate brain scans, blood tests or genetic studies, and consultation with additional mental health specialists may also be necessary. Counsel's own observations of the client's mental status, while necessary, can hardly be expected to be sufficient to detect the array of conditions (e.g., post-traumatic stress disorder, fetal alcohol syndrome, pesticide poisoning, lead poisoning, schizophrenia, mental retardation) that could be of critical importance.

counsel's performance was outside a broad range of reasonable conduct and, but for counsel's ineffectiveness, the result of the competency hearing likely would have been different.

United States v. Jernigan, 20 F.3d 621, 623 (5th Cir. 1994).[156]

In Jernigan the complaint was that counsel had relied upon written reports, rather than calling the authors personally to contest the state's case.  The Fifth Circuit distinguished this situation from the constructive denial of counsel that arose in Hull (supra).  Jernigan, 20 F. 3d at 623.  Here, of course, we are dealing with a situation analogous to Appel v. Horn, 250 F.3d 203, 216 (3d Cir. 2001) and Hull (supra) where counsel has failed to investigate or to test the state's case at all.

Counsel will be clearly ineffective if, as here, he fails to inquire into or request a hearing regarding competency where there were indicia of incompetence that would provide reasonable counsel with reason to doubt Mr. Austin's competency.  Jermyn v. Horn, 266 F.3d 257, 300 (3d Cir. 2001) cited with approval in Althouse v. Cockrell, 2002 U.S. Dist. LEXIS 18371 (N.D. Tex. Sept. 12, 2002).

Ineffectiveness also inheres where preliminary inquiry is inadequate to answer the question and no further investigation is conducted or where counsel is unaware of the indicia because of a failure to conduct any reasonable investigation in the circumstances.  Where a defendant seeks out a capital charge and a death sentence as Mr. Austin did and talks about his significant depression as Mr. Austin did, there can be no excuse for failing to conduct an investigation into that defendant's background.

---

[156] It is respectfully submitted that to the extent that this formulation requires proof that the outcome of the competency hearing "likely would have been different" it is in conflict with the clear authority of the Supreme Court.  In Strickland the Supreme Court expressly eschewed a test that would require a defendant to show that the outcome of the proceeding would likely have been different, favoring instead the lower threshold of reasonable probability.

Mr. Austin's counsel could have sought access to Mr. Austin's educational records, medical history, military records, some of his correctional records and his prior criminal history, including court records.   These sources would have provided meaningful testing of the superficial indications of incompetency.   However, defense counsel failed to present Mr. Austin's history as disclosed in those records to the court or to the court appointed psychologist, rendering the psychological examination essentially meaningless.

For instance, Mr. Austin received a general discharge from the Army and his medical records indicate problems with "frequent and severe headaches," "depression or excessive worry" and "nervous trouble."  Exhibit 13 - Army Medical Records.   Mr. Austin's military records further indicate that he was placed on limited duty and prohibited from handling weapons or classified material pending psychiatric evaluation.   Exhibit 13 - Army Medical Records.  Defense counsel could have requested these medical records or simply accessed them through the court records as they were entered into evidence in Mr. Austin's earlier trial, where he had entered an insanity defense.

Also readily available from the 1978 trial record is Dr. Franklin Lewis' testimony in support of Mr. Austin's insanity claim.   On December 11, 1978, Dr. Lewis testified that Mr. Austin might be suffering from "brain damage" or "brain dysfunction," neither of which could be ruled out without further testing, and diagnosed Mr. Austin as having "severe personality disturbance with schizoid thinking." Exhibit 17 - Direct Examination of Dr. Franklin Lewis.   The Dallas County Court records also include a letter from Mr. Austin to Judge James B. Zimmerman, begging for psychiatric help:

> I pleaded insanity.  I did not make that plea just to get out of going to T.D.C.  I did it because I want help and I need help.  You have Dr. Louis's [sic] report on me about my case.  I know there's something wrong with me and I don't think prison's going to help me any.  I want to go to Rusk to get help for my problem.

I'm willing to do my time in T.D.C. but I want to go to Rusk first.  I want help before its to late.

Exhibit 5.

As detailed earlier in this petition, Mr. Austin's TDCJ Health Records also contained a wealth of material that would have been invaluable in any competency assessment.  It is to be remembered that, at the 2001 *Faretta* hearing, Mr. Austin had spent more than 20 of the previous 21 years in prison.  In these circumstances, obtaining the custodial records would have been the only prudent course.

These are simply an example of the volumes of evidence that effective counsel would have discovered upon undertaking even a relatively cursory investigation into Mr. Austin's health and history to inform a determination of his competency.[157]

Despite extensive and readily available evidence calling Mr. Austin's mental condition into doubt, Mr. Arnold failed to present this evidence to the court and to the court ordered psychologist, apparently on the basis of his own judgment that: "Mr. Austin is competent to stand trial." (RR. II-4).  While counsel is not obliged to develop frivolous arguments in favor of incompetence, see Cronic, 466 U.S. at 656 n. 19 (noting that the Sixth Amendment does not require that counsel do what is unethical or impossible), counsel is obliged to provide meaningful testing of the state's competency claims where material, such as that before Mr. Arnold, demonstrates that the defendant's competence is far from certain.[158]  Counsel thus must act as an advocate at the competency hearing, and present relevant material evidence to the court and to the court appointed psychologist where an alternative version of the defendant's

_____

[157] Other examples have been detailed in this application in addressing the question of Mr. Austin's actual incompetence.

[158] Mr. Arnold himself had asserted that he required an assessment by a psychologist in order to provide effective assistance of counsel given Mr. Austin's highly unusual behavior.  CR. 12, *Defendant's Motion to Permit*

competency exists.   Certainly, before concluding that Mr. Austin, who had after all actively sought a capital charge and was actively seeking a death penalty, was competent counsel should have made reasonable inquiries.

At Mr. Austin's *Faretta* hearing Mr. Arnold asked only four questions, all of them apparently concerned with the status of Mr. Arnold's appointment. Mr. Arnold "just wanted to make sure that it's in the record that you're not requesting that Mr. Loper and I be discharged as your court appointed lawyers because of any personality conflict between you and either of us." (RR.II-16).  Mr. Arnold did not make sure that the evidence of incompetence was considered by the court.

Where counsel's actual or constructive absence from pre-trial procedures results in no adversarial testing of the state's evidence of competency, the defendant's right to a fair trial is fundamentally compromised.  See <u>Cooper v. Oklahoma</u>, 517 U.S. 348 (1996).  While counsel's behavior is often analyzed under the two prongs of <u>Strickland v. Washington</u>, 466 U.S. 668 (1984), which requires that counsel's performance fall below an objective standard of reasonableness and that the defendant be prejudiced by counsel's deficient performance, situations where the defendant is actually or constructively denied counsel fall outside of the <u>Strickland</u> rubric and prejudice is presumed.  Where no actual assistance has been provided to the defendant, the Sixth Amendment guarantee of "assistance" for the accused's "defense" has been violated and a showing of prejudice is extraneous to proving the constitutional violation. <u>Cronic</u>, 466 U.S. at 654 n. 11.

Prejudice is presumed where counsel completely failed to advocate for his client, <u>Rickman v. Bell</u>, 131 F.3d 1150, 1157 (6th Cir. 1997), where appellate counsel did nothing on

---

*Examination of the Defendant and for Authority to Incur Expenses.*

the defendant's behalf. <u>Blankenship v. Johnson</u>, 118 F.3d 312, 317-18 (5th Cir. 1997),  and

where counsel "made no attempt to represent his client's interests."  <u>Tucker v. Day</u>, 969 F.2d

155, 159 (5th Cir. 1992).

Mr. Arnold failed to provide Mr. Austin with representation prior to or during Mr.

Austin's *Faretta* hearing.  In fact, Mr. Arnold did nothing on Mr. Austin's behalf.  After learning

that Mr. Austin intended to dismiss his counsel, Mr. Arnold failed to investigate Mr. Austin's

competence, failed to challenge or test the state's case and failed to challenge or test

voluntariness of the waiver of counsel. Mr. Arnold then declared that he agreed with Dr.

Brown's assessment that Mr. Austin was competent.

> Finally, we note that prejudice to a defendant is presumed when his counsel's
> performance is so deficient as to effectively constitute a denial of the right to
> counsel. See <u>Strickland</u>, 466 U.S. at 692. In this case, despite the strong evidence
> of Hull's incompetence (evidence that could presumably be presented only by
> counsel), Hull's trial counsel "agreed" at the conclusion of the competency
> hearing that Hull was competent to stand trial. This is essentially tantamount to
> "constructive denial of the assistance of counsel altogether[, which] is legally
> presumed to result in prejudice." Id. The order of the District Court must therefore
> be reversed and the case remanded with instructions to grant the writ.

<u>Hull v. Kyler</u>, 190 F.3d 88, 112 (3d Cir. 1999)  See also <u>Roberts v. Dretke</u>, 356 F.3d 632 (5th

Cir. 2004) (granting a COA where failure to furnish psychiatrist with any documentation of prior

mental illness.);[159] Appel, (<u>supra</u>) (Counsel failed to investigate or test case for competency at

all.);  <u>Bouchillon v. Collins</u>, 907 F.2d 589, 597 (5th Cir.1990) ("It must be a very rare

circumstance indeed where a decision not to investigate would be 'reasonable' after counsel has

notice of the client's history of mental problems.");  <u>Brown v. Sternes</u>, 304 F.3d 677, 694 (7th

---

[159] As a result of a procedural default the court on reviewing this claim on its merits was not able to consider the
volume of mental health materials gathered by post-conviction counsel and that had not been presented to the
examiner at trial.  <u>Roberts v. Dretke</u>, 381 F.3d 491 (5th Cir. 2004)  Unlike the situation in <u>Roberts</u>, the defense
expert was unaware of any previous suicidal thoughts and Mr. Austin has submitted a wealth of material, including
an opinion from Dr. Brown himself as to the unreliability of the competency assessment.

Cir.2002) ("Where a defense attorney has received information from a reliable source that his client has had a history of psychiatric problems, but failed to adequately investigate the history, counsel failed to provide effective assistance."); Bloom v. Calderon, 132 F.3d 1267 (9th Cir.1997) (holding trial counsel ineffective for failing to present expert with readily available mitigating evidence); Clabourne v. Lewis, 64 F.3d 1373 (9th Cir.1995) (holding trial counsel ineffective for failing to adequately prepare testifying trial expert with recent mental health records which would have changed the defense expert's diagnosis, as well as state expert's diagnoses).

Even if the court finds that Mr. Austin was not constructively denied counsel, Mr. Austin was denied *effective* assistance of counsel.

The Sixth Amendment recognizes the right to assistance of counsel because it envisions counsel's playing a role that is critical to the ability of the adversarial system to produce just results. Strickland v. Washington, 466 U.S. 668, 686 (1984). The right to counsel is not fulfilled whenever a person who happens to be a lawyer is appointed to stand beside the accused at trial, rather the Sixth Amendment right to counsel encompasses the right to effective assistance of counsel. Id. Counsel is ineffective when his performance falls below an objective standard of reasonableness and counsel's deficient performance prejudiced the defense. Id. at 687.

While Strickland teaches that the affirmative conduct of counsel is subject to deferential review, "this measure of deference must not be watered down into a disguised form of acquiescence." Profitt v. Waldron, 831 F.2d 1245, 1248 (5th Cir. 1987). Further, such deference afforded to counsel's "strategic" decisions is wholly inappropriate where counsel has failed to conduct a through investigation to allow a reasoned strategic judgment. Wiggins v. Smith, 539 U.S. 510 (2003) (finding the counsel's duty to conduct investigation firmly established and

"virtually unchallengeable").

In an ineffectiveness claim regarding an assessment of competency a petitioner need not show that he was incompetent – only that there was a reasonable probability that he was incompetent, and counsel failed to inquire into that incompetency.  Hull v. Kyler, 190 F.3d 88, 110 (3d Cir. 1999) ("Therefore, to prove that he was prejudiced by his counsel's performance, Hull need not demonstrate that he definitely was incompetent in 1979. Rather, he must only establish that there was a reasonable probability that he was.")

> These cases unequivocally provide that a criminal defendant is entitled to adequate procedures, including the opportunity to present evidence and to cross-examine government witnesses, when his competency is at issue. . . . Under these circumstances, when a defendant's own attorney fails to effectively use the procedures to determine competency that are mandated by Supreme Court precedent, we believe that the prejudice to the possibly still-incompetent defendant is manifest.

Hull v. Kyler, 190 F.3d 88, 111 (3d Cir. 1999).

**CLAIM IX.** **In violation of Mr. Austin's constitutional rights he was provided with ineffective assistance by his standby counsel who failed to urge a competency hearing or a reconsideration of the previous competency hearing when evidence emerged mandating this course.**

By letter dated August 14, 2001 Mr. Austin advised the court that he wished to proceed *pro se* with the assistance of standby counsel.  CR. 20-21.

Following a hearing on October 11, 2001 the trial court in this case granted Mr. Austin's request that he be allowed to proceed *pro se* and appointed Mr. Arnold as standby counsel.

Mr. Austin, by letter dated January 23, 2002 advised the court that he wished to proceed pro se without stand by counsel.  At a hearing conducted on January 25, 2002 Mr. Austin was persuaded by the court that he was better served proceeding *pro se* with standby counsel.  This is

ultimately the course that Mr. Austin chose.[160]   A notation reflecting the result of this hearing

was made on the court's copy of Mr. Austin's letter of January 23rd.  (CR. 60-61).

There is no question but that "whatever else may or may not be open to him on appeal, a

defendant who elects to represent himself cannot thereafter complain that the quality of his own

defense amounted to a denial of 'effective assistance of counsel.'"  <u>Faretta</u>, 422 US at 834 n.46

However, it remains open to a defendant to challenge a conviction based upon the

ineffectiveness of standby counsel not in relation to the defense presented but in relation to

counsel's performance of the responsibilities of standby counsel.[161]

This contention flows from a correct understanding of the Supreme Court's holding in

<u>McKaskle v. Wiggins</u>, 465 U.S. 168, 177 (1984).  The court in <u>McKaskle</u> made it clear that an

election to proceed *pro se* implicated two constitutional rights – the right to the assistance of

counsel and the right to present one's own defense.  A defendant who by consent or request

proceeds *pro se* with stand by counsel is taking advantage of both constitutional rights.[162]  The

<u>McKaskle</u> court made the point that a trial court is not bound to accept this type of arrangement.

However, where a court does so the constitutional requirement that the assistance of counsel be

effective is controlling.[163]

Importantly, such an ineffectiveness claim does not revolve around the presentation of

the defense at trial; that is a matter subject to the defendant's ultimate control as *pro se* counsel.

---

[160] This hearing has not been included in the record for appeal, notwithstanding Mr. Austin's designation of the appellate record.  During this hearing the trial judge urged Mr. Austin to continue to proceed with Mr. Arnold as standby counsel.

[161] Importantly, this claim is narrowly expressed to cover the conduct of standby counsel as standby counsel.  It is wholly separate and distinct from the consideration of hybrid representation.

[162] This understanding is consistent with the long held principle that every presumption against a waiver of constitutional rights should be entertained and such a waiver must be clear, express and unequivocal.

[163] A trial court may insist on an all or nothing waiver of the right to the assistance of counsel but unless it does so a defendant should not be taken to have waived his right to the effective assistance of counsel in his or her role as standby counsel.

The ineffectiveness that must be analyzed is the performance of standby counsel's duties in that role.  One of those central roles is as a "safety net" to ensure that a defendant receives a fair trial.[164]

The Supreme Court in McKaskle made the point that standby counsel had considerable latitude to involve himself in the conduct of a criminal trial.  With power comes responsibility and the conduct of standby counsel in this regard may be subject to review for ineffectiveness.[165]

The present case does not require this court to define the contours of the responsibility of standby counsel because the matter at hand is clear as a matter of logic.  Standby counsel remains counsel for the defendant albeit in a standby role.

It is clearly ineffective assistance for counsel to fail to inquire into or seek a hearing regarding competency where there were indicia of incompetence that would provide reasonable counsel with reason to doubt a defendant's competency.  Jermyn v. Horn, 266 F.3d 257, 300 (3d Cir. 2001).

As a matter of common sense, one of the inarguable roles of standby counsel who

---

[164] See, e.g. United States v. Bertoli, 994 F.2d 1002, 1018-19 (3d Cir. 1993) (discussing two purposes of standby counsel: to insure defendant has fair trial and to allow trial court to conduct trial efficiently); State v. Ortisi, 706 A.2d 300, 308-09 (N.J. Super. Ct. App. Div. 1998) (citing Bertoli dual purpose proposition).

[165] Consistent with the Court's position in McKaskle, a number of courts have expressed a willingness to conduct such a review in narrow circumstances.  People v Bloom, 774 P.2d 698 (Cal. 1989) (defendant might be able to show ineffective assistance by demonstrating that standby "counsel failed to perform competently within the limited scope of the duties assigned to or assumed by counsel."); Ali v. United States, 581 A.2d 368, 380 (D.C. 1990) (holding that pro se defendant could assert ineffective assistance of counsel claim challenging standby counsel's competency "'within the limited scope of duties assigned to or assumed by counsel'); People v Doane, 246 Cal. Rptr. 366, 372 (Ct. App. 1988) (finding that standard for standby counsel's effectiveness must reflect her small role); Jelinek v. Costello, 247 F. Supp. 2d 212, 266 (D.N.Y. 2003) (In an appropriate case, a defendant who proceeds pro se may make out a claim that he received ineffective assistance of standby counsel.)  see also Downey v. People, 25 P.3d 1200, 1204 (Colo. 2001) (en banc); State v. Bettney, 529 A.2d 1356, 1357 (Me. 1987) (per curiam)  Circuit Courts of Appeal dealing with the matter have explicitly left such a claim open even where they have dismissed particular claims before them.  Wiggins v. Procunier, 753 F.2d 1318, 1321-1322 (5th Cir. 1985) (Resolved "without reaching the difficult issue as to the possibility of an ineffective assistance of counsel claim vis-a-vis standby counsel, appointed to assist an individual  in conducting his own defense."; United States v. Schmidt, 105 F.3d 82, 90 (2d Cir. 1997)  (leaving open the possibility of IAC claim against standby counsel in appropriate circumstances.); United States v. Cochrane, 985 F.2d 1027, 1029 (9th Cir. 1993) (Not deciding whether IAC generally available against standby counsel.); United States v. Pina, 844 F.2d 1, 7 (1st Cir. 1988) (Where standby counsel had been

becomes aware of evidence that a defendant is incompetent is to seek to have competency examined and resolved.  This responsibility inheres in his roles as an officer of the court and his responsibility to the defendant as standby counsel.  It is a role that is consistent with the interests of justice and that in no way infringes a defendant's *Faretta* rights; counsel's role in no way extends to the manner of conduct of the defense.  If the defendant is incompetent his purported exercise of his *Faretta* rights need not be respected.[166]

Such an approach is indicated in the Supreme Court's recognition that a defendant's *Faretta* right "exists to affirm the dignity and autonomy of the accused and to allow the presentation of what may, at least occasionally, be the accused's best possible defense." McKaskle, 465 U.S. at 176-7

It should also be remembered that a defendant is not able to personally waive a competency hearing or represent himself at such a hearing because of the inherent contradiction in having a possibly incompetent defendant represent himself.  Pate, 383 U.S. 384.  For the same reason it can hardly be suggested that a possibly incompetent defendant can represent himself on the issue of whether evidence suggesting that he is incompetent exists.  This role of standby counsel falls wholly outside the scope of the rights protected by Faretta.

In this case, for the reasons described above, there emerged during the trial of this matter substantial evidence pointing to Mr. Austin's incompetence and the fact that his earlier competency hearing had been vitiated by inadequate and inaccurate information.  In those circumstances it was ineffective for Mr. Arnold not to seek a competency hearing.  Had he done

---

dismissed defendant was not served by counsel, standby or otherwise, so no ineffectiveness claim.)

[166] The Court in Faretta acknowledged that one of the roles of standby counsel is "to represent the accused in the event that termination of the defendant's self-representation is necessary."  Faretta, 422 U.S. at 835 n46. There could be no more poignant example of when self-representation needs to be terminated than when the defendant becomes or is discovered to be incompetent.

so there is a reasonable probability that Mr. Austin would have been found to be incompetent.

# THE WAIVER OF COUNSEL WAS NOT KNOWING, VOLUNTARY AND INTELLIGENT

**CLAIM X.**      **Mr. Austin's rights to Due Process and to counsel as guaranteed under the Constitutions of Texas and the United States were violated when he was subjected to a capital trial without counsel without having made a competent, knowing, voluntary and intelligent waiver of counsel.**

In addition to <u>Dusky</u> competency, before allowing a defendant to waive counsel, "a trial court must satisfy itself that the waiver of his constitutional rights is knowing and voluntary." <u>Godinez v. Moran</u>, 509 U.S. 389, 400 (1993) (citing to <u>Faretta v. California</u>, 422 U.S. 806, 835 (1975)).  <u>Godinez</u> explains that this additional element creates "a 'heightened' standard for… waiving the right to counsel,' but not "a heightened standard of competence."  509 U.S. at 401 (emphasis in original).  The distinction is explained in a footnote:

> The focus of a competency inquiry is the defendant's mental capacity; the question is whether he has the ability to understand the proceedings… The purpose of the 'knowing and voluntary' inquiry, by contrast, is to determine whether the defendant actually does understand the significance and consequences of a particular decision and whether the decision is uncoerced.

509 U.S. at 401 n.12.[167]

It should be noted that Dr. Brown's opinion was directed solely to the former, rather than the latter of these considerations and the court proceeded without the assistance of an assessment by a mental health expert of the voluntariness of Mr. Austin's suicidal actions.  <u>Exhibit 4 – Report of Dr. Jerome Brown</u>

Waiver of the right to counsel must be knowing, intelligent and voluntary.  <u>Johnson v.</u>

---

[167] The "knowing and voluntary" standard of <u>Godinez</u> is sometimes expressed as a "knowing, intelligent and voluntary" standard; though, the meaning seems to be identical.  <u>Wilkins v. Bowersox</u>, 145 F.3rd 1006, 1011 (8th

Zerbst, 304 U.S. 458 (1938).  A "penetrating and comprehensive" examination must be undertaken by the trial court in order to determine the validity of any attempted waiver of counsel.  Von Moltke v. Gillies, 332 U.S. 708, 724 (1948).  In this examination, the purpose of the "knowing and voluntary" inquiry is to determine whether the defendant actually does understand the significance and consequences of a particular decision and whether the decision is uncoerced.  Godinez v. Moran, 509 U.S. 389, 401 n.12 (1993).  A waiver of counsel is intelligent where the defendant is "made aware of the dangers and disadvantages of self-representation" and the record establishes that "he knows what he is doing and his choice is made with eyes open." Faretta v. California, 422 U.S. at 835 (internal quotations omitted).  The validity of a waiver of counsel is considered under the totality of the circumstances, Young v. Lockhart, 892 F.2d 1348, 1351 (8th Cir. 1989), and depends on a range of case-specific factors, including the defendant's education or sophistication, the complex or easily grasped nature of the charge, and the stage of the proceeding.  See Johnson, 304 U.S. at 464.

Courts have recognized that a decision to waive the right to pursue legal remedies is involuntary if it results from duress, including conditions of confinement. See, e.g., Smith v. Armontrout, 812 F.2d 1050, 1058-59 (8th Cir. 1987) (reviewing for error the district court's determination on whether petitioner's particular conditions of confinement rendered his decision to waive appeals involuntary), cert. denied, 483 U.S. 1033 (1987); Groseclose ex rel. Harries v. Dutton, 594 F. Supp. 949, 961 (M.D. Tenn. 1984) ("In the judgment of this Court, the conditions of confinement inflicted on [prisoner] are so adverse that they have caused him to waive his post-conviction remedies involuntarily");  Wilkins v. Bowersox, 145 F.3d 1006, 1015 (8th Cir. 1998) (Mental and emotional problems as well as the limitations those problems might impose on his

Cir. 1998).

121

ability to make rational decisions.)

It is specifically alleged that the conditions of confinement of Mr. Austin in TDCJ and Harris County Jail fell below Eight Amendment and other legal standards and that the coercive pressure of those unlawfully harsh conditions compelled Mr. Austin to his suicidal course. Specific mention is also made in this regard to the failure to provide adequate mental health care for Mr. Austin.

Courts need to consider the mental health of a defendant in considering the validity of the waiver of counsel and as Godinez teaches, this is a distinct enquiry from mere competency and establishes a heightened standard.  See United States v. Cash, 47 F.3d 1083, 1089-90 (11th Cir. 1995) (The mental health of a defendant is also a relevant consideration in assessing whether a waiver of counsel was knowing, intelligent, and voluntary); Wilkins v. Bowersox, 145 F.3d 1006, 1012 (finding mental health relevant in consideration of whether waiver is knowing, intelligent and voluntary).

In Wilkins, a seventeen-year old defendant decided to waive counsel and assist the state in seeking the death penalty.  Id.  The Eight Circuit found the trial court's examination of Wilkins insufficient to establish a knowing, intelligent, and voluntary waiver where the court inquired only into his youth and lack of education and did not consider his history of child abuse, drug use since kindergarten and suicidal tendencies.  Id., at 1012.

> Initially, we note that the state trial court's inquiry to determine the validity of Wilkins' waiver of his right to counsel was not the kind of "penetrating and comprehensive examination" required to ensure that an accused's waiver of counsel is valid. Von Moltke, 332 U.S. at 724 (plurality). The court's colloquy with Wilkins regarding his decision to waive counsel consisted predominantly of leading questions that failed to allow Wilkins to articulate his reasoning process. While Wilkins' simple "yes" and "no" answers indicated an intention to waive his right to counsel, this does not conclusively establish that his waiver of counsel was valid.

Id.

The trial court in <u>Wilkins v Bowersox</u> was faced with a difficult situation that bears many similarities with the current case.  In considering the adequacy of the waiver colloquy the Court of Appeals emphasized the need for a truly probing enquiry that takes into account those elements of a defendant's background that may suggest mental disturbance or that the waiver is not wholly knowing, voluntary and intelligent.

> In the present case, while the state trial court briefly addressed Wilkins' youth and limited educational background, the court took no account of Wilkins' upbringing. The record is uncontroverted that Wilkins was severely abused as a child by his mother and her boyfriends, that he had a history of drug abuse, and that by the age of 10, he had been in and out of mental health facilities and had been described as having demonstrated homicidal and suicidal tendencies. Given the combination of Wilkins' young age and the record evidence of his severely troubled childhood, the state trial court's colloquy with Wilkins was far from the kind of in-depth inquiry that is necessary to ensure a valid waiver of counsel.

<u>Id.</u>, at 1012-1013.

In  the present case there can be no serious dispute about the defendant's very distressing personal history and mental illness.  It also cannot be disputed that both the competency assessment and the waiver colloquy were vitiated by a lack of background information and misinformation.

Similarly, in <u>Schafer v. Bowersox</u>, 329 F.3d 637, 649-51 (8th Cir. 2003) the court overturned Schafer's waiver of his right to counsel.  The Court found that the trial court's colloquy fell below the constitutional minimum in warning the defendant and failed to establish a knowing, intelligent, and voluntary waiver in light of Schafer's mental illness and personality disorder which made him prone to compulsive decision making.

The enquiry to determine whether Mr. Austin's waiver was knowing, voluntary and intelligent fell below constitutional standards and cannot be relied upon as having produced a

valid waiver of counsel.  It bears repeating that Dr. Brown expressed no opinion on voluntariness at all and did not analyze this complex question in his assessment, nor was he asked to do so.[168]

In any event, as a matter of fact clearly established by the evidence of mental illness and the coercive conditions of Mr. Austin's environment, Mr. Austin's waiver was not knowingly, voluntarily and intelligently made.  Instead it was made as the product of suicidal depression, life long brain impairments and the shocking and coercive conditions of his confinement.

Dr. Woods, after a detailed review and assessment, including a consideration of the effects of Mr. Austin's conditions of confinement has concluded in powerful and persuasive terms that

> Acknowledging the difficulties in making an assessment of a person's functioning at some point in the past, it is my opinion which I hold to a reasonable degree of medical certainty that Mr. Austin was not competent to stand trial or to participate in the appellate process and that **his decisions to proceed unrepresented and to plead guilty were not knowing, voluntary, nor intelligent.**  It is my opinion that Mr. Austin's actions were the product of severe and long standing mental illness/defects rather than the autonomous decisions of a person with rational understanding.

Exhibit 95 – Statement of Dr. George Woods (emphasis added)

## THE PLEA OF GUILTY WAS NOT KNOWING VOLUNTARY AND INTELLIGENT

**CLAIM XI.**        **Mr. Austin's rights to Due Process and to trial by jury as guaranteed under the Constitutions of Texas and the United States were violated when his plea of guilty was accepted because it was not competent or voluntary.**

It is beyond dispute that a guilty plea must be both knowing and voluntary. <u>See</u>, <u>e.g.</u>, <u>Boykin v. Alabama</u>,  395 U.S. 238 (1969); <u>McCarthy v. United States</u>, 394 U.S. 459, 466 (1969). "The standard was and remains whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to

---

[168] This is particularly significant because Dr. Brown has expressed that "the standards outlined by the Texas law regarding competency are quite conservative".  <u>Exhibit 96 – Affidavit of Dr. Jerome Brown</u>

the defendant." <u>North Carolina v. Alford</u>, 400 U.S. 25 (1970). That is so because a guilty plea constitutes a waiver of three constitutional rights: the right to a jury trial, the right to confront one's accusers, and the privilege against self-incrimination. <u>Boykin</u>, 395 U.S. at 243.

<u>Parke v. Raley</u>, 506 U.S. 20, 28-29 (1992)

For the same reasons that the waiver of counsel was not a valid waiver, Mr. Austin's plea of guilty was not a valid waiver of the constitutional rights implicit in such a plea.  Mr. Austin's plea of guilty was not a voluntary and knowing choice amongst the alternatives presented. Rather, it was a product of severe mental illness and the coercive conditions of his confinement.

As with the colloquy preceding the waiver of counsel, the plea colloquy was inadequate to support a valid waiver in this case.  As observed in relation to competency, by this stage of the trial both the state and the trial court had even more information relating to his mental illness than at the time of the waiver of counsel.  In these circumstances a more probing enquiry, including a renewed mental health examination was called for, particularly as the earlier examination did not purport to cover voluntariness.  Dr. Woods has since concluded that Mr. Austin's waiver was not voluntary.  <u>Exhibit 95 – Statement of Dr. George Woods</u>.

The plea colloquy was also defective in that it did not create a record addressing the waiver of rights as mandated by the Supreme Court:

> Several federal constitutional rights are involved in a waiver that takes place when a plea of guilty is entered in a state criminal trial. First, is the privilege against compulsory self-incrimination guaranteed by the Fifth Amendment and applicable to the States by reason of the Fourteenth. <u>Malloy v. Hogan</u>, 378 U.S. 1. Second, is the right to trial by jury. <u>Duncan v. Louisiana</u>, 391 U.S. 145. Third, is the right to confront one's accusers. <u>Pointer v. Texas</u>, 380 U.S. 400. We cannot presume a waiver of these three important federal rights from a silent record.

<u>Boykin</u>, 395 U.S. at 243.

While it may not be necessary to parrot a particular formula of words, the record in the trial court is silent as to the waiver of rights regarding confrontation and self-incrimination and

positively assures the defendant that he is not waiving his jury trial right when, of course, he was.

In these circumstances the defendant's waiver cannot be said to have been obtained knowingly and voluntarily and was obtained in violation of his due process rights.

## WITHOUT VALID WAIVER THERE WAS A DENIAL OF A JURY TRIAL

Mr. Austin was indicted on February 28, 2001.  The transcript of proceedings in this case commences at Volume II of the Reporter's Record, recording proceedings from October 11, 2001.  There were in fact a number of hearings prior to this date.  However, no transcript of those proceedings appears in the record.

