## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **PERRY ALLEN AUSTIN,** | § | |
| | § | |
| **Petitioner,** | § | |
| | § | |
| | § | |
| **-VS-** | § | **CIVIL NO. H-04-2387** |
| | § | |
| | § | |
| | § | |
| **RICK THALER,**  § | | |
| **Director, Texas** | § | |
| **Department of Criminal Justice,** | § | |
| **Institutional Division,** | § | |
| | § | |
| **Respondent.** | § | |

_____

## PETITIONER'S FIRST RESPONSE

### THIS IS A DEATH PENALTY CASE.

Richard Bourke
Texas Bar No. 24040553
636 Baronne Street
New Orleans, Louisiana  70113
TEL  (504) 558 9867

Christine Lehmann,
La Bar No.  28122
636 Baronne Street
New Orleans, Louisiana  70113
TEL  (504) 558 9867

Counsel for Perry Allen Austin

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | |
|---|---|
| **PERRY ALLEN AUSTIN,** § | |
| § | |
| **Petitioner,** § | |
| § | |
| § | |
| **-VS-** § | **CIVIL NO. H-04-2387** |
| § | |
| § | |
| **NATHANIEL QUATERMAN,** [1] § | |
| **Director, Texas** § | |
| **Department of Criminal Justice,** § | |
| **Institutional Division,** § | |
| § | |
| **Respondent.** § | |

_____

## PETITIONER'S FIRST RESPONSE

Pursuant to this court's scheduling order, Petitioner now timely files his first Response to Respondent's *Answer.*

Petitioner has gathered and ordered the claims in this pleading in a manner designed to track Respondent's *Answer* and the logical connections between the claims.  Given the length of the pleading and the number of claims, a table of contents is provided.

---

[1] Rick Thaler has replaced  Nathaniel Quaterman as the Director of the TDCJ Institutional Division, accordingly Thaler "is automatically substituted as a party".  Fed. R. Civ. P. 25(d)(1).

# TABLE OF CONTENTS

CLAIM II:  Mr. Austin's rights to Procedural Due Process were violated when, despite sufficient indications of his incompetence, no adequate inquiry was made into his competence to waive counsel, plead guilty and stand trial for penalty. ........................................................................ 11

CLAIM III:  Mr. Austin's rights to Procedural Due Process were violated when, despite sufficient indications of his incompetence presented during the trial, the court declined to hold a mid-trial competence hearing. ...................................................................................................... 11

CLAIM XXIV:  Mr. Austin's rights under the Sixth and Fourteenth Amendments were violated when his direct appeal was considered and determined while he was not competent.................. 11

1.   Deference and the standard of review............................................................................. 11

2.   In defiance of the record, the state argues that there was no evidence suggesting that an adjudication of competence was required and that, in any event, there was an adequate adjudication of competence ........................................................................................................ 13

3.   The trial court was presented with more than sufficient evidence to require a competency hearing in this case....................................................................................................................... 14

Pre-trial evidence of incompetence in this case was sufficient to raise a bona fide doubt, which was found by the trial court...................................................................................... 14

Contrary to the State's Answer, the court's colloquy and the evaluation by Dr. Brown were incapable of dispelling the doubt regarding Mr. Austin's competency without a hearing ... 20

The court heard additional evidence of incompetence by the time of trial, which provided affirmative evidence of incompetence as well as significantly undermining the court's colloquy and Dr. Brown's report .......................................................................................... 22

4.   The minimal procedures that were employed in this case did not meet federal due process standards. ..................................................................................................................................... 27

The procedures utilized were minimal............................................................................... 29

The procedures employed in this case were inadequate in that they failed to address the affirmative evidence raising a bona fide doubt about competence and could not dispel that doubt by pointing to other indicia of competence. ............................................................. 31

5.   The psychological examination that formed a part of the state procedures relied upon was not adequate. ............................................................................................................................... 39

The state relies upon a minimalist psychological evaluation to absolve the trial court of the need to conduct a competency hearing ................................................................................. 39

The standard of care in forensic mental health assessments is designed to ensure the adequacy and reliability of evaluations and confirms the inadequacy of the psychological evaluation in this case. ...................................................................................................... 41

The competency procedures introduced by the Texas legislature in 2003 further highlight the inadequacy of the psychological examination in this case ............................................. 47

The psychological examination failed to adequately address or resolve the central question of whether the defendant's choices were rational or were being substantially affected by mental illness. ......................................................................................................................... 50

Petitioner's colloquy with the court was inadequate to address and dispel the doubt raised in this case. ................................................................................................................................... 52

The opinion of counsel was inadequate to address and dispel the doubt regarding competence raised in this case. ...................................................................................................... 53

6.   Despite the bona fide doubt regarding Mr. Austin's competency, no competency hearing was undertaken when he waived counsel for appeal and post-conviction nor at any point thereafter ............................................................................................................................... 54

CLAIM IV: Deference on substantive competency claim ........................................................... 56

1.   There is no merits determination of this federal constitutional claim to which deference is to be afforded under 2254(d)(1) or (2) ....................................................................................... 56

2.   Deference under 2254(e)(1) applies only to determinations of factual issues and should not apply to the ultimate conclusion of competency, which is a mixed question of fact and law 56

3.   The state court did not make a determination of a factual issue that Petitioner was competent to stand trial for the purposes of  §2254(e)(1) ......................................................... 62

4.   The presumption of correctness does not attach to determinations of factual issues  arising from procedures that do not comport with Due Process ........................................................... 67

CLAIM IV:  Mr. Austin's rights to Substantive Due Process were violated when he was allowed to waive counsel, plead guilty, stand trial, waive counsel on appeal and waive appeals despite being legally incompetent ....................................................................................................... 69

5.   Petitioner has established a violation of his substantive Due Process rights by clear and convincing evidence ................................................................................................................... 70

6.   Contrary to the state's assertions, the legal competency standard requires more than simple factual understanding .................................................................................................... 71

7.   Contrary to the state's assertions, there is clear and convincing factual evidence of Mr. Austin's incompetence at the time of trial .............................................................................. 77

The state's assertions that there is "no" evidence of severe mental illness in the records and "no" evidence supportive of incompetency is so far from reality as to reflect a willful disengagement from the facts of this case. ......................................................................... 77

Dr. Woods and Dr. McGarrahan's Assessments Constitute Clear and Convincing Evidence of Mr. Austin's Incompetency at the Time of the Relevant Case-Related Decisions in this Case ................................................................................................................................. 80

The state's proposed evidence of competence is thin, unreliable, and significantly undermined by other evidence in the record. ..................................................................... 87

CLAIM X:  Mr. Austin's Right to Due Process and to Counsel Were Violated when he was subjected to a capital trial without counsel without having made a competent, knowing, voluntary and intelligent waiver of counsel. ................................................................................. 92

   1.   Deference and Standard of Review. ........................................................................... 92

   2.   The court's colloquy is an inadequate basis for determining that the waiver of counsel was knowing, voluntary and intelligent and resulted in the court relying upon information that was demonstrably false ............................................................................................................. 93

   3.   Petitioner's waiver was not competent, knowing, voluntary or intelligent due to Petitioner's mental illness, his conditions of confinement and the interaction of the two ..... 100

CLAIM XI: Mr. Austin's Right to Due Process was violated because his guilty plea was not a competent, knowing, voluntary and intelligent waiver of his jury trial right. ............................ 110

   1.   Deference and Standard of Review. ......................................................................... 111

   2.   The court's colloquy is an inadequate basis for determining that the guilty plea was competent, knowing, voluntary and intelligent. ...................................................................... 111

   3.   Contrary to the state's assertions, petitioner provided ample evidence of the mental illness and coercive conditions that rendered his plea involuntary. ................................................... 113

CLAIM XVIII: Mr. Austin's Right to Due Process was violated because his waiver of appellate counsel was not competent, knowing, voluntary and intelligent. .............................................. 116

   1.   Deference and Standard of Review. ......................................................................... 116

   2.   Petitioner's waiver was not competent, knowing, voluntary or intelligent .................... 116

CLAIM VII. Mr. Austin's right to the effective assistance of counsel was denied as a result of a conflict of interest when he was appointed counsel who after appointment secretly advocated against Mr. Austin's interests ................................................................................................. 117

   1.   No deference is due as there was no lower court decision on ineffective assistance of counsel. .................................................................................................................................. 117

   2.   The state misstates the nature of the deficient conduct. ................................................ 118

CLAIM VIII:  Mr. Austin's right to counsel was violated when he was afforded ineffective assistance of counsel prior to his *Faretta* hearing. .................................................................. 118

   1.   No deference is due as there was no lower court decision on ineffective assistance of counsel. .......................................................................................................................... 118

   2.   The petitioner has not waived his ineffective assistance of counsel claim. ..................... 118

   3.   Petitioner's right to counsel was violated due to inadequate investigation of his mental health by appointed counsel. ................................................................................................. 119

   4.   Petitioner's right to counsel was violated due to a complete lack of representation at petitioner's Faretta hearing. ....................................................................................................... 125

CLAIM IX. In violation of Mr. Austin's constitutional rights he was provided with ineffective assistance by his standby counsel who failed to urge a competency hearing or a reconsideration of the previous competency hearing when evidence emerged mandating this course. .............. 127

   5.   No deference is due as there was no state court decision on this claim .......................... 127

   6.   If standby counsel is appointed by the state then standby counsel must be minimally effective in that role. ............................................................................................................... 128

CLAIM V: Mr. Austin's rights under the Texas and federal constitutions were violated when the state failed to disclose material helpful to Mr. Austin to the court, Mr. Austin or the court appointed psychologist ............................................................................................................... 128

CLAIM VI: Mr. Austin's right to counsel under the Texas and Federal Constitutions was violated when the state's failure to disclose evidence relevant to the determination of his competence and the voluntariness of his conduct effectively denied him the assistance of counsel on these issues ............................................................................................................................. 128

   1.   No deference is due as there was no state court decision on Mr. Austin's Brady claim. 128

   2.   Contrary to the state's contentions, favorable and material evidence of Mr. Austin's mental illness and incompetence was suppressed by the state. ............................................. 128

   3.   The evidence was suppressed ........................................................................................ 130

   4.   The evidence was favorable and material ..................................................................... 133

CLAIM XII. The trial court denied Mr. Austin his right to trial by jury as guaranteed by the Texas Constitution when, even though a jury trial may not be waived in a capital case in Texas, it accepted his guilty plea and directed a verdict of guilt .................................................................. 136

CLAIM XIII. Without a valid waiver, the trial court denied Mr. Austin his right to trial by jury as guaranteed by the Sixth and Fourteenth Amendments when it accepted Austin's plea of guilty and directed a verdict of guilt .................................................................................................... 136

   1.   No deference is due as there was no state court decision on Mr. Austin's Brady claim. 136

2.   The state errs in treating this case as one in which no jury trial was conducted and no verdict returned ................................................................................................ 136

3.   The Judge Committed Structural Error by Directing a Guilty Verdict in a Criminal Jury Trial................................................................................................................................. 137

4.   Mr. Austin's claim clearly presents a cognizable federal issue ...................................... 139

5.   A plea of guilty does not, in itself, represent a constitutionally effective waiver of the jury trial right.................................................................................................................................. 141

6.   The record shows that Mr. Austin was not asked to and did not waive his jury trial right 142

CLAIM XIV. The trial court denied Mr. Austin his right to trial by jury as guaranteed by the State and Federal Constitutions when it made findings of fact that Mr. Austin's plea was competent and voluntary when these facts were, in the circumstances, the equivalent of elements of the offense................................................................................................................................... 143

CLAIM XV. Mr. Austin was denied his right to a fair and impartial tribunal as a result of the unconstitutional prejudice of jurors preventing them from considering the imposition of a life sentence as an option in a case of capital murder. .................................................................... 145

CLAIM XVI. Mr. Austin was denied his right to a fair impartial tribunal when a majority of jurors provided misleading answers as to their willingness to consider evidence in mitigation were he to be convicted of capital murder ................................................................................. 145

1.   No deference is due as there was no state court decision on Mr. Austin's Brady claim. 145

2.   The state accepts the prevailing constitutional standard but argues that the  claim is defaulted or cannot be proven................................................................................................ 145

3.   Petitioner has alleged and the affidavits of the jurors demonstrate that the jurors held their viewpoints at the time of voir dire ...................................................................................... 146

4.   Post-verdict statements of jurors as to the accuracy of their responses in voir dire are admissible ........................................................................................................................... 150

5.   A claim that a juror did not answer accurately in voir dire is not waived by a failure to challenge the juror in voir dire unless the defendant was put on notice of the inaccuracy of the juror's response ................................................................................................................... 152

CLAIM XVII. Mr. Austin's Due Process and Eighth Amendment rights were violated when the state relied upon prior convictions for violent and sexual offences where those convictions had been obtained unconstitutionally. ............................................................................................ 153

CLAIM XIX. The execution of the death sentence imposed upon Mr. Austin would be in violation of the Eighth Amendment to the Federal Constitution and Article 1, Section 13 of the Texas Constitution as there has not been searching appellate review of Mr. Austin's conviction and sentence of death due to critical omissions from the record as filed. .................................. 153

CLAIM XX. Mr. Austin is entitled to a new trial where, despite his due diligence, critical parts of the trial record have been lost or destroyed. .......................................................... 153

   1.  No deference is due as there was no state court decision on Mr. Austin's Brady claim.  153

   2.  Contrary to the state's position, Petitioner has shown that significant parts of the state court record are missing and that his claims are cognizable in federal habeas proceedings .. 154

CLAIM XXI. The death penalty imposed upon Mr. Austin is violative of the Fifth, Sixth, Eighth and Fourteenth Amendments to the Federal Constitution and the corresponding provisions of the Texas Constitution where the trial court permitted Mr. Austin to represent himself with the express intention of presenting no mitigation evidence and seeking the death penalty thus denying the defendant and the community a regularly applied, fair, and nonarbitrary capital-sentencing proceeding conducted before a jury ....................................................... 158

CLAIM XXII. The death penalty imposed upon Mr. Austin is violative of the Fifth, Sixth, Eighth and Fourteenth Amendments to the Federal Constitution and the corresponding provisions of the Texas Constitution where the presentation of no defense at all has prevented the conduct of a constitutionally mandated proportionality review. .................................................... 158

   1.  No deference is due as there was no state court decision on Mr. Austin's Brady claim.  158

   2.  The right to self-representation that accompanies the right to present a defense does not trump all other constitutional considerations in our criminal justice system......................... 158

CLAIM XXIII. Mr. Austin is entitled to relief based upon the fact that new evidence shows that he is unquestionably innocent of the offense for which he was convicted and sentenced to death ............................................................................................................................. 166

   1.  No deference is due as there was no state court decision on Mr. Austin's Brady claim.  167

   2.  A claim of innocence is reviewable in federal habeas proceedings, notwithstanding a prior plea of guilty ................................................................................................. 167

CLAIMS  XXV-XXIX: Claims arising from the legislative change to Texas' death penalty statute are neither procedurally defaulted, nor Teague barred.................................................. 170

   1.  Petitioner's claim is not barred in this court as the state's procedural rule applied was not independent and adequate to support the judgment or, in the alternative, cause and prejudice is shown ................................................................................................................... 170

   2.  Petitioner's claims are not Teague barred..................................................... 173

CLAIM XXV. The Eighth and Fourteenth Amendments prohibit the execution of an offender sentenced to death when life without parole was not an available sentencing option ............... 176

   1.  The state has failed to respond in the merits and defaulted its opposition to this claim.. 176

CLAIM XXVI. It violates the Eighth Amendment to execute Mr. Austin where the mitigation sentencing element of the Texas death penalty has been amended to reduce the level of

mitigation necessary to avoid the death penalty and Mr. Austin would not now be sentenced to death .................................................................................................................................. 177

CLAIM XXVII. It violates the Eighth and Fourteenth Amendments to execute a man when the future dangerousness sentencing element by which he became eligible for the death penalty has since been de facto abolished. ................................................................................................ 177

    1.   The changes to the Texas special issue questions have narrowed eligibility for the death penalty .............................................................................................................................. 177

CLAIM XXVIII. It violates the Eighth Amendment to execute Perry Austin where that execution would be arbitrary and would serve no legitimate penological purpose ..................................... 181

    1.   The state has failed to rebut Mr. Austin's argument that executing him would be an arbitrary and hence unconstitutional imposition of the death penalty, which would fail to promote any legitimate penological goals ............................................................................ 181

CLAIM XXIX. By operation of the Due Process and Equal Protection Clauses, and the Eighth Amendment the legislative changes of September 1, 2005 are retroactive to Mr. Austin's sentence and he is innocent of the death penalty as now cast. ................................................ 183

    1.   Mr. Austin did not lose his right to life as a result of conviction and would not open the door to claims of violation of the ex post facto clause ........................................................ 183

CLAIM XXX. Mr. Austin's rights under the Eighth Amendment were violated when the jury's consideration of mitigating factors was unconstitutionally limited by the nexus requirement in the mitigation special issue. ................................................................................................ 184

    1.   Petitioner's claim is not barred in this court as the state's procedural rule applied was not independent and adequate to support the judgment and Petitioner does not seek a new rule of constitutional law .............................................................................................................. 184

    2.   The "moral blameworthiness" instruction does not all relevant mitigating evidence within the "effective reach" of the jury .......................................................................................... 186

CLAIM XXXI. Lethal injection, as respondents administer it in Texas, poses an intolerable and foreseeable risk of causing unnecessary pain, torture, and lingering death, in violation of the Eighth Amendment .......................................................................................................... 192

CLAIM XXXII. Lethal injection, as respondents administer it in Texas, constitutes a violation of Petitioner's first amendment right to free speech and to petition the government ..................... 192

CLAIM XXXIII. In violation of the Eighth Amendment TDCJ are acting with deliberate indifference to Petitioner's medical needs in either refusing to plan for a method of central venous access or in secretly planning to perform medically invasive procedures on petitioner without even minimal proper safeguards in place .................................................................. 192

    1.   Petitioner's lethal injection claims are cognizable in federal habeas ............................. 192

2.   This claim is not defeated by Baze, as an examination of Texas' new and ever changing protocol would show................................................................................................ 193

CLAIM XXXIV. It would violate the Eighth Amendment to execute Mr. Austin when he is incompetent to be executed within the meaning of *Ford v. Wainwright*, 477 U.S. 399, 409-410 (1986)................................................................................................................................ 194

1.   No deference is due as there was no state court decision on Mr. Austin's Ford claim as it remains premature.............................................................................................................. 195

2.   This claim was brought to preserve Mr. Austin's rights but is not yet ripe for determination ...................................................................................................................... 195

**BRIEF IN RESPONSE**

**CLAIM II:  Mr. Austin's rights to Procedural Due Process were violated when, despite sufficient indications of his incompetence, no adequate inquiry was made into his competence to waive counsel, plead guilty and stand trial for penalty.**

**CLAIM III:  Mr. Austin's rights to Procedural Due Process were violated when, despite sufficient indications of his incompetence presented during the trial, the court declined to hold a mid-trial competence hearing.**

**CLAIM XXIV:  Mr. Austin's rights under the Sixth and Fourteenth Amendments were violated when his direct appeal was considered and determined while he was not competent.**

> *1.  Deference and the standard of review*

Under the AEDPA, a federal court must defer to a state court's resolution of a determination on the merits of a federal claim unless the state court's "adjudication of the claim . . . resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); or the state court's "adjudication  of the claim . . . resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(1).

In the present case, this court reviews the question of the adequacy of the trial court's procedures in relation to competency *de novo*. There is no state court decision to which to defer, as no state court has ruled on the merits of this claim, and the last state court to review petitioner's claims dismissed the claim on grounds of procedural default alone.  *See Graves v. Dretke,* 442 F.3d 334, 339 (5th Cir. Tex. 2006) (holding that there is no AEDPA deference when claims were dismissed on procedural grounds in the Texas Court of Criminal Appeals and therefore not "adjudicated on their merits"); *Landry v. Cain*, 445 Fed. Appx. 817, 822 (5th Cir. La. 2011) (same).

The question of whether or not a procedural due process violation occurred is a mixed question of law and fact, and thus in the absence of AEDPA deference is reviewed de novo. *See, e.g., Wright v. Quarterman*, 470 F.3d 581, 591 (5th Cir. Tex. 2006) (holding that review is de novo where there has been no adjudication on the merits in state court); *Solis v. Cockrell,* 342 F.3d 392, 394 (5th Cir. 2003) (same); *Henderson v. Cockrell,* 333 F.3d 592, 598 (5th Cir. 2003) (same); *Johnson v. Cain*, 215 F.3d 489, 494 (5th Cir. 2000) (same); *Miller v. Johnson,* 200 F.3d 274, 281 n.4 (5th Cir. 2000) (same*). See also Perillo v. Johnson*, 79 F.3d 441, 445 (5th Cir.1996) (noting that pre-AEDPA federal habeas court reviews state court determinations of mixed questions of law and fact de novo).

The state incorrectly alleges that Mr. Austin carries the burden of showing, by clear and convincing evidence, that a *Pate* violation occurred at the state criminal proceeding. *Answer* at 19 (citing *Wheat v. Thigpen*, 793 F.2d 621, 629 (5th Cir. 1986) (citing *Bruce v. Estelle*, 483 F.2d 1031, 1043 (5th Cir. 1973)). This position is directly contrary to the text and interpretation of AEDPA. *Miller-El v. Cockrell*, 537 U.S. 322, 341-2 (2003)("AEDPA does not require petitioner to prove that a decision is objectively unreasonable by clear and convincing evidence.")

In any event, the state's argument is a misstatement of *Wheat*, a pre-AEDPA case which holds that a habeas petitioner claiming a *Pate* violation must show by clear and convincing evidence that a "real, substantial and legitimate doubt as to [his] mental capacity" exists. *Wheat* however, is alone in setting this standard for *Pate* claims. As authority for its proposition, *Wheat* cites to *Bruce*, but *Bruce* stands for a wholly different proposition, that a habeas petitioner bringing a *substantive* incompetency claim must show a real, substantial and legitimate doubt as to his mental capacity before habeas relief will be granted. *Bruce v. Estelle*, 483 F.2d 1031, 1043 (5th Cir. 1973).

The present claim is a procedural due process claim and the standard set by *Pate* and *Drope* is the familiar requirement that a court must conduct a competency hearing where there is a bona fide doubt as to the defendant's competency. *See*, *e.g. Mathis v. Dretke*, 124 Fed. Appx. 865, 875 (5th Cir. Tex. 2005). To impose a higher standard than bona fide doubt would run directly contrary to the holdings in *Pate* and *Drope*.

Nevertheless, defendant demonstrates the existence of a bona fide doubt as to his competency by clear and convincing evidence in this case and similarly demonstrates by clear and convincing evidence that the state court failed to observe procedures adequate to protect Petitioner's right not to be tried or convicted while incompetent to stand trial. In these circumstances, Petitioner is entitled to relief regardless of the standard of review.

> **2. In defiance of the record, the state argues that there was no evidence suggesting that an adjudication of competence was required and that, in any event, there was an adequate adjudication of competence**

Regarding the substance of Mr. Austin's claim of a denial of procedural due process, the state alleges in its reply that there was never any evidence supporting a finding of incompetence before the trial court and therefore no adjudication of competence was required (*Answer* at 21).

The state concentrates its argument on the information known to the court on October 11, 2011. The state did not respond to the petitioner's argument that the trial court erred in failing to conduct a mid-trial competency proceeding when presented with new evidence that mandated such or address the evidence that emerged immediately prior to and through the trial.

The state incorrectly asserts that a competency hearing was conducted and a competency determination made at the time of the *Faretta* hearing on October 11, 2011. Answer at 18 & 22.

The state is forced to argue that the October 11, 2001 hearing included a competency hearing in order to resist Petitioner's *Pate* claim. However, the state is then left with the problem

that in violation of the teachings of *Drope* the court never revisited the issue of competency despite the snowballing evidence of incompetence and the proof that the information before the court on October 11, 2001 was false.  The state's solution is to simply ignore the additional evidence of incompetence that emerged and by failing to brief this issue has defaulted its opposition to Petitioner's Claim III.

As detailed in the *Second Amended Petition* and further discussed below, Petitioner clearly demonstrates that by the time of the *Faretta* hearing an adequate competency hearing was constitutionally required.  However, just as in *Drope*, it is not necessary to resolve the question of whether adequate evidence of incompetence was present pre-trial, as whatever doubts the state may raise about the evidence at that time, there was unquestionably sufficient evidence by the end of the trial.  *Drope v. Missouri*, 420 U.S. 162, 177-178 (1975)("It  is unnecessary for us to decide whether such an examination was constitutionally required on the basis of what was then known to the trial court since in our view the question was settled by later events.")

In the alternative, the state argues that the procedures ultimately employed by the trial court meet any federal constitutional due process requirements. *Answer* at 20. As demonstrated in the *Second Amended Petition* and further discussed below, the procedures employed by the trial court failed to meet the constitutional standard and were inadequate to protect Petitioner's right not to be tried or convicted while incompetent to stand trial.

### 3.   *The trial court was presented with more than sufficient evidence to require a competency hearing in this case.*

*Pre-trial evidence of incompetence in this case was sufficient to raise a bona fide doubt, which was found by the trial court.*

Petitioner has detailed the evidence in the record in his *Second Amended Petition* but in the face of the state's claim that the evidence in this case did not present a bona fide doubt as to

Mr. Austin's competency it is appropriate to briefly respond.  Even prior to the *Faretta* hearing on October 11, 2001 and the guilty plea on April 1, 2002, the evidence before the trial court was sufficient to mandate a competency hearing pursuant to the federal constitution, and state law. This evidence is briefly summarized below.

In the first and only substantive motion filed by defense counsel, on May 30, 2001 Mr. Arnold requested a psychological evaluation of Mr. Austin in response to the defendant's "highly unusual behavior." CR 12.

The record contains a series of letters written by Mr. Austin to the trial court, beginning May 15, 2001, in which Mr. Austin advises the trial court:

- that his mental stability has steadily decreased; that he wished no attorneys appointed, intended to plead guilty, give up any appeals and request an execution date (CR 5, 5/15/01);

- that he is in segregation and cannot handle prolonged isolation; that he has a very bad problem with depression; that when depressed he contemplates suicide and that he may commit suicide before trial; that he would be pleading guilty, putting up no defense and requesting an immediate execution date; that he does not plan on being in this world much longer (CR 16, 7/19/01);

- that he wishes the trial brought on sooner because "the sooner we get this circus over with the sooner I can die"; that the court cannot prove that he has a death wish; that he is willing to waive the psychological evaluation; that the psychologist will find him to be a sociopath with no feelings of guilt (notably, this statement directly contradicts his protestations of remorse in his letter of May 15, 2001) (CR 18, 8/8/01);

- that he believes that his sincerity in not defending the charge is being doubted; that he wishes the appointed attorneys discharged; that he does not wish any motions filed nor to participate in jury selection (CR 20, 8/14/01)

Mr. Austin's letters leave not the slightest doubt but that he is depressed, seeking death and seeking it through the court system as quickly as it can be provided and will commit suicide in his own right if a death sentence cannot come soon enough.

Thus at a minimum, the trial court, immediately prior to the *Faretta* hearing, had information indicating that the petitioner (1) was depressed and suicidal; (2) had recently engaged in "highly unusual" behaviors that caused his lawyer to seek a psychological evaluation; (3) viewed a quick trial and death penalty as a solution to feelings of depression and suicidality; (4) would likely kill himself if a death sentence were not received swiftly enough; (5) wished to waive his right to counsel and had offered to assist the state in securing the death penalty against him; and (6) had indicated an intent to deceive the court as to his "death wish" so as to be found competent and secure as quick an execution as possible.

Unsurprisingly, in the face of this evidence, on August 27, the trial court ordered a psychological evaluation. Contrary to the state's claim, a competency evaluation was not ordered at the request of defense counsel (Answer at 20) but was ordered *sua sponte* by the court.[2] RR II at 3-4.

The state -- clearly conscious of the fact that the trial court ordering a competency evaluation on its own motion destroys its claim that there was never a doubt about Mr. Austin's competency -- has overreached in its characterization of the record. The state court stated on the record that it had been unwilling to proceed with the *Faretta* hearing without having a

---

[2] A detailed discussion of the record evidence that the competency evaluation was ordered sua sponte in response to Mr. Austin's conduct is undertaken in Petitioner's discussion of deference in this reply brief.

psychological evaluation accomplished.  RR II at 3-4. Texas courts engage in such initial, informal inquiries regarding competency when faced with "bona fide doubt . . . regarding the defendant's competency to stand trial." *See* former Tx. C.Cr.P. art. 46.03. *See also* Dr. Jerome Brown's letter to the court regarding competency (noting that the evaluation was conducted "pursuant to an order from your court for a competency evaluation").  CR 26.

In the light of the above evidence raising a bona fide doubt about the defendant's incompetence as well as the trial court's own indication that it saw competency as an issue, for the state to allege that there was no bona fide doubt as to the defendant's incompetence pre-trial in this case strains credulity.

The state relies upon *Roberts v. Dretke*, 381 F.3d 491, 496 (5th Cir. Tex. 2004) to suggest that there was no doubt about competency in this case, however, its reliance is misplaced.  In *Roberts*, the defendant through his instructions to counsel caused his trial to be conducted in a manner most likely to result in a conviction and the imposition of the death penalty.

Defense counsel obtained a psychological evaluation, not shared with the court, opining that Roberts was competent and stating

> I cannot conclude that Mr. Roberts suffers from any significant degree of depression . . . or for that matter any other psychiatric disturbance. . . Depression can sometimes affect a person's judgment and decision-making so severely that [he] wishes for premature death, . . . I cannot find that depression exists to such a degree that its presence would coerce Mr. Roberts into seeking the death penalty.

R*oberts*, 381 F.3d at 495.  Trial counsel concluded it was unnecessary to request a competency evaluation and the trial court independently concluded that there was no reason to hold a competency hearing. *Roberts*, 381 F.3d at 495.

A *Pate* claim was brought in state habeas proceedings and denied and was then filed as a part of Mr. Roberts' federal habeas petition.  The district court reviewed the information

17

available to the trial court and concluded that the state court had erred in failing to order a

competency evaluation and the Texas CCA had erred in failing to find a *Pate* violation:

> However, the state trial court did find it was aware the petitioner had (1) waived
> his right to individual voir dire, (2) refused to allow a jury instructions regarding
> the effect of parole on a life sentence, (3) directed his counsel to strike members
> of the jury venire who expressed a philosophical opposition to the death penalty,
> and (4) directed his counsel not to call Dr. Arambula to testify.  Furthermore, this
> Court finds that, because the petitioner specifically mentioned his prior
> hospitalization in connection with a suicide attempt in the course of petitioner's
> videotaped confession to Austin Detective Paul Johnson, which was played in its
> entirety for the state trial court and jury at both the guilt-innocence and
> punishment phases of petitioner's trial, the state trial court was also aware
> the petitioner had a history of suicidal ideation. Given this information, the state
> trial court should have ordered a competency trial for the petitioner. Thus, the
> Texas Court of Criminal Appeals erred when it rejected petitioner's Pate claim in
> the course of petitioner's state habeas corpus proceeding.

*Roberts v. Cockrell,99-01022* (WD Tx. 10/22/02) [37] *Memorandum Opinion and Order* at p.43

(footnotes omitted).   However, unfortunately for Mr. Roberts, his case was governed by

§2254(d)(1) and the district court went on to find that while erroneous, the state court's decision

was not unreasonable under AEDPA. *Id.* at 43-4.

As stated by the Fifth Circuit, "the district court held that the state habeas court erred in

denying Roberts's *Pate* claim, and concluded that the trial court should have ordered a

competency hearing. It, however, further concluded that although the state habeas court's ruling

was incorrect, it was not unreasonable."[3]  *Roberts*, 381 F.3d at 496.  The Fifth Circuit affirmed

the district court's denial, on the same basis that, applying AEDPA's §2254(d) deferential

standard, the state court's ruling was not shown to be unreasonable.  *Roberts*, 381 F.3d at 498

---

[3] In state habeas the *Pate* claim had been brought on the basis of bizarre directives given to trial counsel but the trial
judge had not been present for these conferences with counsel. *Roberts v. Cockrell,99-01022* (WD Tx. 10/22/02)
[37] *Memorandum Opinion and Order* at p.33, fn. 59.  In federal habeas, the *Pate* claim was brought on the basis of
"petitioner's waiver of individual voir dire, history of substance abuse, and indented scar on his forehead."  *Id.* at
p.33.

("The state habeas court's conclusion that Roberts was not entitled to relief under *Pate v. Robinson* is neither unreasonable nor contrary to Supreme Court precedent.")

Of course, in the present case this court is not constrained by §2254(d) and must simply apply the *Pate* standard directly to the record from the state court – a process that would have resulted in relief in *Roberts*. Furthermore, Mr. Austin's case presented far more indicia of incompetence, even by the time of the *Faretta* hearing (including the evidence of depression missing in *Roberts*, the self-destructive case strategy and the active suicidality) and certainly by the time of trial.

The state in its *Answer* quotes the *dicta* from the Fifth Circuit, declining to create a *per se* rule that, as a matter of law either *Pate* or *Dusky* were automatically satisfied if it is obvious to the court that the defendant is causing his trial to be conducted in a manner most likely to result in a conviction and the imposition of the death penalty. *Roberts*, 381 F.3d at 496. It is unsurprising that the Fifth Circuit declined to announce a new rule of law in a federal habeas. It is also unsurprising that the Fifth Circuit would hold that these cases should continue to be assessed on a case by case basis.

Of course, in the present case, the self-destructive trial strategy was far from the only indicia of incompetence and the indicia of incompetence must be considered in the aggregate. *Drope*, 420 U.S. at 179-80 ("in considering the indicia of petitioner's incompetence separately, the state courts gave insufficient attention to the aggregate of those indicia in applying the objective standard"). In *Drope*, the Missouri Supreme Court declined to hold that an attempted suicide as a matter of law gave rise to a bona fide doubt. Applying its holding that indicia of incompetence must be considered in the aggregate, the Court held that it did not need to address the issue of an attempted suicide taken in isolation:

> We need not address the Court of Appeals' conclusion that an attempt to commit suicide does not create a reasonable doubt of competence to stand trial as a matter of law. As was true of the psychiatric evaluation, petitioner's attempt to commit suicide "did not stand alone." *Moore v. United States*, 464 F.2d 663, 666 (CA9 1972).

*Drope*, 420 U.S. 180.

The state invites this court to commit the error in analysis repudiated in *Drope* by focusing only on Petitioner's trial strategy.  This court should decline the invitation.

*Contrary to the State's Answer, the court's colloquy and the evaluation by Dr. Brown were incapable of dispelling the doubt regarding Mr. Austin's competency without a hearing*

On the day of the *Faretta* hearing, the court received a three page report of the competency evaluation from Dr. Brown.  CR 24.  While Dr, Brown opined that Mr. Austin was competent, the report contains information further suggesting the need for a constitutionally adequate competency hearing.  The report advised the trial judge that Mr. Austin: had chosen to spontaneously confess to this capital murder charge, without prompting and without benefit to himself; expected to receive the death penalty; and was willing to testify for the prosecution.  CR 25-6.  It was also clear on the face of the report that the psychologist had relied wholly on an interview with Mr. Austin, had not been aware of the letters sent to the court and defense counsel, and had not questioned Mr. Austin about his mental health history, his depression or his suicide threats.  CR 25-6.

On October 11, 2011, the court conducted a *Faretta* hearing. At this hearing, the court engaged in an unsworn colloquy with Mr. Austin regarding his understanding of his decision to waive counsel.  The colloquy began with a clear statement that the court was conducting its hearing for the purposes of *Faretta*:

> Do you understand this hearing today is for the purposes of the Court deciding whether or not you will be able to represent yourself in the capital murder trial that you are going to inevitably face?

RR II at 5

During this colloquy, which focused on his understanding of his rights, the court asked

four questions relating to Mr. Austin's mental health:

> Court:  Have you ever been declared mentally incompetent?
> Austin: No, ma'am.
> Court:  Have you ever been treated for any mental health disorder?
> Austin: No, ma'am.
> * * * *
> Court:  Ever have any mental health problems while you were in the Army?
> Austin: No, ma'am.
> Court:  Ever seek any mental health counseling while you were in the Army?
> Austin: No, ma'am.

RR II at 6-7.  The fact that Mr. Austin lied about his mental health problems in order to ensure

that he could continue on his suicidal course only underpins the inadequacy of a superficial

colloquy based purely on self-report, particularly in a case where there is evidence indicating that

the defendant is motivated to appear incompetent in order to avoid any legal impediment to his

suicide.

Dr. Brown did not take the stand and indeed was not present in court.  The court did,

however, briefly reference his report as "probative information for the Court on making a

determination on his ability to represent himself. And so it is in the file." RR II at 4.  Also, in

response to a question from the court, defense counsel indicated that he believed that Mr. Austin

was competent. RR II at 5.

The court concluded:

> Let the record reflect then that the Court finds the defendant has sufficient age,
> background, education to understand the implications and dangers of self-
> representation, that he has been informed of the general nature of the offense
> charged and the possible penalties, although the Court finds he is fully aware of
> those . He understands there are technical rules of evidence and procedure with
> which he would be obligated to comply, that he will not be given any special
> consideration due to his lack of training or legal experience.  And he understands
> that he will not be allowed to obstruct the orderly procedure in the Court or
> interfere with the fair administration of justice.  And that although he has no right

to standby counsel, the Court will appoint Mr. Arnold to sit as standby counsel for the course of the trial.

RR II at 15-5.

The court made no competency determination at this time, apparently finding its doubts regarding competency assuaged by Dr. Brown's report, the colloquy with Mr. Austin regarding his mental health history, and defense counsel's statement.  As discussed in more detail below, this approach is inadequate for two reasons.  First, once a reasonable doubt is raised about a defendant's competency to stand trial, that doubt cannot be dispelled by resort to conflicting evidence in the absence of a constitutionally adequate competency hearing.  *Moore v. United States*, 464 F.2d 663, 666 (9th Cir. Cal. 1972).  Second, given the nature of the doubt about Mr. Austin's competency, arising principally from his depression, his suicidality and his effort to use the court to kill himself, the information suggesting competence, which did not address the rationality of Mr. Austin's choice to kill himself in the trial, was insufficient to dispel the doubt created.

*The court heard additional evidence of incompetence by the time of trial, which provided affirmative evidence of incompetence as well as significantly undermining the court's colloquy and Dr. Brown's report*

By the time of trial, the trial court was convinced that Mr. Austin was only representing himself because he wanted the jury to give him a death sentence – even stating as much to jurors in voir dire.  RR VI at 10.  The state questioned prospective jurors about how they would feel about Mr. Austin having a death wish and seeking death for himself. E.g. RR IV at 49.  Consistent with his earlier letters to the court, during voir dire Mr. Austin did not seek to question or challenge any jurors.  Instead he agreed to 67 strikes proposed by the state.  CR 68-9.

Again, consistent with his earlier letters to the court proclaiming his desire to obtain a death sentence, Mr. Austin entered a plea of guilty.

As detailed in the *Second Amended Petition*, during the trial itself the court was presented with significant additional evidence of Petitioner's incompetence.

This evidence included Mr. Austin's letter to Sergeant Allen in which he spontaneously offered to confess to the murder if guaranteed a death sentence and threatened to kill a guard to assure his execution if this were not done. Sergeant Allen read this letter to the court and jury.

Dear Sergeant Allen,

How are you doing?

I hope everything is going well with you. As for myself, well, I'm hoping things will get better. I want to help you out if you'll help me out. I know you want to close that murder case concerning [DK], and I will help you. I will confess to it on several conditions. First, the charge must be capital murder. Second I must be guaranteed the death penalty. This must be guaranteed. If not, then I will kill a T.D.C.J. guard and guarantee myself the death penalty. This, I promise. So help save a life and see if you can get these guarantees for me. Thank you. Sincerely,

Perry A. Austin.

State's Trial Ex. 68; RR X at 25.  This evidence should have made it absolutely clear that Mr. Austin's entire course of conduct was directed to being executed.  It should also have made it clear that his motivation was driven by the desire to die, rather than by remorse for a prior murder.  A rational man tortured by remorse over a murder does not threaten to kill another person if he is not punished for the first murder.  The letter directly conflicts with Mr. Austin's statement to Dr. Brown that he was driven by remorse and matches far more closely to Mr. Austin's earlier suggestion to the trial judge that she could not prove that he had a death wish.

The evidence also included Mr. Austin's second confession to Sergeant Allen, a tape of which was played at trial. RR X at 35, Trial Ex. 78, Petitioner's Ex. 101. In that confession Mr. Austin admitted that he had sent the original letter confessing to the murder because he was "depressed," that the depression had been worsened by being placed in segregation, that he had been experiencing spontaneous crying and that he was currently trying to kill himself via the

courts. Mr. Austin also admitted a lengthy mental health history beginning in childhood and noted that he had been psychiatrically evaluated in relation to a prior criminal trial:

> I've been going to counseling and psychiatrists since I was a kid.  I guess I had behavioral problems and I was always in trouble at school. I was emotionally disturbed, psychiatrist said at my trial that I didn't have no feelings that I had no conscience at all.

Petitioner's Ex. 101.  Mr. Austin concluded by stating that the only reason he had not killed himself is because he believed in hell and that suicide was a sin.

The playing of the tape represents affirmative evidence raising a doubt about Mr. Austin's competence and, in particular, about whether his decisions in the case were rational choices or affected by his mental illness.

Critically, the playing of the tape should also have undermined the trial court's confidence in Dr. Brown's evaluation and its own colloquy.  The court now knew that Mr. Austin had an extensive history of mental health involvement and psychiatric testimony in a previous trial.  The court now knew that Mr. Austin had lied during his colloquy, denying any mental health history in a manner designed to make him appear more competent.  The court now knew that there was significant other information not assessed as a part of the Dr. Brown evaluation and not incorporated into Dr. Brown's conclusions.  The court also knew that Mr. Austin's confession was connected to his depression and the effects of segregation, which only confirmed what the court had learned from Mr. Austin's letters in which he had been complaining to the trial court of depression, his conditions of confinement and his segregation aggravating his depression and suicidality.

In addition, and as discussed in the *Second Amended Petition*, the state introduced into evidence two sets of correctional records containing notations regarding Mr. Austin such as "emotional problems," "very disturbed individual", and "severe character disorder."  *State's*

24

*Trial Exhibits 79 & 81*. These correctional records also include references to two prior suicide attempts,  substance abuse problems beginning at a young age, psychiatric treatment as a juvenile,  and mental health treatment and assessment both prior to and during his service in the army. These documents also detailed Mr. Austin's first criminal offense – the bizarre and disturbing rape of his sisters, indicated that Mr. Austin had been assessed for sanity in relation to that offense, and described a request for psychiatric assistance that he made after that trial. See Second Amended Petition, p. 19 and nt. 51 and 52.

Consistent with his letters, during the penalty phase, Mr. Austin presented no evidence and asked only five questions, all related to the physical appearance of a victim in a prior case. RR IX at 125-126. During his penalty phase closing argument, Mr. Austin discussed his homosexuality, his engagement in anal sex and informed the jury that if they did not sentence him to death he would kill again. RR XI at 15f.

Finally, in the state's closing argument, it read aloud from a letter, written by Mr. Austin after his trial for the aggravated rape of his sisters, to the trial judge who presided over the case:

> As you know, I pleaded insanity. I did not make that plea just to get out of going to T.D.C.  I did it because I want help, and I need help. You have Dr. Louis' [sic] report on me about my case, I know there's something wrong with me and I don't think prisons going to help me any. I want to go to Rusk to get help for my problem. I'm willing to do my time in TDC but I want help before its too late. . . All I'm asking is that you send me to Rusk until the doctors solve me of my problem then go ahead and send me to TDC for life if you want to . . . . All I want is help and I don't think I can live with myself knowing that my problem is still with me.

RR XI at 21-2.  This represented more evidence of mental health problems of a long standing nature but also put the court clearly on notice that Mr. Austin had previously been tried on an insanity plea and that a mental health report had been prepared.

The additional evidence received after the *Faretta* hearing (at which the state claims a competency hearing was conducted and a competency determination was made) was of

overriding significance for two reasons. First, it provided significant additional positive evidence of petitioner's mental illness and of the fact that his mental illness was driving his avid pursuit of the death penalty in this case. Secondly, this evidence obviously contradicts Mr. Austin's protestations of a lack of mental health history in his colloquy with the court, and specifically contradicts the answers he gave to the court regarding his mental health history while in the military. Moreover, all of this information regarding Mr. Austin's mental health history is information to which Dr. Brown apparently did not have access, and thus undermines the reliability of his conclusions. Objectively, a bona fide doubt was raised and could not be dispelled by the factually inaccurate indicia of competence, which did not directly address the doubt, in any event.

In sum, the state's allegation that "the trial court was neither presented with, nor itself became aware of, *any evidence* capable of supporting a finding of incompetence," (Answer at 21, emphasis added) in this case simply does not bear scrutiny. There was more than enough evidence of a relevant mental health issue before the court prior to trial to constitute a bona fide doubt. The trial court did initiate a competency evaluation as a result of such a doubt. A large amount of additional evidence was then presented at trial, evidence which both added to the positive case for incompetence and fatally undermined the thin evidence for competence then before the court. A more detailed analysis of the import of the evidence is contained below and in the affidavits of the mental health experts.

The *Drope* opinion teaches that competency is not immutable and that the trial court must be alert to respond to new evidence of incompetence. *Drope*, 420 U.S. at 181. This standard was also reflected in the statutory scheme operating in Texas at the time. Tex. Code of Crim. Proc. Art. 46.02(2)(b)("If during the trial evidence of the defendant's incompetency is brought to

the attention of the court from any source, the court must conduct a hearing out of the presence of the jury to determine whether or not there is evidence to support a finding of incompetency to stand trial."). The state court followed neither prescription.

The state cannot credibly argue that the additional information received during trial was not important and did not raise a doubt about Mr. Austin's competence and cast doubt on the value of the prior assessments. Dr. Brown himself, when advised of the voluminous records not made available to him in his original evaluation and the type of material contained therein expressed the opinion that information relevant and significant to the evaluation was withheld. . Petitioner's Ex. 96. Dr. Brown stated that records of Mr. Austin's past psychiatric problems might have provided information critical to the determination of his competency to stand trial. Petitioner's Ex. 96. Based on the historical information obtained from reading Dr. Cicerello's affidavit, Dr. Brown expressed the opinion that it was possible that Mr. Austin's judgment was significantly impaired by his mental difficulties at the time that Dr. Brown saw him. *Id.*.

Dr. Brown has now provided an affidavit to the state to the effect that having reviewed the additional materials he maintains his original opinion. This, however, is beside the point as the question to be answered in the present case is whether, applying an objective test, a bona fide doubt existed as to Mr. Austin's competency. Dr. Brown acknowledges that the fact of the previously undisclosed records, given their nature, create a doubt, even if on closer review he did not find a compelling reason to change his original opinion. *Respondent's Ex. A* at 1-2.

### 4. *The minimal procedures that were employed in this case did not meet federal due process standards.*

The state next alleges that even if a competency hearing were required, the procedures utilized in this case suffice. In reality, however, it can in no way be said that the minimal process that was provided in this case meets the federal constitutional standard. The Constitution

requires that state courts "observe procedures adequate to protect a defendant's right not to be tried or convicted while incompetent to stand trial." *Drope*, 420 U.S. at 172.  One aspect of this requirement is that where a bona fide doubt is raised about competency, the court must conduct an adequate hearing to determine the defendant's competency.  *Id.*

In assessing the adequacy of state procedures against this standard, one question a court should ask is whether the procedures adopted were adequate to confidently resolve the doubt that had been created, having regard to the nature of the doubt created in a particular case.  In the present case the doubt created centered most particularly on Mr. Austin's capacity for rational understanding or, put another way, his capacity for rational choice in the case.

The state claims that a competency hearing was conducted on October 11, 2011 and that the trial court made a competency determination.  *Answer* at 18, 20.  As detailed above, this is simply not the case.  Given the doubt created in this case, the state court erred in failing to conduct a competency hearing.

However, because the state argues that the procedure followed in the trial court was adequate to meet constitutional standards a review of the inadequacy of that procedure is required. The procedures the state relies upon are detailed at *Answer* p.20 and comprise: Dr. Brown's report of September 25, 2011; counsel's opinion as to Mr. Austin's competency; and, the trial court's *Faretta* colloquy on October 11, 2011.

Petitioner relies upon his *Second Amended Petition* and emphasizes the following points below: the procedure adopted was on any view superficial and minimal; the procedure did not meet accepted standards under the federal Due Process Clause for determining competency; the procedures did not address the affirmative evidence of incompetence, but instead sought to dispel it with other evidence of competence; the psychological examination relied upon was not

adequate to meet constitutional standards, failing to meet prevailing standards for forensic mental health assessments, failing to meet the requirements of the Texas competency statute; and failing to address the central question of Mr. Austin's capacity for rational understanding; the colloquy was wholly inadequate to address the doubt raised; and, counsel's opinion was also inadequate.

The state argues through the affidavits of Dr. Brown and Dr. Allen that the procedures used in the evaluation were adequate. However, this position is overwhelmingly rebutted by the affidavits of Drs. Hielbrun, Connell, Woods and McGarrahan ('nee Cicerello) attached to the original petition along with the specific rebuttal contained in the affidavits of Dr. Hielbrun, McGarrahan and Woods attached to this Response.[4]

*The procedures utilized were minimal.*

As described above, once Mr. Austin indicated to the court his desire to waive counsel and represent himself, the court appointed a psychologist to evaluate him. RR2 at 3-4. On September 25, 2001, psychologist Jerome Brown saw Mr. Austin briefly. A copy of Dr. Brown's file as it existed at the time of post-conviction consultation with Dr. Brown is attached as Ex. 119. Dr. Brown reviewed no records, performed no testing and spoke to no collateral sources. Dr. Brown was not even given a copy of the letters from Mr. Austin to the court. Mr. Austin declined to inform him, or was not asked, regarding his extensive mental health history. Mr. Austin refused to discuss his criminal history in any detail, in particular not revealing the disturbing nature of his prior offending and his previous insanity plea. Dr. Brown did not attempt to diagnose Mr. Austin or in any way engage with the evidence of depression or

---

[4] Funding was sought to obtain a responsive affidavit from Dr. Connell but this request was denied. The absence of a response from Dr. Connell should not be taken as any form of acquiescence to the state's Answer.

suicidality that was before the court, but as to which Dr. Brown was apparently uninformed. *See* CR 23-26 (Dr. Brown's report).

On October 11, 2011, after the psychologist issued his report finding Mr. Austin to be competent, the court addressed the defendant's request to represent himself. The judge spoke to the defendant briefly applying a standard form *Faretta* colloquy, asking questions regarding education, ability to communicate, and understanding of the law and the rights he was waiving. Mr. Austin assured the court that he understood the right he was waiving and, as noted above, falsely asserted that he had no history of mental health problems. RR II at 5f.   Neither on October 11, 2001 nor on any other date did the trial court conduct an actual, focused inquiry into petitioner's competency resulting in a finding to which deference is due.

Dr. Brown did not take the stand and indeed was not present in court; the court briefly referenced his report as "probative information for the Court on making a determination on his ability to represent himself. And so it is in the file."  RR II at 4. Mr. Austin's appointed counsel were present, but made no attempt to represent Mr. Austin. When asked by the court whether he had anything to say, attorney Mack Arnold said that he believed that Mr. Austin was competent.[5] RR II at 4.

Facts supportive of a finding of incompetence that had previously come to the court's attention were not referenced, explored, examined or dispelled. The court did not attempt to elicit evidence regarding defense counsel's original report of "highly unusual behaviors," or question the defendant or anyone else regarding the many letters he sent to the court indicating that he was depressed, suicidal, and actively seeking the death penalty. The court did not attempt to

---

[5] After the colloquy and the court's finding that Mr. Austin could represent himself, Mr. Arnold asked four questions of Mr. Austin so to establish that his desire to go pro se was not due to any conflict with defense counsel.  RR II at 15-6.

secure or review records of the defendant's current or prior mental health, not even from his current custodian.

On April 1, 2002, the judge and the defendant engaged in another colloquy regarding the guilty plea; again, Mr. Austin assured the court that he understood his rights and (again falsely) denied any mental health history or issues. RR IX at 4-6.  The court allowed Mr. Austin to plead guilty and represent himself in his capital case.[6]

On April 4, 2002, after hearing all of the evidence and after Mr. Austin had been sentenced to death the trial court engaged in another pro forma colloquy regarding Petitioner's desire to waive appellate and post-conviction counsel.  RR XII at 4-8.  Extraordinarily, the court again asked whether Mr. Austin had been treated for any mental health disorder and accepted Mr. Austin's "No" without comment, despite having heard evidence that he had been going to counseling and psychiatrists since he was a child and had plead not guilty by reason of insanity at an earlier trial.

None of these minimal procedures individually or together are adequate to meet the constitutional requirement for an adequate hearing once a bona fide doubt is raised.

*The procedures employed in this case were inadequate in that they failed to address the affirmative evidence raising a bona fide doubt about competence and could not dispel that doubt by pointing to other indicia of competence.*

Even if a state were entitled to adopt a procedure that allowed a judge to conduct no hearing despite a bona fide doubt about competency, the procedure adopted here is patently inadequate to meet the Due Process requirements.

*Pate* and *Drope* are the two leading U.S. Supreme Court cases on the right to an adequate procedural determination of competency. The precise holdings and underlying facts in these

---

[6] It had now been six months since the *Faretta* hearing but no competency inquiry was made.

cases are particularly illuminating in determining what constitutes adequate procedures in this case.

In *Pate*, the Supreme Court held that due process had been violated because, as in the present case, the state court had failed to follow a state statute requiring that a jury be impaneled where there was a bona fide doubt of defendant's competence. The Court found that the evidence of the defendant's past "pronounced irrational behavior" that was presented at trial required a stand-alone competency hearing in spite of other evidence of competency, i.e., the trial court's assessment of its colloquies with defendant and the stipulation that a psychiatrist would testify that the defendant "knew the nature of the charges against him and was able to cooperate with counsel when he examined him two or three months before trial." *Pate*, 383 U.S. at 383; see also *id.* at 386. The *Pate* court held that "[w]hile [the defendant's] demeanor at trial might be relevant to the ultimate decision as to his sanity, *it cannot be relied upon to dispense with a hearing on that very issue.*" (emphasis added). In other words, when, as in *Pate*, evidence of significant past irrational behavior and underlying mental illness creates a bona fide doubt as to competence, the procedures chosen must allow for this doubt to be specifically addressed; this doubt cannot simply be dispelled by the acknowledgement of positive evidence of competence that does not dispel the evidence creating the doubt about competency.  The evidence from the court colloquies and the psychological report in *Pate* did not dispel the doubt raised by the defendant's past irrational behavior because the colloquies and brief assessment did not engage with, much less resolve, the relationship of that past behavior and apparent mental illness to the defendant's competence.  The same is true here, where neither the colloquy nor the evaluation of Dr. Brown served to dispel the evidence creating the doubt.

Notably, the state's argument in the instant case almost precisely echoes the dissent in *Pate*. The *Pate* dissent acknowledges the evidence of past irrational behavior and apparent mental illness, but notes that, on the record that exists, "I cannot say as a matter of common knowledge that it evidences incapacity during the trial." Therefore the dissent *disregards* this evidence, and substitutes the evidence of the defendant's colloquies with the court, the opinion from the psychologist, and the statement by Pate's own lawyers that the defendant had demonstrated "lucidity" during the trial. This reasoning, however, was rejected. The majority in *Pate* does not discount these three factors, but notes, again, that they do not dispense with the bona fide doubt based upon the past irrational behavior, nor with the hearing that is therefore required.

> The Supreme Court of Illinois held that the evidence here was not sufficient to require a hearing in light of the mental alertness and understanding displayed in Robinson's "colloquies" with the trial judge. 22 Ill. 2d, at 168, 174 N. E. 2d, at 823. But this reasoning offers no justification for ignoring the uncontradicted testimony of Robinson's history of pronounced irrational behavior. While Robinson's demeanor at trial might be relevant to the ultimate decision as to his sanity, **it cannot be relied upon to dispense with a hearing on that very issue**. Cf. *Bishop v. United States*, 350 U.S. 961 (1956), reversing 96 U. S. App. D. C. 117, 120, 223 F.2d 582, 585 (1955).

*Pate v. Robinson*, 383 U.S. 375, 385-386 (U.S. 1966)(emphasis added). The Court's reliance on *Bishop* is also instructive. In *Bishop* the Court summarily reversed a denial of a §2255 competency claim and remanded for an evidentiary hearing. A review of the underlying opinion in *Bishop* demonstrates far more extensive evidence to support competency[7] that exist in the present case but the Court nevertheless required that a hearing on competency be conducted. *Bishop v. United States*, 350 U.S. 961 (1956), reversing 223 F.2d 582 (1955).

Similarly, in *Drope v. Missouri*, 420 U.S. 162, 95 S. Ct. 896, 43 L. Ed. 2d 103 (1975), the Supreme Court concluded that the state court "fail[ed] to give proper weight to the information

---

[7] The D.C. Court of Appeals listed seven items supporting competency. *Bishop*, 223 F.2d at 585-586.

suggesting incompetence which came to light during trial." This evidence included a history of irrational behavior (though not as pronounced as in *Pate*), as well as a suicide attempt during trial  Like the dissenting justice in *Pate*, the state court in *Drope* discounted this evidence in favor of  evidence apparently supportive of competence, e.g.,  the defendant's demeanor at trial. The Supreme Court, citing *Pate,* noted that while demeanor at trial is relevant, this understanding "offers no justification for ignoring the uncontradicted testimony of . . .[a] history of pronounced irrational behavior." Both demeanor at trial and a history of irrational behavior are relevant to competency; if one of these factors, however, is sufficient to engender a doubt, then procedures must be put in place that are capable of exploring and resolving that doubt. In *Drope*, that meant that adequate procedures had to address not just competence in general terms, but the relationship between the defendant's apparent mental illness and his competence or lack thereof. "Whatever the relationship between mental illness and incompetence to stand trial, in this case the bearing of the former on the latter was sufficiently likely that, in light of the evidence of petitioner's behavior including his suicide attempt. . . the correct course was to suspend the trial until such an evaluation could be made." *Drope*, 420 U.S. 908-9.

Following *Pate* and *Drope*, courts faced with this issue have held that once there is evidence raising a doubt about competence, that evidence cannot be dispelled by resort to conflicting evidence; an evidentiary hearing must be conducted.  *Moore v. United States*, 464 F.2d 663, 666 (9th Cir. Cal. 1972)("Once there is such evidence from any source, there is a doubt that cannot be dispelled by resort to conflicting evidence."); *see also McMurtrey v. Ryan*, 539 F.3d 1112, 1126 (9th Cir. Ariz. 2008)(same); *Campbell v. Lockhart*, 789 F.2d 644, 646 (8th Cir. Ark. 1986)(same); *Lindhorst v. United States*, 658 F.2d 598, 607 (8th Cir. 1981)(same)

In the instant case, the doubt stems from, *inter alia*, evidence of past mental illness that is in some ways more marked than in *Pate* and *Drope* in that it relies on actual diagnoses rather than simply past behavior, and in that Mr. Austin's letters and statement to Sgt. Allen clearly connect the defendant's depression and suicidality to his decisions to confess, waive counsel, plead guilty and seek execution. As in *Drope* and *Pate*, the procedures the trial court follows – the colloquies with the defendant and the seeking of a psychological report – are inadequate in that they do not address the relationship between Mr. Austin's depression and suicidality on the one hand and his competence on the other. As in *Pate* and *Drope*, unrelated evidence of competence—Mr. Austin's colloquy with the court (in which Mr. Austin denies any mental illness), a psychological assessment (which fails to address Mr. Austin's depression and suicidality or mental health history), and a statement by defense counsel -- are insufficient to dispel the original doubt. Further proceedings are required.

The very minimal procedures in this case do not meet federal standards and are not a substitute for a hearing.  In *Pate*, the Supreme Court held that the conviction of an accused person while he is legally incompetent violates due process, and that "state procedures must be adequate to protect this right." *Pate*, 383 U.S. at 378 (1966)). "The failure to observe procedures *adequate to protect a defendant's right not to be tried or convicted while incompetent* to stand trial deprives him of his due process right to a fair trial." *Drope*, 420 U.S. at 172 (emphasis added). *See also Mata v. Johnson*, 210 F.3d 324, 329 (5th Cir. Tex. 2000) ("A habeas petitioner may, on collateral review of his state conviction, obtain relief *if he can show that the state procedures were inadequate to ensure that he was competent to stand trial*." (*citing Carter v. Johnson*, 131 F.3d 452, 459 n.10 (5th Cir. 1997), *Pate v. Robinson*, 383 U.S. 375, 15 L. Ed. 2d 815, 86 S. Ct. 836) (emphasis added)).

In *Drope*, the U.S. Supreme Court makes clear that federal courts have not specified a definitive set of procedures required in every case, as what is required to determine competence varies depending upon the nature of the evidence before the court.

Moreover, the ongoing duty of the court to assess competency is not extinguished once an initial competency determination is completed; the issue must be reassessed if new evidence surfaces of the defendant's incompetence.  *Drope*, 420 U.S. at 181 (1975).  *See also State v. Snyder*, 874 So. 2d 739, 742-743 (La. Apr. 14, 2004). As in *Drope,*  the state court in this case "fail[ed]to give proper weight to the information suggesting incompetence which came to light during trial." *Drope*, 420 U.S. at 179. *See also Burt v. Uchtman*, 422 F.3d 557, 566 (7th Cir. 2005) (requiring renewed competency hearing  because of facts that came out during trial).

Procedures for lawyers that have been required in competency cases and cited approvingly by the Fifth Circuit include, in *Mata v. Johnson*, a preliminary hearing to determine necessary procedures, a "team of psychiatrists and psychologists," follow-up and repeat examinations of the defendant, examination of records, and evidentiary hearings including live testimony by experts as well as by the defendant. *Mata v. Johnson*, 210 F.3d 324 (5th Cir. 2000) (citing *Rumbaugh v. Procunier*, 753 F.2d 395, 396 (5th Cir. 1985), *Ford v. Haley*, 195 F.3d 603 (11th Cir. 1999)). In *Wheat v. Thigpen*, the Fifth Circuit, in rejecting the challenge to the competency determination below, explicitly approved the procedures utilized by the district court, including an evidentiary hearing featuring the testimony of state, defense and court experts, deposition testimony from the state court judges, and trial transcripts. *Wheat v. Thigpen*, 793 F.2d 621, 631 (5th Cir. 1986).  *See also Floyd v. United States*, 427 F.2d 63, 65 (5th Cir. 1970) (approvingly noting that district court relied on "testimony and depositions" not merely on hospital and medical reports and records). Similarly, in *Bruce v. Estelle*, the trial court heard

36

testimony from multiple doctors, reviewed medical records, and listened to the testimony of lay witnesses. *Bruce v. Estelle*, 483 F.2d 1031, 1033 (5th Cir. 1973) *overruled on other grounds by Zapata v. Estelle*, 585 F.2d 750 (5th Cir. 1978).

Because Mr. Austin's then counsel sat out the *Faretta* hearing, and because Mr. Austin himself was advocating to be found competent, the proceedings in this case entirely lacked any elements of adversarial testing. The U.S. Supreme Court has identified adversarial testing as particularly critical to an adequate finding of competence. In *Ford v. Wainwright*, the United States Supreme Court assessed the procedures used to determine competency to be executed in Florida, noting that "the lodestar of any effort to devise a procedure must be the overriding dual imperative of providing redress for those with substantial claims and of encouraging accuracy in the factfinding determination. The stakes are high, and the 'evidence' will always be imprecise." In pursuit of that accuracy, the court highlighted the importance of elements of adversarial testing completely lacking in Mr. Ford's (and Mr. Austin's) cases: the court's weighing and considering of different psychiatric opinions, the cross-examination and challenging of psychiatric opinion, and the presentation of evidence by all sides. The court opined:

> In *Ake v. Oklahoma*, 470 U.S. 68 (1985), we recognized that, because "psychiatrists disagree widely and frequently on what constitutes mental illness [and] on the appropriate diagnosis to be attached to given behavior and symptoms," the factfinder must resolve differences in opinion within the psychiatric profession "on the basis of the evidence offered by each party" when a defendant's sanity is at issue in a criminal trial. *Id.,* at 81. The same holds true after conviction; without any adversarial assistance from the prisoner's representative -- especially when the psychiatric opinion he proffers is based on much more extensive evaluation than that of the state-appointed commission -- the factfinder loses the substantial benefit of potentially probative information. The result is a much greater likelihood of an erroneous decision.

*Ford v. Wainwright*, 477 U.S. 399, 414 (U.S. 1986).

In *Floyd v. United States*, 427 F.2d 63, 65 (5th Cir. 1970), the Fifth Circuit remanded for a new competency hearing, the results of which it ultimately upheld. In contrasting the new

hearing with the old, the court approvingly cited data tested by the adversarial process. The Court noted that on remand the trial court had held a "full hearing at which Floyd was well represented," and that "[u]nlike the earlier consideration leading to our reversal, the Court acted on testimony and depositions, not merely on hospital and medical reports and records, although such reports were used." In *O'Rourke v. Endell*, 153 F.3d 560 (8th Cir. 1998), the Eighth Circuit reviewed a competency hearing in which the defendant's appointed counsel took the position that the defendant was competent.   153 F.3d at 565.   The Eighth Circuit determined that the defendant "should have been represented by an attorney, either a counsel of record or a 'next friend,' to argue [the contrary position]," and concluded that the "court's failure to appoint such a representative resulted in an evidentiary hearing on [the defendant's] competence that failed to develop adequately all material facts, that was neither full nor fair, and that did not afford [the defendant] the process he was due." *Id.* at 569.  The Tenth Circuit reached a similar conclusion in *Collins,* reversing where counsel, although present at competency hearing, did not "subject the prosecution's competency case to 'meaningful adversarial testing.'" *Collins,* 430 F.3d at 1265-66 (citation omitted). *See also Smith v. Armontrout,* 626 F. Supp. 936, 939 (W.D. Mo. 1986) (holding that "the underlying procedures used in state court [to determine competence to waive appeals] were wholly inadequate," noting in particular the lack of adversarial process).

Courts have held that due process requires that defense counsel test the government's case regarding competency, even over the objection of the defendant.  "The desire of a defendant whose mental faculties are in doubt to be found competent does not absolve counsel of his or her independent professional responsibility to put the government to its proof at a competency hearing when the case for competency is in serious question." *Wilcoxson v. State,* 22 S.W.3d 289, 305-06 (Tenn. Crim. App. 1999) (*citing Hull v. Freeman*, 932 F.2d 159, 168 (3d Cir. 1991)

(overruled on unrelated grounds by *Coleman v. Thompson*, 501 U.S. 722 (U.S. 1991)); *Appel*, 250 F.3d 203 (counsel must advocate for defendant during competency hearing regardless of defendant's wishes); *Shepard v. Superior Court of Los Angeles County,* 180 Cal.App.3d 23 (1986) (holding trial court erred by removing counsel who would assert defendant's incompetence over defendant's objection).

5. ***The psychological examination that formed a part of the state procedures relied upon was not adequate.***

*The state relies upon a minimalist psychological evaluation to absolve the trial court of the need to conduct a competency hearing*

The state relies upon the evaluation conducted by Dr. Brown as absolving the trial court of the need to conduct a hearing, despite the evidence raising a doubt as to competency. For this reason, careful review of the adequacy of Dr. Brown's assessment is appropriate to determine whether it can carry this burden. The petitioner's due process challenge is of course to the procedures utilized and relied upon by the court, not the court appointed expert; but an analysis of the inadequate nature of the mental health evaluation is necessary in order to properly assess how much reliance can be placed on the results of that evaluation. Federal and state courts have weighed in regarding the baseline requirements of mental health examinations for purposes of competency determinations, noting in particular the importance of the study and analysis of records, follow-up evaluations, and the administration of psychological testing. *See e.g., Ford v. Wainwright,* 477 U.S. 399, 415, nt. 3 (U.S. 1986); *Mata v. Johnson*, 210 F.3d 324 (5th Cir. 2000) (*citing Rumbaugh v. Procunier*, 753 F.2d 395, 396 (5th Cir. 1985); *Ford v. Haley*, 195 F.3d 603 (11th Cir. 1999); *Bruce v. Estelle*, 483 F.2d 1031, 1033 (5th Cir. 1973) *overruled on other grounds by Zapata v. Estelle*, 585 F.2d 750 (5th Cir. 1978); *Brown v. Sternes*, 304 F.3d 677, 696-

7 (7th Cir. 2002) (finding that the analysis of records is an essential part of any assessment of competency to stand trial).

As noted above, the court appointed psychologist in this case, Dr. Jerome Brown, met only briefly with the defendant on a single occasion, took a page of notes and wrote up a three page report. Dr. Brown did not conduct a medical examination of Mr. Austin. He did not administer any psychometric or other testing.  He did not attempt to determine whether Mr. Austin suffered from a diagnosable mental illness. He did not attempt to determine whether Mr. Austin was taking any psychiatric medication. He examined no collateral records, regarding either past mental health history or the defendant's current functioning at the jail.  He conducted no collateral interviews regarding Mr. Austin's mental state or functioning.  He accepted Mr. Austin's statements as accurate. CR at 23-26.

In fact, Dr. Brown relied wholly upon the self-report of Mr. Austin in a brief interview to conclude that Mr. Austin was "competent to stand trial" in a capital case in which the death penalty was the expected punishment. His conclusion was based largely on the following data points:  (1) Mr. Austin appeared to have average intelligence; (2) Mr. Austin manifested no obvious signs of severe[8] mental illness, i.e., "severe" psychosis, brain damage or mental retardation, during the time he spent with him; and (3) Mr. Austin claimed to be pursuing the death penalty because he committed the crime and felt guilty. CR at 23-26.

Particularly given the complexity of the defendant's mental health issues, the nature of the doubt about competence in the case and the seriousness of the case, Dr. Brown's examination

---

[8] Dr. Brown, in his affidavit submitted by the state, offers that he has conducted 'thousands' of competency evaluations. In all of these cases, he relies solely on the defendant's self-report and assumes the defendant's competence unless glaring evidence of severe mental illness – specifically, mental retardation, brain damage or psychosis -- manifests during the brief encounter. He did not alter this procedure in this case despite indications that mental illness had substantially affected Mr. Austin's decision to waive his rights, and despite the exceptional seriousness of the case.

does not represent an adequate procedure for protecting a defendant against the risk of being tried while incompetent. As described below, the evaluation fails to meet the basic standard of care in the profession of forensic mental health, highlighting its limitations and lack of reliability. Similarly, it fails to meet the current statutory requirements in Texas state court. Critically, it fails to address or answer the central question at issue and the source of the doubt as to competence in this case – Mr. Austin's rational understanding and ability to make rational choices in the case.

*The standard of care in forensic mental health assessments is designed to ensure the adequacy and reliability of evaluations and confirms the inadequacy of the psychological evaluation in this case.*

Dr. Kirk Heilbrun, the author of *Principles of Forensic Mental Health Assessment* and an acknowledged authority on forensic mental health evaluations, has authored a second affidavit to respond to the assertions in the state's answer as well as to Drs. Brown and Allen's affidavits for the state. Petitioner's Ex. 107 *Affidavit of Kirk Heilbrun*. In his first affidavit, Dr. Heilbrun concluded that Dr. Brown's examination does not meet the standard of care in the field of forensic mental health assessments. Petitioner's Ex. 90. Dr. Brown's assessment falls short of this standard in a number of ways. First, the doctor utilized inadequate sources of information, relying solely upon the defendant's self-report and declining to make use of psychological testing, collateral interviews or records. This neglect of alternative sources and any attempt at verification of findings flies the face of "at least 25 years of research, scholarship, training, forensic ethical guidelines, and professional practice literature." Petitioner's Ex. 107, 3. Second, Dr. Brown neglected to analyze the defendant's motivation to proceed pro se, despite numerous reasons for concern in the content of the interview itself. Third, the "length and depth" of the evaluation and report are inadequate. Dr. Heilbrun found that the issue posed by the case – the

question of whether the defendant's actions "is deliberately self-destructive behavior, and what motivates such behavior – is complex, "and should be considered in depth" rather than in two and a half pages. Petitioner's Ex. 90, 9226-9227; see also Petitioner's Ex. 107 at 3. *Id.*; *See also* Petitioner's Ex. 91 *Statement of Dr. Mary Connell*.

Dr. Brown states in his affidavit, attached to the state's Answer, that his method of competency evaluation is essentially to rely on the defendant's self-report and assume the defendant's competence unless evidence of severe mental impairment – specifically, mental retardation, brain damage or psychosis -- manifests during the interview or, if the defendant is claiming impairment. State's Exhibit A at 3. This form of assessment is ill adapted to deal with a defendant who is denying impairment.

Dr. Heilbrun acknowledges that in certain situations, a brief exam such as used by Dr. Brown might be adequate, but that it is patently inadequate in such a "complex and high stakes case" as Mr. Austin's, particularly one in which the connection of Mr. Austin's depression and his motives to seek the death penalty had already been raised via Mr. Austin's letters to the court:

> It is certainly possible to identify overwhelming problems affecting trial competency in a brief evaluation.  For example, an individual who is agitated, disheveled, incoherent, and highly suspicious may not require many other sources of information (or even a lengthy interview) to document present incapacity to proceed.  However, the evaluation of trial competency must take into account not only symptoms and related capacities, but the demands on the defendant as part of proceeding with disposition of charges.  The present case, in contrast to the very simple example cited earlier in this paragraph, involves an individual with some history of depression and suicide attempts who is expressing a preference to plead guilty with the expectation that this will result in his execution.  This is a complex and high-stakes case, requiring that a reasonable evaluation consider whether this preference is being substantially affected by depression or other psychopathology.  This is a difficult question to answer, requiring procedures that go substantially beyond self-report as part of the evaluation.
>
> * * * *
>
> When an evaluator decides that he/she will address only minimal levels of capacity, and then draws a conclusion about the defendant's trial competence in light of that minimal-capacity opinion, it can be difficult for the judge to

> disentangle this opinion.  For instance, if Mr. Austin showed adequate capacities
> to understand his charges, the possible penalties upon conviction, and the
> adversarial nature of the legal system, and could express himself reasonably well
> in talking with counsel and in possible testimony, that might suggest "minimally
> competent" capacities.  However, if he were also depressed and wished to be
> executed largely as a result of this depression, this might not be considered fully
> with the "minimal competence evaluation" approach.  The trial judge could then
> not hear the nuanced details of this aspect of trial competency when reading such
> a minimal-standard report or hearing testimony.

Petitioner's Ex. 107 at 2.[9] In other words, Dr. Brown incorrectly limited the content and breadth

of his competency evaluation to issues of factual understanding of the proceedings and minimal

communication ability only, in order to conform to his idea of a "minimum" competency

standard. Dr. Heilbrun concluded that this does not encompass all possible manifestations and

sources of competency and overly limits the information provided to the court. Petitioner's Ex.

107 at 4. Similarly, Dr. McGarrahan criticized Dr. Brown for attempting to meet a surmised legal

standard of proof rather than provide an opinion within a reasonable degree of

psychological/medical certainty. Petitioner's Ex. 108, 7-8.

> Dr. Heilbrun also criticized Dr. Brown for defining the scope of disorders that could

contribute to a defendant's incompetency and the possible evidence of incompetency, overly

narrowly:

> Dr. Brown defines the scope of disorders that could contribute to a defendant's
> incompetency, as well as the evidence for this incompetency observed upon
> interview, in a narrow fashion.  I would agree that the great majority of cases in
> which defendants are adjudicated incompetent for trial involve such disorders,
> and feature defendants who show overt signs of incompetency during interview.
> That is very different from saying that these are the only disorders that could
> render a defendant incompetent, or the only reason to collect additional
> information is when overt problems are seen during the interview.  For example,
> serious depression that would substantially impair a defendant's rational decision-
> making and capacity to work with counsel in his/her own defense might not be
> obvious during the interview—but could have a very significant impact on the
> defendant's relevant capacities.

---

[9] Notably, in comparison with Dr. Brown's very brief interview, Dr. McGarrahan spent six hours with petitioner, and Dr. Woods spent 12. 5 hours with him over the course of four separate meetings. See Petitioner's Exs 108, 109.

Petitioner's Ex. 107 at 5. See also Petitioner's Ex 108 (McGarrahan) at 7-8 ("It is short-sighted and grossly underestimates the impact of mental illness of we limit the conditions relevant to competency to those suggested by Dr. Brown.").

Dr. Antoinette McGarrahan, who conducted a six hour neuropsychological evaluation in this case, discusses specifically in her affidavit how the brevity of Dr. Brown's examination, its reliance solely on the defendant's self-report and its limited understanding of issues relevant to competency caused him to miss the significant brain damage at issue in this case:

> Drs. Allen and Brown argue that psychological and neuropsychological testing is not important to a determination of competency. However, the deficits observed and present upon neuropsychological testing that were seen with Mr. Austin are susceptible to being missed with a very brief unstructured type interview, especially because of the superior verbal and memory abilities with which Mr. Austin presents. These abilities allow him to appear, on the surface, much higher functioning then is actually the case, as the high verbal skills "mask" the underlying deficits with problem solving, decision making, rational reasoning, et cetera.  In fact, because of the very brief and content –limited evaluation of Dr. Brown 'evaluation," it was not surprising to see that Dr. Brown felt that Mr. Austin was able to "engage in conversation" with him and that the conversation itself did not elicit "red flags" as to his competency.  Had there been a longer interview and more information obtained, the "red flags" (i.e., deficits in rational understanding) would have become more readily apparent.

Petitioner's Ex. 108 at 6. The same limitations caused Dr. Brown to neglect entirely the "rational" portion of a competency evaluation:

> Although I agree with Dr. Allen that "most" competency examinations are routine, I disagree that it merely requires questioning specific to competency material, such as "what are you charged with?, do you have an attorney?, etc.," as this completely misses the idea of the "rational" portion of the statute and will certainly lead to false positive findings of competency (i.e., finding that the person is competent when they are not).  While it does not always need to be assessed via objective comprehensive neuropsychological testing, evaluation of the individual's rational appreciation of his/her situation needs to be addressed, and Dr. Allen's position does not consider the rational abilities of the defendant, which can not be gathered through mere questioning of court personnel, the

charge, etc., nor does this type of questioning get at whether a defendant can rationally assist defense counsel.

Petitioner's Ex. 108 at 8. *See also* Petitinoer's Ex. 109 at 11-12.

The newly ratified SPECIALTY GUIDELINES FOR FORENSIC PSYCHOLOGY, adopted by the American Psychological Association Council of Representatives on August 3, 2011, make clear that Dr. Brown's lack of recourse to collateral records, and lack of consideration of "all reasonable perspectives" in relation to the defendant's desire to represent himself, plead guilty and receive death do not meet the basic standard of care in the field and are lacking in reliability. Some of the relevant guidelines are as follows:

8.03 Acquiring Collateral and Third Party Information
Forensic practitioners strive to access information or records from collateral sources with the consent of the relevant attorney or the relevant party, or when otherwise authorized by law or court order.

9.01 Use of Appropriate Methods
Forensic practitioners strive to utilize appropriate methods and procedures in their work. When performing examinations, treatment, consultation, educational activities or scholarly investigations, forensic practitioners seek to maintain integrity by examining the issue or problem at hand from all reasonable perspectives and seek information that will differentially test plausible rival hypotheses

9.02 Use of Multiple Sources of Information
Forensic practitioners ordinarily avoid relying solely on one source of data, and corroborate important data whenever feasible (American Educational Research Association, American Psychological Association, & National Council on Measurement in Education, in press). When relying upon data that have not been corroborated, forensic practitioners seek to make known the uncorroborated status of the data, any associated strengths and limitations, and the reasons for relying upon the data.

National Institute of Justice Standards

The National Judicial College has published a set of best practice standards for competency evaluations, which includes review of relevant records and psychological testing:

C. Assessment Tools

45

Best Practice: It is a best practice for the well-qualified mental health professional to determine which, if any, clinical assessment tool(s) is appropriate for a competency evaluation in a given case.

Discussion: A competency evaluation is a contextual and functional evaluation. Insofar as the contextual aspect is concerned, this means that it differs with respect to each particular defendant due to the unique circumstances of his or her case and the abilities the defendant may be expected to demonstrate as a party to the case. Insofar as the functional aspect is concerned, the competency evaluation also addresses the defendant's current knowledge of the court proceedings and his or her ability to assist counsel in providing relevant information; conducting himself or herself appropriately in court and making rational decisions about his or her defense in consultation with counsel. Psychological tests that measure intelligence, neurocognitive functioning, psychopathology, or malingering may be relevant to the assessment of defendants' abilities. Forensic assessment instruments (e.g., MacArthur Competence Assessment Tool (MacCAT) and Competence Assessment for Standing Trial for Defendants with Mental Retardation (CAST MR)) developed to assess knowledge, understanding, and reasoning pertaining to court proceedings may be useful in addressing defendants' knowledge and reasoning regarding the court proceedings they face. Which, if any, clinical assessment tool(s) is indicated in a given case depends upon a number of factors; therefore, it is a best practice to leave that determination to the discretion of the well-qualified mental health professional.

\* \* \* \*

4. Statement of Information Accessed for Evaluation

Best Practice: It is a best practice for the mental health professional to include in the report a list of the information gathered, and documents and records reviewed, for purposes of the evaluation.

Discussion: It is a best practice for the mental health professional to consider third-party information in conducting a competency evaluation and to list such information in the report. It is a best practice for sources of data to include the following, when applicable:

- police reports, including statements from an investigator or someone who dealt directly with the defendant near the time of the alleged offense or the arrest;
- criminal and civil legal records, including criminal convictions and the dates of any civil commitments;
- mental health, medical, and hospital admissions records, including medications prescribed;
- mental health screenings, competency evaluations and/or other mental health evaluations or psychological testing, including results;

46

- history of competency restorations, including type and length of treatment;
- educational, military, and employment records;
- interviews and consultations with third parties, including defense counsel, relatives, and jail personnel; and
- any other information, data, or collateral sources obtained or reviewed for the evaluation.

National Judicial College, Mental Competency: Best Practices Model, II(C); III(A)(4).[10]

In sum, as stated by Drs. Heilbrun and Connell in the original petition, Dr. Brown's evaluation clearly falls beneath the standard of care in the mental health profession, particularly in relation to the lack of use of collateral sources of information, the lack of analysis of the defendant's motivation to seek the death penalty, and his overly limited conception of breadth of a competency examination and the possible sources and manifestations of incompetency. It does not provide an adequate basis for a court to dispel the bona fide doubt existing about Mr. Austin's competency, with or without a hearing.

*The competency procedures introduced by the Texas legislature in 2003 further highlight the inadequacy of the psychological examination in this case*

Notably, the state of Texas in 2003 passed legislation setting standards for competency evaluations that highlight the inadequacy and unreliability of the examination in the present case. Tex. Code of Crim. Proc. Art 46B.001 *et. seq.* (Added by Acts 2003, 78th Leg. Ch. 35 § 1 eff. 1 Jan. 2004).

The current statute requires that the appointed expert be provided with "previous mental health evaluation and treatment records." Tex. Code of Crim. Proc. Art 46B.021 (Added by Acts 2003, 78th Leg. Ch. 35 § 1 eff. 1 Jan. 2004). Obviously, this did not happen here, resulting in a report predicated upon misinformation and a complete lack of knowledge or analysis of Mr. Austin's mental health history. Furthermore, the statute lays out the factors that must be

---

[10] Available at: http://www.mentalcompetency.org/model/model-sec-II.html#IIC (last visited 3/5/12).

considered by a mental health professional in any examination used in a court competency

determination. According to the statute, "an expert shall consider . . .the following:"

> (1) the capacity of the defendant during criminal proceedings to:
>     (A) rationally understand the charges against the defendant and the potential consequences of the pending criminal proceedings;
>     (B) disclose to counsel pertinent facts, events, and states of mind;
>     (C) engage in a reasoned choice of legal strategies and options;
>     (D) understand the adversarial nature of criminal proceedings;
>     (E) exhibit appropriate courtroom behavior; and
>     (F) testify;
> (2) as supported by current indications and the defendant's personal history, whether the defendant:
>     (A) has a mental illness; or
>     (B) is a person with mental retardation;
> (3) whether the identified condition has lasted or is expected to last continuously for at least one year;
> (4) the degree of impairment resulting from the mental illness or mental retardation, if existent, and the specific impact on the defendant's capacity to engage with counsel in a reasonable and rational manner; and
> (5) if the defendant is taking psychoactive or other medication:
>     (A) whether the medication is necessary to maintain the defendant's competency; and
>     (B) the effect, if any, of the medication on the defendant's appearance, demeanor, or ability to participate in the proceedings.

Tex. Code of Crim. Proc. Art. 46B.024.  The experts report must then: identify and address these

issues and any other issues referred; describe the procedures, techniques and tests used in the

examination and the purpose of each; and, state the expert's clinical observations, findings and

opinions on each of the issues. Tex. Code of Crim. Proc. Art. 46B.024.

By contrast to the procedure adopted here, the Texas statutory scheme, would have:

resulted in a review of critically relevant records that in turn would have transformed the content

of any clinical interview and further investigation; specifically have engaged with the issue of

whether the defendant's capacity engage in a reasoned choice of legal strategies and options;

contained a diagnosis of mental illness including a discussion of the duration of the illness;

included a discussion of the degree of impairment and the specific impact on defendant's

capacity to engage with counsel in a rational manner; and, determined whether the defendant was taking medication and the effect upon him.  Rather than a simple up or down vote on competency, the resulting report would have addressed each issue and stated observations, findings and opinions as to each.

Tellingly, Dr. Brown maintains that a more minimal approach is adequate, a view based upon his very narrow view of what competency entails and what types of mental disease or defect may impact competency.  According to his report and subsequent affidavit, Dr. Brown did not consider whether or not Mr. Austin suffered from a mental illness--such as organic brain damage or depression – but rather looked only for symptoms of "severe" brain damage, mental retardation, or psychosis. When Dr. Brown determined that these symptoms were absent, he saw no need to continue to assess Mr. Austin's mental health and determine if any other mental illness or defect was present.  Nor did Dr. Brown consider the impact of any mental illness on Mr. Austin's competency. CR 23-26, State's Answer, Exh. A.

Thus Dr. Brown's report does not meet the Texas courts' own minimum standards for competency evaluations. This statute was not in force at the time of the original evaluation, and the defense is not alleging that Dr. Brown or the court were in violation of this statute. Rather, the statute supports Petitioner's submission that the procedure adopted was not adequate - - - the fact that the legislature has adopted a very different procedure supports this position.[11]

---

[11] Importantly, the assessment this court must make is not whether the procedures employed were consistent with local practice at the time but whether they are adequate to protect the defendant's rights.  The fact that in 2003 the Texas legislature adopted the new procedures, including the requirement that the expert review records, and that this requirement is also found in the prevailing standards for forensic mental health assessment underpins the importance of record review to the reliability of an evaluation.

*The psychological examination failed to adequately address or resolve the central question of whether the defendant's choices were rational or were being substantially affected by mental illness.*

In Mr. Austin's case, it is unquestionable that further procedures were necessary in order to adequately determine the defendant's competence. As described in detail above, the court had before it evidence that the defendant was depressed and suicidal, and that he was deliberately disguising that mental illness, in order to be found competent and be ensured a death sentence.  It was therefore incumbent upon the court to address and examine the defendant's depression and suicidality and the degree to which his mental illness affected his decisions to confess, waive counsel and plea in this case. Pursuant to *Pate* and *Drope*, the doubt related to his suicidality, depression and "death wish" could not be dispelled by simple reference to the psychological report in this case, particularly not when this report declined to engage with the petitioner's suicidal depression and the relation of this mental illness to competence, and particularly when this report was undermined by the lack of information regarding petitioner's mental health history, whether due to petitioner's deliberate disguising of such history or Dr. Brown's neglect of the relevant questioning.

For the psychological report to have been relevant to the inquiry before the court, Dr. Brown unquestionably should have inquired about the letters, the evidence of suicidality and depression, and the defendant's motivation to confess, waive counsel and plea. Dr. Brown also should have reviewed records of the defendant's current and past mental health history, to determine the extent to which they corroborated and/or clarified these issues.[12]

_____

[12] Notably, the brevity of the psychological examination and lack of collateral access rendered it incapable of grappling with the central question in the case.  In *Hays v. Murphy*, 663 F.2d 1004 (10th Cir.1981) the 10th circuit held that despite the "full  hearing" accorded in the court below, the competency determination had been deficient because "there was no sufficient opportunity for proper psychiatric and psychological evaluation of Mr. Hays."  *Id.* at 1011. The state relied heavily on one thirty minutes interview which was "clearly inadequate to serve as a basis for such a serious determination," and none of the witnesses revealed the type of "extended, close observation in a

Dr. Brown's methodology was the opposite, beginning with a presumption of competence, unless the defendant claimed impairment or there was severe impairment apparent in the interview no further enquiry was necessary, further, no enquiry into mental illness short of severe retardation./brain damage/psychosis was necessary. *State's Answer, Ex. A.* This methodology produces a uniquely slender reed to rely upon when determining competency where the operative concern is that a defendant may be engineering his own execution as a result of mental illness and is motivated to disguise that illness in order to make good his plan.

As described in the affidavits of Drs. McGarrahan and Woods, in this case the defendant suffers from depression and a particular, rather than global, form of brain damage. Petitioner's Exhs. 93, 95, 108, 109. A brief evaluation without access to records or collateral information is inadequate to diagnose depression unless the patient himself admits to his condition and is willing to provide an honest and detailed past history. A brief, initial evaluation without recourse to objective psychological or neuropsychological testing is unquestionably inadequate to diagnose Mr. Austin's particular brain damage.  Petitioner's Ex. 109 at 2, 11-12. Dr. Brown defends his examination by claiming that such an examination is sufficient to identify "severe" mental retardation, brain damage or psychosis, and that only these three conditions can cause incompetence. State's Answer, Ex. A. But this is an overly limited understanding of competency that does not match the legal standard and is conclusively refuted by Dr. Heilbrun, Ex. 107, February 23, 2012, p. 5; see also Affidavits of Drs. McHarrahan and Woods (Ex. 108 & 109.

---

proper setting which is generally recognized as essential for the psychiatric and psychological evaluations required." *Id.* The court remanded for a procedurally adequate hearing including more extensive observation and interviewing. *Id. at 1013.*

*Petitioner's colloquy with the court was inadequate to address and dispel the doubt raised in this case.*

Petitioner's colloquies with the court, at the *Faretta* hearings and in relation to his guilty plea, were also inadequate to address and dispel the doubt raised in this case regarding petitioner's competence. As discussed above, the Supreme Court has been quick to recognize the limits of even far more extensive colloquies to dispel doubts created about competence.

Here, the trial court, like Dr. Brown, failed to grapple in these colloquies with the positive evidence of the defendant's suicidal depression and his attempt to use the court system to commit suicide. Like Dr. Brown, the court asked no questions regarding these circumstances, despite being in possession of a series of letters which forefront the problem of the defendant's motivation, and which provide notice of petitioner's intent to deceive the court on this issue. RR. II at 5-14 (*Faretta* colloquy); RR IX at 3f (guilty plea colloquy)

While one may posit the case of a capital defendant who wishes to have himself charged, convicted, sentenced to death and executed as swiftly as possible who is making his decision uninfluenced by mental illness, it is certainly not safe to assume that the defendant is influenced by mental illness, particularly not when he is writing letters to the court expressing his suicidal depression.

The state court was not conducting a competency hearing and asked no questions specific to the positive evidence of incompetency.  The court's questions in the October 11, 2001 and April 4, 2002 colloquies were taken directly from a "Faretta warnings" form that the court utilized in those hearings.  CR. 31-2; RR. II at 5-14;CR. 84-5; RR XXII at 4-9.  Contrary to the state's assertions, the court was not conducting a competency hearing on October 11, 2001, but a *Faretta* hearing. Similarly, on April 1, 2002, the court was addressing the defendant's guilty plea. This may explain why the court neglected to address the defendant's mental health history

52

or functioning in any depth in the hearings but it is fatal to the state's argument that the colloquies can dispel the doubt created by the evidence of suicidal depression and the petitioner's hope to kill himself via the courts.

Certainly a defendant's demeanor, including colloquies with the court, can be relevant to competency determinations. However, in both *Pate* and *Drope*, such colloquies were deemed inadequate to dispel the doubt engendered by evidence of the defendant's past irrational behavior and mental illness, precisely because these colloquies did not fully engage with or resolve this evidence. This case is similar; except that in this case, the colloquies were also built on false statements regarding the defendant's lack of mental health history. Petitioner's Ex. 90, Affidavit of Dr. Heilbrun; Affidavit See Ex. 109, Affidavit of Dr. Woods (""[T]he colloquies are undeniably relevant to the competency determination, but much less than is usual in this case due to Mr. Austin's established attempt to mask his true functioning, and the fact that Mr. Austin's statements to the court regarding his mental health have now been proven to be both untruthful and part of an overall attempt to deceive the court as to his "death wish" and mental functioning."). Reliance on a procedure dependent upon accurate self-report in a case with a defendant apparently motivated to deny mental illness in order to ensure his execution is obviously just as unsatisfactory as relying upon self-report in the case of a defendant who claims impairment and is motivated to avoid execution.

*The opinion of counsel was inadequate to address and dispel the doubt regarding competence raised in this case.*

The opinion of defense counsel regarding a defendant's competence may be relevant. In this case, however, its relevance and weight are limited, for two reasons. First of all, defense counsels' engagement with petitioner was extremely limited. From the moment of defense counsels' appointment in this case, petitioner was working to have them removed; contacts

between petitioner and counsel were very minimal and substantive conversation was nill. Secondly, defense counsel, despite having seen indications of mental illness in the defendant's "highly unusual behavior," did not engage the question of the defendant's suicidality and depression and past mental health history. Defense counsel sought no records regarding petitioner's mental health history. Defense counsel spoke to no members of Mr. Austin's family or other collateral witnesses. No investigator or mitigation specialist was retained.  Therefore defense counsel's knowledge of Mr. Austin's mental health was similarly limited.

**6.** ***Despite the bona fide doubt regarding Mr. Austin's competency, no competency hearing was undertaken when he waived counsel for appeal and post-conviction nor at any point thereafter***

The day after Mr. Austin was sentenced to death, on April 4, 2002, the following colloquy occurred:

> Court: Mr. Austin, my understanding is, sir, that you would prefer to waive your right to appeal, but understand that the law will not allow you to do that; is that right?
> Austin: yes, ma'am.
> Court: And, accordingly, you want to waive your right to counsel and represent yourself pro se on appeal; is that correct?
> Austin: Yes, ma'am.
> Court: All right. All right. And let the record reflect that Mr. Austin waived his right to counsel for purposes of his trial as well. The Court conducted a Faretta hearing at that juncture and found that he was competent to represent himself and was making that decision freely and voluntarily with full knowledge of the potential consequences. Okay. Mr. Austin, as you are aware, I have to ask you certain questions concerning your representation of yourself on appeal.
>                              * * * *
> Court: Have you ever been declared mentally incompetent or treated for any mental health disorder?
> A:              No, ma'am.
>                              * * * *
> Court: And do you wish to waive your right to counsel both on the appeal of your conviction and sentence as well as the Writ of Habeas Corpus?
> A:              Yes, ma'am.
>                              * * * *

54

> Court: For the record, the Court finds that Mr. Austin fully understands the posture in which he presently finds himself, that he is knowingly, intelligently, voluntarily waiving his right to assistance of counsel both as to the direct appeal of his conviction and sentence and as to the Writ of Habeas Corpus with respect to that conviction and sentence.

RR XII at 4-8.

As noted above in relation to the prior *Faretta* colloquy, the questions asked here track the standardized "*Faretta* warning" form utilized by the court and signed by Mr. Austin. CR 84-5. One of the questions asked was whether the petitioner had ever treated for any mental health disorders. At this point, of course, the court had heard repeated evidence that Mr. Austin had seen mental health professionals as a child and while in the military, and moreover had been assessed in relation to the 1978 rape of his sisters. The court, however did not bat an eye when Mr. Austin answered "no" to this question. Nor did the court ask questions regarding petitioner's depression, suicidality, or motivation to waive appeals and appellate counsel. The court made no inquiries as to Mr. Austin's current mental functioning, declining even to acquire and review his recent medical jail records. Had the court done this, it would have determined that the defendant had recently been diagnosed with depression in the Harris County Jail and prescribed the anti-depressant Remeron; the court was unaware of these facts. Petitioner's Exh. 15, 4063. Indeed, the court dropped from its earlier *Faretta* colloquy the question about mental health in the military, even though it now knew that Mr. Austin had in fact received psychiatric care in the military. Perhaps unwittingly, the court in fact made fewer enquiries in the face of evidence of more psychiatric involvement.

While this hearing was formally a *Faretta* hearing to waive counsel, it was clear to the court that Mr. Austin was seeking to represent himself so that he could waive his entitlement to direct and collateral review and be swiftly executed. This should have heightened and expanded the court's *Faretta* enquiry in order to determine Mr. Austin's mental competence "in the present

posture of things, that is, whether he has capacity to appreciate his position and make a rational choice with respect to continuing or abandoning further litigation or on the other hand whether he is suffering from a mental disease, disorder, or defect which  may substantially affect his capacity in the premises." *Rees v. Peyton*, 384 U.S. 312, 314 (1966)(Ordering remand for psychiatric examination and competency hearing for defendant seeking to waive further collateral review).

**CLAIM IV: Deference on substantive competency claim**

> ***1.   There is no merits determination of this federal constitutional claim to which deference is to be afforded under 2254(d)(1) or (2)***

This court clearly owes no deference under 2254(d), as there is no state court decision on the merits to which to defer – the state court having procedurally defaulted the claim and declined to reach the merits. The state does not argue that §2254(d) apply.

> ***2.   Deference under 2254(e)(1) applies only to determinations of factual issues and should not apply to the ultimate conclusion of competency, which is a mixed question of fact and law***

The state preserves[13] a claim that a presumption of correctness applies to a competency finding it alleges was made on October 11, 2001.  The state asserts that "[a] state court's conclusion regarding a defendant's competency is entitled to a presumption of correctness."  [62] *Respondent's Answer* at 22 referring to 2254(e)(1).  Acknowledging superseded authority in favor of the state's position, Petitioner submits that under the current statutory scheme a

---

[13] The restrictions of 2254(e) may be waived by the state by a failure to assert their protection.  The United States supreme Court remanded for a decision on state waiver of its §2254(e)(2) argument in *Bradshaw v. Richey*, 546 U.S. 74, 80 (2005)("the Sixth Circuit has had no opportunity to address the argument that the State failed to preserve its *Holland* argument. It is better situated to address this argument in the first instance.")  On remand, the Sixth Circuit found that the state had waived any challenge relying on §2254(e)(2) by failing to timely raise the challenge.  *Richey v. Bradshaw*, 498 F.3d 344, 352 (6th Cir. 2007)

conclusion of competency by a state court should not be accorded deference under §2254(e)(1)

for the following reasons.

The starting point for the analysis must be the terms of §2254(e)(1) and the Supreme

Court's

> (e)(1) In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, **a determination of a factual issue made by a State court shall be presumed to be correct**. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.

28 U.S.C. § 2254 (emphasis added).  The United States Supreme Court has made the point that

AEDPA distinguishes in its treatment between determinations of factual issues and decisions and

that (e)(1) does not apply to decisions:

> AEDPA does not require petitioner to prove that a decision is objectively unreasonable by clear and convincing evidence. The clear and convincing evidence standard is found in § 2254(e)(1), but **that subsection pertains only to state-court determinations of factual issues, rather than decisions**.  Subsection (d)(2) contains the unreasonable requirement and applies to the granting of habeas relief rather than to the granting of a COA.

*Miller-El v. Cockrell*, 537 U.S. 322, 341-2 (2003)(emphasis added).[14]

An analysis of the pre-AEDPA, Fifth Circuit authority relied upon by the state shows a

line of cases distinguishing between the factual determinations underpinning or compelling the

ultimate competency decision and that ultimate decision itself.   The state's contention relies

upon an inaccurate[15] paraphrase of a statement in *DeVille v. Whitley* where the court stated:

> Appellants have failed to meet their heavy burden of proving actual mental incompetency at the time of their pleas. See *Flugence v. Butler*, 848 F.2d 77, 79 (5th Cir.1988).   **A factual finding of competency by the state court is presumed to be correct.** *Id.*

---

[14] This formulation bears similarities to the approach that had already adopted by the Fifth Circuit. *Valdez v. Cockrell*, 274 F.3d 941, 951 (5th Cir. Tex. 2001)
[15] The state inserts the word "conclusion" instead of the words "factual finding", which appear in the *DeVille* opinion. *Deville*, 21 F. 3d. at 656.  This blurring of the conclusion and the underlying factual finding obscures the critical point at issue here.

*DeVille v. Whitley*, 21 F.3d 654, 656 (5th Cir. La. 1994)(emphasis added).  The opinion in

*Flugence* relied upon in *Deville* reveals the following:

> **A medical inquiry into competency is a fact-finding exercise**, and the factual
> finding of competence is presumed to be correct. 28 U.S.C. § 2254(d); *Maggio v.
> Fulford*, 462 U.S. 111, 103 S. Ct. 2261, 76 L. Ed. 2d 794 (1983); *Bruce v. Estelle*,
> 536 F.2d 1051 (5th Cir. 1976).

*Flugence v. Butler*, 848 F.2d 77, 79 (5th Cir. La. 1988)(emphasis added).  The relevant part of

the opinion in *Bruce*, relied upon by the court in *Flugence* holds as follows:

> The ultimate focus in a retrospective competency hearing must be whether at the
> time of trial the accused had sufficient ability to consult with his attorney with a
> reasonable degree of rational understanding and whether he had a rational as well
> as factual understanding of the proceedings against him. *Dusky v. United States*,
> 362 U.S. 402, 80 S. Ct. 788, 4 L. Ed. 2d 824 (1960). Before the court can
> meaningfully apply this legal standard, however, it must often ascertain the nature
> of petitioner's allegedly incapacitating illness. It is at this initial juncture that
> expert testimony is particularly valuable, for the existence of even a severe
> psychiatric defect is not always apparent to laymen. Because of this difficulty in
> detecting medical diseases, the trial court may find it necessary to make an initial
> fact-finding on whether the accused suffers from a mental defect at all. **Although
> sometimes dispositive of the ultimate competency question, this medical
> inquiry is properly classified as pure fact-finding and reviewable only under
> the clearly erroneous standard.**
> Once it is established that an individual suffers from a clinically recognized
> disorder, the court must decide whether such condition rendered the accused
> incompetent under the *Dusky* formulation. As enunciated in *Makris*, this second
> stage determination of legal incompetency is subject to a review more stringent
> than the clearly erroneous rule. To insure protection of valuable constitutional
> rights, this court is bound to take a hard look at the ultimate competency
> "finding."

*Bruce v. Estelle*, 536 F.2d 1051, 1059-1060 (5th Cir. Tex. 1976)(emphasis added).

As can be seen from the passage in *Bruce*, the court was identifying a clear distinction

between the factual determinations that may underpin or even compel a particular competency

decision and the application of legal principle to the facts to reach the ultimate decision.  As cited

above, the subsequent decisions of the court maintain this distinction in their language.  *Flugence*

("A medical inquiry into competency is a fact-finding exercise"); *DeVille* ("A factual finding of competency")

The court in *Flugence* also relied upon the United States' Supreme Court's pre-AEDPA treatment of this issue in *Maggio v Fulford*, a treatment that has been strongly argued to be *dicta* only.  1 R. Hertz & J. Liebman, Federal Habeas Corpus Practice & Procedure § 20.3b(d), p. 954-6 fn 55 (5th ed. 2005).  However, whether *dicta* or not, as discussed below, the Court's  analysis was specific to the former §2254(d) and does not translate to the present statute.

It is to be remembered that under former §2254, federal courts did not afford deference to questions of law or mixed questions of fact and law and so in the absence of a finding that a particular finding was a finding of fact, no deference was due.  *Perillo v. Johnson*, 79 F.3d 441, 445 (5th Cir.1996) (noting that pre-AEDPA federal habeas court reviews state court determinations of mixed questions of law and fact de novo ).  This pre-AEDPA practical consideration, which operated at the time of the *Maggio* opinion, made the *Maggio* opinion a determination specific to the application of former §2254(d) and which does not translate to the changed statutory scheme.

The United States Supreme Court has acknowledged that its decisions under former-§2254(d) as to whether a finding should be regarded as a question of fact subject to deference or a mixed question of fact and law have relied upon a practical assessment of whether the facts were so bound up in the conclusion that deference should be granted to the trial court's decision:

> In the  §  2254(d)  context,  as  elsewhere,  the  appropriate  methodology  for distinguishing questions of fact from questions of law has been, to say the least, elusive. . . .
>
> * * * *
>
> Perhaps much of the difficulty in this area stems from the practical truth that the decision to label an issue a "question of law," a "question of fact," or a "mixed question of law and fact" is sometimes as much a matter of allocation as it is of analysis. At least in those instances in which Congress has not spoken and in

which the issue falls somewhere between a pristine legal standard and a simple historical fact, the fact/law distinction at times has turned on a determination that, as a matter of the sound administration of justice, one judicial actor is better positioned than another to decide the issue in question.

*Miller v. Fenton*, 106 S. Ct. 445, 451 (1985)(citations omitted).  Before the passage of AEDPA,

the Court made the point even more firmly:

> It must be acknowledged, however, "that the Court has not charted an entirely clear course in this area." Miller, 474 U.S. at 113. In regard to § 2254(d), as in other contexts, the proper characterization of a question as one of fact or law is sometimes slippery. See ibid.; Wainwright v. Witt, 469 U.S. 412, 429, 83 L. Ed. 2d 841, 105 S. Ct. 844 (1985) ("It will not always be easy to separate questions of 'fact' from 'mixed questions of law and fact' for § 2254(d) purposes . . . ."). Two lines of decisions compose the Court's § 2254(d) law/fact jurisprudence.

> In several cases, the Court has classified as "factual issues" within § 2254(d)'s compass questions extending beyond the determination of "what happened." This category notably includes: competency to stand trial (e. g., Maggio v. Fulford, 462 U.S. 111, 117, 76 L. Ed. 2d 794, 103 S. Ct. 2261 (1983) (per curiam)); and juror impartiality (e. g., Witt, 469 U.S. at 429; Patton v. Yount , 467 U.S. 1025, 1036, 81 L. Ed. 2d 847, 104 S. Ct. 2885 (1984); Rushen v. Spain, 464 U.S. 114, 120, 78 L. Ed. 2d 267, 104 S. Ct. 453 (1983)). While these issues encompass more than "basic, primary, or historical facts," their resolution depends heavily on the trial court's appraisal of witness credibility and demeanor. See, e. g., Witt, 469 U.S. at 429 (Although the trial court is "applying some kind of legal standard to what [it] sees and hears," its "predominant function in determining juror bias involves credibility findings whose basis cannot be easily discerned from an appellate record."). This Court has reasoned that a trial court is better positioned to make decisions of this genre, and has therefore accorded the judgment of the jurist-observer "presumptive weight." Miller, 474 U.S. at 114 (when an "issue involves the credibility of witnesses and therefore turns largely on an evaluation of demeanor, there are compelling and familiar justifications for leaving the process of applying law to fact to the trial court").

> On the other hand, the Court has ranked as issues of law for § 2254(d) purposes: the voluntariness of a confession (Miller, 474 U.S. at 116); the effectiveness of counsel's assistance ( Strickland v. Washington, 466 U.S. 668, 698, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984)); and the potential conflict of interest arising out of an attorney's representation of multiple defendants ( Cuyler, 446 U.S. at 341-342). "What happened" issues in these cases warranted a presumption of correctness, but the Court declared "the ultimate question" outside § 2254(d)'s domain because of its "uniquely legal dimension." Miller, 474 U.S. at 116; see also Sumner v. Mata, 455 U.S. 591, 597, 71 L. Ed. 2d 480, 102 S. Ct. 1303 (1982) (per curiam) ("The constitutionality of the pretrial identification procedures used in this case is a mixed question of law and fact that is not governed by § 2254(d)."); Brewer v.

> Williams, 430 U.S. 387, 397, 51 L. Ed. 2d 424, 97 S. Ct. 1232, and n. 4, 403-404 (1977) (waiver of Sixth Amendment right to assistance of counsel is not a question of historical fact, but rather requires application of constitutional principles to facts).

*Thompson v. Keohane*, 516 U.S. 99, 110-112 (1995).

In the year after the Court in *Thompson* described the unclear and slippery approach to former §2254(d), Congress acted, passing AEDPA and providing a more clear cut approach to this question.

Under AEDPA, where there is a state court merits decision, a federal court on review must accord deference both as to questions of law and as to factual determinations. 28 U.S.C. §2254(d)(1) & (d)(2). The need for a slippery jurisprudence to ensure that mixed questions of fact and law receive deference in circumstances where the factual determinations may merge with the legal conclusions is gone. In cases where a state court has made a merits decision, Congress has directed the courts in exactly how to give deference: to defer to both the legal conclusions and factual determinations.

AEDPA also provided for a presumption of correctness as to state court determinations of factual issues, a provision that applies even where a merits determination on the federal claim was not made. 28 U.S.C. §2254(e)(1). Viewing (e)(1) alongside (d)(2), the Supreme Court found that (e)(1) applies to factual determinations but does not apply to decisions. *Miller-El*, 537 U.S. at 341. This distinction is well displayed in the case of state court findings of mental retardation, where a finding of mental retardation is reviewed under (d)(2) and the underlying findings e.g.., intellectual functioning, adaptive deficits, and age of onset, are reviewed pursuant to (e)(1). *Brumfield v. Cain*, 04787-JJB-CN (MDLA 2012) (citing *Williams v. Quarterman*, 293 Fed. Appx 298, 308 (5th Cir. 2008) (construing a Texas state court's evaluation of the mental retardation prongs under the *Briseno* decision to be purely factual decisions reviewable for clear

error); *Rivera v. Quarterman*, 505 F.3d 349, 361 (5th Cir. 2003)(same)). *See also Valdez v. Cockrell*, 274 F.3d 941, 951 n. 17 (5th Cir. 2001) (parenthetical).

For this reason, the state's assertion that a "conclusion" of competency must be rebutted by clear and convincing evidence is not correct. Only the state court's factual determinations are entitled to the presumption of correctness.

The state court was given an opportunity to review Petitioner's federal claims, and the evidence upon which they rely and to issue a merits decision, which would have been subject to deference both as to questions of law and fact. However, the state court chose not to consider the merits of Petitioner's federal claims, nor to make any determinations of the factual issues raised in that petition. Instead, the state court opted to interpose a new procedural bar and make no merits determination. The state cannot now complain when this court is asked to review the merits of Petitioner's claims and make legal and factual determinations.

### 3. The state court did not make a determination of a factual issue that Petitioner was competent to stand trial for the purposes of §2254(e)(1)

The state court in the present case did not make "a determination of a factual issue" that Petitioner was competent to stand trial.

In invoking the presumption of correctness afforded by §2254(e)(1), the state argues that the state court made a determination of competency to which the presumption of correctness attaches on October 11, 2001:

> Thus, the trial court concluded that Austin was competent to waive counsel, plead guilty, and stand trial on punishment. 2 RR 14-16.

[62] *Respondent's Answer* at 22. The passage relied upon by the state as representing a finding of competency to which the presumption of correctness reads as follows:

> THE COURT: Okay. All right. Let the record reflect then that the Court finds the defendant has sufficient age, background, education to understand the

62

implications and dangers of self-representation, that he has been informed of the general nature of the offense charged and the possible penalties, although the Court finds he is fully aware of those. He understands there are technical rules of evidence and procedure with which he would be obligated to comply, that he will not be given any special consideration due to his lack of training or legal experience. And he understands that he will not be allowed to obstruct the orderly procedure in the Court or interfere with the fair administration of justice. And that although he has no right to standby counsel, the Court will appoint Mr. Arnold to sit as standby counsel for the course of the trial.

Let me make certain then that you understand, Mr. Austin, that the Court is granting your Motion to Proceed Pro Se and represent yourself in the course of the trial, that Mr. Arnold will be appointed by the Court as standby counsel. However, let me make certain that you understand that despite the fact that you will not be allowed to obstruct the orderly procedure of the Court or interfere with the fair administration of justice, that you do have the right to change your mind about representing yourself; and in the event that you do that, you are to alert my court through Mr. Arnold as soon as possible.

> [The court then allowed Mr. Arnold to ask Mr. Austin questions directed to demonstrating that he was not dissatisfied with appointed counsel]

THE COURT: That's fine. All right. Mr. Austin, I need to you sign these documents first. It basically memorializes what has occurred on the record.

2 RR 14-16 (transcript of F*aretta* hearing, October 11, 2001). A review of the passage relied upon by the state conclusively reveals that the state court did not, in fact, make a determination of competency to stand trial. This conclusion is confirmed by a review of the history of the proceedings.

No claim of incompetence was ever raised in this case, orally or by motion, the trial court never conducted a hearing on competency, no jury was ever empanelled to determine the issue of competency and the state court never formally stated that it was finding Mr. Austin competent to stand trial.

Further, the state erroneously argues "the trial court granted Austin's defense attorney's request for a competency evaluation and appointed Dr. Brown to evaluate Austin's competence CR.11." *Answer* at 20. The portion of the record cited by the state is neither a request for a

competency evaluation, nor an order appointing Dr. Brown to evaluate Mr. Austin's competency. The order found at CR. 11 is the July 13, 2001 order of the court "*On Defendant's Motion To Permit The Examination Of The Defendant and For Authority To Incur Expenses*" CR. 11. A review of the record shows that the order was signed in response to a defense request aimed at preparation of the case, not a competency evaluation.

In one of only two motions filed by defense counsel in the case, Mr. Arnold moved on May 30, 2001 for leave to proceed *ex parte* on a funding motion "requesting expert assistance in the preparation of his defense." CR. 9. This motion was granted on July 13, 2001. CR. 8. Accompanying this motion was a motion to permit a psychological examination and for authority to incur expenses. CR. 12-13. In this motion, counsel stated that the requested psychological examination was in order to allow counsel "to render effective assistance of counsel. CR. 12. In this motion counsel noted that Mr. Austin had "exhibited some highly unusual behavior" and that counsel sought to "understand the impact of this unusual behavior on the accused's mind". CR. 12-13. Counsel stated that expert assistance was "vital to the defense preparation, as it impacts every aspect of the case from voluntariness of any statements to mental health defense to mitigation." CR. 13. The state court granted this motion on July 13, 2001 and it is this order that appears at CR. 11.

At no point in this motion or the accompanying order is the word competency mentioned. The state, in an effort to prop up the conduct of the proceedings in state court has overreached in claiming that the trial court granted defense counsel's request for a competency evaluation. No such thing occurred.

On July 13, 2001, the court granted the order to allow defense counsel to obtain a psychological evaluation. The docket sheet (CR. 87) indicates that the case was also set for pre-

trial motions on September 12, 2001. CR.15 (Agreed setting approved by judge). The examination requested by defense counsel did not, however, occur.

By letter dated August 8, 2001 (CR. 18), mailed on August 9, 2001 (CR. 19) and filed in the record on August 17, 2001 (CR. 18), Mr. Austin wrote to the court offering to waive the psychological evaluation in order to move the case forward on the basis that the psychologist would merely conclude that Mr. Austin was "a sociopath, extremely violent, no respect for authority, and no feelings of guilt." CR. 18. Mr. Austin also wrote to the court by letter dated August 14, 2001 (CR. 20), mailed on August 14, 2001 (CR. 21) and filed in the record on August 17, 2001 (CR. 20), and requested that his appointed attorneys be discharged and that he be permitted to represent himself. CR. 20.

The docket sheet reflects an entry for August 21, 2001 that states only "reset to 8-23-01". CR. 87. No transcript or other material is in the record reflecting what occurred on this date.

The docket sheet reflects an entry for August 27, 2001 that states only "Δ appeared reset to 9/12/01". CR. 87. This appears to be the most likely date for the chambers hearing at which Mr. Austin requested to proceed *pro se* and the court ordered a psychological evaluation.[16] There is no transcript available from that hearing but its content is later described by the trial court in its preamble to the F*aretta* hearing.

> On a previous setting, I believe probably about six weeks ago, if my memory serves me correctly, Mr. Austin was brought into chambers with the Prosecution and the Defense with a court reporter present and at that time Mr. Austin indicated, consistent with at least one of his letters, that he wanted to discharge his lawyers and proceed pro se.
> The Court had already granted a Motion for a Psychological Evaluation for the Defense. However, that had not yet been accomplished at the time that Mr. Austin

---

[16] The court on October 11, 2001 refers to the hearing having occurred about six weeks earlier. Counsel calculates that six weeks prior would have been August 30, 2001, only three days after the docket sheet entry recording the defendant's presence at court. In the Second Amended Petition, counsel had inferred that this chambers hearing had occurred on July 13, 2001. [38] at p.57 of 252, p.51 of petition. On further review it appears that August 27, 2001 is the more likely date, though no transcript exists or can be obtained for either date.

made this known to the Court; and the Court explained to Mr. Austin that it wanted a psychological evaluation accomplished before we proceeded to a Faretta hearing.

RR II at 3-4, October 11, 2001.[17]

Dr. Brown's report to Judge Cosper indicates that "defendant was interviewed and examined on September 20, 2001 pursuant to an order from your court for competency evaluation."  CR. 22.  No order for a competency evaluation appears in the record and the transcript of the proceeding at which the order for the evaluation was issued is not available.

Mr. Austin was not present at the September 12, 2001 hearing (CR. 22), though counsel for the state, defense counsel and the judge were present.  No transcript is available of what occurred and the case was set for October 1, 2001.  CR. 22.  On October 1, 2001 Mr. Austin was brought to court, though no transcript from this date is available, and the case was set for hearing on October 11, 2001.  CR. 23

Dr. Brown's report, dated September 25, 2011 was filed into the record on October 11, 2001. CR. 24.

Upon receiving the report, however, the state court did not conduct a competency hearing and did not make a competency finding, instead stating on October 11, 2001:

the Court appreciates the fact that the evaluation has been done. It is probative information  for the Court on making a determination on his ability to represent himself. And so it is in the file.

RR. II. at 4.  The state court then conducted a *Faretta* hearing, involving a colloquy and a written waiver of court appointed counsel, operating according to a form titled "Faretta Warnings Waiver of Court Appointed Counsel Court Findings and Order Allowing Defendant to Proceed

---

[17] The absence of the transcript of this and other hearings is the subject of separate complaint but is also relevant in determining the weight to be given to the state court's factual determinations.  28 U.S.C. 2254(f)("If the State cannot provide such pertinent part of the record, then the court shall determine under the existing facts and circumstances what weight shall be given to the State court's factual determination.")

Pro Se." CR. 31-2;[18] RR. II at 5-14.  Introducing the colloquy to Mr. Austin, confirmed that its

purpose was to help the court decide whether he would be allowed to represent himself:

> Do you understand this hearing today is for the purposes of the Court deciding
> whether or not you will be able to represent yourself in the capital murder trial
> that you are going to inevitably face?

RR II at 5

Neither the court's written nor oral findings contain any reference to a competency

finding.  CR. 32; RR. II at 14-5.

Thus, it is clear that the state is in error in suggesting that defense counsel sought a

competency evaluation and in suggesting that on October 11, 2001 the state court made a finding

of competency.

In any event, as described below, Petitioner satisfies his burden of establishing his

incompetence by clear and convincing evidence, rebutting any presumption of correctness that

may be found to apply.

### 4. *The presumption of correctness does not attach to determinations of factual issues arising from procedures that do not comport with Due Process*

AEDPA disposed of the former §2254(d) factors requiring, *inter alia* a full and fair

hearing before a presumption of correctness would apply to state court factual determinations,

relying instead on a requirement that the presumption of correctness be rebutted by clear and

convincing evidence.  §2254(e)(1);  *Valdez* (*supra*).

---

[18] For reasons unknown to counsel, the form shows Mr. Austin's signature with a date of 11/27/01. CR. 32. No transcript is available for that date and the docket sheet records the only activity on that date as "reset 2/1/02". CR. 88. The transcript on October 11, 2001 certainly suggests that the form or one like it was signed on that day. RR. II at 16 ("THE COURT: That's fine. All right. Mr. Austin, I need to you sign these documents first. It basically memorializes what has occurred on the record. (Defendant signs documents.)")

The quality and depth of the state court findings, however, remain relevant to both whether the (e)(1) presumption of correctness will apply and, if it does apply, to a petitioner's satisfaction of the clear and convincing evidence standard.

In *Panetti v. Quarterman*, the Supreme Court held that AEDPA deference does not apply to a ruling arising out of a state court's factual determination that itself violated due process. *Panetti v. Quarterman*, 551 U.S. 930, 953 (2007) (refusing to apply AEDPA deference to state court's decision regarding competence to be executed due to inadequate procedures). *See also Wiley v. Epps*, 625 F.3d 199 (5th Cir. Miss. 2010) (declining to defer to state court ruling on *Atkins* issue due to inadequate procedures that violated due process, citing *Panetti*); *Rivera*, 505 F.3d at 358 ("The lesson we draw from *Panetti* is that, where a petitioner has made a prima facie showing of retardation . . . , the state court's failure to provide him with the opportunity to develop his claim deprives the state court's decision of the deference normally  due."). No AEDPA deference was applied in these cases once it was determined that  the procedures utilized below were constitutionally infirm.

In *Wiley v. Epps*, 625 F.3d 199 (5th Cir. Miss. 2010),  the Fifth Circuit specifically acknowledged its earlier holding in *Valdez* but noted that the Supreme Court  in *Panetti* has since recognized that a state court's unreasonable application of federal law in its choice of procedures may undermine the AEDPA deference given to the state court adjudication.

Procedural infirmities, substantive deficiencies or an insufficient inquiry by a state court may also render a state court's holding too unreliable to constitute a "factual determination" for the purposes of §2254(e)(1).  *Fahy v. Horn*, 516 F.3d 169, 183 (3d Cir. Pa. 2008)("Today we hold that when a state court's waiver colloquy fails to reveal whether the requirements of a valid waiver have been met due to procedural infirmities, substantive deficiencies, and an insufficient

probing into a defendant's knowledge of the rights he is waiving, the findings by that court concerning the waiver are too unreliable to be considered "factual determinations." They are not, therefore, entitled to the presumption of correctness.")

Of course, even where the presumption of correctness applies, these sorts of defects will be relevant to determining that the presumption has been rebutted.  The "failure to consider key aspects of the record is a defect in the fact-finding process," and if the omitted evidence was 'very significant," the state court's factual determination will be deemed "unreasonable" and not entitled to (d)(2) or (e)(1) deference.  *Taylor v. Maddox*, 366 F.3d 992, 1000-1001, 1008 (9th Cir. 2004) (("Obviously, where the state court's legal error infects the fact-finding process, the resulting factual determination will be unreasonable and no [(e)(1)] presumption of correctness can attach to it." When we determine that state-court fact-finding is unreasonable, therefore, we have an obligation to set those findings aside and, if necessary, make new findings."). *See also Guidry v. Dretke*, 397 F.3d 306, 326-7 (5th Cir. 2005) ("Consistent with this scheme, and pursuant to subpart (e)(1), the district court did not accept the state court's determinations of fact because the trial court made no findings on considerable evidence critical to Guidry's claim.. Consequently, under subpart (d)(2), the district court concluded the trial court's decision "was based on an unreasonable determination of the facts")(citation omitted);  *Lambert v. Blackwell*, 387 F.3d 210, 239 (3d Cir. Pa. 2004)("the extent to which a state court provides a "full and fair hearing" is no longer a threshold requirement before deference applies; but it might be a consideration while applying deference under § 2254(d)(2) and § 2254(e)(1).");

**CLAIM IV:  Mr. Austin's rights to Substantive Due Process were violated when he was allowed to waive counsel, plead guilty, stand trial, waive counsel on appeal and waive appeals despite being legally incompetent**

**5.** ***Petitioner has established a violation of his substantive Due Process rights by clear and convincing evidence***

While not accepting that the presumption of correctness applies here, Petitioner has rebutted any such presumption as it relates to Mr. Austin's competency by clear and convincing evidence. Even on the record available Petitioner has established his entitlement to relief and this court will be in an even better position to determine whether Petitioner has satisfied the clear and convincing standard following an evidentiary hearing.

Petitioner has presented a huge body of evidence demonstrating Mr. Austin's severe mental illness and the manner in which his mental illness rendered him incompetent during the pre-trial period, at the time of trial and during the period of his waiver of post-trial representation and relief. That body of evidence includes: medical, mental health, correctional, military and legal records dating from Mr. Austin's early childhood to the present day; contemporaneous mental health assessments and eyewitness accounts of Mr. Austin's condition at the time of trial; thorough and current mental health assessments by a psychologist and a psychiatrist who both opine that Mr. Austin was not competent; eyewitness accounts of persons who have known Mr. Austin over the years and observed the presence and effects of his mental illness; affidavits from experts in forensic mental health assessments documenting the failures and inadequacies of the evaluation and colloquy at the time of trial and of the approach taken by the state's experts in Respondent's *Answer*. *See* Second Amended Petition at 1-40, 49-60.

Further, the body of evidence offered by Mr. Austin is not simply contrary to the evidence in the record relied upon by the state but directly undermines that evidence by showing it to be false, unreliable or fatally flawed.

The state relies upon (1) the evaluation by Dr. Brown; (2) the opinion of trial counsel and (3) the trial court's colloquies with Mr. Austin to argue that Mr. Austin was competent, along

with (4) the new affidavits of Dr. Brown and the opinion of Dr. Allen. In its Answer, the state fails to address the evidence offered by Petitioner, ignoring the evidence entirely for the most part even to the extent of incorrectly claiming that Petitioner failed to cite a single mental health evaluation stating that he suffered from suicidal depression or lifelong brain impairments. *Answer* at 28. The state's position is wholly in error as Petitioner attached two mental health evaluations drawing these conclusions to his original petition and extensively discussed them in the petition. Peitioner's Ex. 95 (Affidavit of Dr. George Woods); Petitioner's Ex. 93 (Statement of A. Cicerello Ph.D.).

Finally, the state seeks to answer the clear evidence of incompetence by misstating the legal test for competence.

### 6.   Contrary to the state's assertions, the legal competency standard requires more than simple factual understanding

Because the state's erroneous construction of the legal standard for competence infects the entirety of the state's analysis as well as the opinions expressed by Dr. Brown (both to the trial court and his affidavit to this court) and Dr. Allen, Petitioner will begin by responding to the state's analysis of the competency standard.

The state, through its own briefing and the statements of its experts, appears to assert that Mr. Austin conclusively demonstrated his competence by his understanding of his charges and possible sentence, and by his ability to communicate with other human beings. *Answer* at 23.

Both Drs. Brown and Allen stress repeatedly that in their opinion the standard of competence is minimal and once it is reached, any further exploration of the defendant's mental health is irrelevant. State's Answer, Exhs. A and B.

Dr. Brown acknowledges that Mr. Austin was depressed at the time of the trial (though in his opinion mildly so) and wanted to be executed by the system, but concludes that this is

irrelevant for the purposes of assessing competence because it does not represent severe mental retardation, brain damage or psychosis. Under Dr. Brown's analysis, Mr. Austin understands the basic facts of his case and because he could communicate with others,[19] his depression and suicidality, even to the extent that they control his decisions in his case, are irrelevant. State's Answer, Exh. A. This represents a significant misunderstanding of the law. While some may argue that the legal competency standard may be described as 'minimal" it is certainly not limited to a bare factual understanding and ability to communicate, and it unquestionably incorporates the ability to make rational decisions. A discussion of the law on competency is followed by a more specific analysis of the claims made by the state and its experts in relation to that law.

The U.S. Supreme Court in *Dusky v. U.S.*, 362 U.S. 402 (1960) articulates the two pronged competency standard as follows: (1) "whether he (the defendant) has sufficient present ability to consult with his attorney with a reasonable degree of rational understanding" and (2) "whether he has rational as well as factual understanding of proceedings against him."

Much subsequent caselaw has focused on the meaning of the term "rational understanding." The Supreme Court in *Dusky* itself fleshes out this phrase in a limited but illuminating way: "[i]t is not sufficient merely that the defendant can make a recitation of the charges or the names of witnesses, for proper assistance in the defense requires an understanding that is rational as well as factual." This indicates that a static comprehension of charges, court roles and events related to the offense is not sufficient; rather, the defendant must be able, at a

---

[19] *See Godinez v. Moran*, 509 U.S. 389, 403-404 (1993)("Although the Dusky standard refers to "ability to consult with [a] lawyer," the crucial component of the inquiry is the defendant's possession of "a reasonable degree of rational understanding." In other words, the focus of the Dusky formulation is on a particular level of mental functioning, which the ability to consult counsel helps identify.")(Kennedy J. concurring).

minimum, to use these discrete items of understanding in a "rational" process of analysis or judgment.

Subsequent U.S. Supreme Court caselaw has further clarified that the phrase "rational understanding" includes the ability to make a *reasoned or rational choice or decision*, at least in situations in which such decisions are required of the defendant.  In *Rees v. Peyton*, 384 U.S. 312, 314 (1966), a capital case in which the defendant moved to abandon all litigation on his own behalf, the Court articulated the *Dusky* standard as follows: "whether [Petitioner] has capacity to appreciate his position and *make a rational choice* with respect to continuing or abandoning further litigation or on the other hand whether he is suffering from a mental disease, disorder, or defect which may substantially affect his capacity in the premises." *Rees*, 384 U.S. 312; *see also Godinez*, 509 U.S. 389 (equating the *Dusky* "rational understanding" standard and the Rees "rational choice" standard).

In *Godinez*, the Supreme Court again described substantive competency as inclusive of the defendant's ability to make a rational choice, this time in a situation in which the defendant's competence to waive counsel and plead guilty was at issue.  In describing why the *Dusky* standard for competence to stand trial—rather than a higher, more specific standard--- should apply to the plea and waiver situations, the court stressed that defendants in all these situations face significant strategic choices. *Godinez,* 509 U.S. 389. The stress on decision-making continued with *Cooper v. Oklahoma*, 517 U.S. 348, 364 (1996).

Thus all defendants – or at least all those in trial or facing a waiver of constitutional rights -- must have the capacity to choose rationally in order to be competent to proceed.  The Court in *Godinez* stated explicitly that a standard requiring "reasoned choice" is "[no] different from (much less higher than)" the *Dusky* standard of "rational understanding."  *Godinez*, 509

U.S. at 403.. The Court then bolstered its point by pointing to its own previous use of the phrase "rational choice" in Rees:

> We have used the phrase "rational choice" in describing the competence necessary to withdraw a certiorari petition, *Rees v. Peyton*, 384 U.S. 312, 314, 16 L. Ed. 2d 583, 86 S. Ct. 1505 (1966) (per curiam), but there is no indication in that opinion that the phrase means something different from "rational understanding."

*Godinez*, 509 U.S. at 398, nt. 9. In sum, regardless of whether the defendant is facing a guilty plea, executing a waiver of counsel, standing trial, or waiving further legal proceedings in a capital case, the competency standard includes an analysis of his or her ability to make a rational decision regarding the exercise of his or her constitutional rights. [20]

Lower federal courts have followed the Supreme Court in viewing the capacity for "rational choice" as a critical component of competency.  In *Rumbaugh v. Procunier*, 753 F.3d 395, 399 (5th Cir. 1985), the Fifth Circuit described the "volitional" component of competency as "the person's ability to make a rational choice among available options," and held that it, along with the "cognitive" component, was essential to competency.  Fifteen years later, in *Mata v. Johnson,* 210 F.3d 324, 327-29 (5th Circ. 2000), the same court stressed that while the Court's description of the relevant standard in *Rees* differed in wording from *Dusky*-- in that *Rees* specifically referenced the abandonment of further litigation-- "both standards inquire about the discrete capacity to understand *and make rational decisions concerning the proceedings at issue*." (emphasis added). *Accord United States v. Hogan*, 986 F.2d 1364, 1371 (11th Cir. 1993) (holding that the *Rees* and *Dusky* standard are the same); *Giarratano v. Procunier*, 891 F.2d 483,

---

[20] The Supreme Court's most recent discussion of the substantive competency standard is found in *Pannetti v. Quartermann*. *Pannetti* deals with yet another context for competency – competency to be executed. While such a situation does not involve a "decision" per se, the court in *Pannetti* continued to emphasize that competency requires some "rational" capacity that extends beyond a mere knowledge of relevant facts—in this case knowledge of the state's stated reasons for execution:  "A prisoner's awareness of the State's rationale for an execution is not the same as a rational understanding of it." A defendant with significant mental illness may be able to recite the state's reason for the execution without being able to rationally understand that reason, in that he or she cannot reasonably analyze, infer or make judgments in relation to this stated reason.

487 (4th Cir. 1989); *Murray v. Quarterman*, 2006 U.S. Dist. LEXIS 67300, 25-26 (N.D. Tex. Sept. 20, 2006); *Corcoran v. Buss*, 483 F. Supp. 2d 709, 730 (N.D. Ind. 2007); *Groseclose ex rel. Harries v. Dutton*, 594 F. Supp. 949, 957 (M.D. Tenn. 1984).

Moreover, as Dr. Woods indicated in his most recent affidavit "[t]he forensic literature is clear. . .that a defendant suffering from certain mental illnesses may demonstrate competence in basic cognitive tasks, but still be unable to exercise rationality in decision making. This may be the case even though the defendant's  understanding of his options is not impaired by mental illness;  defendants may see and understand their options and the attendant consequences but be unable to rationally act on that information due to the imposition of mental illness and cognitive impairment. (Maroney 2006; Freedman 2009)".  Petitioner's Exhibit 109. Courts have held the same.[21]

---

[21] *See United States v. Timmins,* 82 Fed. Appx. 553 (9th Cir. 2002) (remanded for new competency hearing because district court erroneously dismissed unanimous expert evidence that despite defendant's understanding of the relevant charges and consequences, his mental illness would prevent him from being able to rationally choose a plea offer; **Lafferty v. Cook,** 949 F.2d 1546 (10th Cir. 1991), cert. denied, 112 S.Ct. 1942 (1992) (holding that state trial court erred in finding defendant competent to stand trial; although defendant had a factual understanding of the proceedings against him, there was substantial testimony that he lacked a rational understanding of the proceedings because of his paranoid delusional system); *United States v. Hemsi,* 901 F.2d 293 (2d Cir. 1990) (holding that the trial court properly found defendant incompetent (over defendant's objection), based on expert testimony that while defendant had an intellectual understanding of the proceedings, his mental illness prevented him from rationally acting on that understanding and in his own interest); *Ross v. Lantz*, 392 F.Supp. 2d 236, 239-240 (D. Conn. 2005) (acknowledging the defendant's intellectual grasp of his legal position and available options, but noting the need for the trial court to make findings regarding defendant's "volitional capacity" in order to assess whether his decision to forego legal processes was driven by suicidal despair); *United States v. Salley*, 246 F. Supp. 2d 970, 979-980 (N.D. Ill. 2003)(concluding that defendant is not competent to stand trial because, although he understands the nature and consequences of the proceeding, he lacks the capacity to make rational choices about fundamental decisions such as whether to waive his right to counsel, to plead guilty, to confront the witnesses against him through cross-examination,  or to testify in his own defense); *United States v. Calek*, 48 F. Supp. 2d 919, 923 (D. Neb. 1999) (finds schizophrenic individual incompetent because although he is able to understand the nature of the proceedings against him, "in his present state, [he] can do little more than be a passive presence in the courtroom. He cannot assimilate information necessary to make relevant decisions that could affect his ultimate disposition."); *United States v. Nagy*, 1998 U.S. Dis. LEXIS 9478 (DNY 1998) (finding the defendant incompetent despite a factual understanding of the charges and proceedings because his mental illness skewed his understanding of the proceedings so that he could not rationally make strategic decisions); *In re Cockrum*, 867 F. Supp. 484, 494 (E.D. Tex. 1994) (finding the petitioner incompetent to waive habeas corpus review of his conviction and sentence despite his understanding of the proceedings against him because he suffers from mental disorders which prevent him from making a rational decision on the issue); *United States v. Blohm*, 579 F.Supp. 495, 499 (DNY 1983) (finding defendant incompetent because although he had an intellectual understanding of the charges and proceedings, his understanding of the criminal proceedings was distorted by a mental illness which infected his decision making and

Notably, according to U.S. Supreme Court caselaw, a defendant is incompetent due to lack of capacity for rational choice when mental illness *substantially affects* his or her capacity to make such a choice. *Whitmore v. Arkansas*, 495 U.S. 149, 166 (U.S. 1990) (articulating competency standard as requiring "meaningful evidence that [petitioner] was suffering from a mental disease, disorder, or defect that *substantially affected* his capacity to make an intelligent decision" (emphasis added)); *Rees*, 384 U.S. 312 ("whether he has capacity to appreciate his position and make a rational choice with respect to continuing or abandoning further litigation or whether he is suffering from a mental disease, disorder or defect which may substantially affect his capacity in the premises"); *Dennis v. Budge*, 378 F.3d 880, 890 (9th Cir.  2004) (noting that the relevant question in a competency determination is whether a mental illness substantially affects the prisoner's capacity to appreciate his options and make a rational choice among them).

There is clear and convincing evidence in the record that, at the time of his trial, plea of guilt and waivers of counsel, petitioner suffered from a serious mental illness which substantially affected (and indeed negated) Mr. Austin's ability to exercise rational choice in relation to the exercise of his constitutional rights.

---

ability to consult with counsel).  Note that some courts view the capacity for rational choice, and the attendant ability to "appreciate and weigh information and advice" as part of the capacity to assist counsel.  *United States v Salley*, 246 F.Supp. 2d 970, 977 (D. Ill. 2003) (emphasis added). Other courts and experts see these two capacities as separate. *See* N. Poythress, R. Bonnie, J. Monahan, R. Otto, & S. Hoge, *Adjudicative Competence: The MacArthur Studies* 103 (2002)  ( "A defendant who is competent to assist counsel may not be competent to make the specific decisions regarding the defense of his or her case that are encountered as the process of criminal adjudication unfolds."; distinguishing competence to assist counsel and "decisional competence").

### 7. *Contrary to the state's assertions, there is clear and convincing factual evidence of Mr. Austin's incompetence at the time of trial*

*The state's assertions that there is "no" evidence of severe mental illness in the records and "no" evidence supportive of incompetency is so far from reality as to reflect a willful disengagement from the facts of this case.*

The original petition laid out the voluminous evidence of Mr. Austin's lifelong mental health issues. Second Amended Petition at 6-41, 49-60.  Attached to the petition were hundreds of pages of records documenting mental illness at each stage of Mr. Austin's life, as well as affidavits from experts who had examined, tested and evaluated Mr. Austin. In response, the state denies that Mr. Austin is in any way mentally ill and labels any claims to the contrary "bald assertions."  *Answer* at 28.  The state asserts, for instance, that Mr. Austin claims to suffer from "suicidal depression" and "lifelong brain impairment" but "fails to cite a single mental-health evaluation" to this effect.  *Answer* at 28. The state also asserts that there is no evidence in the record supportive of incompetence. State's Answer at 21. These statements are so extreme as to bear no resemblance to reality.

This is an enormous volume of information in the record documenting Mr. Austin's mental illness.  Responding to Dr. Allen's assertion that there is no history of serious mental illness, Dr. McGarrahan pithily stated:

> Anyone who reviews Mr. Austin's file, specifically the military records, court testimony of family members, psychological evaluation by Dr. Lewis, Darnell Hospital records, Texas Department of Criminal Justice records, and Harris County Jail psychiatric records, can clearly see that he has a history of severe mental illness, and this is consistent with the history given to me by Mr. Austin's father.  The records are replete with references to his poor emotional functioning that was evident from at least the age of 15, if not much earlier.  This is not a case where the individual has no history of mental illness until their arrest for capital murder and then spontaneously develops it and "conveniently" utilizes it for purposes of evading responsibility for the crime and/or avoiding harsh punishment.  It is evident from the record that Mr. Austin has been ambivalent about acknowledging (or even being able to recognize) his mental illness, let alone using it as a "crutch" in his legal situation.

Petitioner's Ex. 108, Affidavit of Dr. Mcgarrahan.

The state's assertion regarding a lack of mental health evaluations is of course belied by the reports of Dr. Antoinette McGarrahan 'nee Cicerrello and Dr. George Woods, who have both diagnosed Mr. Austin as suffering from Major Depressive Disorder, Severe, Recurrent, combined with a cognitive disorder.  Dr. McGarrahan and Dr. Woods based their diagnoses on objective testing and psychiatric evaluation, as well as numerous citations to hundreds of pages of records; their first and second affidavits describe at length their methods of evaluation and how they arrived at their conclusions. Petitioner's Exs. 108 and 109. Dr. Elizabeth Ferguson diagnosed Mr. Austin with depressive disorder at the Harris County Jail immediately prior to his guilty plea and trial in 2002, and prescribed him Remeron, a powerful anti-depressant. Petitoner's Ex. 15, 4021, 4050-51. Notably, on death row, Mr. Austin has been diagnosed in the prison with major depressive disorder, recurrent, in partial remission, as recently as 2011. Petitioner's Exh. 118. Mr. Austin was also diagnosed with a major mental illness in 1978, by Dr. Franklin Lewis,[22] and was diagnosed as suicidal in 1975. Petitioner's Ex. 28 (Psychological evaluation of Dr. Franklin Lewis); Petitioner's Ex. 97 (Darnell Hospital Medical Records).

Beyond the diagnoses, the evidence of mental illness is the case is extensive. Because most of this evidence has been addressed at length in the original petition, what follows is only a brief summary.

Witness affidavits document evidence of childhood trauma, early extensive substance abuse, and Mr. Austin's marked withdrawal and anger as a child. Mr. Austin first attempted suicide at age fourteen, and spent two days in the hospital recovering. Mr. Austin quit school and joined the military in his late teens. Military records report that he suffered from severe

---

[22]  Drs. McGarrahan and Woods have described the manner in which their diagnoses are consistent with the observations and testings of Dr. Lewis.  Petitioner's Ex. 108 at 6; Petitioner's Ex. 109 at 4.

headaches, sleeplessness, depression, anxiety, and impulsive anger. Mr. Austin was prohibited from handling weapons pending a psychiatric examination and was ultimately discharged from the army after being assessed with a "failure to adapt socially and emotionally." Mr. Austin attempted suicide a second time while in jail awaiting trial for the bizarre rape and attempted rape of his sisters. Dr. Lewis evaluated him in relation to the trial for that offense, and noted schizoid thinking, symptoms of depression and possible brain dysfunction. TDCJ prison records and affidavits from fellow inmates indicate ongoing mental health difficulties, including threats of self-harm, depression and suicidality. The records from Harris County Jail prior to Mr. Austin's 2002 guilty plea and capital trial, and affidavits from inmates from that period, detail a more acute mental health crisis, marked by sleeplessness, confusion, severe depression, suicidality, and active attempts at suicide via sex with HIV positive individuals. Letters and statements from this time period to the court, prosecution, guards, Sgt. Allen, mental health professionals and penpals provide further evidence of his depression and suicidality. Prison records subsequent to the trial describe crying spells, paranoia, mood springs, and blunted affect. Second Amended Petition at 6-41, 49-60.

Moreover, objective psychological and neuropsychological testing manifest depression and suicidality as well as a cognitive disorder, see Petitioner's Ex. 93, consistent with and supportive of Dr. McGarrahan's and Woods' diagnoses. Petitioner's Exs. 93, 95, 108, 109.

The state also asserts, through its experts, that there is no evidence in the record supportive of a finding of incompetency. Dr. Allen asserts that "there is nothing in these documents that supports the notion that Mr. Austin was incompetent at the time of Dr Brown's examination of him." Any assertion to the contrary "is speculative." State's Answer, Exh. B.

Dr. McGarrahan in her affidavit (Petitioner's Ex. 108) responds in detail to this claim before concluding:

> It is clear from the records described above that Mr. Austin has suffered from depression the majority of his life, including the time period of his competency evaluation with Dr. Brown and during his capital murder trial.   The above-described mental health history is hardly what one would call "speculative."

*Id.*

Like the statement regarding "no" evidence of mental illness, Dr. Allen's statement is patently false. In actuality, Dr. Woods described in detail in his 2004 report how Mr. Austin's severe depression prior to and at the time of trial rendered him acutely suicidal, resulting in the letter to  Sergeant Allen, and how his brain impairment contributed to keeping him "stuck" on an irrational and self-destructive course through the waiver of his appeals. Petitioner's Ex. 95. This suicidality and accompanying rigidity of thought and conduct are documented in contemporaneous jail records and letters to the court and other officials, as well as in Dr. Woods' and Dr. McGarrahan's affidavits.  As a result of the conjunction of these two mental conditions, Mr. Austin was unable to rationally choose to waive counsel, plead guilty, make decisions in the course of trial, or waive appellate and collateral review.

*Dr. Woods and Dr. McGarrahan's Assessments Constitute Clear and Convincing Evidence of*
*Mr. Austin's Incompetency at the Time of the Relevant Case-Related Decisions in this Case*

Since his four hours with Mr. Austin in 2004, Dr. Woods has spent an additional eight and a half hours interviewing Mr. Austin, and in response to the affidavits of Drs. Allen and Brown, has produced a more recent and detailed account of the evidence underlying his conclusions.  Petitioner's Exs. 95, 109. That account describes the manner in which Dr. Woods reached his diagnosis, and the manner in which he reached his conclusions regarding competency. Dr. Woods first of all analyzed the hundreds of pages of records, past psychological

assessments, neuropsychological and psychological testing discussed above, and drew out from these significant evidence of childhood and adult depression. Simultaneously, he began an extensive neuropsychiatric evaluation of Mr. Austin, "lasting a total of 12.5 hours spread over the course of four meetings." "The number and length of these interviews," he notes, "has allowed me to better understand the nature of Mr. Austin's depression over time and the manner in which it interacts with his prefrontal lobe dysfunction. The multitude of meetings spaced out over time has also allowed me to assess the veracity of Mr. Austin's statements to me regarding his mental functioning, social history, and the events and decisions made at and around his capital trial in 2002." Petitioner's Ex. 109.

In his second affidavit, Dr. Woods describes in detail how he arrived at his conclusion that Mr. Austin was not just depressed, suicidal and suffering from frontal lobe dysfunction, but incompetent in relation to his case-related decisions in 2001 and 2002. As part of this assessment, he makes a detailed analysis of the contemporaneous jail records, recording and commenting upon events of significance to Mr. Austin's competency. This analysis of the facts is adopted by petitioner and extracted below as a part of Petitioner's clear and convincing showing of incompetence:

> The records from the time preceding, during and following Mr. Austin's capital trial establish that Mr. Austin was not only profoundly depressed but suicidal during that critical period, and provide clear indications that his decisions to confess, waive counsel and plead guilty in the manner that he did were a direct result of his suicidality.
>
> Affidavits from fellow prisoners regarding the time prior to and around Mr. Austin's original letter to Sgt. Allen offering to confess to the murder in exchange for the death penalty, while he was housed at the Hughes Unit, describe an individual who was depressed, suicidal, isolated and at times agitated.
>
> After the letter and accompanying confession, Mr. Austin was moved to the Harris County Jail for trial. Contemporaneous jail records, affidavits from fellow inmates and letters Mr. Austin wrote to the court provide evidence that

leading up to and during the trial, guilty plea and waivers of counsel  and appeals Mr. Austin was suffering from depression, suicidality, frequent crying spells, nightmares, racing thoughts, confusion, reduced sleep, irritability and poor concentration. He was also attempting to commit suicide via sex with HIV positive inmates and engage in other forms of self-harm. These are the symptoms of depression with suicidality.(Athanasios Koukopoulos 1999)

A brief timeline of this history follows:

•      On September 7, 2000, Mr. Austin wrote a letter to Sgt. Allen asserting that he would confess to the murder of DK only if he could be guaranteed the death penalty. If he were not guaranteed the death penalty, he would kill a guard and get it for himself.

•      On January 20, 2001, Mr. Austin mailed the letter to Sgt. Allen.

•      On January 30, 2001, Sgt. Allen came and saw Mr. Austin and elicited a statement confessing to the murder.

•      On March 14, 2001, Mr. Austin was moved to the Harris County Jail pending capital trial on the murder.

•      On May 1, 2001, Mr. Austin was moved to segregation due to an assertion by his lawyer that he had threatened another inmate.

•      On May 9, 2001, one of Mr. Austin's penpals contacted the jail because of Mr. Austin's repeated discussion of suicide in his letters and his concrete plan to commit suicide with a razor. As a result, Mr. Austin was referred to a psychiatric evaluation on May 14, 2001. At that session he denied any psychiatric history and refused medications.

•      On September 25, 2001, Mr. Austin was evaluated by Dr. Jerome Brown.

•      On October 7, 2001, Mr. Austin began a hunger strike that lasted for ten days. Guards recorded his behavior as very "agitated" during this period.

•      On October 10, 2011, the trial court held that Mr. Austin could represent himself pro se. During a colloquy with the court, Mr. Austin asserted that he had no mental health issues or history.

•      On October 18, 2001, Mr. Austin was again referred to mental health services. He again refused psychiatric assistance, but complained of sleeplessness.

•      In 2001 and 2002, Mr. Austin wrote a number of letters to the judge and to officials at the jail regarding his seeking of the death penalty:

o      May 15, 2001 Mr. Austin wrote that he does not want or require an attorney. He asked the court "to sentence me to death and get on with it." "My mental stability has steadily decreased and I've turned back to drugs again."

o      July 19, 2001 Mr. Austin asked to be moved into population. He reiterated that he will not put up a defense at trial and that he will drop all appeals and "request an execution date as soon as is conveniently possible." "I cannot handle prolonged isolation. I have a very bad problem with depression and when I get depressed I tend to think

about suicide a lot.  If I am forced to remain in seg [sic] too long I won't be around to stand trial."

o       August 8, 2001        Mr. Austin referenced a "previous request to move my trial to an earlier date." In this letter, he stated that will not defend himself, will plead guilty and will be sentenced to death. "So, the sooner we get this circus over with the sooner I can die. No, I don't have a death wish, or at least you all can't prove it." "I am even willing to waive the psych [sic] hearing/interview. I can tell you exactly what he's going to say. I am a socialpath [sic], extremely violent, no respect for authority and no feelings of guilt.  I am fully competent and definitely know the difference between right and wrong. So let's get this show on the road please."

o       August 14, 2001        Mr. Austin again requested to proceed pro se.

o       January 23, 2002        Mr. Austin requested to proceed pro se without standby counsel

•       Mr. Austin's letters to jail officials in 2002 describe his worsening mental crisis.

o       January, 2002 Mr. Austin wrote to a jail official, asking to be moved from regular segregation to double-door segregation. "To whom it concerns; Could you please have me moved to double-door separation? I have been feeling and thinking violent and aggressive thoughts lately and they get worse as time goes on."  "I'm facing the death penalty now and will be dead in another two or three years. . . What more can you possibly do to me?"

January 24, 2002        Letter to Major Berry, threatening harm to self or others.

•       On January 24, 2002, Lt. Moore referred Mr. Austin for psychiatric screening, noting that he is "very depressed." The referral also notes that the lack of a support system for Mr. Austin "could potentially increase the likelihood of self-harm." On the same date, Mr. Austin was seen by counselor Karen Wilson. She reported Mr. Perry as angrily refusing services and denying any mental health problems. She decided to refer him to a psychiatrist despite his refusal of psychiatric assistance "due to specific situational factors that could potentially increase the likelihood of self harm."

•       On January 25, 2002, Mr. Austin was diagnosed as depressive. Sleeplessness and crying spells were noted in the report.

•       On February 21, 2002, Mr. Austin gave a second taped statement to Sgt. Allen regarding the murder. In it, he said that he'd seen psychiatrists as a child and had behavioral problems, and that he wrote the original letter because he was depressed while locked up in solitary.

•        After the session, Sgt Allen informed the sheriff's office that Mr. Austin was engaging in sexual acts with HIV positive inmates in order to contract HIV. Sgt. Martinez confronted Mr. Austin regarding this and he admitted doing

so, saying that "he did not care, since he was probably going to be sentenced to death due to his case status. He mentioned that he had fired his layer and will represent himself in court and was planning to present no defense on his behalf, hoping to get a death sentence. Due to the fact that inmate Austin seems too calm and peaceful on the resolution to get the death penalty, it is recommended that he is placed on suicide watch to prevent him harming himself while in custody."

- • On February 22, 2002, counselor Karen Wilson saw Mr. Austin. She wrote that Mr. Austin was crying frequently, and subject to racing thoughts and nightmares. She referred him to psychiatrist.

- • On February 25, 2002, Mr. Austin for the first time reported his psychiatric history to mental health professionals at the jail, including early suicide attempts, early psychiatric assessments, and his current symptoms, including, inter alia, crying spells, nightmares, and sleeplessness.  On February 28, 2002, Mr. Austin was diagnosed as depressive and prescribed the anti-depressant Remeron. His symptoms included crying spells, nightmare, depression, ruminative thought, irritable mood, and poor concentration.

- • Jury selection took place between March 18th and 21st, 2002. Mr. Austin "consented" to sixty-three prosecution challenges, and entered no challenges on his own behalf.

- • On March, 22, 2002, Mr. Austin saw counselor Karen Wilson. He continued to refuse to talk about the 1978 offense but wanted her to know about it; he asked her to research the offense or contact his penpal Denise Lindsey.

- • On March 28, 2002, Mr. Austin agreed that it is "probably true" that he was manipulating the system in such a way that Harris County had no choice but to sentence him to death. His mood was noted as dysphoric and tearful at times.

- • On April 1, 2002, the court determined that Mr. Austin was competent to plead guilty, based on assertions that he has no mental health history or issues, and Mr. Austin plead guilty.

- • On April 2, 2002, Mr. Austin represented himself in the penalty phase of his trial. He presented no evidence, and asked only five questions, all regarding the physical appearance of the victim in a prior case. In closing argument, he explained to the jury that he likes to be on the receiving side of anal penetration and that he will kill again if they don't sentence him to death.

- • On April 4, 2002, Mr. Austin waived his right to appeal and to appellate counsel.

- • Also on April 4, 2002, Mr. Austin was seen by Dr. Elizabeth Ferguson. She noted that he was exhibiting depressive symptoms and was paranoid and guarded. She also noted dysphoric mood, blunted affect, low psychomotor activity, and sallow complexion with darkened circles under his eyes. She ordered the continuation of remeron.

- • On April 4, 2002, Mr. Austin saw Karen Wilson, counselor. He discussed with her his plans to represent himself so as to be executed as quickly as possible. He noted that he could not forgive himself for the rape of his sisters in 1978. He stated that he cannot commit suicide himself because he knows forgiveness from God would be impossible at that point.

> • October 25, 2002, Mr. Austin wrote to the judge asking to set the execution date for June 23rd, his birthday.
> • On November 4, 2002, Mr. Austin wrote to the court of appeals stating that he will be defending himself, and that he wants to be executed.
> • On January 13, 2003, he wrote a letter to criminal court of appeals asking them to affirm his conviction and sentence and waive any hearings.
> • On June 2, 2003, Mr. Austin waived his right to post-conviction counsel.

Karen Wilson, the licensed professional counselor who was the mental health professional with the most sustained and regular exposure to Mr. Austin during this period, has offered the following statement to counsel in this case, regarding the period of time in 2001 and 2002, preceding and through the conclusion of the capital trial, when she was treating him:

> [Mr. Austin] also confessed to me that, in relation to his trial and appeals, he was doing everything he could to get the death penalty, because he wanted to die. I met with him a number of times during the trial itself. He told me that he allowed the state to choose the jurors and agreed with whomever the prosecutors felt would be a good candidate. He told me that his main goal was to ensure that the two questions that the jury would consider during the punishment phase were understood and answered so that the death penalty would be inevitable. I perceived all this as an attempt at suicide by proxy.

Petitioner's Ex. 109 at 12-16.

Dr. Woods then combines this detailed account of the contemporaneous records with the results of his own neuropsychiatric interviewing of Mr. Austin:

> This contemporaneous record, along with this reflection from his primary mental health caretaker at the time, offers strong support for my conclusion that Mr. Austin's decision to pursue the death penalty was a direct result of contemporaneous depression and active suicidality, and that the various decisions he made in order to achieve that outcome – to author and send the letter to Sgt. Allen, to waive counsel at trial, to plead guilty, to conduct voir dire and the penalty phase in a particular manner, and to waive appellate counsel and appeals – were irrational, involuntary and substantially affected by his mental illness.

> I have also interviewed Mr. Austin repeatedly regarding the events of and around the capital trial in 2002. Mr. Austin has described his experience of the period preceding, during and following the trial in a manner consistent with severe depression and active suicidality. Through careful and repeated interviewing, cross-referenced with contemporaneous records, I have been able to identify the

> triggers for this episode as well as evidence of its profundity. Mr. Austin has also described to me his decisions to confess, waive counsel, plead guilty and waive appeals in a manner that is consistent with these decisions having been driven by active suicidality and depression.   I have also been able to identify the manner in which Mr. Austin's thinking became "stuck" upon the course of action that he set in motion with the letter to Sergeant Allen, despite the irrationality of this course of action. Mr. Austin's accounts regarding these matters are internally consistent, consistent between visits and consistent with accounts of suicidality and depression from known sufferers of these ailments.

> This mental health history and history of assessment, combined with the records of the waivers and trial and with Mr. Austin's internally consistent accounts of that time, establish to a reasonable degree of medical certainty that Mr. Austin was incompetent at the time of the trial and at the time of his various waivers of rights..

Petitioner's Ex. 109 at 16-17; *see also* Petitioner's Ex. 108 (Dr. McGarrahan, similarly concluding that Mr. Austin was incompetent at the time of the trial and relevant waivers). This information and Dr. Woods' conclusions were detailed in the Second Amended Petition and its exhibits, including Dr. Woods' first affidavit.  It is detailed again here to respond.to the state's claim that Petitioner is making conclusory statements and that there is no evidence for the suggestion of mental illness.

The combination of the significant mental health history and past diagnoses, the extensive records contemporaneous with the waivers and trial, the observed behavior of Mr. Austin, the psychological and neuropsychological testing, the combined 18.5 hours of evaluation by Drs. Woods and McGarrahan, and the in depth analysis of Drs. Woods and McGarrahan provide clear and convincing evidence that Mr. Austin was incompetent at the time of his trial, waivers of counsel and guilty plea.

*The state's proposed evidence of competence is thin, unreliable, and significantly undermined by other evidence in the record.*

The state contends that the petitioner's competence is demonstrated by his letters to the court, which demonstrate his ability to communicate with others and his oral statements in court, which demonstrate that he understood that he had been charged with capital murder and he understood the penalty range for that charge. State's Answer at 23. The state also relies on the original assessment of Dr. Jerome Brown and his recent statement reaffirming that assessment, and a statement by Dr. Thomas Allen, who has never assessed Mr. Austin but recently reviewed relevant records and on that basis formed an opinion as to Mr. Austin's competency. Each will be addressed in turn.

Regarding the letters written to court, the petitioner does not deny that he is capable of communicating with others. But while the sentence structure and spelling in the letters addressed to the court may be adequate, their content very clearly indicate suicidal intent driven by depression. The letters adamantly state Mr. Austin's desire to not only represent himself at trial but be executed. They describe symptoms of depression and suicidality but allege that the court can't prove a death wish. Thus, contra the state, the letters Mr. Austin wrote to the court are supportive of his claim of incompetency. Petitioner's Ex. 109 at 12.

The state also points to defendant's colloquies with the court as evidence of his competence. Colloquies are certainly relevant to competency determinations; they offer, however, a very narrow view of the defendant's functioning, in this case even more so than usual given Mr. Austin's attempt to mask his mental health history. Obviously the evidentiary weight of the colloquies is significantly undermined by the fact that Mr. Austin's statements to the court have now been proven to be untruthful and part of an overall attempt to deceive the court as to his "death wish" and mental functioning. Petitioners Ex. 109 at 12.

Finally, the state relies on the affidavits of Drs. Jerome Brown and Thomas Allen. Dr. Brown is the doctor who assessed Mr. Austin immediately prior to trial. The Second Amended Petition, and the affidavits of Drs. Heilbrun and Connell that were attached, describe the limitations of the information provided to Dr. Brown, and the inadequacy of his brief competency evaluation unsupported by record review, testing or collateral interview. Petitioner's Exs. 90, 91. In his new affidavit prepared for the state filing, Dr. Brown focuses on defending the propriety of his this evaluation as the kind he has performed in thousands of cases. He notes that more in depth analysis is only required in a case if significant evidence of mental retardation, psychosis or brain damage is evident within the initial, brief interview with the defendant. State's Answer Ex. A. As already discussed, see supra claim IV, sec 5, this view is resoundingly rejected by Drs. Heilbrun, Woods and McGarrahan in their affidavits.  As Dr. McGarrahan notes:

> No where in Chapter 46B of the Texas Code of Criminal Procedure does the standard regarding competency state that the only areas of difficulty that could render a defendant incompetent would be those described by Dr. Brown.  In fact, the Code does not define any particular psychiatric condition or diagnosis or symptom or set of symptoms that is needed for such a determination.  Further, it is not the diagnosis but the functional impairment(s) that would render the person incompetent.  That is, an individual can suffer from any of the conditions listed by Dr. Brown, even all of them at the same time, and still be competent, as it is the functional impairment (i.e., how the condition impairs their functioning) that is relevant.  Further, there is nothing in the statute regarding competency that the mental health examiner has to find "clear evidence" of incompetency or impairment or that they are mandated to find that the person is "severely dysfunctional."   There is no legal standard of proof that the mental health professional must utilize in evaluating the individual for functional impairment. . . . .  Mental health professionals conducting competency examinations are not to search for or achieve legal standards of proof such as "clear" evidence but provide an opinion within a reasonable degree of psychological certainty.  There are conditions other than those listed by Dr. Brown that undoubtedly can lead to incompetency, such as bipolar disorder, major depression, autism, delirium, and posttraumatic stress disorder, to name a few, if they affect the functional abilities of the person to the extent listed in the statute.  It is short-sighted and grossly underestimates the impact of mental illness if we limit the conditions relevant to competency to those suggested by Dr. Brown, and this may result in sending otherwise incompetent defendants to trial, including those who are facing the

death penalty.

Petitioner's Exs. 108 at 7, 107 at 5, 109 at 11. The issue of the adequacy of Dr. Brown's

evaluation is addressed in more detail in claim IV, section 5, *supra*.

Dr. Brown indicates in his affidavit that he has now been able to review the materials

provided by defense counsel in Mr. Austin's petitions, including petitioner's exhibits 1-106. He

does not address any of the hundreds of pages of documents in detail, but simply notes that

"there is nothing in these exhibits that would justify changing my opinion, that would indicate

that Mr. Austin's opportunity for a fair and impartial evaluation had been compromised because

of what he withheld or that additional evaluation, including more psychological testing or

psychiatric interview, would have made any difference." State's Answer Ex. A. Dr. Heilbrun

responds:

> Forensic psychologists and forensic psychiatrists who conduct evaluations for the
> courts should not rely on information from single sources without attempting to
> verify it.   Such verification can be attempted in various ways.   Often the
> evaluating professional seeks consistency across sources, collecting information
> using self-report, third party descriptions, documentation in the records,
> psychological testing, and specialty measures.  This is an active, ongoing process.
> For example, when there is the possibility that significant clinical depression
> affects an individual's reasoning about his plea, the evaluator would seek multiple
> sources of information about the defendant's history of depression and current
> symptoms.   Typically there are some inconsistencies across sources.   This can
> require the evaluator to follow up further, sometimes with a second interview
> confronting the defendant with additional information obtained from other
> sources, before drawing a final conclusion about depression and its impact on
> reasoning about a plea.
>
> For these reasons, it is impossible (in my view) to conclude, as Dr. Brown has,
> that "there is nothing in these exhibits that would justify changing my opinion,
> that would indicate that Mr. Austin's opportunity for a fair and impartial
> evaluation had been compromised because of what he withheld, or that additional
> evaluation, including more psychological testing or psychiatric interviewing,
> would have made any difference."   The process of conducting a forensic
> assessment in a complex, high-stakes case involves taking multiple sources of
> information and inserting them into the data-gathering/interpretation/reasoning
> sequence before drawing final conclusions.   Perhaps a fairer conclusion by Dr.
> Brown would be that a review of the additional information reflected nothing

> obvious that would apparently have changed his opinion resulting from 2001 evaluation. But without taking this additional information and using it as part of the active assessment process, it is extremely difficult to gauge its full meaning.

Petitioner's Ex. 107 at 2-3.  Dr. Brown's opinion is undermined by his bias in favor of his earlier conclusion (which he states he would need compelling evidence to alter); his inaccurate appreciation of the competency standard; his failure to grapple with or answer the historical evidence or considered expert opinions in support of Petitioner's claims; and, his inadequate methodology.

The state also relies on a statement provided by Dr. Thomas Allen. Dr. Allen has never met Mr. Austin. He indicates, however, that he has reviewed the materials submitted by the defense in the second amended petition. And like Dr, Brown, he asserts, without any engagement in detail, that Mr. Austin's "psychiatric history" apparently reflects conduct disorder rather than actual psychiatric illness" and that  there are no signs of "severe depression" in the record. Similarly, and again without engagement in the record, he asserts that "there is nothing in these documents that supports the notion that Mr. Austin was incompetent at the time of Dr. Brown's examination of him." As indicated above, these statements are all demonstrably false. Dr. Allen also asserts that in his opinion the competency report submitted by Dr. Brown is "very probably accurate" regarding Mr. Austin's competence to stand trial and "[w]hatever suicidality or depression that was present in 2001 at the time of Dr. Brown's exam was not evident nor impairing Mr. Austin's capacity to proceed."  State's Answer Ex. B.

Drs. Heilbrun, McGarrahan and Woods all strongly question Dr. Allen's statements regarding Mr. Austin's probable diagnosis and competency without having met the patient. Petitioner's Ex. 108 at 1 (Dr. McGarrahan, citing chapter 465.18(b)(3) and (4) of the Psychologists' Licensing Act and Rules and Regulations of the Texas State Board of Examiners of Psychologists and Section 9.03 of the Specialty Guidelines of Forensic Psychology);

90

Petitioner's Ex. 107 at 5, 8 (Dr. Heilbrun, stating that "[n]either Dr. Allen nor I can know these things without a personal evaluation of Mr. Austin.".); Petitioner's Ex. 109 at 2 (Dr. Woods). Dr. Allen also offers a number of criticisms of the methodology of Drs. McGarrahan and Woods that are definitively refuted in new affidavits by those two doctors. *See* Petitioner's Exs. 108 at 2-7, 109 at 9-11, 107 at 5-6, 8.

Due to the legal and factual shortcomings of the affidavits of Drs. Allen and Brown they are unable to support the state's claim that Mr. Austin was, in fact, competent.

McGarrahan also criticizes Dr. Allen for  not, at the minimum, qualifying his opinions with a statement regarding his lack of contact with Mr. Austin, as required by the licensing rules of the Texas State Board of Examiner of Psychologists, and the national Specialty Guidelines for Forensic Psychology. Petitioner's ex. 108, 1. Both Drs. Heilbrun and Dr. McGarrahan criticize Dr. Allen for the patent inaccuracy of his statement that Dr. McGarrahan, in her 2004 evaluation, conducted inadequate effort testing. Pet ex. 107 at 5-6, Petitioner's ex. 108 at 2-5. Both Drs. McGarrahan and Heilbrun also critique Dr. Allen for his overly broad and inaccurate statement regarding the significance of post-hoc psychological testing. Petitioner's ex. 107, 8, Petitioner's Ex. 108, 6. Dr. McGarrahan, who unlike Dr. Heilbrun has reviewed a full set of Mr. Austin's records, criticizes Dr. Allen for his extreme and unfounded statements denying  the existence of any and all evidence of Mr. Austin's serious mental illness and incompetency in the record, despite scores of documents to the contrary. Petitioner's Ex. 108, 7. Dr. McGarrahan also rejects Dr. Allen's "gross overgeneralization" regarding the possible manifestations of depression. Petitioner's Ex. at 9.

The petitioner requests that this Court consider discounting the affidavits of Drs. Brown and Allen, due to their significant misreading of the facts in the record, and also due to Dr.

Allen's decision to draw conclusions regarding Mr. Austin's mental health without having ever met him. *See Demosthenes v. Baal*, 495 U.S. 731, 736 (U.S. 1990) (discounting defense expert report not based on personal examination of Baal and stated only in conclusory and equivocal fashion that, based on his evaluation of the reports of the examining psychiatrists, Baal "may not be competent.").

**CLAIM X:  Mr. Austin's Right to Due Process and to Counsel Were Violated when he was subjected to a capital trial without counsel without having made a competent, knowing, voluntary and intelligent waiver of counsel.**

### 1. *Deference and Standard of Review*

In the present case, this Court reviews the question of the competent, knowing, voluntary and intelligent nature of the waiver of counsel *de novo*.

The state asserts that this claim "is entitled to deference" (Answer, 38) but cites no caselaw or statutory analysis in support; nor does the state indicate what type of deference, pursuant to what standard, is appropriate. The petitioner's claim is a claim of federal constitutional law that was neither brought to the attention of nor reviewed by the trial court. Nor was any such claim reviewed on the merits by the Court of Criminal Appeals, which procedurally defaulted all claims. There is therefore no AEDPA deference in this case, as no state court has adjudicated the claim on the merits.  *Landry v. Cain*, 445 Fed. Appx. 817, 822 (5th Cir. La. 2011)(finding that habeas review on the question of the knowing, voluntary and intelligent nature of a waiver of counsel is de novo, when the court in state post-conviction dismissed the claim on procedural grounds. "When the disposition was procedural—and thus the claim was not adjudicated on the merits in state court—the standards of AEDPA do not apply." (citing *Graves v. Dretke*, 442 F.3d 334, 339 (5th Cir. 2006)).

Waiver of counsel was not regarded as a question of fact under former §2254(d) and is clearly not a determination of a factual issue subject to a presumption of correctness under

§2254(e)(1). *Brewer v. Williams*, 430 U.S. 387, 397 and n. 4, 403-404 (1977) (waiver of Sixth Amendment right to assistance of counsel is not a question of historical fact, but rather requires application of constitutional principles to facts).  The question of whether or not the petitioner's waiver of counsel was competent, knowing, voluntary and intelligent is a mixed question of law and fact, and thus in the absence of AEDPA deference is reviewed de novo. *See, e.g., Wright v. Quarterman*, 470 F.3d 581, 591 (5th Cir. Tex. 2006) (holding that review is de novo where there has been no adjudication on the merits in state court).

Moreover, as discussed below, the trial court did not make an actual finding in this case of the knowing, voluntary or intelligent nature of the waiver of counsel, though the court did make some underlying factual findings as to Mr. Austin's understanding of, for example, the penalty range for capital murder.

> **2.  *The court's colloquy is an inadequate basis for determining that the waiver of counsel was knowing, voluntary and intelligent and resulted in the court relying upon information that was demonstrably false***

The state recognizes that the court was obliged to ensure that Mr. Austin's was a voluntary, intelligent and competent waiver of the right to counsel.  The state relies almost exclusively on the adequacy of the court's colloquy in this case. But that colloquy, particularly in the circumstances of this case, was clearly inadequate, in that the court did not undertake the sort of "penetrating and comprehensive examination of all the circumstances" required by the caselaw. *See Shafer v. Bowersox*, 329 F.3d 637, 647 (8th Cir. Mo. 2003)(to "make certain that an accused's professed waiver of counsel is understandingly and wisely made," a trial judge must undertake a "penetrating and comprehensive examination of all the circumstances under which such a plea is tendered." (*quoting Von Moltke v. Gillies*, 332 U.S. 708, 724 (1948) ("To discharge this duty properly in light of the strong presumption against waiver of the

93

constitutional right to counsel, a judge must investigate as long and as thoroughly as the circumstances of the case before him demand.")). The Fifth Circuit has recently reiterated the requirement that the trial court address "the totality of the circumstances," and, inter alia, "ensure that the waiver is not the result of coercion or mistreatment of the defendant." *Landry v. Cain*, 445 Fed. Appx. 817, 822-23 (5th Cir. La. 2011) ("In order to determine if the criminal defendant has effectively waived the right to counsel, this court has stated that "a district court must consider the totality-of-circumstances." This requires consideration of various factors including the defendant's age and education, and other background, experience, and conduct. The court must ensure that the waiver is not the result of coercion or mistreatment of the defendant, and must be satisfied that the accused understands the nature of the charges, the consequences of the proceedings, and the practical meaning of the right he is waiving.")   The totality of the circumstances reviewed to determine voluntariness must also encompass mental coercion overbearing the will of the defendant or state-induced emotions so intense that the defendant was rendered unable to weigh rationally his options. *Matthew v. Johnson*, 201 F.3d 353, 365 (5th Cir. Tex. 2000),

In its Answer, the State has ignored the Supreme Court's admonition that "there *is* a 'heightened' standard for pleading guilty and for waiving the right to counsel, but it is not a heightened standard of *competence*." *Godinez v. Moran*, 509 U.S. 389, 401 (1993).  The Court in W*estbrook* had explicitly made the point that a competency hearing is not enough and does not satisfy the trial court's "serious and weighty responsibility" of determining whether there is an intelligent and competent waiver:

> Although petitioner received a hearing on the issue of his competence to stand trial, there appears to have been no hearing or inquiry into the issue of his competence to waive his constitutional right to the assistance of counsel and proceed, as he did, to conduct his own defense. "The constitutional right of an

accused to be represented by counsel invokes, of itself, the protection of a trial court, in which the accused -- whose life or liberty is at stake -- is without counsel. This protecting duty imposes the serious and weighty responsibility upon the trial judge of determining whether there is an intelligent and competent waiver by the accused." *Johnson v. Zerbst*, 304 U.S. 458, 465; *Carnley v. Cochran*, 369 U.S. 506.

*Westbrook v. Arizona*, 384 U.S. 150 (1966). The Court in *Godinez* explained that in *Westbrook* it was using the term "competence to waive" as a shorthand for the "intelligent and competent waiver" requirement of *Johnson* v. *Zerbst*. *Godinez*, 509 U.S. at 401. While clarifying that there is only one standard for competence to stand trial, the court was at pains to emphasize that "there *is* a 'heightened' standard for pleading guilty and for waiving the right to counsel, but it is not a heightened standard of *competence*." *Godinez*, 509 U.S. at 401. The Court explained that

> The focus of a competency inquiry is the defendant's mental capacity; the question is whether he has the ability to understand the proceedings. The purpose of the "knowing and voluntary" inquiry, by contrast, is to determine whether the defendant actually does understand the significance and consequences of a particular decision and whether the decision is uncoerced.

*Godinez*, 509 U.S. at 401 n.12 (citations omitted).

The defendant's mental health is an important part of such an inquiry, particularly once that issue has come to the attention of the court. *Withrow v. Williams*, 507 U.S. 680, 693 (1993) (a Due Process analysis of voluntariness looks to the totality of the circumstances and includes the defendant's mental health – in this case in the context of the voluntariness of a confession)(citations omitted.); *Stano v. Dugger*, 921 F.2d 1125, 1144-45 (11th Cir. 1991) (en banc) (in determining whether waiver of counsel is knowing, intelligent and voluntary, court considers "(1) the background, experience and conduct of the defendant including his age, educational background, and his physical and mental health; (2) the extent to which the defendant had contact with lawyers prior to the trial; (3) the defendant's knowledge of the nature of the charges, the possible defenses, and the possible penalty; (4) the defendant's understanding

of the rules of procedure, evidence and courtroom decorum; (5) the defendant's experience in criminal trials; (6) whether standby counsel was appointed, and the extent to which he aided the defendant; (7) whether the waiver of counsel was the result of mistreatment or coercion; or (8) whether the defendant was trying to manipulate the events of the trial" [internal quotation marks omitted*]). Shafer v. Bowersox*, 329 F.3d 637, 649 (8th Cir. Mo. 2003) ("The importance of the trial court's omissions at the colloquy is magnified in significance when Shafer's mental condition is taken into consideration. There was undisputed state court evidence from a number of experts that Shafer suffered from depression, personality disorders, and other psychological problems that caused impulsive and irrational decision making and frequent mind changes. The state's expert admitted that he had not even attempted to determine whether Shafer could knowingly and intelligently waive his rights and plead guilty. A thorough colloquy was even more important under these circumstances to ensure that Shafer could make knowing, voluntary, and intelligent decisions."); *Wilkins v. Bowersox*, 145 F.3d 1006, 1012 (8th Cir. 1998); *United States v. Cash*, 47 F.3d 1083 (11th Cir. 1995).

In this case, at the time of waiver of counsel, the court was certainly on notice that mental health was an issue and had itself ordered a psychological evaluation.  As previously established, the court had been provided with information indicating that petitioner (1) was depressed and suicidal;  (2) had recently engaged in "highly unusual" behaviors that caused his lawyer to seek a psychological evaluation; (3) viewed  a quick trial and death penalty as a solution to feelings of depression and suicidality; (4) would likely kill himself if a death sentence were not received swiftly enough; (5) wished to waive his right to counsel and had offered to assist the state in securing the death penalty against him; and (6) had indicated an intent to deceive the court as to his "death wish" so as to be found competent and secure as quick an execution as possible.

96

Critically, the court had been made aware through Mr. Austin's letters that the extent of Mr. Austin's depression and his suicidality was influenced by the conditions of confinement imposed by the state of Texas.

It was thus absolutely clear, at the point of the *Faretta* colloquy, that Mr. Austin's desire to represent himself was directly related to his desire to be swiftly tried, advance no defense, swiftly receive a death sentence and be executed.  Yet the court in its colloquy asked only four questions relating to Mr. Austin's mental health:

> Court:  Have you ever been declared mentally incompetent?
> Austin: No, ma'am.
> Court:  Have you ever been treated for any mental health disorder?
> Austin: No, ma'am.
>                          * * * *
> Court:  Ever have any mental health problems while you were in the Army?
> Austin: No, ma'am.
> Court:  Ever seek any mental health counseling while you were in the Army?
> Austin: No, ma'am.

RR II at 6-7.  No questions were asked about prison conditions and their influence on Mr. Austin's mental health or choices.

As established above, all the answers to the questions above are false and can hardly provide the basis for supporting the state court's acceptance of the waiver or a finding in this court that the waiver met constitutional standards.[23]

Critically, the court did not ask about the defendant's "death wish" or motivation for seeking swift execution, even though the court had been made well aware that this was why Mr. Austin wished to waive counsel.  The state argues that all that the court was required to do was to consider why Mr. Austin wished to represent himself and then describes that motivation as "he

---

[23] In the context of AEDPA deference, which does not apply here, the Supreme Court made clear that reliance on erroneous facts will undermine the reasonableness of the ultimate decision.  *Wiggins v. Smith*, 539 U.S. 510, 528 (2003)(partial reliance on an erroneous factual finding further highlights the unreasonableness of the state court's decision).

wanted to make all the decisions in his case regarding trial strategy.  2 RR 13."  *Answer* at 28.

Mr. Austin in fact said, "Well, as far as I'm concerned, there will be no strategy."  2 RR 14.

This was a case where the defendant had complained to the trial judge of depression, of suicidality, of the impact of the conditions of his confinement on his depression, and of the impact of the depression on his suicidal thoughts.  Mr. Austin had written to the trial court repeatedly asking for swift procedures because "the sooner we get this circus over with the sooner I can die". CR 18.  Only a few days later, and in an explicit bid to make it clear that he wished no defense in this death penalty case, Mr. Austin again wrote to the court formally requesting to discharge counsel.  2 RR 20.

In this case confirming that the defendant wished to represent himself so that he could ensure that no defense was presented should only have been a starting point, not as the state urges, an end point.

Furthermore, despite the fact that Mr. Austin had explicitly tied his depression and suicidality to his conditions of confinement in his letters to the court, the court made no inquiry of his conditions of confinement, their interaction with his mental state or the impact of these circumstances on the quality of his waiver.

Finally, once it became clear that the defendant had lied in this colloquy, the court did not revisit competence nor the question of whether the waiver was a knowing, voluntary, intelligent and competent waiver.  (Indeed, as discussed below, the court asked some of the same questions and elicited some of the same lies when allowing Mr. Austin to waive appellate counsel.)

The court took account of Dr. Brown's report finding Mr. Austin competent, finding it "probative information for the Court on making a determination on his ability to represent himself. And so it is in the file." Notably, however, Dr. Brown did not weigh in on the question

of whether the waiver of the right to counsel or indeed to plead guilty was knowing, voluntary and intelligent but confined his consideration to the question of competency to stand trial, and so the trial court could not have based its decision on Dr. Brown's report.   Indeed, Dr. Brown makes clear in his recent Affidavit (State's Ex. A) that his evaluation was strictly limited to the severe mental impairments he finds relevant to competency and stopped well short of exploring issues of mental health as relevant to assessing the voluntariness of a constitutional waiver.[24] Furthermore, Dr. Brown, was not provided with the letters Mr. Austin had written to the court linking his depression, his conditions of confinement and his desire to waive counsel in order to hasten his execution.  Petitioner's additional criticisms of Dr. Brown's evaluation and report are detailed elsewhere and are equally pertinent here.

Dr. Brown's evaluation was not intended to and does not provide sufficient support for the trial court's acceptance of the waiver of counsel (beyond being a bare statement of competency) and does not impede Petitioner's clear and convincing showing in this claim.

At the end of the colloquy, the court concludes:

Let the record reflect then that the Court finds the defendant has sufficient age, background, education to understand the implications and dangers of self-representation, that he has been informed of the general nature of the offense charged and the possible penalties, although the Court finds he is fully aware of those . He understands there are technical rules of evidence and procedure with which he would be obligated to comply, that he will not be given any special consideration due to his lack of training or legal experience.  And he understands that he will not be allowed to obstruct the orderly procedure in the Court or interfere with the fair administration of justice.  And that although he has no right to standby counsel, the Court will appoint Mr. Arnold to sit as standby counsel for the course of the trial.

2 RR 14-5.

---

[24] Dr. Brown makes it clear that in his competency evaluation once the minimum level is reached it does not matter what additional difficulties remain, are hidden, or are not inquired into.

Notably, the court confines its findings to matters usually considered in assessing whether the waiver was knowing and intelligent.  There is no discussion of or findings regarding competency or voluntariness.

The courts colloquy and findings are wholly inadequate to sustain a finding that Mr. Austin executed a voluntary, intelligent and competent waiver of his right to counsel.  To the contrary, there is clear and convincing evidence that he did not.

### 3. *Petitioner's waiver was not competent, knowing, voluntary or intelligent due to Petitioner's mental illness, his conditions of confinement and the interaction of the two*

As discussed above, the State vastly underestimates the severity and the longevity of Mr. Austin's mental illness.  While the State asserts that "Austin fails to cite a single mental health evaluation which states that he suffered from 'suicidal depression,' or any medical evaluation explaining that Austin suffered from 'lifelong brain impairments,'" (*Answer* at 28) the State simply ignores the substantial documentation presented in the *Second Amended Petition* of Mr. Austin's mental illness throughout his teenage and adult years.  Glaringly, the State fails to mention the expert opinions of Dr. Woods and Dr. Cicirello – each of whom, after conducting an in-depth evaluation of Mr. Austin and review of records, diagnosed him with, *inter alia*, major depressive disorder and a cognitive disorder n.o.s..  Ex. 95 at 9093; Ex. 93 at 7779.

Instead, the state cites selectively from some of the records held by the Board of pardons and Parole and the TDCJ but in doing so ignores the evidence relied upon by Petitioner in those same records.  Moreover, the Harris County Sheriff's Office Medical Services Division itself diagnosed Mr. Austin with a depressive disorder not otherwise specified in February 2002.  Ex. 15 at 004021.  In fact, Mr. Austin's jail records provide substantial documentation that he was suffering from suicidal ideation and depression in early 2002, which the State ignores in its

briefing even though these records date from the months immediately following the waiver of counsel. The incidents are detailed in the *Second Amended Petition* at 37-40 and include an attempt by Mr. Austin to contract HIV by having unprotected sex with HIV-positive inmates.

To the extent that there are gaps in Mr. Austin's mental health history – periods of time which lack official documentation of his depression and suicidal tendencies – such gaps are due to the woefully inadequate mental health services in the Texas prison system, where Mr. Austin spent nearly all of his adult years.[25]  Since October 1978, at the age of nineteen, Mr. Austin has spent only fourteen months in the free world.

The District Court in the *Ruiz* lawsuit found in 1980 and again in the late 1990's that the mental health services in the Texas prison system failed to meet the needs of, or even to identify, inmates with mental illness.  In 1980, Judge Justice found that

> TDC's program for the care and treatment of inmates with mental disorders can be characterized as rudimentary at best. Although a very large number of inmates have some character of mental disorder, few resources have been devoted by TDC to the provision of mental health services. Professional treatment personnel are virtually non-existent on the units. "Treatment" there consists almost exclusively of the administration of medications, usually psychotropic drugs, to establish control over disturbed inmates. Other options, such as counseling, group therapy, individual psychotherapy, or assignment to constructive, therapeutic activities are rarely, if ever, available on the units. Essentially, an inmate with a mental disorder is ignored by unit officers until his condition becomes serious. . . . At no point does TDC provide systematic development of treatment plans for those few inmates whose need for assistance with mental disorders is recognized. Regular follow-ups of individuals who are discovered to have mental disorders simply do not occur.

*Ruiz v. Estelle*, 503 F. Supp. 1265, 1332-33 (S.D. Tex. 1980).  The Court specifically found that "TDC has no program whatever for the identification, treatment, or supervision of inmates with suicidal tendencies," *id*. at 1334 – inmates such as Mr. Austin.  The Court also found that mental

---

[25] Dr. Woods observed as much in his affidavit. Pet. Ex. 109 (Dr. Woods)(" As a rule, correctional mental health records must be regarded cautiously, as mental health resources in correctional institutions are generally limited.")

health services were vastly understaffed: among other deficiencies, the bulk of mental health services were provided by uncertified psychologists who were "inadequately trained, poorly supervised, and sparsely placed," *id.* at 1333-34; and TDC employed only "the equivalent of five full-time psychiatrists to provide treatment for over 26,000 inmates, approximately 17,000 of whom likely suffer from mental disorders of some type." *Id.* at 1337.  The Court concluded that "TDC does not yet employ an adequate number of mental health professionals and support staff to provide minimally necessary mental health services to the inmate population." *Id.* at 1338.

In 1999, the Court again found that the mental health services available to Texas prisoners, even if not unconstitutional, were still terribly inadequate.  "It is found by a preponderance of the evidence that the TDCJ-ID medical and psychiatric care services . . . are not adequately reaching the unit infirmaries. Medical orders in the UTMB and Texas Tech hospitals are, in many cases, ignored or neglected in the units. . . . Simply stated, large numbers of inmates throughout the TDCJ system are not receiving adequate health care." *Ruiz v. Johnson*, 37 F. Supp. 2d 855, 893 (S.D. Tex. 1999).  As will be discussed *infra*, the inadequate mental health care was far worse in administrative segregation, where Mr. Austin spent three years of his confinement.  *Id.* at 913-914.

In light of the documented failures of TDC's mental health services to diagnose and treat inmates' psychiatric problems, the observations of those who interacted with Mr. Austin on a regular basis during his incarceration provide particularly important insights into Mr. Austin's psychiatric state.  Surely enough, numerous affidavits from fellow inmates at TDC corroborate Mr. Austin's claim that he was suffering from depression and suicidal ideation in the years prior to the waiver of counsel.[26]

---

[26] *See, e.g.,* Petition at 29-30 n.83, 30, (quoting Exhibit 71, Affidavit of Robert Richardson; Exhibit 70, Affidavit of John Thompson; Exhibit 100, Affidavit of Dempsey Sutton); *id.* at 30 (quoting Exhibit 37, Affidavit of Jordan

102

As to the conditions of Mr. Austin's confinement, the State's Answer only addresses a narrow slice of time – between his false confession to Sgt. Allen in January of 2001[27] and his decision to waive counsel in October of that same year.  To understand the impact that the conditions of confinement had upon Mr. Austin, however, the Court must consider that Mr. Austin, a mentally ill man, lived in such circumstances *for years*.

Mr. Austin's Second Amended Petition sets forth in great detail the prison facilities in which he lived and the dismal conditions of those facilities; there is no need to repeat them here. *See* Petition at 18-21; 24-41.  However, it is necessary to confront the State's specious argument that "Austin provides no other evidence to establish that the conditions of his confinement prior to his decision to waive counsel were in any way 'unlawfully harsh' or so 'shocking and coercive' as to cause him to attempt suicide-by-state." Answer at 36-37.  In fact, there is ample documentation that these conditions were shocking and coercive, that they fell below constitutional minimums, and that they were more than harsh enough to drive a mentally ill man to seek the death penalty.

---

Massad); *see also* Exhibit 72, 007595, Affidavit of Jimmy Hinson ("Perry did get depressed in seg. He would come out at recreation time and sit in silence…"); Exhibit 73, 007600, Affidavit of Michael Harrell ("I know that Perry was kept in an administrative segregation unit for a while. I believe that being in seg really messes with a person mentally. . . being in seg really messed up Perry."); Exhibit 74, 007610, Affidavit of John Creekmore, ("Sometime Perry would get so depressed that he did not want to eat."); Exhibit 75, 012217, Affidavit of Frank Skoff ("Perry just didn't care. He might take an inhaler and basically try and suffocate himself. I would say that's pretty suicidal."); Exhibit 98, Affidavit of Anna Arceneaux, interview with Greg McCracken ("Perry told me more than once that he thought about killing himself . . . . I remember that Perry told me one time that he wished he could just end his life, but he didn't want to end his own life because he didn't want to go to hell."); Exhibit 70, Affidavit from John Thompson ("Perry showed me scars from cutting himself. I think they were on his wrists. He said that he had tried to commit suicide while he was incarcerated in TDC.").

[27] Mr. Austin notes for the record that the letter to Sgt. Allen is dated September 7, 2000, and counsel's initial claim that he wrote that particular letter while in the transit cells at Eastham was mistaken.  On information and belief, Mr. Austin wrote what was effectively the first draft of the letter while in the transit cells but that letter was never sent. Later, while in safekeeping at Hughes and sent to isolation following an incident with a guard, Mr. Austin re-wrote the letter and sent it to Sgt. Allen.  As Mr. Austin explained to Sgt Allen during their second taped interview on February 21, 2002, "I'd gotten locked up in solitary when I mailed it. I had written the letter a really long time before I think I was depressed when I wrote that letter for at least ten years."  Petitioners Ex. 101 at 14.

For instance, in the time leading up to his false confession and waiver of counsel, Mr. Austin spent three long years, from 1995 to 1998, in administrative segregation in Eastham Unit. The conditions for inmates in administrative segregation at that time, and particularly for mentally ill inmates, were in 1999 decried as unconstitutional by the District Court in *Ruiz*. The Court found

> by a preponderance of the evidence that inmates in administrative segregation, particularly those in Levels II and III, are deprived of even the most basic psychological needs. More than mere deprivation, however, these inmates suffer actual psychological harm from their almost total deprivation of human contact, mental stimulus, personal property and human dignity. The scene revealed by the plaintiffs' experts, one largely unrefuted by defendants' emphasis on policies and procedures, is one of a frenzied and frantic state of human despair and desperation. Furthermore, plaintiffs submitted credible evidence of a pattern in TDCJ of housing mentally ill inmates in administrative segregation—inmates who, to be treated, would have to be removed to inpatient care. These inmates, obviously in need of medical help, are instead inappropriately managed merely as miscreants. It is determined that TDCJ officials are well aware of both these conditions and these inmates' ensuing pain and suffering. Whether because of a lack of resources, a misconception of the reality of psychological pain, the inherent callousness of the bureaucracy, or officials' blind faith in their own policies, TDCJ has knowingly turned its back on this most needy segment of its population.

*Ruiz v. Johnson*, 37 F. Supp. 2d at 913-14.  The Court found that the conditions in administrative segregation violate the Eighth Amendment:

> Before the court are levels of psychological deprivation that violate the United States Constitution's prohibition against cruel and unusual punishment. It has been shown that defendants are deliberately indifferent to a systemic pattern of extreme social isolation and reduced environmental stimulation. These deprivations are the cause of cruel and unusual pain and suffering by inmates in administrative segregation, particularly in Levels II and III.

*Id*. at 914-15.[28]

---

[28] This opinion was based, inter alia, upon the testimony of experts employed by the petitioners, who visited and studied TDCJ administrative segregation units between October 1997 and October 1998. As noted above, Mr.

The *Ruiz* Court's findings are echoed by the sworn statements of a number of individuals who spent time in administrative segregation at Eastham or witnessed the effect that administrative segregation had upon Mr. Austin.  *See* Petition at 27-30.[29]

Mr. Austin spent the years immediately prior to his false confession in safekeeping at the Hughes Unit.  Contrary to the State's assertion, *see* Answer at 35, safekeeping inmates in Hughes Unit at that time did *not* have "essentially the same freedoms as any other inmate of the same level classification."  *Id.*  To the contrary, numerous individuals who were housed in safekeeping at Hughes corroborate that they had fewer job options, contact visits, and educational

---

Austin was held in Eastham Administrative Segregation from August 7, 1995 through June 11, 1998, as well as at various times in Hughes Unit administrative segregation between 1998 and 2001. Drs.  Riveland, and Dr. Craig Haney, a psychologist and specialist on the effects of administrative segregation, both visited administrative segregation units; Dr. Haney visited Eastham segregation particularly. Both also reviewed documentation on administrative segregation units for that period. Both testified in the trial and their testimony was attached to the original petition. Moreover, In Ruiz II, Keith Curry visited administrative segregation sites in TDCJ in early 2002 and reviewed documentation on administrative segregation units, including documents relating back to 1999.

[29] See also Exhibit 116 – Affidavit of Richard Goeglein, July 8, 2010: "In my time at TDC I have been housed in transit cells in the following units: Stiles, Beto 1, Eastham, Ellis II, Ferguson, Allred. The older units (Eastham, Ellis II, Ferguson, Beto I) are really really bad. It can make you crazy sitting by yourself constantly. In terms of electricity- if they let you see the cells you would see- there is no fan in the cell. The electricity and the light were on two breakers and often the electricity was off, so even if you had your own fan you couldn't use it. Sometimes when I was able to get my property back there I would unscrew the light and connect the fan into the light socket. Often it was a choice between air and light, so I would chose to sit in the dark. I think part of the reason they switched the electricity off at the wall socket was because people were using it to start fires. It can make people crazy and act out like that. Sometimes when you need attention for the guards and they ignore you it makes you crazy. I will specifically describe my experience of being locked up in the transit cells on Eastham. You are supposed to have both property and electricity. In terms of property sometimes you don't get it. They tell you 'its coming' 'we can't find it' on Eastham it was 50/50  whether you got your property back. The transit cells at Eastham also stink. The cells are really dirty you really have to clean them yourself when you get there, it's a good thing that the guards don't seem to mind giving you soap. They don't clean the cells, its up to you. At Eastham there are no windows in the transit cells. The only natural light you see comes through the heavy mesh covering the door from the window across the run from your cell. Its also really loud in those cells. People are constantly screaming and banging. If you are already dealing with something, already getting depressed, it doesn't help. You spend your time thinking and sleeping if you can sleep given all the noise. You exercise, but its hard to get motivated because they don't feed you much and if you exercise too much you'll be hungry. The cells are 5 foot by 6 foot with mesh wire all over the door they are tiny hot little cells and in the winter they are tiny cold little cells. In the Winter I would try to get extra towels from the shower because I would be too cold with the blanket they issued me. The cells are always banged up, beds ripped up, light bulbs missing, screaming inmates banging on the walls. It is difficult. You can't get away from it, can't do anything about it you are just stuck wondering when they are going to come tell me something, move me, always anticipating something. Everyday that they don't come for you is a let down. If you are lucky enough to have a light bulb in the cell, you better take it with you. Its hard to explain- just being stuck somewhere with nothing to look forward to except being moved you're not sure, if they are playing game with you or not. The cells are short so there is not much pacing room and eventually you are going to start pacing."

opportunities than general population inmates; and reported routine brutalization and verbal assaults by guards at the Hughes Unit.  *See* Petition at 31-32.[30]  Moreover, when Mr. Austin sent the letter to Sgt. Allen falsely confessing to capital murder, he was being housed in solitary confinement and understandably feared a return to the unbearable conditions of administrative segregation.  *See* Ex. 36 at 001475 (indicating that at a hearing on 1/18/01 he was sentenced to solitary confinement).

After he was charged with capital murder, Mr. Austin was transferred to Harris County and a month-and-a-half later was again placed in administrative segregation, without being told why.  Ex. 14, at 003902.  He remained there, in an exceptionally restrictive and violent environment, *see* Petition at 36-37, from May 1, 2001 through November 2002, including a three-month period at the San Jacinto Jail during Hurricane Allison and its aftermath.  On the

---

[30] *See also* Exhibit 114 – Affidvit of Jeffrey Wilson, July 8, 2010 ("Generally speaking, SK inmates are treated very, very poorly. SK inmates can only work in laundry, garment factory and building SSI. Educational opportunities are also very limited for SK inmates. . . . They say that these kinds of rules are there for my protection, but they're making it so I can't learn anything. Plus, it is not believable that the guards or TDC wanted to protect SK inmates when there were so many brutal attacks on SK inmates. At Hughes, there was an incident where a guy was beaten and stripped in a sallyport. In another, an inmate was stripped naked and whipped with belts. In another incident, a psychiatric inmate was beaten by the unit bosses. GP inmates would never be treated so poorly.  The environment at Hughes—in SK specifically—had a huge effect on Perry. Perry went from being extremely depressed to being suicidal, to not caring anymore. It was hard for Perry to see anything positive when he was in SK at Hughes. It's hard to blame him because all SK inmates were targets. We were called "faggots" and "child molesters" even though the guards didn't know what we were. It was a very hostile environment."); Exhibit 115 – Affidavit of Rusell Olstad, July 2010 ("Another huge problem is that you can't go to the security with problems. Often making a complaint will mean that you get written up. They would tell you to grow testicles to stop being a cry baby there were very few of them who were trying to do their jobs respectfully. Back when Perry was here safekeeping inmates were escorted everywhere, herded from one spot to another. The guys in safekeeping know how the blacks felt when they went through their struggles. We were oppressed. They acted like we were all child molesters and that treatment gets nerve wracking- you get a lot of suicides on safekeeping. Safekeeping is for people with problems and its hard when you can't talk to staff about your problems, when you are constantly hated on. There have been several suicides on this unit.  Perry, [and] myself were some of the first safekeeping inmates to be housed at the Hughes Unit.  Back then the guards were more violent towards us because before we were put on this farm they were told we were child molesters and disease ridden faggots. Back then most of us worked on the segregation unit and the seg officers were violent, looking for any reason to beat you up. The jobs available to safekeeping inmates on the Hughes Unit are garment factory, laundry and the 'garden squad' in the fields. We are also able to be on the clean up crew but only for our own building. Back when Perry was here we also worked in seg kitchen but not anymore.  Back in 1999 it was a real military unit, they could not stand us, they did not want safekeeping on this farm. Hateful clannish rednecks ran this prison. In fact two wardens that I know of have petitioned Huntsville to get rid of safekeeping on this unit. Warden Herbert Scott and Warden Dawn Grounds. General population feed us in the chow hall. The guards encourage the general population guys to serve us small portions and often they will take food of the line.").

day of his first *Faretta* colloquy with the judge, on October 11, 2001, Mr. Austin was in the midst of a hunger strike, protesting the fact that he was in administrative segregation for no stated reason. *See, e.g.*, Ex. 15 at 003883; Ex. 14 at 003957-59.  There was no mention of this fact – which certainly would have had a bearing on his mental state – during the colloquy.

Based on the recent filings, there is a factual dispute between the petitioner and the state regarding the length of time during which Mr. Austin was in administrative segregation at Harris County Jail. Both the state and the petitioner agree that petitioner was moved to administrative segregation on May 1, 2001. The state, however, asserts that he was moved out of administrative segregation on October 11, 2001, the date of his *Faretta* hearing, while the defense claims that he remained in administrative segregation through February 14, 2002. The state cites no evidence for its contention, other than an October 18, 2001 letter indicating that petitioner will continue to be held in segregation for the foreseeable future, a document which of course supports petitioner's position. Much additional evidence supports the fact that Mr. Austin continues to be held in administrative segregation after October 11, 2001. Mr. Austin goes on a hunger strike to protest his being held in segregation on October 7, 2001, and the strike does not end until October 17, 2001. On October 15, 2001, as the state concedes in its answer, Mr. Austin files a grievance to be let out of administrative segregation, an unlikely action if he had already been transferred. Moreover, on or around January 24, 2002, Mr. Austin wrote a letter in which he asked to be moved to "doubledoor" segregation, noting that he was already in "administrative separation" at the time. Finally, the record is clear that on February 14, 2002, Mr. Austin was transferred to general population as per orders of Dr. Ferguson and Lt. Moore.

The state also asserts that "during this entire time" – apparently the time that Mr. Austin was in administrative segregation at Harris County Jail – Mr. Austin filed only two formal

grievances regarding his conditions, and therefore petitioner cannot now assert that the conditions in administrative segregation at Harris County Jail were coercive. However many formal grievances he filed, there is a significant amount of evidence in the file regarding Mr. Austin's experience of the conditions of administrative segregation in Harris County Jail and the effects of those conditions on his mental functioning.

- On May 2, 2001, Mr. Austin wrote to Dr. Ned Hicks, a pastor with whom he had been corresponding. He told him that he was in segregation "and it is really hard. I've got too much time to think and this situation is really ating me up."

- On May 9, 2001, Deputy R. Chacon documented that he had received a phone call from a friend of Mr. Austin's who informed him that "Mr. Austin repeatedly wrote about killing himself, he also mentioned to her that he would do it during the early hours and he would use a razor blade to achieve the suicide attempt."

- On July 9, 2001, Mr. Austin wrote to Judge Cosper, pleading that he be released from administrative segregation. "I have a very bad problem with depression and when I get depressed I tend to think about suicide a lot. If I am forced to remain in seg [sic] too long I won't be around to stand trial."

- On August 8, 2001, Mr. Austin wrote to the judge again asking that his trial date be moved forward so his suffering in administrative segregation would come to an end through his execution.

- On October 7, 2001, Mr. Austin went on a hunger strike to protest at his continuing detention in segregation. The strike ended on October 17th

- On October 15, 2001, as the state concedes in its answer, Mr. Austin files a grievance to be let out of administrative segregation.

- In January of 2002, in a despairing and hopeless letter, Mr. Austin wrote to Major Berry asking that he be moved to the even more secure "doubledoor" lockdown, noting the deterioration of his mental health and his fear that he might hurt someone, and claiming that it is basically impossible for his living conditions to get any worse.

- On February 21, 2002, one week after being released from segregation, Mr. Austin asserted to Sgt Allen in his second recorded statement regarding the murder that he wrote the initial letter to Sgt Allen because he was depressed, due in significant part to being forced to live in segregation.

- 

For the state, in light of this record, to imply that Mr. Austin had not sufficiently complained of being kept in administrative segregation is wholly unsupported.

Besides ample evidence of Mr. Austin's mental illness preceding and at the time of the waiver, and of the coercive conditions to which he was subject, there is also evidence in the record of the interaction of these two elements. Mr. Austin himself, in the letters and complaints regarding housing conditions surveyed immediately above, made the interaction of the two obvious. *See, e.g.,* Letter to Court, July 9, 2001 ("I cannot handle prolonged isolation. I have a very bad problem with depression and when I get depressed I tend to think about suicide a lot. If I am forced to remain in seg too long I won't be around to stand trial."). Sworn affidavits from fellow inmates detail the effects that the conditions have had on Mr. Austin's mental health. The affidavits of inmates held in administrative segregation in Eastham were summarized in the original petition. See Original Petition, p. 29, and ftnt 82 (affidavits of Bernard Richard, Alan Fontenot, Robert Richardson). These and other inmates observed Mr. Austin's mental state as it deteriorated under the pressure of segregation, and they noted in their petitions a general

worsening of his mental state, increased isolation and reduced communication, evidence of self-harming behavior and Mr. Austin being reduced to a near catatonic condition, not moving or even eating for days at a time. See Original Petition, p. 29, ftnt 83 (affidavits of Robert Richardson, John Thompson, Dempsey Sutton)

Affidavits of inmates who were held in "safekeeping" at the Hughes Unit at the same time as Mr. Austin were also summarized in the original petition. See Original petition, p. 31, ftnts 86-90 (interviews of Jeffrey Wilson, Michael Harell, John Creekmore). The emphasis of these affidavits was the regular verbal and physical abuse that the (mostly declared homosexual) inmates held in safekeeping regularly suffered from the guards. *See* Original petition, p. 31, ftnt 90 (interviews of Jeffrey Wilson, Ricky Johnson, michael Harrell, Brian Whetstone).

New affidavits were acquired in light of the state's denial of oppressive conditions in Hughes Safekeeping. Inmate Jeffrey Wilson noted that in general, safekeeping inmates were treated "very poorly", their work and educational opportunities were extremely limited and they were brutally beaten by the guards.  Ex. 114.  Mr. Wilson also noted that "[t]he environment at Hughes—in SK specifically—had a huge effect on Perry." *Id.*   Inmate Russell Olstad also commented on violent and nerve wracking conditions in Hughes Safekeeping, the suicides on the unit and its effect on psychologically vulnerable prisoners such as Mr. Austin. Ex. 115.

Dr. George Woods has reviewed the evidence of mental illness and prison conditions and their interaction, and concluded that the Mr. Austin's decision to proceed without counsel was not knowing, voluntary or intelligent. Exhibit 95 (Affidavit of Dr. George Woods) p. 18. In contrast, neither Dr. Brown nor Dr. Allen has offered any opinion on whether petitioner's waiver of counsel was knowing, voluntary or intelligent.

**CLAIM XI: Mr. Austin's Right to Due Process was violated because his guilty plea was not a competent, knowing, voluntary and intelligent waiver of his jury trial right.**

### 1.  *Deference and Standard of Review*

In the present case, this Court reviews the question of the competent, knowing, voluntary and intelligent plea de novo.

The petitioner's claim is a claim of federal constitutional law that was neither brought to the attention of nor reviewed by the trial court. Nor was any such claim reviewed on the merits by the Court of Criminal Appeals, which procedurally defaulted all claims. There is therefore no AEDPA deference in this case, as no state court has adjudicated the claim on the merits.  *Landry v. Cain*, 445 Fed. Appx. 817, 822 (5th Cir. La. 2011)(finding that habeas review on the question of the knowing, voluntary and intelligent nature of a waiver of counsel is de novo, when the court in state post-conviction dismissed the claim on procedural grounds. "When the disposition was procedural—and thus the claim was not adjudicated on the merits in state court—the standards of AEDPA do not apply." (citing *Graves v. Dretke*, 442 F.3d 334, 339 (5th Cir. 2006)).

Whether a defendant waived his constitutional rights is an issue of federal law, and not a question of fact and is clearly not a determination of a factual issue subject to a presumption of correctness under §2254(e)(1). *Brewer v. Williams*, 430 U.S. 387, 397 and n. 4, 403-404 (1977) (waiver of Sixth Amendment right to assistance of counsel is not a question of historical fact, but rather requires application of constitutional principles to facts).

### 2.  *The court's colloquy is an inadequate basis for determining that the guilty plea was competent, knowing, voluntary and intelligent.*

The state in its Answer relies on the guilty plea colloquy to demonstrate the competent, knowing, voluntary and intelligent nature of the petitioner's guilty plea in this case. (Answer, 40). But as with the colloquy for the waiver of counsel, the guilty plea colloquy, particularly in the circumstances of this case, was clearly inadequate.

The guilty plea colloquy was even more superficial in its questioning regarding mental health than the *Faretta* colloquy. The court asked only two following two questions:

Court:  Are you of sound mind?

Austin: Yes, ma'am

Court: And, Mr. Austin, when you committed this offense, were you of sound mind?

Austin: Yes, ma'am

RR IX at 5. This, again, was after the court had been put on notice, in particular via the defendant's letters to the court, that mental health was a significant issue in this case. And as in the *Faretta* colloquy, undisputed records now make clear that the petitioner's response to at least the first question (and the only one relevant to the plea) was demonstrably false. Harris County Jail records indicate that just a few days before this colloquy, Mr. Austin was "dysphoric" and "tearful" in a psychological counseling session, and admitted that he was "manipulating the system in a way so that Harris County has no choice but to sentence him to death."  Petitioner's Ex. 15.   Also noted in the records of that counseling session is that Mr. Austin is diagnosed with depression and taking anti-depressant medication (Remeron), but had stopped and reinitiated the drug "again last night and does not yet know if the new dosage of Remeron will work for him." Petitioner's Ex. 15. Obviously the colloquy was not adequate, particularly given the degree to which the court had been put on notice, to establish the facts of Mr. Austin's mental illness and its significance for the efficacy of the plea's waiver or rights.

The court asked three questions relevant to the voluntariness of the plea:

Court:  Has anyone reached any agreement with you to get you to enter your plea?
Austin: No,'ma'am.
Court; Has anybody promised you anything to get you to enter your plea?
Austin:No, ma'am.

> Court: has anybody threatened you to enter your plea?
> Austin: No, ma'am

RR IX at 4-5. Again, particularly given the degree to which the court had been put on notice, via the defendant's letters, of the issues of mental illness and the interactions of that illness and coercive prison conditions, this was inadequate to establish the voluntariness of the plea.

### 3. Contrary to the state's assertions, petitioner provided ample evidence of the mental illness and coercive conditions that rendered his plea involuntary.

Petitioner will not repeat the evidence and arguments offered in support of the claims regarding competency and the waiver of the right to counsel. Petitioner does draw specific attention to the information in the Harris County jail records contemporaneous with Mr. Austin's trial and the elapse of time between Dr. Brown's evaluation (9/20/01), the original *Faretta* hearing (10/11/01) and the plea (4/1/02). These matters serve only to increase the cogency of the evidence of mental illness and involuntariness and reduce the reliability and probative force of the earlier evaluation.

A plea not voluntarily and intelligently made has been obtained in violation of due process and is void. See *McCarthy v. United States*, 394 U.S. 459, 466 (1969). The test for determining a guilty plea's validity is "'whether the plea represents a voluntary and intelligent choice among the alternative courses of action open to the defendant.'" *Hill*, 474 U.S. at 56 (*quoting North Carolina v. Alford*, 400 U.S. 25, 31, 27 L. Ed. 2d 162, 91 S. Ct. 160 (1970)). Courts assessing whether a defendant's plea is valid look to "all of the relevant circumstances surrounding it", *Brady v. United States*, 397 U.S. 742 at 749, 90 S. Ct. 1463, 25 L. Ed. 2d 747, and may consider such factors as whether there is evidence of factual guilt.

The Fifth Circuit, in *Matthew v. Johnson*, 201 F.3d 353, 364-365 (5th Cir. Tex. 2000), noted that, as in the waiver of the right to counsel, a guilty plea must be both competent and

knowing voluntary and intelligent. The court in *Matthews* also had the following to say about the necessary "voluntariness" of the plea

> The plea must be entered "voluntarily," i.e., not be the product of "actual or threatened physical harm, or . . . mental coercion overbearing the will of the defendant" or of *state-induced emotions so intense that the defendant was rendered unable to weigh rationally his options with the help of counsel*.

*Id.* at 365. *See also Reyes v. Quarterman*, 2009 U.S. Dist. LEXIS 32849, 22-23 (S.D. Tex. Apr. 16, 2009) (same). Petitioner has provided ample evidence in this case of coercive conditions and state-induced emotions so intense that the defendant was rendered unable to weigh rationally his options.

The state, as it has in relation to other claims, makes the assertion that petitioner provides no evidence for his claim that his guilty plea was not knowing, voluntary and intelligent. *Answer* at 40. In particular, according to the state, Mr. Austin "merely alleges that his guilty plea was the product of a harsh prison environment which helped amplify his severe mental illness," but provides no evidence of either the mental illness or the prison conditions (Answer, 40). As discussed at length above, this is an obvious mischaracterization of the Petitioner's Second Amended Petition and the claims and evidence it entailed. Extensive evidence is provided of (1) Mr. Austin's mental illness at the time of the decision to plea guilty and at the time of the guilty plea, (2) the coercive prison conditions that Mr. Austin suffered at the time of his decision to confess and plead guilty, when he was being held in Harris County, and (3) the effects of these conditions on Mr. Austin's mental illness and his decision to plead guilty in order to secure a death sentence.

It should be noted that Mr. Austin's decision to confess and decision to plead guilty are obviously one and the same. The letter to Sgt. Allen, dated September 7, 2000, written while Mr. Austin was in Hughes, states that he will only confess to the crime if he can be guaranteed the

death penalty; obviously implicit in this decision is an intent to plead guilty to the crime. This decision was reaffirmed at multiple points..

The evidence of mental illness both at the time of the decision to plea guilty, see infra, and at the time of the guilty plea is described at length in Dr. Woods' second affidavit and adequately summarized above. Given the state's assertion of lack of evidence, however, petitioner highlights the evidence of mental illness from the Harris County Jail (Petitioner's Ex. 14 & 15) surrounding the time of the guilty plea, which took place on April 1, 2002, in particular.

- On February 28, 2002, Mr. Austin was diagnosed with depression disorder at Harris County jail. He was prescribed the powerful anti-depressant Remeron for the first time.

- On March 22nd, Mr. Austin noted that the medicine was making him drowsy and causing him to sleep excessively.

- On March 28th, just days before the guilty plea, Mr. Austin affirms to Karen Wilson, his counselor, that he is using the court system to commit suicide. In a later affidavit provided to petitioner's counselor, Mr. Wilson confirmed that she viewed this as "suicide by proxy." Petitioner's Ex. 110 (Karen Wilson) Ms. Wilson describes Mr. Austin's mood as dysphoric and tearful.

- Also on March 28th, the record notes that the petitioner has stopped his medication but then started it again, and "he does not know if the new dosage will work for him."

- On April 1, 2002, Mr. Austin pled guilty.

- On April 3, 2002, a guard notes that Mr. Austin is angry and hostile to everyone.

- On April 4, 2002, Mr. Austin sees Dr. Elizabeth Ferguson. She notes that he is showing depressive symptoms as well as paranoia. His mood is dysphoric, his affect blunted, his

psychomotor activity is low and his complexion is sallow with dark circles under his eyes. She continues the prescription of Remeron.

The state also asserts that the petitioner presents no evidence of coercive prison conditions when Mr. Austin decided to plead and plead guilty. The original letter to Sgt. Allen, dated September 7, 2000, was written while Mr. Austin was in either Hughes safekeeping or Hughes segregation. The conditions in Hughes safekeeping and segregation are well established by Petitioner. At the times when Mr. Austin reaffirmed this decision to plea, on, inter alia, May 5, 2001, July 19, 2001, August 8, 2001, and November 23, 2001 – he was housed in administrative segregation at Harris County jail. It is true that on April 1, 2002, when he actually pled guilty, he was in general population at Harris County. The fact that he was removed from segregation was a relief, but not a large enough one, given his mental illness and particularly the interaction of his depression with his frontal-lobe dysfunction, to allow him to change tacks and challenge the case against him. Mr. Austin knew only too well that he could be placed back in that environment at any time.

**CLAIM XVIII: Mr. Austin's Right to Due Process was violated because his waiver of appellate counsel was not competent, knowing, voluntary and intelligent.**

### 1. *Deference and Standard of Review*

For the reasons described above in relation to waiver of trial counsel, this Court reviews the question of the competent, knowing, voluntary and intelligent nature of the waiver of counsel on appeal in this case *de novo* and without the need to satisfy §2254(d).

### 2. *Petitioner's waiver was not competent, knowing, voluntary or intelligent*

For the reasons described above and in the Second Amended Petition, the waiver of counsel on April 4, 2002 was not competent, knowing, voluntary or intelligent.  As described above, the colloquy was even less adequate than previous colloquies, despite the fact that the

116

court now had more information of mental illness, was aware that Mr. Austin had lied in his last two colloquies to cover up his mental health problems and was now waiving appellate and collateral review and guaranteeing his execution.

Petitioner specifically adopts the discussion in this Response regarding his competency at the time of this waiver and in the post-trial period.

Petitioner specifically submits that where, as here, the waiver of counsel was tantamount to a waiver of all review in a death case that the procedures and protections established for that type of waiver should have applied in addition to the usual considerations applicable to *Faretta*. The state court should have heightened and expanded its's *Faretta* enquiry in order to determine Mr. Austin's mental competence "in the present posture of things, that is, whether he has capacity to appreciate his position and make a rational choice with respect to continuing or abandoning further litigation or on the other hand whether he is suffering from a mental disease, disorder, or defect which may substantially affect his capacity in the premises." *Rees v. Peyton*, 384 U.S. 312, 314 (1966)(Ordering remand for psychiatric examination and competency hearing for defendant seeking to waive further collateral review).

**CLAIM VII. Mr. Austin's right to the effective assistance of counsel was denied as a result of a conflict of interest when he was appointed counsel who after appointment secretly advocated against Mr. Austin's interests**

> *1.   No deference is due as there was no lower court decision on ineffective assistance of counsel.*

This court clearly owes no deference under 2254(d), as there is no state court decision on the merits to which to defer – the state court having procedurally defaulted the claim and declined to reach the merits. The state does not argue that §2254(d) apply.

### 2. *The state misstates the nature of the deficient conduct*

The state resists this claim by arguing that counsel's duty to report the threat of a violent crime against another is reasonable performance.

Petitioner was at pains to make clear that his complaint did not revolve around the fact that trial counsel had made the report to the Harris County authorities. The real problem lay in the fact that counsel did not disclose this conduct. By misstating the nature of the claim the state seeks to provide an answer to its merit. Petitioner directs the court to the terms of the claim as fully outlines in Petitioner's Second Amended Petition.

**CLAIM VIII: Mr. Austin's right to counsel was violated when he was afforded ineffective assistance of counsel prior to his *Faretta* hearing.**

### 1. *No deference is due as there was no lower court decision on ineffective assistance of counsel.*

This court clearly owes no deference under 2254(d), as there is no state court decision on the merits to which to defer – the state court having procedurally defaulted the claim and declined to reach the merits. The state does not argue that §2254(d) apply.

### 2. *The petitioner has not waived his ineffective assistance of counsel claim.*

The state asserts that "[b]ecause Austin was competent and made a knowing, intelligent and voluntary waiver of counsel, all of his claims of ineffective assistance of counsel must be rejected." (state, 52) Petitioner did not waive his counsel, however, until October 11, 2001. Counsel was appointed on March 21, 2001. The bulk of petitioner's claim focuses on those seven months; the additional claim relates to expectations for standby counsel only.

The state also asserts that petitioner's claim that counsel was deficient in relying on Dr. Brown's inadequate assessment was inadequately briefed and therefore waived. [find this in state's answer and address]

### 3. *Petitioner's right to counsel was violated due to inadequate investigation of his mental health by appointed counsel.*

Petitioner alleges that between March 21, 2001, the date counsel was appointed, and October 11, 2001,[31] the date he was granted the right to proceed pro se, significant work should have been done on the case. The reality is that almost no work was done. In seven months, in this capital case, appointed counsel did not ask for or receive discovery, collected no records, spoke to no witnesses, and authored and filed only one motion, a motion for a psychiatric examination.

That motion, which requested funding and approval for a mental health examination of the defendant, noted "highly unusual behaviors" on the part of the petitioner indicating that mental health was an issue in the case and must be investigated "in order to render effective assistance of counsel." The motion noted that such mental health investigation could be relevant, in Mr. Austin's case, to "the voluntariness of statements, mental health defenses and mitigation." Petitioner claims that once counsel was appointed and this motion was filed, counsel had, at a minimum, a duty to collect relevant records and provide them to the psychologist who was ultimately appointed to evaluate Mr. Austin. Counsel collected no records and provided nothing to the appointed expert either following the signing of the court's funding order or after the expert was transformed into a court appointed competency expert.

The state claims, in its response, that appointed counsel did all that was required of them to meet prevailing standards in the profession. According to the state, soon after counsel was appointed, Mr. Austin expressed a desire to represent himself. Thus, in an abundance of caution, solely in response to this expressed desire, appointed counsel requested an expert evaluation. The expert reported back to defense counsel that Mr. Austin was competent. The state asserts that nothing else could have been expected of defense counsel, and notes that defense counsel is

---

[31] Due to a typographical error, Petitioner at p,109 of the Second Amended Petition listed this date as April 2, 2002. This is incorrect.

permitted to rely on an expert's opinion and cannot be forced to second guess that opinion. The state similarly asserts that defense counsel is also permitted to rely on the defendant. Given that the defendant falsely denied his mental health history, the fault for the lack of knowledge of such cannot be attributed to defense counsel.

There are numerous misstatements of fact and law in the state's account. First of all, there is no evidence that defense counsel filed his motion for funds for a psychological examination solely in response to Mr. Austin's desire to proceed pro se. The motion itself makes no mention of the defendant's desire to waive counsel, but rather cites "highly unusual behavior" "for the past several months" both at TDCJ and at Harris County, and claims that the evaluation is necessary for purposes of "voluntariness of statements to mental health defenses to mitigation" and "in order to render effective assistance of counsel in this case."

Secondly, it is hardly the case that the expert examined the petitioner on defense counsel's behest and reported back to counsel. As previously detailed, the examination that was conducted was at the behest of the court and the report was filed into the court record on October 11, 2001.  There is no evidence in the record that defense counsel saw or was aware of the contents of the report before that date.  Thus to assert that defense counsel hired an expert to thoroughly vet the mental health issues before abandoning any investigation or legal strategy on that front is to misread the facts entirely.

Appointed counsel remained on the case until October 11th. In all this time, appointed counsel conducted no investigation of the mental health issues that had been raised.  As argued at length in the original petition, this performance was clearly deficient pursuant to *Strickland*. As the state claims that counsel acted within prevailing professional norms, it must also be pointed out that counsel's performance in this regard fell well below those norms, including the

standards described in the ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases, 1989 or the Revised Edition (2003).[32]  Should an evidentiary hearing be granted on this claim, Petitioner will present direct and expert evidence of the prevailing standards and norms at the time of Mr. Austin's trials to demonstrate that the almost complete inaction of defense counsel in this case fell below those standards.

The state makes a number of more specific arguments.

As noted above, the state argues that defense counsel is able to rely on expert advice, and therefore Dr. Brown's opinion that Mr. Austin was competent freed him from all duties related to mental health issues. This is untrue and, in any event, Dr. Brown's report was not filed until October 11, 2001, the day counsel was relieved.  Tthere is no evidence that it was provided to defense counsel before that.  Even if it had been provided on the day authored, that would still have been September 25, 2001 and would provide no justification for the preceding inaction. The duty to investigate initiated at the date of counsels' appointment, on March 14, 2001, and was kicked into higher gear whenever counsel witnessed the "highly unusual" behaviors that motivated them to file the motion for psychiatric evaluation on May 30, 2001.

In any event, Dr. Brown's report in no way would have absolved counsel of his responsibilities.  First of all, as noted above, Dr. Brown did not examine all relevant mental health issues regarding which defense counsel had a duty to investigate. In particular, Dr. Brown did not address the voluntariness of petitioner's statement or his already stated desire to plead guilty and waive counsel. It is ineffective to rely upon a mental health evaluation that is so deficient and limited in its scope.  Secondly, it is well established that, regardless of whether counsel hires an expert, he or she has an independent duty to investigate and collect records

---

[32] Petitioner specifically asserts that the 2003 Guidelines are also relevant as they captured the existing professional norms and standards as they existed in 2002, were written up, adopted and published in 2003.

related to mental health, and to furnish those records to the hired expert.[33]   The American Bar Association Standards for Criminal Justice have also weighed in on counsel's duty in relation to a requested evaluation, noting the duty to obtain and submit to the evaluator relevant records.[34]   Third, Defense counsel cannot merely follow the advice of an expert when his or her own failure to investigate or provide that expert with materials rendered the expert's opinion unreliable.[35]   "'Strategy resulting from

---

[33] *Roberts v. Dretke*, 381 F.3d 491, 499-500 (5th Cir. Tex. 2004) **("Trial counsel provides deficient performance if he fails to investigate a defendant's medical history when he has reason to believe that the defendant suffers from mental health problems." [comes out wrong way]);** *Bouchillon v. Collins*, 907 F.2d 589, 597 (5th Cir. 1990) ("It must be a very rare circumstance indeed where a decision not to investigate would be 'reasonable' after counsel has notice of the client's history of mental health problems."); *Profitt v. Waldron*, 831 F.2d 1245, 1248-49 (5th Cir. 1987) (holding that counsel has duty to investigate mental health history of defendant who has been committed to a mental institution); *Beavers v. Balkcom*, 636 F.2d 114, 116 (5th Cir. 1981) (failed to investigate def's background in mental institutions holding that counsel has duty to obtain medical records and speak with treating physicians). *Brown v. Sternes*, 304 F.3d 677 (7th Cir. 2002) ("Trial counsel was ineffective for failing to investigate non-capital defendant's mental illness and in permitting the court appointed experts to evaluate defendant with inadequate data. Prejudice is shown, in part, because the medical records counsel neglected to obtain showed defendant suffered from chronic schizophrenia and raised a "bona fide doubt" regarding his competence. ("Where a defense attorney has received information from a reliable source that his client has had a history of psychiatric problems, but failed to adequately investigate the history, counsel failed to provide effective assistance noting it is common knowledge that an evaluating psychiatrist's expert opinion concerning a defendant's mental status will be based primarily on "past psychiatric history, family history, criminal activity, and medical records"); *Bloom v. Calderson*, 132 F.3d 1267 (9th cir. 1997) (holding trial counsel ineffective for failing to present expert with readily available mitigating evidence); *Claiborne v. Lewis*, 64 F.3d 1373 (9th cir. 1995) (holding trial counsel ineffective for failing to adequately prepare testifying trial expert with recent mental health records which would have changed the defense expert's diagnosis , as well as state expert's diagnosis)**;** *Affinito v. Hendricks*, 366 F.3d 252, 260 (3d Cir. 2004) ("When the key issue in a criminal case is whether the defendant suffered from diminished capacity, we can think of nothing more critical than ensuring that the defense's psychiatric expert has as complete and accurate a description of the facts and circumstances surrounding the crime as possible. . . . A defendant's own statements to the police have to be some of the most, if at times not the most, crucial documents with which an evaluating mental health expert should be familiar.").

[34] ABA Standards for Criminal Justice 7-3.5. (b), entitled the Attorney's duty to provide information, states as follows:

> The attorney initiating an evaluation should take appropriate measures to obtain and submit to the evaluator any record or information that the mental health or mental retardation professional regards as necessary for conducting a thorough evaluation on the matter(s) referred. Ordinarily, such records and information will include relevant medical and psychological records, police and other law enforcement reports, confessions or statements made by defendant, investigative reports, autopsy reports, toxicological studies, and transcripts of pretrial hearings. The attorney should also obtain and submit to the evaluator any other record or information that the attorney believes may be of assistance in facilitating a thorough evaluation on the matter(s) referred.

[35] *see Jacobs v. Horn*, 395 F.3d 92, 103-04 (3d Cir. 2005) (holding counsel's decision not to further investigate defendant's mental status after defense expert informed counsel he did not find any evidence of major mental illness was objectively unreasonable where counsel failed to provide expert with background information on crime or defendant's history and inform expert it was a capital case); *Bloom v. Calderon*, 132 F.3d 1267, 1278 (9th Cir. 1997) ("When the defense's only expert requests relevant information which is readily available, counsel inexplicably does not even attempt to provide it, and counsel then presents the expert's flawed testimony at trial, counsel's performance is deficient."); *Walker*

lack of diligence in preparation and investigation is not protected by the presumption in favor of counsel.'" *Antwine v. Delo*, 54 F.3d 1357, 1367 (8th Cir. 1995) (quoting *Kenley,* 937 F.2d at 1304).

The state also asserts, as noted above, that the ineffective assistance of counsel claim is undermined in this case because of the lack of cooperation by the defendant, citing the petitioner's false statements to the court and Dr. Brown regarding his lack of mental health issues and history. The caselaw is clear that defense counsel's duties regarding investigating competence are not negated by the defendant's desire to be found competent. *See Hull v. Freeman*, 932 F.2d 159, 168 (3d Cir. 1991) ("[I]t is axiomatic that the desire of a defendant whose mental faculties are in doubt to be found competent does not absolve counsel of his or her independent professional responsibility to put the government to its proof at a competency hearing when the case for competency is in serious question"); *United States v. Boigegrain*, 155 F.3d 1181, 1189 (10th Cir. Colo. 1998) (*quoting Bundy v. Dugger*, 816 F.2d 564, 566 n.2 (11th Cir. 1987) ("If defense counsel suspects that the defendant is unable to consult with him with a reasonable degree of rational understanding, he cannot blindly accept his client's demand that his competency not be challenged.") (citation and quotation marks omitted).

Finally, the state argues that there was no duty whatsoever to investigate mental health in this case, as the petitioner's desire to proceed pro se is not itself enough to mandate a mental

---

*v. Mitchell,* 587 F. Supp. 1432, 1443 (E.D. Va.1984). (atty ineffective in relying on expert advise alone in choosing not to pursue insanity plea, without taking step of investigating records or interviewing people familiar with defendant's mental history, noting failure "to take an obvious and readily available investigatory step," i.e. exploration of institutional history of which def counsel was on notice). *cf. Caro v. Calderon*, 165 F.3d 1223, 1228 (9th Cir. 1999) ("A lawyer who knows of but does not inform his expert witnesses about . . . essential pieces of information going to the heart of the case for mitigation does not function as 'counsel' under the Sixth Amendment."). *See also In Proffit v. Waldron*, 831 F.2d 1245, 1249 (5th Cir. 1987) , (holding that obtaining the opinion of a court-appointed psychiatrist did not excuse defendant's counsel of any duty to investigate further, when counsel had information indicating prior mental health history but did not pursue records of this history, including a previous finding of criminal insanity in another case.) The state's reliance on *Smith* is misplaced as even in that case the court was only willing to accept counsel's reliance upon "objectively reasonable evaluations and opinions of expert witnesses" *Smith v. Cockrell*, 311 F.3d 661, 676 (5th Cir. Tex. 2002). Dr. Brown's report does not meet this standard.

health investigation. (state 58) As established above, however, the need to investigate mental health arose not from this desire alone but from this desire in conjunction with the "highly unusual behavior" learned of by appointed counsel, which counsel themselves felt required investigation  "in order to render effective assistance of counsel." In addition, the record establishes that the letters that Mr. Austin sent to the court were forwarded to counsel. These letters contain obvious evidence of mental illness, including statements that Mr. Austin's "mental stability has steadily decreased," and that  he "has a very bad problem with depression" which typically leads to thoughts of suicide and that he might not "be around to stand trial" (July 19, 2001). He also makes requests for a quick death sentence and asserts that the court cannot prove that he has a death wish. (May 15, 2001, July 19, 2001, August 8, 2001). Certainly these letters also indicate that an investigation into Mr. Austin's mental health is necessary.

Finally, the state argues that because the petitioner plead guilty, any ineffective assistance of counsel claim is waived unless, absent said ineffective assistance, the petitioner would have insisted on going to trial. *Hill v. Lockhart*, 474 U.S. 52, 29 (1985). This is the standard when the defendant pleads guilty on the advice of counsel – not what occurred here at all.  *Id.* at 56-7.

In reality, the caselaw in guilty plea cases demands nothing else than what is required in other cases, a showing of prejudice. In this case, if appointed counsel had properly investigated the mental health issues, the defendant would have been found incompetent, or not been permitted to proceed pro se/plead guilty/waive review or the defendant would have received treatment, counseling, advice, support that would have allowed him to control his illness just as we have done since becoming involved.

### 4. *Petitioner's right to counsel was violated due to a complete lack of representation at petitioner's Faretta hearing.*

The state does not specifically address the petitioner's claim that he was denied adequate representation at his *Faretta* hearing – a hearing that the state argues was actually a competency hearing. It is undeniable that Mr. Arnold and Mr. Loper were still appointed counsel for the purpose of that hearing, though admittedly they did not behave as such. It is possible that they were under the impression that they were not to participate as counsel because the issue addressed at the hearing was their removal, but if so, that impression was incorrect.

At Mr. Austin's *Faretta* hearing Mr. Arnold asked only four questions, all of them after the court ruled and all of them concerned with the status of Mr. Arnold's appointment and whether any aspersions were being cast on him. Mr. Arnold "just wanted to make sure that it's in the record that you're not requesting that Mr. Loper and I be discharged as your court appointed lawyers because of any personality conflict between you and either of us." (RR II at 16). Other than those questions, defense counsel played no role in the hearing except to respond to a direct informational question from the court.

The issues at any *Faretta* hearing are whether the defendant is waiving his right to counsel in a manner that is knowing, voluntary and intelligent, and whether he is competent to make that waiver and to represent himself at trial. It is unquestionable that the determination of such matters constitutes a critical stage in a trial wherein counsel is required. *See, e.g., Raymond v. Weber*, 552 F.3d 680, 683-685 (8th Cir. S.D. 2009); *United States v. Collins*, 430 F.3d 1260, 1264 (10th Cir. 2005) (agreeing with other circuits that competency hearing is critical stage of criminal prosecution); *Appel v. Horn*, 250 F.3d 203, 215 (3rd Cir. 2001); *United States v. Klat*, 332 U.S. App. D.C. 230, 156 F.3d 1258, 1262 (D.C. Cir. 1998); *United States v. Barfield,* 969 F.2d 1554, 1556 (4th Cir. 1992); *Sturgis v. Goldsmith*, 796 F.2d 1103, 1108-09 (9th Cir. 1986).

Such representation was not provided. Indeed, petitioner claims that the utter lack of representation at this hearing and in preparation for his hearing amounts to a *Cronic* deprivation of counsel, as the issue of the defendant's competence and the legality of the waiver were not subject to "meaningful adversarial testing." *Collins*, 430 F.3d at 1264, citing *United States v. Cronic*, 466 U.S. 648 (1984)

The present case is closely analogous to *Appel v. Horn*, 250 F.3d 203 (3rd Cir. 2001), wherein the Third Circuit found a *Cronic* violation due to appointed counsel's failure to in any way test the state's competency case.   In *Appel*, the defendant told his appointed public defenders upon their initial appointment, and then the court, that he wished to represent himself. The court insisted on a competency determination first and appointed a psychologist to examine him. Counsel did no independent investigation of defendant's competency, offered no materials to the evaluating expert, and did not cross-examine the expert, introduce any evidence or make any arguments at the competency hearing. The court held that this amounted to a constructive denial of counsel and reversed pursuant to *Cronic.*

*United States v. Collins*, 430 F.3d 1260, 1264 (10th Cir. 2005) is similar. Counsel filed a motion requesting a psychological examination to determine competency.  Prior to the hearing on the issue, the attorney filed a motion to withdraw based on his inability to communicate with his client, but the court chose not to rule on the withdrawal until after the competency hearing was completed. At the competency hearing counsel declined to comment and remained silent because of his pending motion to withdraw.  *United States v. Collins*, 430 F.3d 1260, 1265-1266 (10th Cir. N.M. 2005)(granting relief).  Notably, the attorney in *Collins* case did at least file for a competency hearing, which was not done in Mr. Austin's case. *See also Hull v. Kyler*, 190 F.3d 88, 92 (3d Cir. Pa. 1999)(because counsel did not cross examine state expert or put on any

witnesses at the competency hearing, despite knowing of two other state doctors that had found defendant incompetent, the court found a constructive denial of counsel pursuant to *Cronic*, rejecting arguments based upon defense counsel's own belief that the defendant was competent and the defendant's desire to be found competent).

Should this court find that *Cronic* does not apply, counsel's inadequate representation also clearly meets the standard of *Strickland* and *Jerrigan* in that counsels' conduct was clearly deficient, and that deficiency prejudiced his defense.[36] Prevailing objective professional standards clearly dictate a duty to represent a client at a *Faretta* or competency proceeding, both in preparation and in cross-examination and argument. If this had happened, then the extensive prejudice of petitioner's mental illness would have come to light, and petitioner would either not have been allowed to have represented himself, or have been treated to the extent that self-representation became possible. See *Hull v. Kyler*, 190 F.3d 88, 110 (3d Cir. 1999) (holding that in an ineffectiveness claim regarding an assessment of competency a petitioner need not show that he was incompetent, only that there was a reasonable probability that he was incompetent, and counsel failed to inquire into that incompetency).

**CLAIM IX. In violation of Mr. Austin's constitutional rights he was provided with ineffective assistance by his standby counsel who failed to urge a competency hearing or a reconsideration of the previous competency hearing when evidence emerged mandating this course.**

> ### 5.  *No deference is due as there was no state court decision on this claim.*

This court clearly owes no deference under 2254(d), as there is no state court decision on the merits to which to defer – the state court having procedurally defaulted the claim and declined to reach the merits. The state does not argue that §2254(d) apply.

---

[36] "To establish a claim for ineffective assistance [the defendant] must demonstrate that counsel's performance was outside a broad range of reasonable conduct and, but for counsel's ineffectiveness, the result of the competency hearing likely would have been different." *United States. V. Jernigan*, 20 F.3d 621, 623 (5th Cir. 1994)

> ***6. If standby counsel is appointed by the state then standby counsel must be minimally effective in that role.***

The state argues that there is no right to effective standby counsel and for the reasons contained in the Second Amended Petition, Petitioner maintains that there is such a right where stand by counsel are employed.

Certainly, to the extent that a state capital procedure conforms with Due Process when allowing a mentally ill defendant represent himself by appointing standby counsel, that counsel must be effective. In this case, unconstrained by 2254(d) deference, this court is at liberty to consider the constitutional requirement of effective standby counsel with fresh eyes. Respondent does not assert that relief would be barred by *Teague*.

**CLAIM V: Mr. Austin's rights under the Texas and federal constitutions were violated when the state failed to disclose material helpful to Mr. Austin to the court, Mr. Austin or the court appointed psychologist**

**CLAIM VI: Mr. Austin's right to counsel under the Texas and Federal Constitutions was violated when the state's failure to disclose evidence relevant to the determination of his competence and the voluntariness of his conduct effectively denied him the assistance of counsel on these issues**

> ***1. No deference is due as there was no state court decision on Mr. Austin's Brady claim.***

This court clearly owes no deference under 2254(d), as there is no state court decision on the merits to which to defer – the state court having procedurally defaulted the claim and declined to reach the merits. The state does not argue that §2254(d) apply.

> ***2. Contrary to the state's contentions, favorable and material evidence of Mr. Austin's mental illness and incompetence was suppressed by the state.***

In his original petition, Mr. Austin alleged that the state had violated *Brady v. Maryland* by failing to turn over prior to trial evidence in its possession that would likely have resulted in a different outcome. This evidence included TDCJ custodial records which were introduced mid-

trial but not revealed to the defense beforehand, including psychological referrals, history of past suicide attempts, childhood substance abuse, and psychological counseling as a juvenile; assessments of Mr. Austin as "very disturbed,"  "sexually deviant," "emotionally unstable" and suffering from a "severe character disorder";  history of psychiatric assessments while in the military; notation of Mr. Austin's psychological evaluation in relation to 1978 trial, and his request for psychiatric assistance after trial. Mr. Austin also alleges that the state had access to Mr. Austin's Harris County Jail records, which, as discussed above, contain a plethora of evidence of his contemporaneous mental illness. Finally, the state had in its possession, and did not turn over, Mr. Austin's second statement to Sgt Allen, in which Mr. Austin describes some of his mental health history and treatment.

The TDCJ records and the statement to Sergeant Allen were very clearly in the possession of the state, as they were introduced at trial. The record is less clear as to whether the Harris County records were in the possession of the state and Petitioner seeks an opportunity for factual development to prove this point.[37] Even if this information was not in the possession of the state, however, it still falls within the ambit of *Brady* material pursuant to *Kyles v. Whitley*

Petitioner claims that the state had information regarding Mr. Austin's  mental illness and should have disclosed that information when competency was raised, and certainly when Mr. Austin made assertions to the court contrary to the information in the state's possession, e.g., that he had no history of mental illness. The state has a duty pursuant to *Brady* to turn over evidence of the defendant's incompetence in relation to a competency determination. *See e.g., Ashley v. Texas*, 319 F.2d 80 (5th Cir. 1963) (holding government's failure to disclose the existence of psychiatric opinions, indicating that the defendants were legally incompetent, was as suppression

---

[37] The content of the District Attorney's file, makes clear that the DA had ready access to this information and sought it.

of evidence resulting in a denial of due process because it could have assisted in insanity defense); *Ex parte Lewis*, 587 S.W.2d 697, 701 (Tex. Crim. App. 1979) ("Therefore, we hold that, like exculpatory evidence, information about the incompetence of a defendant can be of such substantial value to the defense that elementary fairness requires it to be disclosed even without a specific request from the defendant. Accord, *Ashley v. Texas*; b/c conviction of an incompetent defendant is invalid); [38] *Nickerson v. State*, 69 S.W.3d 661 (Tex.App. - Waco 2002) (reversing murder conviction due to prosecution's untimely disclosure of a videotape showing defendant's bizarre behavior in jail prior to trial, in a case in which competency was at issue and insanity a possible defense); *United States v. Spagnuolo*, 960 F.2d 990 (11th Cir. 1992) (New trial ordered on basis of Brady violation where prosecution failed to disclose results of a pre-trial psychiatric evaluation of defendant in which a prison psychiatrist found that a mental disorder had motivated a prison assault, in that the report could have made an insanity defense a viable option and also raised serious questions regarding defendant's competence to stand trial). *See also Black v. Kemp*, 758 F.2d 523 (11th Cir. 1985) (judge's order of a psychiatric examination placed a duty upon the prosecution to provide the doctor and the defense with material relevant to the assessment).

### 3. *The evidence was suppressed*

The state, in its answer, argues that *Brady* does not apply in this case because the evidence at issue was not suppressed, as the defendant knew of his own medical records or those

---

[38] In *Matthew v. Johnson*, 201 F.3d 353, 366 (5th Cir. Tex. 2000), the Fifth Circuit, in reviewing a Brady claim not involving competency, noted favorably the holding in *Lewis* that it violated due process to fail to provide information that raised questions of "the applicant's sanity at the time of the alleged offense, and of his competency to stand trial." 587 S.W.2d at 700, noting that "[i]t has long been held that a conviction of a legally incompetent accused is invalid, and that a guilty plea is valid only if made by a legally competent individual." (internal citation omitted).

records could have been discovered by defense counsel via due diligence. State at x (citing *Rector v. Johnson*, 120 F.3d 551, 558-59 (5th Cir. 1997)).

However, just because the defendant knew of, or had known of, the incidents recorded in documents, does not mean that he knew of the existence of the records.  The records at issue in this case contain many examples of spontaneous notes and assessments made by mental health professionals and correctional officers that the petitioner would have no reason to know existed. Moreover, a number of courts have held that a mentally ill defendant cannot be presumed to have known or informed his counsel of the existence of his or her own mental health records, at least when his or her competency or sanity is in doubt. In *United States v. Spagnoulo*, 960 F.2d 990 (11th Cir. 1992), for instance, the 11th circuit found that a Brady violation had occurred when the state did not turn over a psychiatric report written while the defendant was in jail pre-trial, relating to a jail-based assault. The 11th circuit, similarly to the 5th circuit, requires a showing that "the defendant does not possess the evidence nor could he obtain it himself with any reasonable diligence" to succeed on a *Brady* claim. In relation to this issue, the Court found:

> Spagnoulo did not possess the evidence nor could he obtain it with any reasonable diligence because we will not presume that Spagnoulo had the mental ability to know that the report existed at the relevant time. Additionally, Spagnoulo's lawyer did not learn of the assault leading to the psychiatric evaluation or Spagnoulo's regiment of medication until after the trial in this case.

*United States v. Spagnoulo*, 960 F.2d 990, 995 (11th Cir. Fla. 1992) (emphasis added). Similarly, in *Nickerson v. State*, 69 S.W.3d 661 (Tex.App. - Waco 2002), a murder conviction was reversed due to the prosecution's untimely disclosure of a videotape showing defendant's bizarre behavior in jail prior to trial, in a case in which competency was at issue and insanity a possible defense. Regarding the issue of possession/diligence, the court characterized the standard as follows:

> the State has no duty to disclose matters of public record "if defense counsel

131

should know of them and fails to obtain [them] because of a lack of diligence in his own investigation." Dalbosco v. State, 960 S.W.2d 901, 903 (Tex. App.--Texarkana 1997, order), disp. on merits, 978 S.W.2d 236 (Tex. App.--Texarkana 1998, pet. ref'd). "The necessary inquiry is whether [defense counsel] knew or should have known facts that would have allowed him to access the undisclosed evidence." 960 S.W.2d 901 (citing United States v. Payne, 63 F.3d 1200, 1208 (2nd Cir. 1995)).

And concluded:

So far as a Brady inquiry is concerned, then, the relevant question is whether [defense counsel] should have known that [the January 8 episode had occurred]." Id. Given the uncertainty regarding Nickerson's sanity, Nickerson's "knowledge" of the event has no bearing on what his attorney should have known. Thus, we cannot say that counsel should have known that the incident had occurred.

*Nickerson v. State*, 69 S.W.3d 661, 676 (Tex. App. Waco 2002). Similarly, in *Ex Parte Lewis*, ,

587 S.W.2d 697, 701 (Tex. Crim. App. 1979), the court held:

The State argues that the prosecutor's duty to disclose extends only to favorable information unknown to the defense, and it points out that the applicant knew that he had seen a psychiatrist.  It would be anomalous to hold that the (concededly) illiterate, mentally retarded, alcoholic, and (according to the psychiatrist psychotic applicant had a duty to tell his counsel that there was available evidence of his insanity and incompetent.

*Ex parte Lewis*, 587 S.W.2d 697, 701 (Tex. Crim. App. 1979). See also *Clements v. Coiner*, 299

F. Supp. 752, 758 (S.D. W. Va. 1969)(Brady violation found when state failed to turn over letter

from psychiatrist detailing defendant's mental illness and lack of criminal responsibility

regarding a prior crime, despite the fact that defense counsel knew that defendant had visited that

psychiatrist).

Noticeably, these courts do not find that due diligence necessarily requires collecting all

jail records related to the defendant, even in cases in which mental health is at issue. Rather, due

diligence requires seeking records out if a specific factual predicate for the existence of those

records has been laid. In Mr. Austin's case, the state itself argues in response to the ineffective

assistance of counsel claim that counsel had no such specific factual basis. *See, e.g., United*

*States v. Patrick*, 985 F.Supp. 543 (E.D.Pa. 1997), aff'd 156 F.3d 1226 (3rd Cir. 1998) (Evidence could not have been obtained by the defendant through the exercise of due diligence as the government never identified the information that was contained in the withheld documents.); *Keeter v. State*, 105 S.W.3d 137 (Tex. App. 2003).

### 4.   *The evidence was favorable and material*

The state next argues that the evidence was not "favorable" because, whether as exculpatory nor impeachment evidence, it would not "make the difference between conviction and acquittal." (p. 49). Certainly the state's construction is entirely too narrow given that *Brady* itself was a case involving suppressed evidence relevant to the penalty phase only. The Supreme Court noted in *Bagley* that "a constitutional error occurs and the conviction must be reversed, only if the evidence is material in the sense that its suppression undermines confidence in the outcome of the trial." *Bagley*, 473 U.S. at 678, 105 S. Ct. at 3381. The Supreme Court in *Bagley* more clearly explained the concept of material evidence when it stated that "the evidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *Bagley*, 473 U.S. at 682, 105 S. Ct. at 3383.  Should Mr. Austin have been found incompetent, the verdict surely would have been different in that he would not have been convicted or sentenced to death. Should Mr. Austin have been treated for his mental illness and therefore decided, as he did later, to accept counsel and pursue his case, the verdict also would likely have been different. Moreover, the Supreme Court in *Brady* itself indicated that the principle underlying the decision was not "punishment . of society for misdeeds of a prosecutor" but "avoidance of an unfair trial." *Brady v. Maryland*, 373 U.S. 83, 87-88 (1963).  It has long been established that it is unfair to subject an incompetent

individual to a criminal trial." For the prosecution to withhold evidence that would reveal a defendant's incompetence "casts the prosecutor in the role of an architect of a proceeding that does not comport with standards of justice." *Id.*

In *United States v. Spagnoulo*, 960 F.2d 990 (11th Cir. 1992) , the court ordered new trial ordered on basis of Brady violation where prosecution failed to disclose results of a pre-trial psychiatric evaluation of defendant which would have fundamentally altered strategy and raised serious competency issue. the court held that the psychiatric report "was 'material' because it could have fundamentally altered the defense's strategy and made an insanity defense a viable option. Additionally, the report raised serious questions concerning Spagnoulo's competence to stand trial and could have materially altered the defense's approach to plea negotiations." *United States v. Spagnoulo*, 960 F.2d 990, 995 (11th Cir. Fla. 1992).  See also *Ashley v. Texas*, 319 F.2d 80, 83-85 (5th Cir. Tex. 1963) (holding that suppression of opinions of state doctors that defendant was mentally ill amounted to a denial of due process). The state has cited no cases supporting its proposition that evidence relevant to a competency or *Faretta* determination is not favorable or material pursuant to *Brady*.

The state also argues that the suppressed evidence is not material because there is no "reasonable probability" that had such evidence been revealed to the court it would have changed the outcome of the case, in the light of Dr. Brown's affidavit stating that he has now reviewed the material attached to the original petition and claims that it would not have changed his opinion. But this is simply not credible. The standards of his own profession would have required Dr. Brown to thoroughly reexamine Mr. Austin in the light of evidence demonstrating that his statements to Dr. Brown denying mental health issues and history were false:

> Forensic psychologists and forensic psychiatrists who conduct evaluations for the
> courts should not rely on information from single sources without attempting to

134

verify it.  Such verification can be attempted in various ways.  Often the evaluating professional seeks consistency across sources, collecting information using self-report, third party descriptions, documentation in the records, psychological testing, and specialty measures.  This is an active, ongoing process. For example, when there is the possibility that significant clinical depression affects an individual's reasoning about his plea, the evaluator would seek multiple sources of information about the defendant's history of depression and current symptoms.  Typically there are some inconsistencies across sources.  This can require the evaluator to follow up further, sometimes with a second interview confronting the defendant with additional information obtained from other sources, before drawing a final conclusion about depression and its impact on reasoning about a plea.

For these reasons, it is impossible (in my view) to conclude, as Dr. Brown has, that "there is nothing in these exhibits that would justify changing my opinion, that would indicate that Mr. Austin's opportunity for a fair and impartial evaluation had been compromised because of what he withheld, or that additional evaluation, including more psychological testing or psychiatric interviewing, would have made any difference."   The process of conducting a forensic assessment in a complex, high-stakes case involves taking multiple sources of information and inserting them into the data-gathering/interpretation/reasoning sequence before drawing final conclusions.  Perhaps a fairer conclusion by Dr. Brown would be that a review of the additional information reflected nothing obvious that would apparently have changed his opinion resulting from 2001 evaluation. But without taking this additional information and using it as part of the active assessment process, it is extremely difficult to gauge its full meaning.

Petitioner's Ex. 107 (Heilbrun).

Even if Dr. Brown would have declined to alter his opinion, surely the trial court, in the face of this information, would have acknowledged the altered factual situation and ordered, pursuant to Texas law, a jury trial to determine competence.  Moreover, this information also entirely undermines the trial court's opinion apart from Dr. Brown's report, which was likewise based on misrepresentations in Mr. Austin's colloquy with the court regarding his prior psychiatric history and present mental functioning. In reality, at the very time that the court was accepting Mr. Austin's guilty plea upon the representation that he had no actual psychiatric history or symptoms, Mr. Austin was showing significant symptoms of and receiving treatment for depression, including psychiatric medication, at the jail. Such facts mandate a more through

inquiry, and the result of that inquiry would have been a finding of mental illness and present incompetence.

**CLAIM XII. The trial court denied Mr. Austin his right to trial by jury as guaranteed by the Texas Constitution when, even though a jury trial may not be waived in a capital case in Texas, it accepted his guilty plea and directed a verdict of guilt**

This claim is based exclusively on state law and not federal law and so does not present a federal claim. Claim XII is withdrawn.

**CLAIM XIII. Without a valid waiver, the trial court denied Mr. Austin his right to trial by jury as guaranteed by the Sixth and Fourteenth Amendments when it accepted Austin's plea of guilty and directed a verdict of guilt**

> *1. No deference is due as there was no state court decision on Mr. Austin's Brady claim.*

This court clearly owes no deference under 2254(d), as there is no state court decision on the merits to which to defer – the state court having procedurally defaulted the claim and declined to reach the merits. The state does not argue that §2254(d) apply.

> *2. The state errs in treating this case as one in which no jury trial was conducted and no verdict returned*

The state fails to squarely address the argument that Mr. Austin makes in Claim XIII: that the trial court's issuance of a directed verdict was unconstitutional. Instead, the state seeks to analyze the present case as if it were one in which there was no jury, no trial and no jury verdict. This position is not supported by the record, which clearly shows that the court, the parties and the jury undertook a jury trial at which the issue of guilt was submitted to the jury for verdict and a verdict returned, albeit upon a direction by the trial judge to return a guilty verdict.

Certainly Mr. Austin concedes that the state of Texas can confect a procedure whereby a defendant can "plead guilty" in the sense of providing a confession to the elements of the offense in front of a jury and allow the jury to consider whether the state has met is burden and return a

136

verdict. However, this is not what is referred to and discussed in federal constitutional jurisprudence as a plea of guilty nor is it what occurred in this case.

Beyond this, the state incorrectly argues that the present claim is synonymous with the challenge to Mr. Austin's competence and guilty plea. The state misunderstands the procedural posture of the case and the constitutional claim brought.

### 3.   *The Judge Committed Structural Error by Directing a Guilty Verdict in a Criminal Jury Trial*

Mr. Austin was charged with a capital offense which the Sixth and Fourteenth Amendments require be tried by jury. *Duncan v. Louisiana*, 391 U.S. 145, 149 (1968).

Mr. Austin was not asked to waive his jury trial right and in fact was assured that he would receive a jury trial. RR.9 at 4-6, Second Amended Petition at 126-8.

A jury trial was then conducted and the issue of guilt was submitted to the jury for a verdict with a direction by the trial judge to return a verdict of guilty. *See* CR.I at 70 (Jury Charge)

> You are instructed to find the defendant guilty of the offense of capital murder as charged in the indictment and assess the punishment in this cause.

CR.I at 70 (Jury Charge). A jury verdict of guilt was returned:

> "We, the Jury, find the defendant, Perry Allen Austin, guilty, of capital murder, as charged in the indictment."

*See* CR.I at 77 (verdict form signed by jury foreperson). The return of the directed verdict is also reflected in the transcript of proceedings:

> First, as directed by the Court to find the defendant guilty of capital murder, the jury has signed a verdict form. "We, the jury, find the defendant, Perry Allen Austin, guilty of capital murder as charged in the indictment.

*See* RR.XI at 29. The trial court proceeded expressly upon the authority of that jury verdict:

> The Court **having received the jury's verdict of guilty of capital murder** as

> alleged in the indictment in Cause No. 870377, and further having answered
> Special Issue No.1 unanimously yes and Special Issue No. 2 unanimously no, it
> now becomes my responsibility, Mr. Austin, to sentence you.

RR.11 at 30 (emphasis added).   Consistent with the requirements of Texas law, a written

judgment in the case was entered into the record that confirms that the jury trial right was not

waived, that the jury returned a verdict of guilt and that the defendant was adjudged guilty of the

offense "as found by the verdict of the jury".[39]  C.R. 81-2.

The insurmountable constitutional problem with this jury trial, is that the trial judge

directed the jury to return a verdict of guilty.  Federal law makes abundantly clear that a judge

may *never* direct a verdict of guilty in a criminal jury trial.  *Sparf v. United States*, 156 U.S. 51,

105-6 (1895).  The state makes no claim to the contrary.

The Supreme Court has held that not only is it unconstitutional to direct a verdict against

the defendant in a criminal case but that this constitutes structural error, necessitating reversal.

In 1986, the Court assumed that such a directed verdict would constitute structural error:

> [H]armless-error analysis presumably would not apply if a court directed a verdict
> for the prosecution in a criminal trial by jury. We have stated that "a trial judge is
> prohibited from entering a judgment of conviction or directing the jury to come
> forward with such a verdict . . . regardless of how overwhelmingly the evidence
> may point in that direction." *United States v. Martin Linen Supply Co.*, 430 U.S.
> 564, 572-573 (1977) (citations omitted). *Accord, Carpenters v. United States*, 330
> U.S. 395, 408 (1947). This rule stems from the Sixth Amendment's clear
> command to afford jury trials in serious criminal cases. *See Duncan v. Louisiana*,
> 391 U.S. 145 (1968). Where that right is altogether denied, the State cannot
> contend that the deprivation was harmless because the evidence established the
> defendant's guilt; the error in such a case is that the wrong entity judged the
> defendant guilty.

---

[39] *See* Tex. Code Crim. Proc. art. 42.01(detailing the required contents of the written judgment).  The written
judgment, signed by the trial court, reflects, *inter alia*: that jury trial was not waived (art. 42.01(4); that the jury
was charged by the court (art. 42.01(6)); that the jury returned a verdict of guilty of capital murder (art. 42.01(7)); that
the defendant was adjudged guilty of the offense "as found by the verdict of the jury" (art. 42.01(8)).[39]  A "verdict"
is defined under Texas law as a "written declaration by a jury of its decision of the issue submitted to it in the case".
Tex. Code Crim. Proc. art. 37.01

*Rose v. Clark*, 478 U.S. 570, 578 (1986).   The Court confirmed the unconstitutionality of directing a verdict against a criminal defendant in *Sullivan v. Louisiana*, holding that the Sixth Amendment

> includes, of course, as its most important element, the right to have the jury, rather than the judge, reach the requisite finding of "guilty." . . . . Thus, although a judge may direct a verdict for the defendant if the evidence is legally insufficient to establish guilt, he may not direct a verdict for the State, no matter how overwhelming the evidence.

*Sullivan v. Louisiana*, 508 U.S. 275, 277 (1993) (citations omitted).   In 1999, the Court reaffirmed *Rose* and held that even though partial directed verdicts with respect to individual elements would be subject to harmless error analysis, the same would not be true of a directed verdict of guilt:

> Justice Scalia, in dissent, also suggests that if a failure to charge on an uncontested element of the offense may be harmless error, the next step will be to allow a directed verdict against a defendant in a criminal case contrary to *Rose* . . . . Happily, our course of constitutional adjudication has not been characterized by this "in for a penny, in for a pound" approach. We have no hesitation reaffirming *Rose* at the same time that we subject the narrow class of cases like the present one to harmless-error review.

*Neder v. United States*, 527 U.S. 1, 17 n.2 (1999).

> In the present case the trial court directed a jury verdict, thus requiring reversal.

### 4.  Mr. Austin's claim clearly presents a cognizable federal issue

The state argues that Petitioner's claim is not cognizable in federal habeas proceedings. The question of whether the judge may direct a verdict of guilt in a jury trial is a constitutional question, as established by the authorities cited above, and is therefore clearly cognizable on federal habeas review.   The state cites inaccurately to an unpublished decision, *Bishop v. Epps*, 265 Fed. Appx. 285 (5th Cir. 2008) (unpublished), to argue that "because such a claim requires a federal court to review a state court's interpretation of state law, the Fifth Circuit has specifically

found that claims alleging a defendant was improperly allowed to waive his right to a jury trial are not cognizable on federal habeas review."

The circumstances in the Bishop case are more fully explained in the opinion of the district court, upheld in the unpublished opinion cited by the state.   See *Bishop v. Epps*, 1:04CV319, 2007 U.S. Dist. LEXIS 60321, 2007 WL 2363465  (N.D. Miss. Aug. 16, 2007) at *66-7.   In *Bishop*, the defendant did not wish to have a penalty phase conducted before a jury and did not want any evidence in mitigation of punishment presented.   Defendant and the state each executed a written waiver of jury trial as to the penalty phase and after a colloquy with the trial judge, the defendant maintained his waiver of jury trial as to the penalty phase.   No jury sat in the penalty phase, instead the matter was submitted to the trial judge, with no mitigation offered, and the trial judge imposed a death sentence.

The defendant in *Bishop* had argued on direct appeal to the Mississippi Supreme Court that state law did not permit waiver of a jury trial as to penalty phase except where there was a plea of guilty or waiver of the trial jury also.   *Bishop v. State*, 812 So. 2d 934, 944 (Miss. 2002). The Mississippi Supreme Court found that Mississippi law did permit a defendant to have a jury trial as to guilt and then waive the jury and proceed by judge trial as to penalty. *Bishop*, 812 So. 2d 934, 944-7 (Miss. 2002).

In his federal habeas proceeding Mr. Bishop argued "that he was improperly allowed to waive his right to sentencing by a jury, claiming that Mississippi state law prohibits such a waiver." *Bishop v. Epps*, 265 Fed. Appx. 285, 294 (5th Cir. Miss. 2008).   Unsurprisingly, the Fifth Circuit held that the interpretation of a Mississippi statute was a question for the state court and did not present an issue for federal review.

*Bishop* provides no guidance to this court and no support for the state's position.   In *Bishop* there was no jury trial at penalty, no directed verdict and there was both an express written and express verbal waiver of the jury trial right.

A federal constitutional claim that a defendant was subjected to a directed verdict is certainly cognizable on federal habeas review.  Similarly, as *Boykin* made clear, "The question of an effective waiver of a federal constitutional right in a proceeding is of course governed by federal standards." 395 U.S. at 242-243.

### 5. *A plea of guilty does not, in itself, represent a constitutionally effective waiver of the jury trial right*

Seeking to defend a directed verdict, the state seeks to imply a waiver of the jury trial right in a case where there was no waiver sought, a jury trial was conducted and a verdict returned.  The state is forced to argue that any defendant who pleads guilty "clearly (and constitutionally) waives his Sixth Amendment right to a jury trial." *State's Answer* at 62 (citing Boykin, 395 U.S. at 243).

Contrary to the state's citation, *Boykin* does not stand for the proposition that a defendant who pleads guilty clearly and constitutionally waives his Sixth Amendment right to a jury trial. To the contrary, in *Boykin* the defendant had pled guilty and the Supreme Court reversed, holding that a plea of guilty without more does not represent a valid waiver of, *inter alia*, the jury trial right and that such a waiver will not be presumed from a silent record:

> In *Carnley v. Cochran*, 369 U.S. 506, 516, we dealt with a problem of waiver of the right to counsel, a Sixth Amendment right.  We held: "Presuming waiver from a silent record is impermissible. The record must show, or there must be an allegation and evidence which show, that an accused was offered counsel but intelligently and understandingly rejected the offer. Anything less is not waiver." We think that the same standard must be applied to determining whether a guilty plea is voluntarily made.
>
> * * * *
>
> Several federal constitutional rights are involved in a waiver that takes place when

a plea of guilty is entered in a state criminal trial. First, is the privilege against compulsory self-incrimination guaranteed by the Fifth Amendment and applicable to the States by reason of the Fourteenth.  Second, is the right to trial by jury. Third, is the right to confront one's accusers. We cannot presume a waiver of these three important federal rights from a silent record.

What is at stake for an accused facing death or imprisonment demands the utmost solicitude of which courts are capable in canvassing the matter with the accused to make sure he has a full understanding of what the plea connotes and of its consequence. When the judge discharges that function, he leaves a record adequate for any review that may be later sought, and forestalls the spin-off of collateral proceedings that seek to probe murky memories.

*Boykin,* 395 U.S. at 242-244 (citations omitted)(footnotes omitted).

Long before *Boykin*, the Supreme Court had held that the Sixth Amendment requires an express waiver of the jury trial right:

Not only must the right of the accused to a trial by a constitutional jury be jealously preserved, but the maintenance of the jury as a fact finding body in criminal cases is of such importance and has such a place in our traditions, that, before any waiver can become effective, the consent of government counsel and the sanction of the court must be had, in addition to the *express and intelligent* consent of the defendant.

*Patton v. United States* , 281 U.S. 276, 312 (1930) (emphasis added).  There was no such waiver in this case.

### 6.   *The record shows that Mr. Austin was not asked to and did not waive his jury trial right*

The state does not seek to show that Mr. Austin expressly or intelligently waived his jury trial right but instead argues that any defendant who pleads guilty waives his jury trial right.  As discussed, above, this is directly contrary to the Supreme Court's holdings on this issue but in this case it is also directly contrary to the record, where Mr. Austin was assured he was not waiving his jury trial right, a jury trial was conducted and a jury verdict obtained.

Mr. Austin certainly never *expressly* waived his right to a jury trial.  Nor does the plea colloquy create a record that adequately reflects a voluntary and intelligent waiver of the jury trial right under *Patton* or *Boykin*.  Importantly, the record here was not merely silent on the

issue of waiver of jury trial; rather, the judge affirmatively *reassured* the defendant that he was about to have a jury trial and then a jury trial was, in fact conducted.

The state takes the insupportable position of asking this court to infer a waiver from the jury trial right in a case where a mentally ill defendant was never asked to waive that right, was assured he was not waiving that right, a jury trial was conducted, a verdict was obtained from the jury and the judge proceeded to sentence based upon the conviction returned by the jury.  Such an inference is not reasonably open on this record and in any event does not approach the standard established for express and intelligent waiver of the jury trial right or reflect the presumption against waiver that applies as a matter of federal constitutional law.

To counsel's knowledge, no court has ever found a jury trial waiver to exist when the trial court explicitly informed the defendant that he was *not* waiving that right and a jury trial was then conducted. The state cites no case that supports its position.

The state asks this court to hold that state courts can constitutionally direct guilty verdicts based upon an inferred waiver of the jury trial right where the defendant is not asked to waive that right and actually told that he is being afforded a jury trial.  Such a position is directly contrary to the Constitution and the clearly established principles announced by the United States Supreme Court.

**CLAIM XIV. The trial court denied Mr. Austin his right to trial by jury as guaranteed by the State and Federal Constitutions when it made findings of fact that Mr. Austin's plea was competent and voluntary when these facts were, in the circumstances, the equivalent of elements of the offense.**

The state court confected a procedure whereby Mr. Austin would enter a plea upon arraignment before the jury but the question of Mr. Austin's guilt would be submitted to the jury for verdict.  The trial judge explained to Mr. Austin "that in entering a plea of guilty to capital

murder, you are essentially admitting each and every element necessary to establish your guilt for the offense of capital murder".  RR.9 at 6.

In these circumstances, Mr. Austin's plea is to be understood in constitutional terms as a confession, rather than a plea of guilty that in and of itself is a conviction:

> A plea of guilty is more than a confession which admits that the accused did various acts; it is itself a conviction; nothing remains but to give judgment and determine punishment.

*Boykin v. Alabama*, 395 U.S. 238, 242 (1969). *See also Kercheval v. United States*, 274 U.S. 220, 223 (1927)("A plea of guilty differs in purpose and effect from a mere admission or an extra-judicial confession; it is itself a conviction.  Like a verdict of a jury it is conclusive. More is not required; the court has nothing to do but give judgment and sentence.")

A jury must always be permitted to consider the reliability and weight to be given to a defendant's confession.  *Crane v. Kentucky*, 476 U.S. 683, 689 (1986)("Confessions, even those that have been found to be voluntary, are not conclusive of guilt.")  The state's cite to *Miranda* is both inaccurate and beside the point – the question is not the court's gatekeeping role in excluding involuntary or uncounseled confessions but the necessity for the jury to determine the facts essential to a finding of guilt.

In the present case, the trial court withdrew from the jury any question of whether Mr. Austin's confession should be given weight or be found to be reliable - - - the trial court instructed the jury that it had "determined that Mr. Austin is mentally competent to enter his plea of guilty and that he is entering this plea freely and voluntarily with full knowledge of the consequences . . ."  RR.9 at 16.  In the circumstances of the present case – where the proof of guilt consisted of Mr. Austin's confession and the issue of guilt was presented to the jury in that way, the establishment that the plea/confession was entered competently and voluntarily effectively became elements for the state to prove.

144

If the state of Texas wishes to undertake a procedure by which a defendant pleads guilty before a jury and that jury returns a verdict, then the jury must be the body that considers and determines the defendant's guilt. *State v. Gaudin*, 515 U.S. 506, 509-11 (1995). This includes, determining the weight and reliability to be given to the plea/confession. Indeed, those questions become the equivalent of elements of the offense in a plea-to-jury scheme of the type undertaken here.

Contrary to the state's claim, Petitioner seeks no new rule of constitutional law, nor an extension of *Apprendi* or *Ring*. These cases are argued by way of analogy and the constitutional principles Petitioner relies upon are longstanding and require no new constitutional principle.

**CLAIM XV. Mr. Austin was denied his right to a fair and impartial tribunal as a result of the unconstitutional prejudice of jurors preventing them from considering the imposition of a life sentence as an option in a case of capital murder.**

**CLAIM XVI. Mr. Austin was denied his right to a fair impartial tribunal when a majority of jurors provided misleading answers as to their willingness to consider evidence in mitigation were he to be convicted of capital murder**

> **1. *No deference is due as there was no state court decision on Mr. Austin's Brady claim.***

This court clearly owes no deference under 2254(d), as there is no state court decision on the merits to which to defer – the state court having procedurally defaulted the claim and declined to reach the merits. The state does not argue that §2254(d) apply.

> **2. *The state accepts the prevailing constitutional standard but argues that the claim is defaulted or cannot be proven***

The state concedes that the controlling standard on jury bias derives from *McDonough Power Equipment, Inc. v. Greenwood*, 464 U.S. 548 (1984): in order to obtain a new trial, a party "must first demonstrate that a juror failed to answer honestly a material question on voir dire, and then further show that a correct response would have provided a valid basis for a challenge

for cause." *Id.* at 556.   The state does not contest that, under this standard, if a juror misrepresented his or her willingness to consider mitigating evidence in a capital trial on *voir dire*, the defendant would be entitled to a new trial.

Instead, the state makes three arguments in opposition to Mr. Austin's assertion that multiple sitting jurors harbored an unconstitutional prejudice which prevented them from considering the imposition of life rather than death; and that these jurors provided misleading answers as to their ability to consider mitigating evidence.

The state argues that: (1) the juror's affidavits describe their opinions now, not at the time of trial; (2) that affidavits or testimony from jurors is inadmissible; (3) that this claim is waived by a failure to challenge the jurors during voir dire.

Each of the state's arguments are entirely lacking in merit.

### 3.   Petitioner has alleged and the affidavits of the jurors demonstrate that the jurors held their viewpoints at the time of voir dire

Mr. Austin has satisfactorily demonstrated that the jurors held their biased viewpoints *at the time of voir dire*, as opposed to at the time of their post-conviction statements to the defense team.   As a factual matter, it is simply untrue that the statements from the jurors only reflect a present belief in the automatic imposition of the death penalty.   Rather, the affidavits specifically refer to the impact of their beliefs upon their thinking at the time that they served as jurors on Mr. Austin's case – thus locating that belief at the time of trial.   For example, juror William Gibbs explained:

> I believe that "an eye for an eye" is correct. If you kill someone you should face the death penalty.
> Once someone is guilty of capital murder I believe that the only appropriate penalty is the death penalty. I do not think that there is anything that would be mitigating so that a person should not get the death sentence, this includes being insane.
> Once I heard that Perry Austin had admitted to intentionally killing a nine year

old boy I was only going to vote one way - I was going to vote "yes" he was a future danger and "no" there was nothing mitigating. I was not going to vote for anything other than the death penalty.

Exhibit 65 - Statement of William Gibbs (emphasis added).  It is clear from this statement that Mr. Gibbs held the belief *at the time of trial* that any convicted child killer should receive the death penalty, without considering any mitigating evidence at all.  Yet when asked on *voir dire*, his testimony was precisely the opposite:

> Q: If you were selected to sit on a capital murder jury and the jury returned a verdict of guilty for capital murder, the jury would be answering the certain questions we discussed.  If the evidence called for it, could you as a juror answer those questions in such a way that you know the death penalty would result?
> A: Yes.
> Q: And if the evidence called for it, answer those questions in such a way that you know a life sentence would result?
> A: Yes.
> . . . .
> Q.  Can you consider, then, in your mind that this question [special question #1], depending on the evidence, could be answered either yes or no?
> A.  Yes.
> . . . .
> Q.  Can you consider that in Issue No. 2 that it could be answered in a yes or no fashion?
> A.  Yes.
> Q.  All right.  And the only way that the defendant would be – receive the death penalty, then, is if the answer to Question No. 2 was no.  Okay.  You understand that?
> A.  Yes.

R.R. V at 32, 38, 39-40 (Individual *voir dire*, 3/20/02).

Similarly, Juror Finnegan's statement reflects a belief about the death penalty that he held at the time of the trial.  He stated:

> I believe that once Austin was found guilty of the murder of the victim the only appropriate sentence was death in accordance with Texas law.
> I believe that the prosecutors chose me to be on Austin's jury because Perry wanted to die and Perry knew with me working in law enforcement, I would sentence him to death.

Exhibit 94 - Statement of Juror Finnegan.  This statement cannot be understood as meaning anything other than that Juror Finnegan held the belief *at the time of voir dire* that any convicted murderer should be put to death, without considering mitigating information.  Indeed, he believes that he was selected for jury service on the basis of that very belief.  This notwithstanding his response during voir dire that he "[a]bsolutely" could answer the special questions "in such a way that a life sentence would result."  R.R. V at 67.

> Likewise, juror David Condon made the following statement:
>
> For me, if somebody is not insane and kills somebody, especially a child, the only appropriate penalty is the death penalty. Other than showing that it was an accident or the person was insane I do not think that any other considerations are relevant. If you are found guilty of capital murder you should get the death penalty. . . .
> When I was asked at the time the jury was selected whether I could consider voting for life I said yes and I was talking about a situation where someone was insane and did not know what they were doing.

Exhibit 67 - Statement of David Condon (emphasis added).  Juror Condon's statement clearly refers back to his belief about the appropriateness of imposing the death penalty *when he was selected to jury service* on Mr. Austin's case.  At that time, he held the belief that insanity was the only mitigator in a capital case which would make him consider a verdict of life.  As someone who was "insane and did not know what they were doing" would not be guilty of capital murder, Mr. Condon did not show an ability to consider all the mitigating evidence presented in a capital case and make a considered decision about whether life was the appropriate punishment.

Importantly, if even *one* of these jurors, or the others whose statements are cited in the Second Amended Petition (pp. 139-42), was unable to consider mitigating evidence or a life sentence at the time of trial, the death verdict must be overturned.  The Supreme Court has made it clear that no death penalty imposed by a jury that contains a single juror who cannot, in good

148

faith, consider the presence of mitigating evidence can be allowed to stand.  *Morgan v. Illinois*, 504 U.S. 719, 735 n.8 (1992) ("[T]he measure of a jury is taken by reference to the impartiality of each, individual juror.").

The state's linguistic games should not persuade this court that these statements from jurors are anything but what they clearly are: reflections of long-held and deep-seated beliefs about the automatic imposition of the death penalty in the event that the defendant is found guilty of capital murder.  At the very least, Mr. Austin has made a sufficient showing to warrant an evidentiary hearing on whether the jurors were actually biased and whether they misrepresented their beliefs and their ability to apply the law during *voir dire*.  *See, e.g.*, *United States v. Robertson*, 473 F.3d 1289, 1294 (10th Cir. 2007) ("'When confronted with a claim of juror bias, the trial court has wide discretion in deciding how to proceed.' . . . . For example, 'on rare occasions it is within the district court's discretion to refuse to hold a hearing when it can clearly be established that a hearing would not be useful or necessary.'") (quotations omitted); *United States v. Vitale*, 459 F.3d 190, 197 (2d Cir. 2006) ("[A] trial court is required to hold a post-trial jury hearing when reasonable grounds for investigation exist. . . . 'Reasonable grounds are present when there is clear, strong, substantial and incontrovertible evidence, that a specific, nonspeculative impropriety has occurred which could have prejudiced the trial of a defendant.'") (citations omitted); *United States v. Angulo*, 4 F.3d 843, 847 (9th Cir. 1993) ("[I]n determining whether a hearing [on jury misconduct or bias] must be held, the court must consider the content of the allegations, the seriousness of the alleged misconduct or bias, and the credibility of the source") (citation omitted).

### 4. *Post-verdict statements of jurors as to the accuracy of their responses in voir dire are admissible*

This Court is in no way prohibited from considering post-verdict statements by jurors as relevant evidence about this claim. While it is true that courts will not retroactively inquire into the content of jury deliberations, it is absolutely permissible to conduct an evidentiary hearing and adduce testimony from jurors about the truth or falsehood of the statements they made in *voir dire*. *Tanner v. United States*, 483 U.S. 107 (1987), upon which the state relies, is a case about the permissibility of juror testimony to shed light on juror misconduct and incompetency during trial and jury deliberations – not jurors' misrepresentations during *voir dire*. *Tanner* is thus inapposite to the question presented here. Importantly, *Tanner* relies upon four protections built into the jury trial system that protect against juror misconduct and render post-verdict juror testimony unnecessary; one of these protections is *voir dire*. *Id.*, 483 U.S. at 127; *see also See McDonough Power Equip. v. Greenwood*, 464 U.S. 548, 554 (1984) ("*Voir dire* examination serves to protect [the right to a fair trial] by exposing possible biases, both known and unknown, on the part of potential jurors. Demonstrated bias in the responses to questions on *voir dire* may result in a juror's being excused for cause; hints of bias not sufficient to warrant challenge for cause may assist parties in exercising their peremptory challenges. The necessity of truthful answers by prospective jurors if this process is to serve its purpose is obvious."). When a juror fails to answer honestly during *voir dire*, the protective function of *voir dire* unravels, and it becomes permissible to inquire after the fact into the veracity of the juror's statements.

Numerous federal cases, including Supreme Court cases, have recognized that a defendant is entitled to present evidence at a hearing from a juror whose partiality or honesty during *voir dire* is suspect. The Supreme Court has explicitly held that an evidentiary hearing on

the juror's partiality is the proper method of assessing the validity of a juror bias claim, and that juror testimony will often be central to that hearing:

> Due process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen. Such determinations may properly be made at a hearing like that ordered in *Remmer* [*v. United States*, 347 U.S. 227 (1954)] and held in this case. n7
>
> FOOTNOTES
>
> n7 Respondent correctly notes that determinations made in *Remmer*-type hearings will frequently turn upon testimony of the juror in question, but errs in contending that such evidence is inherently suspect. As we said in *Dennis v. United States*, 339 U.S. 162 (1950), "[one] may not know or altogether understand the imponderables which cause one to think what he thinks, but surely one who is trying as an honest man to live up to the sanctity of his oath is well qualified to say whether he has an unbiased mind in a certain matter." *Id.*, at 171. See also *United States v. Reid*, 12 How. 361, 366 (1852).

*Smith v. Phillips*, 455 U.S. 209, 217 (1982).  The jurors in Mr. Austin's case clearly may be called upon to testify about their bias and any misleading or false testimony they gave during *voir dire*.

Other cases implicitly make clear that juror testimony, either in the form of an affidavit or oral testimony, is a regularly accepted component of the adjudication of juror bias cases.  In fact, the Supreme Court in *Williams v. Taylor* considered an affidavit from the juror who had allegedly answered questions on *voir dire* untruthfully and reversed the district court's denial of an evidentiary hearing on the matter.  *Williams v. Taylor*, 529 U.S. 420, 440-43 (2000).  There was no indication in that opinion that it would be impermissible to consider sworn statements or testimony from the juror in question.   Indeed, on remand a full evidentiary hearing was conducted and the district court concluded that the relevant juror had failed to answer material questions honestly and relief was granted.  *Williams v. Netherland*, 181 F. Supp. 2d 604 (E.D.

Va. 2002).  Likewise, although denying the petitioner relief on his jury bias claim, in *Hatten v. Quarterman* the Fifth Circuit expressed no qualms with the submission of a post-trial affidavit from the juror whose bias was at issue and noted that an evidentiary hearing was held at which the juror was subpoenaed but did not appear.  570 F.3d 595, 601-602 (5th Cir. 2009).

Contrary to the state's position, nor do the Federal Rules of Evidence preclude juror affidavits or testimony to determine whether a juror lied during *voir dire*, as this inquiry does not touch upon the nature of the deliberations of the jury.  Rule 606(b) prohibits juror testimony

> as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith.

Fed. R. Evid. 606(b).  An inquiry into whether the juror lied during *voir dire* falls outside these prohibitions.

### 5. *A claim that a juror did not answer accurately in voir dire is not waived by a failure to challenge the juror in voir dire unless the defendant was put on notice of the inaccuracy of the juror's response*

Mr. Austin certainly has not waived his present challenge to the jurors' impartiality by not challenging these jurors during *voir dire*.  The specific allegation made by petitioner is that certain jurors lied or misrepresented themselves under oath during *voir dire*.  Because they misrepresented their beliefs when asked, Mr. Austin had no reason to know that these jurors would refuse to consider mitigating evidence and meaningfully apply the law, and had no basis for a cause challenge.  Jurors are presumed to respond honestly during *voir dire*. Notably, in *Williams*, the Supreme Court determined that there was no reason for trial counsel to have known about – or objected to – a misrepresentation which occurred during *voir dire*:  "The trial record contains no evidence which would have put a reasonable attorney on notice that Stinnett's non-response was a deliberate omission of material information."  *Williams v. Taylor*, 120 S. Ct.

1479, 1493 (2000).  The state relies on *Dawson v. Wal-Mart Stores, Inc.* in support of its waiver argument, but that case merely holds that "*[w]hen the basis for challenge to a juror is timely shown*, the failure to object constitutes a waiver of the right to attack the composition of the jury." 978 F.2d 205, 209 (5th Cir. 1992) (emphasis added).  There was no timely showing of a basis to challenge theses jurors, and thus no waiver can be implied.

Of course, Mr. Austin's decision not to object to *other* jurors' service does not in any way constitute a waiver of his objections to *any and all jurors*.  Such a rule would impermissibly infringe upon the defendant's right to challenge for cause any individual juror who cannot sit impartially on the jury.

The state's arguments have no merit, and Mr. Austin is clearly entitled to relief on this claim.

**CLAIM XVII. Mr. Austin's Due Process and Eighth Amendment rights were violated when the state relied upon prior convictions for violent and sexual offences where those convictions had been obtained unconstitutionally.**

Mr. Austin withdraws this claim.

**CLAIM XIX. The execution of the death sentence imposed upon Mr. Austin would be in violation of the Eighth Amendment to the Federal Constitution and Article 1, Section 13 of the Texas Constitution as there has not been searching appellate review of Mr. Austin's conviction and sentence of death due to critical omissions from the record as filed.**

**CLAIM XX. Mr. Austin is entitled to a new trial where, despite his due diligence, critical parts of the trial record have been lost or destroyed.**

> ***1. No deference is due as there was no state court decision on Mr. Austin's Brady claim.***

This court clearly owes no deference under 2254(d), as there is no state court decision on the merits to which to defer – the state court having procedurally defaulted the claim and declined to reach the merits. The state does not argue that §2254(d) apply.

153

### 2. *Contrary to the state's position, Petitioner has shown that significant parts of the state court record are missing and that his claims are cognizable in federal habeas proceedings*

The state asserts that "Austin has provided absolutely no evidence to establish that the record in this case in incomplete . . . ." State's Answer at 76. To the contrary, Mr. Austin has pointed specifically to evidence from the record that hearings took place that were not included in the record, as corroborated by a comparison of the Clerk's Record and the Reporter's Record, and as confirmed by several statements made by the judge referring to communications which are not otherwise memorialized in the record. Second Amended Petition at 148-151.

The state then argues, purely out of speculation, that the court setting which took place in chambers that the judge referred to at the *Faretta* hearing was a "brief meeting" and that "such meetings are commonplace and do not necessitate being recorded by the court reporter." State's Answer at 76. The state fails to note, however, that according to the trial judge, the meeting in chambers took place *with a court reporter present*, indicating that it was important enough to be recorded and certainly should have been included in the record. R.R. II at 3 ("[A]bout six weeks ago . . . Mr. Austin was brought into chambers with the prosecution and the defense *with a court reporter present* and at that time Mr. Austin indicated, consistent with at least one of his letters, that he wanted to discharge his lawyers and proceed *pro se*.") (emphasis added).

The state wishes to diminish the importance of the unrecorded proceedings by arguing that there was no evidence that judge actually relied on the information from these meetings in coming to her decision on competency. Yet the state cannot explain away the court's statement at the *Faretta* hearing: "And based on that evaluation and *based upon prior conversations with Mr. Austin*, his persistence in entering his plea of guilty before the jury for this many months, based on that, the Court finds, Mr. Austin, that you are mentally competent to enter your plea of

guilty . . . ."  R.R. IX at 6.  The state speculates that the "prior conversations" referred to are in fact the "conversation that was held during the *Faretta* hearing itself."  State's Answer at 78. This interpretation is strained, at best.  The plain meaning of the judge's words is that she is referring to conversations that took place *before*, not at, the hearing.  Thus the record makes clear that the judge did, in fact, rely upon discussions she had with Mr. Austin in proceedings that were not made a part of the record on appeal.  It is impossible to say whether her factual determination was made in error without a complete transcription of the material upon which she based that determination.

Importantly, the two letters from Mr. Austin, cited in the Second Amended Petition, which refer to communications with the judge that are not contained in the record, are still relevant here even though they post-date the *Faretta* colloquy.

The first letter makes clear that there was a pre-trial hearing on whether to remove Mr. Arnold as stand-by counsel – and the transcript of this hearing is missing from the record. CR 61 (1/25/02); CR 88(docket sheet). This hearing is highly relevant to Mr. Austin's competency to plead guilty less than two months later.

The second letter, which references an exchange between Mr. Austin and the trial judge on how to expedite his appeal, is particularly relevant to his suicidality and his competency to waive his appeals.  Petitioner's Ex. 89.

Both of these letters therefore point to the existence of hearings which are unrecorded but which are material to several of Mr. Austin's claims on habeas and would have led a reviewing appellate court to question Mr. Austin's competency to waive various constitutional rights.

Defendant makes non-frivolous claims regarding his competence and the quality of his waiver of his constitutional rights before, during and after trial.  The incomplete transcripts,

155

omitting as they do critical encounters of direct relevance to the claims and relied upon by the trial court, cannot be regarded as a record of sufficient completeness for adequate consideration of the errors assigned.  Cf. *Draper v. Washington*, 372 U.S. 487, 497-500 (1963)(citing cases). Neither Petitioner, nor a reviewing court should be limited to the trial court or the prosecutor's assurance that there was no error demonstrated in the unavailable transcript.  *Eskridge v. Washington State Bd. Of Prison Terms & Paroles*, 357 U.S. 214, 216 (1958)(" The conclusion of the trial judge that there was no reversible error in the trial cannot be an adequate substitute for the right to full appellate review . . . ").

       This is not a case where a petitioner merely speculates about the content of missing transcript.  In the present case, the missing transcript dealt directly with Mr. Austin's waiver's and assertion of his right to self-representation and in one case involves a relatively contemporaneous claim by Petitioner indicating that the transcript would disclose advice by the trial judge on how Petitioner could most effectively waive his appeals.  Petitioner is clearly prejudiced by the absence of the transcripts and they are clearly shown to be substantial and material.  The Fifth Circuit Court of Appeal has found omissions from transcript to be prejudicial to effective appellate review where there is either specific prejudice or where transcript omissions are substantial and significant.  See *United States v. Selva*, 559 F.2d 1303, 1304 (5th Cir. 1977); *United States v. Gregory*, 472 F.2d 484, 486 (5th Cir. 1973); *United States v. Garcia-Bonifascio*, 443 F.2d 914 (5th Cir. 1971); *United States v. Rosa*, 434 F.2d 964 (5th Cir. 1970); *United States v. Atilus*, 425 F.2d 816 (5th Cir. 1970).

       Further, the Supreme Court has held that for appellate counsel to meet his duty to search out plain error, counsel must be provided with a complete transcript.  *Hardy v. United States*, 375 U.S. 277 (1964).   Similarly, the Texas Court of Criminal Appeals cannot perform its

constitutionally indispensable role in a death penalty case of providing for review if it does so on a materially incomplete record.

Finally, the state makes the meritless argument that Claims XIX and XX are not cognizable on federal habeas review. To the contrary, challenges to the adequacy of state appellate review can be – and on numerous occasions have been – reviewed by federal courts in habeas corpus proceedings. *See, e.g.*, *Parker v. Dugger*, 498 U.S. 308, 322-23 (1991) (on habeas review, entertaining a challenge to the adequacy of the state appellate review of the case, and ordering a remand to the Florida courts for proceedings in which the entire record would be reviewed); *Boyd v. Newland*, 467 F.3d 1139, 1150-1151 (9th Cir. 2006) (granting habeas relief where defendant, who raised a plausible *Batson* claim, was denied a transcript of the complete *voir dire*, and where a reviewing court was therefore unable to "examine the 'totality of the relevant facts' and 'all relevant circumstances . . . .'") (citation omitted); *Bransford v. Brown*, 806 F.2d 83, 86 (6th Cir. 1986) ("[I]n order to demonstrate denial of a fair appeal [on habeas], petitioner must show prejudice resulting from the missing transcripts. Petitioner must present something more than mere speculation that the transcripts were requisite to a fair appeal. Petitioner must produce some modicum of evidence to support the conclusion that an error may have been disclosed in the missing transcript).

As explained in the Second Amended Petition, the U.S. Supreme Court has repeatedly recognized that meaningful appellate review is critical to a constitutional scheme of capital punishment under the Eighth Amendment, that such meaningful appellate review is impossible in the absence of a complete record, and that the absence of a complete record can constitute a deprivation of due process. *See* Second Amended Petition at 151-56. Mr. Austin's claims that he was denied a searching review of his conviction and sentence on appeal, and that he deserves

a new trial in light of the fact that several portions of the record which are demonstrably relevant to some of his central claims for relief, undeniably present federal questions of law and are cognizable on habeas review.

**CLAIM XXI. The death penalty imposed upon Mr. Austin is violative of the Fifth, Sixth, Eighth and Fourteenth Amendments to the Federal Constitution and the corresponding provisions of the Texas Constitution where the trial court permitted Mr. Austin to represent himself with the express intention of presenting no mitigation evidence and seeking the death penalty thus denying the defendant and the community a regularly applied, fair, and nonarbitrary capital-sentencing proceeding conducted before a jury**

**CLAIM XXII. The death penalty imposed upon Mr. Austin is violative of the Fifth, Sixth, Eighth and Fourteenth Amendments to the Federal Constitution and the corresponding provisions of the Texas Constitution where the presentation of no defense at all has prevented the conduct of a constitutionally mandated proportionality review.**

> ***1.   No deference is due as there was no state court decision on Mr. Austin's Brady claim.***

This court clearly owes no deference under 2254(d), as there is no state court decision on the merits to which to defer – the state court having procedurally defaulted the claim and declined to reach the merits. The state does not argue that §2254(d) apply.

> ***2.   The right to self-representation that accompanies the right to present a defense does not trump all other constitutional considerations in our criminal justice system***

The record makes it abundantly clear that Mr. Austin wished to obtain the death penalty, and that his decision to waive counsel and proceed *pro se* was an attempt to secure a state-administered suicide.  The state contends that this scenario presents no constitutional problems, as the right to self-representation trumps all other considerations, including the community's interest in a fair and non-arbitrary death penalty proceeding.[40]

---

[40] Importantly, this claim does not raise a claim of ineffective assistance of counsel for failure to present mitigation, not simply because Mr. Austin was unrepresented for much of the proceedings in state court but more fundamentally because this is a different constitutional claim with a wholly different constitutional theory and jurisprudence.  *See State v. Koedatich*, 548 A.2d 939, 997 (N.J. 1988).

The right to represent oneself at trial, however, is *not* absolute.  As the Supreme Court recently explained in *Indiana v. Edwards*, when considering a "mental-illness-related limitation on the scope of the self-representation right":

> *Faretta* itself and later cases have made clear that *the right of self-representation is not absolute*. *See Martinez v. Court of Appeal of Cal., Fourth Appellate Dist.*, 528 U.S. 152, 163, 120 S. Ct. 684, 145 L. Ed. 2d 597 (2000) (no right of self-representation on direct appeal in a criminal case); *McKaskle v. Wiggins*, 465 U.S. 168, 178-179, 104 S. Ct. 944, 79 L. Ed. 2d 122 (1984) (appointment of standby counsel over self-represented defendant's objection is permissible); *Faretta*, 422 U.S., at 835, n. 46, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (no right "to abuse the dignity of the courtroom"); *ibid*. (no right to avoid compliance with "relevant rules of procedural and substantive law"); *id*., at 834, n. 46, 95 S. Ct. 2525, 45 L. Ed. 2d 562 (no right to "engag[e] in serious and obstructionist misconduct," referring to *Illinois v. Allen*, supra).

554 U.S. 164, 171 (2008) (emphasis added).  In *Edwards*, the Court concluded that a state may require counsel where a mentally ill defendant was competent to stand trial but not competent to conduct a trial on his own.  In coming to that conclusion, the Court relied on several well-established principles of law regarding the underpinnings of the right to self-representation, and emphasized that the fairness or arbitrariness of the proceedings *is* relevant to whether the defendant should be permitted to exercise his right to self-representation.  The Court explained:

> [A] right of self-representation at trial will not "affirm the dignity" of a defendant who lacks the mental capacity to conduct his defense without the assistance of counsel. *McKaskle*, supra, at 176-177, 104 S. Ct. 944, 79 L. Ed. 2d 122 ("Dignity" and "autonomy" of individual underlie self-representation right). To the contrary, given that defendant's uncertain mental state, the spectacle that could well result from his self-representation at trial is at least as likely to prove humiliating as ennobling. Moreover, insofar as a defendant's lack of capacity threatens an improper conviction or sentence, self-representation in that exceptional context undercuts the most basic of the Constitution's criminal law objectives, providing a fair trial. As Justice Brennan put it, "[t]he Constitution would protect none of us if it prevented the courts from acting to preserve the very processes that the Constitution itself prescribes." *Allen*, 397 U.S., at 350, 90 S. Ct. 1057, 25 L. Ed. 2d 353 (concurring opinion). See *Martinez*, 528 U.S., at 162, 120 S. Ct. 684, 145 L. Ed. 2d 597 ("Even at the trial level . . . the government's interest in ensuring the integrity and efficiency of the trial at times outweighs the defendant's interest in acting as his own lawyer"). See also *Sell v. United States*, 539 U.S. 166, 180, 123 S. Ct. 2174, 156 L. Ed. 2d 197 (2003)

> ("[T]he Government has a concomitant, constitutionally essential interest in
> assuring that the defendant's trial is a fair one").
> Further, proceedings must not only be fair, they must "appear fair to all who
> observe them." *Wheat v. United States*, 486 U.S. 153, 160, 108 S. Ct. 1692, 100
> L. Ed. 2d 140 (1988). An amicus brief reports one psychiatrist's reaction to
> having observed a patient (a patient who had satisfied *Dusky*) try to conduct his
> own defense: "[H]ow in the world can our legal system allow an insane man to
> defend himself?" Brief for State of Ohio et al. as Amici Curiae 24 (internal
> quotation marks omitted). See *Massey*, 348 U.S., at 108, 75 S. Ct. 145, 99 L. Ed.
> 135 ("No trial can be fair that leaves the defense to a man who is insane, unaided
> by counsel, and who by reason of his mental condition stands helpless and alone
> before the court").

*Edwards*, 554 U.S. at176-77.  Certainly, self-representation in Mr. Austin's case – in which a suicidal man was permitted to waive counsel so that he could sabotage the adversarial system and secure a death sentence – failed to "affirm the dignity" of the defendant, risked "improper conviction or sentence," "undercut[] the most basic of the Constitution's criminal law objectives, providing a fair trial," and in no way "appear[ed] fair to all who observe[d]" the trial.  *Id*.

The state has not cited any cases holding that a defendant who *affirmatively seeks the death penalty, and waives counsel with the sole purpose of presenting no defense at all*, has a right to self-representation that outweighs all community interests in fairness.  As argued in the Second Amended Petition, *United States v. Davis*, upon which the state relies, is inapposite.  The Fifth Circuit expressly found in that case that the defendant wished to employ a tactical strategy (risky though it may be) of presenting evidence of residual doubt, rather than mitigation, at the penalty phase, 285 F.3d 378, 384-85 (5th Cir. 2002); and explicitly noted that the defendant "consistently maintained that he is not on a suicide mission." *Id*. at 385 n.6.  *Davis* says nothing about a situation such as the instant case, in which the defendant incontrovertibly *was* on a suicide mission and wished to present no defense at all.

A post-*Faretta* decision of the Louisiana Supreme Court, holding that a defendant may not represent himself for the express purpose of securing the death penalty, is more on point:

A defendant has a federal constitutional right of self-representation and may proceed to defend himself without counsel when he voluntarily and intelligently elects to do so. *Faretta v. California*, 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975). In the present case, however, unlike *Faretta*, the defendant has no complaint about the competence, diligence or workload of his two court appointed attorneys. Instead, his motivation for electing to represent himself is that he wishes to be found guilty of first degree murder and sentenced to death. In effect, he requests that he be allowed to defend himself because he fears that the lawyers appointed to represent him will be effective advocates and obtain an acquittal or a sentence of less than death. Furthermore, the record reflects that the defendant is 19 years old, has completed eight grades of school, and has a history of mental illness, although he has been found mentally capable of standing trial. Under these circumstances we conclude that the trial court erred in granting the defendant's request.

When an accused manages his own defense, he relinquishes many of the traditional benefits associated with the right to counsel. For this reason, in order to represent himself, the accused must "knowingly and intelligently" forego those relinquished benefits. *Faretta v. California*, *supra*; *Johnson v. Zerbst*, 304 U.S. 458, 58 S.Ct. 1019, 82 L. Ed. 1461 (1938). Although a defendant need not himself have the skill and experience of a lawyer in order competently and intelligently to choose self-representation, he should "be made aware of the dangers and disadvantages of self-representation, so that the record will establish that "he knows what he is doing and his choice is made with eyes open.' " *Faretta v. California*, *supra*, 422 U.S. at 835, 95 S.Ct. at 2541; *Adams v. United States ex rel McCann*, 317 U.S. 269, 63 S.Ct. 236, 87 L. Ed. 268 (1942). The record in this case does not affirmatively show that the defendant was sufficiently advised and made aware of the dangers and disadvantages of self-representation. *Moreover, a defendant's election to represent himself for the purpose of acquiescing in his conviction of a capital offense and in his death sentence cannot be sanctioned as an intelligent choice.*

*State v. Shank*, 410 So. 2d 232, 233 (La. 1982).

The Supreme Court's plurality opinion in *Lockett v. Ohio* is also instructive. It emphasizes the utmost importance of providing the decision-maker at capital sentencing with a full picture of the mitigating evidence in the case. Indeed, it is this presentation of mitigation evidence which makes the imposition of the death penalty constitutional:

> [W]here sentencing discretion is granted, it generally has been agreed that the sentencing judge's "possession of the fullest information possible concerning the defendant's life and characteristics" is "[highly] relevant -- *if not essential* -- [to the] selection of an appropriate sentence . . . .".

*Lockett v. Ohio*, 438 U.S. 586, 602-03 (1978) (plurality) (quotation omitted) (emphasis in original).  The Court continued:

> [T]he Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death. . . . Given that the imposition of death by public authority is so profoundly different from all other penalties, we cannot avoid the conclusion that an individualized decision is essential in capital cases. The need for treating each defendant in a capital case with that degree of respect due the uniqueness of the individual is far more important than in noncapital cases. . . .The nonavailability of corrective or modifying mechanisms with respect to an executed capital sentence underscores the need for individualized consideration as a constitutional requirement in imposing the death sentence.

*Lockett*, 438 U.S. at 604-605 (plurality) (footnotes omitted).  Because Mr. Austin was permitted to proceed *pro se* and actively pursue a death sentence, here, as in *Lockett*, the jury was prevented "from giving independent mitigating weight to aspects of the defendant's character and record and to circumstances of the offense proffered in mitigation," thus "creat[ing] the risk that the death penalty will be imposed in spite of factors which may call for a less severe penalty. When the choice is between life and death, that risk is unacceptable and incompatible with the commands of the Eighth and Fourteenth Amendments." *Id*.

  As Justice Marshall has forcefully argued, a defendant who seeks to present *no* defense must not be permitted to sabotage the independent Eighth Amendment prohibition on the arbitrary imposition of the death penalty:

> Society's independent stake in enforcement of the Eighth Amendment's prohibition against cruel and unusual punishment cannot be overridden by a defendant's purported waiver.  By refusing to pursue his Eighth Amendment claim, Bishop has, in effect, sought the State's assistance in committing suicide. Society is not powerless, however, to resist a defendant's effort to prompt the exercise of capital force. . . . In the present case, the defendant Bishop, acting as his own defense counsel, failed to introduce any mitigating evidence at the sentencing hearing. Moreover, he was successful in persuading the sentencing tribunal to refuse to permit his standby counsel to present such evidence. By that action, the sentencing court deprived itself of the very evidence that this Court has

deemed essential to the determination whether death was the appropriate
sentence. We can have no assurance that the death sentence would have
been imposed if the sentencing tribunal had engaged in the careful weighing process
that was held to be constitutionally required in *Gregg v. Georgia* and its progeny.
This Court's toleration of the death penalty has depended on its assumption that
the penalty will be imposed only after a painstaking review of aggravating and
mitigating factors. In this case, that assumption has proved demonstrably false.
Instead, the Court has permitted the State's mechanism of execution to be
triggered by an entirely arbitrary factor: the defendant's decision to acquiesce in
his own death. In my view, the procedure the Court approves today amounts to
nothing less than state-administered suicide.

*Lenhard v. Wolff*, 444 U.S. 807, 811-12, 813-15 (1979) (Marshall, J., dissenting from denial of

stay of execution) (footnotes omitted).

Several states have recognized the need to avoid the undermining of our system of justice

by suicidal capital defendants and have introduced rules to prevent exactly that which occurred

here. *Muhammad v. State*, 782 So. 2d 343, 363 (Fla. 2001)(Requiring preparation of detailed

PSI and, where appropriate, having the court call mitigation witnesses or appoint counsel for the

purpose of presenting mitigation); *State v. Koedatich*, 548 A.2d 939, 997 (N.J.

1988)(Constitution demands that mitigating factors must be introduced in a death case,

regardless of the defendant's position); *State v. Shank*, 410 So. 2d 232, 233 (La. 1982)(Declining

to permit self-representation for the purpose of seeking a death sentence); *Morrison v. State*, 373

S.E.2d 506, 509 (Ga. 1988) (where defendant refuses to offer mitigating evidence, the trial court

may have an obligation to conduct an independent investigation into evidence of mitigation); *See*

*also* Epstein, J., *Mandatory Mitigation: An Eighth Amendment Mandate To Require Presentation*

*Of Mitigation Evidence, Even When The Sentencing Trial Defendant Wishes To Die*, 21 Temp.

Pol. & Civ. Rts. L. Rev. 1 (2011).

In Mr. Austin's case, the state does not meaningfully challenge the assertion that Mr.

Austin sought self-representation not so as to defend himself, but so as to preclude the offering

of any defense; and that as a result, there is a serious risk that the death sentence was imposed

arbitrarily.  The state simply argues that the bare right to proceed *pro se* – not the right to represent oneself in furtherance of one's own defense, but the right to waive counsel and effectively join forces with the prosecution – trumps any other constitutional imperatives.  Such an absolutist stance is not supported by case law and is antithetical to the strict procedural protections that our law mandates in order to preserve the constitutionally of our system of capital punishment.

The state also argues that the Court should not consider this claim on appeal because Mr. Austin's own actions of waiving counsel "invited or induced" the error.  This argument has no more merit than would an argument that a court cannot hear a claim on appeal that an incompetent defendant was erroneously permitted to waive counsel; for there, too, it could be said that the defendant in some sense "invited" the error.  Mr. Austin made no secret of the fact that his goal in representing himself was to secure the death penalty.  The trial court had sufficient information before it to deny the request to waive counsel or to take other remedial measures on the basis that Mr. Austin's suicidal self-representation without more would undermine the adversarial process and eviscerate the constitutional protections against the arbitrary imposition of the death penalty.  The fault here, in allowing a suicidal man to represent himself for the express purpose of securing a death sentence, must fall squarely upon state of Texas.

Mr. Austin further contends that the presentation of no defense at all – including mitigating evidence – deprives the Court of the ability to conduct a proportionality review, which is necessary to the constitutional imposition of the death penalty.  It is true that in *Pulley*, the Supreme Court held that the absence of a formal mechanism for *comparative* proportionality review did not render a death penalty statutory scheme unconstitutional.  *Pulley v. Harris*, 465

164

U.S. 37, 48-50 (1984).  However, *Pulley* does not in any way sanction the disproportionate imposition of death sentences; it simply holds that a state's procedures may be adequate to ensure proportionality even without a distinct *comparative* proportionality review.   The consideration of mitigating evidence was, in fact, central to the determination that Texas's scheme was constitutional notwithstanding the absence of proportionality review:   "By authorizing the defense to bring before the jury at the separate sentencing hearing whatever mitigating circumstances relating to the individual defendant can be adduced, Texas has ensured that the sentencing jury will have adequate guidance to enable it to perform its sentencing function."  *Pulley v. Harris*, 465 U.S. 37 (1984).  In this case neither the jury nor the reviewing courts had any information regarding mitigating evidence that could have ensured the proportionality of Mr. Austin's sentence.  This is not the situation anticipated in Pulley, where mitigation evidence was provided including the defendant's own sworn statement of remorse. *Pulley*, 456 U.S. 37, 40.

Moreover, to the extent that *Pulley* holds that proportionality review is unnecessary, this holding has been undermined by subsequent Supreme Court precedent focusing on whether the death penalty is a proportional punishment for a particular type of individual who committed a particular type of crime.  Since *Pulley* – in *Atkins*, *Roper*, and *Graham* – the Supreme Court has emphasized and invigorated its "narrowing jurisprudence, which seeks to ensure that only the most deserving of execution are put to death . . . ." *Atkins v. Virginia*, 536 U.S. 304, 319 (2002). As explained in a recent article,

> *Graham* . . . stands as confirmation of an Eighth Amendment proportionality regime that limits punishment to those who, based on personal characteristics as well as the underlying crime, meet the categoric eligibility threshold. While heretofore the categoric approach has been to exclude groups from the pool of those eligible to receive the punishment of death, in each instance that exclusion has been delineated because at least some in that category are not 'the worst.'

165

> This winnowing process can have only one rationale - to ensure that only those
> who are indeed 'the worst' are those who actually receive the sentence of death.

Epstein, J., Mandatory Mitigation: An Eighth Amendment Mandate To Require Presentation Of

Mitigation Evidence, Even When The Sentencing Trial Defendant Wishes To Die, 21 Temp. Pol.

& Civ. Rts. L. Rev. 1, 19 (2011).

As seen in *Atkins*, *Roper*, and *Graham*, there is an independent constitutional requirement

that the death penalty only be imposed upon the most culpable, upon the worst of the worst.

Culpability is not measured solely according to the crime committed – rather, *Atkins* and *Roper*

center around the culpability of the *offender* in light of his personal traits and circumstances.

Indeed, the most brutal crime imaginable, committed by an individual who is mentally retarded

or a juvenile and therefore categorically less culpable, would not justify the imposition of the

death penalty.  In *Atkins*, the Court made clear that it would bring its own judgment to bear upon

the excessiveness or proportionality of executing individuals with mental retardation, and

through this "independent evaluation of the issue," concluded that "such punishment is

excessive."  *Atkins v. Virginia*, 536 U.S. 304, 321 (2002).  In Mr. Austin's case, because he was

permitted to waive counsel with the explicit intention of committing suicide by the judicial

system, there has been no check on the proportionality of his sentence and no meaningful

determination that Mr. Austin is among the most deserving of execution.  His death sentence,

therefore, cannot stand.

**CLAIM XXIII. Mr. Austin is entitled to relief based upon the fact that new evidence shows that he is unquestionably innocent of the offense for which he was convicted and sentenced to death**

### 1. *No deference is due as there was no state court decision on Mr. Austin's Brady claim.*

This court clearly owes no deference under 2254(d), as there is no state court decision on the merits to which to defer – the state court having procedurally defaulted the claim and declined to reach the merits. The state does not argue that §2254(d) apply.

### 2. *A claim of innocence is reviewable in federal habeas proceedings, notwithstanding a prior plea of guilty*

The state contends that because Mr. Austin pled guilty, any actual innocence claim is foreclosed. State's Answer at 79-80. However, the actual innocence exception left open in both *Herrera v. Collins*, 506 U.S. 390 (1993), and *House v. Bell*, 547 U.S. 518, 555 (2006), relates to *actual, factual* innocence of a crime, not legal innocence. A voluntary plea of guilty establishes legal guilt but not *factual* guilt. Whether or not Mr. Austin pled guilty to the offense (here, out of a suicidal desire to be executed) is of no moment when applying the constitutional prohibition on the execution of an individual who is actually innocent. The relevant issue is whether Mr. Austin can make a "truly persuasive" showing of actual innocence.

Petitioner reiterates his previous assertion that the Fifth Circuit has erred in holding that a claim of actual innocence is not cognizable on federal review. That question has been deliberately left open by the United States Supreme Court in *Herrera* and *Bell*, and what is more, six out of nine justices appear to have concluded that a "truly persuasive" showing of actual innocence *would* bar execution. *See Herrera*, 506 U.S. at 419 (O'Connor and Kennedy, J.J. concurring) ("[T]he execution of a legally and factually innocent person would be a constitutionally intolerable event."); *id*. at 429 (White, J. concurring) ("I assume that a persuasive showing of 'actual innocence' made after trial, even though made after the expiration of the time provided by law for the presentation of newly discovered evidence, would render

unconstitutional the execution of petitioner in this case."); *id*. at 441-42 (Blackmun, Stevens, and Souter, J.J. dissenting) ("'[A] truly persuasive demonstration of "actual innocence" made after trial would render the execution of a defendant unconstitutional.' . . . . "I would hold that, to obtain relief on a claim of actual innocence, the petitioner must show that he probably is innocent.").

The state argues that Texas clemency proceedings provides such an effective fail safe against wrongful execution that federal habeas relief cannot be warranted.  *See id.* at 417 ("We may assume, for the sake of argument in deciding this case, that in a capital case a truly persuasive demonstration of "actual innocence" made after trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief if there were no state avenue open to process such a claim.")

Texas clemency proceedings, however, provide no sufficient "fail safe" nor do they represent an avenue open in this case.  A pardon based on innocence may only be granted in limited procedural circumstances requiring particular recommendations or orders by Texas state actors to be filed in support of the claim.  37 TAC § 143.2 The Texas Administrative Code prevents the Board from even considering such an application unless it contains the written recommendation of at least two of the current trial officials or the certified judgment of a court recommending state habeas relief based upon actual innocence.

As to the latter, Petitioner applied to the state trial court for state habeas relief based upon actual innocence and, as this court has previously held, that application was procedurally defaulted by the Texas Court of Criminal Appeals as untimely.  This court has also already held that the method used by the CCA to calculate the timeliness of Petitioner's filing had never been announced and could not support a default of a federal constitutional claim.

As to the former, the trial officials are "[t]he present sheriff, each chief of police, prosecuting attorney, and judge in the county and court of conviction and release." 37 TAC § 141.111. So, the only avenue for executive clemency runs in the first instance not through the Governor, nor even through an advisory board but through the prosecutorial and law enforcement agencies who prosecuted Petitioner and sought his death for a crime he did not commit. This version of clemency does not by any standard represent a state fail safe adequate to bar habeas relief. At most, the existence of this theoretical avenue should be regarded as no more than an exhaustion requirement. Should this court be persuaded that an avenue for relief justifying denial of habeas relief exists, Petitioner requests that the court stay and abate the proceedings to allow Petitioner to exhaust this avenue and thereby either relieve the court of the need to adjudicate the claim or prove conclusively that no avenue for relief but federal habeas exists.

As for the merits of the defendant's claim of actual innocence, both as a stand-alone claim under *Herrera* and as a gateway claim to avoid any procedural default under *Schlup*, the primary concern that the state raises is that a persuasive showing cannot be made on a recantation alone. However, the state has oversimplified Mr. Austin's argument and misrepresented the strength of the evidentiary support he has amassed. It is critical that the *only* evidence of guilt in this case is Mr. Austin's confession. Thus a recantation by Mr. Austin here is far more significant than it may be in many cases, because it throws the state's entire case into doubt.

In arguing that a recantation is insufficient to prove innocence, the state relies upon *Graves v. Cockrell*, 351 F.3d 143, 153 (5th Cir. 2003). However, in that case the Court held that "Graves cannot meet this burden with the recanted testimony of Carter, given the numerous

contradictory statements Carter has made *and other evidence of Graves' guilt*." *Id.* (emphasis added).  In the present case, by contrast, there was no other significant evidence of guilt aside from Mr. Austin's confession.   Where the state's case relies entirely on the defendant's confession, a recantation – combined with the extensive evidence of Mr. Austin's suicidality, which provides a motive for Mr. Austin to lie, along with polygraph evidence that corroborates the truthfulness of Mr. Austin's recantation – is extremely persuasive evidence of innocence. This persuasiveness is heightened by the fact that the initial confession was inaccurate and of dubious veracity from the beginning, *see* Second Amended Petition at 168-69, while the believability of the subsequent recantation is supported by numerous affidavits and other corroborating information, *see* Second Amended Petition at 169-70.

At the very least, Mr. Austin should be granted an evidentiary hearing at which he can prove that he is actually innocent of the murder of which he has been convicted.

## CLAIMS  XXV-XXIX: Claims arising from the legislative change to Texas' death penalty statute are neither procedurally defaulted, nor Teague barred

### *1. Petitioner's claim is not barred in this court as the state's procedural rule applied was not independent and adequate to support the judgment or, in the alternative, cause and prejudice is shown*

On January 3, 2006, Petitioner presented these claims in state court as a part of his subsequent application for a writ of habeas corpus.  Where a subsequent application urges claims that are said to have been previously unavailable the application is to be dismissed by the Court of Criminal Appeals unless it contains sufficient specific facts establishing that:

> (1)     the current claims and issues have not been and could not have been presented previously in a timely initial application or in a previously considered application filed under this article or Article 11.07 because the factual or legal basis for the claim was unavailable on the date the applicant filed the previous application;

Tex. Code Crim. Proc. Art. 11.071(5)(a).

Mr. Austin's previously filed application was filed on June 21, 2004.  The claim at issue arises from a piece of legislation voted on in May 2005, approved by the Governor in June 2005 and coming in to effect on September 1, 2005.

On April 5, 2006 the CCA summarily dismissed Mr. Austin's application as an abuse of the writ, holding in relevant part:

> . . . Applicant now seeks review of nine claims which he alleges were unavailable to him when his initial application was filed.
> We have reviewed the application and find that it fails to meet the requirements of Texas Code of Criminal Procedure, Article 11.071, section 5, for consideration of subsequent grounds for relief.  This application is dismissed as an abuse of the writ.

*Ex parte Perry Allen Austin*, WR-59,527-02 (April 5, 2006) (not designated for publication).

To bar federal review of a constitutional claim, a state procedural rule must be independent and adequate.  *Sayre v. Anderson*, 238 F.3d 631, 634 (5th Cir. 2001).  The rule applied here was independent of the merits of the federal claim but cannot meet the adequacy requirement as a clearly announced and regularly applied rule.  *Wheat v. Thigpen*, 793 F.2d 621,625 (5th Cir. 1986),

Obviously, the factual or legal basis for constitutional claims arising out of the legislative amendments could not have been presented previously because the factual or legal basis for the claims was unavailable on the date Mr. Austin filed the previous application. Art. 11.071(5)(a).

The procedural rule announced in art. 11.071(5) does not, on its terms, apply where "the factual or legal basis for the claim was unavailable on the date the applicant filed the previous application."  Texas has never previously announced that this rule will be extended to claims whose basis did not arise until after the filing and dismissal of a petitioner's previous application.

Counsel has been unable to identify a single case in which the Texas CCA held that a successor petition raising a claim based upon a subsequent legislative change is procedurally

barred.  Thus the CCA's dismissal of the successor application here does not constitute a state procedural ruling that is "adequate" to bar federal review.  The U.S. Supreme Court has held that "only a firmly established and regularly followed state practice may be interposed by a State to prevent subsequent review . . . of a federal constitutional claim."  *Ford v. Georgia,* 498 U.S. 411, 423-24 (1991) (internal quotation marks and citation omitted); *see also Wheat v. Thigpen,* 793 F.2d 621,625 (5th Cir. 1986), *cert. denied,* 480 U.S. 930 (1987) ("If the state does not clearly announce the procedural rule or the state courts do not strictly or regularly follow the procedural rule, then the federal courts may reach the issue the state court refused to address").  Texas has absolutely no "firmly established and regularly followed state practice" to decline review of successor claims based on new legislative changes.   In fact, the CCA frequently reviews successor petitions in a similar context: when claims are based on new case law, such as *Penry II* or *Atkins*.  *See, e.g.*, *Ex parte Buntion*, 2009 Tex. Crim. App. Unpub. LEXIS 635, 2-5 (Tex. Crim. App. Sept. 30, 2009) (unpublished) (remanding for a new punishment phase based on a claim raised under *Penry II* where initial habeas petition was filed in 1996 and *Penry II* was handed down in 2001);  *Ex parte Newton*, 2009 Tex. Crim. App. Unpub. LEXIS 482 (Tex. Crim. App. July 22, 2009) (remanding for consideration of MR claim in light of *Atkins*); *Ex parte Williams*, 2009 Tex. Crim. App. Unpub. LEXIS 316 (Tex. Crim. App. Apr. 29, 2009) (remanding subsequent application in light of new case law, *Miller-El*); *Ex parte Tercero*, 2008 Tex. Crim. App. Unpub. LEXIS 796 (Tex. Crim. App. Oct. 29, 2008) (remanding application where new claim based on new law, *Roper v. Simmons*).

As this court has previously found, novelty in procedural rules cannot be permitted to thwart federal review. *Ford v. Georgia,* 498 U.S. 411, 424 (1991) The procedural rule applied by the Texas CCA is not adequate.

If the state procedural rule does extend to bar claims, such as this, arising after the dismissal of a previous application rendering them entirely unavailable in state court then the case would more appropriately be covered by 28 U.S.C §2254(b)(1)(B) permitting consideration of claims where "(i) there is an absence of available State corrective process; or (ii) circumstances exist that render such process ineffective." It is certainly not the case that a death row prisoner's opportunity for review of his federal constitutional claims can be thwarted by a state procedural rule that is impossible to comply with and that requires a petitioner to file his claims before they come into existence.

In the alternative, cause and prejudice is shown for the default of the state procedural rule. Because the basis for Claims XXV through XXIX were previously unavailable, Mr. Austin has established cause for failing to raise them earlier. *See, e.g., Murray v. Carrier*, 477 U.S. 478, 488 (1986) ("[A] showing that the factual or legal basis for a claim was not reasonably available to counsel . . . would constitute cause under this standard."). As Mr. Austin claims that as a result of these federal constitutional violations Mr. Austin has been unlawfully sentenced to death there can be no question of his ability to meet the prejudice standard. *U.S. v Frady*, 456 U.S. 152 (1982)("actual and substantial disadvantage infecting entire trial with error of constitutional dimensions); *See also Sawyer v. Whitley*, 505 U.S. 333 (1992)(Innocence of the death penalty).

### 2. *Petitioner's claims are not Teague barred*

The state argues that Claim XXV, along with the next four claims, are *Teague*-barred. This is not the case. It is true that in Claim XXV, Mr. Austin is advocating for the recognition of a new rule of constitutional law: that in order to impose the death sentence, states are required by the Eighth and Fourteenth Amendments to provide the sentencing option of life without parole

(LWOP).  However, this new rule is *substantive*, and it therefore meets one of the two exceptions

to the *Teague* rule against retroactivity on collateral review.  As the Supreme Court explained in

*Penry*:

> [A] new rule placing a certain class of individuals beyond the State's power to
> punish by death is analogous to a new rule placing certain conduct beyond the
> State's power to punish at all. In both cases, the Constitution itself deprives the
> State of the power to impose a certain penalty, and the finality and comity
> concerns underlying Justice Harlan's view of retroactivity have little force. As
> Justice Harlan wrote: "There is little societal interest in permitting the criminal
> process to rest at a point where it ought properly never to repose." *Mackey*, *supra*,
> at 693. Therefore, the first exception set forth in *Teague* should be understood to
> cover not only rules forbidding criminal punishment of certain primary conduct
> but also rules prohibiting a certain category of punishment for a class of
> defendants because of their status or offense. Thus, if we held, as a substantive
> matter, that the Eighth Amendment prohibits the execution of mentally retarded
> persons such as Penry regardless of the procedures followed, such a rule would
> fall under the first exception to the general rule of nonretroactivity and would be
> applicable to defendants on collateral review.

*Penry v. Lynaugh*, 492 U.S. 302, 329-30 (1989).  Here, Mr. Austin is urging the court to

recognize a new rule of constitutional law: that, in keeping with evolving standards of decency

and a truly overwhelming national consensus, the death penalty may not be imposed without

offering the jury the sentencing alternative of life without parole.  Such a constitutional rule

would put a certain class of individuals – those who could be kept safely in prison for life and

whose culpability was insufficient to warrant death rather than life without parole – beyond the

power of the state to punish.  In light of this rule, those who were convicted without the benefit

of the LWOP alternative and who fall into this class of individuals may not now be executed.[41]

The remedy for this constitutional violation is either reduction of Mr. Austin's sentence from

---

[41] Similarly, *Atkins v. Virginia*, 536 U.S. 304 (2002), which bars the execution of the mentally retarded; *Roper v. Simmons*, 543 U.S. 551, 568 (2005), which bars the execution of juvenile offenders; and *Graham v. Florida*, 130 S. Ct. 2011 (2010), which "prohibits the imposition of a life without parole sentence on a juvenile offender who did not commit homicide," *id.* at 2034, have all been held to be retroactive under the first *Teague* exception.  *In re Sparks*, 2011 U.S. App. LEXIS 19228, 7-8 (5th Cir. 2011).

death to life without parole, or a new sentencing phase at which Mr. Austin can prove that he should be sentenced to LWOP rather than death.

As to claims XXVI and XXVII, Mr. Austin relies on settled principles of law, and as such "the result [is] dictated by precedent existing at the time the defendant's conviction became final." *Teague v. Lane*, 489 U.S. 288, 301 (1989) (citations omitted). The substantive law in the state of Texas has changed, and that change makes these claims available to Mr. Austin in habeas proceedings, but the constitutional principles which support his argument are longstanding. Moreover, *Teague* allows for retroactive application even of new constitutional rules when, as in *Atkins* and *Roper*, the rule prohibits punishing a certain class of people in a specific way. *See Penry v. Lynaugh*, 492 U.S. 302, 330 (1989) ("[T]he first exception set forth in *Teague* should be understood to cover not only rules forbidding criminal punishment of certain primary conduct but also rules prohibiting a certain category of punishment for a class of defendants because of their status or offense. Thus, if we held, as a substantive matter, that the Eighth Amendment prohibits the execution of mentally retarded persons such as Penry regardless of the procedures followed, such a rule would fall under the first exception to the general rule of nonretroactivity and would be applicable to defendants on collateral review.").

Claim XXVIII is not *Teague*-barred, as the state contends, because Mr. Austin relies on settled principles of law – here, the requirement under the Eighth Amendment that the death penalty not be imposed in an arbitrary and capricious fashion, *see, e.g.*, *Furman v. Georgia*, 408 U.S. 238, 310 (1972), (Stewart, J., concurring); and that the death penalty is constitutional only insofar is contributes to acceptable goals of punishment, specifically deterrence and retribution. *Gregg v. Georgia*, 428 U.S. 153, 183 (1976).

Claim XXIX is not *Teague*-barred, as the state contends, because Mr. Austin relies on settled principles of law – here, the Eighth Amendment, Due Process, and Equal Protection Clauses' prohibitions against invidious discrimination and against the discriminatory deprivation of a fundamental right.

**CLAIM XXV. The Eighth and Fourteenth Amendments prohibit the execution of an offender sentenced to death when life without parole was not an available sentencing option**

> **1.  *The state has failed to respond in the merits and defaulted its opposition to this claim***

On the merits, the state has not even attempted to combat Mr. Austin's argument that the Eighth and Fourteenth Amendments prohibit the imposition of the death penalty unless LWOP is an alternative sentence.  The state has not rebutted the overwhelming evidence submitted by Petitioner that there is, at this point, a clearly established national consensus that the jury should be presented with an LWOP alternative in order to increase the accuracy of its decision-making. Indeed, *every single death penalty state* now provides for an LWOP alternative.  Death Penalty Information Center, *States Offering Life Without Parole*, http://www.deathpenaltyinfo.org/life-without-parole (last visited 2/29/12).  Nor has the state explained why *not* having an LWOP sentencing alternative in any way serves the penological purposes of deterrence and proportionate retribution.  The state has presented no evidence to counter the data which clearly demonstrates that the absence of an LWOP alternative coerces juries to choose death and reduces the reliability of their verdicts.  The state has also failed to rebut Petitioner's contention that the logic of *Beck v. Alabama*, 447 U.S. 625 (1980) supports finding a constitutional right to an LWOP alternative.

On the merits, then, the state has made absolutely no effort to rebut the compelling argument that Mr. Austin was entitled, pursuant to the Eighth and Fourteenth Amendments, to a life without parole sentencing alternative, in order to ensure the accuracy and fairness of his sentence.  The state should be regarded as having defaulted its opposition to this claim by failing to brief its response on the merits.

**CLAIM XXVI. It violates the Eighth Amendment to execute Mr. Austin where the mitigation sentencing element of the Texas death penalty has been amended to reduce the level of mitigation necessary to avoid the death penalty and Mr. Austin would not now be sentenced to death**

**CLAIM XXVII. It violates the Eighth and Fourteenth Amendments to execute a man when the future dangerousness sentencing element by which he became eligible for the death penalty has since been de facto abolished.**

### 1.   The changes to the Texas special issue questions have narrowed eligibility for the death penalty

Petitioner maintains that it violates the Eighth and Fourteenth Amendments to execute Mr. Austin where, due to the change in law providing jurors with a sentencing alternative of life without parole, he would not now be sentenced to death.  Both special issues – the mitigation special issue and the "future dangerousness" special issue – which were decided by the jury against Mr. Austin have now been substantively altered, and under these new definitions Mr. Austin would no longer be death-eligible.

The state tries to argue that the passage of the LWOP statute did not affect Mr. Austin's eligibility for the death penalty, and that at most, it could have made him less likely to be sentenced to death.  *See* Answer at 89, 91.  The state is incorrect.  The changes to the special issues *do* involve the question of eligibility for the death penalty.  The special issues are sentencing elements that must be proved beyond a reasonable doubt by the state.  *See* Tex. Code Crim. Proc. art. 37.071(2)(c).  If the jury finds that the mitigation special issue should be answered "yes," or that the future dangerousness issue should be answered "no," the defendant

*cannot be sentenced to death*.  If either of these questions is answered in favor of the defendant, then he is not death-eligible.

With respect to the mitigation special issue, the state argues that Mr. Austin was not deprived of the opportunity to present mitigating evidence because "a sentencing option of life without parole in no way relates to Austin's culpability" and "could not render him less deserving of the death penalty."  Answer at 91.  The state's narrow construction of mitigating evidence is flatly contradicted by Supreme Court law and represents an approach to mitigation that has been specifically repudiated.  Mitigating evidence is not limited to evidence about the defendant's *culpability*; where the state is trying to prove future dangerousness, evidence negating such danger is certainly a mitigating factor.  *See, e.g.*, *Skipper v. South Carolina*, 476 U.S. 1, 4-5 (1986) ("[E]vidence that a defendant would in the future pose a danger to the community if he were not executed may be treated as establishing an 'aggravating factor' for purposes of capital sentencing . . . .  Likewise, evidence that the defendant would not pose a danger if spared (but incarcerated) must be considered potentially mitigating.") (citations omitted); *Simmons v. South Carolina*, 512 U.S. 154, 163 (1994) ("The defendant's character, prior criminal history, mental capacity, background, and age are just a few of the many factors, *in addition to future dangerousness*, that a jury may consider in fixing appropriate punishment.") (citations omitted) (emphasis added).  Moreover, the Supreme Court has made abundantly clear that the defense may present *any evidence* having a tendency to warrant a sentence other than death:

> "'Relevant mitigating evidence is evidence which tends logically to prove or disprove some fact or circumstance which a fact-finder could reasonably deem to have mitigating value'" . . . .  Thus, a State cannot bar "the consideration of . . . evidence if the sentencer could reasonably find that it warrants a sentence less than death.". . . .   Once this low threshold for relevance is met, the "Eighth Amendment requires that the jury be able to consider and give effect to" a capital

178

> defendant's mitigating evidence. . . . [S]ee also *Payne v. Tennessee*, 501 U.S. 808,
> 822, 115 L. Ed. 2d 720, 111 S. Ct. 2597 (1991) ("We have held that a State
> cannot preclude the sentencer from considering 'any relevant mitigating evidence'
> that the defendant proffers in support of a sentence less than death. . . . [V]irtually
> no limits are placed on the relevant mitigating evidence a capital defendant may
> introduce concerning his own circumstances" . . . .).

*Tennard v. Dretke*, 542 U.S. 274, 284-85 (2004) (citations omitted).

With regard to the future dangerousness issue, the state cannot ignore that, even though

the danger to "society" can reflect both prison and non-prison contexts, there is a significantly

different standard set when the *only* inquiry the jury is making is whether the defendant can live

safely in prison without any chance of being paroled.  The Supreme Court has specifically

recognized the significance of the possibility of parole in assessing future dangerousness.  *See*

*Simmons*, 512 U.S. at 163-64 ("In assessing future dangerousness, the actual duration of the

defendant's prison sentence is indisputably relevant. Holding all other factors constant, it is

entirely reasonable for a sentencing jury to view a defendant who is eligible for parole as a

greater threat to society than a defendant who is not. Indeed, there may be no greater assurance

of a defendant's future nondangerousness to the public than the fact that he never will be

released on parole."); *id*. at 168-69 ("[I]f the State rests its case for imposing the death penalty at

least in part on the premise that the defendant will be dangerous in the future, the fact that the

alternative sentence to death is life without parole will necessarily undercut the State's argument

regarding the threat the defendant poses to society.").   The significance of the defendant's

ineligibility for parole in determining future dangerousness applies even where, as here, there is

some history of violence in the prison context.  Indeed, although the state argues that Petitioner

has not presented evidence that with the advent of the LWOP sentencing alternative, it is easier

to keep clients off death row, such support does exist.   Since the passage of the LWOP statute,

there has been a significant decline in the number of death sentence per year in the state of

Texas.  In 2004, there were 23 death sentences.  Since 2005, there has been a steady decline; in 2008 there were nine death sentences imposed, in 2009  and 2010 there were only eight.  Death Penalty Information Center, *Death Sentences in the United States From 1977 By State and By Year*,   http://www.deathpenaltyinfo.org/death-sentences-united-states-1977-2008#2010   (last visited 2/29/12).   The number of death sentences sought and returned in Texas since the introduction of life without parole has collapsed and commentators on Texas' death penalty system have had no difficulty in identifying the change in the sentencing law as a major factor in media comments:

> While the debate over capital punishment rages anew in Texas, new inmates going to death row have hit a 35-year low as prosecutors are pushing for fewer death sentences and, many believe, juries have become less willing to give them.
>
> Various factors have contributed to a stark decline in death sentences and a dramatic shake-up in the ranking of counties that use it the most.
> The biggest game-changer appears to be the introduction of life without parole as an option for juries in 2005, according to several prosecutors and defense lawyers. The change in state law represented a huge shift for jurors in capital cases, who previously were responsible for choosing
> either the death penalty or a life sentence in which a convicted killer could be eligible for parole in 40 years.
> "With life without parole being a viable option now, [juries] feel a lot more comfortable that that person is not going to be let out back into society," Tarrant County District Attorney Joe Shannon said. "We are probably waiving the death penalty more times than we used to because we're trying to forecast the outcome of the case."
> * * * *
> The trend has also come with a change in which parts of the state are securing the most sentences.
>
> In Harris County, once known as the death penalty capital of the nation for sending more people to death row than most states, death sentences dropped nearly 70 % over the last 4 years, from 28 to 9, according to state records.
>
> "In many more cases, we are opting not to seek the death penalty because life without parole means the person convicted will not get out of prison and that makes us feel much better that the public will be protected from such a person," said Maria McAnulty, the county's trial bureau chief.

A. Batheja, *Death sentences have dropped sharply after life without parole became possible*, Fort Worth Star-Telegram, November 15, 2009. Available at http://deathpenaltynews.blogspot.com/2009/11/texas-death-sentences-have-dropped.html (Last viewed 2/29/12).   At an evidentiary hearing Petitioner would present direct evidence of the statistical phenomenon described above and of the expert opinion of capital practitioners that the reduction in death sentences is closely related to the introduction of life without parole.

As argued in the Second Amended Petition, it is fundamentally inconsistent with the dignity of man to execute Mr. Austin even though under the current sentencing scheme he would no longer be death-eligible or, at the very least, would likely not have been sentenced to death.

**CLAIM XXVIII. It violates the Eighth Amendment to execute Perry Austin where that execution would be arbitrary and would serve no legitimate penological purpose**

> ### 1. *The state has failed to rebut Mr. Austin's argument that executing him would be an arbitrary and hence unconstitutional imposition of the death penalty, which would fail to promote any legitimate penological goals*

The state contends that, if the court were to accept Mr. Austin's argument, states would be prohibited from amending parole or penal laws without rendering all previous sentences unconstitutional.  This is not so.  The Eighth Amendment case law which prevents the arbitrary imposition of the death penalty is specific to the capital context and does not apply to all criminal cases.  In the capital context, the need to retroactively apply substantive criminal laws limiting the class of people who are eligible for the death penalty is inviolable – but the same logic is not transferrable to the vast majority of amendments to penal and parole laws.

Nor is it true that, following the logic of Mr. Austin's argument, previous inmates convicted of capital murder but sentenced to life with parole would lose their eligibility for parole.  Mr. Austin has asserted, correctly, that it is unconstitutional to execute someone who was sentenced under a previous legal scheme in which life without parole was not an option, as

doing so would lead to the arbitrary imposition of the death penalty.  There is no correlate that an individual who was *not* sentenced to death must have his parole taken away, as there is no constitutional problem with the sentence that this individual received.

The state attempts to characterize Mr. Austin's argument as purely procedural, arguing that the process by which a punishment is imposed in not subject to proportionality review, and that the "Eighth Amendment does not proscribe 'cruel and unusual process.'"  Answer at 94.  The state errs in two different ways.  First, the change in parole law is not a procedural change – it creates a *different substantive standard* for eligibility for the death penalty, with respect to both the mitigation special issue and the future dangerousness special issue.  Second, the state entirely discounts the robust Eighth Amendment case law which focuses on the *procedural* requirements for a constitutional system for capital punishment.  While the Supreme Court has refused to hold the death penalty unconstitutional *per se*, it has frequently emphasized that the procedures to implement it must be adequate to avoid unconstitutional arbitrariness.  *See, e.g.*, *Gregg v. Georgia*, 428 U.S. 153, 188 (1976) ("While *Furman* did not hold that the infliction of the death penalty *per se* violates the Constitution's ban on cruel and unusual punishments, it did recognize that the penalty of death is different in kind from any other punishment imposed under our system of criminal justice. Because of the uniqueness of the death penalty, *Furman* held that it could not be imposed under sentencing procedures that created a substantial risk that it would be inflicted in an arbitrary and capricious manner.").

The state's assertion that Mr. Austin received an adequately individualized sentencing decision relies, again, on the erroneous premise that the absence of parole is not relevant to personal culpability and thus does not constitute mitigation evidence.  This position, as described *supra*, is flatly inconsistent with Supreme Court law on the issue.

Finally, as for Mr. Austin's argument regarding retribution and deterrence, the state simply rests upon the alleged facts in the case and asserts that it would not "*enhance* deterrence" to commute his sentence to life.   Answer at 94-95 (emphasis added).   Neither of these considerations, of course, represents the appropriate inquiry.   In *Atkins*, the question whether executing the mentally retarded would further the twin goals of deterrence and retribution did not rest upon the facts of the crime alleged – it rested instead upon the personal culpability of a particular class of individuals and the utility of trying to deter specific conduct within that class. *See Atkins*, 536 U.S. at 319-20.   Moreover, the question of deterrence was not whether deterrence would be increased *by taking death off the table*.   Rather, the burden lay in the other direction: the Court was unconvinced that *imposing the death penalty* would measurably increase deterrence.   *Id.* at 320 ("[E]xecuting the mentally retarded will not measurably further the goal of deterrence.").

The state has failed to rebut Mr. Austin's argument that executing him would be an arbitrary and hence unconstitutional imposition of the death penalty, which would fail to promote any legitimate penological goals.

**CLAIM XXIX. By operation of the Due Process and Equal Protection Clauses, and the Eighth Amendment the legislative changes of September 1, 2005 are retroactive to Mr. Austin's sentence and he is innocent of the death penalty as now cast.**

> *1.   Mr. Austin did not lose his right to life as a result of conviction and would not open the door to claims of violation of the ex post facto clause*

Mr. Austin has not asserted that, as a man facing the death penalty, he is a member of a suspect class.   However, the discriminatory denial of his right to life is nonetheless subject to strict scrutiny, because the right to life is recognized as fundamental.   The state errs when it asserts that, due to his conviction for murder, he has lost his fundamental right to life.   As explained in the Second Amended Petition, the Supreme Court has repeatedly recognized that

even those on death row retain a fundamental right to life.  Second Amended Petition at 204-06.

Accordingly, the deprivation of that right must comport with the requirements of substantive due

process – which, in this case, would mean that the decision not to make the LWOP statute

retrospective was necessary to serve a compelling state interest.  The state has not claimed, nor

can it, that strict scrutiny could be met here.

As for the state's argument, made under the rubric of rational basis scrutiny, that the state

had a rational interest in non-retroactivity in order to avoid *ex post facto* claims, this justification

surely cannot hold water with respect to those who were sentenced to death, like Mr. Austin.  It

is not an *ex post facto* violation to reduce an inmate's sentence from death to life in prison

without parole, and the state cannot rationally deprive Mr. Austin of the opportunity to be judged

under a more lenient standard on that basis.

**CLAIM XXX. Mr. Austin's rights under the Eighth Amendment were violated when the jury's consideration of mitigating factors was unconstitutionally limited by the nexus requirement in the mitigation special issue.**

> *1.  Petitioner's claim is not barred in this court as the state's procedural rule applied was not independent and adequate to support the judgment and Petitioner does not seek a new rule of constitutional law*

As explained *supra*, "only a firmly established and regularly followed state practice may

be interposed by a State to prevent subsequent review . . . of a federal constitutional claim."

*Ford v. Georgia,* 498 U.S. 411, 423-24 (1991) (internal quotation marks and citation omitted).

In dismissing Claim XXX, the CCA did not apply Tex. Code Crim. Proc. Art. 11.071(5)(a) in a

regular manner; that dismissal does not, therefore, bar federal review.  Because the "factual or

legal basis for [Claim XXX] was unavailable on the date the applicant filed the previous

application,"[42] Tex. Code Crim. Proc. Art. 11.071(5)(a), the CCA's refusal to review it runs

---

[42] *Tennard*, *Smith*, and *Robertson* were all decided after the first state habeas petition was filed in 2004, and before the successor state habeas petition was filed in 2006.

contrary to its ordinary practice of reviewing successor petitions based on new law – including, in particular, petitions based on the *Tennard* and *Dretke* line of cases.  *See Tennard v. Dretke*, 542 U.S. 274, 287 (2004); *Smith v. Texas*, 543 U.S. 37 (2004); *Ex Parte Mark Allen Robertson*, AP-74,720 (Tex. Crim. App. 3/16/05) (remanding a post-conviction petition challenging the nullification instruction because the legal basis was unavailable prior to *Tennard* and *Smith*).

The Texas CCA has recently confirmed that Texas courts do, indeed, review successor petitions based on the *Tennard* line of cases.  *Ex Parte Hood*, 304 S.W.3d 397 (Tex. Crim. App. 2010).  The *Hood* court reasoned that, because the CCA has frequently (albeit inconsistently) given habeas petitioners the opportunity to raise *Penry* claims in successive habeas petitions after *Tennard* and *Smith*, it would continue to consider such claims without finding them procedurally barred under Article 11.071(5).  *Id.* at 35-36.[43]  Effectively, as a matter of fairness, *Tennard* and *Smith* claims are treated by the Texas CCA *as if they are* based in new law, regardless of whether *Tennard* and *Smith* actually did create "new law" for AEDPA and other purposes.

Claim XXX does not address the constitutionality of the "nullification instruction" at issue in *Hood*.  However, Claim XXX – which argues that Mr. Austin's death sentence was imposed without giving the jury a vehicle for adequate consideration of the mitigating evidence – is similarly rooted in *Tennard*'s rejection of the "nexus" requirement.  The CCA has explicitly acknowledged that the *Tennard* line of cases entirely debunks the "constitutional relevance" and

---

[43] *Hood* follows on the heels of a number of cases, both published and unpublished, in which the Texas CCA found that a post-*Tennard* claim that the nullification instruction failed to provide an effective vehicle for the consideration of all relevant mitigation evidence sufficed to defeat the bar against successive or untimely habeas petitions.  *See, e.g.*, *Ex parte Moreno*, 245 S.W.3d 419, 425-426 (Tex. Crim. App. 2008); *Ex parte Martinez*, 233 S.W.3d 319, 322-324 (Tex. Crim. App. 2007); *Ex parte Davis*, 2009 Tex. Crim. App. Unpub. LEXIS 750, 3-6 (Tex. Crim. App. Nov. 18, 2009); *Ex parte Lim*, 2008 Tex. Crim. App. Unpub. LEXIS 407, 2-3 (Tex. Crim. App. June 4, 2008); *Ex Parte Shelton Denoria Jones*, WR-62,589-03 (Tex. Crim. App. 9/13/06) (per curiam) (unpublished) (holding explained in greater detail at *Ex parte Jones*, 2009 Tex. Crim. App. Unpub. LEXIS 480, 2-3 (Tex. Crim. App. June 10, 2009). Other cases, including the first *Hood* decision, went the other way.

"nexus" requirements previously employed by the Fifth Circuit.  *See, e.g., Ex parte Moreno*, 245 S.W.3d 419, 425-426 (Tex. Crim. App. 2008).

Because the CCA did not follow a "firmly established and regularly followed state practice" in declining to review Mr. Austin's *Tennard* claim, *see Ford,* 498 U.S. at 423-24, Claim XXX is not procedurally defaulted.

Claim XXX is not *Teague*-barred, as the state contends, because Mr. Austin relies on settled principles of law – the same principles of law which underpin the Supreme Court's decisions in *Penry I*, *Tennard*, and *Smith*.  As the Supreme Court explained in *Abdul-Kabir v. Quarterman*:

> A careful review of our jurisprudence in this area makes clear that well before our decision in *Penry I*, our cases had firmly established that sentencing juries must be able to give meaningful consideration and effect to all mitigating evidence that might provide a basis for refusing to impose the death penalty on a particular individual, notwithstanding the severity of his crime or his potential to commit similar offenses in the future.

*Abdul-Kabir v. Quarterman*, 550 U.S. 233, 246 (2007).  The Court's debunking of the Fifth Circuit's "nexus" requirement rested on clearly established law, and that same clearly established law supports a finding here that the mitigation special issue unlawfully constrained the jury's consideration of mitigating evidence to that which reduced his "moral blameworthiness."

### 2.   The "moral blameworthiness" instruction does not all relevant mitigating evidence within the "effective reach" of the jury

To understand how the "moral blameworthiness" instruction limits the jury's consideration of the mitigating evidence to that which has a "nexus" to the crime, one need only consider the state's own argument with respect to Claims 25-29, in which the state asserts that an LWOP alternative does not relate to Mr. Austin's culpability and is therefore irrelevant as

mitigating evidence.  To the contrary, as explained *supra*, the Supreme Court has held that the defense may present *any evidence* having a tendency to warrant a sentence other than death:

> "'Relevant mitigating evidence is evidence which tends logically to prove or disprove some fact or circumstance which a fact-finder could reasonably deem to have mitigating value'" . . . . Thus, a State cannot bar "the consideration of . . . evidence if the sentencer could reasonably find that it warrants a sentence less than death.". . . .  Once this low threshold for relevance is met, the "Eighth Amendment requires that the jury be able to consider and give effect to" a capital defendant's mitigating evidence. . . . [S]ee also *Payne v. Tennessee*, 501 U.S. 808, 822, 115 L. Ed. 2d 720, 111 S. Ct. 2597 (1991) ("We have held that a State cannot preclude the sentencer from considering 'any relevant mitigating evidence' that the defendant proffers in support of a sentence less than death. . . . [V]irtually no limits are placed on the relevant mitigating evidence a capital defendant may introduce concerning his own circumstances" . . . .).

*Tennard v. Dretke*, 542 U.S. 274, 284-85 (2004) (citations omitted).  Any evidence that could "warrant[] a sentence less than death" sweeps far more broadly than any evidence pertaining to the defendant's moral blameworthiness.

The state argues that mitigating evidence needs only be within the "effective reach" of the jury; that here, there was no reasonable likelihood that the jury thought it was precluded from giving effect to any mitigating evidence; and that therefore there was no error.  This is not the case.  Mr. Austin disputes that the "moral blameworthiness" instruction places all relevant mitigating evidence within the "effective reach" of the jury.  For example, a jury would likely deem any evidence of positive character traits irrelevant to a defendant's "moral blameworthiness" and thus would refuse to consider such evidence, even though, as the Supreme Court has recognized, such humanizing evidence is central to any sentencing decision and certainly to the penalty phase decision at a capital trial.  In discrediting the Fifth Circuit's "constitutional relevance test," the Court explained:

> [T]he test will screen out any positive aspect of a defendant's character, because good character traits are neither "handicap[s]" nor typically traits to which criminal activity is "attributable." In *Skipper v. South Carolina*, 476 U.S. 1, 5, 90 L. Ed. 2d 1, 106 S. Ct. 1669 (1986), however, we made clear that good character

> evidence can be evidence that, "[u]nder *Eddings*, . . . may not be excluded from the sentencer's consideration." We observed that even though the petitioner's evidence of good conduct in jail did "*not relate specifically to petitioner's culpability for the crime he committed*, there is no question but that such [evidence] would be 'mitigating' in the sense that [it] might serve 'as a basis for a sentence less than death.' *Lockett*, supra, at 604, 57 L. Ed. 2d 973, 98 S. Ct. 2954." Id., at 4-5, 90 L. Ed. 2d 1, 106 S. Ct. 1669 (citation omitted). Such evidence, we said, of "a defendant's disposition to make a well-behaved and peaceful adjustment to life in prison is . . . by its nature relevant to the sentencing determination." Id., at 7, 90 L. Ed. 2d 1, 106 S. Ct. 1669.

*Tennard v. Dretke*, 542 U.S. 274, 285 (2004) (emphasis added).  Similarly, the Texas instruction and special issue here constrict the mitigation evidence available to that which reduces the defendant's moral blameworthiness, and in so doing unconstitutionally limit the scope of evidence which is within the jury's reach.  Even if the state did not *intend* to limit the scope of the jury's consideration of mitigation evidence by employing the phrase "moral blameworthiness," and even if judicial decisions have interpreted the term "moral blameworthiness" broadly, an individual jury would still likely interpret the instruction to preclude a full consideration of mitigating evidence.  *See Boyde v. California*, 494 U.S. 370, 380 (1990), ("[T]he proper inquiry in such a case is whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that prevents the consideration of constitutionally relevant evidence.").

The state's brief reflects a continued lack of understanding of the Supreme Court's holding in the *Tennard* line of cases, which rejected the Fifth Circuit's rule that only evidence which relates to the defendant's personal culpability for the crime itself is constitutionally relevant.  The state argues that "Evidence of a defendant's character or background attains constitutionally mitigating relevance to his culpability for the crime only if it reflects a reduced culpability, *i.e.*, *that the capital murder is to some degree attributable to those aspects of his character or background proffered in mitigation of punishment . . . .*"  Answer at 102 (emphasis

added).   The state's logic is precisely that which the Supreme Court has repeatedly and vehemently disavowed.   *See Tennard*, 542 U.S. at 285 (quoted *supra*); *Abdul-Kabir v. Quarterman*, 550 U.S. 233, 246 (2007) ("[S]entencing juries must be able to give meaningful consideration and effect to *all mitigating evidence* that might provide a basis for refusing to impose the death penalty on a particular individual, notwithstanding the severity of his crime or his potential to commit similar offenses in the future.") (emphasis added).   The Supreme Court has rejected the notion that moral culpability is the only measure of mitigation.   In *Brewer v. Quarterman*, the Court explained, "[W]e have long recognized that a sentencing jury must be able to give a '"reasoned moral response"' to a defendant's mitigating evidence—particularly that evidence which tends to diminish his culpability—when deciding whether to sentence him to death." 550 U.S. 286, 289 (2007) (citations omitted).   By separating out evidence that diminished culpability as one important type of mitigating evidence, the Court necessarily implied that there were *other* relevant types of mitigating evidence.   The Court continued:

> This principle first originated in *Lockett v. Ohio*, 438 U.S. 586, 98 S. Ct. 2954, 57 L. Ed. 2d 973 (1978), and *Eddings v. Oklahoma*, 455 U.S. 104, 102 S. Ct. 869, 71 L. Ed. 2d 1 (1982), in which we held that sentencing juries in capital cases "must be permitted to consider *any* relevant mitigating factor," *id*., at 112, 102 S. Ct. 869, 71 L. Ed. 2d 1 (emphasis added). In more recent years, we have repeatedly emphasized that a *Penry* violation exists whenever a statute, or a judicial gloss on a statute, prevents a jury from giving meaningful effect to mitigating evidence that may justify the imposition of a life sentence rather than a death sentence.

*Id*. at 289 (citation omitted).   The Court has thus consistently rejected the notion that the state may limit the type of mitigation evidence that the jury may consider, as long as it has some tendency to justify a sentence other than death.

The state appears to conflate case law on the need for jurors to be given a proper vehicle to consider *all* mitigating evidence in rendering a verdict, *see, e.g.*, *Penry I*, 492 U.S. at 328; with case law drawing a distinction between an *emotional* response and a *reasoned* response to

189

mitigating evidence, *see, e.g.*, *Saffle v. Parks*, 494 U.S. 484, 487 (1990).  Mr. Austin is not

arguing here that the jury should have been permitted to show mercy in this case and hand down

a verdict without reference to the mitigating evidence.  Rather, he is arguing that the "moral

blameworthiness" instruction and mitigation special issue limited the *type* of evidence which the

jury was instructed to consider in its deliberations.  The *Penry* and *Tennard* line of cases could

not be clearer that there must be a vehicle for the jury to consider *all* mitigating evidence – not

only evidence that relates to the moral culpability of the defendant, but any evidence that may

justify a sentence less than death.  The jury instruction in Mr. Austin's case failed to meet that

standard, requiring instead a nexus between the mitigating evidence and the crime, and as such

the death verdict must be overturned.

As discussed in the Second Amended Petition, even though Mr. Austin, who was

attempting to use the state's death penalty machinery to commit suicide, did not present a classic

mitigation case, there were still substantial mitigating factors that the jury should have

considered in determining the appropriate sentence but were likely precluded from considering in

light of the "moral blameworthiness" nexus requirement, including:

> Mr. Austin's clear attempt to commit suicide by state;
> Mr. Austin's confession to the crime and expression of remorse;
> The violence of the Texas prison system, particularly toward homosexuals, and
> Mr. Austin's suffering in that system;
> Mr. Austin's history of extremely disturbed behavior, which was indicative of
> mental illness or abnormality.

*See* Second Amended Petition at 218-19.  It simply is not true, as the state asserts, that the jury

had an adequate vehicle for considering such evidence through the future dangerousness special

issue.  State's Answer at 101.  Indeed, as explained in the Petition, some of these mitigating

factors – such as the violence in the Texas prison system and Mr. Austin's history of disturbed

behavior – are "two-edged sword[s]," *see, e.g.*, *Penry v. Lynaugh*, 492 U.S. 302, 324 (1989), that cut *against* Mr. Austin in the future dangerousness calculus.

The state argues that the U.S. Supreme Court has already approved the wording of the special issue challenged here in *Penry II.  See Penry v. Johnson,* 532 U.S. 782, 803 (2001).  The Court's discussion of the instruction was, however, *dicta*.  Moreover, in that case the Court was ruling specifically on the adequacy of the vehicle for the jury to consider evidence of mental retardation – evidence that *did* bear upon the question of moral culpability.  The Court was not presented with a situation in which the jury was prevented from considering mitigating evidence that did *not* bear upon the question of moral culpability, and it therefore passed no judgment on what type of instruction would be required in order to ensure that the jury had an adequate vehicle to consider such mitigating evidence.

Moreover, although the state has argued that the Fifth Circuit upheld the "moral blameworthiness" instruction in *Beazley v. Johnson*, 242 F.3d 248, 259-260 (5th Cir. 2001), it should be noted that this decision was from 2001, prior to the Supreme Court's decision in *Tennard* and in the midst of the Fifth Circuit's persistently erroneous interpretation of *Penry* and its progeny.

The Fifth Circuit, affording deference under 2254(d)(1), has recently denied relief on the basis that the state court's rejection of a similar claim was not shown to be an unreasonable application of clearly established law.  *Blue v. Thaler*, 10-70025, 2011 U.S. App. LEXIS 25437 (5th Cir. Tex. Dec. 22, 2011) at *42.  In the present case, this court is not asked to determine whether the state court's denial on the merits was unreasonable but to review the claim on its merits in light of the *Tennard* line of cases.   As to this question, the Fifth Circuit's pronouncements are at best *dicta*.

In short, the state has failed to undermine Mr. Austin's claim that his Eighth Amendment rights were violated when the jury's consideration of mitigating factors was unconstitutionally limited by the nexus requirement in the mitigation special issue.

**CLAIM XXXI. Lethal injection, as respondents administer it in Texas, poses an intolerable and foreseeable risk of causing unnecessary pain, torture, and lingering death, in violation of the Eighth Amendment**

**CLAIM XXXII. Lethal injection, as respondents administer it in Texas, constitutes a violation of Petitioner's first amendment right to free speech and to petition the government**

**CLAIM XXXIII. In violation of the Eighth Amendment TDCJ are acting with deliberate indifference to Petitioner's medical needs in either refusing to plan for a method of central venous access or in secretly planning to perform medically invasive procedures on petitioner without even minimal proper safeguards in place**

### *1. Petitioner's lethal injection claims are cognizable in federal habeas*

The State suggests that Claim XII should be dismissed because a challenge to the method of execution is not cognizable in habeas corpus. The State contends that this claim should be brought as a separate civil rights action under 42 USC Section 1983. *State's Answer* at 105-106, *citing Hill v. McDonough*, 547 U.S. 573, 579 (2006). *Hill*, however, did not hold that Section 1983 was the exclusive means for raising a challenge to the method of execution. In that case, the prisoner filed a Section 1983 lawsuit, which the State wished to have considered as a successive habeas petition and thereby dismissed. The Supreme Court held that Section 1983 was a cognizable basis for litigating such a claim. It did not, and could not, reach the question whether the method of execution claim could also be brought in habeas corpus.

Since the filing of the amended petition in this case, it has become clear under Texas state law that a claim that the method of execution violates the constitution is not ripe until the execution is "immanent." *Gonzales v State*, 353 S.W.3d 826, 837 (Tex.Crim.App. 2011).

Likewise, a challenge to the method of execution is not cognizable under Article 11.071. Ex *parte Alba,* 256 S.W.3d 682, 685 (Tex.Crim.App. 2008); *Ex parte Coble*,  2012 WL 405481 (Tex. Crim. App., Feb. 8, 2012).  It is this that explains the Texas CCA summary dismissal of this claim.

However, Mr. Austin is mindful that he cannot wait until his execution is immanent to file a civil rights suit under Section 1983.  In *Reese v. Livingston,* 453 F.3d 289 (5th Cir. 2006), the Fifth Circuit held that a death-sentenced prisoner who filed such a lawsuit in the shadow of a death warrant was barred by laches.

Thus, Mr. Austin does not have a remedy which can be employed in State Court in a timely enough manner to be reviewed in Federal court.  As a result, this Court has de novo review of this claim.  28 U.S.C Section 2254(b)(1)(B)(i) ("absence of available State corrective process" grounds for de novo review).  If this Court were inclined to find this claim non-cognizable, it should dismiss the claim for want of jurisdiction, but specifically without prejudice to the filing of a section 1983 lawsuit within sixty days from dismissal, and barring the State from challenging the ripeness of that suit.  Surely the State cannot be heard to claim in State court that a claim is filed too soon, and in Federal court that it is filed too late.

## 2. *This claim is not defeated by Baze, as an examination of Texas' new and ever changing protocol would show*

In the alternative, the State contends that its protocol and procedures are similar to those approved by the Supreme Court in *Baze v. Rees*. 128 S. Ct. 1520 (2008).  However, *Baze* was a case which proceeded to hearing after discovery and an evidentiary hearing.  In order for this Court to compare the Supreme Court's ruling in *Baze* with the Texas procedures, Mr. Austin would need to examine the actual practice of the Texas authorities since the new protocol was

adopted in 2008.  That can only be done after discovery, either in this action or in a Section 1983 action.

After all, the State's procedures for lethal injection are a moving target.  The State attaches its 2008 protocol to its answer.  See Respondent's Ex. D.  At the same time, it has been widely reported that the State's supply of sodium thiopental, the first drug of the series prescribed by that protocol (see *Answer* at 109) has expired, and that the State replaced it with pentobarbital as long as a year ago.  "New drug sparks sharp increase in execution cost," Austin American-Statesman, February 24, 2012, http://www.statesman.com/news/texas/new-drug-sparks-sharp-increase-in-execution-cost-2197326.html; "New lethal injection drug drives up cost of execution," KSAT-12, February 24, 2012, http://www.ksat.com/news/New-lethal-injection-drug-drives-up-cost-of-execution/-/478452/9008414/-/13r2ch1z/-/index.html; "Texas executions threatened as stocks of death penalty drug run low," The Guardian, February 14, 2012, http://www.guardian.co.uk/world/2012/feb/14/texas-executions-threatened-stocks-run-low?newsfeed=true.

It is clear that there is a new protocol then, issued in 2011; and with respect to the prospective change in execution drug, it is expected that there will be yet another protocol.  As to this claim, the Court should order the State to file new responsive pleadings, and attach the current (and any prospective) protocol for lethal injection in Texas.

After that, this Court should allow Mr. Austin a reasonable time to employ the provisions of Habeas Rule 6 to promulgate interrogatories and requests for production of documents, and seek deposition testimony, before considering Claim XII.

**CLAIM XXXIV. It would violate the Eighth Amendment to execute Mr. Austin when he is incompetent to be executed within the meaning of *Ford v. Wainwright*, 477 U.S. 399, 409-410 (1986).**

  1. ***No deference is due as there was no state court decision on Mr. Austin's Ford claim as it remains premature.***

This court clearly owes no deference under 2254(d), as there is no state court decision on the merits to which to defer – the state court having procedurally defaulted the claim and declined to reach the merits. The state does not argue that §2254(d) apply.

  2. ***This claim was brought to preserve Mr. Austin's rights but is not yet ripe for determination***

This *Ford* claim was brought with leave of the court on an unopposed motion to amend. [41] *Order Granting Leave to Amend* (12/6/06).  With no execution date imminent it remains premature to consider Mr. Austin's *Ford* claim, however, the usual pleading rules for *Ford* claims required that the claim be brought in Mr. Austin's first habeas petition.  *See In re Davis*, 121 F.3d 952 (5th Cir. 1997); *Resendiz v. Quarterman*, 454 F.3d 456, 458-459 (5th Cir. Tex. 2006).

The state urges that the claim be dismissed without prejudice to refiling when the claim is exhausted and execution is imminent.  *Answer* at 115.

Since the state's filing the United States Supreme Court has expressly ruled that a *Ford* claim need not be filed in a first habeas petition and will not be barred if brought in an application filed when the claim is first ripe:

> The statutory bar on "second or successive" applications does not apply to a Ford claim brought in an application filed when the claim is first ripe. Petitioner's habeas application was properly filed, and the District Court had jurisdiction to adjudicate his claim.

*Panetti v. Quarterman*, 551 U.S. 930, 947 (U.S. 2007)

It appears to undersigned counsel that the matter is settled, and *In re Davis* is overruled. However, the Supreme Court did not expressly overrule *Davis*, the state has not had an opportunity to concede that *Panetti* overruled *Davis* and counsel is loath to withdraw or concede

195

a claim that is so fundamental.  Counsel has been unable to discover any Fifth Circuit cases addressing this issue since *Panetti*.

In these circumstances, counsel cannot consent to the dismissal without prejudice of the claim but draws the court's attention to the language in *Panetti*.  Certainly, if the court were to dismiss this claim, rather than continue to hold it as not yet ripe, Petitioner asks that it be dismissed without prejudice and with specific direction that the claim may be timely refiled "when the claim is first ripe".


Respectfully submitted,

__*/s/ Richard Bourke*_____
Richard Bourke
Tx. Bar No. 24040553
Christine Lehmann
La. Bar No. 28122
Louisiana Capital Assistance Center
636 Baronne Street
New Orleans  LA  70113
Tel. (504) 558 9867
Counsel for Perry Austin


## CERTIFICATE OF SERVICE

I hereby certify that on the 5th day of March 2012, I served a true and correct copy of the foregoing pleading by electronic mail from the clerk of court for delivery on opposing counsel:

Jeremy Greenwell
Assistant Attorney General
Office of the Attorney General
PO Box 12548, Capitol Station
Austin, TX 78711-2548
512/936-1600

_____*/s/ Richard Bourke*_____

196