PETITIONER'S EXHIBIT LIST

107     Affidavit of Kirt Heilbrun, Ph.D., February 23, 2012;

108     Affidavit of Antoinette McGarrahan, Ph.D., February 23, 2012;

109     Affidavit of George Woods, M.D., March 4, 2012;

110     Affidavit of Karen Wilson, October 21, 2009

111     Affidavit of Frank Skoff, July 7, 2010

112     Affidavit of John Edward Creekmore, July 7, 2010;

113     Affidavit of Troy Treadway, July 7, 2010;

114     Affidavit of Jeffrey Wilson, July 8, 2010;

115     Affidavit of Russell Olstad;

116     Affidavit of Richard Goeglein, July 8, 2010;

117     Affidavit of Brian Whetstone, July 8, 2010;

118     Medical Records, TDCJ, Perry Austin, 2003-2011

119     File of Dr. Jerome Brown

Exhibit 107 :     <u>Affidavit of Kirt Heilbrun, Ph.D., February 23, 2012</u>

COUNTY OF PHILADELPHIA

STATE OF PENNSYLVANIA

## AFFIDAVIT OF KIRK HEILBRUN

COMES NOW, KIRK HEILBRUN, being duly sworn, and deposes and states as follows:

At your request, and pursuant to our telephone conversations of February 13, 2009 and February 20, 2012, I am commenting on several questions associated with my review of the following documents concerning your client, Perry Austin (*In the Matter of State of Texas v. Perry Allen Austin*, Cause No. 870377):

- Affidavit of Kirk Heilbrun, PhD (6-20-04)
- Affidavit of Mary A. Connell, PhD (6-21-04)
- Affidavit of Thomas G. Allen, PhD (1-22-08)
- Affidavit of Jerome B. Brown, PhD (1-29-08)
- Affidavit of Antoinette Cicerello, PhD (6-21-04)
- Unsigned affidavit of Antoinette McGarrahan (2012)
- Defense Petition regarding Mr. Austin's competence (date; pp. 51-96)
- State Response to Defense Petition (date; pp. 17-45).

This affidavit should be read in conjunction with my earlier affidavit and is intended to respond to the new material raised, rather than to revisit the opinions that I have already expressed.

1. *Describe your qualifications, particularly as an expert in the practice of forensic mental health assessment and an expert on standards of practice/standards of care in forensic mental health assessment.*
   - Currently Professor and Head, Department of Psychology, Drexel University
   - Currently a core faculty member in the Drexel University Law-Psychology Program, training lawyer-psychologists in forensic mental health assessment (FMHA), legally relevant research, and policy analysis
   - Currently director, Forensic Assessment Clinic, Drexel Department of Psychology, providing assessments of adults and adolescents in forensic contexts (primarily criminal and juvenile). Also providing analysis to Pennsylvania Board of Psychology regarding whether work conducted by Pennsylvania licensed psychologists is consistent with professional standards (when complains have been filed with the Pennsylvania Board against such individual).
   - Previously Clinical Director, Forensic Unit, Central State Hospital, and Associate Professor, Department of Psychiatry, Medical College of Virginia
   - Previously Staff Psychologist, then Chief Psychologist, Forensic Service, Florida State Hospital, Chattahoochee, FL

- Diplomate in Forensic Psychology and in Clinical Psychology, American Board of Professional Psychology
- Fellow of the American Psychological Association
- Author or co-author of approximately 115 research or scholarly papers or chapters, and seven books, focusing primarily on FMHA and violence risk assessment
- Specifically, author of *Principles of Forensic Mental Health Assessment* (2001; Kluwer/Academic Press) and *Evaluating the Risk of Violence in Adults* (2009; Oxford University Press); co-author of *Forensic Mental Health Assessment: A Casebook* (2002; Oxford University Press) and *Foundations of Forensic Mental Health Assessment* (2009; Oxford University Press).

2. *In light of information provided by Drs. Allen and Brown in their respective Affidavits, can you elaborate on your previously-expressed opinions concerning the evaluation of trial competency conducted by Dr. Brown with Mr. Allen on 9-30-01?*

There are several areas that need elaboration in light of this additional information. I will address each by quoting from each Affidavit (in italics) and commenting on the material quoted.

(Dr. Brown): *In 2007...I prepared and signed an affidavit at the urging of defense counsel after discovering that other information was available to review concerning Mr. Austin. At that time I expressed concern that additional information relevant to the evaluation results was withheld by Mr. Austin or was otherwise unavailable to me when the original competency evaluation was conducted. Because of this, I stated that it was possible that the information not known might have resulted in an erroneous conclusion on my part regarding his competency.*

In my view, this is an appropriate acknowledgment of the importance of additional information in a complex case involving a possible death sentence.

(Dr. Brown): *I have now been able to review the materials provided by defense counsel in his petition...Although much of this information was not available to me at the time of the original evaluation, there is nothing in these exhibits that would justify changing my opinion, that would indicate that Mr. Austin's opportunity for a fair and impartial evaluation had been compromised because of what he withheld, or that additional evaluation, including more psychological testing or psychiatric interviewing, would have made any difference.*

Forensic psychologists and forensic psychiatrists who conduct evaluations for the courts should not rely on information from single sources without attempting to verify it. Such verification can be attempted in various ways. Often the evaluating professional seeks consistency across sources, collecting information using self-report, third party descriptions,

Heilbrun Affidavit
Texas v. Austin
3-2-12
Page 3

documentation in the records, psychological testing, and specialty measures. This is an active, ongoing process. For example, when there is the possibility that significant clinical depression affects an individual's reasoning about his plea, the evaluator would seek multiple sources of information about the defendant's history of depression and current symptoms. Typically there are some inconsistencies across sources. This can require the evaluator to follow up further, sometimes with a second interview confronting the defendant with additional information obtained from other sources, before drawing a final conclusion about depression and its impact on reasoning about a plea.

For these reasons, it is impossible (in my view) to conclude, as Dr. Brown has, that "there is nothing in these exhibits that would justify changing my opinion, that would indicate that Mr. Austin's opportunity for a fair and impartial evaluation had been compromised because of what he withheld, or that additional evaluation, including more psychological testing or psychiatric interviewing, would have made any difference." The process of conducting a forensic assessment in a complex, high-stakes case involves taking multiple sources of information and inserting them into the data-gathering/interpretation/reasoning sequence before drawing final conclusions. Perhaps a fairer conclusion by Dr. Brown would be that a review of the additional information reflected nothing *obvious* that would *apparently* have changed his opinion resulting from 2001 evaluation. But without taking this additional information and using it as part of the active assessment process, it is extremely difficult to gauge its full meaning.

(Dr. Brown): *A professional and ethical competency evaluation does not usually require extensive review of records, interviews with relevant parties, psychological testing beyond the mental status examination, or use of a psychiatric examination...The competency evaluation that was conducted was essentially the same as those I have conducted thousands of times, and are the same as those conducted by my colleagues at the Harris County Forensic Psychiatry Unit as well as mental health professionals across the state of Texas for decades.*

A mental health professional asserting that *any* FMHA does not require at least some attempt to verify findings based on self-report makes this assertion despite at least 25 years of research, scholarship, training, forensic ethical guidelines, and professional practice literature to the contrary. Using only an interview, whether this includes formal mental status examination or not, increases the risk that the evaluator will (a) fail to detect exaggerated or minimized reports of symptoms or legal capacities, (b) make basic factual errors (e.g., wrong alleged offense, inaccurate mental health history), (c) fail to detect subtle symptoms of disorder that are not immediately apparent upon interview, and/or (d) fail to identify areas in need of additional clarification, among other risks. The use of multiple sources of information in FMHA is one of the most basic and widely-accepted principles that currently exist.

It is certainly possible to identify overwhelming problems affecting trial competency in a brief evaluation. For example, an individual who is agitated, disheveled, incoherent, and highly suspicious may not require many other sources of information (or even a lengthy interview) to document present incapacity to proceed. However, the evaluation of trial competency (including competency to waive constitutional rights) must take into account not only symptoms and related capacities, but the demands on the defendant as part of proceeding with disposition of charges. The present case, in contrast to the very simple example cited earlier in this paragraph, involves an individual with some history of depression and suicide attempts who is expressing a preference to plead guilty with the expectation that this will result in his execution. This is a complex and high-stakes case, requiring that a reasonable evaluation consider whether this preference is being substantially affected by depression or other psychopathology. This is a difficult question to answer, requiring procedures that go substantially beyond self-report as part of the evaluation.

(Dr. Brown): *It is important to remember that the competency standard is a minimum and conservative one, and once that minimum level is reached, it does not matter what additional difficulties remain, are hidden, or are not inquired about. That is, once he is determined to be minimally competent, then he passes the standard and should proceed forward regardless of other psychological issues.*

When an evaluator decides that he/she will address only minimal levels of capacity, and then draws a conclusion about the defendant's trial competence in light of that minimal-capacity opinion, it can be difficult for the judge to disentangle this opinion. For instance, if Mr. Austin showed adequate capacities to understand his charges, the possible penalties upon conviction, and the adversarial nature of the legal system, and could express himself reasonably well in talking with counsel and in possible testimony, that might suggest "minimally competent" capacities. However, if he were also depressed and wished to be executed largely as a result of this depression, this might not be considered fully with the "minimal competence evaluation" approach. The trial judge could then not hear the nuanced details of this aspect of trial competency when reading such a minimal-standard report or hearing testimony. If there are difficulties that have not been detected or described, then clearly these cannot be incorporated into testimony addressing questions such as those concerning the individual's capacity for rational decision-making.

(Dr. Brown): *A professional and ethical competency evaluation does not usually require extensive review of records, interviews with relevant parties, psychological testing beyond the mental status examination, or use of a psychiatric examination. Such efforts are indicated only if there is evidence of impairment during the contact with the defendant that would raise questions about his ability to function adequately, or if he claims impairment. The only areas of difficulty*

Heilbrun Affidavit
Texas v. Austin
3-2-12
Page 5

*that could render a defendant incompetent would be cognitive dysfunction (brain damage), intellectual deficits (mental retardation), or severe mental illness (psychosis).*
Dr. Brown defines the scope of disorders that could contribute to a defendant's incompetency, as well as the evidence for this incompetency observed upon interview, in a narrow fashion. I would agree that the great majority of cases in which defendants are adjudicated incompetent for trial involve such disorders, and feature defendants who show overt signs of incompetency during interview. That is very different from saying that these are the only disorders that could render a defendant incompetent, or the only reason to collect additional information is when overt problems are seen during the interview. For example, serious depression that would substantially impair a defendant's rational decision-making and capacity to work with counsel in his/her own defense might not be obvious during the interview—but could have a very significant impact on the defendant's relevant capacities.

(Dr. Allen): *In my review of Dr. Brown's report, and after reviewing the materials provided by Mr. Austin's counsel, it is my opinion that the competency report submitted by Dr. Jerome Brown fulfilled his obligation to the court in providing a competent, and very probably accurate, expert opinion on Mr. Austin's competency to stand trial. During Dr. Brown's examination there was no clinical indication of any severe mental disease or defect that was impairing Mr. Austin's competency to proceed.*

This requires a brief comment on the methodology of reviews conducted after the original evaluation was performed and based on reading documents. Reviewers can describe the appropriateness of an evaluator's methods, but it is far more difficult to determine whether the results obtained during this evaluation are accurate. I cannot conclude that Mr. Austin was depressed and that such depression affected his decision to plead guilty. However, in light of a documented history of depression and the further documentation that Mr. Austin went to unusual lengths to provide self-incriminating information to those beyond his defense team, I can raise the question of whether Mr. Austin's potential depression and its possible relationship to his plea decision were evaluated thoroughly.

I would also note that in my 2004 affadavit, I observed that one of the important reasons for reviewing records and obtaining other third party information is to alert the evaluator to the possibility of problems that may not be readily apparent during the interview.

(Dr. Allen): *In the second amended petition, it appears that considerable post-hoc psychological testing has been performed on Mr. Austin. For example, a "neuropsychological evaluation undertaken by Dr. Cicerello" was performed. Page 81 of that document indicates "Mr. Austin was honest and forthright with Dr. Cicerello and her test results are valid." However, inadequate actual effort testing was performed, which would have provided an empirical basis for such an opinion.*

Heilbrun Affidavit
Texas v. Austin
3-2-12
Page 6

Formal testing for response style ("actual effort testing") was not conducted by Dr. Brown. However, it was conducted by Dr. Cicerello. As outlined in her affidavit (6/21/04), she administered the Test of Memory Malingering, the Miller Forensic Assessment of Symptoms Test, and the Personality Assessment Inventory. The first two are specialized measures of malingering; the third has response style scales. In addition, she scored a within-test/embedded measure of cognitive effort, the Reliable Digit Span, which utilizes scores already derived from a task administered within the IQ battery. Under the circumstances, this appears sufficient to conclude that Mr. Austin was not malingering symptoms of psychopathology or brain damage.

(Dr. Allen): *In the second amended petition I found that well-thought-out positions of psychologist researchers and writers were actually being misapplied. For example, while it is scientifically accurate that a statistical approach, in the long run, is more accurate than a clinical approach, it does not mean that clinical assessment has been or should be thrown out the window. Psychological testing is a way to test clinical hypotheses. Psychological testing requires clinical correlation.*

I agree with Dr. Allen that both clinical and statistical methods are important in FMHA. Clinical approaches (including interviewing and observing behavior) and empirically validated tests (such as psychological tests and specialized measures) each offer valuable contributions to the FMHA process. In complex cases, the best approach involves using both.

(Dr. Allen): *In criminal evaluations, inaccurate self-report is the norm, and unless it is the product of severe mental disease or defect it has little impact on whether or not someone is competent to stand trial...inaccurate self-report often demonstrates that the Defendant is well motivated to serve himself in the legal process, and is not at all uncommon in criminal populations heavily weighted by Antisocial Personality Disorders.*

Here Dr. Allen apparently refers to those with personality disorder who are exaggerating or faking symptoms of severe psychopathology because they perceive they can help themselves in the legal process. This is a response style known as "malingering." However, he does not address another kind of recognized response style ("denial/defensive"). This involves responding to questions about symptoms that are genuinely experienced by indicating that they are not. It is hard to see how denying symptoms that actually exist, as may have occurred with Mr. Austin in his 2001 evaluation with Dr. Allen, would demonstrate motivation to serve himself in the legal process. It is certainly possible that such denial of symptoms may reflect motivation to be executed, but this cannot be disentangled from potentially debilitating depression without careful evaluation and analysis.