On October 22, 2001 the court conducted a <u>Faretta</u> hearing and granted Mr. Austin's motion to waive counsel and to proceed *pro se*.

On April 1, 2002 Austin entered a plea of guilty to the indictment and the State began the presentation of its case for death.

A jury had been selected over the course of the week of March 18, 2001.  Before the jury was sworn Austin was arraigned in the absence of the jury and entered a plea of guilty to the indictment. (RR.9 at 4.)  The court confirmed with Austin that he intended to enter a plea of guilty before the jury as well.  A colloquy then ensued in which the Court conducted some enquiry as to Austin's understanding of the ramifications of a plea of guilty.

> THE COURT:  I need to give you certain admonishments before you do that.  You understand the charge against you is capital murder; is that correct?
> MR. AUSTIN:  Yes, ma'am.
> THE COURT:  You have the right to a jury trial.  The law provides that you must have a jury trial in this instance, and we are getting ready to proceed with one.  Do you understand the range of punishment that applies to someone who is found guilty of capital murder is either life imprisonment or the death penalty?
> MR. AUSTIN:  Yes, ma'am.
> THE COURT:  Has anyone reached any agreement with you to get you to enter your plea?

MR. AUSTIN:  No, ma'am.

THE COURT:  Has anybody promised you anything to get you to enter your plea?

MR. AUSTIN:  No, ma'am.

THE COURT:  Has anybody threatened you to get you to enter your plea?

MR. AUSTIN:  No, ma'am.

THE COURT:  Are you of sound mind?

MR. AUSTIN:  Yes, ma'am.

THE COURT:  And, Mr. Austin, when you committed this offense, were you of sound mind?

MR. AUSTIN:  Yes, ma'am.

THE COURT:  Do you understand the ramifications and consequences of entering your plea of guilty?

MR. AUSTIN:  Yes, ma'am.

THE COURT:  Do you understand, sir, that in entering a plea of guilty to capital murder, you are essentially admitting each and every element necessary to establish your guilt for the offense of capital murder?

MR. AUSTIN:  Yes, ma'am.

THE COURT:  The law requires me to admonish you, Mr. Austin, that this is a felony.  Of course, a plea of guilty or no contest could result in your exclusion from admission to this country, denial of naturalization under Federal law or possible deportation if you are not a United States citizen.  If you are a United States citizen, you may disregard that.

Let the record reflect that prior to this the Court has received information concerning Mr. Austin's competency and, I believe, sanity or not?

MR. ARNOLD:  I believe, Your Honor, it was just competency to stand trial.

THE COURT:  All right.  And based on that evaluation and based upon prior conversations with Mr. Austin, his persistence in entering his plea of guilty before the jury for this many months, based on that, the Court finds, Mr. Austin, that you are mentally competent to enter your plea of guilty, that you are doing so freely and voluntarily with full knowledge of the consequences.

A final question, however.  Do you understand that by entering a plea of guilty before the jury, in addition to admitting each and every element necessary to establish your guilt, that you are effectively waiving any defense that you may have?

MR. AUSTIN:  Yes, ma'am.

THE COURT:  Including a possible insanity defense if there was one to submit?

MR. AUSTIN:  Yes, ma'am.

THE COURT:  The Court, therefore, will accept the defendant's plea of guilty.

At the conclusion of this colloquy the Court stated that it accepted Austin's plea of guilty.  (RR.9 at 6.)

The jury was then brought in to the court, sworn[169] and given general admonishments by the Court.   Austin was arraigned in front of the jury and entered a plea of guilty to the indictment.  (RR. 9 at 15.)  The Court then stated the following to the jury:

> Ladies and gentlemen of the jury, the defendant has entered a plea of guilty to the offense of capital murder.  Having been fully admonished by the Court and the Court having determined that Mr. Austin is mentally competent to enter his plea of guilty and that he is entering this plea freely and voluntarily with full knowledge of the consequences, this Court has accepted his plea of guilty, that which you have just heard him enter before the jury.  At the conclusion of the trial, *the jury will be ordered by the Court to find Mr. Austin guilty of capital murder*.  The following evidence, therefore, is admitted for the purpose of aiding you, if it does aid you, in intelligently exercising your discretion regarding punishment and the punishment issues which will be submitted to you.

(RR. 9 at 16) (emphasis added).   The State then presented its penalty phase case over the next two days.  On April 3, 2004 the Court charged the jury on the law.  (RR. 9 at 4.)  The charge was read to the jury and a copy was provided to the jury to take with them in to the jury room.  The charge included the following:

> Notwithstanding that, the Court, as required by law, has admonished him of the consequences.  It plainly appearing to the Court that the defendant is mentally competent, and that he makes this plea freely and voluntarily, said plea is received by the Court.  *You are instructed to find the defendant guilty of the offense of capital murder as charged in the indictment*, and assess the punishment in this cause.

(C.R. I at 70) (emphasis added).  The jury was provided with a pre-typed verdict form containing a finding of guilt and requiring only the Foreman's signature.  (C.R. I at 77.)   The Court's direction that the jury must enter a verdict of guilty was further emphasized by the state in closing argument.  (R.R. IX at 5.)

In less than ten minutes the jury returned a verdict of guilty and answers of "yes" and "No" to the two special issues.  (R.R. IX at 29; C.R . I at 77 et. seq.)

_____

[169] "You and each of you do solemnly swear that in the case of the State of Texas against the defendant, you will a

**CLAIM XII.** **The trial court denied Mr. Austin his right to trial by jury as guaranteed by the Texas Constitution when, even though a jury trial may not be waived in a capital case in Texas, it accepted his guilty plea and directed a verdict of guilt.**

Mr. Austin had a right to jury trial that is enshrined in the Texas Constitution. Importantly, not only is right to jury trial declared to be *inviolate*, the terms of the Constitution limit the legislature to the passage of laws needed to regulate trial by jury and to maintain its *purity:*

§ 15.  Right of trial by jury

Sec. 15. The right of trial by jury shall remain inviolate. The Legislature shall pass such laws as may be needed to regulate the same, and to maintain its purity and efficiency. . . .

Tex. Const. Art. I § 15.  See also Tex. Code Crim. Proc. Art. 1.12.

While the Code allows for the waiver of the right to jury trial in an ordinary felony case, a defendant cannot waive his right to trial by jury in a death case.  Tex. Code Crim. Proc. art. 1.13 (a), (b); art. 1.14 (a).

No person can be convicted of a capital felony in a trial at which the State seeks the death penalty other than by verdict of a jury duly rendered.  Tex. Code Crim. Proc. art. 1.15.

In this case, the verdict was that of the judge.  The Court provided the jury with a guilty verdict form and ordered that the foreperson sign it.  It defies reason to describe this procedure as producing a "verdict of a jury duly rendered".  A directed verdict represents an impermissible waiver by the court of the defendant's constitutionally guaranteed jury trial right.

The Texas Court of Criminal Appeals has held that a directed verdict is permissible in the case of a capital felony trial where a plea of guilty is entered before the jury.

---

true verdict render according to the law and the evidence, so help you God."  Tex. Code Crim. Proc. art. 35.22

Appellant's claims that the judge's instructing action in a verdict deprived appellant of trial by jury and that instructed verdicts are not provided for in capital cases are also without merit. In Crawford v. State, 617 S.W.2d 925 (Tex.Cr.App. 1980), cert. denied 452 U.S. 931, 101 S. Ct. 3067, 69 L. Ed. 2d 431, reh. denied 453 U.S. 923, 101 S. Ct. 3160, 69 L. Ed. 2d 1005 (1981), the defendant pled guilty to the offense of capital murder, the trial judge directed a verdict of guilt, and the jury subsequently assessed punishment at death. We noted no fundamental error in directing the verdict of guilt in the case, nor do we find such error now. A directed verdict, therefore, is permissible in capital cases where the defendant pleads guilty, and the plea is properly accepted by the court. Furthermore, the defendant is not deprived of a trial by jury when a verdict is directed pursuant to a guilty plea since the jury receives evidence at the punishment stage and must determine whether the defendant is to receive life imprisonment or the death penalty.

Morin v. State, 682 S.W.2d 265, 269 (Tex. Crim. App. 1983)

It should, however, be recognized that Morin was a volunteer who did not seek a grant of certiorari from the U. S. Supreme Court or pursue federal habeas review.  Rehearing was denied by the Court of Criminal Appeals on January 9, 1985 and he was executed on March 13, 1985.

The sole case relied upon by the court in Morin, Crawford v. State, 617 S.W.2d 925 (Tex.Cr.App. 1980), cert. denied 452 U.S. 931, reh. denied 453 U.S. 923 (1981), provides no real authority for the proposition that a directed verdict is permissible.  The Crawford court did not address the probity of the directed verdict, merely reciting it as a part of the procedural background of the case.  The denial of certiorari in that case appears to relate to a point of jury selection and the Supreme Court's decision in Witherspoon, not any consideration of directed verdicts.

It is respectfully submitted that the Court of Criminal Appeals conclusion that a directed verdict is permissible and consistent with the conduct of a constitutionally guaranteed jury trial is incorrect.  The Constitutional imprecation is that the right to jury trial is inviolate and that the purity of the jury trial system will remain intact.  Directed verdicts of guilt are anathema to this ideal.

It is to be remembered that even on a guilty plea the role of the jury in determining culpability is not purely ceremonial.  For instance, a jury empanelled to consider punishment on a felony plea continues to have a role in rejecting the defendant's guilt on the basis of its finding that the defendant is insane. Tex. Code Crim. Proc. art. 37.13.

In truth, a plea at culpability phase followed by a directed verdict of guilt does not afford a defendant his jury trial guarantee in a capital trial.  However, the Court of Criminal Appeals has held that a capital trial involving a plea and directed verdict is still a jury trial because the critical issue is for the jury to determine the special issue questions. Matchett v. State, 941 S.W.2d 922, 930-931 (Tex. Crim. App. 1996); Holland v. State, 761 S.W.2d 307, 313 (Tex. Crim. App. 1988), cert. denied, 489 U.S. 1091 (1989); Williams v. State, 674 S.W.2d 315, 319 (Tex. Crim. App. 1984).

It is respectfully submitted that the reasoning in these cases is flawed.  The Texas Constitution and the Code of Criminal Procedure provide for no waiver of a jury trial in a capital case.  It is not possible to allow a defendant to waive jury trial at culpability phase and still refer to the whole proceeding as a jury trial merely because the special issues are submitted to the jury. This is at least a partial waiver of jury trial and is inconsistent with the Code and Mr. Austin's jury trial guarantee.  It does nothing to preserve the purity of the jury trial system and certainly does not preserve this right as inviolate.  The legislature has chosen trial by jury as the sole means of determination of guilt and penalty in capital cases and this decision should be respected.

**CLAIM XIII.**     **Without a valid waiver, the trial court denied Mr. Austin his right to trial by jury as guaranteed by the Sixth and Fourteenth Amendments when it accepted Austin's plea of guilty and directed a verdict of guilt.**

The Sixth and Fourteenth Amendments accord to Mr. Austin a right to a jury trial before he can be convicted and sentenced to death.

> The Sixth Amendment provides that "in all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury . . . ." In Duncan v. Louisiana, 391 U.S. 145, 149, 20 L. Ed. 2d 491, 88 S. Ct. 1444 (1968), we found this right to trial by jury in serious criminal cases to be "fundamental to the American scheme of justice," and therefore applicable in state proceedings. The right includes, of course, as its most important element, the right to have the jury, rather than the judge, reach the requisite finding of "guilty." See Sparf v. United States, 156 U.S. 51, 105-106, 39 L. Ed. 343, 15 S. Ct. 273 (1895). Thus, although a judge may direct a verdict for the defendant if the evidence is legally insufficient to establish guilt, he may not direct a verdict for the State, no matter how overwhelming the evidence. Id. See also United States v. Martin Linen Supply Co., 430 U.S. 564, 572-573, 51 L. Ed. 2d 642, 97 S. Ct. 1349 (1977); Carpenters v. United States, 330 U.S. 395, 410, 91 L. Ed. 973, 67 S. Ct. 775 (1947).

Sullivan v. Louisiana, 508 U.S. 275, 277-278 (1993).

Waiver of the right to a jury trial is possible only where there is an express, knowing and intelligent waiver of that right.  Patton v United States, 81 U.S. 276 (1930); Boykin v. Alabama, 395 U.S. 238 (1969).

There was no waiver of the jury trial right in this case, in fact, Mr. Austin was assured that the law required that a jury trial be conducted and that such a trial was about to proceed.

> You have the right to a jury trial.  The law provides that you must have a jury trial in this instance, and we are getting ready to proceed with one.

(R.R. IX at 4.)

In the absence of a waiver the trial court was obliged to provide a jury trial as understood by the Federal Constitution.

A plea of guilty is inherently inconsistent with the right to a jury trial under federal jurisprudence.  Federal jurisprudence holds a plea of guilty is more than a confession that admits that the accused did various acts; it is itself a conviction; nothing remains but to give judgment

and determine punishment.[170] See Kercheval v. United States, 274 U.S. 220, 223.  In this way, the concept of a guilty plea that results in a verdict rendered by a jury is impossible.  A guilty plea and a jury trial on the issue of guilt are mutually exclusive for the purposes of the Sixth and Fourteenth Amendments.

Furthermore, given that the court was obliged to provide a jury trial within the terms of the Sixth Amendment, it was impermissible for the court to direct a verdict of guilty.  Sparf v. United States, 156 U.S. 51, 105-106 (It is not competent for the court, in a criminal case, to instruct the jury peremptorily to find the accused guilty of the offence charged.); United Brotherhood of Carpenters & Joiners v. United States, 330 U.S. 395, 408 (1947) (A judge may not direct a verdict of guilty no matter how conclusive the evidence); Rose v. Clark, 478 U.S. 570, 578 (1986) (Where there is a directed verdict the wrong entity judged the guilt of the defendant); Neder v. United States, 527 U.S. 1, 17 (1999) (Affirming the continued force of Rose v. Clark).

By allowing the defendant to plead guilty and directing the jury to return a verdict of guilt the court denied Austin's rights as guaranteed by the Sixth and Fourteenth Amendments.


**CLAIM XIV.**       **The trial court denied Mr. Austin his right to trial by jury as guaranteed by the State and Federal Constitutions when it made findings of fact that Mr. Austin's plea was competent and voluntary when these facts were, in the circumstances, the equivalent of elements of the offense.**


Following the decision of the Supreme Court of the United States in Ring v Arizona it has been made clear that factual findings necessary to the infliction of a death penalty are to be

---

[170] Notably, the plea colloquy in this case did not advise Mr. Austin of this fact, describing the effect of the plea as

treated as elements of the offense and to be determined by a jury, rather than a judge alone. Ring v. Arizona, 536 U.S. 584, 588-589 (2002)[171]   (The Sixth Amendment does not permit a defendant to be exposed to punishment beyond that allowed by the facts reflected in the jury verdict alone.); Apprendi v. New Jersey, 530 U.S. 466, 499 (2000) (Scalia, J., dissenting) (All the facts which must exist in order to subject the defendant to a legally prescribed punishment must be found by the jury.)

When a defendant pleads not guilty there is a presumption of competence and a presumption of sanity.  However, when a defendant pleads guilty the burden shifts and before accepting the plea there must be satisfactory proof of competence and voluntariness:

> (b)     No plea of guilty or plea of nolo contendre shall be accepted by the court unless it appears that the defendant is mentally competent and the plea is free and voluntary.

Tex. Code Crim. Proc. art. 26.13 (b).   At one time it was accepted in Texas that the determination of these factual questions should be submitted to the jury with the plea.  Harris v. State, 76 Tex. Crim. 126, 130-2 (Tex. Crim. App. 1915).  However, it was later determined that findings of competence and voluntariness of a plea should be made by the trial judge alone. Taylor v. State, 88 Tex. Crim. 470 (Tex. Crim. App. 1918).  These decisions came at a time when a defendant in Texas could only be convicted of a felony offense upon the entry of a verdict by a jury.  A short time later a procedure for the waiver of a jury trial to allow a plea before a judge alone in felony prosecutions was introduced.  Articles 10a, 11 and 12, C.C.P. 1925, as amended by Acts 1931, 42nd Leg., ch. 43, p. 65, §§ 1, 2 and 3.  Fairfield v. State, 610 S.W.2d 771, 776 (Tex. Crim. App. 1981) citing Thornton v. State, 601 S.W.2d 340 (Tex. Crim.

---

no more than an admission to each of the elements of the offense.
[171] The decision Ring was delivered after the verdict in this case but before the conviction and sentence were made final upon denial of the appeal.

App. 1980).  However, no waiver of jury trial is permitted in a capital case.

The logic of Taylor cannot survive the insight provided by Ring.  Given that Texas practice calls for a jury to be directed to convict upon a plea of guilty, the findings of fact necessary for the acceptance of such a plea become the equivalent of elements of the offense. Indeed, under federal jurisprudence, the acceptance of the plea is the entry of a conviction.

Here the facts reflected in the verdict actually returned by the jury (rather than directed by the judge) are insufficient to expose him to any penalty.  Mr. Austin is only exposed to a penalty by the directed finding that he was guilty of first degree murder.  This finding in turn was mandated by the trial judge's factual findings that the plea was competent and voluntary.  Such a position is inconsistent with the entrenched role of the jury in determining critical facts in homicide cases. Ring, 536 U.S. at 599 (2002) citing  Walton v. Arizona, 497 U.S. 639, 710-711 (1990) (Stevens, J., dissenting).  The Due Process Clause guarantees that the jury will be solely responsible for the determination of guilt and this has been breached in Austin's case. United States v. Gaudin, 515 U.S. 506, 509-511 (1995); Sullivan v. Louisiana, 508 U.S. 275, 277-278, (1993); Williams v. Florida, 399 U.S. 78, 100 (1970).

A finding by the trial judge that a defendant's plea is competent and voluntary is not just tantamount to a judicial finding of each element of the offense.  It is a finding of guilt by a judge, not a jury.  This violates Mr. Austin's Due Process and jury trial guarantees.

## THE JURY IN THIS CASE WAS ACTUALLY BIASED

**CLAIM XV.**      **Mr. Austin was denied his right to a fair and impartial tribunal as a result of the unconstitutional prejudice of jurors preventing them from considering the imposition of a life sentence as an option in a case of capital murder.**

**CLAIM XVI.**     **Mr. Austin was denied his right to a fair impartial tribunal when a majority of jurors provided misleading answers as to their willingness to consider evidence in mitigation were he to be convicted of capital murder.**

> *Whatever else might be said of capital punishment, it is at least clear that its imposition by a hanging jury cannot be squared with the Constitution.*

Witherspoon v. Illinois, 391 U.S. 510, 523 (1968)

> *It took us longer to choose a foreperson than to decide on the death penalty.*

Ronnie Erwin, a juror in the trial of Perry Austin.  Exhibit 68 - Statement of Juror Erwin.

The Sixth and Fourteenth Amendments of the Federal Constitution and Article 1, Section 10 of the Texas Constitution guarantee a criminal defendant a fair and impartial jury.

This guarantee is violated where any juror, let alone the bulk of the jury, is actually biased against the defendant.

> In essence, the right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors. The failure to accord an accused a fair hearing violates even the minimal standards of due process.  In re Oliver, 333 U.S. 257, 92 L. Ed. 682, 68 S. Ct. 499 [(1948)]; Tumey v. Ohio, 273 U.S. 510, 71 L. Ed. 749, 47 S. Ct. 437 [(1927)]. 'A fair trial in a fair tribunal is a basic requirement of due process.' In re Murchison, 349 U.S. 133, 136, 99 L. Ed. 942, 75 S. Ct. 623 [(1955)]. In the ultimate analysis, only the jury can strip a man of his liberty or his life. In the language of Lord Coke, a juror must be as 'indifferent as he stands unsworne.' Co. Litt. 155b. His verdict must be based upon the evidence developed at the trial. Cf. Thompson v. City of Louisville, 362 U.S. 199, 4 L. Ed. 2d 654, 80 S. Ct. 624 [(1960)].  This is true, regardless of the heinousness of the crime charged, the apparent guilt of the offender or the station in life which he occupies. It was so written into our law as early as 1807 by Chief Justice Marshall in 1 Burr's Trial 416 (1807). 'The theory of the law is that a juror who has formed an opinion cannot be impartial.' Reynolds v. United States, 98 U.S. 145, 155, 25 L. Ed. 244 [(1879)]."

Irvin v. Dowd, 366 U.S. 717, 721-722 (1961) (footnote omitted). See also Turner v. Louisiana, 379 U.S. 466 (1965) at 472 and n.10 (Due process alone demands that, if a jury is to be provided the defendant, regardless of whether the Sixth Amendment requires it, the jury must stand impartial and indifferent to the extent commanded by the Sixth Amendment.)

A short time later the Supreme Court directly applied the Sixth Amendment jury trial guarantee to the states, creating a further impartial jury guarantee. Duncan v. Louisiana, 391 U.S. 145 (1968) (The Fourteenth Amendment guarantees a right of jury trial in all state criminal cases which, were they tried in a federal court, would come within the Sixth Amendment's guarantee of trial by jury.)

The Sixth and Fourteenth Amendments guarantee the impartiality of a capital sentencing jury.  Morgan v Illinois, 504 U.S. 719, 728 (1992).

The Supreme Court has made it clear that no death penalty imposed by a jury that contains even one juror who cannot, in good faith, consider the presence of mitigating evidence can be allowed to stand.  Morgan, 504 U. S. at 735, n.8 ("the measure of a jury is taken by reference to the impartiality of each, individual juror"); Ross v. Oklahoma, 487 U.S. 81, 85 (1988).

> A juror who will automatically vote for the death penalty in every case will fail in good faith to consider the evidence of aggravating and mitigating circumstances as the instructions require him to do. Indeed, because such a juror has already formed an opinion on the merits, the presence or absence of either aggravating or mitigating circumstances is entirely irrelevant to such a juror. Therefore, based on the requirement of impartiality embodied in the Due Process Clause of the Fourteenth Amendment, a capital defendant may challenge for cause any prospective juror who maintains such views. If even one such juror is empaneled and the death sentence is imposed, the State is disentitled to execute the sentence.

Morgan v Illinois, 504 U.S. 719, 729 (1992).

The Supreme Court has set forth a particularized test for determining whether a new trial is required in the context of juror "dishonesty" during voir dire or on jury questionnaires. In order to obtain a new trial, the defendant "must first demonstrate that a juror failed to answer honestly a material question . . . and then further show that a correct response would have provided a valid basis for a challenge for cause." McDonough Power Equip., Inc. v. Greenwood,

464 U.S. 548 (1984).

The McDonough test is now routinely applied in a criminal context and applies equally to deliberate concealment as to innocent mistakes.

> Although in *McDonough* the juror's incorrect response in voir dire was an honest mistake, the test applies equally to deliberate concealment and to innocent non-disclosure, as our sister circuits have held. See, e.g., Zerka v. Green, 49 F.3d 1181, 1185 (6th Cir. 1995); United States v. Langford, 990 F.2d 65, 68 (2d Cir. 1993); Artis v. Hitachi Zosen Clearing, Inc., 967 F.2d 1132, 1141-42 (7th Cir. 1992); Burton v. Johnson, 948 F.2d 1150, 1158 (10th Cir. 1991); United States v. St. Clair, 855 F.2d 518, 522-23 (8th Cir. 1988); United States v. Scott, 854 F.2d 697, 698 (5th Cir. 1988).

Jones v. Cooper, 311 F.3d 306, 310 (4th Cir. 2002).

In addition to considerations of misleading responses by jurors, a defendant may always bring a claim of actual bias and seek a hearing to demonstrate the existence of that bias.

> Thus, regardless of whether a juror's answer is honest or dishonest, it remains within a trial court's option, in determining whether a jury was biased, to order a post-trial hearing at which the movant has the opportunity to demonstrate actual bias or, in exceptional circumstances, that the facts are such that bias is to be inferred.  See Smith v. Phillips, 455 U.S. 209, 215-216 (1982); id., at 221-224 (O'Connor, J., concurring).

McDonogh, 464 U.S. at 556 (Blackmun, J., concurring).  The remedy for a claim of actual bias is a hearing and if bias is proven a retrial.

> This Court has long held that the remedy for allegations of juror partiality is a hearing in which the defendant has the opportunity to prove actual bias.

Smith v. Phillips, 455 U.S. 209, 215 (1982).

In this case Mr. Austin specifically makes claims for relief on both bases, that is, misleading responses on voir dire concealing a basis for cause challenge and actual bias.

In any event, in this case it is less important to determine whether the jurors acted deliberately or innocently in failing to disclose their unconstitutional bias in favor of the death penalty than in some cases.  This is not a case where the undisclosed information gives rise to an

implied bias and the concealment of the information is used inferentially to support a finding of bias.  In this case the undisclosed information is the very fact that the juror actually possesses an unconstitutional bias.

The central thrust of this claim is that when asked at voir dire whether they could answer the special issues in such a way as to result in a life sentence each juror responded that they could and that they could consider mitigating evidence.  Each had therefore denied the existence of a bias of the sort condemned in <u>Morgan</u>.[172]

As demonstrated below, a number of the jurors unequivocally believed that death would be the only appropriate penalty were a guilty verdict returned and that this would be the only verdict they would return.  The strength of the juror's views leaves no doubt as to the effect that their views had upon their voting.  These jurors were ineligible to serve under *Morgan* because of bias.  There is also no question that had the jurors frankly answered questions about their willingness to vote for life and consider mitigation then the basis for a challenge for cause would have been made out.

**Juror William Gibbs**

In a post-conviction interview Juror Gibbs stated:

> I believe that "an eye for an eye" is correct.  I you kill someone you should face the death penalty.
>
> Once someone is guilty of capital murder I believe that the only appropriate penalty is the death penalty.  I do not think that there is anything that would be mitigating so that a person should not get the death sentence, this includes being insane.
>
> Once I heard that Perry Austin had admitted to intentionally killing a nine year old boy I was only going to vote one way - I was going to vote "yes" he was a

---

[172] Given the questions the jury asked and were answered there can be no suggestion that the defendant waived any claim of bias by failing to explore for partiality.  The juror's clearly answered that they were not biased.

future danger and "no" there was nothing mitigating.  I was not going to vote for anything other than the death penalty.

Exhibit 65 - Statement of William Gibbs

***Juror David Condon***

In a post-conviction interview Juror Condon stated:

For me, if somebody is not insane and kills somebody, especially a child, the only appropriate penalty is the death penalty. Other than showing that it was an accident or the person was insane I do not think that any other considerations are relevant. If you are found guilty of capital murder you should get the death penalty.

Exhibit 67 - Statement of David Condon

***Juror Ronnie Erwin***

In a post-conviction interview Juror Erwin stated:

I believe that if you are found guilty of capital murder the only appropriate penalty is the death penalty. The only thing that would make that different is if the person was insane. After Perry Austin admitted he did the murder the case was pretty simple. He wanted the death penalty and we were happy to give it to him. When we got sent to the jury room we were ready to go home. No one wanted to be the foreperson. It took us longer to choose a foreperson than to decide on the death penalty.

Exhibit 68 - Statement of Ronnie Erwin

**Juror Bryan Finnegan**

Ina  post-conviction interview Juror Finnegan stated:

We did not deliberate very long it was about ten minutes. Everybody agreed that Austin was guilty and during the penalty phase all agreed that Perry deserved the death penalty.

I believe that once Austin was found guilty of the murder of the victim the only appropriate sentence was death in accordance with Texas law.

I believe that the prosecutors chose me to be on Austin's jury because Perry wanted to die and Perry knew with me working in law enforcement, I would sentence him to death.

I've never known another FBI agent to serve on a capital murder jury.

Exhibit 94 - Statement of Juror Finnegan.

**Juror Israel Tamayo**

In a post-conviction interview Juror Tamayo stated:

It only took eight or nine minutes to come to our decision. The judge told us after sentencing that she had predicted we would take ten minutes to sentence him to death. IT wasn't even discussed and we just went in the jury room and that was it, period.

The death penalty is especially appropriate for child killers. I do not consider mental illness to be mitigation because it is too easy for defendants to lie and manipulate circumstances.

Exhibit 85 - Statement of Juror Tamayo

**Juror Jimmy Maddox**

In a post-conviction interview juror Maddox stated:

I believe that when somebody is found guilty of very violent murders especially against children and premeditated or repeated crimes the death penalty should be imposed. If it is shown that a person has a serious mental illness or defect this is a situation where the jury should consider not imposing the death penalty.

Exhibit 66 - Statement of Juror Maddox

**Juror Sharon Phillips**

In a post-conviction interview Juror Phillips stated:

1. I found the experience of being on a capital jury very sad. I was sad for the victim, sad for his family and sad for Perry. Obviously he didn't grow up in the Cleaver family. What's sad is that maybe he didn't have better parents, he probably needed some help when he was a young man.

Nevertheless if you kill a child and know what you are doing and you are convicted by a jury of your peers and there's overwhelming evidence, then that's it, you should get the death penalty. If, however, you don't know what you are doing when you commit the murder you should be taken off the streets and given psychiatric help for the rest of your life.

Exhibit 86 - Statement of Juror Phillips

***Alternate Juror Robert Earhart***

In a post-conviction interview alternate Juror Earhart stated:[173]

Perry Austin pled guilty to the capital murder of a nine year old boy.  I did not have to vote in this case but if I had there would have been no doubt that I would have voted for death.

I believe that if someone is guilty of the intentional killing of a nine year old boy, that the only appropriate sentence is the death penalty.  Other than someone being completely insane, I cannot thing of anything that I would regard as mitigating.  I cannot imagine voting on the two questions in the penalty phase in any way other than "yes" and "no" in a case where someone intentionally killed a nine year old boy.

Exhibit 64 - Statement of Robert Earhart

## THE PRIOR CONVICTIONS USED BY THE STATE IN PENALTY PHASE WERE UNCONSTITUTIONALLY OBTAINED

At the outset of this claim it should be noted that insufficient time and resources have been available to permit an adequate exploration of the circumstances of each of Mr. Austin's prior convictions.  Nevertheless, preliminary enquiry reveals a number of issues of constitutional magnitude.

**CLAIM XVII.   Mr. Austin's Due Process and Eighth Amendment rights were violated when the state relied upon prior convictions for violent and sexual offences where those convictions had been obtained unconstitutionally.**

In violation of Mr. Austin's constitutional rights the state in the penalty phase of this capital trial introduced evidence of three prior convictions, each of which was obtained

---

[173] It is appreciated that actual bias on the part of an alternate juror is, of itself, no basis for relief but Juror Earhart's reflections are included to emphasize the complete collapse of the orderly trial process in this case.

unconstitutionally.

The first prior conviction was the 1978 aggravated sexual assault.  This conviction is constitutionally infirm as a result of <u>Brady</u> violations and the ineffective assistance of counsel.  It is also an unconstitutional conviction in as much as Mr. Austin is factually innocent of the offense; being instead not guilty by reason of insanity.  The conviction was only allowed to stand because of the ineffectiveness of appellate counsel.

The psychological and psychiatric evidence developed in this habeas petition demonstrates for the first time the severe prejudice suffered by Mr. Austin as a result of counsel's ineffectiveness in the 1978 trial.  Despite the opinion of psychologist, Dr. Lewis, that more testing was necessary because of the possibility of serious organic injury no further testing was conducted.  Further, counsel failed to adequately investigate Mr. Austin's history and develop documentary evidence of Mr. Austin's bizarre child hood behavior and difficulties while on military caps as a dependent and then as an enlisted man.  Even the limited investigation and examination that has been conducted for the purposes of this habeas petition has disclosed reliable information regarding Mr. Austin's history and then mental functioning.

The state's mental health witness was the now infamous Dr. Grigson.  On information and belief the state were aware of substantial impeachment material available about Dr. Grigson and failed to disclose it.