(Dr. Allen): *The MacArthur Competence Assessment Tool-Criminal Adjudication (MacCAT-CA) referred to in the second amended petition is an abbreviated version of a research instrument. This instrument does not include any measures to help the clinician determine if responses during the examination are malingered.*

The MacCAT-CA was developed through an extensive research project. However, it was designed for use by forensic clinicians, not merely abbreviated from its research form. It is accurate to say that the MacCAT-CA does not have a built-in measure of response style. Determining response style during the evaluation must be done by other means, including observation of behavior, interviews with third parties, review of records, and administration of psychological tests sensitive to response style and (possibly) specialized measures of response style.

(Dr. Allen): *During the course of Dr. Brown's evaluation of Mr. Austin, and based on the data provided in the second amended petition, I see no indication that there was ever any evidence that Mr. Austin suffered from a severe mental disease or defect that would impair his "Reasoning, Appreciation, Understanding" as the scales are constructed and defined by this instrument.*

This is impossible to say without administering the instrument.

(Dr. Allen): *To assert that a competent opinion can only occur with the use of this instrument is simply not accurate, and this instrument, like all other measuring devices, cannot be used absent clinical judgment.*

It is possible that a reasonably good evaluation of trial competence can be conducted without the use of the MacCAT-CA, even in a complex case. However, it is potentially very helpful to have this measure included. It provides a basis for comparing measured capacities to those of other "known groups" (e.g., hospitalized incompetent defendants; possibly incompetent defendants in jail; those in jail without any apparent need to raise the competence question), so the evaluator is not limited to conclusions that a defendant "can" or "cannot" do something—and can go beyond qualifiers such as "poor," "minimal," "moderate," "reasonably good," and "excellent."

Consider how the MacCAT-CA might have been useful in Mr. Austin's case. The MacCAT-CA provides a vignette involving a bar fight and the subsequent legal defense of an individual involved in this fight. It primarily focuses on the defendant's knowledge of the adversary system, the roles of courtroom participants, the defendant's role in a hearing or trial, and the capacities to make important decisions such as plea and testimony. If Mr. Austin had demonstrated a different reasoning process for the hypothetical defendant in the MacCAT-CA than he showed for himself in his own case, that would have prompted the

Heilbrun Affidavit
Texas v. Austin
3-2-12
Page 8

evaluator to explore his motivation for such a difference. This could have helped to rule out (or confirm) suicidal motivation stemming from any symptoms that Mr. Austin might have experienced at the time of his 2001 evaluation with Dr. Brown.

(Dr. Allen): *Such testing post-hoc is irrelevant to Mr. Austin's condition and competency in 2001. That Mr. Austin was suffering from some neuropsychological impairment that was compromising his competence to stand trial in 2001 is speculative.*

This is quite accurate in some respects, less so in others. Some symptoms and disorders have the potential to change considerably across time, whether due to maturation, treatment, or other influences. Depression is among these disorders. Finding that Mr. Austin was depressed in 2005, for example, and had been depressed much earlier in his life, would not in itself lead to the necessary conclusion that he was depressed when evaluated by Dr. Brown in 2001. However, it would underscore the importance of considering depression in 2001 very carefully.

Other disorders and symptoms, however, are much more stable. Intellectual deficiency, for instance, does not change much over time (although adaptive functioning can). Some neuropsychological symptoms can also be stable, so their presence (if accurately identified) some years after an original evaluation *would* suggest that they were present at the time of that earlier evaluation (unless they resulted from a cause, such as a stroke, brain injury, or the like, occurring after the first evaluation but before the second).

(Dr. Allen): *Whatever suicidality or depression that was present in 2001 at the time of Dr. Brown's exam was not evident nor impairing Mr. Austin's capacity to proceed...He was...clearly acting out of, and appropriately motivated by, self-interest...(he) avoided discussion of prior "psychiatric" history out of his legal self-interest, not severe mental disease or defect...Based on Mr. Austin's report to Dr. Brown, it was clear that he had his reasons for representing himself, even if they were wrong, legally stupid, or melodramatic...It was not a wise choice, but it was conscious, it was reasoned, and not a product of any severe mental disease or defect."*

Neither Dr. Allen nor I can know these things without a personal evaluation of Mr. Austin. Further, even conclusions that are appropriately qualified (e.g., "based on Dr. Brown's report") are exceedingly limited by the cursory nature of the 2001 evaluation. We simply cannot meaningfully rule out the possibilities of depression and suicidal thinking affecting his legal choices in 2001 without considerably more information than Dr. Brown's evaluation offers.

_____

Kirk Heilbrun

Signed and sworn to me this _____5_____ day of March 2012

_____

Notary Public

NOTARIAL SEAL
ROXANE STALEY-NOPE
Notary Public
PHILADELPHIA CITY, PHILADELPHIA CNTY
My Commission Expires Feb 9, 2014

My commission expires _2/9/14_

Exhibit 108 :       <u>Affidavit of Antoinette McGarrahan, Ph.D., February 23, 2012</u>

COUNTY OF DALLAS

STATE OF TEXAS

## AFFIDAVIT OF ANTOINETTE R. MCGARRAHAN, PH.D.

COMES NOW, ANTOINETTE R. MCGARRAHAN, PH.D., formerly Antoinette Cicerello, Ph.D., being duly sworn, and deposes and states as follows:

This affidavit is being written at the request of Mr. Perry A. Austin's appellate counsel in response to affidavits filed by the State on 12/19/08 by Thomas Allen, Ph.D. and Jerome Brown, Ph.D. The purpose of this affidavit is to address particular allegations, statements, and opinions by Drs. Allen and Brown that are, in my professional opinion, inaccurate. I have attached a list of the records reviewed and sources relied upon in gathering information for and forming the opinions contained in this affidavit. I have also attached a bibliography for cites referenced in this affidavit. The Court should be reminded that while I performed a comprehensive neuropsychological evaluation, consisting of a clinical interview, mental status examination, and extensive testing, totaling approximately six hours, and a review of numerous documents, Dr. Allen did not perform a face-to-face interview or evaluation of Mr. Austin. Although Dr. Brown did not state in either his original competency report, dated 9/25/01, or his 12/19/08 affidavit how much time he spent with Mr. Austin, it appears to have been very brief, likely less than an hour. The Court should also note that Chapter 465.18 (b) (3) and (4) (limitations on forensic services) of the Psychologists' Licensing Act and Rules and Regulations of the Texas State Board of Examiners of Psychologists, which applies to all psychologists licensed in the State of Texas, including myself, Dr. Brown, and Dr. Allen, states that:

> "Licensees should not render a written or oral opinion about the psychological characteristics of an individual without conducting an examination of the individual unless the opinion contains a statement that the licensee (psychologist) did not conduct an examination of the individual."

Dr. Allen makes no such statement in his affidavit. Further, this Licensing Act indicates that,

> "A written or oral opinion about the psychological characteristics of an individual rendered by a licensee (psychologist) who did not conduct an examination of that individual must contain clarification of the extent to which this limits the reliability and validity of the opinion and the conclusions and recommendations of the licensee (psychologist.)"

Dr. Allen did not make any such statements in his affidavit. The Texas Licensing Act's sentiment is further delineated in Section 9.03 of the Specialty Guidelines for Forensic Psychology, which are guidelines set by the American Psychology-Law Society, Division 41, of the American Psychological Association, to "improve the quality of forensic psychological services; enhance the practice and facilitate systematic development of forensic psychology; encourage a high level of quality in professional practice; and encourage forensic practitioners to acknowledge and respect the rights of those they serve," as well as to "provide guidance on professional conduct to the legal system and other organizations and professions." These Guidelines mirror those of the Texas Licensing Act and state:

> "Forensic practitioners recognize their obligations to only provide written or oral evidence about the psychological characteristics of particular individuals when they have sufficient information or data to form an adequate foundation for those opinions or to substantiate their findings. Forensic practitioners seek to make reasonable efforts to obtain such information or data, and they document their efforts to obtain it. When it is not possible or feasible to examine individuals about whom they are offering an opinion, forensic practitioners strive to make clear the impact of such limitations on the reliability and validity of their professional products, opinions, or testimony."

Austin, Perry                                                                                          2

There are no such statements in Dr. Allen's affidavit regarding the limitations on the reliability and validity of his opinions given that he did not conduct a face-to-face examination of Mr. Austin, nor is there any statement that he did not conduct an examination or made any efforts to request one.

1) Dr. Allen claims that during my neuropsychological evaluation of Mr. Austin on 5/26/04 "inadequate actual effort testing was performed" and that, "without such testing," my opinions and conclusions are "highly inaccurate."

As discussed below, the assertion that "inadequate effort testing was performed" during my examination is patently false.  The examination that I performed of Mr. Austin on 5/26/04 included objective stand-alone measures to test for effort, motivation, response style, and malingering (i.e., the intentional production of false or grossly exaggerated physical or psychological symptoms motivated by external incentives).  It also involved use of embedded effort indexes, an assessment of Mr. Austin's performance patterns within tests and across measures, an assessment of Mr. Austin's performance in comparison to his known prior level of functioning, and observations made of him during the evaluation.  All of these components are considered part of a standard forensic neuropsychological evaluation and are crucial in any case where the intentional faking or exaggeration of symptoms for secondary gain (e.g., avoiding the death penalty) is a distinct possibility.  In fact, the importance of assessing effort, motivation, and malingering has become so well-known in the field of neuropsychology, with a wide literature base emerging over the last 20 years, that the American Academy of Clinical Neuropsychology published a consensus statement on the neuropsychological assessment of effort, response bias, and malingering that outlines the purpose and importance of refining critical issues in this area, and it addresses the current state of knowledge and recommendations of expert neuropsychologists to assist clinicians with regard to the assessment of effort, response bias, and malingering (Heilbronner et, al. 2009).  It is interesting to note here that although this statement paper was not published until 2009, and my evaluation of Mr. Austin occurred in 2004, the tests that I administered and the procedures that I utilized in Mr. Austin's case were just those discussed by this paper and seen as appropriate and recommended methods for evaluating effort and motivation, and included use of stand-alone tests of malingering and effort, embedded measures of effort, general personality inventories that contain validity scales, consistency within measures and across measures, and consistency between known history and current performance.

During my examination of Mr. Austin in 2004, I fully evaluated his effort and motivation during tests of cognitive functioning, as well as during tests of psychological and emotional functioning, in order to determine whether he was putting forth full effort and was motivated to perform to the best of his ability.  As outlined in my affidavit, signed 6/21/04, I administered the Test of Memory Malingering, the Miller Forensic Assessment of Symptoms Test, and the Personality Assessment Inventory, the first two of which are stand-alone measures of malingering and the last of which is a personality test that has scales to measure malingering.  In addition, I scored a within-test/embedded measure of cognitive effort, the Reliable Digit Span, which utilizes scores already derived from a task administered within the IQ battery.  I further looked for consistency across tests and within cognitive domains to assess for response bias (i.e., inaccurate/false presentation of oneself).  Finally, I considered Mr. Austin's overall level of performance on the test battery.  As is standard in my practice in conducting these evaluations, I spread the tests of motivation, effort, and malingering across the entire battery so that Mr. Austin's effort was assessed at different points throughout the examination, including at the end of the evaluation when fatigue and other factors may play a role in his ability to put forth adequate effort.  According to the authors of the position statement regarding assessment of malingering, effort, and response bias noted above, "Because effort can vary during an evaluation, if possible clinicians should use multiple validity measures covering multiple domains distributed throughout the testing" (Heilbronner, et al., 2009; page 1107).  Thus, the methodology that I utilized in evaluating Mr.

Austin's performance effort incorporated several of the recommended components for evaluating effort, response bias, and malingering as outlined in the position statement discussed above (Heilbronner, et al., 2009). The authors specifically note, "Stand-alone effort measures and embedded validity indicators should both be employed" (Heilbronner, et al., 2009; page 1106). When the tests of effort, motivation, and malingering were administered to Mr. Austin, he was not privy to the purpose of the task and was lead to believe that the particular test in front of him was just one more in a series of tests designed to assess brain functioning or psychological symptoms.

The Test of Memory Malingering, one of the measures that I administered to Mr. Austin, is a stand-alone standardized objective measure used to assess exaggeration or feigning of memory and other cognitive impairment. This measure was published in 1996 (Tombaugh, 1996) and has been extensively researched in the literature. It is one of the most commonly utilized symptom validity tests (malingering tests) among neuropsychologists (Slick et al., 2004). It has been shown across many studies to have good reliability and validity in assessing response bias and malingering (Rees et al., 1998; Tombaugh, 1996, 1997). It is generally accepted in the field of forensic psychology and neuropsychology and is widely utilized by professionals in the field for the purpose of testing for effort and motivation. Mr. Austin's performance results on the Test of Memory Malingering, as stated in my 6/21/04 affidavit, was without error (Trial 1 = 50, Trial 2 = 50, Retention Trial = 50), indicating that he was putting forth full effort on tests of cognitive functioning and that he was motivated to perform to the best of his ability. Further supporting Mr. Austin's motivation and effort to do well during tests of cognitive functioning was his performance on a within-measure index of effort and motivation called the Reliable Digit Span. This index uses scores already derived on a subtest (i.e., Digit Span subtest) from the IQ measure that was in place at the time, the Wechsler Adult Intelligence Scale-III. This is considered an embedded measure of effort and motivation and is another way to assess performance motivation. Mr. Austin's score on the Reliable Digit Span index was 13, far above the cut-off score of seven or less that has been shown repeatedly in the research literature to represent a score with which poor effort becomes highly suspect for malingering or poor effort (Greiffenstein, et al., 1994; Mathias et al., 2002; Babikian et al., 2006). Mr. Austin's score of 13 was nowhere near that cut-off and indicates, again, that he was putting forth more than sufficient effort and motivation and was not malingering or trying to present an unrealistic picture of his brain functioning. Additional evidence to support my conclusion that Mr. Austin was putting forth full effort during tests of cognitive functioning was his pattern of responding within tests, such that he showed the appropriate pattern of getting easy items right and missing items more frequently as they increased in difficulty level. Also indicative of Mr. Austin's effort and motivation to do well was the consistency of his performance within cognitive domains. That is, he performed similarly on tests that assessed the same brain function, whereas an individual's performance may be suspect if they performed differently on tests that measured the same function.