Sanity was the central and only issue in this case and the jury asked to hear Dr. Lewis's testimony again.  These constitutional errors, striking as they do at the heart of the sanity question cannot be regarded as harmless.

Even if the decision of the jury in 1979 is otherwise constitutionally defensible, the fact that Mr. Austin is factually innocent makes the conviction and sentence violative of the

constitution.  As the mental health evidence in this case shows, Mr. Austin has a significant cognitive impairment and a severe mood disorder.  A jury considering the 1978 offense in the light of the new evidence of Mr. Austin's innocence would not convict.

Finally, the brief filed by appellate counsel was cursory and ineffective.

The second conviction relied upon is that following on from a plea to aggravated sexual assault in relation to Jennifer Ortega.  In this case the court failed to conduct a colloquy that ensured that a knowing, voluntary and intelligent plea had been obtained in the case.  The court has also failed to preserve a record of this colloquy despite Mr. Austin's refusal to authorize the destruction of the record of the plea.  Counsel in this case also provided ineffective assistance by failing to explain to the prime suspect in a capital murder that a conviction for aggravated sexual assault would be used against him should he ever be charged with capital murder.  Beyond this counsel was ineffective in failing to investigate the case adequately, including investigation into mitigating evidence such as the genuine consent of both Jennifer and her mother to the relationship and the fact that Jennifer had been in a previous relationship with an older man..

The third conviction is the aggravated assault case in the prison.  In this case, on information and belief, there was a substantial Brady violation when the state failed to disclose critical evidence in Mr. Austin's defense, including the record of death threats the TDC was aware of against Mr. Austin and his friends in the lead up to the incident.  Similarly, there was a failure to disclose evidence of staff participation in the tit for tat violence that was plaguing the Unit at that time.  The Brady violation was so pervasive as to constructively deny Mr. Austin the assistance of counsel altogether.  Mr. Austin was also denied the effective assistance of counsel due to a complete breakdown in the relationship between Mr. Austin and counsel to the point where he was constructively denied counsel.  Counsel was also ineffective in failing to conduct

an adequate investigation, which would have uncovered a number of the matters detailed above.

In these circumstances it was a violation of Mr. Austin's Due Process and Eighth Amendment guarantees for the state to rely upon these impugned convictions.

## THE WAIVER OF APPELLATE COUNSEL WAS NOT KNOWING VOLUNTARY AND INTELLIGENT

**CLAIM XVIII.  Mr. Austin's constitutionally guaranteed right to appellate counsel was denied when the trial court accepted a purported waiver of counsel that was not a knowing, voluntary and intelligent waiver of his right to the assistance of counsel.**

The Due Process clause of the Fourteenth Amendment guarantees appellants the right to counsel on direct appeal.  Douglas v. California, 372 U.S. 353, 355-57 (1963); Evitts v. Lucey, 469 U.S. 387, 392 (1985); Clark v. Johnson, 227 F.3d 273, 283 (5th Cir. 2000).  "The Fourteenth Amendment guarantees a criminal appellant the right to counsel on a first appeal as of right." Penson v. Ohio, 488 U.S. 75, 79 (1988).  The Gideon v. Wainwright right to effective assistance of counsel, and the Due Process right to appellate counsel creates a constitutional right to effective appellate counsel:

> a party whose counsel is unable to provide effective representation is in no better position than one who has no counsel at all.  A first appeal as of right therefore is not adjudicated in accord with due process of law if the appellant does not have the effective assistance of an attorney.

Evitts, 469 U.S. at 397; see Gideon v. Wainwright, 372 U.S. 335, 339 (1963) (finding a constitutional right to counsel); Cuyler v. Sullivan, 446 U.S. 335, 344 (1980) (finding a constitutional right to effective counsel).  Given the complexity of the appellate system, the Supreme Court has observed that the right to appeal would be "a meaningless ritual" and a "futile gesture" without effective assistance.  Douglas, 372 U.S. at 358; Evits, 469 U.S. at 397. The Court has noted that:

> The need for forceful advocacy does not come to an abrupt halt as the legal proceeding moves from the trial to appellate stage. Both stages of the prosecution, although perhaps involving unique legal skills, require careful advocacy to ensure that rights are not forgone and that substantial legal and factual arguments are not inadvertently passed over.

Penson, 488 U.S. at 85.

Mr. Austin's purported waiver of appellate counsel took place on April 4, 2002 and formed a part of the same course of conduct as the waiver of trial counsel and the plea of guilty. In the same way that each of those decisions was vitiated by a lack of competence and a lack of voluntariness, the decision to waive appellate counsel is also to be set aside. Mr. Austin's decision to waive counsel was a decision of his mental illness, not a knowing and voluntary decision of his own.  Ex. 95 Statement of Dr. George Woods.

Further, given the additional indicia of incompetence and involuntariness that had arisen during the course of the trial the trial court's colloquy with the defendant was insufficiently probing in the circumstances to support a constitutionally valid waiver.

## THERE WAS NO EFFECTIVE DIRECT APPELLATE REVIEW OF MR. AUSTIN'S TRIAL

*Factual Overview*

The Reporter's Record in this case is incomplete as a result of the omission of transcript of at least two critical hearings, bearing directly upon Mr. Austin's competence and the voluntariness of his waiver of counsel.  As a result, the Court of Criminal Appeals did not conduct the constitutionally and statutorily mandated review of the entire record prior to affirming Mr. Austin's conviction and sentence.  Had this transcript been available, the Court of Criminal Appeals would have reversed Mr. Austin's conviction and death sentence.

Mr. Austin was convicted and sentenced to death on April 3, 2002.  On April 10, 2002, pursuant to Rules 25 and 34 of the Texas Rules of Appellate Procedure, Mr. Austin timely filed a

*Designation of the Clerk's Record on Appeal*.   (C.R. 99-101).   Mr. Austin's Designation requested, *inter alia*, that the Clerk and Court Reporter prepare as a part of the record in the appeal of this cause true and correct copies of:

> 4. All hearings held outside the presence of the jury;
> * * * *
> 6. All communications between the Trial Court and the Defendant, Counsel for the Defendant, and the Prosecutor.

(C.R. 99).

The Reporter's Record was originally due on June 6, 2002, but was not filed by this date. The Court of Criminal Appeals wrote to Linda Hacker, the Official Court Reporter, seeking either the filing of the record or a motion to extend time.  (01667)

On July 1, 2002 the Court Reporter filed a *Request for Extension of Time to File Record* seeking an extension until August 30, 2002.  (01666)  In that request the Court Reporter observed that the record in the appeal was expected to cover approximately 2,500 pages and 14 days of testimony.  The request for an extension of time was granted.

On August 27, 2002 the Court Reporter once again filed a *Request for Extension of Time to File Record*, seeking until October 30, 2002 for the filing of the Reporter's Record.  In this request the Court Reporter reiterated that the record covered 14 days of testimony but refined her estimate of the length of the record to approximately 700 pages.

On October 18, 2002 the Official Court Reporter, Linda Hacker, certified the various Volumes of the Record as containing:

> a true and correct transcription of all portions of evidence and other proceedings and requested in writing by counsel for the parties to be included in this volume of the Reporter's Record, in the above-styled and numbered cause, all of which occurred in open court or in chambers and were reported by me.

(See, for example, RR. XI-33).

The Reporter's Record filed by the Official Court Reporter consists of the following:

Vol. 1  -       Clerk's Record
Vol. 2  -       October 11, 2001 – Faretta Hearing
Vol. 3  -       March 18, 2002 – General Voir Dire
Vol. 4 -        March 19, 2002 – Individual Voir Dire
Vol. 5 -        March 20, 2002 – Individual Voir Dire
Vol. 6 -        March 21, 2002 – Individual Voir Dire
Vol. 7 -        March 21, 2002 – General Voir Dire
Vol. 8 -        March 21, 2002 – Individual Voir Dire
Vol. 9 -        April 1, 2002 – Punishment Phase
Vol. 10 -       April 2, 2002 – Punishment Phase
Vol. 11 -       April 3, 2002 – Punishment Phase
Vol. 12 -       April 4, 2002 – Appeal Hearing
Vol. 13 -       Exhibits
Vol. 14 -       Exhibits
Vol. 15 -       Exhibits

As can be observed, the Reporter's Record consists of only 9 days of testimony/hearings spread over 11 volumes.

On October 25, 2002, pursuant to Texas Code of Appellate Procedure art. 37.2, the Court of Criminal Appeals officially notified Mr. Austin that the Reporter's Record had been received and filed.  (01670)

Mr. Austin did not submit a brief and the State chose to waive its right to submit a brief. In the interests of justice and consistent with Tex. Code Crim. Proc. art. 37.071, § 2(h) the Court of Appeals accepted the case without benefit of briefs and "reviewed the entire record."  The court, finding no unassigned fundamental error, affirmed the judgment of the trial court.  Austin v. State, (Tex. Crim. App. April 2, 2003).

Unfortunately, due to the omission of transcript of critical hearings from the Reporter's Record, the Court of Criminal Appeals did not review the entire record in this case and was not able to conduct a meaningful review for fundamental error.

The following table lists the court appearances as reflected in the Clerk's Record and the

Reporter's Record:

| Date | Event | Clerk's Record | Reporter's Record |
|------|-------|----------------|-------------------|
| 04/25/01 | Agreed setting (?) "disp" (?) for 6/26/01<br>Defendant present | 0004 | |
| 07/13/01 | Agreed Setting of 9/12/01 for "PTMO" (Pre-Trial Motions)<br>Defendant present | 0015 | |
| 09/12/01 | Agreed Setting to 10/1/01 for "Disp"<br>Defendant not brought to court | 0022 | |
| 10/1/01 | Agreed setting to 10/11/01 for Hearing<br>Defendant present | 0023 | |
| 10/11/01 | Court Hearing - Faretta Hearing – 20 pages<br>Agreed Setting to 2/4/02 for "JTRL" and 2/1/02 for "PTCR" | 0034 | Vol. 2 |
| 01/25/02 | Agreed Setting to 3/18/02 (JTRL) and 2/27/02 (OTHR)<br>(Defendant Present) | 0039 | |
| 03/18/02 | Court Hearing - General Voir Dire – 87 pages | | Vol 3 |
| 03/19/02 | Court Hearing - Individual Voir Dire – 67 pages | | Vol 4 |
| 03/20/02 | Court Hearing - Individual Voir Dire – 91 pages | | Vol 5 |
| 03/21/02 | Court Hearing - Individual Voir Dire – 52 pages | | Vol 6 |
| 03/21/02 | Court Hearing - General Voir Dire – 55 pages | | Vol 7 |
| 03/21/02 | Court Hearing - Individual voir dire – 37 pages | | Vol 8 |
| 04/01/02 | Court Hearing - Penalty Phase | | Vol. 9 |
| 04/02/02 | Court Hearing - Penalty Phase | | Vol. 10 |
| 04/03/02 | Court Hearing - Penalty Phase | | Vol. 11 |
| 04/04/02 | Court Hearing - Appeal Hearing – 10 pages | | Vol 12 |

As can be seen, a review of the Clerk's Record reveals five court dates that are not reflected in the Reporter's Record.  It is apparent from the record that at least two of these hearings involved the court's direct communications with Mr. Austin regarding his waiver of right to counsel, and were relied upon by the trial court in finding Mr. Austin competent, accepting his waiver of counsel and accepting his plea of guilty.

At the commencement of the *Faretta* hearing held on October 11, 2001 – the first hearing reflected in the Reporter's Record – the trial judge said:

about six weeks ago… Mr. Austin was brought into chambers with the

prosecution and the defense with a court reporter present and at that time Mr. Austin indicated, consistent with at least one of his letters, that he wanted to discharge his lawyers and proceed *pro se*.

(RR. II-3).

It is clear from this remark that on a date earlier than October 11, 2001 the court had conducted a substantive discussion with Mr. Austin about his decision to waive his right to counsel, and that this discussion had taken place in the presence of the Court Reporter.  The Clerk's Record suggests that this hearing may have been held on October 1 or July 13; or, it may have taken place on another date altogether.

On January 23, 2002 Mr. Austin wrote a letter to the trial court indicating that he wished to dismiss Mr. Arnold as stand-by counsel.  That letter is preserved in the Clerk's Record but has had added to it a holographic notation recording Mr. Austin's agreement of January 25, 2002[174], made in open court, to continue to accept Mr. Arnold as stand-by counsel.  (CR. 64)  Obviously, there was some form of colloquy with Mr. Austin on the question of his representation.  Equally obviously, this colloquy was once again omitted from the Reporter's Record.  In fact, the trial judge urged Mr. Austin to accept standby counsel and ultimately persuaded him to do so by explaining the presence of a pro forma standby counsel would make it more likely that Austin's sentence would be upheld on appeal.

The trial judge made it clear at the October 11, 2001 *Faretta* hearing that she had regard to her earlier discussion with Mr. Austin in determining that he was competent and that his waiver was voluntary.  On April 1, 2002, on accepting Mr. Austin's plea of guilty,  the trial judge once again referenced her unrecorded prior conversations with Mr. Austin, making it clear that the hearings absent from the record influenced her decision-making.  (RR. IX–6).

---

[174] The notation actually places the date in 2001 but this is obviously an error.

A further undocumented communication is revealed by Mr. Austin's letter to the trial court of September 1, 2002.  This letter records that the trial judge advised Mr. Austin on the appropriate papers to file to hasten his execution.

> When I was sentenced in your court you had advised me to file certain motions and briefs to expedite the appeals process, otherwise it would take just as long, if not longer to attain what I am seeking.

Letter from Perry Austin to Judge Cosper, September 1, 2002.  In fact, Judge Cosper advised Mr. Austin on how to expedite his execution by filing an *Anders* brief.  (Exhibit 89).

The Reporter's Record in this cause is deficient in a number of critical respects and as a result there has been no effective appellate review of Mr. Austin's death sentence.

**CLAIM XIX.**  **The execution of the death sentence imposed upon Mr. Austin would be in violation of the Eighth Amendment to the Federal Constitution and Article 1, Section 13 of the Texas Constitution as there has not been searching appellate review of Mr. Austin's conviction and sentence of death due to critical omissions from the record as filed.**

**CLAIM XX.**  **Mr. Austin is entitled to a new trial where, despite his due diligence, critical parts of the trial record have been lost or destroyed.**

The Eighth Amendment[175] mandates comprehensive direct review of capital convictions. In the absence of this meaningful review, the imposition of the death penalty is arbitrary and capricious.  Gregg v. Georgia, 428 U.S. 153 (1976).  To avoid running afoul of the Eighth Amendment, the death penalty must be administered "in a way that can rationally distinguish between those individuals for whom death is an appropriate sanction and those for whom it is

---

[175] The same considerations are implicated by Article 1, Section 13 of the Texas Constitution ("Excessive bail shall not be required, nor excessive fines imposed, nor cruel or unusual punishment inflicted.") and this claim references both.

not." Spaziano v. Florida, 468 U.S. 447, 460 (1984).  Appellate review is an indispensable safeguard against such arbitrariness: "We have emphasized repeatedly the crucial role of meaningful appellate review in ensuring that the death penalty is not imposed arbitrarily or irrationally." Parker v. Dugger, 498 U.S. 308, 321 (1991).  "[M]eaningful appellate review" in capital cases "serves as a check against the random or arbitrary imposition of the death penalty." Gregg, 428 U.S. at 195 (opinion of Stewart, Powell, and Stevens, JJ.); and see, e.g. Clemons v. Mississippi, 494 U.S. 738, 749 (1990) ("[T]his Court has repeatedly emphasized that meaningful appellate review of death sentences promotes reliability and consistency.").

The Supreme Court has consistently found that the constitutionality of state death penalty schemes, including Texas' own death penalty scheme, is predicated on the provision for mandatory and meaningful appellate review:

> By providing prompt judicial review of the jury's decision in a court with statewide jurisdiction, Texas has provided a means to promote the evenhanded, rational, and consistent imposition of death sentences under law. Because this system serves to assure that sentences of death will not be "wantonly" or "freakishly" imposed, it does not violate the Constitution. *Furman v. Georgia*, 408 U.S. at 310 (Stewart, J. concurring).

Jurek v. Texas, 428 U.S. 262, 276 (1976); see *Whitmore v. Arkansas*, 495 U.S. 149, 171 (Marshall, J. dissenting) (listing instances in which the constitutionality of state death penalty schemes depends upon the provision for appellate review).  Considering Florida's death penalty scheme, the Court found it crucial that the risk that "the death penalty will… be imposed in an arbitrary or capricious manner… is minimized by Florida's appellate review system." Proffitt v. Florida, 428 U.S. 242, 253; and see Dobbert v. Florida, 432 U.S. 282, 295 (1977).  In allowing for the resumption of the death penalty in Georgia, the *Gregg* court observed that "an important aspect of the new Georgia legislative scheme… is its provision for appellate review . . . in every case in which the death penalty is imposed." Gregg v. Georgia, 428 U.S. 153 at 211; see also

McCleskey v. Kemp, 481 U.S. 279, 303 (1987) ("the Georgia system adds 'an important additional safeguard against arbitrariness and caprice' in a provision for automatic appeal of a death sentence to the State Supreme Court."); Zant v. Stephens, 462 U.S. 862, 884 (1983) ("Our decision in this case depends in part on the existence of an important procedural safeguard, the mandatory appellate review of each death sentence by the Georgia Supreme Court to avoid arbitrariness and to assure proportionality.").

Just as the death penalty cannot be constitutional under the Eighth Amendment without meaningful appellate review, no constitutionally effective review can be undertaken when the trial record is incomplete as to the critical issue of the competency and voluntariness of a waiver of counsel.  Indeed, the Supreme Court has held that, where plain error – the federal equivalent of Texas' fundamental error – is alleged, "a reviewing court cannot properly evaluate a case except by viewing such a claim against the entire record." U.S. v. Young, 470 U.S. 1, 16 (1985). In Gardner v. Florida, 470 U.S. 349 (1977) the Court vacated a Florida death sentence, holding that a denial of due process had occurred when a portion of the presentencing report, relied upon by the judge when he sentenced the defendant to death, was not provided to the Florida Supreme Court on appeal: "Even if it were permissible to withhold a portion of the report from a defendant, and even from defense counsel, pursuant to an express finding of good cause for nondisclosure, it would nevertheless be necessary to make the full report a part of the record to be reviewed on appeal" Id at 361 .  See also Parker v Dugger, 498 U.S. 308, 321 (1991) ("It cannot be gainsaid that meaningful appellate review requires that the appellate court consider the defendant's actual record.").

Justice Frankfurter is the author of an important concurrence that has come to stand for the principle that meaningful appellate review demands review of the "entire record of the

proceedings": "In reviewing criminal cases, it is particularly important for appellate courts to re-live the whole trial imaginatively and not to extract from episodes in isolation abstract questions of evidence and procedure." <u>Johnson v. U.S.</u> 318 U.S. 189, 202 (1943) (Frankfurter, J. concurring). *And see, e.g.* <u>U.S. v. Dweck</u>, 913 F.2d 365, 370 (7th Cir. 1990) (quoting from <u>Johnson</u>); <u>Beets v. Iowa Dep't of Corrections Servs</u>. 164 F.3d 1131 (8th Cir. 1999) (same).

All federal circuit court of appeals have insisted that meaningful appellate review, particularly where plain error is alleged, must include an examination of the entire record. *See* <u>U.S. v. Joyner</u>, 191 F.3d 47, 55 (1st Cir. 1999) ("We must consider the likely impact the prosecutor's remarks had on the jury in light of the entire record, including the closing argument presented by the defense"); <u>U.S. v. Salameh</u>, 152 F.3d 88, 128 (2d Cir. 1998) ("Reversal for judicial bias is appropriate only where [there has been] an examination of the entire record"); <u>U.S. v. Graham</u>, 758 F.2d 879, 883 (3d Cir. 1985) ("The determination of whether plain error has occurred… is to be made by the reviewing court on a case-by-case basis, upon review of the entire record"); <u>U.S. v. Cedelle</u>, 89 F.3d 181, 185 (4th Cir. 1996) ("The court does not view the error in isolation, but rather by viewing it against the entire record"); <u>U.S. v. Rodriguez</u>, 43 F.3d 117, 123 (5th Cir. 1995) ("An error is harmless if the reviewing court is sure, after viewing the entire record, that the error did not influence the jury or had a very slight effect on its verdict.").

Texas law encodes the constitutional requirement of meaningful appellate review for capital sentences. Death sentences "shall be subject to automatic review by the Court of Criminal Appeals," Tex. Code Crim. Proc. art. 37.071, § 2(h). Appellate review must be review of the entire record. Even in ordinary felony cases, Texas' Rules of Appellate Procedure mandate a new trial where there is a loss or destruction of even part of the record:

> Rule 34.6(f) is a relatively new rule, but the principles that brought it into being are not. It has a predecessor in the former Rules of Appellate Procedure and more

than one predecessor within former versions of the Code of Criminal Procedure. We have noted before that the cases under former versions, including Article 40.09 of the Code of Criminal Procedure, are still helpful and that the principles underlying these former versions apply to the newer rules. See Gomez v. State, 962 S.W.2d 572, 574 (Tex. Crim. App. 1998); Gibbs v. State, 819 S.W.2d 821, 828 (Tex. Crim. App. 1991).

The Rule applies whether we are faced with the loss or destruction of the entire record or only a portion of the record. See, e.g. Harris v. State, 790 S.W.2d 568, 574 (Tex. Crim. App. 1989) (pretrial motion); Austell v. State, 638 S.W.2d 888, 890 (Tex. Crim. App. 1982) (voir dire examination); Gamble v. State, 590 S.W.2d 507, 509 (Tex. Crim. App. 1979) (final arguments); Hartgraves v. State, 374 S.W.2d 888, 890 (Tex. Crim. App. 1964) (hearing on motion for new trial). We have said that "the circumstances in such cases should be viewed from the appellant's standpoint, and any reasonable doubt resolved in favor of the appellant." Gamble, 590 S.W.2d at 508 (citing Young v. State, 146 Tex. Crim. 220, 222, 172 S.W.2d 500, 501 (1943); Lamkin v. State, 138 Tex. Crim. 311, 317, 136 S.W.2d 225, 228 (1940)). Further, the unavailability of the record through no fault of the appellant is not immune from a harm analysis. The provision in the rule that the appellant show that the missing portion of the record is necessary to her appeal is itself a harm analysis. Issac v. State, 989 S.W.2d 754, 757 (Tex. Crim. App. 1999)

Routier v. State, 112 S.W.3d 554, 570-571 (Tex. Crim. App. 2003).

The weighty public policy considerations reflected in this insistence on a complete record for appellate review have even more gravity when the proceeding to be reviewed results in a sentence of death.  The Supreme Court has long recognized the need for heightened procedural safeguards where life is at stake.  Well before the Court established the right to counsel in all felony cases, Gideon v. Wainwright, 372 U.S. 335 (1963), it recognized that right in capital cases, Powell v. Alabama, 287 U.S. 45, 71-72 (1932).  Time and again the Court has condemned procedures in capital cases that might be completely acceptable in an ordinary case.  See, e. g. Bullington v. Missouri, 451 U.S. 430 (1981);  Beck v. Alabama, 447 U.S. 625 (1980); Green v. Georgia, 442 U.S. 95 (1979) (per curiam);  Lockett v. Ohio, 438 U.S. 586 (1978);  Gardner v. Florida, 430 U.S. 349 (1977);  Woodson v. North Carolina, 428 U.S. 280 (1976).    These

decisions reflect an appreciation of the fundamental fact that death is different.[176]  It follows that the Texas Rule providing for retrial where the record is incomplete on appeal should be enforced even more stringently where life and death hang in the balance.

In considering the predecessor provisions to the current Rules governing preparation of the record for appeal.  Court of Criminal Appeals Justice Clinton referenced Supreme Court jurisprudence in Furman and Jurek before emphasizing the public policy interest in a review of the *entire* record in capital cases.

> That this court have before it the entire record in a capital case serves a public policy which considers assuring evenhanded imposition of the ultimate penalty as important, if not more so, than faulting the one condemned for inability to demonstrate on appeal how an error resulted in disadvantage

McGee v. State, 711 S.W.2d 257, 260 (Tex. Crim. App. 1986) (Clinton, J. concurring).

The constitutional requirement of effective appellate review in capital cases has not been met in this case.  The interests of public policy demand searching appellate review to confirm the probity of allowing Mr. Austin to stand to trial, and to represent himself, given his mental state. Knowing and intelligent waiver of the right to counsel is inherent in the assertion of the right to self-representation and must be affirmatively reflected in the record.  Martin v. State, 630 S.W.2d 925, 956 (1982) (Davis, J. concurring).   A reviewing court's examination of a defendant's knowing and intelligent waiver of his right to counsel must involve an examination

---

[176]     The Supreme Court has also consistently required a heightened standard of fact-finding in capital cases because of the dire consequences for the defendant and the community.  Ford v. Wainwright, 477 U.S. 399, 411 (1986) ("in capital proceedings generally, this Court has demanded that fact-finding procedures aspire to a heightened  standard of reliability") (citing, inter alia, Spaziano v. Florida,  468 U.S. 447, 456 (1984), Woodson v. North Carolina, 428 U.S. 280,  305 (1976) (opinion of Stewart, Powell, and Stevens, JJ.)); see also, Caldwell v. Mississippi, 472 U.S. 320, 323 (1985); Simmons v. South Carolina, 512 U.S. 154, 172 (1994) (opinion of Souter, O'Connor, Ginsburg, JJ.) ("The Eighth Amendment . . . imposes a heightened standard for reliability"); Satterwhite v. Texas, 486 U.S. 249, 263 (1988) (Brennan, Marshall, Blackmun, JJ. concurring) ("[T]he difference of death  from all other punishments requires a correspondingly  greater degree of scrutiny…. Because of this  heightened  concern for reliability, "time and again the Court has condemned procedures in capital cases that might be completely acceptable in an ordinary case.").

of the whole of the defendant's words and actions on this subject and the whole of the explanations and qualifications presented to him by counsel and the trial court. These matters are so fundamental as to represent structural error, not amenable to harmless error analysis. The missing portions of transcript are directly relevant to these questions.

The question here is one of constitutional, rather than statutory dimensions. Even were a constitutional question not at stake, however, Mr. Austin would be entitled to a new trial under the terms of the Rules of Appellate Procedure, art. 34.6(f):

First, Mr. Austin timely requested a reporter's record. Art. 34.6(f)(1).

Second, without Mr. Austin's fault a significant portion of the recording has been lost, destroyed or is inaudible. Art. 34.6(f)(2).

Third, the lost, destroyed or inaudible portion is necessary to the appeal's resolution. Art. 34.6(f)(3).

Fourth, the missing portion cannot be replaced by agreement of the parties. Art. 34.6(f)(4).

Mr. Austin timely filed a designation of the record seeking to have the court reporter transcribe the relevant material. Due diligence requires no more. *See* Bond v. State, 694 S.W.2d 622, 623 (Tex App. Beaumont 1985, pet. ref'd) (citing cases standing for the proposition that defendant need be diligent only in requesting the transcription of the record. When, through no fault of his own, the defendant is deprived of the record, an appellate court cannot affirm the conviction).

Having designated the record, Mr. Austin received a notice from the Clerk of the Court of Appeal certifying that the record had been prepared in accordance with the Court of Appeal's order on the preparation of the record. Code of Appellate Procedure art. 37.2. In these

circumstances, particularly as a *pro se* defendant, Mr. Austin cannot be faulted for not raising the error before now.

In addition to his constitutional right to have an appellate court review the entirety of his trial record, Mr. Austin had a statutory right to a complete and certified record, in compliance with his request for trial records.  Texas Code App. Proc. art. 37.2.  Here, the clerk erroneously certified an incomplete record for appellate review.  This error foreclosed the searching review mandated by <u>Furman</u> and its progeny as a protection against caprice and arbitrariness, and deprived Mr. Austin of his statutory rights.


## THE COMPLETE ABSENCE OF ANY DEFENSE HAS PRODUCED A SENTENCE THAT IS ARBITRARY AND UNRELIABLE

**CLAIM XXI.**      **The death penalty imposed upon Mr. Austin is violative of the Fifth, Sixth, Eighth and Fourteenth Amendments to the Federal Constitution and the corresponding provisions of the Texas Constitution where the trial court permitted Mr. Austin to represent himself with the express intention of presenting no mitigation evidence and seeking the death penalty thus denying the defendant and the community a regularly applied, fair, and non-arbitrary capital-sentencing proceeding conducted before a jury.**


**CLAIM XXII.**      **The death penalty imposed upon Mr. Austin is violative of the Fifth, Sixth, Eighth and Fourteenth Amendments to the Federal Constitution and the corresponding provisions of the Texas Constitution where the presentation of no defense at all has prevented the conduct of a constitutionally mandated proportionality review.**


The Constitution requires heightened standards of reliability in death cases and a death sentence imposed in the absence of such standards of reliability will be unconstitutional.  In

particular, the court has jealously guarded the need for an individualized consideration of mitigation and sentence.

> The United States Supreme Court in Furman v. Georgia, 408 U.S. 238 (1972) decided that existing death penalty statutes violated the Eighth Amendment's ban on cruel and unusual punishment. Justice White aptly summed up the problem with the death penalty statutes as they existed in 1972, when he wrote that they lacked a "meaningful basis for distinguishing the few cases in which it is imposed from the many cases in which it is not." 408 U.S. at 313 (White, J. concurring). A few years later, the Court in Gregg v. Georgia, 428 U.S. 153 (1976) approved Georgia's revised death penalty statute which created a separate sentencing proceeding where the finder of fact weighs aggravating and mitigating circumstances to determine whether death is the appropriate penalty. In particular, the consideration of aggravating and mitigating circumstances serves an important function by channeling jury discretion. Gregg, 428 U.S. at 197 (Stewart, J., for the plurality).

> The presentation of both aggravating and mitigating circumstances is necessary for the jury to make an individualized determination that the death penalty is the appropriate penalty. Eddings v. Oklahoma, 455 U.S. 104, 110-12, 71 L. Ed. 2d 1, 102 S. Ct. 869 (1982). Without this critical information, the jury cannot make an informed, reliable determination. The Court has repeatedly recognized the importance of the presentation of mitigating evidence during the sentencing phase of a capital case. See Skipper v. South Carolina, 476 U.S. 1, 90 L. Ed. 2d 1, 106 S. Ct. 1669 (1986) (holding that capital defendant had right to present all relevant mitigating evidence); Lockett v. Ohio, 438 U.S. 586, 606, 57 L. Ed. 2d 973, 98 S. Ct. 2954 (1978) (overturning Ohio's death penalty law which allowed consideration of only three types of mitigating evidence).

> Indeed, withholding mitigating evidence undermines the jury's ability to consider the pivotal question it is supposed to consider during its deliberations:

State v. Dodd, 120 N.W.2d 1, 41 (Wash. 1992) (Utter J, dissenting).

Mr. Austin sought to represent himself expressly so that he could put on no defense; not as an exercise in reverse psychology or some other tactic but in an effort to ensure that no defense would be presented, that no adversarial proceeding at all would be conducted and that he would be executed. As a result of his suicidal depression Mr. Austin pursued a death wish that mounted a direct attack on our community's constitutionally supported interest in an adversarial trial system. In violation of the constitution, the trial court allowed that attack to succeed.

159

The system of criminal justice should not be available as an instrument of self-destruction.

Faretta v. California, 422 U.S. 806, 840 (1975) (dissent of Burger, C.J., joined by Blackmun & Rehnquist, JJ.).

This is not a case in which a defendant's right to present his own defense is implicated. It is a case in which the community's Eighth Amendment interest in avoiding the arbitrary and capricious imposition of the death penalty is implicated and where there is no countervailing constitutionally protected right vested in the defendant.