With further respect to assessment of Mr. Austin's level of effort and motivation to perform well on tests of cognitive functioning, his overall level of performance was reviewed and revealed average to high average intellectual abilities with commensurate neurocognitive functioning in most areas assessed, which was actually slightly *higher* than expected given his educational attainment. His language skills ranged from above average to superior, his memory abilities were superior, his academic skills were at the high school level or above, and his simple attention, as well as sustained attention, ranged from above average to superior. These functional levels are those of someone putting forth full effort, as one cannot fake a higher level of functioning than they have. That is, he can not perform better than he is capable of performing. This is the pattern one sees when an individual is motivated to do well and does not want to be seen as cognitively impaired or mentally ill. When individuals attempt to feign impairment or mental illness, this is not the pattern that appears. If his performance on neuropsychological testing was below expected levels compared to his history, his

effort and motivation would have been called into question. Similarly, the areas that Mr. Austin showed significant difficulties on were the areas of initial conceptualization, inflexibility of processing on complex tasks, fine motor skills, and gross manual strength, which suggests dysfunction of pre-frontal brain systems. This pre-frontal dysfunction seen on objective testing was consistent with mental status findings (i.e., observations made of him during my testing) of reduced spontaneity of speech and increased response latency, and his history that is replete with observations by others of apathy, poor judgment, difficulty in adapting to new situations, and blunted social sensibility (See examples identified in his military records, psychological report and court testimony by Dr. Franklin Lewis, Affidavit of George Woods, M.D., and Harris County Jail Mental Health records). Thus, the objective findings were commensurate with his clinical history and observations made by me, further indicating that Mr. Austin presented an accurate and consistent picture of himself regarding his cognitive capacity and abilities. In addition, an in-person interview with Mr. Austin's father, Mr. William Austin, confirmed the significant social and adaptive difficulties that Mr. Austin had from an early age. Thus, the issues of effort, motivation, and malingering were all fully addressed by me during my evaluation and the findings showed that there were no indications that he was feigning cognitive impairment or putting forth less than optimum effort.

In addition to assessing Mr. Austin's effort and motivation levels on tests of cognitive functioning, as described extensively above, I also tested Mr. Austin for response bias (attempts to present himself in an inaccurate light) with respect to emotional and psychological functioning. According to the position statement referenced above, "When a psychological disorder (e.g., depression) and ability deficits (e.g., memory) are claimed, clinicians should administer measures that can evaluate response bias related to both (Heilbronner, et al., 2009; page 1107). This was done by me in a similar fashion as to the assessment of cognitive motivation and effort, that is, with the use of objective measures, clinical observations, and evaluation of the consistency between his prior history and his test results. I utilized all of these tools to come to the conclusion that he was, indeed, motivated to perform well and present an accurate picture of himself with respect to emotional functioning, and it was clear that he did not want to be seen as mentally ill and likely minimized and significantly downplayed his psychiatric history and psychological symptomatology. Toward the goal of evaluating his effort to perform well and present an accurate picture of himself on psychological tests, I administered the Miller Forensic Assessment of Symptoms Test (M-FAST), a brief structured screening interview designed to provide information regarding the probability that an individual is feigning or malingering psychiatric illness (Miller, 2001). This instrument has been researched and shown to have strong reliability and validity in the assessment of malingering mental illness (Miller, 2001; Miller, 2004). A score above the suggested cut-off of six would warrant a more comprehensive evaluation of malingering with a longer structured interview technique, such as the Structured Interview of Reported Symptoms (SIRS; Rogers, 1992). Mr. Austin scored a zero on the M-FAST, indicating no evidence of an attempt to present an unrealistic or false picture of his psychological and emotional status. In addition, I administered the Personality Assessment Inventory (PAI; Morey, 1991), a standardized objective measure of psychological symptoms and personality functioning, which has validity indicators to determine how the individual being tested responded to the test items in order to assess for response bias. According to the authors of the position statement referenced above, "The evaluation of self-reported symptoms is best accomplished using psychometric instruments containing proven validity measures" (Heilbronner, et al., 2009), and the PAI qualifies as such. The incorporated validity scales assess for positive impression management (i.e., "fake good" efforts), negative impression management (i.e., "fake bad" efforts), and random and careless responding (i.e., poor effort). There have been numerous malingering detection studies utilizing the PAI (See a list of studies in Berry & Schipper, 2007). Mr. Austin's results on the PAI revealed that he approached the test in an open and honest fashion, with no attempts to present an unrealistic or inaccurate impression of himself that was either more negative or more positive than the clinical picture would warrant, showing that he

was motivated to present an honest picture of himself with respect to psychological, emotional, and personality functioning. His standard scores (T-scores) across all four validity scales fell within the normal range (with a mean of 50, a standard deviation of 10, and suggestions of clinical relevance occurring at or above a score of 60). His T-scores on these validity scales were 46, 44, 47, and 41, all well within the range of normal, and these scores were clearly outlined in my original affidavit. In conclusion, it is clear that I adequately and thoroughly evaluated Mr. Austin's effort and motivation regarding his cognitive capacity as well as his emotional and psychological functioning and found such to be sufficiently evidenced and well-supported by the objective testing results, clinical history, and observations. I believe I followed standard, recommended procedures for thoroughly evaluating Mr. Austin's motivation and effort. Thus, the opinions made by me regarding Mr. Austin's cognitive and psychological functioning should be considered valid and reliable. My efforts to evaluate motivation, response bias, and malingering were documented in my original affidavit and available, upon request, in my test data for other experts to review.

2) Dr. Allen states in his affidavit that my neuropsychological evaluation of Mr. Austin on 5/26/04 was "rather meaningless" because he found "no indication that an assessment specific to issues related to competency had occurred."

While a neuropsychological evaluation itself does not pose questions specific to courtroom procedures, courtroom personnel, the nature of the individual's charges, the potential consequences if found guilty of their charges, et cetera, it does assess an individual's ability to make rational decisions, formulate logical thought, make decisions, relate information, including states of mind, contemplate legal strategies, weigh options, understand both short and long-term consequences of actions and decisions, and problem solve. It also incorporates psychological testing to determine what, if any, emotional factors are playing a role in someone's competency or incompetency, and the nature and severity of those factors. In fact, results from a scientific study conducted by Nestor and others (1999) demonstrated empirical evidence for the importance of certain neuropsychological constructs, including social intelligence and episodic memory, in understanding the cognitive dynamics of competence. Certain emotional factors and mental illnesses can influence one's decision making ability and testing for such can be critical in cases such as Mr. Austin's where he was motivated to appear logical and rational and coherent to the best of his ability to ensure his stated outcome of getting the death penalty. While too often forensic evaluators are looking for "negative response bias," that is, "faking bad" or grossly exaggerating symptoms for the purpose of secondary gain (e.g., avoiding the death penalty by appearing mentally ill), mental illness can be missed if the individual is engaged in "positive impression management," which involves the presentation of oneself as without symptoms, without psychological issues, and with all faculties in place in an effort to "look better" (i.e., "fake good") to achieve ones goal (e.g., procuring the death penalty for oneself). The Texas Code of Criminal Procedure, 46B, clearly states that not only factual understanding is required for competency, but also rational understanding, and neuropsychological assessment can assist in this manner. It is clearly short-sighted and fails to consider the entirety of the competency standard to state that such an evaluation is "rather meaningless." It should be noted, however, that I do not believe that neuropsychological testing is required, warranted, or feasible in all or even most competency evaluations, although in certain cases, such as the case with Mr. Austin, I do believe that critical information regarding Mr. Austin's rational abilities was missed as a result of not pursuing objective testing and other collateral information. It is also important to recognize that I make that statement because it was exactly those rational abilities that were impaired in Mr. Austin and evident on neuropsychological testing. Objective psychological testing results from my examination, as well as statements made by Mr. Austin during my examination, showed that he was suicidal, and this is consistent with prior records showing a long history of suicidal depression (See his Military records, Darnell Hospital records, Harris County Jail records, Dr. Lewis' psychological evaluation, etc).

Taking that information, along with the letters he was writing to legal personnel (i.e., the judge) and others related to the case (i.e., the investigator), as well as his self-destructive behavior of engaging in unprotected sex with inmates in the Harris County Jail as a way to contract AIDS, clearly shows that Mr. Austin has a chronic issue with suicidal depression and that his suicidal depression appears to have been present at the time of his trial and competency evaluation with Dr. Brown and likely impaired his ability to reason and make sounds judgments.

Drs. Allen and Brown argue that psychological and neuropsychological testing is not important to a determination of competency. However, the deficits observed and present upon neuropsychological testing that were seen with Mr. Austin are susceptible to being missed with a very brief unstructured type interview, especially because of the superior verbal and memory abilities with which Mr. Austin presents. These abilities allow him to appear, on the surface, much higher functioning then is actually the case, as the high verbal skills "mask" the underlying deficits with problem solving, decision making, rational reasoning, et cetera. In fact, because of the very brief and content-limited evaluation of Dr. Brown's evaluation, it was not surprising to see that Dr. Brown felt that Mr. Austin was able to "engage in conversation" with him and that the conversation itself did not elicit "red flags" as to his competency. Had there been a longer interview and more information obtained, the "red flags" (i.e., deficits in rational understanding) would have become more readily apparent. As I indicated in my 6/21/04 affidavit:

> "The interplay of Mr. Austin's various psychiatric conditions is complex. The cognitive disorder that he suffers from predisposes him to severe bouts of depression given his inflexibility of thinking, poor ability to adapt, difficulty with conceptual initiation, mental rigidity, and blunted social sensibility. He would have difficulty finding alternative ways of coping or dealing with stressful situations and may become fixed on one method of responding, even though it may not be working. In turn, during times of depression, his cognitive deficits become exacerbated, leading to increased difficulties in attention and concentration, problem solving, and basic ability to function on a day-to-day basis. This cycle is supported by collateral sources suggesting that Mr. Austin did not adapt well to segregation, at times spending days in his cell without eating, bathing, or interacting with others."

Thus, a comprehensive neuropsychological evaluation is (and would have been) a reliable way to determine those deficits that are being masked by an individual who is positively motivated to minimize cognitive impairments and who seeks to avoid findings of a mental illness, such as was the case with Mr. Austin, in order to achieve a goal of procuring the death penalty as a way to passively end his life. If the neuropsychological testing had been performed in 2001 at the time when Mr. Austin's competency to stand trial was being assessed, the results would likely have revealed what they revealed in 2004, and in such a manner as described by Dr. George Woods in his affidavit could suggest that Mr. Austin's incompetence was vulnerable to not being detected by a brief interview like that performed by Dr. Brown.

3) Dr. Allen states in his affidavit that "post-hoc testing (such as occurred in this case) is irrelevant" to whether or not Mr. Austin was competent years earlier.

This is simply not true. First of all, the neuropsychological testing that was performed occurred less than three years after Dr. Brown first saw Mr. Austin for a competency evaluation. The nature of the difficulties found by neuropsychological testing in 2004 were not the kind that spontaneously appear as they were not the result of an acute brain process or recent neurological insult or head trauma that occurred in the intervening period between the competency evaluation and the neuropsychological testing. As I indicated in my initial affidavit, Mr. Austin's cognitive impairments and dysfunction appears to have been present since childhood and may be the product of a neurodevelopmental anomaly, and they were highly consistent with observations and testing made by Dr. Lewis many years

earlier when Mr. Austin was just 19. The impairments seen on my neuropsychological testing are persistent deficits and although I have not tested Mr. Austin since 2004, the nature of his impairments are such that they are likely to be present in a similar type and similar severity should he be re-tested today. Just as the deficits that he had when I saw him did not spontaneously appear without an intervening neurological insult, so too do they not spontaneously remit or disappear. Thus, the evidence that I have supports that the deficits seen on neuropsychological testing that I performed in 2004 were most likely present, and missed, at the time of his competency examination with Dr. Brown as well as during his trial for capital murder.

4) Dr. Allen states in his affidavit that Mr. Austin has "no history of serious mental illness" and that "there is no evidence to support such."

Anyone who reviews Mr. Austin's file, specifically the military records, court testimony of family members, psychological evaluation by Dr. Lewis, Darnell Hospital records, Texas Department of Criminal Justice records, and Harris County Jail psychiatric records, can clearly see that he has a history of severe mental illness, and this is consistent with the history given to me by Mr. Austin's father. The records are replete with references to his poor emotional functioning that was evident from at least the age of 15, if not much earlier. This is not a case where the individual has no history of mental illness until their arrest for capital murder and then spontaneously develops it and "conveniently" utilizes it for purposes of evading responsibility for the crime and/or avoiding harsh punishment. It is evident from the record that Mr. Austin has been ambivalent about acknowledging (or even being able to recognize) his mental illness, let alone using it as a "crutch" in his legal situation.

5) Dr. Brown states in his affidavit that "the only areas of difficulty that could render a defendant incompetent would be cognitive dysfunction (brain damage), intellectual deficits (mental retardation), or severe mental illness (psychosis)," and that "Mr. Austin revealed no evidence of significant cognitive dysfunction, intellectual deficits, or symptoms of psychosis" and thus could not be incompetent. He added that there was "nothing that would provide clear evidence that he (Mr. Austin) was severely dysfunctional" on or about the time of his trial.

No where in Chapter 46B of the Texas Code of Criminal Procedure does the standard regarding competency state that the only areas of difficulty that could render a defendant incompetent would be those described by Dr. Brown. In fact, the Code does not define any particular psychiatric condition or diagnosis or symptom or set of symptoms that is needed for such a determination. Further, it is not the diagnosis but the functional impairment(s) that would render the person incompetent. That is, an individual can suffer from any of the conditions listed by Dr. Brown, even all of them at the same time, and still be competent, as it is the functional impairment (i.e., how the condition impairs their functioning) that is relevant. Further, there is nothing in the statute regarding competency that the mental health examiner has to find "clear evidence" of incompetency or impairment, or that they are mandated to find that the person is "severely dysfunctional." There is no legal standard of proof that the mental health professional must utilize in evaluating the individual for functional impairment. The statute states that a person is incompetent to stand trial if they do not have:

(a) sufficient present ability to consult with their lawyer with a reasonable degree of rational understanding; or

(b) a rational as well as factual understanding of the proceedings against him/her.

In addition, the statute defines many functional abilities that need to be assessed with the defendant. Mental health professionals conducting competency examinations are not to search for or achieve legal standards of proof such as "clear" evidence but provide an opinion within a reasonable degree of psychological/medical certainty. There are conditions other than those listed by Dr. Brown that

undoubtedly can lead to incompetency, such as bipolar disorder, major depression, autism, delirium, and posttraumatic stress disorder, to name a few, if they affect the functional abilities of the person to the extent listed in the statute. It is short-sighted and grossly underestimates the impact of mental illness if we limit the conditions relevant to competency to those suggested by Dr. Brown, and this may result in sending otherwise incompetent defendants to trial, including those who are facing the death penalty.

(6) Dr. Allen states in his affidavit that "there is nothing (in the documents) that supports the notion that Mr. Austin was incompetent at the time of Dr. Brown's examination of him."