There may be a constitutionally protected right to defend oneself but there is no constitutionally protected right to state assisted suicide.[177]

In Faretta the Supreme Court made it clear from the outset that the question it was considering was whether a defendant had a right to *conduct a defense*:

the question is whether a State may constitutionally hale a person into its criminal courts and there force a lawyer upon him, even when he insists that he wants to conduct his own defense.

Faretta v. California, 422 U.S. 806, 807 (1975).

In Faretta the Court reviewed a long line of cases upholding the right of self-representation but each referred to the right to conduct one's own *defense*. None of the cases there discussed involved an abandonment of the adversarial process and the desire to have *no*

_____

[177] V.T.C.A. Penal Code § 22.08 criminalizes aiding in suicide: (a) A person commits an offense if, with intent to promote or assist the commission of suicide by another, he aids or attempts to aid the other to commit or attempt to commit suicide. An offense under this section is a Class C misdemeanor unless the actor's conduct causes suicide or attempted suicide that results in serious bodily injury, in which event the offense is a state jail felony. V.T.C.A. 22.08(b).

Placing poison in the mouth of a person attempting to commit suicide is murder, rather than assisting in suicide. Aven v. State, 277 S.W. 1080 (Cr. App. 1995). Euthanasia or mercy killing is considered murder in the state of Texas. Flores v. State, 920 S.W.2d 347, 353 (1996). Thus, this section encompasses action which indirectly contributes to another's voluntary suicide, and does not include action on part of an accused which directly causes the death of another, even if the action was undertaken at the request of the deceased. Such action would be murder. Goodin v. State, 726 S.W.2d 956 (App. 2 Dist. 1987).

*strategy* and *no defense* in a capital case.  Indeed the entire language of the court in <u>Faretta</u> emphasizes the right to make one's own defense.  What the right acknowledged in <u>Faretta</u> prohibits is having stand-by counsel "make or substantially interfere with any significant tactical decisions." <u>McKaskle v. Wiggins</u>, 465 U.S. 168, 178 (1984).

It is the right to defend oneself, and even to defend oneself poorly, that is guaranteed by the Sixth Amendment.  But the Constitution and the Bill of Rights guarantee minimum standards of procedure and substance not just for the good of the individual but for the good of the society as a whole.

A prisoner has the right to defend himself because it is he who will suffer the consequences of failure and a respect for an individual's choice as to how to defend himself must be honored out of "that respect for the individual which is the lifeblood of the law." <u>Faretta</u>, 422 U.S. at 819-820 ("The right to is given directly to the accused; for it is he who suffers the consequences if the defense fails.")  This does not mean, however, that as a community we surrender control over the integrity of our justice system.

In <u>United States v. Davis</u>, 285 F.3d 378 (5th Cir. 2002) the Fifth Circuit was required to consider the case of a prisoner who, as a part of his defense strategy, wished to offer no traditional mitigation evidence.  The Court ruled that the appointment of independent amicus counsel to present mitigation evidence was inappropriate "when that appointment will yield a presentation to the jury that directly contradicts the approach undertaken by the defendant." <u>Davis</u>, 285 F.3d at 381

Critical to the Fifth Circuit's resolution of the case was the finding that Davis was *defending* himself.  The Court found that

> Davis has indicated that he *intends to employ an admittedly risky strategy* during the penalty phase. Instead of presenting traditional mitigating evidence, he intends

to attack the strength of the government's case as to his guilt. *This is a specific tactical decision.* Davis has made it quite clear that he does not want any traditional mitigating evidence to be presented on his behalf. Nevertheless, the district court has appointed the independent counsel specifically for the purpose of presenting a full penalty phase defense which will utilize traditional mitigating factors. As such, *Davis's strategy* is in direct conflict with the independent counsel's approach. Because Davis's right to self-representation encompasses the *right to direct trial strategy*, the district court's decision to impose an independent counsel into these proceedings is overturned.

Id. at 384-385 (footnotes omitted) (emphasis added).

The Fifth Circuit distinguished Davis from the case of a defendant with a death wish by noting that the Davis defendant was proposing to utilize his residual doubt argument and further that he envisaged a strategy in which he would attract a higher standard of guilt phase review if a death penalty were imposed. Id. at 384 n.6. Critically, Davis had a strategy, however bad it may have been, and that strategy did represent *a defense*.

In Mr. Austin's case he explicitly stated that he did not want a defense and did not want any strategy: "As far as I'm concerned, there will be no strategy." RR. II-14. See also CR. 5-6, 16, 18-19, 20-21, 58-59). In this unusual and narrow situation, the logic in Davis is not apposite.

The adversarial criminal trial process is not simply a personal right of a defendant. It represents a critical component of our democratic system of government and our civil society. As much as it may value a defendant's autonomy, society's interest in the adversarial trial process extends well beyond the defendant's right to present the defense of his choosing.

Nor is it accurate to suggest, as the Court seems to later in its opinion, that the quality of his representation at trial is a matter with which only the accused is legitimately concerned. See ante, at 834. Although we have adopted an adversary system of criminal justice, see Gideon v. Wainwright, supra, the prosecution is more than an ordinary litigant, and the trial judge is not simply an automaton who insures that technical rules are adhered to. Both are charged with the duty of insuring that justice, in the broadest sense of that term, is achieved in every criminal trial. See Brady v. Maryland, 373 U.S. 83, 87, and n. 2 (1963); Berger v. U.S., 295 U.S. 78, 88 (1935). That goal is ill-served, and the integrity of and public confidence in the system are undermined, when an easy conviction is

obtained due to the defendant's ill-advised decision to waive counsel. The damage thus inflicted is not mitigated by the lame explanation that the defendant simply availed himself of the "freedom" "to go to jail under his own banner...." <u>U.S. ex rel. Maldonado v. Denno</u>, 348 F. 2d 12, 15 (CA2 1965).

<u>Faretta v. California</u>, 422 U.S. 806, 839-840 (1975) (per Burger CJ dissenting); <u>see also</u> <u>Ake v. Oklahoma</u>, 470 U.S. 68, 83 (1985) (the interests of the State in an accurate capital proceeding are substantial.).

Even when a prisoner does seek to present a defense, the right to self-representation is not unalloyed and not inviolate.  <u>Illinois v. Allen</u>, 397 U.S. 337 (1970) (The trial judge may terminate self-representation by a defendant who deliberately engages in serious and obstructionist misconduct.)  The Court retains the right, in protection of the trial process, to force representation upon a defendant.

In short, even if the Sixth Amendment right to conduct one's own defense may ordinarily be said to triumph over the Eighth Amendment's prohibition on arbitrarily and capriciously imposed death penalties, where a prisoner conducts absolutely no defense then the sabotage of the adversarial process must yield to the Eighth Amendment's prohibition against the arbitrary imposition of capital punishment.

This is the position reached after careful consideration by the courts of New Jersey.  <u>State v. Koedatich</u>, 112 N.J. 225, 548 A.2d 939 (1988), <u>cert. denied</u>, 488 U.S. 1017 (1989).

A similar view has been entertained by the Supreme Court of Georgia:

In view of the concern for reliability inherent in our death-penalty procedures, including the automatic review by this court, see O.C.G.A. §§ 17-10-2; 17-10-30 and 17-10-35, the trial court in a case like this may have an obligation to conduct an independent investigation into the possible existence of evidence in mitigation.

<u>Morrison v. State</u>, 258 Ga. 683, 687 (1988).

The Florida Supreme Court, concerned at the need for accuracy and the creation of an

appropriate record for proportionality review has also ordered that where a defendant presents no evidence in mitigation the court must do one of the following: order a comprehensive PSI and call witnesses where there is significant mitigation; appoint counsel to present mitigation evidence; or, use stand-by counsel for this purpose.  Muhammad v. State, 782 So. 2d 343 (Fla. 2001).

Texas lack's Florida's provision for a pre-sentencing report, and there is no systemic independent voice providing information upon which the sentencer's discretion can rely.  Here, where standby counsel fails to play his proper role, the ensuring complete failure to defend a capital case thwarts the proportionality review that is so fundamental to the constitutionality of capital sentencing schemes.


## MR. AUSTIN IS INNOCENT OF THE OFFENSE FOR WHICH HE WAS CONVICTED AND SENTENCED TO DEATH


**CLAIM XXIII.  Mr. Austin is entitled to relief based upon the fact that new evidence shows that he is unquestionably innocent of the offense for which he was convicted and sentenced to death**


Mr. Austin is innocent of the capital murder of DK, the offense for which he stands convicted and sentenced to death.

> Our system fails every time any time an innocent person is convicted, no matter how meticulously the procedural requirements governing fair trials are followed. That failure is even more tragic when an innocent person is sentenced to a prison term … . [W]e will not elevate form so highly over substance that fundamental justice is sacrificed.

State v. Thomas, 586 A.2d 250, 253-54 (N.J. Super. Ct. App. Div. 1991); accord Commonwealth v. Brison, 618 A.2d 420, 424 (Pa. Super. Ct. 1992);  Sewell v. State, 592 N.E.2d 705, 707 (Ind.

Ct. App. Dist. 3 1992).

The Supreme Court held in Robinson v. California, 370 U.S. 660 (1962), that "[e]ven one day in prison would be cruel and unusual punishment for the 'crime' of having a common cold." Id. at 667; and see Herrera v. Collins, 506 U.S. 390, 398 (1993) ("The central purpose of any system of criminal justice is to convict the guilty and free the innocent.").  One might argue that a person with the common cold might potentially be infectious: the wholly innocent person is not even guilty of a hypothetical offense. Pottinger v. City of Miami, 810 F.Supp. 1551, 1565 (S.D.Fla. 1992) (a person "may not be convicted under the Eighth Amendment" of "innocent conduct"), remanded in part on other grounds, 40 F.3d 1155 (11th Cir. 1994).

Actual innocence is clearly understood by the Court of Criminal Appeals to represent a free-standing claim for relief under the Due Process clause of the Fourteenth Amendment.  Ex parte Franklin, 72 S.W.3d 671, 675 (Tex. Crim. App. 2002); Ex parte Elizondo, 947 S.W.2d 202, 208 (Tex. Crim. App. 1996).  Notwithstanding the position taken by the Fifth Circuit on this issue, it is submitted that the correct reading of *Herrera* is to allow relief from execution upon a truly persuasive showing of innocence.[178]  Actual innocence will also act as a doorway allowing a petitioner to reach the merits of a claim that may otherwise be procedurally barred. Schlup v. Delo, 513 U.S. 298 (1995).

This case relies upon the evidence of a single eyewitness, and the single eyewitness is Mr. Austin himself.  The police thoroughly investigated the case back in 1992 and in the absence of Mr. Austin's false confession at that time they were not even able to charge him.  It was only

---

[178]   Altogether, six Justices in Herrera (O'Connor, Kennedy, Stevens, Souter, White, and Blackmun) appeared to hold that "truly persuasive" evidence of actual innocence would create a viable federal habeas claim, although they articulated slightly different standards for granting relief. See Herrera v. Collins, 506 U.S. 390, 419-20 (1993) (O'Connor and Kennedy, J.J. concurring) (recognizing constitutional right to make a "truly persuasive" showing of actual innocence as basis for federal habeas relief); id. at 429 (White, J. concurring) (same); id. at 441-42

Mr. Austin's own confession, almost ten years later, that allowed the case to proceed.

New evidence has now been developed that proves Mr. Austin's innocence. That evidence does not simply impeach the state's case against Mr. Austin but – as has been true in other single eyewitness cases – it proves innocence.

The truth of the matter is that John Maranto, not Perry Austin, was responsible for the death of DK.

John Maranto was a local drug dealer and, as was his modus operandi, used school age children to distribute some of his drugs. One of those children was KK, the older brother of DK. KK was then, and went on to be, a drug dealer, at that time dealing in marijuana on behalf of John Maranto in return for free drugs by way of a commission. (See Exhibit 30, Houston Police Department Record of John Maranto; Exhibit 20, Houston Police Department Record of KK).

John Maranto, again as was his modus operandi, became paranoid that KK was skimming from him. Maranto enlisted the aid of his former cellmate Perry Austin to find KK so that he could confront him with his allegation. Mr. Austin took the day off work and drove around looking for KK and instead found DK. DK, familiar with Mr. Austin, volunteered to drive with him to look for KK. After driving around for sometime they drove to John Maranto's house and went inside. DK remained a willing participant in the excursion. An effort was made to call places that KK may have been visiting but without success. Mr. Austin left to visit one more place that KK may have been, leaving the still-consenting DK in Maranto's company.

Mr. Austin's search was fruitless, and upon his return to the house he discovered DK bound and gagged in the back room of the house. Tragically, DK had died, apparently suffocating on the gag in his mouth. Mr. Austin then assisted in the disposal of DK's body by

_____

(Blackmun, Stevens, and Souter, J.J. dissenting) (same).

166

taking it to the area of the landfill where it was ultimately found.

Mr. Austin never intended or foresaw that DK would be killed or seriously injured. Indeed, given DK's consent to his travels with Mr. Austin, Mr. Austin's conduct does not amount to kidnapping.

To the best of Mr. Austin's knowledge, DK's death was accidental and, importantly for DK's family, Mr. Austin does not believe that DK was molested in any way before his death.

Mr. Austin has submitted to a polygraph examination conducted by Joe Bartlett, an impeccably qualified polygrapher of nearly forty years experience in law enforcement.  In Mr. Bartlett's professional opinion Mr. Austin's description of the circumstances of DK's death and his role in it is a truthful account.  (Exhibit 60, Report of Joe Bartlett).[179]

The Texas Court of Criminal Appeals has defined some of the contours of an actual innocence claim and has specifically approved a trustworthy witness recantation as actual evidence of innocence even in the face of a guilty plea.  Ex parte Elizondo, 947 S.W.2d 202 , 209 (Tex. Crim. App. 1996); Ex parte Franklin, 72 S.W.3d 671 (Tex. Crim. App. 2002); Ex parte Tully, 109 S.W.3d 388 (Tex. Crim. App. 2002) (rehearing denied, Ex parte Tuley, 2003 Tex. Crim. Appl. Lexis 158 (2003)).

_____

[179] It is understood that polygraph examinations are not admissible in jury trials in Texas and as a result are not available as evidence of actual innocence.  It is submitted that this construction of a remedial, equitable remedy is unduly narrow.  It also represents a violation of Mr. Austin's Sixth Amendment rights to present a defense.  A *per se* ban should not be permitted to stand and Mr. Bartlett's methods and results should instead be subjected to analysis under *Daubert*.  United States v. Posado, 57 F.3d 428 (5th Cir. 1995).

In any event, the results of Mr. Austin's polygraph examination remain relevant and admissible even if not as direct evidence of innocence.  First, the examination provides evidence directly relevant to competency – the fact that Mr. Austin was lying when he confessed to a capital offense is an indicator of incompetency.  Jackson v. State, 548 S.W.2d 685 (Tex. Crim. App. 1977).

Secondly, the polygraph report is an information source relied upon by psychologists and psychiatrists and as a part of the factual basis for the opinion of the mental health professionals in this case is admissible.  See Charles W. Daniels, Using Polygraph Evidence After Scheffer, 27 Champion 36 (2003); Jackson v. State, 548 S.W.2d 685 (Tex. Crim. App. 1977); Joiner v. State, 825 S.W.2d 701 (Tex. Cr. App. 1992).

Thirdly, such evidence may be considered, even if it is not admissible, as a part of a Schlup-type claim.  Reasonover v. Washington, 60 F. Supp. 2d 937, 971 (E.D. Mo. 1999).

This is a single eyewitness case.  The Houston Homicide Division and the FBI agree that the only evidence corroborating Mr. Austin's confession was some similarities between a generic piece of rope in Mr. Austin's car and the degraded rope found at the scene where DK was found.[180]  However, this evidence is clearly of little probative force and in no way impedes a finding of innocence.  Cf. <u>Elizondo</u> (<u>supra</u>) (sexually explicit drawing and inappropriate note as possible corroboration of sole eyewitness' initial account are discounted when the witness credibly recants).

There is no reason in principal for distinguishing between the recantation of a third party eye witness and the recantation of a defendant eye witness.  The question is one of the reliability of the recantation.

In this case Mr. Austin's recantation of his eyewitness statement against himself is highly credible.  A full and credible explanation has been provided for the offering of the false statement and is supported by the highly reliable evidence of Dr. Woods and Dr, Cicerello. (Exhibits 93, 95).  Mr. Austin is and was suffering from a serious mental illness, and this illness sponsored his attempt at state-assisted suicide.

The original confessional statement was itself dubious, attracting the suspicion of Sergeant Waymon Allen, who was unconvinced as to its accuracy, particularly as to motive.  In fact, Sgt. Allen's February 2002 interview, explicitly designed to clarify areas in which Mr. Austin's account was not believed, disclosed other reasons to doubt the accuracy of the confession.  For instance, the account of DK's behavior was apparently inconsistent with DK's

---

[180] FBI records show that a homicide detective, presumably Sgt,. Allen, requested assistance in coordinating FBI witnesses for the trial.

> He [the homicide detective] explained that in 1993, FBI agents recovered rope from the subject's vehicle, which is the only known corroborating evidence to the confession.

(Exhibit. 62, FBI Memorandum (07156, 07157)).

character.  DK was apparently a boisterous child and Mr. Austin's false confession paints him as an entirely passive figure.  RR.XII-Ex.78

Apart from the obviously false account of motive for the killing of DK, Mr. Austin's false confession provides a highly implausible version of the cause of death.  Despite the fact that the police did not find a drop of DK's blood on Mr. Austin, his car or DK's clothes, Mr. Austin maintained that he had slashed DK's throat.  There was also no sign of any injury to DK's throat area, which might be expected if DK had died as Mr. Austin had claimed.  As the opinion of Dr. Marc Krouse, Deputy Medical Examiner for Tarrant County confirms, this absence of damning evidence confirms what one would expect to see if Mr. Austin's account were true. (Exhibit 97).

Mr. Austin's confessional statement was also inaccurate as to the manner in which DK's body was tied.  Despite multiple opportunities to change his story, Mr. Austin maintained in both the January 2001 and February 2002 statement that the only rope on DK was tied around his hands and up around his neck.  This is a false detail in a false confession.  Mr. Austin did not tie DK up and so was unable to recall that, in fact, DK's legs had been tied together – a fact clearly demonstrated by the forensic evidence.  (See RR. XIV).

New evidence supports Mr. Austin's true account.  Witnesses have now disclosed that KK was, in fact, dealing drugs at that time. This fact is corroborated by KK's significant criminal history, which reveals substantial drug dealing activity at a young age.  (Exhibit 20).  New evidence also demonstrates that John Maranto was a drug dealer and would routinely use young people to sell his drugs for them.  (Exhibits 30, 31).  Further, John Maranto was prone to becoming angered and accusing his dealers of stealing from him.  (Exhibit 83, Statement of Michael Goodner; Exhibit 59, Statement of Jennifer Ortega).

New evidence has also emerged from John Maranto's niece, Lori Sascenberg, who has a memory of Perry sitting on the couch at her house sobbing and hysterical and distressed because of something that John had done on the day of DK' disappearance.  (Exhibit 92, Affidavit of Eleni Antonopoulos (07669)).

Perry Austin's claims of innocence of this crime are not a new thing.  He denied responsibility in 1992, but – interestingly – made it clear to Sgt. Allen that he could not speak out because there was someone else involved. [181]  The indications that someone close to Perry might be involved are corroborated by new evidence of John Maranto's emotional reaction on the discovery of the body and his avoidance of a lie detector test. [182]  (Exhibit 33, Houston Police Department Records).  Mr. Austin has also previously maintained his innocence of this offense to Denise Lindsey and, on information and belief, disclosed to her that John Maranto was the person responsible.  Mr. Austin was also unable to lie to his pastor about his guilt in the crime even when pursuing his self-destructive course in 2001. [183]  (Exhibit 78, Statement of Ned Hicks).

Upon a comparison of this showing with the analysis of the court in Elizondo, reveals that relief is mandated.  In Elizondo there was a witness recantation with a credible motive provided for the original false testimony – the pressure of the natural father.  There is now a witness recantation with a credible motive for the original false testimony.  In Elizondo there was

---

[181]Exhibit 33 Houston Police Department Report Incident no. 090050692K ( "Allen asked Austin if he was the one that killed David. Austin replied 'I did not kill him'. Allen asked Austin if he would tell me if he knew who it was? Austin stated that he would not tell if it were someone else. Allen told Austin that this made no sense that he would not tell who had killed an innocent child if it would clear him as a suspect in this case. Austin stated that if were just him it would be different. Allen noted that Austin had tears in his eyes at this time. However he repeatedly stated that he did not do it.") p2113

[182] id ("Allen told Maranto that the remains if DK had been found yesterday down the street from his apartment. Maranto stated he had to sit down. Maranto sit (sic) down on the ground and covered his face. Maranto stated are you sure its him. Maranto stated don't tell me about it.") p 2113 (avoidance of lie detector test 2114)

[183] Exhibit 78, Statement of Ned Hicks.

other potentially corroborating evidence for the original guilty statement in the form of overly sexualized behavior by the alleged child victim. Here there is the rope which could not be matched to the rope at the crime scene. However, in <u>Elizondo</u> the natural father fervently denied applying pressure to produce the original inculpatory statement. Here there is no countervailing evidence to Mr. Austin's retraction: in fact, there is new evidence supporting it.

To borrow from the court's style in <u>Elizondo</u>: Mr. Austin's claim of a false confession is not implausible on its face, and a jury comparing the false confession made in the midst of the bizarre and flagrant suicide attempt with the more reasoned account now provided would find the account now provided more credible. <u>Elizondo</u>, 947 S.W.2d at 209. The evidence of Mr. Austin's false confession not only voids the earlier inculpatory evidence but also provides affirmative evidence of innocence. There is clear and convincing evidence that no reasonable jury would convict Mr. Austin in light of the new evidence.

It is further submitted that Mr. Austin's innocence claim is connected to constitutional violations – in particular, the claims in this application relating to competency, waiver of counsel at trial and appeal and the plea of guilty are constitutional violations that are directly related to the innocence claim. They are all about the failure to detect or respond to Mr. Austin's mental illness, the same mental illness that sponsored the false confession. And so, to the extent necessary, Mr. Austin meets the requirements of <u>Schlup v. Delo</u>, 513 U.S. 298 (1995) such that procedural bars should not operate to the prejudice of Mr. Austin's claims.

## MR. AUSTIN WAS NOT COMPETENT AT THE TIME OF HIS DIRECT APPEAL

**CLAIM XXIV.   Mr. Austin's rights under the Sixth and Fourteenth Amendments were violated when his direct appeal was considered and determined while he was not competent**

Mr. Austin's constitutionally guaranteed right to Due Process was denied when his case was submitted for direct appellate review at a time at which he was not competent.  Mr. Austin's lack of competence stemmed from and was a continuation of the same lack of competence that undermined his trial.  Exhibit 95 - Report of Dr. Woods.

Competence is a continuing concept and does not cease to be a prerequisite for fairness at the point at which the jury has returned its verdict.  Inherent in the recognition of a right to counsel on direct appeal is the right to be competent to take advantage of the assistance of counsel. See Rohan ex rel. Gates v. Woodward, 334 F.3d 803, 812-13 (9th Cir. 2003); Commonwealth v. Silo, 364 A.2d 893, 894-95 (Pa. 1976); Commonwealth v. Haag, 809 A.2d 271, 299 (Pa. 2002); State v. Debra A.E. 523 N.W.2d 727, 729 (Wis. 1994); Carter v. State, 706 So.2d 873, 875 (Fla. 1997); People v. Owens, 564 N.E.2d 1184, 1187 (Ill. 1990)

## THE DUE PROCESS AND EQUAL PROTECTION CLAUSES AND THE EIGHTH AMENDMENT PROHIBITS THE EXECUTION OF AN OFFENDER SENTENCED TO DEATH WHERE LIFE WITHOUT PAROLE WAS NOT AN AVAILABLE SENTENCING OPTION

When Jurek v. Texas, 96 S. Ct. 2950, 2954 (1976) was decided the necessity for a life without parole sentencing option (LWOP) was not considered by the Supreme Court, however, by the end of the 1970's there were twelve states that provided for life without parole as a sentencing alternative to the death penalty in capital cases.[184]  Since that time standards of decency have evolved to require that capital juries have available a sentencing option of life without parole.  Life without parole is now a sentencing option in serious murder cases in 39 out of 40 death penalty jurisdictions in America, or 51 out of 52 sentencing jurisdictions.  The only

---

[184] Steven J. Mulroy, *Avoiding "Death by Default": Does the Constitution Require a "Life Without Parole" Alternative to the Death Penalty?* 79 Tul. L. Rev. 401 (2004) n.302.

exception is New Mexico, a state on the brink of abolition.[185]

Legislative action, uniform in its direction and overwhelming in numbers has demonstrated a national consensus in favor of death sentences only being imposed where a jury has the opportunity to make a reasoned moral response to the offense and the offender through a choice between death and life without parole.

Jury's responses to the life without parole sentencing option have demonstrated that juries across the country believe death to be unnecessary and excessive in many cases and that life without parole better reflects contemporary community standards in many cases.

In the same way that a national consensus evolved against the imposition of death sentences where the sentencer was given no choice but to impose the death penalty, a national consensus has emerged against the imposition of death sentences where the sentencer is not given the choice of life without parole.

A national consensus has now developed requiring that a sentencer in a capital proceeding have available the option of life without parole in order to make an accurate individualized determination of moral culpability and the appropriate punishment.  The imposition of a sentence of death by a sentencer in the absence of a reasoned moral decision to discard an available alternative option of life without parole is unconstitutional as it fails to comport with the standards of the Eighth Amendment.

Mr. Austin's sentence was imposed without the available option of life without parole. The execution of Mr. Austin would violate the Eighth Amendment.

**CLAIM XXV.   The Eighth and Fourteenth Amendments prohibit the execution of**

---

[185] New Mexico has two men on death row, has executed one person since 1976 and passed legislation through the House in Spring this year that would have abolished the death penalty altogether. H.B. 576, New Mexico 47th Legislature (2005)

**an offender sentenced to death when life without parole was not an available sentencing option**

*The procedure used to select who gets death is central to the Eighth Amendment*

There is no question that the Eighth Amendment concerns itself as much with the procedures for imposing the death penalty as with the penalty of death itself. The opinion[186] of the court in <u>Furman</u> focused on the procedures by which convicted defendants were selected for the death penalty rather than on the actual punishment inflicted. <u>Furman v. Georgia</u>, 408 U.S. 238 (1976)(broad, unguided discretion in making a capital sentencing decision violates the Constitution.)

The question of whether death sentences are imposed under procedures that violate constitutional standards has been at the heart of Eighth Amendment jurisprudence in the modern era of the death penalty. <u>Gregg v. Georgia</u>, 428 U.S. 153 (1976) (Georgia capital sentencing scheme passed muster where it focused the jury's attention on the particularized nature of the crime and the particularized characteristics of the individual defendant, permitted consideration of any aggravating or mitigating circumstance, and required a finding of at least one statutory aggravating circumstance before the imposition of a death penalty verdict.); <u>Woodson v. North Carolina</u>, 428 U.S. 280, 303 (1976)  (Mandatory death penalty scheme unconstitutional because it failed to provide for the "particularized consideration of relevant aspects of  the character and record of each convicted defendant before the imposition upon him of a sentence of death."); <u>see also</u> <u>Beck v. Alabama</u>, 447 U.S. 625 (1980) (invalidating death penalty where procedures forced jury to choose between death sentence and acquittal).

*Sentencing proceedings where the sentencer is denied the option of life without parole prevent an individualized consideration of the offender's moral culpability and the appropriateness of*

---

[186] Taking the opinion of the court to be that of the narrowest concurring judges.

*the death penalty and fail to advance any legitimate penological purpose*

The imposition of a sentence of death by a sentencer in the absence of a reasoned moral decision to discard an available alternative option of life without parole is unconstitutional as it fails to comport with the standards of the Eighth Amendment.

This Court's recent jurisprudence in <u>Atkins v. Virginia</u> makes clear that a death sentence scheme is constitutional only if it advances two societal purposes: retribution or deterrence. <u>Atkins v. Virginia</u>, 536 U.S. 304, 319 (2002) (citing <u>Gregg v. Georgia</u>, 428 U.S. 153, 183 (1976)).[187]   Excluding the availability of a sentence to LWOP does not advance any of these purposes, and indeed has the opposite effect because it encourages a jury to sentence a defendant to death in order to prevent the defendant's future release. As Professor Mulroy has noted:

> LWOP sentencing option is constitutionally required,  . . . because the lack of such an option artificially skews the sentencing decision toward death sentences that would otherwise not be imposed. Jurors may impose a death sentence because, though they properly understand the choices before them, the choice they feel is most appropriate, LWOP, is not one of the available options. Because of this "forced choice," the jury settles for a death sentence as the less inappropriate of the limited alternatives, a scenario which has been termed "death by default." The imposition of the death penalty simply because the state fails to provide the less severe punishment that jurors prefer is manifestly "excessive" punishment.

Steven J. Mulroy, *Avoiding "Death by Default": Does the Constitution Require a "Life Without Parole" Alternative to the Death Penalty?* 79 Tul. L. Rev. 401, 411-412  (2004).[188]

By failing to provide the jury with an option to sentence a defendant to a life without possibility of parole, the state "effectively withholds from the jury the life-without-parole alternative, [and] . . . diminish[es] the reliability of the jury's decision that death, rather than that

---

[187]   In *Gregg*, the Court also noted "Another purpose that has been discussed is the incapacitation of dangerous criminals and the consequent prevention of crimes that they may otherwise commit in the future." citing *inter alia People v. Anderson*, 493 P. 2d 880, 896 (Cal. 1972), cert. denied, 406 U.S. 958 (1972).

[188]   Professor Mulroy also noted that empirical research showed that when "LWOP is unavailable as a sentencing

alternative, was the appropriate penalty in this case." <u>Simmons</u>, 512 U.S. at 174 (Souter, J., concurring). The resulting sentence "should be vacated as having been 'arbitrarily or capriciously' and 'wantonly and . . . freakishly imposed.'" <u>Id.</u> at 173 (quoting <u>Furman v. Georgia</u>, 408 U.S. 238, 249 (1972) (Douglas, J., concurring); and <u>Id.</u> at 310 (Stewart, J., concurring)).

The absence of a life without parole option actually results in "harsher penalty options," <u>Fontenot v. State</u>, 881 P.2d 69, 74 n.2 (Okla. 1994) (reversing death sentence where jury informed of sentencing choices of life or death, but not informed of intermediate option of life without possibility of parole), and "unquestionably tips the scales in favor of a death sentence that a fully informed jury might not impose." <u>Brown v. Texas</u>, 118 S. Ct. at 356 (Stevens, J. dissenting from denial of cert.).

The soul of retribution in the criminal law is proportionality and Mr. Austin's sentencing jury were denied the opportunity to make a reasoned moral response and impose a proportionate, retributive sentence upon him.  The second special issue asked whether there were sufficient mitigating circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed.  Tex. Code Crim. Proc. art. 37.071(2)(e)(1) (2005)  The jury were unable to consider whether the circumstances justified a sentence of life without parole instead of death.

The goal of ensuring accuracy in the determination of who deserves the death penalty[189] is thwarted when the jury are presented with a forced choice of death of life with parole after an unspecified period as the jury is not given an opportunity to give appropriate individualized effect to retribution (or containment).  The proportionate retributive sentence of life without parole was not available to the Applicant's jury and so they were forced to select a

option [it] significantly increases the likelihood that the jury will vote for a death sentence." <u>Id.</u>
[189] Central to the Eighth Amendment is the Supreme Court's "narrowing jurisprudence, which seeks to ensure that only the most deserving of execution are put to death".  Atkins, 536 U.S. at 319.

disproportionately heavy sentence, in preference to a disproportionately light sentence.

No legitimate penological purpose for the death penalty is served by excluding the option of life without parole.