Dr. Allen makes this determination and opinion despite the fact that he has not evaluated Mr. Austin at any time during this process, and he has made no statement of the limitations on the reliability and/or validity of his opinion in light of that fact, as required by the Texas Psychologists' Licensing Act, as noted above. While I acknowledge that I was not involved in nor asked to do a specific competency evaluation of Mr. Austin, I did personally and extensively evaluate Mr. Austin. I also reviewed numerous documents and records of his history and I performed a collateral interview with Mr. Austin's father. Given the results of my several-hour direct evaluation of Mr. Austin, I concur with the opinions posited by Dr. George Woods regarding Mr. Austin's impairments in rational understanding that could have significantly affected his ability to reason in a rational manner, as Dr. Woods' evaluation and opinions were based on an in-depth personal interview with Mr. Austin and a review of records, and he relied on objective testing in coming to his conclusions. In addition, his conclusions were consistent with what I observed and found in the objective neuropsychological data results. His opinions and conclusions are well-founded and well-supported by the materials present in this case and with what the field of forensic mental health says about the issues of competency and mental illness. Although I agree with Dr. Allen that "most" competency examinations are routine, I disagree that it merely requires questioning specific to competency material, such as "what are you charged with?, do you have an attorney?, etc.," as this completely misses the idea of the "rational" portion of the statute and will certainly lead to false positive findings of competency (i.e., finding that the person is competent when they are not). While it does not always need to be assessed via comprehensive objective neuropsychological testing, evaluation of the individual's rational appreciation of his/her situation must be addressed. Dr. Allen's position does not consider the rational abilities of the defendant, and can not be gathered through mere questioning of court personnel, the charge, etc., nor does this type of questioning get at whether a defendant can rationally assist defense counsel.

(7) Dr. Allen states in his affidavit that the "defendant is presumed competent" and must have a "severe mental disease or defect impairing competency or defying the presumption of competency."

"Presumption of competence" is a legal determination, not a medical/psychological one. Mental health professionals who evaluate defendants for competency do not "presume" competence and go into the evaluation looking for evidence that "defies" it. The objective is to evaluate the individual, weigh the factors in support of competency and those in support of incompetency, and make an opinion based on forensic psychological principles regarding competency. According to Grisso (2003), "No particular degree of deficits in trial-related capacities signifies competence or incompetence to stand trial." Grisso adds, "Instead, legal determinations of incompetence require a consideration of the degree of incongruency between a defendant's functional abilities and the anticipated demands of the defendant's trial" and that "No degree of incongruency between defendant ability and trial demand is determinative of the pretrial competency question." There should be no preconceived notion on either side of the competency issue. While legally they may be presumed competent and legally have to be found incompetent within a certain legal standard of proof, neither issue is for the mental health evaluator to determine, as both issues are determined by law.

(8) Dr. Allen implies in his affidavit that there is only one type of depression that exists. He states, "Severely depressed people don't write much, unless it is a single suicide note prior to actually taking their lives; they don't talk much; they don't have the energy to represent themselves in court."

This is a gross overgeneralization. Depression is heterogeneous. Contrary to Dr. Allen's assertion, there are many types of depression and not all depressed individuals present in the same manner, with the same set of symptoms, or with the same level of severity. The Diagnostic and Statistical Manual of Mental Disorders-IV-TR (DSM-IV-TR, 2000) recognizes several different types of depression and allows for the diagnosis to include "specifiers" to identify such (e.g., "with atypical features"). In addition, a Mixed Episode, sometimes referred to as "agitated depression" frequently includes irritable mood, insomnia, psychomotor agitation/restlessness, and suicidal thinking (DSM-IV-TR, 2000). Further, mental health professionals should be acutely aware that many people who successfully commit suicide can and often do engage in very goal-directed behaviors and energy-requiring tasks before killing themselves. It is commonly known among mental health professionals that such individuals often make efforts to get their "affairs" in order and they go through the effort to give away their belongings, and these activities may span several days or even weeks before the act of suicide occurs. It is also commonly known that when severely depressed individuals, particularly those without the energy to function adequately, begin a course of treatment with medication, the early stages of such treatment can be the most dangerous as the person starts to develop energy, including the physical energy to carry out suicide, but remains quite emotionally and psychologically depressed. Severely depressed individuals can and do carry out goal-directed behaviors, including representing themselves in court, particularly if they are motivated toward a goal of passively committing suicide (e.g., suicide by State).

(9) Dr. Allen states in his affidavit that "there certainly were no signs of severe depression in the record," while also dismissing and downplaying Mr. Austin's very real psychiatric history.

It cannot be reiterated enough that Dr. Allen did not conduct an examination of Mr. Austin at any point in this process, nor does it appear that he ever requested to perform an evaluation of Mr. Austin to be able to make the most accurate diagnoses and opinions possible. In addition, there were numerous references to indicators of mental illness included in Mr. Austin's military records, Dr. Franklin Lewis' psychological evaluation that included objective psychometric test data, Dr. Lewis' court testimony, the Harris County Jail records, Darnell Hospital records, and Texas Department of Criminal Justice records, all of which were apparently missed or not considered by Dr. Allen.

(10) Dr. Allen states in his affidavit that "In criminal evaluations, inaccurate self-report is the norm."

There is no research to support this contention and it suggests a presumption on the part of the evaluator that the individual is most likely feigning, malingering, or faking and must prove himself or herself to the examiner that they are not. While I undoubtedly believe that these types of cases warrant assessment of effort, motivation, malingering, and response bias, given the potential for secondary gain, I do not believe that mental health professionals should go into an evaluation with a preconceived notion that the individual is most likely faking. A healthy degree of skepticism is important in these types of cases and is a basis for gathering collateral information (records, collateral interviews) to corroborate an individual's self-report. The evaluator should be an objective party who sets out to make an unbiased opinion, albeit with the inclusion of supporting documents and records. The potential for inaccurate self-report is a very important reason for gathering records, talking to other individuals who have associated with or who have knowledge of the defendant, and performing objective psychological tests. If the evaluator becomes biased in any way, such as a priori presuming

inaccurate self-presentation, the evaluator should not perform the evaluation.  If one looks to the aspirational guidelines set forth in the Specialty Guidelines for Forensic Psychology, Section 1.02 pertaining to "impartiality and fairness:"

> "When conducting forensic examinations, forensic practitioners strive to be unbiased and impartial, and avoid partisan presentation of unrepresentative, incomplete, or inaccurate evidence that might mislead finders of fact.  Forensic practitioners strive for accuracy, impartiality, fairness, and independence."

(11) Dr. Allen states in his affidavit that the idea that Mr. Austin suffered from severe depression or suicidal depression at the time of Dr. Brown's competency examination is "speculative."

Mr. Austin has a limited history of psychiatric treatment, despite what appeared to be extensive psychiatric difficulties in the past, beginning at a very young age.  He first saw a mental health professional at the age of "less than 5" due to "temper problems."  However, that treatment only lasted a few sessions.  In addition, he saw a counselor in 1975 following "an incident" with his younger sister."  He refused to discuss "the incident" further with me but indicated that he only saw that counselor on a few occasions as well.  He reported that he was placed on antidepressant medication in 2002, while awaiting trial for the murder charge.  He indicated that he has had repeated episodes of depression with suicidal ideation dating back to childhood but really never received appropriate care.  Mr. Austin's military records, the Harris County Jail records, Darnell Hospital records, Texas Department of Criminal Justice records, and Dr. Lewis' psychological evaluation all reference depression.

There were clear indications in the file pertaining to a longstanding history of depression with respect to Mr. Austin, including a suicide attempt in adolescence (15 years old) by overdose (see Darnell Hospital records from 3/24/76-3/26/76) that was deemed "severe" and required that he be admitted to the intensive care unit for stabilization and observation.  Just two years later, while in the military, he was referred for a psychiatric evaluation with notes of depression or excessive worry, "nervous trouble," anger issues, fighting, and difficulties with sleep.  Military records revealed that he was subsequently discharged and "separated" from the Army because of "failure to adapt socially and emotionally."  Testimony from his sisters during his trial for the 1978 offenses against them demonstrated that Mr. Austin was isolative upon his return from the military.  Mr. Austin told me, as well as having previously told TDCJ personnel, that he attempted suicide by overdose while in the Dallas County Jail awaiting his trial for the 1978 offenses.  In 1978, Mr. Austin was evaluated by Franklin Lewis, Ph.D., a psychologist, who administered objective psychological tests, as well as interviewed Mr. Austin and performed a mental status examination.  The objective psychological tests performed showed no indication of malingering or deception but did reveal significant clinical psychopathology (abnormalities in emotional and personality functioning).  Dr. Lewis diagnosed Mr. Austin with "severe personality disturbance with schizoid thinking and anti-social features," as well as "latent borderline schizophrenia," which suggests severe impairment in thinking, emotional responsivity, and social interactions.  During the examination, Dr. Lewis noted evidence of a thought disorder, impaired attention and concentration, depressed mood, flat affect, and a history of "sudden violent outbursts without any predisposing reason."  In addition, Dr. Lewis indicated that Mr. Austin was "adamant that he was not crazy."  Dr. Lewis observed at that time that Mr. Austin was depressed, highly suspicious, and spoke only when required, all this despite Dr. Lewis having been retained by defense counsel.  In 1979, Mr. Austin sent a letter to the judge in his 1978 trial requesting psychiatric assistance.  TDCJ records from the mid-1980s demonstrated ongoing emotional problems and referral for psychiatric services.

A Harris County Jail MHMR Screening Intake on 3/4/01 revealed that Mr. Austin reported a long
history of psychiatric difficulties as well as ongoing nightmares, crying spells, and guilt, and he was
observed to have poor insight and poor judgment. He was referred to a psychiatrist at the jail. Shortly
thereafter, Mr. Austin began writing notes to detention personnel about wanting to kill himself and
others, although when mental health staff attempted to intervene, he refused medications. He then
started writing letters to the judge in his capital murder case requesting the death penalty, initiated a
hunger strike, continued to refuse psychiatric help, and commenced to engage in other self-destructive
behavior, namely having unprotected sex in the jail in order to contract AIDS. Jail personnel noted on
1/24/02 that Mr. Austin appeared very depressed, and on 1/25/02 they diagnosed him with depression.
He was started on antidepressant medication on 2/28/02, and it appears that he was maintained on the
medication until sometime in 4/02. Both my evaluation on 5/26/04 and Dr. Woods' evaluation on
5/26/04 and 6/19/04 revealed findings of a major depressive disorder that was recurrent and severe. In
fact, objective testing of his psychological symptoms and personality functioning with the Personality
Assessment Inventory revealed that Mr. Austin was experiencing recurrent suicidal thoughts and that
the score he produced on the Suicide scale was sufficiently high as to be a "significant warning sign"
of the potential for suicide and that needed it to be taken seriously and addressed (Personality
Assessment Inventory Suicide Scale T-score = 78 – almost three standard deviations above the mean).
His Suicide Scale was the second highest scale elevation, and the Depression Scale (T-score = 70 –
two standard deviations above the mean) was also significantly elevated. It should be added that these
scores are taken in the context of an honest and forthright approach to the test by Mr. Austin as
evidenced by his scores on the validity scales (see above for explanation). All of these scores were
reported in my initial affidavit.

Writings by Mr. Austin at the time surrounding his trial were evidence that severe depression was
certainly an issue and that Mr. Austin appeared to have a "death wish" by doing all he could to procure
the death penalty, including asking an investigator for a "guarantee" that he would get it and engaging
in unprotected sex in the Harris County Jail in an effort to contract AIDS. Mr. Austin waived his right
to an attorney and pled guilty to the crime. During closing arguments of the trial, Mr. Austin
effectively asked the jury to sentence him to death. He waived all death row appeals and he was within
a week of his execution date when he was finally persuaded by a pen pal to initiate his appeals and file
habeas corpus proceedings. Mr. Austin has since indicated that he did not commit the murder and
revealed that severe depression, coupled with suicidal ideation but an inability to carry it out, was what
led him to confess to the crime and his initial efforts to maintain that stance through his execution date.
His statements are not "out of the blue" and without a history (see all references of depression/mental
illness above), nor are his statements of wanting the death penalty to passively commit suicide
surprising given his psychiatric history. Certainly, if Mr. Austin's statements one week before his
scheduled execution were the first time I saw any evidence of depression, claims of depression, or
suicidality, the genuineness of such comments would be highly suspect and seriously called into
question. However, this was not the first time such symptoms were reported or apparent, as evidenced
by record after record revealing his depression. It is clear from the records described above that Mr.
Austin has suffered from depression the majority of his life, including the time period of his
competency evaluation with Dr. Brown and during his capital murder trial. The above-described
mental health history is hardly what one would call "speculative."

Austin, Perry                                                                              12

_Antoinette McGarrahan_

Antoinette R. McGarrahan, Ph.D.

Signed and sworn to me this __23__ day of __February__, 2012.

_Sharen Dougherty_

Notary Public, State of Texas

My commission expires __9 - 7 - 12__



SHAREN DOUGHERTY
Notary Public
STATE OF TEXAS
My Comm. Exp. Sep. 07, 2012

Sources of Information
Attachment to Affidavit of Antoinette R. McGarrahan, Ph.D.