The absence of life without parole does not increase the deterrent effect of the Texas capital sentencing scheme – it would be nonsensical to suggest that more people are deterred by the prospect of death/life with parole than death/life without parole.

The absence of life without parole does not increase the range or accuracy of the retributive purpose of the capital sentencing scheme. Death is available as the maximum retributive sentence regardless. Accuracy and proportionality are diminished by denying the popular sentencing option of life without parole. The Texas legislature (and those of virtually the entire country) have agreed that life without parole is the appropriate alternative sentence to death for capital offenses. On information and belief, no prisoner has ever survived thirty-five (or forty) years in the Texas prison system and so a life with parole sentence has the same retributive effect as a sentence of life without parole.[190]

The inclusion of life without parole can only serve to increase deterrence and allows for retribution to be administered in a manner proportionate to the offending involved. It serves the legitimate penological purposes of a sentencing scheme under the Eighth Amendment, denying a life without parole option does not.

### *A National Consensus For The Life Without Parole Sentencing Option*

A national consensus has now developed requiring that a sentencer in a capital proceeding have available the option of life without parole in order to make an accurate

---

[190]   For the same reason, sentences of life with or without parole have the same containment effect on inmates and cost the state the same amount of money in maintaining prisoners in custody. Significantly, the system also provides the safety valve of executive clemency should it be determined that life without parole is too harsh a

individualized determination of moral culpability and the appropriate punishment.

In addition to the twelve states that prohibit the death penalty,[191] thirty-seven of the thirty-eight death penalty states, as well as the civilian and military federal death penalty statutes, mandate provision of an option to sentence the defendant to LWOP.[192] The only exception is New Mexico, a state on the brink of abolition.[193]  This plainly constitutes a national consensus on the issue.[194]

Moreover, not only is the consensus widespread, but the consistent trend has been towards adopting this requirement. Cf. Atkins v. Virginia and Roper v. Simmons.  By 1980 when the reintroduction of the death penalty had stabilized twelve states had a sentencing alternative of

punishment in an individual case.
[191]   Alaska; Hawaii; Iowa; Maine; Massachusetts; Michigan; Minnesota; North Dakota; Rhode Island; Vermont; West Virginia; Wisconsin.
[192] Twelve states require that a sentencing jury is instructed on all three options include life with parole, life without parole and death: Ga. Code Ann. 17-10-30.1;  S.B. 422, 2004 Leg., Reg. Sess. (Kan. 2004) (amending Kan. Stat. Ann. 21-4622 to -4624, -4635, 22-3717); Ky. Rev. Stat. Ann. 532.030(4); Md. Code Ann., Crim. Law 2-201; Miss. Code Ann. 99-19-103; Mont. Code Ann. 46-18-202(2); Nev. Rev. Stat. 175.554(4); N.Y. Crim. Proc. Law 400-27; Okla. Stat. Ann. tit. 21, 701.9(A); Utah Code Ann. 76-3-206; Wash. Rev. Code 9A.32.040.  Twenty-five states offer only death and LWOP. See Ala. Code 13A-5-46(e); Ariz. Rev. Stat. Ann. 13-703(A); Ark. Code Ann. 5-4-601(b)(1); Cal. Penal Code 190.3; Colo. Rev. Stat. Ann. 18-1.3-1201; Conn. Gen. Stat. Ann. 53a-35b, -46a(f); Del. Code Ann. tit. 11, 4209(a); Fla. Stat. Ann. 775.082(1); Idaho Code 18-4004; 730 Ill. Comp. Stat. Ann. 5/5-8-1; Ind. Code Ann. 35-50-2-3(a); La. Code Crim. Proc. Ann. art. 905.6; Mo. Rev. Stat. 565.020.2; Neb. Rev. Stat. 28-105, -303, 29-2520 to -2524; N.H. Rev. Stat. Ann. 630:5(V); N.J. Stat. Ann. 2C:11-3(b); N.C. Gen. Stat. 15A-1371(a1); Ohio Rev. Code Ann. 2929.03(A); Or. Rev. Stat. 163.105; 61 Pa. Cons. Stat. 331.21; S.C. Code Ann. 16-3-20(A); S.D. Codified Laws 24-15-4; Tenn. Code Ann. 39-2-202(b); Tex. Code Crim. Proc. 37.071; Va. Code Ann. 53.1-151(B1) ; Wyo. Stat. Ann. 6-2-101(b).
[193] New Mexico has two men on death row, has executed one person since 1976 and passed legislation through the House in Spring this year that would have abolished the death penalty altogether. H.B. 576, New Mexico 47th Legislature (2005) The fact that Texas has attempted to adopt this rule prospectively does not undermine its place in the emerging national consensus that requires such a procedure.  See e.g., Atkins v. Virginia, 536 U.S. 304, 314 (2002) (counting, inter alia,  Tennessee and Georgia  in the assessment of a national consensus even though those states barred the execution of mentally retarded defendants prospectively only); see also id., at 342 Scalia J., dissenting (noting that "Eleven of those that the Court counts enacted statutes prohibiting execution of mentally retarded defendants convicted after, or convicted of crimes committed after, the effective date of the legislation; n1 those already on death row,  or consigned there before the statute's effective date, or even (in those States using the date of the crime as the criterion of retroactivity) tried in the future for murders committed many years ago, could be put to death.")
[194] See e.g., Roper v. Simmons, 125 S. Ct. 1183 (2005) (noting that eighteen death penalty states, plus twelve states that abolished the death penalty altogether, constituted a national consensus on the ban of executing juveniles); Atkins v. Virginia, 536 U.S. 304  (2002) (noting thirty jurisdictions prohibiting ban on executing mentally retarded defendants constitute national consensus).

life without parole. [195]   Only five more had joined this group by 1986[196] but since that time twenty two more states have amended their death penalty schemes to provide a sentencing option of life without parole. The movement has been labeled "a significant and  consistent trend since the 1970s."  Steven Mulroy, *Avoiding "Death by Default": Does the Constitution Require a "Life Without Parole" Alternative to the Death Penalty?,* 79 Tul. L. Rev. 401, 451 (noting that in each decade since re-institution of the death penalty, "eight or more states have adopted an LWOP option, and no state has gone in the other direction").

The national consensus reflects, in part, a widespread judgment that life without parole as a sentencing option is necessary to guarantee accuracy in the determination of who should get the death penalty. It advances the penological purposes served by the death penalty by allowing the sentencing jury to make an accurate individualized determination of moral culpability and the appropriate punishment.  Given the number of capital prosecutions and executions that occur in Texas, the significance of the legislature's requirement that life without parole be an alternative in capital sentencing proceedings in this jurisdiction cannot be overstated.

In comparing the national consensus that has developed on this issue with the indicia of national consensus found in other circumstances the case for consensus is overwhelming.

In Coker the Court observed that in reviving death penalty laws to satisfy Furman's mandate, none of the States that had not previously authorized death for rape chose to include rape among capital felonies. Of the 16 States in which rape had been a capital offense, only three provided the death penalty for rape of an adult woman in their revised statutes.  Two of these

---

[195] For a count of states before Texas' recent move, see Steven J. Mulroy, *Avoiding "Death by Default": Does the Constitution Require a "Life Without Parole" Alternative to the Death Penalty?* 79 Tul. L. Rev. 401, 411-412 (2004) n.301 & 302.

[196] This was the year the 5th Circuit decided Andrade v. McCotter, 805 F.2d 1190 (5th Cir. 1986)(Sentencing option of life without parole not required).  The court in Andrade did not undertake any analysis of the type described in the

schemes were invalidated by <u>Woodson</u> and when they were re-enacted did not include rape. Three other states had provided for the death penalty for rape of a child, though one of these had also been invalidated as it required a mandatory death penalty.

With the adoption of life without parole by the Texas legislature a national consensus has developed of even greater significance than that in <u>Coker</u>.[197]

This overwhelming national consensus can be compared to the consensus recognized in respect of the mentally retarded and juveniles as summarized by the Court in <u>Simmons</u>

> When *Atkins* was decided, 30 States prohibited the death penalty for the mentally retarded. This number comprised 12 that had abandoned the death penalty altogether, and 18 that maintained it but excluded the mentally retarded from its reach. 536 U.S., at 313-315, 153 L. Ed. 2d 335, 122 S. Ct. 2242. By a similar calculation in this case, 30 States prohibit the juvenile death penalty, comprising 12 that have rejected the death penalty altogether and 18 that maintain it but, by express provision or judicial interpretation, exclude juveniles from its reach.

<u>Simmons</u> at 1191.   The consensus present in requiring life without parole as a sentencing alternative for capital sentencers is far greater than that present in either <u>Atkins</u> or <u>Simmons</u>, or for instance, <u>Enmund v. Florida</u>, 458 U.S. 792 (1992) (striking down the death penalty for certain crimes of aiding and abetting felony-murder, where only eight jurisdictions authorized such punishment).

Significant is not only the fact that legislatures have adopted life without parole but also the overwhelming support such legislation has received.  To take Texas as an example, both the senate (26:5) and the house (121:2) passed the life without parole bill by an overwhelming majority.  In introducing the bill in Committee the bill's author, Senator Lucio, advised that a

---

Supreme Court's Eighth Amendment jurisprudence but, in any event, the landscape has shifted significantly since then.

[197] Here only one state does not have life without parole, but far from actively seeking death sentences, New Mexico is on the brink of abolition.  In <u>Coker</u> Georgia may have been the only state with a functioning capital rape statute but it was actively pursuing death penalties and had support in other states, though their death penalty schemes were

poll of Texans showed that 78% favored the introduction of life without parole.[198]  In May 2005

the 2005 Houston Area Survey showed a decline in support for the death penalty and an increase

in support for life without parole as an alternative to execution.

> Local support for the death penalty continues to decline, with 60 percent
> supporting capital punishment for convicted murderers this year compared with
> 62 percent in 2003, 64 percent in 2001 and 68 percent in 1999. Meanwhile,
> support for a life sentence without possibility of parole as an alternative to
> execution - an option that doesn't exist in Texas - increased to 64 percent this year
> from 57 percent in 2003 and 54 percent in 2001.

Mike Snyder, Houston Chronicle, May 6, 2005 Section B, p.5.[199]  Members of the Supreme

Court have commented in the past on the poll data supporting the life without parole option and

recent academic review of the topic confirms that poll data shows support and an increase in

support for life without parole.[200]

Another powerful indicator of the evolving moral standards of our community in capital

sentencing is jury decision making. [201]  The return of jury verdicts[202] reflect a consensus that

juries across the country believe there are many cases where a sentence of death is unnecessary

---

at that time suspended.

[198] Committee Proceedings, 3/15/05.  Available at http://www.senate.state.tx.us/75r/Senate/commit/c590/c590.htm.

[199] The Houston Area Survey polls members of Harris County, the County in which Mr. Austin was tried and sentenced to death and a County with a record as one of the most prolific death penalty jurisdictions in the country.

[200] Brown v Texas, 522 U.S. 940 (1997) (Stevens, J); Steven J. Mulroy, *Avoiding "Death by Default": Does the Constitution Require a "Life Without Parole" Alternative to the Death Penalty?* 79 Tul. L. Rev. 401, 451.

[201] When considering jury decisions, the appropriate jury decisions to look at are those where a jury has had the option of death or life without parole.

> Of course, the jury's judgment is meaningful only where the jury has an appropriate measure of
> choice as to whether the death penalty is to be imposed.

Coker v. Georgia, 433 U.S. 584, 596 (U.S. 1977).  The consensus evidenced by jury verdicts is not whether the death penalty is always inappropriate but that the option of life without parole allows juries to render decisions that more accurately reflect community standards of who should and should not get the death penalty.

[202]   In those states where life without parole has been introduced as an alternative to the death penalty there is evidence that this option has found considerable favor with jurors.  See e.g., Commonwealth v. Trivigno, 561 Pa. 232, 256 (Pa. 2000)  (noting drop off in the number of death penalties returned in after instruction on LWOP was given). The figures from 1990 to 2003 are as follows 10, 19, 16, 17, 21, 20, 11, 10, 12, 15, [Year 2000]12, 6, 9, 6. With the opportunity of an evidentiary hearing the applicant will present evidence of a significant drop off in the number of death penalties returned in virtually every jurisdiction where this switch has been made.

and excessive and that life without parole better reflects contemporary community standards in many cases.

Social, legal, religious organizations, as well as academics have also endorsed the principle that juries must be offered life without parole as a sentencing option.  The Constitution Project, a bipartisan legal organization made up of prosecutors, judges, defense lawyers and academics issued a report in 2001 identifying a consensus of eighteen suggested reforms of the death penalty.  Among these suggested reforms was the availability of an LWOP option. The Constitution Project, Death Penalty Initiative, *Mandatory Justice: Eighteen Reforms to the Death Penalty*, July 16, 2001.  This Report was followed up in 2006 with the release of a second report, Mandatory Justice: The Death Penalty Revisited, February 1, 2006.  recommendation 8 of that report called for life without praole to be a sentencing option in all capital cases.[203]

Academics have also noted that the lack of an LWOP option may compel jurors to impose a death sentence where the jury believes that a life sentence is the appropriate option.  Two researchers involved in the Capital Jury Project[204] found, after interviewing numerous capital jurors that:

> many jurors said they felt compelled to impose death in view of what they

---

[203] Both reports are available at the Constitution Project website, last checked 11/26/06:
http://www.constitutionproject.org/deathpenalty/article.cfm?messageID=136&categoryId=2

[204] The Capital Jury Project is a multidisciplinary study of capital jury decision making involving intensive interviews with hundreds of jurors from hundreds of capital trials from around  the country.  Professors Bowers and Steiner, in *Death by Default*, note the source for the empirical data on which they rely:

> The CJP is organized as a consortium of university-based investigators - chiefly criminologists, social psychologists, and law faculty members - specializing in the analysis of data collected in their respective states and collaborating to address the following objectives of the Project: (1) to examine and systematically describe jurors' exercise of capital sentencing discretion; (2) to identify the sources and assess the extent of arbitrariness in jurors' exercise of capital discretion; and (3) to assess the efficacy of the principal forms of capital statutes in controlling arbitrariness in capital sentencing. . . . The preparation of the interview data for state-level and project-wide analyses is carried out at the College of Criminal Justice, Northeastern University. This research began in 1990 with funding from the Law and Social Sciences Program of the National Science Foundation, grant NSF SES-9013252

*Id* at n. 185.

> believed the alternative to be. In fact, many said they would have voted for LWOP instead of death if it had been available, and some explicitly indicate, that despite their vote for death they thought life was the punishment the defendant deserved. Some, indeed, voted for death because they believed it would keep the defendant in prison for the rest of his natural life. Overwhelmingly, these interview responses convey the impression that permanent incapacitation is the foremost sentencing goal of many capital jurors, that they impose death not because they regard it as necessary for retributive reasons but because they see it as the only way to be sufficiently sure that the defendant will not return to society where he would have a chance to victimize others.

William J. Bowers & Benjamin D. Steiner, *Death by Default: An Empirical Demonstration of False and Forced Choices in Capital Sentencing*, 77 Tex. L. Rev. 605, 680.  As these researchers discovered, a scheme that did not have a real LWOP option (or inform the jury of that option) encouraged "unreliability and excessiveness" and recognized that "to ensure the primacy of retributive purposes, jurors must have retributively appropriate sentencing options available." *Id.* at 717. See also Steven Mulroy, *Avoiding "Death by Default": Does the Constitution Require a "Life Without Parole" Alternative to the Death Penalty?,* 79 Tul. L. Rev. 401 (observing "a growing and overwhelming body of empirical evidence now demonstrates that the absence of an LWOP option causes the death penalty to be imposed as an expedient rather than as the product of a reasoned judgment that death is the appropriate punishment.").[205] These studies were confirmed both within, and outside the framework of the Capital Jury Project.[206]

---

[205] Citing *inter alia* William J. Bowers, *Capital Punishment and Contemporary Values: People's Misgiving and the Court's Misperceptions*, 27 Law & Soc'y Rev. 157, 169-70 (1993) (finding that capital jurors in California, Florida, and South Carolina believe murderers sentenced to death will be released from prison sooner than the law permits, and that this mistaken impression is associated with voting for death); Theodore Eisenberg & Martin T. Wells, Deathly *Confusion: Juror Instructions in Capital Cases*, 79 Cornell L. Rev. 1, 15 (1993) (finding that South Carolina jurors vote for death "because of false impressions about parole eligibility"); Anthony Paduano & Clive A. Smith, *Deadly Errors: Juror Misperception Concerning Parole in the Imposition of the Death Penalty*, 18 Colum. Hum. Rts. L. Rev. 211, 222-25 (1987) (drawing on case studies and other data to conclude that jurors' misperceptions regarding parole eligibility of capital defendants constrain them to vote for death).

[206] For instance, Professor Mulroy also noted that :

> one study had psychologists conduct detailed interviews of twenty-seven randomly chosen capital-sentencing jurors from nine different cases in Oregon, prior to that state's addition of an LWOP option. . . . Almost all jurors said that parole possibility was an important factor and that they would have preferred having an LWOP option. . . . The study concluded that "if given the opportunity, more jurors would

Relevant as well, a variety of religious organizations including the Catholic Church, have recognized that the availability of permanent incapacitation reduces or eliminates the need to impose the death penalty.[207]

Public opinion polling data reflects the national consensus that LWOP should be an available option.  A May 7, 2002 ABC News poll found that 65% of Americans support the death penalty when no alternative is offered. ABC News, May 7, 2002, available at http://abcnews.go.com/sections/us/DailyNews/deathpenalty_poll020507.html (last visited December 28, 2005). When given the sentencing option of life without the possibility of parole, only 46% of Americans support the death penalty. Id.

Four members of the Supreme Court have noted that the public supports an LWOP option when determining a just verdict.[208] Professor Mulroy's research confirms that this not only suggests that citizens prefer the option of life without parole, but that permanent incapacitation without execution is the public's preferred method of punishment:

> [P]olling data from the federal Bureau of Justice Statistics is typical. Citizens were first asked whether they favored or opposed the death penalty for persons convicted of murder. In response, 64% favored the death penalty. However, when those same respondents were asked to choose between the death penalty and LWOP for convicted murderers, support for the death penalty dropped to 48%.

---

choose sentences of LWOP, and therefore fewer defendants would be sentenced to die. *Id. citing* Benjamin D. Steiner, William J. Bowers, & Austin Sarat, *Folk Knowledge as Legal Action: Death Penalty Judgments and the Tenet of Early Release in a Culture of Mistrust and Punitiveness*, 33 Law & Soc'y Rev. 461, 482 (1999).

[207] See 46) Catechism of the Catholic Church, No. 2266 ("If bloodless means are sufficient to defend human lives against an aggressor and to protect public order and the safety of persons, public authority must limit itself to such means, because they better correspond to the concrete conditions of the common good and are more in conformity to the dignity of the human person.'").  *See also* Evangelium Vitae, Para. 56  March 25, 1995  (The Gospel of Life), an encyclical letter on various threats to human life issued by Pope John Paul II.

208  See *Brown v. Texas, supra* at n. 2 ("Poll data from various States supports the conclusion that full information would have an impact on jurors' decisionmaking." citing Bowers, Vandiver, & Dugan, A New *Look at Public Opinion on Capital Punishment: What Citizens and Legislators Prefer,* 22 Am. J. Crim. L. 77, 101, 105 (1994).  The members of the Court noted "Not surprisingly, the death penalty becomes even less attractive as the length of parole ineligibility increases." See *Brown* at n.2 quoting Bowers, at 105 ("while 51.6% of people in Nebraska prefer the death penalty when the alternative is life imprisonment when defendant would be parole ineligible for 25 years, only 46.4% prefer the death penalty when defendant would be parole ineligible for 40 years").

> Between 1991 and 1998, seven national polls have asked versions of the question: "What should be the penalty for murder - the death penalty or LWOP?" 264 The polls show a consistent drop of between 15% and 20% in death penalty support when an alternative is offered. A nationwide poll conducted just this year confirms these results.

79 Tul. L. Rev. 401, 444-445.  See also Samuel R. Gross, *Update: American Public Opinion on the Death Penalty - It's Getting Personal,* 83 Cornell L. Rev. 1448, 1455 (1998) (noting the significance of the argument for incapacitation as a basis to vote for life, as well as the power of the argument concerning release as a basis for imposing death).

***The forced choice created by sentencing in the absence of a life without parole option violates the Supreme Court's holding in Beck v. Alabama, 447 U.S. 625 (1980).***

In <u>Beck v. Alabama</u>, this Court rejected a death penalty scheme based upon Eighth and Fourteenth Amendment grounds, that required a jury to acquit the defendant or sentence him to death, finding that a jury might be unconstitutionally coerced to sentencing a defendant to death whom it might otherwise convict and impose a lesser sentence. <u>Beck v. Alabama</u>, 447 U.S. 625 (1980).

A similar analysis applies here.  Juries are forced to choose between an disproportionately lenient sentence and a disproportionately harsh sentence.  The lack of an LWOP option encourages arbitrary sentencing and "unacceptably enhance the risk that the jury will default to a death sentence that it would otherwise not have imposed. Such a death sentence cannot be imposed constitutionally." Mulroy, at n. 58.

***Denial of mitigating evidence***

Evidence of length of incarceration obviously mitigates against a death penalty and no more so than under the Texas sentencing scheme where jurors must assess future dangerousness and then consider whether any mitigating evidence warrants a sentence less than death – the nature of the available sentence less than death will control whether the mitigating evidence is

sufficient to tip the scales.

To deny a defendant the opportunity to present constitutionally relevant evidence in mitigation of the death penalty, mitigating evidence that is now available in every state but new Mexico, is to deny his Due Process and Equal Protection Rights.

## TEXAS HAS NARROWED ITS CAPITAL SENTENCING ELEMENTS, REDUCING THE CIRCUMSTANCES IN WHICH A DEATH SENTENCE MAY BE ANNOUNCED

*Overview*

The sentencing elements under the Texas death penalty scheme for the purposes of Mr. Austin's trial required that the jury be satisfied:

- beyond reasonable doubt guilt of capital murder; Tex. Code Crim. Proc., art. 37.071(2)(a)(1); § 19.03, Tex. Penal Code.

- beyond reasonable doubt that Mr. Austin would, more likely than not, commit violent criminal acts in the future so as to constitute a continuing threat to society whether in or out of prison. Tex. Code Crim. Proc., art.37.071(2)(b)(1); Muniz v. State, 851 S.W.2d 238, 250 (Tex. Crim. App. 1993)

- that, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is not a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed. Tex. Code Crim. Proc., art.37.071(2)( e)(1).

Under the law as it operated at that time a sentence of life imprisonment would have been with eligibility for release on parole after thirty-five years.  The jury were specifically instructed to this effect.  (I, p.74)

From September 1, 2005 the State of Texas has made substantive changes to the sentencing elements for capital murder as a part of its adoption of life without parole as the only sentencing alternative to the death penalty.

Both the "future danger" and "mitigation" issues have been substantively changed, narrowing the class of offenders who are eligible for the death penalty and excluding Mr. Austin from that group.

The mitigation special issue now asks whether mitigating evidence reduces a defendant's moral blameworthiness to the point where a sentence of life <u>without</u> parole is warranted instead of death.   This is a quantum leap from the previous question which asked whether the defendant's moral blameworthiness was sufficiently reduced to warrant a sentence of life <u>with</u> parole; if not then death was the only option.  Mr. Austin's moral culpability was sufficiently reduced by his mitigating circumstances to warrant life without parole but not enough to entitle him to future release.  He would not now be eligible for the death penalty.

The future dangerousness special issue now operates such that a defendant will not be eligible for the death penalty unless the state proves beyond reasonable doubt that he is likely to commit future acts of criminal violence so as to constitute a continuing threat to society in prison.  In effect, the legislature has abolished the death penalty for those who can be safely maintained in the prison system for life.  Mr. Austin was sentenced to death under the operation of a sentencing element that has since been abolished and is no longer eligible to receive a death penalty.

The question is whether it accords with the our community's standards of moral decency and with the dignity of man to execute Mr. Austin under the terms of an abandoned sentencing scheme when the state has adopted a new, narrower scheme within which he would not be

subject to the death penalty?

The answer is no.

**CLAIM XXVI.  It violates the Eighth Amendment to execute Mr. Austin where the mitigation sentencing element of the Texas death penalty has been amended to reduce the level of mitigation necessary to avoid the death penalty and Mr. Austin would not now be sentenced to death**

*The mitigation special issue*

The jury were provided with a verdict form, which listed the mitigation special issue as follows:

> Do you find from the evidence taking, into consideration all of the evidence, including the circumstances of the offense, the Defendant's character and background, and the personal moral culpability of the Defendant, that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed.

Verdict Form, (I, 79).  The jury were told that a sentence of life imprisonment would entitle MR.

Austin to release on parole after thirty-five years. (I, p.74)  Since September 1, 2005 the law has

changed such that the question a capital sentencing jury must now answer is:

> Do you find from the evidence taking, into consideration all of the evidence, including the circumstances of the offense, the Defendant's character and background, and the personal moral culpability of the Defendant, that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment without parole rather than a death sentence be imposed.

Tex. Code Crim. Proc., art.37.071(2)( e)(1) (2005).  To paraphrase – is there sufficient evidence

reducing Mr. Austin's blameworthiness to warrant that a sentence of life imprisonment without

parole, rather than death be imposed.

The life without parole bill did not simply introduce life without parole as the alternate

sentencing option for capital juries in Texas, it changed the words of the special issue question

posed to juries in Texas, lowering the bar of mitigation evidence necessary to avoid a death

penalty.

On August 31, 2005, if a defendant could not muster sufficient mitigating evidence to warrant a sentence of life imprisonment with parole then the jury were bound to answer the mitigation special issue in the negative and the defendant would be sentenced to death.  From September 1, 2005 if a defendant can muster enough mitigating evidence to warrant a sentence of life imprisonment without parole instead of death he avoids the death penalty, even if he would not have been able to muster sufficient mitigating evidence to warrant a sentence in which he were granted the possibility of parole.

Where a defendant has already been convicted of capital murder it will take a huge amount of mitigating evidence to reduce his moral blameworthiness to a level at which a jury would agree that imprisonment with the possibility of release on parole is appropriate.  By contrast, it is a much lesser quality and/or quantity of mitigating evidence that will be necessary to persuade a jury that life without parole is warranted.

Mr. Austin's jury was not persuaded that his moral blameworthiness was sufficiently mitigated to warrant him having the opportunity for release on parole.  However, no reasonable jury would have concluded that Mr. Austin's mitigation did not reduce his moral blameworthiness sufficiently to warrant a sentence of life imprisonment without parole.

### *It is fundamentally inconsistent with the dignity of man to execute a prisoner for something that is no longer a death penalty offense*

Whatever may be said about penalties less than death, it has never been acceptable in this country to execute someone for an offense that is no longer criminal.  It could also never be acceptable in this country to execute someone where the scope of a sentencing element has been narrowed so that he would no longer be death eligible.

When rape ceased to be an offense for which the death penalty could be imposed there

was no suggestion that anyone already sentenced to death for rape should still be executed.  It does not matter that at the time of the rape the moral standards of the community endorsed the death penalty.  It does not matter that at the time of Johnny Paul Penry's offense prevailing standards permitted the execution of the mentally retarded.  What matters is that our community's prevailing standards have evolved to the point at which we have turned our backs on the execution of the mentally retarded.

To execute Mr. Austin in order to pay lip service to a law that has since been abandoned fails to reflect his fundamental dignity as a human being.

Indeed, where a state legislature has chosen to limit the reach of the death penalty, this has been seen as evidence of an evolving moral standard in that state that bars any future executions of those now excluded from the death penalty. See Fleming v. Zant, 259 Ga. 687, 386 S.E.2d 339 (Ga. 1989) ("The legislative enactment reflects a decision by the people of Georgia that the execution of mentally retarded offenders makes no measurable contribution to acceptable goals of punishment. Thus, although there may be no "national consensus" against executing the mentally retarded, this state's consensus is clear.");  Van Tran v. State, 66 S.W.3d 790, 798-799 (Tenn. 2001) ("it is unmistakably clear that the societal consensus in Tennessee, as reflected in the overwhelming vote and comments of the legislature, directly repudiates the Penry decision's constitutional sanction on executing the mentally retarded. We therefore conclude that the execution of mentally retarded individuals violates evolving standards of decency that mark the progress of a maturing society both nationally and in the State of Tennessee.)

The state of Texas has determined that where an offender's moral blameworthiness warrants life without parole instead of death then this is to be given effect.  In the face of this decision by the people of the state of Texas, it would be inconsistent with Mr. Austin's dignity as

a human being if he were to be executed even though his moral blameworthiness warrants a sentence of life without parole instead of death.

At the very least Mr. Austin deserves an opportunity to demonstrate that the mitigating evidence in his case warrants a sentence of life without the possibility of parole, instead of death. The inability of the jury to weigh Mr. Austin's moral blameworthiness against a sentence of life without parole clearly had a substantial and injurious effect on the outcome of the trial – forcing an inappropriate choice of death as the sentencing option.  Had the jury had the option of life without parole then it is reasonably probable that this is the option they would have selected.

**CLAIM XXVII. It violates the Eighth and Fourteenth Amendments to execute a man when the future dangerousness sentencing element by which he became eligible for the death penalty has since been de facto abolished.**

***Proof of Probable Future Violence – the Future Dangerousness Special Issue***

The probable future violence special issue, which is usually less accurately[209] described as the "future dangerousness" special issue asks the jury:

> Whether there is probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society.

Tex. Code Crim. Proc, art.37.071(2)(b)(1).  The state bears the burden of proving a likelihood of future violence constituting a threat to society beyond a reasonable doubt. art.37.071(2)(b)(2)(c) Probability in this context means that the defendant will more likely than not commit violent criminal acts in the future so as to constitute a continuing threat to society. Muniz v. State, 851

---

[209] Under this special issue the state must prove more than that the defendant is a dangerous person, it must prove *beyond a reasonable doubt* that the defendant is *more likely than not* going to commit acts of *future violence* that would constitute a continuing threat to society.  This asks a very specific question about the likelihood of the defendant committing future acts of violence and in answering it the jury is to have specific regard to the circumstances in which he finds himself i.e. in prison.  The concept of future danger describes a vague connotation of risk that is far below the bar the state must meet.  A campfire is dangerous unless properly managed but if

S.W.2d 238, 250 (Tex. Crim. App. 1993)

In considering the special issue the jury may consider the threat the defendant may pose to society in or out of prison[210] but the clear focus is on the society existing for the defendant in the Department of Corrections.[211]

Until the legislature acted on September 1, 1999 the Texas Constitution prevented juries from being told that a defendant would serve a fixed minimum period of imprisonment before eligibility for parole.[212]

Following the 1999 amendments, the CCA has held that the future dangerousness special issue requires that for the portion of a sentence that a prisoner is not eligible for parole "the jury must decide the probability he will pose a threat to the prison population for at least that long, and then, the probability he will threaten the general public after that."  Smith v. State, 898 S.W.2d 838, 864 (Tex. Crim. App. 1995) (Clinton, J. dissent) adopted by Blue v. State, 125 S.W.3d 491 at n.5 (Tex. Crim. App. 2003)  The state may not argue the possibility of early release as this is contrary to the terms of the statutorily mandated instruction on the meaning of

---

managed is not likely to cause anyone any harm.

[210] Muniz v. State, 851 S.W.2d 238, 250 (Tex. Crim. App. 1993)("The State's burden of proof on the second punishment question required the State to prove that appellant would, more likely than not, commit violent criminal acts in the future so as to constitute a continuing threat to society whether in or out of prison.")