1. Register record of contact with Central Counties MHMR Center (4/28/75);
2. Hamilton Heights High School records (1971-1974);
3. Copperas Cove High School records (1974);
4. Killeen Independent School District records (1974);
5. Darnell Hospital records (1975);
6. Military records (1976-1977);
7. Psychological Report of Franklin Lewis, Ph.D. (12/11/1978);
8. Testimony of Franklin Lewis, Ph.D. (1979);
9. Testimony of James P. Grigson, M.D. (1/1979);
10. Letter from Perry Austin to trial judge seeking psychiatric assistance following 1979 conviction;
11. Letter from Rod Poirot, Esq., Mr. Austin's 1979 trial attorney, alerting the courts to Mr. Austin's plea for psychiatric intervention;
12. Perry Austin's statement to police on 8/25/1992;
13. Police Interview Notes between Sgt. Allen and Perry Austin, 9/6/1992;
14. Police Interview notes between Sgt. Allen and Perry Austin, 4/25/1993;
15. Letter dated 9/7/2000, actually sent 1/2001, by Perry Austin offering to confess if guaranteed the death penalty;
16. Statement of Perry Austin, 1/31/2001;
17. Brief competency letter of Jerome Brown, Ph.D., 9/25/2001;
18. Transcript of Fraetta [sic] hearing to determine competency of Perry Austin's right to waive counsel, 10/11/2002;
19. Transcript of evidence and argument in capital trial, day 1 (4/1/2002);
20. Transcript of evidence and argument in capital trial, day 2 (4/2/2002);
21. Transcript of evidence and argument in capital trial, day 3 (4/3/2002);
22. Letter from Perry Austin to Judge Cosper, 4/17/2001;
23. Letter from Perry Austin to Judge Cosper, 7/20/2001;
24. Harris County Jail records (10/2001 – 4/2002);
25. Letter from Perry Austin to Judge Cosper, 8/14/2001;
26. Letter from Perry Austin to Judge Cosper, 1/23/2002;
27. Letter from Perry Austin to Judge Cosper, 2/19/2002;
28. Letter from Perry Austin to Judge Cosper, 2/21/2002;
29. Letter from Perry Austin to Judge Cosper, 4/7/2003;
30. Letter from Perry Austin to Judge Cosper, 8/29/2003;
31. Letter from Perry Austin to Judge Cosper, 6/24/2003;
32. Transcript of Faretta Hearing on appeal rights (4/4/2002);
33. TDCJ records relevant to 1978 rape offense;
34. Report of Polygrapher, Joe Bartlett (5/14/2004);
35. Affidavit of Mary A. Connell, Ed.D., ABPP (6/21/2004);
36. Affidavit of Kirk Heilbrun, Ph.D., ABPP (6/2004);
37. Trial Transcript Testimony of Teresa Ann Austin (1978);

38. Trial Transcript Testimony of Susan Austin (1978);

39. Trial Transcript of Beverly Gonzales (1978);

40. Affidavit of George Woods, M.D. (6/20/04);

41. Affidavit of Thomas Allen, Ph.D. (1/22/08);

42. Affidavit of Jerome Brown, Ph.D. (1/29/08);

43. Affidavit of Antoinette Cicerello, Ph.D. (6/21/04);

44. Letter from Perry Austin to Judge Cosper, 7/22/08;

45. TDCJ Windham School records (1978-2004);

46. In-person collateral interview with Mr. William Austin (Perry Austin's father) on 5/17/04, totaling approximately one and one-quarter hours; and

47. Clinical interview, mental status examination, and neuropsychological and psychological testing conducted on 5/26/04, totaling approximately six hours.

Bibliography
Attachment to Affidavit of Antoinette R. McGarrahan, Ph.D.

American Psychiatric Association (2000). Diagnostic and Statistical Manual of Mental Disorder (4th Ed). Washington, DC. American Psychiatric Association.

Babikian, T., Boone, K.B., Lu, P., & Arnold, G. (2006). Sensitivity and Specificity of Various Digit Span Scores in the Detection of Suspect Effort. *The Clinical Neuropsychologist, 20*; 145-159.

Berry, D. T. R. & Schipper, L. J. (2007). Detection of feigned psychiatric symptoms during forensic neuropsychological examinations. In G. J. Larabee (Ed): *Malingered Neuropsychological Deficits*. New York, NY: Oxford University Press.

Greiffenstein, M. F., Baker, W. J., & Gola, T. (1994). Validation of Malingered Amnesia Measures with a Large Clinical Sample. *Psychological Assessment, 6*, 3; 218-224.

Grisso, T. (2003). *Evaluating Competencies: Forensic Assessments and Instruments (2nd Ed)*. New York: NY. Kluwer Academic/Plenum Publishers.

Heilbronner, R. L., Sweet, J. J., Morgan, J. E., Larrabee, G. J., Millis, S. R., & Conference Participants (2009). American Academy of Clinical Neuropsychology Consensus Conference Statement on the Neuropsychological Assessment of Effort, Response Bias, and Malingering. *The Clinical Neuropsychologist, 23*; 1093-1129.

Mathias, C., Greve, K. W., Bianchini, K. J., Houston, R. J., & Crouch, J. A. (2002). Detecting Malingered Neurocognitive Dysfunction Using the Reliable Digit Span in Traumatic Brain Injury. *Assessment, 9*, 3; 301-308.

Miller, H.A. (2001). *Miller Forensic Assessment of Symptoms Test (M-FAST): Professional Manual*. Odessa, FL: Psychological Assessment Resources.

Miller, H.A. (2004). Examining the use of the M-FAST with criminal defendants incompetent to stand trial. *International Journal of Offender Therapy and Comparative Criminology, 48*, 268-280.

Morey, L. C. (1991). *Personality Assessment Inventory Professional Manual*. Odessa, FL: Psychological Assessment Resources.

Nestor, P.G., Daggett, D., Haycock, J., & Price, M. (1999). Competence to Stand Trial: A Neuropsychological Inquiry. *Law and Human Behavior, 23*, 4; 397-412.

Psychologists' Licensing Act and Rules and Regulations of the Texas State Board of Examiners of Psychologists.

Rees, L. M., Tombaugh, T. N., Gansler, D., & Moczynski, N. (1998). Five validation experiments of the Test of Memory Malingering (TOMM). *Psychological Assessment, 10*, 10-20.

Rogers, R., Bagby, R. M., & Dickens, S. E. (1992). *SIRS, Structured Interview of Reported Symptoms: A Professional Manual*. Odessa, FL: Psychological Assessment Resources.

Slick, D. J., Tan, J. E., Strauss, E. H., & Hultch, D. F. (2004). Detecting malingering: A survey of experts' practices. *Archives of Clinical Neuropsychology, 19*, 465-473.

Specialty Guidelines for Forensic Psychology.  Adopted by APA Council of Representatives, August 3, 2011. (In Press).  *American Psychologist.*

Tombaugh, T. (1996). *TOMM. Test of Memory Malingering*. North Tonawanda, NY: Multi-Health Systems.

Tombaugh, T. (1997). The Test of Memory Malingering (TOMM): Normative data from cognitively intact and cognitively impaired individuals. *Psychological Assessment, 9*, 260-268.

Exhibit 109 :     Affidavit of George Woods, M.D., March 4, 2012

County of Alameda
State of California
March 3, 2012

## AFFIDAVIT OF GEORGE WOODS, MD

COMES NOW, GEORGE WOODS, M.D., being duly sworn, and deposes and states as follows:

I, George W. Woods, Jr., M.D., after being sworn under oath, swear and affirm that the following is true and correct:

I am a licensed physician specializing in psychiatry and neuropsychiatry. My qualifications are described in my June 20th, 2004 affidavit in this case.

I have had a private practice for over 29 years, in which I have treated thousands of people with mood disorders. More specifically, my neuropsychiatric practice has included, and continues to include, persons with brain injury and mood disorders, such as depression and bipolar disorder. The psychopharmacology of mood disorders and cognitive impairments, such as temporal lobe epilepsy is intricately related, and this is a specialty in my practice.

Also, as noted in my 2004 report, I have taught at the University of California, Davis, Department of Psychiatry, Forensic Psychiatry Fellowship. I taught competency to graduate psychiatrists. I currently teach Clinical Aspects of Forensic Psychiatry to third and fourth year residents at Morehouse School of Medicine, Department of Psychaitry.

Since my June 20th, 2004, affidavit, I have reviewed the following new materials provided to me by Mr. Austin's counsel: (1) Affidavit, Kirt Heilbrun, Ph.D., June 20, 2004; (2) Affidavit, Kirt Heilbrun, Ph.D., February 23, 2012; (3) Affidavit, Antoinette McGarrahan, February 23, 2012; (4) Affidavit, Karen Wilson, October 21, 2009; (5( Affidavit, Frank Skoff, July 7, 2010; (5) Affidavit, John Edward Creekmore, July 7, 2010; (6) Affidavit, Tony Treadway, July 7, 2010; (7) Affidavit, Jeffrey Wilson, July 8, 2010; (8) Affidavit, Russell Olstad; (9) Affidavit, Richard Goeglein, July 8, 2010; (10) Affidavit, Brian Whetstone, July 8, 2010; (11) Medical Records, TDCJ, Perry Austin, 2003-2011

In addition, I have examined Mr. Austin on two occasions subsequent to my June 20, 2004 affidavit, on April 12, 2010 and February 10,2 012. Altogether, I have personally evaluated Mr. Austin on four occasions, for a total of 12.5 hours.

The purpose of this follow-up affidavit is to respond to statements made by the state's attorney and two psychologists relied upon by the state (Jerome Brown, PhD, and Thomas Allen, PhD) regarding Mr. Austin's mental health and competence, and regarding mine and Dr. McGarrahan's evaluations of Mr. Austin and our related conclusions. I will first address the statements made regarding Mr. Austin's mental health in general, and then focus in on Mr. Austin's competency at the time of trial and waiver of rights in 2002. I will address criticisms of mine and Dr. McGarrahan's evaluations and methods as they arise.

## Mr. Austin's Mental Health

The state's attorney and Drs. Allen and Brown reach a set of conclusions regarding Mr. Austin's mental health which differ sharply from my own and Dr. McGarrahan's. In brief, the state's attorney and Drs. Brown and Allen contend that Mr. Austin is not mentally ill, and that there is no evidence in the record of this case to support such a claim. The state's attorney indicates that:

> It appears that Austin's only mental health problem as an adult has been his
> sexual deviancy. . . . In addition Austin possesses an above average IQ of 123,
> completed his GED while in the U.S. army, and obtained approximately thirty
> hours of college credit while in prison. Clearly this evidence does not support
> Austin's claim of "lifelong brain impairments."

Similarly, Dr. Allen states that there are no signs of "severe depression" in the record and that "Mr. Austin's psychiatric history apparently reflects conduct disorder rather than actual psychiatric illness." Dr. Allen goes on to suggest that Mr. Austin is "being portrayed in melodramatic fashion as being severely psychiatrically impaired" by myself, Dr. McGarrahan, and Mr. Austin's attorneys.

Notably, Dr. Brown saw Mr. Austin very briefly on one occasion; Dr. Allen has not met Mr. Austin at all. Consultation without seeing the patient, or with minimal time with the patient, must be buttressed with an in depth knowledge of the supporting documents available and a review of relevant clinical literature. Drs Brown and Dr. Allen provided neither.

In order to respond to the state's and the state's experts' assertions regarding Mr. Austin's mental health, I will first describe the significant evidence of mental illness contained in the records of this case, and then describe the additional evidence of mental illness produced by Dr. McGarrahan's psychological and neuropsychological testing and my own neuropsychiatric evaluation. As already indicated in my 2004 report, contrary to the state's experts, I find the multi-sourced evidence of mental illness in this case to be voluminous, convincing and conclusive. Additionally, my clinical interviews, over the course of 8 years, support both the strong documentation as well as Dr McGarrahan's neuropsychological findings.

### *Evidence of mental illness in records –*
The records in this case – affidavits and witness statements, prior evaluations, mental health records, military records, correctional records and court records -- are replete with evidence of Mr. Austin's serious mental illness. In my 2004 report, I referred to some of the important information contained therein, but given the state's experts' extreme claim that there is no evidence of mental illness in the records, I will do so again in greater detail.

The following categories of documentation have been previously submitted to the court with Mr. Austin's petition and reviewed by myself and the state experts: (1) records of childhood

functioning and mental illness; (2) military records; (3) records of the 1978 trial; (4) correctional records; (5) records of the capital trial and related waivers.

*Records of childhood functioning:*
Mr. Austin was born on June 23, 1959. According to witness affidavits, he was subject to significant childhood trauma. His mother was mentally ill and emotionally withdrawn (later becoming a complete recluse) and his father was often absent and physically abusive when present. Outside the home, he was the object of extreme bullying and ostracization within the school and larger community, and subject to regular physical beatings. Such early childhood trauma is significant in that studies have shown the traumatic effect of physical abuse, bullying and neglect on young children, and the positive relation of such early trauma to later depression and mood disorders. (O'Donnell, Creamer et al. 2004) It also appears likely that his mother may have suffered from depression, a disease with an established genetic component. (Blehar 2003).

According to witness affidavits, Mr. Austin was by all accounts a withdrawn child subject to fits of anger. In his early teens, he turned to a variety of drugs. This set of behaviors is consistent with childhood depression, which is often expressed via agitated anger and often accompanied by early substance abuse. (Bair 1998; Brady and Sinha 2005)

According to medical records, when Mr. Austin was 15 years old, he attempted to commit suicide by overdosing on medication. He was hospitalized for three days. He was diagnosed with adolescent adjustment reaction in a mixed personality manifested by adolescent suicide attempt overdose. The severity was labeled "severe" and "acute," and problems were noted both in the family setting and in school. The attending doctor noted that Mr. Austin refused to indicate how many times he had previously attempted suicide. This serious suicide attempt, and the suggestion of others, is very indicative of a mood disorder such as severe depression. Dr. Allen's dismissal of this incident as one of a many manipulative threats of suicide, (at p.5), is unsupported by the records. The mischaracterization of suicide attempts as manipulative behaviors that are inconsistent with the presence of depression is both medically incorrect and likely to mislead a clinician in reaching an appropriate diagnosis.(Gladstone, Beardslee et al. 2011)

*Military records:*
Military records establish that once in the army, Mr. Austin reported severe headaches, sleeplessness, depression and anxiety. (Peterson and Benca 2006)He continued to demonstrate anger when aroused and engaged in seemingly purposeless fighting. He was prohibited from handling weapons pending a psychiatric examination and was ultimately discharged from the army after being assessed with a "failure to adapt socially and emotionally." These reported symptoms are consistent with his previous history and also consistent with a diagnosis of severe agitated depression (Athanasios Koukopoulos 1999), as well as his traumatic history.

*Records relating to 1978 aggravated rape charge:*
After he was dismissed from the army, Mr. Austin went to Indiana for a few months and then returned home, where his depression apparently worsened. Court testimony at his 1978 trial

3

describes him as spending most of this time in his own room and virtually ceasing to communicate with family and friends.

A few months later, according to court records, Mr. Austin sexually assaulted two of his sisters and robbed the other at gunpoint. He was arrested and taken to jail where he again attempted suicide by taking pills.

In relation to his court case, Mr. Austin was assessed by Dr. Franklin Lewis as suffering from a personality disorder with schizoid thinking, latent borderline schizophrenia and possible brain damage. Dr. Lewis noted that in his evaluation Mr. Austin exhibited symptoms of depression, and denied any mental illness. Dr. Lewis also stated that brain damage was likely and that neuropsychological testing should be conducted.

After Mr. Austin was convicted, he wrote a letter to the judge requesting psychiatric assistance:

> I want help and need help. You have Dr. Louis' report on me about my case, I know there's something wrong with me and I don't think prisons going to help me any. I want to go to Rusk to get help for my problem. I'm willing to do my time in TDC but I want help before its too late. . . All I'm asking is that you send me to Rusk until the doctors solve me of my problem then go ahead and send me to TDC for life if you want to . . . . All I want is help and I don't think I can live with myself knowing that my problem is still with me.