[211] The Court of Criminal Appeals has consistently held that the clear focus of the special issue is the ""society" that would exist for the defendant and that "society" would be the "society" that is within the Department of Corrections." Rougeau v. State, 738 S.W.2d 651 (Tex. Crim. App. 1987); James v. State, 772 S.W.2d 84 (Tex. Crim. App. 1989) (accord); Boyd v. State, 811 S.W.2d 105 (Tex. Crim. App. 1991) (accord).  In Caldwell the court upheld the denial of a requested jury instruction to consider the special issue in the context of the defendant spending his life in prison on the basis that it was redundant.  Applying Rogeau the Court held that no special instruction was necessary, as the jury would clearly focus its attention on the society within the Department of Corrections in accordance with the natural meaning of the word "society" in its context. Caldwell v. State, 818 S.W.2d 790, 799 (Tex. Crim. App. 1991)

[212] Smith v. State, 898 S.W.2d 838 (Tex. Crim. App. 1995)(" the Texas Constitution prohibits, without legislative action, the jury to consider parole in any manner when considering whether a capital defendant should be sentenced to life or death.") This influenced the Court of Criminal Appeals' construction of the future dangerousness special issue.

life imprisonment.[213]   Any argument of the possibility of escape would be equally unavailing in this case.[214]

In a system in which life without parole has become the only sentencing alternative to death, the sole question for the jury in the future dangerousness issue is the probability that the defendant will pose a threat to society while in prison.  There is no occasion to consider the threat a defendant may present if in free society as he will never be eligible for parole.

To update the formulation of the special issue: the State's burden of proof requires the State to prove beyond reasonable doubt that the defendant would, more likely than not, commit violent criminal acts in the future so as to constitute a continuing threat to society in prison.  Cf. Muniz v. State, 851 S.W.2d 238, 250 (Tex. Crim. App. 1993).

### Mr. Austin is innocent of the death penalty – he would not be found to be a future danger under the new standard

While the jury received evidence of a number of prior violent offenses and alarming incidents in prison, evidence of Mr. Austin's mental health difficulties, of the exposure of Mr. Austin to violence as an identified homosexual in the prison system and of his non-violent conduct in an appropriately managed prison environment would lead a jury focused upon his future danger to prison society to experience a reasonable doubt about the likelihood of Mr. Austin committing future acts of violence such as to constitute a threat to society.

A properly instructed jury would not conclude beyond reasonable doubt that Mr. Austin was likely to commit future acts of violence.  He is, quite simply, no longer eligible for the death penalty.  At the very least, the inability of the jury to limit their considerations of future danger to

---

[213] Burton v State, 73,204 (Tex. Crim. App. 10/25/00) (not designated for publication) (Improper for state to suggest that a prisoner may possibly be released earlier than forty years due to future legislative action and ineffective assistance of defense counsel to fail to object.)

[214] It is to be remembered that the state must prove a likelihood of future violence beyond a reasonable doubt.  The

the prison environment had a substantial and injurious effect upon the jury's vote on the future danger special issue and they would probably not have found Mr. Austin a future danger if their consideration had been focused in this way.

***It is fundamentally inconsistent with the dignity of man to execute a prisoner for something that is no longer a death penalty offense***

As detailed above in respect of the lowering of the bar on the mitigation special issue, the narrowing of the scope of the future dangerousness special issue, renders Mr. Austin's execution inconsistent with the fundamental dignity of man. This proposition is equally true whether it is accepted that Mr. Austin would not receive the death penalty under the scheme or simply that there is a reasonable probability that he would not receive the death penalty.

**CLAIM XXVIII.** **It violates the Eighth Amendment to execute Perry Austin where that execution would be arbitrary and would serve no legitimate penological purpose**

***The Texas Death Penalty Scheme is unconstitutionally arbitrary***

The question of whether Mr. Austin's execution would violate the Eighth Amendment is to be judged at the date of that execution, not at the date the sentence of death is imposed.[215]

---

mere possibility of a future escape could not meet that threshold, particularly in a case of this sort where there is no evidence of a tendency to violent escape attempts.

[215] The court in <u>Penry I</u> explained why fundamental fairness would call for substantive changes in the eligibility for a particular punishment to operate retroactively.

> In our view, a new rule placing a certain class of individuals beyond the State's power to punish by death is analogous to a new rule placing certain conduct beyond the State's power to punish at all. In both cases, the Constitution itself deprives the State of the power to impose a certain penalty, and the finality and comity concerns underlying Justice Harlan's view of retroactivity have little force. As Justice Harlan wrote: "There is little societal interest in permitting the criminal process to rest at a point where it ought properly never to repose." *Mackey*, supra, at 693. Therefore, the first exception set forth in *Teague* should be understood to cover not only rules forbidding criminal punishment of certain primary conduct but also rules prohibiting a certain category of punishment for a class of defendants because of their status or offense. Thus, if we held, as a substantive matter, that the Eighth Amendment prohibits the execution of mentally retarded persons such as Penry regardless of the procedures followed, such a rule would fall under the first exception to the general rule of nonretroactivity and would be applicable to defendants on collateral review. Accordingly, we address the merits of Penry's claim.

Unlike considerations in other areas of the law, the Eighth Amendment's concern extends beyond ensuring that the procedures under which a sentence was imposed in the past comported with constitutional requirements as understood at the time of sentencing.  Where a human life is at stake the Eighth Amendment requires an analysis of whether the execution of the sentence of death comports with constitutional requirements as understood at the time of execution. Anything less would fail to reflect the dignity of man and the evolving moral standards of our community.  Death is different and the Eighth Amendment will not countenance the execution of a human being out of deference to good faith reliance on the laws of the past when dealing with something as fundamental as the sentencing elements that expose a person to possible execution. Such an approach cheapens human life in exactly the manner the Eighth Amendment forbids.

The Texas death penalty scheme under which Mr. Austin faces execution is marred by gross arbitrariness.  The scheme provides that offenders who kill someone after September 1, 2005 will be eligible for the death penalty only if they cannot be safely maintained in prison and if their moral culpability is such that a sentence of life in prison without parole is not warranted. However, for those accused of killing someone before September 1, 2005, they will be eligible for the death penalty even if they can be safely kept in prison and even if their moral culpability is sufficiently reduced such a sentence of life in prison without parole would be warranted.

There is no magic about the September 1, 2005.  On September 1, 2005 the price of gas rose to more than $3 a gallon; President Bush recruited former Presidents, George H. Bush and Bill Clinton to assist in aid efforts following the hurricane; Gwyneth Paltrow told Time magazine that Brad Pitt and Jennifer Aniston had overhyped their relationship; and, 27,000 people watched the Astros beat the Reds.  Nothing, however, happened on September 1, 2005 that would justify

---

Penry v. Lynaugh, 492 U.S. 302, 329-330 (U.S. 1989)

it being the critical date for deciding whether the measured moral response of our community is to kill or not kill people who can be safely contained in prison or whose conduct warrants life without parole instead of death.

September 1, 2005 is an arbitrary dividing line unrelated to the moral culpability of the offender, the severity of the offense, the penological interests of deterrence and retribution, or the individualized considerations of each of the offenders who fall on either side of the line.

### *"Kill them all, let God sort them out" v. the Eighth Amendment*

Legend (or history) has it that during the sack of Beziers in France in 1209 AD by the Crusaders the Papal Legate Arnaud Amaury was asked what to do with Catholics mixed in with the heretics in the city.  His answer was to "Kill them all, and let God sort them out".

Such an approach cannot pass constitutional muster today under the Eighth Amendment yet this is the premise that underlies the execution of Mr. Austin following a narrowing of the class of death eligible offenders in a way that excludes him.

Texas has determined that the death penalty is never appropriate for a prisoner who can be safely confined for the rest of his life.  The Eighth Amendment requires that before Mr. Austin is executed he have an opportunity to show that he is one of those people for whom the death penalty is never appropriate.

Texas has also determined that the death penalty should not be imposed upon those whose moral blameworthiness warrants a sentence of life imprisonment without the possibility of parole, even if it does not warrant a sentence of life with the possibility of future release. The Eighth Amendment requires that before Mr. Austin is executed he have an opportunity to prove that his moral blameworthiness warrants a sentence of life without parole, rather than death.

***The fact that Perry Austin's offense was committed before September 1, 2005 has nothing to do with his moral culpability or any particularized consideration of him as an individual and cannot sustain the execution of a human being***

The fundamental respect for humanity underlying the Eighth Amendment requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death. Woodson v. North Carolina, 428 U.S. 280, 304 (1976)

Instead of determining who is to be executed or not based upon a particularized consideration of each defendant, the Texas death penalty scheme is now marred by an arbitrary rule.  It now provides two different standards for selecting those to be executed, based not upon the individual circumstances of the offender and the offense but upon whether the offense occurred before or after September 1, 2005.

To this extent  it treats all persons convicted of a murder committed before September 1, 2005 not as uniquely individual human beings, but as members of a faceless, undifferentiated mass to be subjected to the blind infliction of the penalty of death without regard to the fact that they can be safely maintained in custody or that their mitigating evidence would warrant a sentence of life without parole.  Woodson, 428 U.S. at 304.

***The execution of an offender who would not be eligible for the death penalty under the law today makes no measurable contribution to deterrence or retribution***

Under Gregg, a punishment is "excessive" and unconstitutional if it (1) makes no measurable contribution to acceptable goals of punishment and hence is nothing more than the purposeless and needless imposition of pain and suffering; or (2) is grossly out of proportion to the severity of the crime. Gregg v. Georgia, 428 U.S. 153, 173 (1976)

The Gregg Court identified two principal penological purposes that the death penalty was said to serve: retribution  and deterrence of capital crimes by prospective offenders.

Deterrence as a goal of punishment operates on the theory that similarly placed individuals will be deterred from committing similar offences for fear of receiving a similar penalty.  An offender similarly placed to Mr. Austin is no longer eligible to receive the death penalty at all as no reasonable jury could be satisfied beyond reasonable doubt that he is likely to commit future acts of violence while undergoing a period of life imprisonment and the mitigation in his case calls for life without parole, rather than death.

To execute someone for an offense that no longer carries the death penalty can have no deterrent effect.  Similarly placed offenders considering similar criminal behavior know that they will not be exposed to similar punishment.

Further, to execute an offender in circumstances that the legislature has determined no longer requires the death penalty to deter offenders and is no longer appropriate for the death penalty is nonsensical and contrary to the underlying legislative intent.[216]

Nor will exempting those who can be safely confined in prisons from execution lessen the deterrent effect of the death penalty with respect to offenders who are likely to be violent even in prison. Such individuals are unprotected by the exemption and will continue to face the threat of execution.

> Nor will exempting the mentally retarded from execution lessen the deterrent effect of the death penalty with respect to offenders who are not mentally retarded. Such individuals are unprotected by the exemption and will continue to face the threat of execution.  Thus, executing the mentally retarded will not measurably further the goal of deterrence.

---

[216]   Addressing legislation decriminalizing sodomy, the Rhode Island Supreme Court made the following observation:
> A major purpose of a criminal statute is to deter conduct deemed unacceptable and either *malum in se* or at least *malum prohibitum* by the Legislature.
> When by virtue of amendment or repeal such conduct is no longer prohibited, prosecution can have no deterrent effect. The sole purpose of prosecution in such a situation is pure punishment for its own sake.
State v. Mullen, 740 A.2d 783, 786 (R.I. 1999).

Atkins, 536 U.S. at 320.

The execution of Mr. Austin would also make no measurable contribution to the goal of retribution.  Retribution as administered by the criminal law involves a measured moral response to the offender and his conduct and is defined by proportionality.

The goals of retribution are not advanced where the measure of retribution is determined not by proportion to the gravity of the offense and the moral culpability of the offender but by a calendar.

If the culpability of a murderer who commits his crime on September 2, 2005 is insufficient to require the most extreme sanction available to the State, the culpability of a similarly placed murderer whose offense was committed on a different date does not merit that form of retribution either. Atkins, 536 US, at 319.

### The Eighth Amendment will not tolerate arbitrariness in the operation of a law that determines which criminal defendants are to receive the death penalty

If the legislative changes are permitted to operate prospectively then the day will not be long coming when two defendants with near identical personal circumstances will be tried in the Harris County courthouse for near identical conduct and one will be sentenced to death while the other receives life on the simple caprice that they committed their offenses on different days.

We tolerate arbitrariness in the law all of the time; legislatures are forced to make changes and courts develop new interpretations and procedures.  However, it is one thing to tolerate some arbitrariness as a by-product of the rule of law, it is something completely different to tolerate arbitrariness in the law that determines which criminal defendants are to receive the death penalty.  This type of arbitrariness is intolerable and this was the judgment at the heart of Furman.

If allowed to proceed Mr. Austin's execution will be "cruel and unusual in the same way

that being struck by lightning is cruel and unusual." <u>Furman</u>, 408 U.S. at 309 Of all the people convicted of capital murder, many of whom have committed crimes as reprehensible or more so than Mr. Austin, Mr. Austin is among a "capriciously selected random handful upon whom the sentence of death will be carried out" because his offense was committed before September 2005.  To complete the quote from Stewart J. "the Eighth and Fourteenth Amendments cannot tolerate the infliction of a sentence of death under legal systems that permit this unique penalty to be so wantonly and so freakishly imposed." <u>Furman</u>, 408 U.S. at 309 (Stewart J., concurring); <u>Gregg</u>, 428 U.S. at 188.

***By conditioning the execution of offenders on the arbitrary consideration of the date of their offense the Texas scheme fails to ensure only the most deserving of execution are put to death***

Central to the Eighth Amendment is the Supreme Court's "narrowing jurisprudence, which seeks to ensure that only the most deserving of execution are put to death".[217] <u>Atkins</u>, 536 U.S. at 319.

By killing people who commit their offenses before September 1, 2005 even though they can be safely maintained in prison but not those who commit their offenses after that date the

---

[217] This narrowing jurisprudence must also be read in the context of the Supreme Court's insistence on heightened standards of reliability in death cases. The Eighth Amendment demands and the United States Supreme Court has "stressed the need" for reliable decision making when the death penalty is at issue." <u>Deck v. Missouri</u>, 125 S. Ct. 2007, 2014 (2005)  Whatever the case may be in non-capital prosecution, the Eighth Amendment demands that specific consideration be given to the capital nature of the case in order to determine whether the rules and procedures applied in an ordinary case reach the standard of heightened reliability that the law requires.

> In capital proceedings generally, this Court has demanded that factfinding procedures aspire to a heightened standard of reliability. This especial concern is a natural consequence of the knowledge that execution is the most irremediable and unfathomable of penalties; that death is different.

<u>Ford v. Wainwright</u>, 477 U.S. 399, 411 (1986) citing, inter alia, <u>Spaziano v. Florida</u>, 468 U.S. 447, 456 (1984), <u>Woodson v. North Carolina</u>, 428 U.S. 280,  305 (1976) (opinion of Stewart, Powell, and Stevens, JJ.); see also, <u>Caldwell v. Mississippi</u>, 472 U.S. 320, 323 (1985); <u>Simmons v. South Carolina</u>, 512 U.S. 154, 172 (1994) (opinion of Souter, O'Connor, Ginsburg, JJ.) ("The Eighth Amendment . . . imposes a heightened standard for reliability"); <u>Satterwhite v. Texas</u>, 486 U.S. 249, 263 (1988) (Brennan, Marshall, Blackmun, JJ. concurring) ("[T]he difference of death  from all other punishments requires a correspondingly  greater degree of scrutiny . . .  Because of this heightened  concern for reliability,  "time and again the Court has condemned procedures in capital cases that might be completely acceptable  in an ordinary case."). This heightened standard of reliability in fact finding is also reflected in applicable standards of international law, which hold that capital cases warrant "a particularly stringent need for reliability in determining whether a person is responsible for a crime that carries a penalty of death."  Inter-

Texas scheme does nothing to ensure that only the most deserving are put to death.  Similarly, executing those whose moral blameworthiness warrants life without parole instead of death if they committed their offense before September 1, 2005 but not after in no way ensures that only the most deserving are put to death.

By striking down that section of the Texas scheme that purports to make the changes to the sentencing elements prospective only, this Court would ensure that only the most deserving are put to death.

### NARROWING THE SENTENCING ELEMENTS FOR CAPITAL MURDER ON A PURELY  PROSPECTIVE BASIS GIVES RISE TO INVIDIOUS DISCRIMINATION

As detailed above, the effect of the amendments to the Texas capital sentencing scheme is to make substantive changes to the sentencing elements of the death penalty.  It narrows the class made eligible for the death penalty by the future dangerousness special issue and sets a lower quantum for the reduction of moral blameworthiness that mitigating evidence must achieve for a defendant to escape the death penalty.

Section 17 of the life without parole bill (SB 60, 79th Regular Session, 2005) contains the standard savings clause placed in innumerable criminal statutes in Texas.[218] Exhibit 108, Texas, SB 60, 79th Regular Session.

If applied prospectively only the bill would invidiously discriminate against those charged with a capital murder and occurring before September 1, 2005.

---

American Commission for Human Rights, Report No. 97/03 (Graham v United States), para 27.
[218] The relevant provisions reads:
> (a) The change in law made by this Act applies only to an offense committed on or after the effective date of this Act. For purposes of this section, an offense is committed before the effective date of this Act if any element of the offense occurs before the effective date.
> (b) An offense committed before the effective date of this Act is covered by the law in effect when the offense was committed, and the former law is continued in effect for that purpose.

The right to life is a fundamental right and before the legislature may draw an arbitrary distinction in the manner in which that right is taken away it must show a compelling state need. Even if no fundamental right is involved, there must be a rational basis for such discrimination. Where the death penalty is in issue the Eighth Amendment imposes an additional level of judicial scrutiny to ensure that any distinction the legislature makes is not 'clearly wrong".

In considering whether there is a rational basis for drawing a distinction based on the date of passage of the amending legislation it is relevant to weigh the relative merits of previous reliance upon the law. However, death is different and the balance tilts in favor of granting retrospective effect to ameliorative changes in the law. It should also be noted that both as the default position in Texas and as a matter of international law prisoners are to receive the benefit of ameliorative changes in sentencing.

Finally, the statute introducing life without parole in Texas is ambiguous in the intended scope of its savings clause and adopting a statutory construction that is consonant with a just and fair result and with the dictates of the constitution, discloses that the amendments to the sentencing elements and available range of sentences are retrospective as well as prospective.

The provisions of the life without parole bill amending the sentencing elements of the capital sentencing scheme are retrospective in operation and the Applicant is innocent of the death penalty as now defined

**CLAIM XXIX.  By operation of the Due Process and Equal Protection Clauses, and the Eighth Amendment the legislative changes of September 1, 2005 are retroactive to Mr. Austin's sentence and he is innocent of the death penalty as now cast.**

### *Invidious discrimination*

There can be no doubt that if the amending statute operates in a solely prospective

fashion then it creates an apparent inequity.

- The Act fundamentally changes the nature of the enquiry in the future dangerousness special issue.  In effect, it amends an 'element' necessary to impose the death penalty by limiting the class of people whose conduct or nature exposes them to possible execution. It has placed those who would be a future danger only if released on parole beyond the reach of the death penalty and reserved it for those who even while imprisoned are likely to commit violent acts such as to constitute a continuing threat to society.

- The Act allows those who commit murders after September 1 the benefit of having a jury weigh a possible death sentence against life without parole, rather than the prospect of future release of the offender.

- Prisoners who represent no danger within the prison but who committed their crimes before 1 September face death, while those who commit their crimes after September 1 will be spared.

- Two juries may sit in adjacent courtrooms in Harris county to deliberate on the appropriate sentence for men charged with identical crimes only days or weeks apart. One jury will not only have the option of life without parole but that defendant will have the advantage of having the prosecution forced to prove beyond reasonable doubt that he would be a danger while imprisoned.  The other defendant will need to defend against the much more troubling allegations that he will be a danger if released and that his moral culpability is too great to warrant a sentence including the future possibility of parole.

### The Discrimination Inherent in the Statute is Subject to Strict Scrutiny

The continued use of the death penalty implicates the fundamental right to life.  The fundamental right to life has been acknowledged by the Supreme Court in a variety of contexts.

In finding that the police had no right to kill a fleeing felon, the Court matter-of-factly stated: "The suspect's fundamental interest in his own life need not be elaborated upon." Tennessee v. Garner, 471 U.S. 1, 9 (1985); see also County of Sacramento, 523 U.S. at 836-37, 848-49, 855 (acknowledging a substantive due process claim where police killed a motorcycle passenger in the course of a high speed chase, but finding no violation in the absence of deliberate conduct); id. at 856 (Kennedy, J., concurring) ("There can be no question that an interest protected by the text of the Constitution is implicated: The actions of the State ... resulted in the undoubted loss of life... . We have no definitional problem, then, in determining whether there is an interest sufficient to invoke due process.").  In the very different situation involving a family's desire to end the life of a relative who was in a persistent vegetative state, the Court also recognized the state's "unqualified interest in the preservation of human life" regardless of the quality of the life being saved. Cruzan v. Dir., Mo. Dep't of Health, 497 U.S. 261, 280, 282 (1990); see also Washington v. Glucksberg, 521 U.S. 702, 728-29 (1997) (finding a state's unqualified interest in the preservation of life justifies ban on physician-assisted suicide). See also Roe v. Wade, 410 U.S. 113 (1973)  (noting that if a fetus were a "person," the "right to life would then be guaranteed specifically by the [Fourteenth] Amendment") ; Mattis v. Schnarr, 547 F.2d 1007, 1017-18 (8th Cir. 1976), vacated on other grounds, Ashcroft v. Mattis, 431 U.S. 171, 173 (1977) (per curiam) (discerning from Yick Wo v. Hopkins, 118 U.S. 356 (1886);  Johnson v. Zerbst, 304 U.S. 458 (1938);  Screws v. United States, 325 U.S. 91 (1945);  and Roe 410 U.S. 113 (1973); the "right to life as fundamental," although the court's opinion was vacated on other grounds by the Supreme Court). Thus, both early and modern judicial decisions reveal implicit and explicit regard for the right to life as a fundamental constitutional right.

Most significantly for the issue being considered here, the Court has explicitly recognized

even a death row inmate's interest in continuing to live. The Court described a person whom the state planned to execute when he had become insane as being "stripped of his fundamental right to life." Ford v. Wainwright, 477 U.S. 399, 409 (1986).  In addition, in addressing the question of what process is due to a capital defendant in the clemency context, a majority of the Court acknowledged that a condemned inmate continues to have an interest in his life. See Ohio Adult Parole Auth. v. Woodard, 523 U.S. 272, 281 (1998) (plurality opinion) ("We agree that respondent maintains a residual life interest."); Id. at 288-89 (O'Connor, J., concurring in part and concurring in the judgment). The concurring opinion of Justice O'Connor, joined by Justices Souter, Ginsburg, and Breyer, was necessary to uphold the judgment, and Justice Stevens's dissenting opinion would have given the defendant even greater protection. See Id. at 290-95 (Stevens, J., concurring in part and dissenting in part).

When the Court was presented with the claim that a person facing execution was in fact innocent, five Justices explicitly used language from the substantive due process tradition in concluding that the execution of an innocent defendant would violate the Constitution. See Herrera v. Collins, 506 U.S. 390, 419 (1993) (O'Connor, J., concurring) (expressing that execution of an innocent individual would be unconstitutional); id. at 430-31 (Blackmun, J., dissenting) (same).  In Herrera v. Collins, Justice Blackmun, joined by Justices Souter and Stevens, stated definitively: "Nothing could be more contrary to contemporary standards of decency or more shocking to the conscience than to execute a person who is actually innocent." . Id. at 430 (Blackmun, J., dissenting) (citations omitted).  Justice O'Connor, joined by Justice Kennedy, began her concurring opinion in the same case with the statement: "I cannot disagree with the fundamental legal principle that executing the innocent is inconsistent with the Constitution." . Id. at 419 (O'Connor, J., concurring).  She then went on to describe "the

execution of a legally and factually innocent person" as a "constitutionally intolerable event," no matter whether the verbal formula used to achieve the result evoked the <u>Ford v. Wainwright</u> "contemporary standards of decency" standard, the <u>Rochin v. California</u> prohibition against practices "shocking to the conscience," or the failure to adhere to a "principle of justice so rooted in the traditions and conscience of our people as to be  ranked as fundamental." <u>Id.</u> (O'Connor, J., concurring) (internal quotation marks and citations omitted).   And even the majority opinion, along with Justice White, concurring in the judgment, assumed that a persuasive showing of actual innocence would render a defendant's execution unconstitutional. <u>Id.</u> at 417; <u>Id.</u> at 429 (White, J., concurring in the judgment).

Given such recognition of the fundamental quality of the right to life, that right should be afforded the same protection as other fundamental rights. To comply with substantive due process standards, that protection requires the government to show that extinguishing the life of any person is necessary to serve a compelling interest. <u>See</u> Sherry F. Colb, <u>Freedom from Incarceration: Why Is This Right Different from All Other Rights?</u>, 69 N.Y.U. L. Rev. 781, 785-94 (1994) (arguing that the right to liberty should require strict scrutiny of laws authorizing confinement).   Further, in establishing a scheme of capital punishment, there must be a compelling interest in establishing the distinction between those who are and those who are not subject to a possible death sentence.   In the current context it also requires showing that the decision to make the ameliorative effects of the legislative changes prospective only was necessary to serve a compelling state interest.  The state cannot meet this burden.

### *Due Process, Equal Protection and prospective legslation*

In <u>Jackson v. Alabama</u>, 530 F.2d 1231 (5th Cir. 1976) the Fifth Circuit considered the constitutionality of Alabama legislation requiring that in the future the sentence of any persons convicted of any felony or misdemeanor be credited with time spent incarcerated pending trial.

The legislation was specifically made prospective and Jackson claimed that the Act must be applied retrospectively since otherwise it would establish an irrational classification of persons sentenced before and after its effective date, and thus, invidiously discriminate against those persons in the former class in contravention of the Fourteenth Amendment.

The Fifth Circuit first noted that there is no *per se* bar on prospective legislation.  Id. at 1238. It went on to consider whether in this instance the solely prospective application of the act violated the Fourteenth Amendment and determined that it did not do so, stating:

> We find in the circumstances here present that the "factors of reliance and burden on the administration of justice", *Stovall v. Denno*, 1967, 388 U.S. 293, 300, 87 S. Ct. 1967, 1972, 18 L. Ed. 2d 1199, 1205, outweigh the apparent inequity in determining a fixed cutoff date, and we hold also that the Alabama legislature's conferring only prospectively the benefits of Act No. 58 violated no constitutional guarantee. See *Jones v. Cupp*, 9 Cir. 1971, 452 F.2d 1091; *Williams v. United States*, 1964, 118 U.S. App. D.C. 255, 335 F.2d 290; *Graham v. Thompson*, 10 Cir. 1957, 246 F.2d 805; *Comerford v. Commonwealth*, 1 Cir. 1956, 233 F.2d 294, cert. denied 352 U.S. 899, 77 S. Ct. 141, 1 L. Ed. 2d 90.

Id. at 1238.

Importantly, the Fifth Circuit accepted, as it must, that the Equal Protection challenge stated a valid constitutional claim.  Equally importantly, the Fifth Circuit acknowledged the inequity in the arbitrary effective date of the legislation but adopted the reasoning of the Court in Stovall v Deno to balance that inequity against the reliance on the previous law and the burden a change would put on the administration of justice.

In determining that the balance lay in favor of a prospective only application of the statute the Fifth Circuit split with the balance achieved by the 4th Circuit in similar situations. Cf. Ham v. North Carolina, 4 Cir. 1973, 471 F.2d 406; Mott v. Dail, E.D.N.C.1972, 337 F. Supp. 731, appeal dismissed, 4 Cir. 1973, 473 F.2d 908.  See also Cole v. North Carolina , 4 Cir. 1969, 419 F.2d 127; People v. Frye, 1966, 35 Ill.2d 604, 221 N.E.2d 262.

In Mr. Austin's case the balancing test is quite different.

***Balancing death***

It is often stated that death is different and the Supreme Court has acknowledged that cases involving the death penalty require special considerations.[219]   This is obviously also true when balancing the functional and austere considerations of a system based on rules applied to many against the unique and intrinsic value of an individual human life.

In considering the balancing interests in the prospective application of ameliorative legislation that narrows the scope of an offense (or penalty) and lowers the bar for mitigating evidence it is difficult not to be drawn into comparisons with the analysis in <u>Teague v Lane</u> and the analysis taken up by the Supreme Court in <u>Schriro v. Summerlin</u>, 542 U.S. 348 (2004).

The first point to be taken from <u>Summerlin</u> is that made by Scalia J. writing for the majority, and that is that substantive rules are not <u>Teague</u> exceptions; rather, they do not come within the rule of <u>Teague</u> at all and will ordinarily apply retroactively:[220]

---

[219] The Supreme Court has acknowledged that the "qualitative difference of death from all other punishments"-- namely, its severity and irrevocability--"requires a correspondingly greater degree of scrutiny of the capital sentencing determination" than of other criminal judgments. <u>California v. Ramos</u>, 463 U.S. 992, 998-999 (1983); see also <u>Spaziano</u>, 468 U.S., at 468 (Stevens, J., concurring in part and dissenting in part) (the Eighth Amendment mandates special safeguards to ensure that death is "a justified response to a given offense"); <u>Ake v. Oklahoma</u>, 470 U.S. 68, 87 (1985) (Burger, C. J., concurring in judgment) ("In capital cases the finality of the sentence imposed warrants protections that may or may not be required in other cases").

[220] The Court reached the same result by a slightly different route in <u>Penry I</u>:
> In our view, a new rule placing a certain class of individuals beyond the State's power to punish by death is analogous to a new rule placing certain conduct beyond the State's power to punish at all. In both cases, the Constitution itself deprives the State of the power to impose a certain penalty, and the finality and comity concerns underlying Justice Harlan's view of retroactivity have little force. As Justice Harlan wrote: "There is little societal interest in permitting the criminal process to rest at a point where it ought properly never to repose." *Mackey*, supra, at 693. Therefore, the first exception set forth in *Teague* should be understood to cover not only rules forbidding criminal punishment of certain primary conduct but also rules prohibiting a certain category of punishment for a class of defendants because of their status or offense. Thus, if we held, as a substantive matter, that the Eighth Amendment prohibits the execution of mentally retarded persons such as Penry regardless of the procedures followed, such a rule would fall under the first exception to the general rule of nonretroactivity and would be applicable to defendants on collateral review. Accordingly, we address the merits of Penry's claim.

> New substantive rules generally apply retroactively. This includes decisions that narrow the scope of a criminal statute by interpreting its terms, see *Bousley v. United States*, 523 U.S. 614, 620-621, 140 L. Ed. 2d 828, 118 S. Ct. 1604 (1998), as well as constitutional determinations that place particular conduct or persons covered by the statute beyond the State's power to punish, see *Saffle v. Parks*, 494 U.S. 484, 494-495, 108 L. Ed. 2d 415, 110 S. Ct. 1257 (1990); *Teague v. Lane*, 489 U.S. 288, 311, 103 L. Ed. 2d 334, 109 S. Ct. 1060 (1989) (plurality opinion). n4 Such rules apply retroactively because they "necessarily carry a significant risk that a defendant stands convicted of 'an act that the law does not make criminal'" or faces a punishment that the law cannot impose upon him. *Bousley*, supra, at 620, 140 L. Ed. 2d 828, 118 S. Ct. 1604 (quoting *Davis v. United States*, 417 U.S. 333, 346, 41 L. Ed. 2d 109, 94 S. Ct. 2298 (1974)).

Summerlin, 542 U.S. at 351-2.  The rationale for retroactive operation of the substantive changes to the Texas capital sentencing scheme are particularly strong here.  Texas has narrowed the scope of a criminal statute by narrowing the scope of the future dangerousness special issue and by redefining the mitigation special issue in a way that lowers the bar for mitigating evidence capable of tilting a sentence away from death. There is a significant risk that if these changes are not retroactive, defendants will face execution in circumstances where the law could no longer impose death upon them.