The records related to the 1978 offense provide significant additional evidence of severe mental illness, in particular, depression. The extreme reclusive behavior and the suicide attempt are obviously symptoms of depression. Dr. Lewis' diagnosis, though distinct from mine on the surface, is in actuality consistent with both mine and Dr. McGarrahan's. The neuropsychological testing performed by Dr. Cicerello demonstrates the brain impairment Dr. Lewis suspected. My own findings of temporal lobe disorder and obsessive compulsive disorder are consistent with Dr. Lewis' finding of schizoid thinking and latent borderline schizophrenia. Dr. Lewis also noted clear symptoms of depression, although he did not at the time have the history to make such a diagnosis. As in the evaluations by myself and Dr. McGarrahan, Mr. Austin showed no signs of malingering in Dr. Lewis' evaluation of him. This complex of symptoms, unusual sexual behavior, schizoid thinking, obsessive compulsive behavior, and depression, are consistent with temporal lobe dysfunction.

4

**TABLE 1. Characteristics Historically Attributed to Temporal Lobe Epilepsy***

| Inventory Trait | Reported Clinical Observations |
|---|---|
| Emotionality | Deepening of all emotions, sustained intense affect. |
| Elation, euphoria | Grandiosity, exhilarated mood; diagnosis of manic-depressive disease. |
| Sadness | Discouragement, tearfulness, self-deprecation; diagnosis of depression, suicide attempts. |
| Anger | Increased temper, irritability. |
| Agression | Overt hostility, rage attacks, violent crimes, murder. |
| Altered sexual interest | Loss of libido, hyposexualism; fetishism, transvestism, exhibitionism, hypersexual episodes. |
| Guilt | Tendency to self-scrutiny and self-recrimination. |
| Hypermoralism | Attention to rules with inability to distinguish significant from minor infractions; desire to punish offenders. |
| Obsessionalism | Ritualism; orderliness; compulsive attention to detail. |
| Circumstantiality | Loquacious, pedantic; overly detailed, peripheral. |
| Viscosity | Stickiness; tendency to repetition. |
| Sense of personal destiny | Events given highly charged, personalized significance; divine guidance ascribed to many features of patient's life. |
| Hypergraphia | Keeping extensive diaries, detailed notes; writing autobiography or novel. |
| Religiosity | Holding deep religious beliefs, often idiosyncratic; multiple conversions, mystical states. |
| Philosophical interest | Nascent metaphysical or moral speculations, cosmological theories. |
| Dependence | Cosmic helplessness, "at hands of fate"; protestations of helplessness. |
| Humorlessness | Overgeneralized ponderous concern; humor lacking or idiosyncratic. |
| Paranoia | Suspicious, overinterpretative of motives and events; diagnosis of paranoid schizophrenia. |

*Adapted from Bear and Fedio,[10] with permission.

*Correctional Records:*
The correctional records in this case contain additional information regarding Mr. Austin's mental illness. As a rule, correctional mental health records must be regarded cautiously, as mental health resources in correctional institutions are generally limited. For example, the only treatment available to Mr. Austin in the Texas prison system prior to his capital trial was group therapy. Mr. Austin repeatedly expressed his inability to participate in that form of treatment and requested individual therapy, but none was available. He thus did not receive treatment or further related assessment. Despite this, the TDCJ (Texas Department of Criminal Justice) records contain numerous notations of mental illness, particularly self-harm. Affidavits of fellow prisoners also detail Mr. Austin's self-harm, depression and suicidality, particularly while in administrative segregation.

The records from Harris County Jail, where Mr. Austin was held prior to his capital trial, from March 14, 2001 through the conclusion of the trial, also feature significant evidence of mental

5

illness, specifically, sleeplessness, confusion, severe depression, suicidality, and active attempts at suicide via sex with HIV positive individuals. Two penpals contacted the jail because of concerns about Mr. Austin's mental state and the possibility of suicide. Mr. Austin was eventually diagnosed by Dr. Elizabeth Ferguson as suffering from a "depressive disorder not otherwise specified" and prescribed the antidepressant Remeron. Dr. Elizabeth Ferguson and licensed professional counselor Karen Wilson describe symptoms of depression and suicidality; Karen Wilson notes Mr. Austin's intentional seeking of the death penalty in court. (Affidavit from Karen Wilson.)

More recent record from death row include a diagnosis of major depressive disorder, recurrent, in partial remission (in 2009 and 2011). Prison records subsequent to the trial describe crying spells, paranoia, mood springs, and blunted affect.

*Records related to capital trial and waivers* --
The court record in this case contains numerous letters written by Mr. Austin to the trial judge in which Mr. Austin declares his desire for the death penalty and indicates that his choice to waive counsel and plead guilty are affected by that desire. Mr. Austin's colloquies with the court are notable in that it is clear that Mr. Austin was lying regarding his psychiatric history (claiming falsely that he had none) in order to ensure that he would receive the death penalty. The transcript of the trial demonstrates Mr. Austin's refusal to advocate for himself and intent to enflame the jury against him.

In sum, the records in this case yield a wealth of evidence of longstanding mental illness – including, in particular, depression and suicidality -- at virtually every stage of Mr. Austin's life. Upon a review of the materials, the contention of the state and the state's experts that the records are devoid of such evidence is shown to be incorrect.

### *Evidence of mental illness from objective psychological and neuropsychological testing –*

Franklin Lewis, PhD, administered psychological testing to Mr. Austin in 1978. Mr. Austin's MMPI found schizoid thinking and mood lability within a valid instrument. Dr. McGarahan's Personality Assessment Inventory (PAI) showed no evidence of malingering. It documented continuing depression, suicidality, and identity issues, consistent with all previous psychological testing and prison records. Clearly, medical records, pharmacological treatment, and psychometric instruments, over the years, have supported Axis I mental disorders with Mr. Austin.

As described in Dr. McGarrahan's 2004 report, the neuropsychological testing she conducted indicates that Mr. Austin suffers from pre- frontal lobe dysfunction. More specifically, it establishes that Mr. Austin has difficulty in the area of initial conceptualization and demonstrates inflexibility in the processing on complex tasks. He also manifests a blunted understanding of social context and difficulty in reading social cues. As described by Dr. McGarrahan, these characteristics lead to "inflexibility of thinking, poor ability to adapt, difficulty with conceptual initiation, mental rigidity and blunted social sensibility." (Godefroy 2003)Dr. McGarrahan noted

that as a result Mr. Austin "may become fixed on one method of responding to a situation, even though it may not be working." (Joseph 1999; Murphy, Rubinsztein et al. 2001)Mr. Austin's cognitive deficits also interact unhelpfully with his depression in that his mental rigidity predisposes him to bouts of depression, which in turn exacerbates his cognitive deficits. This cycle is supported by collateral sources suggesting that Mr. Austin has not adapted well to segregation, for example, at times spending days in his cell without eating, bathing, or interacting with others.

### *Evidence of mental illness from Neuropsychiatric Evaluation* --

Finally, I will address the evidence of mental illness that has emerged from my extensive neuropsychiatric evaluation of Mr. Austin, lasting a total of 12.5 hours spread over the course of four meetings. The number and length of these interviews has allowed me to better understand the nature of Mr. Austin's depression over time and the manner in which it interacts with his prefrontal lobe dysfunction. The multitude of meetings spaced out over time has also allowed me to assess the veracity of Mr. Austin's statements to me regarding his mental functioning, social history, and the events and decisions made at and around his capital trial in 2002.

Throughout these meetings, Mr. Austin has consistently manifested the symptoms of depression, though the severity of the illness has waxed and wanted, as is typical in mood disorders. Mr. Austin's prefrontal lobe dysfunction has also consistently manifested itself in these interviews.

In the course of these interviews, I performed physical examinations and taken a medical history. Mr. Austin suffers from migraine headaches with photophobia. This is consistent with his depression, as approximately 30% of people with mood disorders also suffer from migraines; a rate far higher than in the general population. Mr. Austin often sleeps for long periods of time, which is also consistent with depression. Mr. Austin also suffers from hypertension, but regularly neglects to take his medication, due to a general sense of hopelessness. Such failure to take medication for both physical and mental ailments is common in people suffering from depression.

I have questioned Mr. Austin extensively regarding his mental health functioning and symptoms. Mr. Austin has described to me on multiple occasions how he experiences depression. He describes – and has manifested in my presence -- apathy, withdrawal, inability to focus, and inability to attend to detail. He describes – and has manifested in my presence – nihilism, negativity and hopelessness. He describes ruminative thought, i.e., the tendency to go over and over the same things in one's mind. He describes how his illness waxes and wanes, and what the triggers are for his worst episodes. He describes periods of time in which he is so depressed that he cuts himself off from any involvement in the world around him – including limited opportunities for recreation outside his cell -- and "just hibernates." At other times, he describes a sort of "tunnel vision" or a "dim room" where everything around him becomes dark; he becomes distanced and isolated from the world. He has told me that this sort of descent into darkness has troubled him on occasion since childhood, and has often been accompanied by terrible headaches.

7

These descriptions have been consistent between visits. In addition, these descriptions are consistent with the impact of depression on an individual's mental state and body, and match the descriptions offered by others known to suffer from severe depression.(Paelecke-Habermann, Pohl et al. 2005) They are also consistent with affidavits from fellow inmates describing Mr. Austin's depression.

The fact that Mr. Austin suffers from ongoing and severe depression is also supported by the fact that he has, on multiple occasions since picking up his appeals, tried to drop them again. Only the intervention of a strong support network – something that was unavailable to him in 2002 -- has allowed him to hold on, avoid self-harm, and eventually consider other options.

I have also seen significant evidence confirming Mr. Austin's prefrontal brain dysfunction, manifested in rigidity of thinking and inability to change course when set, both in my interactions with him and in his descriptions of interactions with prison personnel.

In my meetings with him, Mr. Austin has also manifested and described symptoms of obsessive-compulsive disorder (OCD). He maintains daily "logs" documenting his minute-by-minute actions, including daily cleaning rituals, the notation of precise quantities of food portions (down to the ounce) and the number of pages read and written, etc.. OCD behaviors are often found in people suffering from mood disorders; the compulsions function as ritualistic attempts to control the depression and anxiety.(Rapaport, Clary et al. 2005) In my 2004 report, I included "rule out obsessive compulsive disorder" in my diagnosis; I now include it in my diagnosis.

Finally, Mr. Austin manifested, in his interviews with me, symptoms of temporal lobe syndrome, including sexual deviancy, magical thinking, unusual religious beliefs, hypergraphia, and limited hallucinations (the last being consistent with frontal as well as temporal lobe dysfunctions). These findings are consistent with the findings of Dr. Lewis, who noted "unusual thinking" and diagnosed Mr. Austin with schizoid features and latent schizophrenia. (Sachdev 1998; Getz, Hermann et al. 2002)I attribute these features of Mr. Austin's thinking to temporal lobe syndrome and features of his OCD rather than schizophrenia, but it is notable that Mr. Austin has been manifesting similar symptoms in this regard since 1978.

In sum, there is a large volume of evidence in this case supportive of severe mental illness, including depression and brain impairment. The contentions by the state and the state's experts that no such evidence exists, and that Mr. Austin suffers from no mental illness, are not supported.

### Mr. Austin's Competency at the Time of Trial

Besides claiming that there is no evidence of mental illness in the records, the two state's experts also assert that there is no evidence in the record supportive of a finding of incompetency. Dr. Allen asserts that "there is nothing in these documents that supports the notion that Mr. Austin was incompetent at the time of Dr Brown's examination of him." Any assertion to the contrary "is speculative."

8

The state's experts also assert that mine and Dr. McGarrahan's assessments of competency are inadequate and/or irrelevant due to (1) inadequate effort testing, (2) lack of specificity as to competence in the evaluations, and (3) the distance in time of the evaluation from the 2002 trial. The doctors also assert that the only information relevant to competence is that immediately manifest in an initial interview, and that if nothing is manifest in that setting, any more detailed and probing assessments, such as that performed by myself and Dr. McGarrahan, are irrelevant. Finally, the state asserts that the defendant's competence is definitively demonstrated by his letters and oral statements to the court, which, respectively, "demonstrate his ability to communicate with others" and "demonstrate that he understood that he had been charged with capital murder and he understood the penalty range for that charge."

I will begin by addressing the specific assertions of the state and the state's experts, and then address the competency claim as a whole.

### *Adequacy of Effort Testing*

Dr. Allen asserts that inadequate effort testing was conducted by Dr. McGarrahan in her assessment. This is quite simply untrue. In her affidavit dated February 23, 2012, Dr. McGarrahan addresses this criticism at length and convincingly refutes it. She details the thorough and multi-faceted effort testing performed, and the precise reasons why certain instruments were chosen and not others. She emphasizes not only that such testing occurred but that by all measures Mr. Austin put forth full effort; indeed the only question regarding the reliability of the data collected was whether Mr. Austin was to some extent "faking good," i.e., denying his own real mental illness. Effort testing is not the only method to determine effort.. The interaction among tests, for example, pointing to frontal lobe impairment, captures the internal consistency of Dr. McGarrahan's testing. Obviously, the history of impaired reality testing and questions of impaired cognition as early as 1978 preclude an academic-rather than realistic-question of effort, as do the prison medical records, which document diagnoses of depression.

Notably, as elaborated on below, I have conducted several psychiatric evaluations of Mr. Austin between 2004 and the present, in which I have continuously checked for the veracity of Mr. Austin's reporting to me. This has involved, inter alia, checking Mr. Austin's reports against his objective affect and symptoms, against symptoms reported by known sufferers of his mental ailments, against objective reports regarding his history such as jail and court records, and against his own accounts to me at different times over the course of years. The internal consistency among the long term medical history and testing, prison medical records and treatment, neuropsychological testing, and my clinical examinations support the conclusion Mr. Austin is not malingering.

Mr. Austin claimed to have had no psychiatric history at the time of the legal proceeding, which was factually inaccurate. He was actually doing the opposite of malingering. The technical term is defensiveness, or inaccurate reporting to hide psychiatric symptomatology.