Added to these considerations are the cogently expressed reasons of the dissent, explaining why death is different and why the normal considerations against retroactivity in such circumstances are weak.  These reasons include the fact that the number of cases likely to be affected is small, considerations of finality are less acute in death cases and the reliance argument less weighty.  Summerlin, 542 U.S. at 361 *et. seq.* (per Breyer J.).

The point should also be made that in Summerlin the Court was considering the possible retroactive effect of Ring v. Arizona, 536 U.S. 584 (2002) and determined that the rule announced in Ring is properly classified as procedural as it altered only the method of

---

Penry v. Lynaugh, 492 U.S. 302, 329-330 (U.S. 1989)

determining whether a defendant engaged in conduct that formed sentencing elements.  Here, there has been both a de facto and a literal change in the phrasing and content of the sentencing elements.  There can be no doubt that these are substantive changes.

### The rational basis for prospective operation

The only rational basis for prospective operation of the statute is to be found in the traditional considerations of reliance and judicial economy.   As Breyer J. pointed out in Summerlin, a question such as this impacts a very limited number of cases.

In 2003 there were over 169,000 prisoners in Texas.[221]  In 2004 the TDCJ received over 45,000 prisoners, almost 8,000 of them from Harris County.[222]   In 2004 there were 14,532 inmates serving a sentence in TDCJ for the offense of murder.

Against these numbers stands the 411 prisoners on death row (less than 1/4 of 1% of the state's prison population).  While a large death row by national standards, a very small number of cases to attract considerations of the weight of reliance and the burden on the administration of justice.

Even if retroactive operation did effect a larger number of prisoners it would impact only on penalty phase, not guilt and would ultimately be giving effect to the intention of the statutory amendment: that prisoners only be executed if they cannot be safely managed in the prison system and if their mitigating circumstances do not warrant life without parole instead of death.

In considering whether there is a rational basis for prospective only operation and whether the Stovall v Denno factors should control it is appropriate to have regard to some additional considerations.   The general savings clause in Texas ordinarily provides for retrospective effect to ameliorative legislation in respect of punishment.  Gov't Code, 311.031

---

[221] Bureau of Justice Statistics, November 2004, www.ojp.usdoj.gov/bjs/pub/pdf/pjim04.pdf

Further, the expectation of the international community is that as a matter of fundamental fairness prisoners will gain the benefit of any subsequent reduction in the penalty for their offense. International Covenant on Civil and Political Rights, Art. 15; American Declaration on the Rights of Man, Art. 9; European Charter of Fundamental Rights, art. 49.

### Properly construed the statute does not intend prospective only effect of the ameliorative provisions

In any event, it is likely unnecessary to reach the Equal Protection and Due Process claims as the statute is ambiguously drafted and if construed to provide a just, reasonable and constitutionally acceptable result the ameliorative provisions are given retrospective operation. Cf. Gov't Cde, art. 311.021 (construe statute to ensure just and reasonable result).

SB 60 contained 16 substantive sections providing for the amendment of 10 separate codal articles in 3 different statues as well as requiring amendments to rules established by the Court of Criminal Appeal and the standards set by local selection committees.  There was, however, only one savings clause.  This clause could not have been intended to control all of the statutory changes.  For instance,

- §2 of SB 60 provides that no person may be punished by the death penalty for an offense committed while he was younger than 18 years (increased from 17 years).  It would be absurd for this change in the law to have effect only in respect of offenses committed after September 1, 2005.  Such an interpretation would fly in the face of the Supreme Court's prohibition in Simmons of the imposition of the death penalty on juvenile offenders.  It is inconceivable that the Texas legislature intended to enact a law that says that juveniles who commit offenses after September 1 may not receive the death penalty but affirm that those who committed offenses before September 1

---

[222] http://www.tdcj.state.tx.us/publications/executive/FY2004%20Statistical%20Report.pdf

still can.

- §11, however, makes §2 look positively rational.  By §11 the Act introduced a new set of provisions to deal with the reformation of sentences of those sentenced to death for offenses committed before September 1, 1991.  However, the Act makes no provision for a separate commencement date or date of effective operation for these amendments.  As a result, and by virtue of §17, the amendments made by §11 apply only to an offense committed after September 1, 2005 and §11 operates only to reform sentences for offenses committed before September 1, 2001.

- The position becomes no clearer in dealing with §14, which bars the appointment of attorneys who have previously been found to have provided ineffective assistance in capital cases. As a result, and by virtue of §17, the amendments made by §14 apply only to an offense committed after September 1, 2005 – capital defendants whose offenses are committed before September 1, 2005 can have lawyers appointed who have previously been found to be ineffective but not those who are accused of crimes committed after September 1, 2005.   This anomaly cannot be explained by considerations of preserving the validity of existing appointments as this is explicitly addressed in §16.

If §17 were given its literal meaning and applied universally to all of the amending provisions then the results would be absurd and unconstitutional.  §17 is a boilerplate savings clause that was repeated in virtually every piece of criminal justice legislation in the 79th Regular Session.  It is not the subject of discussion or analysis in committee or elsewhere during the passage of the bill.  By comparison, there is much discussion in the course of committee hearings for the bill about the need for the amendment to ensure that those youths sentenced to death

before <u>Simmons</u> now serve life without parole, rather than receive parole terms.

The savings clause is a piece of punctuation that has some absurd and clearly unintended effects.  Compared to this is the evidence of legislative intent in the oft stated expressions during the bill's passage that it is designed to narrow those being executed to the people who cannot be safely kept in prison and that it responds to <u>Simmons</u> by ensuring that juveniles who would otherwise have been executed do not get parolable sentences.

Left with an unreliable and ambiguous savings clause the Court of Criminal Appeals should revert to the general savings clause which favors retrospective operation of ameliorative statutes dealing with penalty and statutory principles of construction that seek a construction that will produce a just and reasonable result consonant with the state and federal constitution.

***Conclusion***

Whether as a matter of statutory interpretation or by force of constitutional protections, the ameliorative aspects of the life without parole statute must be taken to apply retrospectively to Mr. Austin and he is rendered "innocent of the death penalty".  At the very least he is entitled to a hearing at which he can demonstrate that he is not a future danger in prison or that there is sufficient mitigating material to warrant a sentence of life imprisonment instead of death.

## THE TEXAS MITIGATION SPECIAL ISSUE CONTAINS AN IMPERMISSIBLE NEXUS REQUIREMENT

The sentencing jurors were precluded in their consideration of relevant mitigating circumstances by being forced to answer a special issue question, which unconstitutionally narrows the consideration of mitigating evidence to that reducing the defendant's moral blameworthiness.

As a result, the jury's considerations were limited to those matters that reflected upon the prediction that Mr. Austin was likely to commit future acts of criminal violence (special issue 1)

and those that reduced his moral blameworthiness.  The jury heard mitigating evidence that it was unable to give effect to through the special issues.  The limitation of the jury's consideration of relevant mitigating evidence through the nexus requirement violated Mr. Austin's Eighth Amendment right to an individualized sentencing determination in which the jury was permitted to give full consideration and full effect to all of the mitigating evidence.

**CLAIM XXX.   Mr. Austin's rights under the Eighth Amendment were violated when the jury's consideration of mitigating factors was unconstitutionally limited by the nexus requirement in the mitigation special issue.**

Mr. Austin's trial heard penalty phase evidence and then were asked to answer the two special issues dictated by Tex. Code Crim Proc. Art. 37.071 (2).  The jury were instructed

> In answering Special Issue No. 2 you shall consider mitigating evidence to be evidence that a juror might regard as reducing the defendant's moral blameworthiness including evidence of the defendant's background, character, or the circumstances of the offense that mitigates against the imposition of the death penalty.

(I, 72-3).  The jury were provided with a verdict form, which listed the special issue as follows:

> Do you find from the evidence taking, into consideration all of the evidence, including the circumstances of the offense, the Defendant's character and background, and the personal moral culpability of the Defendant, that there is a sufficient mitigating circumstance or circumstances to warrant that a sentence of life imprisonment rather than a death sentence be imposed.

Verdict Form, (I, 79).  Transposing the definition of "mitigating evidence" provided to the jury into the special issue question, as the jury was obliged to do, the special issue question becomes a narrow one:

> Whether, taking into consideration all of the evidence, including the circumstances of the offense, the defendant's character and background, and the personal moral culpability of the defendant, there is a sufficient *evidence reducing the defendant's moral blameworthiness* to warrant that a sentence of life imprisonment rather than a death sentence be imposed.

Penalty Phase Instructions and Verdict Form.  (I, 72-3; I, 79).  In order to be relevant mitigating evidence the evidence was required to have a relationship with Mr. Austin's conduct in the murder of DK.  Rhoades v. State, 934 S.W.2d 113, 126 (Tex. Crim. App. 1996) ("photographs of appellant which depict a cheerful early childhood are irrelevant to appellant's moral blameworthiness for the commission of a violent double-murder because such evidence has no relationship to appellant's conduct in those murders."); Goss v. State, 826 S.W.2d 162 (Tex. Crim. App. 1992) ("mitigating evidence is relevant to the jury's individualized assessment of the propriety of death if there is a nexus between the mitigating evidence and the circumstances surrounding the crime that might, from the viewpoint of society, reduce the defendant's "deathworthiness." In other words, the evidence must tend to excuse or explain the criminal act, so as to make that particular defendant not deserving of death.");

This special issue, with its nexus requirement, restricted the jury's assessment to whether there was sufficient evidence reducing Mr. Austin's moral blameworthiness in the sense that it was evidence with a relationship to the murder.[223]

As a vehicle for considering mitigating evidence the special issue as rendered to Mr. Austin's jury is impermissibly narrow as it requires any mitigating evidence to have a sufficient "nexus" to the offense to reduce the defendant's moral blameworthiness.  This nexus requirement was a feature of the jurisprudence of the Court of Criminal Appeals and the Fifth

---

[223] In some cases trial court's have added to the statutory definition an abstract charge in language similar to some of that used in Penry II. The addition expands the jury's ability to receive and make use of mitigating evidence. For example,

> In the abstract portion of the charge, a "mitigating circumstance" is defined as including, "but is not limited to, any aspect of the defendant's character, background, record, emotional instability, intelligence or circumstances of the crime which you believe could make a death sentence inappropriate in this case."

Jones v. State, 944 S.W.2d 642, 656 (Tex. Crim. App. 1996)(Charge did not unduly limit mitigating circumstances because of expanded definition in abstract.); McFarland v. State, 928 S.W.2d 482 (Tex. Crim. App. 1996) (same) The McFarland trial was in August 1992 in Harris County for a 1991 killing.

Circuit for over a decade, including at the time of Mr. Austin's trial.  The Fifth Circuit summarized the analysis of what evidence was relevant to show reduced moral culpability:

> In order to present relevant evidence that one is less culpable for his crime, the evidence must show (1) a "uniquely severe permanent handicap[] with which the defendant was burdened through no fault of his own", *Graham v. Collins*, 950 F.2d 1009, 1029 (5th Cir. 1992) (en banc), aff'd on other grounds, 506 U.S. ___, 113 S. Ct. 892 (1993), and (2) that the criminal act was attributable to this severe permanent condition. *Madden*, 18 F.3d at 307.

Davis v. Scott, 51 F.3d 457, 461 (5th Cir. 1995) citing Graham v. Collins, 950 F.2d 1009, 1029 (5th Cir. 1992) (en banc); Madden v. Collins, 18 F.3d 304, 307 (5th Cir. 1994).  The CCA has also made it absolutely clear that no nexus would be drawn from the fact of disability or prior abuse to reduced moral responsibility – there had to be positive evidence establishing that the offending conduct was attributable to disability or abuse. Davis v. Scott, 51 F.3d 457, 461 (5th Cir. 1995)(offense not shown to be attributable to evidence of paranoid schizophrenia, violent sexual proclivities and abusive childhood.) Madden v. Collins, 18 F.3d 304, 308 (5th Cir. 1994)(personality disorder is not linked causally to the criminal act . . . fails to produce substantial evidence that his childhood abuse . . . had such a psychological effect on him that it led to the criminal act); Barnard v. Collins, 958 F.2d 634, 638 (5th Cir. 1992) (Abused childhood could rise to the level of a Penry claim if the traumatic events caused psychological effects to which the criminal conduct was attributable.)

Both the threshold and nexus test have now been "unequivocally rejected". Smith v. Texas, 543 U.S. 37 (2004); Tennard v. Dretke, 542 U.S. 274 (2004).

The court in Tennard held that a jury must be given an effective vehicle with which to weigh mitigating evidence so long as the defendant has met a "low threshold for relevance," which is satisfied by """evidence which tends logically to prove or disprove some fact or

---

Jones was tried in 1994 in Gregg County for an offense earlier that same year.

circumstance which a fact-finder could reasonably deem to have mitigating value.''''' <u>Tennard</u>, 542 U.S. at 284-5 (quoting <u>McKoy v. North Carolina</u>, 494 U.S. 433 (1990)). Thus, a State cannot bar the consideration of evidence if the sentencer could reasonably find that it warrants a sentence less than death. <u>Tennard</u>, 542 US 285 quoting <u>McKoy</u>, 494 U.S., at 441.

The Court of Criminal Appeals has echoed the Fifth Circuit's erroneous nexus requirement both in terms of <u>Penry</u> claims[224] and also when enforcing the narrow scope of the mitigation special issue.[225]

To require that mitigating evidence have a relationship to the murder for which a defendant stands to be sentenced, rather than have a relationship to the defendant himself is to exclude much of what is recognized as mitigating across the country, including evidence that simply aims to humanize a defendant.  The responsibility of defense counsel to humanize a defendant in a capital penalty phase has long been recognized. <u>Strickland v. Washington</u>, 466 U.S. 668 (1984) (Marshall J.) ("Experienced members of the death-penalty bar have long recognized the crucial importance of adducing evidence at a sentencing proceeding that establishes the defendant's social and familial connections.") citing Goodpaster, *The Trial for Life: Effective Assistance of Counsel in Death Penalty Cases*, 58 N. Y. U. L. Rev. 299, 300-303, 334-335 (1983).  This basic understanding of what members of our community sitting as jurors find relevant and warranting a sentence less than death continues to be reinforced to this day. <u>Marshall v. Cathel</u>, No. 04-9007 (3d Cir., 11/2/05)("The penalty phase focuses not on absolving the defendant from guilt, but rather on the production of evidence to make the case for life. The

---

[224] <u>Smith v. Texas</u>, 543 U.S. 37 (2004) overruling <u>Ex parte Smith</u>, 132 S.W.3d 407 (Tex. Crim. App., 2004)
[225] <u>Goss v. State</u>, 826 S.W.2d 162 (Tex. Crim. App. 1992) ("mitigating evidence is relevant to the jury's individualized assessment of the propriety of death if there is a nexus between the mitigating evidence and the circumstances surrounding the crime that might, from the viewpoint of society, reduce the defendant's "deathworthiness." In other words, the evidence must tend to excuse or explain the criminal act, so as to make that

purpose of the investigation is to find witnesses to help humanize the defendant, given that the jury has found him guilty of a capital offense.") quoting <u>Marshall v. Hendricks</u>, 307 F.3d 36, 103 (3d Cir. 2002).

The Texas mitigation special issue fails to provide a vehicle for juries to consider evidence in mitigation that is not related to the offending for which a defendant is to be sentenced; requiring instead a nexus between the mitigation and the offense in order to reduce the offender's moral culpability.  As stated above, this nexus requirement has now been shown to be comprehensively wrong and must fall in favor of a low threshold of relevance and a vehicle by which relevant evidence may be considered and given effect to.

As a result of the unconstitutional limitation placed upon the use to which the sentencing jury could put evidence of mitigation the jury was unable to give effect to evidence of:

- Mr. Austin's death wish and the fact that he was seeking to kill himself through the judicial process.  These circumstances vitiated in favor of finding Mr. Austin to be a future danger in answering the first special issue and could be given no weight in answering the mitigation special issue as they do not reduce the moral blameworthiness of Mr. Austin for the offense.  In fact, the prosecutor explicitly told the jury in closing "He may think he wants the death penalty; but that is not a mitigating factor, folks."  (XI, p.14)  The jury had no way of giving effect to the powerful mitigating circumstance that Mr. Austin was attempting to commit judicial suicide.

- Mr. Austin's confession to the crime and his expressions of remorse.  These traditionally mitigating circumstances do not reduce Mr. Austin's "moral

---

particular defendant not deserving of death.")

blameworthiness" for the offense for which he was convicted, nor, in the circumstances of this case, did they reduce his risk of future violence; a fact the prosecution emphasized in closing argument.   They are, however, powerful mitigators, in fact, the Capital Jury Project has found remorse to be one of the most significant considerations in the sentencing determinations of capital juries.

- The unregulated violence of the Texas prison system and the victimization of identified homosexuals within that system.   These matters, by Mr. Austin's own account, rendered it more likely that he would commit future acts of violence. (XI, p.19-20)  They could not, however, be given effect in the mitigation special issue as they did not reduce Mr. Austin's moral blameworthiness for the offense at hand.   The fact that his moral blameworthiness for his own future dangerousness was diminished by the state's negligent handling of the Texas prison system could not be given effect.   Nor could the miserable circumstances of Mr. Austin's life in custody in that system.

- Mr. Austin's history of extremely disturbed behavior, suggesting mental illness or abnormality.   This evidence was an aggravator as far as the future danger special issue but could be given no effect as a mitigator unless it reduced Mr. Austin's moral blameworthiness for the instant offense.   The agony of suffering mental illness and the reduced moral blameworthiness for the risk of future danger that these circumstances present could be given no effect.

In each case no evidence of a nexus was offered, leaving the jury with no vehicle to consider the evidence.   The mitigation special issue does not provide a vehicle to give full consideration and full effect to mitigating circumstances other than those that reduce a defendant's moral blameworthiness.   Further, when combined with the first special issue it acts

to funnel jurors toward a death vote where there is evidence of future danger: the jury have no means of taking in to account the reasons for the prisoner's likely future violent conduct and mitigating a sentence of death because of the prisoners reduced moral blameworthiness for that future dangerousness.

## LETHAL INJECTION AS APPLIED IN TEXAS VIOLATES MR AUSTIN'S CONSTITUTIONAL RIGHTS UNDER THE FIRST AND EIGHTH AMENDMENTS

Petitioner make three distinct claims under this heading. Petitioner's first claim is that the state is acting with deliberate indifference to a substantial risk of serious harm in the administration of his death sentence by injecting him with a wholly unnecessary drug and by failing to monitor his level of consciousness, in violation of his Eighth and Fourteenth Amendment rights to remain free from cruel and unusual punishment.  Petitioner's second claim is that the injection of said drug also violates his First Amendment rights to free speech and to petition the government.  Finally, Petitioner's third claim alleges that the state's failure to plan for a method of central venous access and/or to seek venous access in a difficult case without proper safeguards violates his Eighth and Fourteenth Amendment rights to remain free from cruel and unusual punishment.

***The Details of the Texas Execution Protocol Are Hidden But Enough is Known To Describe A Claim And Discovery Will Permit Of Expansion Of The Claim***

The executions conducted in Texas are carried out in the clandestine manner of a medieval secret society.  Secrecy is paramount and almost no written records are kept. Those few who are initiated into the rite are sworn to secrecy, apparently passing on their methods through oral history alone. In a recent response to a request for information by Alberta Phillips about execution procedures, the TDCJ replied:

Information about execution procedures is held in the strictest confidence, is

generally not reduced to writing, and is known to only a few people within the Department.

See Exhibit 110 (Letter from James L. Hall to Alberta Phillips, Jan. 2, 2004).[226]  The TDCJ approach seems to draw its inspiration from Tom Cruise's famous line in the movie, *Top Gun*, "I could tell you, but then I'd have to kill you."  It seems that this is the only way the TDCJ is willing to let Mr. Austin in on the secret.

In an effort to avoid detailed disclosures, the TDCJ adopted a description of the Texas execution method published by the Houston Chronicle, claiming that on account of this article, the "pertinent aspects of Texas' lethal execution method are already a matter of public record".[227]  The description adopted by TDCJ was as follows:

> The process provides for three chemical agents to be administered as follows: first, two needles (one is a back-up) are inserted into each arm of the condemned inmate and connected to several intravenous drip bags containing a saline solution.  Next, a lethal dose (3 grams) of sodium thiopental is given to sedate the inmate.  Then, the intravenous tube is flushed with saline solution.  Next, pancuronium bromide (20 milligrams) is administered to collapse the offender's diaphragm and lungs.  The intravenous tube is flushed again with saline solution.  And finally, potassium chloride (70 milliliters) is administered to stop the offender's heart.

Exhibit 111, *Defendants' Supplemental Response in Opposition to Request for Expedited Discovery*, Aldrich v. Johnson, No. 04-2955 (S.D.Tex. 2004).

In November 2005 a new piece of the puzzle emerged when the TDCJ provided written notice of the protocol it was intending to apply in the execution of death row inmate Charles

---

[226] This response was particularly remarkable as Ms. Phillips' request issued the same day that the Houston Chronicle had published a description of the Texas execution method, citing the TDCJ and the Death Penalty Information Center as its sources. Exhibit 112, Lise Olsen and Mike Tolson, *'Stakes are High' in Death Appeals*, HOU. CHRON., Dec. 12, 2003, at A1.

[227]    Defendants' Supplemental Response in Opposition to Request for Expedited Discovery, Aldrich v. Johnson, No. 04-2955 (S.D.Tex. 2004).

Daniel Thacker:

> The three drug combination used in the lethal injection includes 30 milliliters of solution containing 3 grams of thiopental sodium (Sodium Pentothal); 50 milliliters of solution containing 100 milligrams of pancuronium bromide; and 70 milliliters of solution containing 140 milliequivalents (mEg) of potassium chloride. The drugs are administered sequentially with intervening saline flushes over a period of approximately five minutes.

Exhibit 113, TDCJ Response to Complaint of Charles Daniel Thacker.  As can be seen, the description of the chemical cocktail that the TDCJ has given is significantly different to that previously adopted with a 400% increase in the amount of pancuronium bromide used and containing for the first time a description of the milliequivalents of potassium chloride contained in the 70 ml of solution.

This presumably is the method and the madness of TDCJ's planned technique for killing Perry Austin.  It describes a process that at best is designed to inflict the wanton and unnecessary suffocation of Mr. Austin followed by an extremely painful injection of Potassium Chloride and cardiac arrest.

A more detailed discussion of the individual effects of each of the three drugs in the Texas chemical cocktail and the problems inherent in the TDCJ's use of Pancuronium Bromide is appropriate at this point as this information relates to each of the claims.

***The chemical cocktail chosen by the TDCJ and its effects***

a.      *Sodium thiopental.*

Sodium thiopental, or sodium pentothal, is a short-acting barbiturate that is ordinarily used to render a surgical patient unconscious for mere minutes, only in the induction phase of anesthesia, specifically so that the patient may re-awaken and breathe on his own power if any complications arise in inserting a breathing tube pre-surgery.  Dr. Mark Heath, Assistant Professor of Clinical Anesthesia at Columbia University, submitted a declaration in connection

with a Maryland case challenging the same combinatory use of chemicals as Respondents use.

Dr. Heath's declaration explained the surgical use of sodium thiopental:

> When anesthesiologists use sodium thiopental, we do so for the purposes of temporarily anesthetizing patients for sufficient time to intubate the trachea and institute mechanical support of ventilation and respiration. Once this has been achieved, additional drugs are administered to maintain a "surgical depth" or "surgical plane" of anesthesia (i.e., a level of anesthesia deep enough to ensure that a surgical patient feels no pain and is unconscious for the duration of the surgical procedure). The medical utility of thiopental derives from its ultrashort-acting properties: if unanticipated obstacles hinder or prevent successful incubation, patients will quickly regain consciousness and will resume ventilation and respiration on their own.

Exhibit 114 (Declaration of Dr. Mark Heath, filed in Oken v. Sizer, et. al., No. 24-C-004242, (Cir. Ct. Balt. City 2004).

The entire constitutionality of Texas' chosen method of killing Mr. Austin hangs upon full and continuous sedation by the sodium thiopental but it is a chemical poorly selected for this task.

Because of its brief duration, sodium thiopental may not provide a sedative effect throughout the entire lethal injection.  Dr. Dennis Geiser, the chairman of the Department of Large Animal Clinical Sciences at the College of Veterinary Medicine at the University of Tennessee, has explained:

> Sodium thiopental is not a proper anesthetic for use in lethal injection.  Indeed, the American Veterinary Medical Association standards for euthanasia indicate that the ideal barbituric acid derivative for animal euthanasia should be potent, long acting, stable in solution, and inexpensive.  Sodium pentobarbital (not sodium thiopental) best fits these criteria.  Sodium thiopental is a potent barbituric acid derivative but very short acting with one therapeutic dose.

Exhibit 115, Affidavit of Dr. Dennis Geiser, in the case of Texas v. Jesus Flores, No. 877,994A.

Due to the chemical combination Respondents are anticipated to use, there is also a probability that the second chemical, pancuronium bromide, will neutralize the short sedative

effect of the sodium thiopental.  Dr. Mark Heath stated:

> Sodium thiopental is an ultrashort-acting barbiturate that if administered in inadequate dosage begins to wear off almost immediately…. Sodium Thiopental is not used to maintain a patient in a surgical plane of anesthesia for purposes of performing surgical procedures.  It is unnecessary, and risky, to use a short-acting anesthesia in the execution procedure.  If the solution of sodium thiopental comes into contact with another chemical, such as pancuronium bromide, the mixture of the two will cause the sodium thiopental immediately to crystallize.  These factors are significant in the risk of the inmate not being properly anesthetized, especially since no-one checks that the inmate is unconscious before the second drug is administered.

Exhibit 114, Declaration of Dr. Mark Heath, filed in Oken v. Sizer, et. al., No. 24-C-004242, (Cir. Ct. Balt. City 2004).

These concerns with the usage of sodium thiopental are heightened by the lack of medical personnel, the lack of proper monitoring of the inmate during the process, the lack of inmate-specific dosing of the barbiturate, and especially Respondents anticipated failure to ensure the injection is continuous throughout the procedure.

The TDCJ plan to inject Perry Austin with a one-time dose of sodium thiopental through an intravenous tube, rather than a continuous injection of sodium thiopental throughout his execution.

The TDCJ plan to refrain from continuously administering sodium thiopental is especially problematic because of its choice of an ultrashort-acting barbiturate.

> The use of a continuous administration of the ultrashort-acting barbiturate is essential to ensure continued and sustained unconsciousness during the administration of pancuronium and potassium chloride. … It is my opinion based on a reasonable degree of medical certainty that, given [the selection of] an ultrashort-acting barbiturate, this failure to require a continuous infusion of thiopental places the condemned inmate at a needless and significant risk for the conscious experience of paralysis during the excruciating pain of both suffocation and the intravenous injection of potassium chloride.

Exhibit 114, (Declaration of Dr. Mark Heath, filed in Oken v. Sizer, et. al., No. 24-C-004242,

(Cir. Ct. Balt. City 2004)).

The lack of involvement of medical personnel and proper monitoring increases the risk of pre-injection mixing of the sodium thiopental with the second paralytic agent, causing the sodium thiopental to precipitate out of solution and become inactive, thereby "enhanc[ing] the risk that the inmate will be conscious during the execution." Id.  On the necessity of ensuring that dosing is determined on an individuated basis, Dr. Heath has stated:

> As with most drugs, a person's body composition and physiological attributes (size, weight, and drug tolerance) causes the inmate to react differently to the chemicals. Thus, some prisoners may need a higher concentration of sodium thiopental than others before losing consciousness. [The] failure to account for each inmate's physiological composition creates a significant probability that the inmate will not be unconscious when the other chemicals are administered causing the inmate to suffer an excruciatingly painful death.

Id.  And according to Dr. Geiser:

> [T]he dosage of thiopental sodium must be measured with some degree of precision, and the administration of the proper amount of the dosage will depend on the concentration of the drug and the size and condition of the subject. Additionally, the drug must be administered properly so that the full amount of the dosage will directly enter the subject's blood stream at the proper rate.  If the dosage is not correct, or if the drug is not properly administered, then *it will not adequately anaesthetize the subject, and the subject may experience the untoward effects of the neuromuscular blocking agent.* . .

Exhibit 116, Affidavit of Dr. Dennis Geiser, in the case of Abu-Ali Abdur' Rahman v. Bell, 226 F.3d 696 (6th Cir. 2000), cert. granted, 535 U.S. 1016 (U.S. April 22, 2002), cert. dismissed, 537 U.S. 88 (U.S. Dec 10, 2002) (emphasis added)).[228]  Concluding on the risk concerning the use of sodium thiopental and a paralytic agent by medically untrained personnel, Dr. Heath states:

---

[228]  At this point in the search for further data one encounters TDCJ's sudden administrative decision in 1989 to cease conducting autopsies of executed individuals.  This decision appears to be either willful blindness or consciousness of guilt.  Either way, it precludes the state from presenting any direct evidence to argue that the dosage of sodium pentothal injected into the veins of Texas condemned inmates still provides therapeutic levels of sodium pentothal. The problems inherent in TDCJ's use of sodium thiopental and pancuronium bromide cannot be directly discounted because of Defendants' failure to collect any post-mortem data and so the terrible specter of inadequate anesthesia can never be ruled out for any Texas condemned inmate.

The method of administering thiopental also raises significant concerns. If thiopental is not properly administered in a dose sufficient to cause death or at least the loss of consciousness for the duration of the execution procedure, then it is my opinion held to a reasonable degree of medical certainty that the use of pancuronium places the condemned inmate at risk for consciously experiencing paralysis, suffocation, and the excruciating pain of the intravenous injection of high dose potassium chloride.

Exhibit 114, (Declaration of Dr. Mark Heath, filed in Oken v. Sizer, et. al., No. 24-C-004242,

(Cir. Ct. Balt. City 2004).

Opportunities for problems with the administration of thiopental and other drugs during

lethal injection include, but may not be limited to, the following:

A.    Errors in preparation.  thiopental is delivered in powdered form and must be mixed into

an aqueous solution prior to administration.  This preparation requires the correct

application of pharmaceutical knowledge and familiarity with terminology and

abbreviations.  Calculations are also required, particularly if the protocol requires the use

of a concentration of drug that differs from that which is normally used.

B.    Error in labeling of syringes.

C.    Error in selecting the correct syringe during the sequence of administration.

D.    Error in correctly injecting the drug into the intravenous line.  Three-way stopcocks used

to administer chemical intravenously may be turned in the wrong direction, resulting in a

retrograde injection of the drug into the IV fluid bag rather than into the inmate.  The

design of three-way stopcocks is counterintuitive to many individuals, and the error of

retrograde injection is widespread in clinical practice.  Even seasoned professionals are

known to make this error, and the probability of this error occurring is greatly increased

in the hands of inexperienced practitioners.

E.    The IV tubing may leak.  An "IV setup" consists of multiple components that are

assembled by hand prior to use.  If the personnel who are injecting the drugs are not at the bedside but are instead in a different room or part of the room, multiple IV extension sets need to be inserted between the inmate and the administration site.  Any of these connections may loosen and leak.  In clinical practice, it is important to maintain visual surveillance of the full extent of IV tubing so that such leaks may be detected.  The configuration of the death chamber and the relative positions of the executioners and the inmate hinders or precludes such surveillance, thereby causing a failure to detect a leak. The practice of covering the inmate's body and extremities with a sheet, if the IV tubing runs under a sheet, makes it difficult or impossible to detect the leakage of drugs during injection.  In particular, if the IV tubing were to be incorrectly inserted into the hub of the catheter, there would be leakage of the drug under the sheet and under the inmate's body that would not be detectable.

F.     Incorrect insertion of the catheter.  If the catheter is not properly placed in a vein, the thiopental will enter the tissue surrounding the vein but will not be delivered to the central nervous system and will not render the inmate unconscious.   This condition, known as infiltration, occurs with regularity in the clinical setting.   Recognition of infiltration requires continued surveillance of the IV site during the injection, and that surveillance should be performed by the individual who is performing the injection so as to permit correlation between visual observation and tactile feedback from the plunger of the syringe.