9

### *Specificity of Competency Assessment*

Dr. Allen asserts that "no assessment specific to issues related to competency" had been conducted by myself or Dr. McGarrahan, and thus our assessments are irrelevant. This is untrue, and is important in that it demonstrates an overly limited view of competency evaluations on the part of Dr. Allen. My evaluation as to competency was embedded within the extensive interviewing I conducted with Mr. Austin in this case. Having evaluated Mr. Austin in person over 4 different periods for over 8 years, I have had the opportunity to discuss with him the role of the judge, prosecutor, his attorney, and others in detail. Mr. Austin discussed with me his efforts to hide his psychiatric history, and discussions he had with the court about how to achieve his death more quickly. He clearly understood the charges he was facing, since he was trying to undermine that very process. The forensic literature is clear, however, that a defendant suffering from certain mental illnesses may demonstrate competence in basic cognitive tasks, but still be unable to exercise rationality in decision making. This may be the case even though the defendant's understanding of his options is not impaired by mental illness; defendants may see and understand their options and the attendant consequences but be unable to rationally act on that information due to the imposition of mental illness and cognitive impairment. (Maroney 2006; Freedman 2009) This is exactly the type of impaired decision making seen in cognitive deficits like frontal lobe dysfunction.(Bechara, Damasio et al. 1998; Murphy, Rubinsztein et al. 2001)

My competency-specific assessment of Mr. Austin focused on his ability to make rational decisions regarding the waiver of counsel and appeals, the guilty plea, and the conduct of the penalty phase of his capital trial. In order to assess this ability, I closely observed Mr. Austin's behaviors, thought processes and his interactions with me over the course of 4 hours spread over two visits prior to the 2004 report, and for an additional 8.5 hours spread over two additional visits prior to today. I questioned Mr. Austin regarding his mental health history and current functioning. I also questioned Mr. Austin regarding his recollection and experience of the events leading up to and during his capital trial, and the decisions that he made during this process. I requested neuropsychological testing and reviewed hundreds of pages of records documenting the period during which Mr. Austin made the relevant decisions in relation to his case. Finally, I cross-referenced Mr. Austin's responses to my questions with his answers to the same or similar questions at different times, with my observations of his affect and behavior, with the objective data regarding his functioning and the events of the case as recorded in court records and other documents, with the data gleaned from objective psychological and neuropsychological testing, and with my knowledge of the behavior and functioning of individuals with mood disorders and neurological impairments. All of this resulted in the picture of Mr. Austin's general mental health, and his functioning at the time of the trial and waivers of rights, that I presented to the court in 2004.

Since then, I have spent an additional 8.5 hours evaluating Mr. Austin, which has allowed me to affirm and to some extent elaborate on my earlier diagnosis of his overall mental functioning, and specifically to affirm the data upon which I relied to draw my conclusions regarding his competence in 2002. I will elaborate on this more fully below.

10

### *Relevance of "Post-Hoc" Competency Assessment –*

Dr. Allen asserts that "post-hoc testing is irrelevant to whether or not someone, Mr. Austin, was competent years later." This is an overbroad and untrue statement. The type of neuropsychological damage found in Mr. Austin's brain captures long standing impairments, impairments that existed at the time of Mr. Austin's legal proceedings and were directly relevant to his mental state. These cognitive impairments, particularly his difficulty weighing and deliberating, understanding social context, and his mental flexibility were as contemporaneous to the proceedings as they were at the time of Dr. McFarrahan's 2004 neuropsychological testing. Therefore, barring an injury or insult to the brain, of which there are no reports in a controlled and carefully monitored environment, neuropsychological impairments identified in 2004 should have been present in 2002. Also, Mr. Austin has manifested consistent symptoms of depression since childhood; his disease is chronic. The intensity of the disease, however, will and does still change over time and I have seen evidence of this both in the records and in my interviews with Mr. Austin. Dr. McGarrahan's finding of depressive symptoms in 2004 is therefore relevant in that it corroborates my conclusion that Mr. Austin was depressed in 2004 when I first saw him, and my conclusion that he has suffered from depression historically. It is true that Dr. Mcgarrahan's finding does not alone establish that Mr. Austin was necessarily clinically depressed in 2002, but it is supportive of that conclusion.

### *Requirements of an Adequate Competency Assessment, and the Sufficiency of the Letters to the Court and the Defendant's Colloquy as Bases for the Competency Determination in this Case—*

As noted above, Drs. Brown and Allen both state that any understanding of an individual's functioning that emerges subsequent to and/or apart from an initial brief interview is somehow irrelevant to the process, assuming that that interview establishes a basic understanding of factual proceedings in the case and fails to bring to light severe mental illness. This view seems to emerge from the understanding, on the parts of Drs. Brown and Allen, that the legal standard of competency is itself a minimal one. Whether or not the standard is legally "minimal" is a question for the courts. The question for mental health professionals in a case like Mr. Austin's is whether he has a rational understanding of the case, and whether he can make decisions with a reasonable degree of rational understanding, without being substantially affected by mental disease or defect. There is simply no medical or psychological basis for saying that this question regarding an individual's mental functioning can be answered in every case on the basis of a brief interview, particularly without the review of relevant collateral information. In some cases, serious mental disorders will not manifest themselves in the course of such an interview, particularly where, as in Mr. Austin's case, he was masking his mental illness in the hope of being found competent and capable of representing himself pro se. Similarly, there is no medical or psychological basis for Dr. Brown's assertion that only mental retardation, brain damage or psychosis can form the basis of an assessment of incompetence. Mr. Austin has been diagnosed with a mental disease, Major Depressive Disorder, and a mental defect, frontal lobe impairment. These deficits are synergistic and, in Mr. Austin's case, chronic. Dr. Brown is out of touch with the standard of care regarding depression as a profoundly disabling disorder.(Athanasios

11

Koukopoulos 1999; Heim and Nemeroff 2001; Murphy, Rubinsztein et al. 2001; Zubieta, Huguelet et al. 2001; Delgado 2004; Paelecke-Habermann, Pohl et al. 2005; Rapaport, Clary et al. 2005; David A. Adler, Thomas J. McLaughlin et al. 2006; Kendler, Gatz et al. 2006; Kessler, Akiskal et al. 2006; Levinson, Evgrafov et al. 2007; Rack 2007; Gladstone, Beardslee et al. 2011)

Having had the opportunity to see Mr. Austin over the course of 8 years, at various times, has clearly given me more than a hypothetical foundation upon which to build and assess his mental health history, psychometric and neuropsychological testing, prison diagnoses and treatment for his mood disorders, and behavior at the time of the legal proceedings. It is highly unusual for Dr. Allen to have reached such specific conclusions without having seen Mr. Austin even one time. Without seeing Mr. Austin, it is impossible to see any symptoms, but specifically those interactions between his cognitive symptoms and his mood disorder.

The state's assertion that the letters to and colloquies with the trial court definitively demonstrate Mr. Austin's competence in this case does not bear scrutiny. While the sentence structure and spelling in the letters addressed to the court, may be adequate, their content very clearly indicate suicidal intent driven by depression. The letters adamantly state Mr. Austin's desire to not only represent himself at trial but be executed. They describe symptoms of depression and suicidality but allege that the court cannot prove a death wish. Thus, the letters Mr. Austin wrote to the court, though demonstrating basic communicative skills and a basic factual understanding of the case, are in actuality supportive of Mr. Austin's claim of incompetency. Similarly, the colloquies are undeniably relevant to the competency determination, but much less than is usual in this case due to Mr. Austin's established attempt to mask his true functioning, and the fact that Mr. Austin's statements to the court regarding his mental health have now been proven to be both untruthful and part of an overall attempt to deceive the court as to his "death wish" and mental functioning.

The technical term for inaccurate reporting is dissimulation. Dissimulation includes malingering, the manufacturing of symptoms for secondary gain, and defensiveness, the minimization of real symptoms for gain, like gaining a job or, in this case, masking symptoms in order to be killed.

### *Incompetence at the time of trial and waiver* —

Dr. Allen notes that the fact that Mr. Austin suffered from "severe depression or suicidal depression" or "some neurological impairment that was compromising his competence" at the time of Brown's evaluation is "speculative." He also states that "[t]here is nothing in these documents that supports the notion that Mr. Austin was incompetent at the time of Dr. Brown's examination of him." While I acknowledge that I did not assess Mr. Austin in 2001 or 2002, I disagree strongly with this conclusion. Indeed, as I stated in 2004, I believe to a reasonable degree of medical certainty that Mr. Austin was incompetent at the time of the trial, guilty plea and waivers of counsel and appellate rights in this case.

The information surveyed above firmly establishes that Mr. Austin suffers from longstanding severe depression, is intermittently suicidal, and in addition suffers from frontal lobe

12

dysfunction, obsessive-compulsive disorder and temporal lobe dysfunction. As previously explained, the frontal lobe dysfunction from which Mr. Austin suffers leads to difficulties in adaptation and a tendency to fixate on one method of responding to difficult situations.

The records from the time preceding, during and following Mr. Austin's capital trial establish that Mr. Austin was not only profoundly depressed but suicidal during that critical period, and provide clear indications that his decisions to confess, waive counsel and plead guilty in the manner that he did were a direct result of his suicidality.

Affidavits from fellow prisoners regarding the time prior to and around Mr. Austin's original letter to Sgt. Allen offering to confess to the murder in exchange for the death penalty, while he was housed at the Hughes Unit, describe an individual who was depressed, suicidal, isolated and at times agitated.

After the letter and accompanying confession, Mr. Austin was moved to the Harris County Jail for trial. Contemporaneous jail records, affidavits from fellow inmates and letters Mr. Austin wrote to the court provide evidence that leading up to and during the trial, guilty plea and waivers of counsel and appeals Mr. Austin was suffering from depression, suicidality, frequent crying spells, nightmares, racing thoughts, confusion, reduced sleep, irritability and poor concentration. He was also attempting to commit suicide via sex with HIV positive inmates and engage in other forms of self-harm. These are the symptoms of depression with suicidality.(Athanasios Koukopoulos 1999)

A brief timeline of this history follows:
- On September 7, 2000, Mr. Austin wrote a letter to Sgt. Allen asserting that he would confess to the murder of David Kazmouz only if he could be guaranteed the death penalty. If he were not guaranteed the death penalty, he would kill a guard and get it for himself.
- On January 20, 2001, Mr. Austin mailed the letter to Sgt. Allen.
- On January 30, 2001, Sgt. Allen came and saw Mr. Austin and elicited a statement confessing to the murder.
- On March 14, 2001, Mr. Austin was moved to the Harris County Jail pending capital trial on the murder.
- On May 1, 2001, Mr. Austin was moved to segregation due to an assertion by his lawyer that he had threatened another inmate.
- On May 9, 2001, one of Mr. Austin's penpals contacted the jail because of Mr. Austin's repeated discussion of suicide in his letters and his concrete plan to commit suicide with a razor. As a result, Mr. Austin was referred to a psychiatric evaluation on May 14, 2001. At that session he denied any psychiatric history and refused medications.
- On September 25, 2001, Mr. Austin was evaluated by Dr. Jerome Brown.
- On October 7, 2001, Mr. Austin began a hunger strike that lasted for ten days. Guards recorded his behavior as very "agitated" during this period.
- On October 10, 2011, the trial court held that Mr. Austin could represent himself pro se. During a colloquy with the court, Mr. Austin asserted that he had no mental health issues or history.

13

- On October 18, 2001, Mr. Austin was again referred to mental health services. He again refused psychiatric assistance, but complained of sleeplessness.
- In 2001 and 2002, Mr. Austin wrote a number of letters to the judge and to officials at the jail regarding his seeking of the death penalty:

  o May 15, 2001 Mr. Austin wrote that he does not want or require an attorney. He asked the court "to sentence me to death and get on with it." "My mental stability has steadily decreased and I've turned back to drugs again."

  o July 19, 2001 Mr. Austin asked to be moved into population. He reiterated that he will not put up a defense at trial and that he will drop all appeals and "request an execution date as soon as is conveniently possible." "I cannot handle prolonged isolation. I have a very bad problem with depression and when I get depressed I tend to think about suicide a lot. If I am forced to remain in seg [sic] too long I won't be around to stand trial."

  o August 8, 2001 Mr. Austin referenced a "previous request to move my trial to an earlier date." In this letter, he stated that will not defend himself, will plead guilty and will be sentenced to death. "So, the sooner we get this circus over with the sooner I can die. No, I don't have a death wish, or at least you all can't prove it." "I am even willing to waive the psych [sic] hearing/interview. I can tell you exactly what he's going to say. I am a socialpath [sic], extremely violent, no respect for authority and no feelings of guilt. I am fully competent and definitely know the difference between right and wrong. So let's get this show on the road please."

  o August 14, 2001 Mr. Austin again requested to proceed pro se.
  o January 23, 2002 Mr. Austin requested to proceed pro se without standby counsel

- Mr. Austin's letters to jail officials in 2002 describe his worsening mental crisis.

  o January, 2002 Mr. Austin wrote to a jail official, asking to be moved from regular segregation to double-door segregation. "To whom it concerns; Could you please have me moved to double-door separation? I have been feeling and thinking violent and aggressive thoughts lately and they get worse as time goes on." "I'm facing the death penalty now and will be dead in another two or three years. . . What more can you possibly do to me?"
  January 24, 2002 Letter to Major Berry, threatening harm to self or others.

- On January 24, 2002, Lt. Moore referred Mr. Austin for psychiatric screening, noting that he is "very depressed." The referral also notes that the lack of a support system for Mr. Austin "could potentially increase the likelihood of self-harm." On the same date, Mr. Austin was seen by counselor Karen Wilson. She reported Mr. Perry as angrily refusing services and denying any mental health problems. She decided to refer him to a psychiatrist despite his refusal of psychiatric assistance "due to specific situational factors that could potentially increase the likelihood of self harm."