G.     Migration of the catheter.  Even if properly inserted, the catheter tip may move or migrate, so that at the time of injection it is not within the vein.  This would result in infiltration, and therefore a failure to deliver the drug to the inmate's circulation and

failure to render the inmate unconscious.

H.  Perforation or rupture or leakage of the vein.  During the insertion of the catheter, the wall of the vein can be perforated or weakened, so that during the injection some or all of the drug leaves the vein and enters the surrounding tissue.  The likelihood of this occurring is increased if too much pressure is applied to the plunger of the syringe during injection, because a high pressure injection results in a high velocity jet of drug in the vein that can penetrate or tear the vessel wall.

I.  Excessive pressure on the syringe plunger.   Even without damage or perforation of the vein during insertion of the catheter, excessive pressure on the syringe plunger during injection can result in tearing, rupture, and leakage of the vein due to the high velocity jet that exits the tip of the catheter.  Should this occur, the drug would not enter the circulation and would therefore fail to render the inmate unconscious.

J.   Securing the catheter.  After insertion, catheters must be properly secured by the use of tape, adhesive material, or suture.  The catheter may become dislodged and if this were to occur under a sheet, it would not be detected, and the drug would not enter the inmate's circulation and would not render the inmate unconscious.

K.  Failure to properly administer flush solutions between injections of drugs.  Paralytic agents such as pancuronium cause thiopental to precipitate out of solution on contact, thereby interfering with the delivery of the drug to the inmate and to the central nervous system.

L.  Failure to properly loosen or remove the tourniquet from the arm or leg after placement of the IV catheter will delay or inhibit the delivery of the drugs by the circulation to the central nervous system.  This may cause a failure of the thiopental to render and maintain

the inmate in a state of unconsciousness.

M.    Impaired delivery due to restraining straps. Restraining straps may act as tourniquets and thereby impede or inhibit the delivery of drugs by the circulation to the central nervous system.  This may cause a failure of the thiopental to render and maintain the inmate in a state of unconsciousness.  Even if the IV is checked for "free flow" of the intravenous fluid prior to commencing injection, a small movement within the restraints on the part of the inmate could compress the vein and result in impaired delivery of the drug.

There have been a substantial number of problems encountered in Texas and elsewhere in the United States with the humane provision of adequate intravenous anesthesia.

b.    *Pancuronium bromide.*

The second chemical involved in the lethal injection process, pancuronium bromide, or Pavulon, is a derivative of curare that acts as a neuromuscular blocking agent.  Pavulon "paralyzes all voluntary muscles, but does not affect sensation, consciousness, cognition, or the ability to feel pain and suffocation."  Exhibit 114 (Declaration of Dr. Mark Heath, filed in Oken v. Sizer, et. al., No. 24-C-004242, (Cir. Ct. Balt. City 2004).  Given the substantial risk that the sedative effect of the sodium thiopental is ineffective or neutralized, the pancuronium bromide would serve both to *inflict* and to *mask* the excruciating pain of the condemned inmate.

> If administered alone, a lethal dose of pancuronium would not immediately cause a condemned inmate to lose consciousness. It first would totally immobilize the inmate by paralyzing all voluntary muscles and the diaphragm, *causing the inmate to suffocate to death while experiencing an intense, conscious desire to inhale*. Ultimately, consciousness would be lost, but it would not be lost as an immediate and direct result of the pancuronium. Rather, the loss of consciousness would be due to suffocation, and would be preceded by the torment and agony caused by suffocation. Depending on the physiological attributes of the individual it may take from one to several minutes before suffocation leads to unconsciousness.

Id. (emphasis added).

In <u>Abdur' Rahman v. Bell</u>, Dr. Geiser asserted that while Pavulon paralyzes skeletal muscles, including the diaphragm, it has "*no effect on consciousness or the perception of pain and suffering*." Administration of Pavulon is "*like being tied to a tree, having darts thrown at you, and feeling the pain without any ability to respond.*" <u>Exhibit 116</u> (emphasis added). This assertion is corroborated by the experience of eye surgery patient, Carol Weihrer. During Ms. Weihrer's surgery the sedative she received was ineffectual and Ms. Weihrer was conscious of the entire surgery. Due to the administration of a neuromuscular blocking agent like pancuronium bromide, however, she was unable to indicate her consciousness to doctors:

> I experienced what has come to be known as Anesthesia Awareness, in which I was able to think lucidly, hear, perceive and feel everything that was going on during the surgery, but I was unable to move. It burnt like the fires of hell. It was the most terrifying, torturous experience you can imagine. The experience was worse than death.

<u>Exhibit 117</u>, Affidavit of Carol Weihrer, in the case of <u>Texas v. Jesus Flores</u>, No. 877,994A.

The possibility of such "anesthesia awareness" or "intraoperative awareness" has just recently been explored in depth by the American Society of Anesthesiologists, in a October 25, 2005 report entitled "Practice Advisory for Intraoperative Awareness and Brain Function Monitoring." The task force responsible for the report reviewed more than one hundred and fifty studies, sought comments and consulted technical experts. It is the first national study of its kind.

The final, fifty-page report notes that the planned use of muscle relaxants such as pancuronium bromide <u>increases the risk</u> of intraoperative awareness, particularly in a case in which a "total intravenous anesthesia" method is used, as it is in Texas lethal injections. In addition, the report notes that the clinician's ability to monitor consciousness during the procedure is greatly hindered by the use of drugs such as pancuronium bromide, as patients subject to such drugs cannot give purposeful indications of consciousness as can unparalyzed

patients. *See* Exhibit 109, p. 21.  Patients subject to such drugs therefore must be even more closely monitored by electronic monitoring systems. See id.

In short, the second chemical, pancuronium bromide, or Pavulon, in the lethal injection protocol will bury Mr. Austin alive in a chemical coffin.  If conscious he will experience the horrifying and excruciating sensation of suffocation that caused hanging to be abandoned as an execution method.  He will then suffer the sensation of the third chemical—potassium chloride—burning through his veins and ravaging his internal organs.  Unlike in a surgical context where paralysis during delicate procedures serves a legitimate and beneficial surgical purpose (preventing the patient from unconsciously moving), in the execution process where delicate surgical procedures near vital internal organs are not being performed, where the end sought is death rather than the preservation of life, and where the "patient" is rendered sufficiently immobile for the task by strapping him onto a gurney, paralysis serves no rational purpose.  A paralytic agent will, however, serve to make the execution *appear* humane to witnesses, indicating its presence in the chemical cocktail has more to do with smothering complaint and disguising the unconstitutional conduct of the state of Texas than effectuating the death sentence by lethal injection.

> It is my opinion based on a reasonable degree of medical certainty that the use of pancuronium effectively nullifies the ability of witnesses to discern whether or not the condemned prisoner is experiencing a peaceful or agonizing death. Regardless of the experience of the condemned prisoner, whether he or she is deeply unconscious or experiencing the excruciation of suffocation, paralysis, and potassium injection, he or she will appear to witnesses to be serene and peaceful due to the relaxation and immobilization of the facial and other skeletal muscles.

Exhibit 114, (Declaration of Dr. Mark Heath, filed in Oken v. Sizer, et. al., No. 24-C-004242, (Cir. Ct. Balt. City 2004).  Persons viewing the lethal injection procedure and the public will never realize that a cruel fraud is being perpetrated upon them: instead of witnessing an inmate

quiet and motionless while being "put to sleep," they may in fact be witnessing the cover-up of a cruel and excruciating death.

c.    *Potassium chloride.*

Potassium Chloride is the third chemical agent administered.  If injected alone, or in an inmate who has not been rendered sufficiently anesthetized, potassium chloride would cause excruciating pain.  And, if administered to a conscious inmate after a paralytic agent, that pain would be undetectable to witnesses.

> If administered alone, without prior administration of an anesthetizing dose of pentothal or other anesthetic agent, a lethal dose of potassium chloride would not immediately cause a condemned inmate to lose consciousness. It would first cause excruciating pain as it traveled through the venous system to the heart, and, once it reached the heart, it would cause a painful cardiac arrest that would deprive the brain of oxygen and rather quickly (but not immediately) cause death. If pancuronium was administered prior to the potassium chloride, any visible signs of pain or agony caused by the potassium would be completely masked and undetectable to onlookers or witnesses.

Exhibit 114, Declaration of Dr. Mark Heath, filed in Oken v. Sizer, et. al., No. 24-C-004242, (Cir. Ct. Balt. City 2004). As Senator and anesthesiologist Kyle Janek recently agreed, "the second and third drugs in this regimen would be cruel to someone who could feel them . . . since the pancuronium would cause a patient to be paralyzed and unable to respond to the pain of the potassium injection."[229]

**CLAIM XXXI.  Lethal injection, as respondents administer it in Texas, poses an intolerable and foreseeable risk of causing unnecessary pain, torture, and lingering death, in violation of the eighth amendment.**

---

[229]   Janek, K.  *Attack on Texas' lethal injections is bogus*, Dallas Morning News, 2/1/04.  Senator Janek ultimately supported the existing protocol because of his confidence in the anesthetic dose of sodium thiopental.  In fairness, however, to the Senator, he has not had an opportunity to comment since the new practice advisory was issued.

***The Eighth Amendment's Proscription Against Cruel And Unusual Punishment***

The Eighth Amendment's proscription against cruel and unusual punishment forbids the infliction of unnecessary pain in the execution of a sentence of death.  Louisiana ex rel. Francis v. Resweber, 329 U.S. 459, 463 (1947) (opinion of Reed, J.); Fierro v. Gomez, 865 F. Supp. 1387, 1413 (N.D. Cal. 1994) (execution by lethal gas in California held unconstitutional where evidence indicated "death by this method is not instantaneous.  Death is not extremely rapid or within a matter of seconds.  Rather . . . inmates are likely to be conscious for anywhere from fifteen seconds to one minute from the time that the gas strikes their face" and "during this period of consciousness, the condemned inmate is likely to suffer intense physical pain" from "air hunger"; "symptoms of air hunger include intense chest pains . . . acute anxiety, and struggling to breath"), aff'd, 77 F.3d 301, 308 (9th Cir. 1996), vacated on other grounds, 519 U.S. 918 (1996).  Further, "[p]unishments are cruel when they involve . . . a lingering death."  In re Kemmler, 136 U.S. 436, 447 (1890).  A punishment is particularly constitutionally offensive if it involves the foreseeable infliction of suffering.  Furman v. Georgia, 408 U.S. 238, 273 (1973), citing Resweber, supra (had failed execution been intentional and not unforeseen, punishment would have been, like torture, "so degrading and indecent as to amount to a refusal to accord the criminal human status").

Due to the choice of chemicals the TDCJ intend to inject in Petitioner and the proposed manner of administration, it is not only foreseeable but also predictable that unnecessary pain, torture, and lingering death will result.  The deliberate indifference to this risk of unnecessary pain violates Petitioner's Eighth Amendment rights. See Estelle v. Gamble, 429 U.S. 97, 104 (1976) ("We therefore conclude that deliberate indifference to serious medical needs of prisoners constitutes the 'unnecessary and wanton infliction of pain . . . proscribed by the Eighth Amendment."); Farmer v. Brennan, 511 U.S. 825 (U.S. 1994) ("A prison official's 'deliberate

indifference' to a substantial risk of serious harm to an inmate violates the Eighth Amendment.").

The Court in <u>Farmer</u> made it absolutely clear that the state is obliged to take reasonable measures to guarantee the safety of inmates:

> prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must "take reasonable measures to guarantee the safety of the inmates,

<u>Farmer</u>, 511 U.S. at 832, <u>citing Hudson v. Palmer</u>, 468 U.S. 517, 526-527 (1984).

Petitioner is entitled to Eighth Amendment protection from future harm. <u>Helling v. McKinney</u>, 509 U.S. 25, 33 (1993) Petitioner may seek his remedy from an unsafe and unnecessarily cruel execution protocol now and not await a tragic event. <u>Id.</u>

In determining whether conditions of confinement are constitutional, "the court's judgment must be informed by current and enlightened scientific opinion as to the conditions necessary to insure good physical and mental health for prisoners." <u>Spain v. Procunier,</u> 600 F.2d 189, 200 (9th Cir. 1979); <u>McKinney v. Anderson,</u> 924 F.2d 1500, 1504 (9th Cir. 1991) (accord)

Conditions may establish an Eighth Amendment violation "in combination" when each would not do so alone.  <u>Wilson v. Seiter,</u> 501 U.S. 294, 304 (1991); <u>Gates v. Cook,</u> 376 F.3d 323, 333 (5th Cir. 2004).

### Deliberate Indifference in the Face of the Practice Advisory

According to the October 25, 2005 report from the American Society of Anesthesiologists entitled "Practice Advisory for Intraoperative Awareness and Brain Function Monitoring," inadvertent retained consciousness during a medical procedure involving general anesthesia is particularly possible when: (1) the patient has a history of substance use or abuse; (2) there is a planned use of muscle relaxants during the medical procedure or (3) a "total intravenous anesthesia" method is planned.  All three of these "risk factors" are present in this

case.  The Practice Advisory asserts that there is a definite risk of patients becoming aware during general anesthesia even when administered in a hospital environment by trained personnel.  The Advisory also notes that the risk of intraoperative awareness does not stem simply from an inadequate does of anesthetic but also from "drug delivery errors".  Exhibit 109, p.9 (includes reference to drug delivery error with total intravenous anesthesia equipment) This is critical in Petitioner's case because drug delivery errors will lead to a likelihood of awareness regardless of how large the dose of sodium thiopental planned for in the protocol.

The Practice Advisory provides unequivocal evidence of the substantial risk that serious harm that can result from the procedure to be used in Petitioner's execution, and also provides a description of reasonable measures that can be taken to abate the risk.  It also represents a clear indication, if one were needed, that society's attitudes have evolved to the point at which unnecessary risk of exposure to intraoperative awareness violates current standards of decency. Cf. Id.

Because the relevant officials of the state of Texas, including the Respondent, have been provided with this report, they are subjectively aware of the risk, of the seriousness of the potential harm, and of the reasonable measures that can be taken to abate the risk.

Despite their subjective knowledge of the risks and the seriousness of the harm entailed in their execution protocol, however, the TDCJ have obdurately chosen not to change it.  The TDCJ refuse to justify their otherwise extraordinary refusal to make reasonable provision for Petitioner's safety. In doing so they are being deliberately indifferent to a subjectively known substantial risk of serious harm to Petitioner.

***The use of Pancuronium Bromide is wholly unnecessary and creates an intolerable risk of unnecessary suffering and torture.***

The use of Pancuronium Bromide to collapse Mr. Austin's diaphragm and lungs is

wholly unnecessary.  If the sodium thiopental is truly administered in a lethal dose, than Petitioner will have ceased breathing at the point of the administration of the pancuronium bromide and therefore the collapsing of his diaphragm and lungs serves no purpose.  If the state is admitting the possibility that that Petitioner could receive less than a lethal dose of thiopental, than it is also conceding potential problems in drug delivery that could well result in an extremely painful and protracted execution for Petitioner. Given the risk of error in the administration of the sedative, the use of pancuronium bromide also creates a substantial risk of serious harm to Mr. Austin.

Far from producing a rapid and sustained loss of consciousness and a humane death, Texas' method carries with it an excessive and substantial risk that Perry Austin will consciously suffer an excruciatingly painful and protracted death.

More specifically, there is a substantial risk that Mr. Austin will not be adequately sedated by the administration of sodium thiopental.

If this occurs the administration of the second drug, pancuronium bromide, will mask the fact that the Petitioner will not be fully anesthetized during the execution process. That is, Petitioner will remain conscious and capable of feeling pain when the pancurionium bromide is administered, paralyzing his lungs and suffocating him.  He will remain equally consicous when the extremely painful potassium chloride is administered; he will be unable to indicate this pain or consciousness, however, because of the paralysis of his voluntary muscles. The execution team, therefore, will have no notice of the need to remedy the situation.

It is a long honored tradition that a prisoner facing the firing squad should receive a blindfold so that he need not witness his own death.  Instead of a blindfold, should the sedative fail in a Texas execution, the prisoner will find himself chemically gagged, unable to cry out or

move as he suffers an excruciating death.  To inflict punishment on someone by immobilizing them and then suffocating them in this way is reminiscent of *peine forte et dure*, a method of torture whereby progressively larger weights were placed on a suspects chest causing suffocation and often death.  This technique was finally abolished in 1772 and must be clearly understood to be cruel and unusual punishment.

***The Danger That Lethal Injection As Practiced Will Result In Unnecessary Suffering And Torture Is Greatly Increased By The Failure Of the TDCJ To Establish Necessary Qualifications For Personnel Performing Injections, And By The Failure Of the TDCJ To Establish Standards and Safeguards For The Injection Procedure.***

The TDCJ, to the extent they have one at all, keep their written lethal injection protocol a secret.  Some information on the TDCJ's lethal injection practices has been made public, however.  A former senior Texas Department of Criminal Justice (TDCJ) official who witnessed 219 executions gave an interview to researchers about what happens when Respondents undertake to administer a lethal injection, some details of which were published in the medical journal, The Lancet, in April 2005.

Through the former official it was discovered that the unknown executioners, "typically one to three emergency medical technicians or medical corpsmen," have no training in anesthesia.  After placement of the intravenous lines, the executioners step behind a wall or curtain and remotely administer the drugs to the conscious inmate.  According to the former official, Respondents undertake no direct observation, physical examination, or electronic monitoring for anesthesia purposes.  Nor do Respondents make any attempt afterward to assess the depth of anesthesia of the executed inmate.  See Leonidas G. Koniaris, et al., Inadequate Anaesthesia in Lethal Injection for Execution, THE LANCET 2005; 365:1412.  The TDCJ are believed to limit physicians' services to pronouncing death.

The risk of inflicting severe and unnecessary pain and suffering upon Petitioner in the

lethal injection process is particularly grave because it is believed that the meager procedures and protocols designed by the TDCJ fail to establish the necessary training, qualifications and expertise required of the personnel performing the critical tasks during the lethal injection and do not establish appropriate criteria and standards that personnel must rely upon in exercising their discretion when conducting the lethal injection.  Nor does the protocol include safeguards regarding the manner in which the lethal injection is to be carried out, especially with respect to whether the drugs are appropriately administered so as to ensure that Petitioner is anesthetized.[230] Perhaps most importantly, there are no apparent answers to critical specific questions governing a number of crucial tasks and procedures in the TDCJ's lethal injection procedure such as:

(a)      the minimum qualifications and expertise required for the different personnel performing the tasks involved in the lethal injection procedure after the catheter is inserted;

(b)      the methods for obtaining, storing, mixing, and appropriately labeling the drugs, the minimum qualifications and expertise required for the person who will determining the concentration and dosage of each drug to give, and the criteria that shall be used in exercising this discretion;

(c)      the manner in which the IV tubing, three-way valve, saline solution and other apparatus shall be modified or fixed in the event it is malfunctioning during the execution process, the minimum qualifications and expertise required of the person who shall have the discretion to decide to attempt such action, and the criteria that shall be used in exercising this discretion;

(d)      the manner in which the heart monitoring system shall be modified or fixed in the

---

[230] In a bizarre contrast, it has been reported that condemned prisoners in China who volunteer for organ donation undergo surgery and are killed while anesthetized, rather than facing a firing squad while conscious.  This is intended as an encouragement for voluntary organ donation.

event it is malfunctioning during the execution process, the minimum qualifications and expertise required of the person who shall have the discretion to decide to attempt such action, and the criteria that shall be used in exercising this discretion;

(e)      the manner in which the condition of the condemned prisoner will be monitored to confirm that proceeding to the next procedure would not inflict severe and unnecessary pain and suffering on the condemned prisoner;

(f)      the minimum qualifications and expertise required of the person who is given the responsibility and discretion to order the staff to divert from the established protocols if necessary to avoid inflicting severe and unnecessary pain and suffering on the condemned prisoner, and the criteria that shall be used in exercising this discretion; and

(g)      the minimum qualifications and expertise required of the person who is given the responsibility and discretion to ensure that appropriate procedures are followed in response to unanticipated problems or events arising during the lethal injection procedure, and the criteria that shall be used in exercising this discretion.

The consequences of this failure to develop adequate protocol, procedures, and standards constitutes deliberate indifference to a substantial risk of serious harm to the Petitioner and thereby violates his Eighth Amendment right to be free of cruel and unusual punishment.

## CLAIM XXXII. Lethal injection, as respondents administer it in Texas, constitutes a violation of Petitioner's First Amendment right to free speech and to petition the government.

As described in the previous section, the use of pancuronium bromide will prevent Petitioner from audibly and consciously expressing his pain and requesting assistance during the execution.  This amounts to a denial of his right to free speech and his right to petition the government under the First Amendment.

239

Prison regulations that infringe a prisoner's constitutional right are valid so long as they are "reasonably related to legitimate penological interests." Turner v. Safley, 482 U.S. 78, 89 (1987). But the legitimate penological interest may not be presumed. "The [defendant] must, at the very least, adduce some penological reason for its policy at the relevant stage of the judicial proceedings. 'Considerations advanced to support a restrictive policy [must] be . . . sufficiently articulated to permit . . . meaningful review.' Thus, at a minimum, the reasons must be urged in the district court." Armstrong v. Davis, 275 F.3d 849, 874 (9th Cir. 2001) (quoting Walker v. Sumner, 917 F.2d 382, 386 (9th Cir. 1990)).

There is no reason for using pancuronium bromide.  In fact, given the lack of proper rationale for the use of the chemical, the condemnation for its use, the refusal of the TDCJ to explain its use and its notable effect in gagging the prisoner, it is reasonable to infer that the purpose of the use of this drug is to silence the prisoner.

This inference is corroborated by the TDCJ's conduct in respect of the last words of condemned prisoners.  The TDCJ website publishes the official account of the last words of executed prisoners.  However, the TDCJ has developed a practice of editing the last words of those it has killed to omit references to the execution procedure itself and the sensations being experienced by the condemned.

Although Texas regulations require that the warden ask the question, "Do you have any last words?"[231] there seems to be no requirement that these last words be faithfully recorded.  A review of Texas newspapers following an execution confirms that statements posted on the Texas Department of Criminal Justice are often different from those recorded by reporters who witnessed the execution.  In general there is no consistency behind the sorts of alterations made

---

[231] http://www.csuohio.edu/clevelandstater/Archives/Vol%201/Issue%2010/news/news6.html

(prayers or statements of innocence are sometimes but not always edited).  There is, however, absolute uniformity in the omission of *any* statement pertaining to the *physical effects* of the lethal injection.  Numerous inmates have, with their last breath, gasped that they could feel it, that it burned, or that they could taste it.

Charles Thacker (Tell my attorney "they couldn't find a vein" and "I can already feel it a little bit.")[232], Melvin White ("I can taste it.")[233], Robert Morrow ("I feel it.")[234], Ricky Morrow  (said he could **"feel it"**)[235], Peter Miniel (Said he felt a burning sensation; sputtered and gasped.)[236], Jasen Busby ("Here it comes, I can feel it.")[237], James Colburn ("I can start to feel it now.")[238], Stanley Baker Jr. ("My arm feels cold. . . . Got some pain in my left arm, I guess that's the poison."  Coughed, gasped and slightly wheezed.)[239], Jeffery Doughtie (Winced, said **"It's burning,"**)[240], David Goff (Said he was tasting something "like rubber.")[241], Thomas Mason ("This stuff has a bad taste to it.")[242], Michael McBride ("I feel it in the back of my throat")[243].

**CLAIM XXXIII.**     **In violation of the Eighth Amendment TDCJ are acting with deliberate indifference to petitioner's medical needs in either refusing to plan for a method of central venous access or in secretly planning to perform medically invasive procedures on petitioner without even minimal proper safeguards in place.**

---

[232] Zeke Minaya, *Inmate Executed For Choking Schoolteacher to death in '93*, Houston Chronicle,  November 10, 2005, at B1.
[233] http://www.txexecutions.org/reports/352.asp
[234] Michael Graczyk, *Morrow Executed in Student's Slaying/ Killer Expressed Remorse for the Abduction, Death of 21-Year-Old*, Houston Chronicle, November 5, 2004, at B4.
[235] Prew, *Inmate executed for slaying during Dallas bank robbery*, Huntsville Item, October 20, 2004.
[236] *Condemned Inmate Peter Miniel Executed*, Houston Chronicle, October 6, 2004
[237] *Teenagers' Killer Expresses Regret Before Execution*, Houston Chronicle, August 26, 2004, at B4.
[238] Ruiz, *Mentally Ill Inmate Executed*, Houston Chronicle, March 27, 2003, at A35.
[239] *'That's the Poison,' Says Killer as Injection Starts*, Houston Chronicle, May 31, 2002, at A42.
[240] *Elderly Couple's Killer Put to Death*, Houston Chronicle, August 17, 2001, at A34.
[241] *Worth Killer's Execution Makes 7 for the Year in Texas*, Houston Chronicle, April 26, 2001, at A33.
[242] http://www.txexecutions.org/reports/219.asp
[243] Michael Graczyk,  *Inmate is Executed for Slaying Ex-Girlfriend and Another Teen*, Houston Chronicle, May 12, 2000, at A44.

In order to inject Petitioner with the drugs that will execute him, the TDCJ must obtain IV access by inserting two needles in his veins.  IV access can typically be obtained through a peripheral vein—veins that are located in the lower arms, lower legs, hands, or feet.  Peripheral access cannot always be obtained, however.  It is more difficult to insert needles for an IV than to draw blood because of the size of the necessary needles.  It is also more difficult to find suitable veins in which to insert two needles than to insert only one.  Additionally, the veins utilized for lethal injection should be larger than those required to draw blood, because the injection may cause smaller veins to collapse.

When access to suitable peripheral veins cannot be obtained, resort to a medically invasive procedure must be utilized to gain access to a central vein, such as the internal jugular (neck), subclavian, or femoral (groin) veins.

All central venous access methods are significantly more complex, riskier and more painful than methods of peripheral access. Any attempt to access a central vein brings with it a host of extremely serious potential complications, including:

–        severe bleeding including the possibility of bleeding to death or exanguination

–        pneumothorax, a condition in which air follows the needle track into the chest, forcing the collapse of the lungs, suffocation, and asphyxia

–        cardiac dysrhythmia, an abnormality of the electrical activity of the heart

All of these complications require, for their treatment, ready access to varieties of medical equipment and the presence of qualified medical personnel.  Without these, a patient could die a painful and horrible death.

In November 2005 the TDCJ advised undersigned counsel, in respect of the execution protocol to be applied to another prisoner, that no cut down procedure would be conducted but

declined to provide any additional details of how venous access would be managed.

Although Petitioner is somewhat assured that a cut-down procedure is said not to be an option, Petitioner does not know how TDCJ intend to gain IV access should they face significant difficulty in locating a suitable peripheral vein.  One option is for the state to resort to a cut-down, despite unenforceable assurances to the contrary.  Because the TDCJ keep their protocol a secret, because there are no independent witnesses to the insertion of the IV, and because no autopsy or other medical review of the body is conducted other than pronouncement of death following the injection, Petitioner cannot be satisfactorily assured that the TDCJ will not resort to a cut-down to obtain a suitable vein.  Another option is for the executioners to resort to another method of central vein access such as percutaneous techniques without adequate medical safeguards in place.  A final option is for the executioners to continue trying to locate a peripheral vein for a period of time that constitutes torture.[244]  Any of these paths represent, on the part of the Respondents, a deliberate indifference to the Petitioner's serious medical needs and therefore constitute a violation of his Eighth Amendment rights.

To all of this, Petitioner proposes a reasonable alternative. A surgeon or other qualified professional with the necessary experience and credentials and with access to the necessary equipment should be prepared to access Mr. Austin's central vein through the "percutaneous central line placement" technique, should peripheral vein access prove impossible after a reasonable period of time.  Petitioner asks to be informed of the qualifications of this individual before his execution.

## PETITIONER IS NOT COMPETENT TO BE EXECUTED

---

[244] In California, where the process of insertion of the IV is witnessed, the nation was recently exposed to the delays and errors in this procedure in the execution of Stanley "Tookie" Williams.  The spectacle of a man strapped immobile to a gurney while executioners fish for veins is repugnant to the fundamental dignity of man.

While this claim is premature at this point as no execution date has been set, Fifth Circuit precedent holds that it is appropriate and necessary to bring such a claim at this time.  In Re: Davis, 121 F.3d 952 (5th Cir. 1997);  Richardson v. Johnson, 256 F.3d 257, 258 (5th Cir. 2001) The appropriate course for this court is to dismiss the claim without prejudice as premature and for the claim to be re-raised should an execution date be set and should the conditions under Ford be present.

**CLAIM XXXIV.      It would violate the Eighth Amendment to execute Mr. Austin when he is incompetent to be executed within the meaning of Ford v. Wainwright, 477 U.S. 399, 409-410 (1986).**

In Ford, the Supreme Court held that "[t]he Eighth Amendment prohibits the State from inflicting the penalty of death upon a prisoner who is insane." Id. at 410. In a concurring opinion, Justice Powell concluded that the State may not constitutionally execute those who, because of mental illness, do not rationally understand "the fact of their impending execution and the reason for it." Id. at 422 (Powell, J., concurring). Ford recognizes the extreme "inhumanity and cruelty" of executing a man "who has no comprehension of why he has been singled out and stripped of his fundamental right to life" and "has no capacity to come to grips with his own conscience or deity." Id. at 409. Justice Powell explained that:

> [O]ne of the death penalty's critical justifications, its retributive force, depends on the defendant's awareness of the penalty's existence and purpose. Thus, it remains true that executions of the insane both impose a uniquely cruel penalty and are inconsistent with one of the chief purposes of executions generally. . . . If the defendant perceives the connection between his crime and his punishment, the retributive goal of the criminal law is satisfied. And only if the defendant is aware that his death is approaching can he prepare himself for his passing. Accordingly, I would hold that the Eighth Amendment forbids the execution only of those who are unaware of the punishment they are about to suffer and why they are to suffer it.

Id. at 422-23 (Powell, J., concurring). Under this standard, there can be no doubt that Mr.

Resendiz is presently incompetent and may not be executed without violating the principles first announced in Ford.

Mr. Austin has detailed the severe mental illness that he has suffered and continues to suffer from earlier in this Petition and has attached reports and other records pertinent to this fact.  Mr. Austin adopts and incorporates by reference the earlier account of his mental illness and social history, the conditions of confinement and effect of those and all reports and other exhibits relating to his mental condition for the purposes of this claim.

In the circumstances and given Mr. Austin's severe mental illness, he meets the Ford standard and is not competent to be executed.

**PRAYER FOR RELIEF**

ACCORDINGLY, Applicant Perry Allen Austin prays that this Court:

1.      Issue a writ of habeas corpus to have him brought before it, to the end that he may be discharged from his unconstitutional confinement and restraint and/or relieved of his unconstitutional sentence of death;

2.      Grant such other relief as law and justice require.


Respectfully submitted,


   */s/ Richard Bourke*
RICHARD BOURKE                              DICK WHEELAN
Texas Bar No. 24040553                      Texas Bar No.  21252600
636 Baronne Street                          440 Louisiana Street, Suite 900
New Orleans, Louisiana  70113               Houston, Texas 77002
TEL  (504) 558 9867                         TEL  (713) 225-1300

Counsel for Perry Allen Austin              Counsel for Perry Allen Austin


**CERTIFICATE OF SERVICE**

I hereby certify that on the 28th day of November 2006, I served a true and correct copy of the foregoing pleading by electronic mail from the clerk of court for delivery on opposing counsel:

Georgette Oden
Assistant Attorney General
Office of the Attorney General
PO Box 12548, Capitol Station
Austin, TX 78711-2548
512/936-1600

_____ /s/ Richard Bourke