14

- On January 25, 2002, Mr. Austin was diagnosed as depressive. Sleeplessness and crying spells were noted in the report.
- On February 21, 2002, Mr. Austin gave a second taped statement to Sgt. Allen regarding the murder. In it, he said that he'd seen psychiatrists as a child and had behavioral problems, and that he wrote the original letter because he was depressed while locked up in solitary.
- After the session, Sgt Allen informed the sheriff's office that Mr. Austin was engaging in sexual acts with HIV positive inmates in order to contract HIV. Sgt. Martinez confronted Mr. Austin regarding this and he admitted doing so, saying that "he did not care, since he was probably going to be sentenced to death due to his case status. He mentioned that he had fired his layer and will represent himself in court and was planning to present no defense on his behalf, hoping to get a death sentence. Due to the fact that inmate Austin seems too calm and peaceful on the resolution to get the death penalty, it is recommended that he is placed on suicide watch to prevent him harming himself while in custody."
- On February 22, 2002, counselor Karen Wilson saw Mr. Austin. She wrote that Mr. Austin was crying frequently, and subject to racing thoughts and nightmares. She referred him to psychiatrist.
- On February 25, 2002, Mr. Austin for the first time reported his psychiatric history to mental health professionals at the jail, including early suicide attempts, early psychiatric assessments, and his current symptoms, including, inter alia, crying spells, nightmares, and sleeplessness. On February 28, 2002, Mr. Austin was diagnosed as depressive and prescribed the anti-depressant Remeron. His symptoms included crying spells, nightmare, depression, ruminative thought, irritable mood, and poor concentration.
- Jury selection took place between March 18th and 21st, 2002. Mr. Austin "consented" to sixty-three prosecution challenges, and entered no challenges on his own behalf.
- On March, 22·2002, Mr. Austin saw counselor Karen Wilson. He continued to refuse to talk about the 1978 offense but wanted her to know about it; he asked her to research the offense or contact his penpal Denise Lindsey.
- On March 28, 2002, Mr. Austin agreed that it is "probably true" that he was manipulating the system in such a way that Harris County had no choice but to sentence him to death. His mood was noted as dysphoric and tearful at times.
- On April 1, 2002, the court determined that Mr. Austin was competent to plead guilty, based on assertions that he has no mental health history or issues, and Mr. Austin plead guilty.
- On April 2, 2002, Mr. Austin represented himself in the penalty phase of his trial. He presented no evidence, and asked only five questions, all regarding the physical appearance of the victim in a prior case. In closing argument, he explained to the jury that he likes to be on the receiving side of anal penetration and that he will kill again if they don't sentence him to death.
- On April 4, 2002, Mr. Austin waived his right to appeal and to appellate counsel.
- Also on April 4, 2002, Mr. Austin was seen by Dr. Elizabeth Ferguson. She noted that he was exhibiting depressive symptoms and was paranoid and guarded. She also noted dysphoric mood, blunted affect, low psychomotor activity, and sallow complexion with darkened circles under his eyes. She ordered the continuation of remeron.

15

- On April 4, 2002, Mr. Austin saw Karen Wilson, counselor. He discussed with her his plans to represent himself so as to be executed as quickly as possible. He noted that he could not forgive himself for the rape of his sisters in 1978. He stated that he cannot commit suicide himself because he knows forgiveness from God would be impossible at that point.
- October 25, 2002, Mr. Austin wrote to the judge asking to set the execution date for June 23rd, his birthday.
- On November 4, 2002, Mr. Austin wrote to the court of appeals stating that he will be defending himself, and that he wants to be executed.
- On January 13, 2003, he wrote a letter to criminal court of appeals asking them to affirm his conviction and sentence and waive any hearings.
- On June 2, 2003, Mr. Austin waived his right to post-conviction counsel.

Karen Wilson, the licensed professional counselor who was the mental health professional with the most sustained and regular exposure to Mr. Austin during this period, has offered the following statement to counsel in this case, regarding the period of time in 2001 and 2002, preceding and through the conclusion of the capital trial, when she was treating him:

> [Mr. Austin] also confessed to me that, in relation to his trial and appeals, he was doing everything he could to get the death penalty, because he wanted to die. I met with him a number of times during the trial itself. He told me that he allowed the state to choose the jurors and agreed with whomever the prosecutors felt would be a good candidate. He told me that his main goal was to ensure that the two questions that the jury would consider during the punishment phase were understood and answered so that the death penalty would be inevitable. *I perceived all this as an attempt at suicide by proxy.*

This contemporaneous record, along with this reflection from his primary mental health caretaker at the time, offers strong support for my conclusion that Mr. Austin's decision to pursue the death penalty was a direct result of contemporaneous depression and active suicidality, and that the various decisions he made in order to achieve that outcome – to author and send the letter to Sgt. Allen, to waive counsel at trial, to plead guilty, to conduct voir dire and the penalty phase in a particular manner, and to waive appellate counsel and appeals – were irrational, involuntary and substantially affected by his mental illness.

I have also interviewed Mr. Austin repeatedly regarding the events of and around the capital trial in 2002. Mr. Austin has described his experience of the period preceding, during and following the trial in a manner consistent with severe depression and active suicidality. Through careful and repeated interviewing, cross-referenced with contemporaneous records, I have been able to identify the triggers for this episode as well as evidence of its profundity. Mr. Austin has also described to me his decisions to confess, waive counsel, plead guilty and waive appeals in a manner that is consistent with these decisions having been driven by active suicidality and depression. I have also been able to identify the manner in which Mr. Austin's thinking became "stuck" upon the course of action that he set in motion with the letter to Sergeant Allen, despite the irrationality of this course of action. Mr. Austin's accounts regarding these matters are

16

internally consistent, consistent between visits and consistent with accounts of suicidality and depression from known sufferers of these ailments.

This mental health history and history of assessment, combined with the records of the waivers and trial and with Mr. Austin's internally consistent accounts of that time, establish to a reasonable degree of medical certainty that Mr. Austin was incompetent at the time of the trial and at the time of his various waivers of rights. This is not "speculation," this is careful, multi-sourced and responsible forensic psychiatry.

Dr. Allen stated the following in his report regarding Mr. Austin's competence at the time of Dr. Brown's assessment of him:

> Whatever suicidality or depression that was present in 2001 at the time of Dr. Brown's exam was not evident nor impairing Mr. Austin's capacity to proceed. He communicated rationally and coherently, responded during Dr. Brown's interview without thought interference, and his mood appeared to be such that it was not significantly impairing cognitive capacity. It is clear from Dr. Brown's report that Mr. Austin knew what he was charged with, knew the difference between guilty and not guilty, knew the potential punishment, could communicate rationally and coherently with counsel, knew the various roles of judge, jury, prosecutor, defense attorney, and jury. He was very familiar with the criminal justice system to begin with, and was clearly acting out of, and appropriately motivated by, self-interest. He avoided discussion of prior criminal history with Dr. Brown, and avoided discussion of prior "psychiatric" history out of his legal self-interest, not severe mental disease or defect.

I have previously noted my concerns regarding Dr. Allen's offering of conclusions regarding Mr. Austin's functioning without having seen the patient himself. It is difficult to understand how Dr. Allen could conclude, for instance, that Mr. Austin "avoided discussion of prior psychiatric history [in his interview with Dr. Brown] out of his legal self-interest, not severe mental disease or defect."

More importantly, this statement is problematic for what it leaves out, that is, the central matter at issue in this assessment. One set of questions for mental health practitioners in this case is, certainly, whether Mr. Austin understood the charges against him and the difference between the pleas of guilty or not guilty. The operative, outstanding question in this case, however, is whether Mr. Austin's decision to actively pursue the death penalty was rational, in other words the degree to which his motivation to secure a death sentence, and the case-related decisions that flowed from that motivation, were affected by mental illness. Aside from saying that the decision to pursue the death penalty for oneself is not necessarily driven by mental illness in all cases (a conclusion with which I concur), both Drs. Allen and Brown essentially ignore this question. They do not explore the nature of the decision itself and its interaction with Mr. Austin's mental illness. It is possible that they justify this omission by their conclusion that Mr. Austin has never suffered from any manner of mental illness, but that position has been, I believe, substantially refuted above.

17

## Issues of Diagnosis

The state experts make statements regarding the diagnosis of depression that require a response. Dr. Allen, for instance, asserts that severely depressed people don't write, talk, or represent themselves in court. Both experts imply that depression is inconsistent with Mr. Austin's active attempts to secure a death sentence. This is a significant oversimplication of depression and its diverse manifestations. Individuals suffering from depression and suicide can be goal driven; pathology can drive the goal. Indeed, if a depressed person were unable to be intentional within the context of suicidality, there would be very few if any successful suicide attempts.

Moreover, depression itself has a number of different forms of expression, including both melancholic and agitated depression. I have noted above that agitated depression is particularly common in children, but both children and adults can manifest both forms at the same time.

Overall, my diagnosis of Mr. Austin remains the same as it was in 2004 with the exception that I now have the evidence to definitively diagnosis Mr. Austin with obsessive compulsive disorder. What has changed since 2004 is the that I have now more than doubled the amount of time I have spent with Mr. Austin and as a result feel significantly more certain regarding both the diagnosis and my related conclusions regarding Mr. Austin's competency at trial and competency to waive his rights.

My updated diagnosis is as follows:

I.
- A.   MAJOR DEPRESSIVE DISORDER, SEVERE, RECURRENT
- B.   COGNITIVE DISORDER, NOT OTHERWISE SPECIFIED
- C.   POLYSUBSTANCE ABUSE, CHRONIC, IN INSTITUTIONAL REMISSION
- C.   OBSESSIVE COMPULSIVE DISORDER

II.
    PERSONALITY DISORDER NOT OTHERWISE SPECIFIED, WITH BORDERLINE, DEPENDENT, TRAUMA-DERIVED ANTISOCIAL TRAITS

III.
- A.   DIFFICULTIES INITIATING EXECUTIVE FUNCTION TASKS
- B.   SYMPTOMS CONSISTENT WITH  TEMPORAL LOBE SYNDROME, INCLUDING SEXUAL DEVIANCY, MAGICAL THINKING, UNUSUAL RELIGIOUS BELIEFS, HYPERGRAPHIA

IV.
    LEGAL PROBLEMS

V.
    GAF: 45

18

## Conclusions

Acknowledging the difficulties in making an assessment of a person's functioning at some point in the past, it is my opinion which I hold to a reasonable degree of medical certainty that Mr. Austin was not competent to stand trial, to plead guilty, to waive his right to counsel and to waive appeals. It is also my opinion which I hold to a reasonable degree of medical certainty that his decisions to plead guilty and waive his rights to counsel and appeals were not made voluntarily. At the relevant times, Mr. Austin suffered from a serious mental illness which effectively negated his ability to exercise rational choice in relation to the decisions to waive counsel and appeals and plead guilty, and regarding how to proceed at trial.

George Woods, M.D.

Signed and sworn to me this ___ day of _March_ , 2012.

Notary Public, State of California

MARCELLA J. DRESBAUGH
Commission # 1912491
Notary Public · California
San Francisco County
My Comm. Expires Nov 7, 2014

My commission expires ___

19

## Bibliography

Athanasios Koukopoulos, M., and Alexa Koukopoulos (1999). "AGITATED DEPRESSION AS A MIXED STATE AND THE PROBLEM OF MELANCHOLIA." The Psychiatric clinics of North America 22(3).

Bair, B. D. (1998). "Frequently missed diagnosis in geriatric psychiatry." The Psychiatric clinics of North America 21(4): 941-971, viii.

Bechara, A., H. Damasio, et al. (1998). "Dissociation Of working memory from decision making within the human prefrontal cortex." The Journal of neuroscience : the official journal of the Society for Neuroscience 18(1): 428-437.

Blehar, M. C. (2003). "Public health context of women's mental health research." The Psychiatric clinics of North America 26(3): 781-799.

Brady, K. T. and R. Sinha (2005). "Co-occurring mental and substance use disorders: the neurobiological effects of chronic stress." The American journal of psychiatry 162(8): 1483-1493.

David A. Adler, M. D., S. D. Thomas J. McLaughlin, et al. (2006). "Job Performance Deficits Due to Depression." Am J Psychiatry.

Delgado, P. L. (2004). "Common pathways of depression and pain." The Journal of clinical psychiatry 65 Suppl 12: 16-19.

Freedman, D. (2009). "When is a capitally charged defendant incompetent to stand trial?" International Journal of Law and Psychiatry.

Getz, K., B. Hermann, et al. (2002). "Negative symptoms in temporal lobe epilepsy." The American journal of psychiatry 159(4): 644-651.

Gladstone, T. R., W. R. Beardslee, et al. (2011). "The prevention of adolescent depression." The Psychiatric clinics of North America 34(1): 35-52.

Godefroy, O. (2003). "Frontal syndrome and disorders of executive functions." Journal of neurology 250(1): 1-6.

Heim, C. and C. B. Nemeroff (2001). "The role of childhood trauma in the neurobiology of mood and anxiety disorders: preclinical and clinical studies." Biological psychiatry **49**(12): 1023-1039.

Joseph, R. (1999). "Frontal lobe psychopathology: mania, depression, confabulation, catatonia, perseveration, obsessive compulsions, and schizophrenia." Psychiatry **62**(2): 138-172.

Kendler, K. S., M. Gatz, et al. (2006). "A Swedish national twin study of lifetime major depression." The American journal of psychiatry **163**(1): 109-114.

Kessler, R. C., H. S. Akiskal, et al. (2006). "Prevalence and effects of mood disorders on work performance in a nationally representative sample of U.S. workers." The American journal of psychiatry **163**(9): 1561-1568.

Levinson, D. F., O. V. Evgrafov, et al. (2007). "Genetics of recurrent early-onset major depression (GenRED): significant linkage on chromosome 15q25-q26 after fine mapping with single nucleotide polymorphism markers." The American journal of psychiatry **164**(2): 259-264.

Maroney, T. A. (2006). "EMOTIONAL COMPETENCE, "RATIONAL UNDERSTANDING," AND THE CRIMINAL DEFENDANT." American Criminal Law Review.

Murphy, F. C., J. S. Rubinsztein, et al. (2001). "Decision-making cognition in mania and depression." Psychological medicine **31**(4): 679-693.

O'Donnell, M. L., M. Creamer, et al. (2004). "Posttraumatic stress disorder and depression following trauma: understanding comorbidity." The American journal of psychiatry **161**(8): 1390-1396.

Paelecke-Habermann, Y., J. Pohl, et al. (2005). "Attention and executive functions in remitted major depression patients." Journal of affective disorders **89**(1-3): 125-135.

Peterson, M. J. and R. M. Benca (2006). "Sleep in mood disorders." The Psychiatric clinics of North America **29**(4): 1009-1032; abstract ix.

Rack, M. J. (2007). "Sleep disorders associated with depression." Medlink.

21

Rapaport, M. H., C. Clary, et al. (2005). "Quality-of-life impairment in depressive and anxiety disorders." The American journal of psychiatry **162**(6): 1171-1178.

Sachdev, P. (1998). "Schizophrenia-like psychosis and epilepsy: the status of the association." The American journal of psychiatry **155**(3): 325-336.

Zubieta, J. K., P. Huguelet, et al. (2001). "Cognitive function in euthymic bipolar I disorder." Psychiatry research **102**(1): 9-20.

# ACKNOWLEDGMENT

State of California
County of _Alameda_ )

On _March 9, 2012_ before me, _Marcella J. Dresbaugh_
(insert name and title of the officer)

personally appeared _George W. Woods_,
who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are
subscribed to the within instrument and acknowledged to me that he/she/they executed the same in
his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the
person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing
paragraph is true and correct.

WITNESS my hand and official seal.

Signature _Marcella J. Dres_ (Seal)

MARCELLA J. DRESBAUGH
Commission # 1912491
Notary Public - California
San Francisco County
My Comm. Expires Nov 7, 2014